# UNITED DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **GRAY CONSTRUCTION, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action Number:** |
| **v.** | ) | |
| | ) | **07-CV-584** |
| **HWASHIN AMERICA CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## GRAY CONSTRUCTION, INC.'S OPPOSITION TO HWASHIN AMERICA CORPORATION'S MOTION TO DISMISS

Plaintiff Gray Construction, Inc. ("Gray") respectfully submits this Opposition to Defendant Hwashin America Corporation's ("Hwashin") Motion to Dismiss.

## I.    INTRODUCTION.

Hwashin argues that Gray's claims in this case are compulsory counterclaims to Hwashin's Complaint in Intervention filed in Jennifer and Slade Piggott v. Gray Construction, Inc., et al., CV-06-1158, also pending in the United States District Court for the Middle District of Alabama ("the Piggott case") and Gray's claims in this action should be dismissed or, in the alternative, consolidate with the Piggott case. Hwashin's Motion to Dismiss is without merit and should be denied.

## II.    STATEMENT OF FACTS.

On or about September 24, 2003, Gray and Hwashin entered into a Design/Build Agreement for the construction of an approximately 273,000 square foot manufacturing facility on undeveloped property located in Greenville, Alabama ("Design/Build Agreement"). (Hwashin's Motion to Dismiss, Document No. 6 in the Court Docket at p. 1.). Gray then entered

into subcontracts with various manufacturers and subcontractors for the "New Manufacturing Facility" project. (A true and correct copy of the subcontract cover pages are attached hereto as Exhibit A.).

On October 17, 2006, the roof of the Hwashin facility office collapsed. (Hwashin's Motion to Dismiss at p. 2.). The roof collapsed as a result of Hwashin allowing debris to accumulate on the roof of the office, which substantially clogged the internal drainage system and caused water to pond on the roof. (A true and correct copy of Gray's Third-Party Complaint in the Piggott case at ¶35 is attached hereto as Exhibit B.).

On October 17, 2006,[1] the day of the roof collapse, Gray received a telephone call from Hwashin. (A true and correct copy of the October 17, 2006 Daily Report is attached hereto as Exhibit C.). Hwashin asked Gray to perform emergency repairs to the Hwashin facility. (Id.). Gray immediately assembled a team of its own employees and subcontractors to inspect the facility and begin the repairs as Hwashin requested. (Id.).

Gray entered into formal subcontracts with an effective date of October 17, 2006 with Cooper's Steel Fabricators, Inc., Standard Roofing of Montgomery, Inc., South State Contractors, Inc., MT & R Enterprises, Inc. d/b/a Four Star Interior Construction, RJ Mechanical, Inc., Dotson Electric Company, Inc. and American Fire Protection, Inc. for the emergency repair work to the Hwashin facility. (A true and correct copy of the subcontracts for

---

[1] Hwashin alleges the contract for the repair work was entered into on September 24, 2003 and is the same contract made the basis of the Piggott case. In support of this argument, Hwashin cites Gray's Complaint. Gray admits its Complaint incorrectly states that on September 24, 2003, it entered into a contract with Hwashin for the repairs to the Hwashin facility. Obviously, the date of this agreement is a mistake. Gray and Hwashin could not have possibly contracted to repair the Hwashin facility on September 24, 2003, as the Hwashin facility was not damaged until over three (3) years later, on October 17, 2006. Gray and Hwashin actually entered into a verbal agreement to repair the Hwashin facility on October 17, 2006, the day of the roof collapse, and this agreement was memorialized in Gray's letter to Hwashin dated October 24, 2006.

repair work are attached hereto as Exhibit D.).  The project name assigned to these subcontracts was "Hwashin Storm Damage." (Id.).

On October 24, 2006, Gray wrote Hwashin regarding the emergency repairs.  (A true and correct copy of the October 24, 2006 letter is attached hereto as Exhibit E.).  Gray confirmed that on October 17, 2006, Hwashin requested Gray's assistance in connection with the roof collapse. (Id.).  Gray memorialized the business relationship between Gray and Hwashin by stating:

> Gray will continue to keep track of the significant costs that it and its subcontractors have incurred in assisting Hwashin.  Gray has provided this assistance in good faith and with the expectation of being reimbursed in full for its efforts as a part of Hwashin's building damage claim.
>
> (Id.).

On November 17, 2006, Slade and Jennifer Piggott ("Mr. and Mrs. Piggott") filed their Complaint in the Piggott case.  (A true and correct copy of Mr. and Mrs. Piggott's Complaint in the Piggott case is attached hereto as Exhibit F.).  In the Piggott case, Mr. and Mrs. Piggott allege Gray is liable to them for the negligent and wanton design in the original construction of the Hwashin facility which allegedly caused the roof collapse.  (Id.).  Mr. and Mrs. Piggott make no allegations concerning the repair work. (Id.)

On January 10, 2007, Gray's counsel wrote Michael Smith ("Mr. Smith"), the analyst handling the property damage claim for Hwashin's insurance carrier.  (A true and correct copy of the January 10, 2007 letter is attached hereto as Exhibit G.).   The letter pointed out that on November 29, 2006, Gray submitted an invoice related to the repair work which was due for payment by January 3, 2007.  (Id.).  Neither Hwashin nor its insurance carrier paid the November 29, 2006 invoice. (Gray's Complaint at ¶ 8, Doc. No. 1.)

On March 2, 2007, Gray's counsel sent an updated invoice to Matt Watson ("Mr. Watson"), a third-party investigating the property damage claim for Hwashin's insurance carrier.

(A true and correct copy of the March 2, 2007 invoice is attached hereto as Exhibit H.).  On March 29, 2007, Gray's counsel wrote Mr. Watson in regard to the updated invoice and offered to provide supporting documentation for the invoice if necessary.  (A true and correct copy of the March 29, 2007 letter is attached hereto as Exhibit I.).

On April 4, 2007, Mr. Watson responded to Gray's March 29, 2007 letter.  (A true and correct copy of the April 4, 2007 letter is attached hereto as Exhibit J.).  In his response, Mr. Watson states:

> I would like to clarify that it is not Beacon's intent to be unnecessarily burdensome.  It appears that the work performed had many variables contributing to costs including multiple subcontractors, multiple phases, travel expenses, materials, equipment, etc. spread over weeks and weeks of duration.  Projects of this nature with this level of 'involvement' require substantial amounts of documentation to validate the charges.

(Id.).

On April 11, 2007, counsel for Gray wrote Mr. Smith again.  (A true and correct copy of April 11, 2007 letter is attached hereto as Exhibit K.).  The April 11, 2007 letter confirmed an earlier telephone conversation where Mr. Smith agreed with Mr. Watson by stating the only reason the payment for Gray's repair work had been delayed was the need for supporting documentation.  (Id.).  The letter further confirmed that the payment to Gray was **not** being withheld because of the lawsuit filed by Mr. and Mrs. Piggott.  (Id.).

On May 3, 2007, counsel for Gray sent another letter regarding the repair work to Mr. Watson.  (A true and correct of May 3, 2007 letter is attached hereto as Exhibit L.).  The letter enclosed a copy of Gray's Final Emergency Repair Costs Invoice dated April 30, 2007 and all backup documentation for each line item.[2]  (Id.).  Believing it had resolved all obstacles to

---

[2] As explained by Gray's counsel in the May 3, 2007 letter, backup documentation was not provided for line items under $5,000.00, but Gray's counsel offered to provide additional documentation if it was necessary.  No request for

payment for the repair work, Gray allowed Hwashin until May 14, 2007 to provide full and complete payment to Gray in accordance with the agreement reached with Mr. Smith.  (Id.).

On May 22, 2007, Hwashin, by and through The Alabama Self-Insured Worker's Compensation Fund ("the Fund"), filed a Complaint in Intervention in the Piggott case.  (A true and correct copy of the Complaint in Intervention is attached hereto as Exhibit M.).  Hwashin's Complaint in Intervention seeks recovery of its worker's compensation subrogation interest arising from payments the Fund allegedly made to Mrs. Piggott.  (Id.).  Hwashin's Complaint in Intervention neither mentions in any way the repair work performed by Gray nor alleges that Gray is responsible for the costs to repair the Hwashin facility.  (Id.).[3]

On June 8, 2007, Gray filed a Third-Party Complaint in the Piggott case naming Cooper's Steel Fabricators, Inc., All-South Subcontractors, Freeland Harris Consulting Engineers of Kentucky, Inc., Freeland Harris Consulting Engineers of Georgia, Inc., The Hardy Corporation, Latta Plumbing & Construction Co., Inc., Hwashin America Corporation and Firestone Building Products Company, LLC, as Third-Party Defendants in CV-06-1158.  (See Exhibit B).  Gray alleges that Hwashin is liable under theories of contractual and common law indemnity for Gray's defense costs and expenses and any award of damages associated with Mr. and Mrs. Piggott's claims.  (Id.).  Like Mr. and Mrs. Piggott's claims and Hwashin's claims in intervention, Gray's Third-Party Complaint does not mention or relate to the repair work.  (Id.).

Between May 3, 2007 and June 11, 2007, Catherine Henderson, senior counsel for Hwashin's insurance carrier, took over the investigation of Gray's claim for payment for the

---

additional documentation has been made by Hwashin and Hwashin has not contested the adequacy of the backup documentation provided by Gray.

[3] Hwashin has filed a Motion for Leave to Amend its Complaint in Intervention and assert claims for the property damage and lost profits it allegedly incurred as a result of the roof collapse.  Included in the damages Hwashin seeks to recover are any amounts owed to Gray or its subcontractors for the repairs performed on the Hwashin facility. Gray has opposed Hwashin's Motion for Leave and argued that these additional claims are compulsory counterclaims in this action.  Hwashin's Motion for Leave remains pending before the Court.

emergency repair work.  (A true and correct copy of June 11, 2007 letter is attached hereto as Exhibit N.).  On June 11, 2007, Gray's counsel sent Ms. Henderson a letter asking for immediate payment of the invoice submitted by Gray and informing Ms. Henderson that failure to pay the invoice would result in legal action being taken against Hwashin.  (Id.).

On June 21, 2007, Gray's counsel received a letter from Ms. Henderson.  (A true and correct copy of the June 21, 2007 letter is attached hereto as Exhibit O.).  The letter states that Ms. Henderson has received Mr. Watson's findings regarding the property damage claim, but that Hwashin's insurance carrier has "additional questions" regarding the costs of repairs to the Hwashin facility.  (Id.).

On June 22, 2007, Gray filed its Notice of Lien in the Probate Court of Baldwin County, Alabama.  (A true and correct copy of Notice of Lien is attached as Exhibit to the Complaint, Document No. 1 in the Court Docket.).  On June 25, 2007, after Hwashin refused to pay for Gray's work and after Gray filed its Notice of Lien, Gray filed its Complaint in this action seeking payment for Gray's repair work.  (Complaint, Document No. 1 in the Court Docket.).

## III.    ARGUMENT.

### A.    Gray's Complaint Properly Alleges Claims For Recovery Based On The Repairs Made To The Hwashin Facility.

On or about October 17, 2006, Gray entered into a verbal agreement to perform repair work to the Hwashin facility following a roof collapse.  (See Exhibit C.).  Gray subcontracted portions of this work to various individuals and entities and performed other portions of the work itself.  (See Exhibit D..).   Despite its agreement to pay Gray for its work, Hwashin refuses to pay for the repairs made to the Hwashin facility following the roof collapse.

Gray repeatedly notified Hwashin of the amount owed to it.  Hwashin, through its property insurance carrier, instructed Gray that payments were in the process of being made and

the only barrier to full payment was the lack of supporting documentation.    Hwashin's investigation of the claim was repeatedly assigned and re-assigned to different individuals further the complicating Gray's recovery efforts.    Even after Gray provided all requested documentation and met all Hwashin's demands, Hwashin still refused to pay for the repairs.

There is no question that Gray entered into an agreement with Hwashin to perform repairs to the Hwashin facility.    There is also no question that Gray actually performed the repairs agreed upon.    The only issue at this point seems to be whether Hwashin is entitled to delay payments to Gray based upon an argument that the roof collapse was caused by Gray's negligence.

Even if Gray caused the roof collapse, it does not relieve Hwashin of its responsibility to pay for the repairs.    Obviously, if Hwashin contracted with another entity to perform these repairs, it would have paid that entity for its work.    Hwashin does not suggest that those entities would be forced to recover the repair costs directly from Gray.    Yet, Hwashin is asking the Court to delay recovery until liability for unrelated acts is determined in a separate action which has not even been filed. [4]

The bottom line is that Hwashin entered into an agreement with Gray to perform repair work and Gray made the repairs pursuant to this agreement.    Hwashin has repeatedly stated that it would pay Gray for its repairs.    Hwashin has no justifiable reason for withholding the amount due to Gray and Hwashin should pay the repair costs, plus interest.    This has been alleged in the Complaint and states a claim for breach of contract.

---

[4] Hwashin has filed a Motion for Leave to assert its claims in the <u>Piggott</u> case, but that Motion has not been granted and the Motion for Leave was not filed until after Gray instigated this action.

**B.    Gray's Claims Are Not Compulsory Counterclaims To Hwashin's Complaint In Intervention.**

**1.    Hwashin is not the real party in interest in the Complaint in Intervention.**

Gray's Third-Party claims against Hwashin are not compulsory counterclaims to the Complaint in Intervention because Hwashin is not the real party in interest in the Complaint in Intervention.   On May 22, 2007, Hwashin, by and through the Fund, filed a Complaint in Intervention asserting its claims to recover the Fund's worker's compensation subrogation interest.   (See Exhibit M.).    It is the Fund seeking to recover this subrogation interest, not Hwashin.

Gray recognizes that an employer or insurance carrier is entitled to be reimbursed for all payments made by the employer or the insurance carrier out of any judgment recovered by the employee or his representative in a suit against a third party wrongdoer.   See Millers Mut. Ins. Ass'n v. Young 601 So.2d 962 (Ala. 1992).   As Hwashin admits, however, it has not made any payments to Mrs. Piggott, but the Fund has.   (A true and correct copy of Hwashin's First Amended Complaint in Intervention at Paragraph 76 is attached hereto as Exhibit P.).   Only the Fund made payments to Mrs. Piggott and only the Fund has a right to recover the payments.

Gray does not allege that the Fund is responsible for paying Gray for the repairs to the Hwashin facility.   The agreement to repair the facility and the obligation to make these payments rests directly with Hwashin.   Because Gray's claims in this lawsuit are against Hwashin, not the Fund, its claims could not possibly be counterclaims to the Fund's claims in intervention in the Piggott case.[5]

---

[5] The issue of who the actual Plaintiff in Intervention is has been raised in Hwashin's Motion for Leave to Amend, Gray's Opposition to the Motion, Hwashin's Reply and Gray's Sur-Reply.   The Motion for Leave remains pending before the Court.

**2.     Gray's claims are not compulsory counterclaims because they do not arise from the same transaction or occurrence as Hwashin's complaint in intervention.**

Federal Rules of Civil Procedure, Rule 13 (a) states:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon the claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13.

A claim is deemed to be "compulsory counterclaim" under the logical relationship test if it arises from the same transaction and the same operative facts serve as basis for both claims. See Blue Cross and Blue Shield of Alabama v. Hobbs, 209 F.R.D. 218 (M.D.Ala.  2002.).  See also U.S. v. Aronson, 617 F.2d 119 (5th Cir. 1980.)(Under "logical relationship" test for determining whether counterclaim is sufficiently related to main claim to be compulsory, logical relationship is found when same operative facts serve as basis of both claims or aggregate core of facts upon which claim rests activates additional legal rights, otherwise dormant, in the defendant.).

The core operative facts of the Piggott case concern the roof collapse and injuries resulting from the roof collapse.  Mr. and Mrs. Piggott must prove what caused the roof collapse, whether their respective injuries were caused by the roof collapse and the extent of these injuries. Facts related to activity which occurred after the roof collapse will not be raised in the Piggott case.

Gray's claims in this case and the Fund's claims in the Piggott case do not rest on the same operative facts. Gray's claims in this case do not concern Mr. and Mrs. Piggott's injuries or

the roof collapse.  Gray seeks to recover money owed to it for repairs made to the Hwashin facility after the collapse and Mr. and Mrs. Piggott's injuries were allegedly sustained.

Hwashin claims that Gray has admitted Gray's claims and Hwashin's claims in the Piggott case arise from the same facts.  In support of this argument, Hwashin cites Gray's Opposition to Hwashin's Motion for Leave which states:

> Second, there is an existing case in this Court to which Hwashin is already a party on June 26, 2007.  Gray filed suit against Hwashin in CV-07-584 pending in this Court.  Gray has sued Hwashin for Hwashin's failure to pay for repairs to the facility, the exact same property damage Hwashin is trying to assert in this action.  Hwashin could easily, and more appropriately, file a counterclaim in that action.

Once again, Hwashin misinterprets Gray's statements and pleadings.  Gray argues in Opposition to Hwashin's Motion for Leave that the claims sought to be added in the Piggott case are compulsory counterclaims to this action.  Gray argues that the property damages Hwashin seeks to recover will concern damages which are made the basis of this lawsuit.  Gray argues Hwashin should plead its allegations as counterclaims to this lawsuit, rather than amend its Complaint in Intervention in the Piggott case.

### 3.    Gray's claims are not compulsory counterclaims to Hwashin's attempted Amended Complaint In Intervention because Gray's claims in this case were filed first.

On June 29, 2007, Hwashin filed a Motion for Leave to Amend the Complaint in Intervention and assert claims of property damage and lost profits.  (A true and correct copy of the Motion for Leave is attached hereto as Exhibit Q.).    On July 13, 2007, Gray filed its Opposition to Hwashin's Motion for Leave.  (A true and correct copy of the Opposition to Motion for Leave is attached hereto as Exhibit R.).    The Motion for Leave remains pending before the Court.

In Hwashin's Motion for Leave, it seeks to assert claims for property damage to the Hwashin facility and lost profits. Included in the property damage are the costs of the repairs. Gray argued in Opposition to the Motion for Leave that these claims are actually compulsory counterclaims to this action, and this Complaint was filed prior to the Motion for Leave. Even if the Court grants Hwashin's Motion for Leave, it does not mean this action should be dismissed or consolidated with the <u>Piggott</u> claim.

The United States Supreme Court has routinely held that a claim is not a compulsory counterclaim within the <u>Federal Rules of Civil Procedure</u>, Rule 13, if it was the "subject of another pending action at the time the action was commenced." <u>See</u> <u>Baker v. Goldsill Liquors, Inc.</u>, 94 S.Ct. 2504 (US 1974). Hwashin's attempted claims in the <u>Piggott</u> case should be consolidated with this case.

## C.    Gray's Claims In This Case Should Not Be Joined With Its Third-Party Claims Against Hwashin In The Piggott Case.

Hwashin argues Gray should have joined its claims to its Third-Party Complaint in the <u>Piggott</u> case. Hwashin's argument directly contradicts its arguments in the <u>Piggott</u> case.

On July 23, 2007, Hwashin filed a Motion to Dismiss Gray's Third-Party Complaint and argued the contractual indemnity provision cited by Gray does not apply to Mr. and Mrs. Piggott's claims and the claims for common law indemnity are barred by the worker's compensation exclusivity provision and Gray's active negligence. Hwashin now reverses course and argues the Third-Party Complaint is proper and should have served as an "anchor" for Gray's claims to recover for the repair work.

Hwashin cannot have it both ways. Either the indemnity claims in the <u>Piggott</u> case are due to be dismissed, thereby leaving no anchor indemnity claim under <u>Federal Rules of Civil Procedure</u>, Rule 14(a), or the indemnity claims, contrary to Hwashin's Motion to Dismiss in the

Piggott case, are valid and possible anchor claims.  Hwashin should not be allowed to take an inconsistent position in this case, as opposed to the position it is taking in the Piggott case.

If the Third-Party Complaint in the Piggott case is due to be dismissed, as Hwashin alleges, then Gray would be unable to assert its claims in the Piggott case as Third-Party claims.[6] Had Gray filed its claims in the Piggott case, Hwashin would undoubtedly have moved to dismiss them along with the indemnity claims.

Hwashin is trying to take advantage of its pending Motion to Dismiss in the Piggott case by arguing this case should be consolidated with an action it believes will be dismissed.  If Gray's indemnity claims are dismissed in the Piggott case, Gray will then be unable to sustain these claims in the Piggott case because there is no anchor claim.  Such guessmanship should not be tolerated.

Gray admits it could have asserted its claims in this case alongside the claims for indemnity made in the Piggott case.  Federal Rules of Civil Procedure, Rule 18(a) and the case law are clear, however, that Gray is not required to do so.  Even Hwashin says that Gray "may" join the claims, not that they were required to do so.  (Hwashin's Motion to Dismiss at p. 9.).  It is Gray's decision whether to assert these claims together in one action, or separately in different actions.

> ### D.    At Most, The Two Cases Should Be Consolidated For Purposes Of Discovery, Not Trial.

Attempting to litigate both Mr. and Mrs. Piggott's claims for personal injury, Hwashin's claims for recovery of its property damage and lost profits and Gray's claim for the repair work performed on the Hwashin facility transforms the Piggott case into an incredibly complex and confusing lawsuit.  Gray's claims in this action will require evidence and testimony regarding the

---

[6] Gray filed its Opposition to the Motion to Dismiss on August 16, 2007.  Gray argues its Third-Party claims of contractual and common law indemnity are not due to be dismissed.  The Motion to Dismiss remains pending.

agreement to perform repairs to the Hwashin facility, the cost of repairs, the reasonableness of these costs and Hwashin's subsequent failure to pay Gray for these costs. The <u>Piggott</u> case requires evidence and testimony regarding the original construction of the Hwashin facility, the cause of the roof collapse and Mr. and Mrs. Piggott's alleged injuries.[7]  Trying to litigate multiple claims which focus on different facts and different legal issues is quite simply a bad idea.

Hwashin fails to offer any reason for its insistence upon overly complicating the <u>Piggott</u> case by combining this case and the <u>Piggott</u> case into one extremely complex case. At most, the two actions should be consolidated for the purposes of discovery only.

## IV.    CONCLUSION.

Gray's claims in this action should not be dismissed or consolidated with the <u>Piggott</u> case.  Gray's claims are not compulsory counterclaims to Hwashin's claims in intervention. Hwashin is not the real party in interest in the Complaint in Intervention, the Fund is, and Gray's claims in this action are against Hwashin, not the Fund.  Moreover, Gray's claims in this action do not arise from the same transaction or occurrence as the claims in intervention and are not compulsory counterclaims.

Gray's claims should not be joined to its third-party claims.  Rather, Hwashin takes inconsistent positions on this issue in this case and in the <u>Piggott</u> case. While Gray admits that

---

[7]If Hwashin's Motion for Leave to Assert Additional Claims of Property Damage and Lost Profits is granted, the <u>Piggott</u> case will also require evidence related to the costs to clean up the debris after the roof collapse, the costs to rebuild the office, the reasonableness of all costs allegedly incurred by Hwashin as a result of the roof collapse, whether Hwashin properly mitigated its damages, the value of the Hwashin facility both prior to and after the roof collapse, the exact business property and contents alleged damaged in the roof collapse, the repair or replacement costs of the business property, the value of the business property prior to and after the roof collapse, whether the business property could be salvaged or was a total loss, the length of the alleged interruption in Hwashin's business, whether the interruption resulted in lost sales, whether Hwashin was forced to pay its employees during the interruption, whether the alleged interruption had any effect on Hwashin's customers' profitability, the profitability of Hwashin prior to and after the collapse, the effect of the waiver provisions in the Contract and Hwashin's claims and the effect of the insurance provisions in the Contract and Hwashin's claims.  These claims should be litigated in this action, not the <u>Piggott</u> case.

the claims against Hwashin could have been permissibly joined to its third-party claims in the

Piggott case, the decision whether to assert permissive claims is left to the party asserting the

claim (Gray), not the party (Hwashin) against whom the claim is asserted.

WHEREFORE, Gray respectfully requests this Court deny Hwashin's Motion to Dismiss

or, in the Alternative, Motion to Consolidate.

DATED this the 21st day of August, 2007.

By: *s/Brian M. McClendon*
E. Britton Monroe (MON032)
Mickey B. Wright (WRI048)
Brian M. McClendon (MCC133)
Attorneys for Gray Construction, Inc.

**OF COUNSEL**:
LLOYD, GRAY & WHITEHEAD, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama 35223
Telephone:  (205) 967-8822
Facsimile:  (205) 967-2380

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document to all attorneys of record by electronically filing or mailing via U.S. Mail the foregoing document with the United States District Court, Middle District of Alabama on this the 21st day of August, 2007:

Joseph Lister Hubbard, Esq.
Richard H. Allen, Esq.
Arden Reed Pathak, Esq.
Capell Howard, P.C.
P.O. Box 2069
Montgomery, AL   36102-2069
***Counsel for Hwashin America Corporation***

*s/Brian M. McClendon*
OF COUNSEL

SUBCONTRACT AGREEMENT


BETWEEN


JAMES N. GRAY COMPANY


AND


Q. C. Masonry, Inc.





FEB 0 3 2004


**PROJECT NAME:**       **New Manufacturing Facility**
**SUBCONTRACT NUMBER:**       **203048-04-100**

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 1 |
| Revision Issue Date: | 08/01/03 |

SUBCONTRACT AGREEMENT

BETWEEN

JAMES N. GRAY COMPANY

AND

Cooper's Steel Fabricators, Inc.



PROJECT NAME:                    **New Manufacturing Facility**
SUBCONTRACT NUMBER:              **203048-05-100**

SUBCONTRACT AGREEMENT

BETWEEN

JAMES N. GRAY COMPANY

AND

MR&D LLC



FEB 0 3 2004

PROJECT NAME:          New Manufacturing Facility
SUBCONTRACT NUMBER:     203048-07-700

Standard Subcontract Agreement

SUBCONTRACT AGREEMENT


BETWEEN


JAMES N. GRAY COMPANY


AND


Hardy Corporation





PROJECT NAME:                        New Manufacturing Facility
SUBCONTRACT NUMBER:                  203048-15-100


JAN 1 5 2004

RECEIVED
DEC 0 4 2006
GHH&C


| | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 1 |
| Design/Build Subcontract Agreement | Revision Issue Date: | 08/01/03 |

SUBCONTRACT AGREEMENT

BETWEEN

JAMES N. GRAY COMPANY

AND

All-South Subcontractors, Inc.



PROJECT NAME:                    New Manufacturing Facility
SUBCONTRACT NUMBER:              203048-07-100

Standard Subcontract Agreement

# SUBCONTRACT AGREEMENT

## BETWEEN

## JAMES N. GRAY COMPANY

### AND

## Ard Contracting, Inc.



**PROJECT NAME:**          **New Manufacturing Facility**

**SUBCONTRACT NUMBER:**          **203048-03-100**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **JENNIFER PIGGOTT and SLADE PIGGOTT,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No.: CV-06-1158** |
| **v.** | ) | |
| | ) | |
| **GRAY CONSTRUCTION, INC.,** | ) | |
| | ) | |
| **Defendant/Third-Party Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **COOPER'S STEEL FABRICATORS, INC., ALL-SOUTH SUBCONTRACTORS, FREELAND-HARRIS CONSULTING ENGINEERS OF KENTUCKY, INC., FREELAND HARRIS CONSULTING ENGINEERS OF GEORGIA, INC., THE HARDY CORPORATION, LATTA PLUMBING & CONSTRUCTION CO., INC., HWASHIN AMERICA CORPORATION and FIRESTONE BUILDING PRODUCTS COMPANY, LLC,** | ) | |
| | ) | |
| **Third-Party Defendants.** | ) | |

---

**GRAY CONSTRUCTION, INC.'S THIRD-PARTY COMPLAINT**

---

Pursuant to Federal Rules of Civil Procedure, Rules 7 and 14, Defendant/Third-Party Plaintiff Gray Construction, Inc. ("Gray") respectfully submits this Third-Party Complaint.

## PARTIES

1.     Gray is a Kentucky corporation with its principal place of business in Lexington, Kentucky.

2.      Hwashin America Corporation ("Hwashin") is a Delaware Corporation with its principle place of business in Montgomery, Alabama. Hwashin is the owner of a manufacturing facility in Greenville, Alabama ("Hwashin facility") and at all times was responsible for maintenance of the Hwashin facility roof drains.

3.      Cooper's Steel Fabricators, Inc. ("Cooper's Steel") is a Tennessee corporation with its principal place of business in Shelbyville, Tennessee. Cooper's Steel was responsible for supplying and installing the structural steel, girders, joists, bridging, roof decking, roof frames and other steel products for the Hwashin facility.

4.      All-South Subcontractors, Inc. ("All-South") is an Alabama corporation with its principal place of business in Birmingham, Alabama. All-South was the roofing subcontractor hired Gray to install the roof at the Hwashin facility.

5.      Freeland-Harris Consulting Engineers of Kentucky, Inc. ("Freeland-Harris Kentucky") is a Kentucky corporation with its principal place of business in Lexington, Kentucky.

6.      Freeland-Harris Consulting Engineers of Georgia, Inc. ("FHCE") is a Georgia corporation with its principal place of business in Tucker Georgia.

7.      Freeland-Harris Kentucky and FHCE (collectively "Freeland-Harris") were the structural engineers retained to design and engineer the Hwashin facility.

8.      The Hardy Corporation ("Hardy") is an Alabama corporation with its principal place of business in Birmingham, Alabama. Hardy was the mechanical engineer retained to design and engineer the mechanical systems including, but not limited to, the roof drainage system, at the Hwashin facility.

9.    Latta Plumbing & Construction Co., Inc. ("Latta") is an Alabama corporation with its principal place of business in Gardendale, Alabama. Latta was hired by Hardy to install all plumbing at the Hwashin facility, including pipes incorporated into the roof drainage system, for the intended benefit of Gray.

10.    Firestone Building Products Company, LLC ("Firestone") is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Firestone manufactured the office roof and was hired to inspect the installation of the office roof of the Hwashin facility and verify that the roof had been installed properly.

11.    Hwashin, Cooper's Steel, All-South, Freeland-Harris Kentucky, FHCE, Hardy, Latta and Firestone are collectively referred to as Third-Party Defendants.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over Gray's Third Party Claims pursuant to 28 U.S.C. §1367, as these claims arise from the same occurrence as Mr. and Mrs. Piggott's claims and the Court has jurisdiction over Mr. and Mrs. Piggott's claims pursuant to 28 U.S.C. § 1332.

13.    This Court is the proper venue for this Third-Party Complaint pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the third-party claims occurred in this judicial district.

14.    This Court has personal jurisdiction over the Third-Party Defendants because they conduct business in and transact business throughout the State of Alabama and it would not offend notions of fair play or substantial justice to require Third-Party Defendants to answer Gray's Third-Party Complaint in the State of Alabama.

## STATEMENT OF FACTS

15.    On September 24, 2003, Hwashin contracted with Gray to design and construct

the Hwashin facility.

16.    The Contract entered into by Hwashin and Gray contains the following indemnity

provision:

> 11.10.4.3 Owner's Indemnification Responsibilities. To the fullest extent
> permitted by law, the Owner shall defend, indemnify, and hold harmless
> Design/Builder, its Subcontractors, Suppliers, consultants, agents and
> employees, from any and all claims, liability, damages and expenses
> (including attorney fees and expense), arising out of or resulting from:
>
> (a) Any claim, suit or legal proceeding to recover damages for wrongful
> death, bodily injury, illness or disease or injury to, or destruction of
> tangible property alleged to be caused either directly or indirectly by any
> substances, condition, element, or material or any combination of the
> foregoing: (a) produced by Owner or emitted or released by Owner either
> intentionally or unintentionally, from the facilities designed and/or
> constructed by Design/Builder for the benefit of Owner, or (b) used by
> Design/Builder or incorporated by Design/Builder into the Work herein
> agreed to be performed by Design/Builder for the benefit of Owner if
> specifically required by Owner or if necessary for the planned use of the
> work and to the extent not caused by the mishandling of such substances,
> condition, element or material by Design/Builder, its Subcontractors,
> suppliers, consultants, agents, and employees:

17.    Gray divided the design and construction into parts and subcontracted parts of the

project out to licensed professionals.

18.    Freeland-Harris Kentucky and GNF Architects entered into a Design Consulting

Agreement for Freeland-Harris Kentucky to provide all structural engineering services for the

construction of the Hwashin facility. Freeland-Harris Kentucky then subcontracted with FHCE

for FHCE to provide structural engineering services for the construction of the Hwashin facility

for the intended benefit of Gray.

474053_16.DOC                                  4

19.     The Design Consulting Agreement entered into by GNF Architects and Freeland-

Harris – Kentucky contains the following indemnity provision:

> To the fullest extent permitted by law, the Consultant shall indemnify and
> hold harmless the Owner, Gray and other contractors, consultants and
> subcontractors and all of their agents and employees from and against all
> claims, damages, losses and expenses, including but not limited to
> reasonable attorney's fees, arising out of or resulting from the
> performance of the Consultant's Services provided that:
>
>         (a)     Any such claim, damage, loss or expense is
> attributable to bodily injury, personal injury, sickness, disease or death, or
> to damage to or destruction of tangible property including the loss of use
> resulting therefrom, to the extent caused or alleged to be caused in whole
> or in any part by any negligent act or omission of the Consultant or any
> person directly or indirectly employed by the Consultant or anyone for
> whose acts the Consultant may be liable (including agents, employees
> subcontractors and suppliers of Consultant), regardless but not to the
> extent it is caused in part by a party indemnified hereunder in which case
> each party ultimately determined to be liable shall be responsible for the
> damages, costs, and reasonable attorney's fees in proportion to the
> percentage of liability attributable to that party.

20.     On October 1, 2003, Gray entered into a contract with Hardy for Hardy to provide

all engineering, materials, labor, equipment, services, taxes, cartage and all other items necessary

to complete the Mechanical Systems, including HVAC and plumbing work for the Hwashin

facility.

21.     Hardy subcontracted portions of the work under its subcontract to Latta for the

intended benefit of Gray.

22.     On September 19, 2003, Gray entered into a contract with Cooper's Steel.

Cooper's Steel agreed to "provide all necessary supervision, labor, materials, tools equipment,

services, insurance, taxes, cartage and all other items necessary to complete the Structural and

Miscellaneous Steel Fabrication and Erection work for the Hwashin America Corporation

project located in Greenville, Alabama."

23.    On December 2, 2003, Gray entered into a contract with All-South. All-South agreed to "provide all engineering, materials, labor, equipment, services, taxes, cartage and all other items necessary to complete the Roofing scope of work for the New Manufacturing Facility project for Hwashin America Corporation project located in Greenville, Alabama."

24.    Gray's contracts with Hardy, Cooper's Steel and All-South all contain the following indemnity provision:

> 14.1    SUBCONTRACTOR'S PERFORMANCE.  To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors and Subcontractors and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of the Subcontractor's Work provided that:
>
>       (a)    any such claim, damage, loss or expense is attributable to bodily injury, personal injury, sickness, disease or death, or to damage to or destruction of tangible property including the loss of use resulting therefrom, to the extent caused or alleged to be caused in whole or in any part by any negligent act or omission of the Subcontractor or any person directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable (including sub-Subcontractors and suppliers of Subcontractor), regardless of whether it is caused in part by a party indemnified hereunder.
>
>       (b)    litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the work or materials or processes used by the Subcontractor, or its subcontractors and/or suppliers.
>
>       (c)    claims against or through Gray or liability for claims and liens for labor performed or materials used or furnished through or under Subcontractor on the Project.
>
>       (d)    liability or claims against or through to Gray resulting from the Subcontractor's failure to comply with applicable licensing requirements or Code requirements.
>
>       (e)    liability imposed upon Gray directly or indirectly by Subcontractor's failure or the failure of any of its employees to comply

with law, ordinances, rules, regulations or requirements, including Occupational Safety and Health Administration violations and any penalties, including enhancements, resulting in whole or in part from Subcontractor's acts or omissions.

(f)    such obligations shall not be construed to negate, or abridge, or otherwise reduce any other right or obligation of indemnity under this Agreement or which would otherwise exist as to any party or person described in this Section 14.

25.    Gray's contracts with Hardy, Cooper's Steel and All-South also contain the following express warranty:

The Subcontractor warrants to the Owner and Gray that materials and equipment furnished under this Subcontract will be of good quality and new unless otherwise required or permitted by the Subcontract Documents, that the Work will be performed in a good, workmanlike manner, be free from defects in materials and workmanship, and that the Work will conform with the requirements of the Subcontract Documents.

26.    After installation of the office roof of the Hwashin facility was complete, the roof was inspected by Firestone. Firestone warranted that the roof had been properly installed.

27.    On May 6, 2004, construction of the Hwashin facility Assembly Area was complete and Hwashin executed a Certificate of Substantial Completion for this portion of the project.

28.    On June 30, 2004, construction of the Hwashin facility Office Area was complete and Hwashin executed a Certificate of Substantial Completion for this portion of the project.

29.    On October 17, 2006, the partial roof collapsed at the office area of the Hwashin facility.

30.    According to Mr. and Mrs. Piggott's Complaint, Mrs. Piggott, an employee of Hwashin, was injured in the roof collapse. According to Mr. and Mrs. Piggott's Complaint, Mrs. Piggott suffered serious and permanent injuries, incurred medical expenses, suffered mental

474053_16.DOC                                    7

anguish, was required to miss work and lose income as a result of the October 17, 2006 roof collapse.

31.     According to Mr. and Mrs. Piggott's Complaint, Mr. Piggott was married to Mrs. Piggott at the time of the collapse and Mr. Piggott has suffered injuries arising from his loss of consortium with Mrs. Piggott.

### COUNT ONE FOR CONTRACTUAL INDEMNITY AS TO HWASHIN

32.     Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 29 of this Third-Party Complaint.

33.     Hwashin contractually agreed to indemnify and hold harmless Gray for claims of bodily injury against Gray caused directly and/or indirectly by any condition produced by Hwashin.

34.     Mr. and Mrs. Piggott have asserted claims of negligence and wantonness related to Mr. and Mrs. Piggott's injuries that were allegedly incurred when the roof of the Hwashin facility collapsed upon Mrs. Piggott.

35.     The collapse of the office roof was directly caused by a condition created by Hwashin. The roof collapse was the result of Hwashin failing to maintain the roof drainage system at the Hwashin facility by allowing debris to clog roof drains, which substantially diminished the drainage system's ability to drain water from the roof and which led directly to the collapse.

36.     Gray has been caused to suffer and will continue to suffer damages as a result of Hwashin's refusal to defend and indemnify Gray for the claims asserted by Mr. and Mrs. Piggott.

**WHEREFORE,** Gray demands judgment against Hwashin for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

### COUNT TWO FOR CONTRACTUAL INDEMNITY AS TO FREELAND-HARRIS

37.     Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 34 of this Third-Party Complaint.

38.     Freeland-Harris contractually agreed to indemnify and hold harmless Gray for claims against Gray arising out of or resulting from Freeland-Harris' negligent acts or omissions or Freeland-Harris' failure to comply with applicable laws, ordinances, rules, regulations or requirements.

39.     Mr. and Mrs. Piggott have asserted claims of negligence and wantonness related to the design and construction of the Hwashin facility arising from the work performed by Freeland-Harris under its Design Consulting Agreement with Gray.

40.     Freeland-Harris negligently failed to design and engineer the Hwashin facility, including the girders, joists and structural steel supporting the office roof, and/or negligently failed to review the design of others. Freeland-Harris' negligence specifically includes, but is not limited to, its failure to design and engineer the office facility to accommodate the loads and uneven loads that resulted from the office roof interior drainage system.

41.     Gray has been caused to suffer and will continue to suffer damages as a result of Freeland-Harris' refusal to defend and indemnify Gray for the claims asserted by Mr. and Mrs. Piggott.

**WHEREFORE**, Gray demands judgment against Freeland-Harris for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

## COUNT THREE FOR CONTRACTUAL INDEMNITY AS TO HARDY

42.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 39 of this Third-Party Complaint.

43.    Hardy contractually agreed to indemnify and hold harmless Gray for claims against Gray arising out of or resulting from Hardy's negligent acts or omissions or Hardy's failure to comply with applicable laws, ordinances, rules, regulations or requirements.

44.    Mr. and Mrs. Piggott have asserted claims of negligence and wantonness related to the design and construction of the Hwashin facility arising from the work performed by Hardy under its subcontract with Gray.

45.    Hardy negligently failed to design and install roof drainage systems in accordance with the drawings and specifications and in accordance with national and local codes. Hardy's negligence specifically includes, but is not limited to, its failure to design and install a proper primary and secondary drainage system to service the office roof, failure to design and install a primary and secondary drainage system capable of draining the office roof and failure to supervise and inspect the work of its subcontractors.

46.    Gray has been caused to suffer and will continue to suffer damages as a result of Hardy's refusal to defend and indemnify Gray for the claims asserted by Mr. and Mrs. Piggott.

**WHEREFORE**, Gray demands judgment against Hardy for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

## COUNT FOUR FOR CONTRACTUAL INDEMNITY AS TO COOPER'S STEEL

47.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 44 of this Third-Party Complaint.

48.    Cooper's Steel contractually agreed to indemnify and hold harmless Gray for claims against Gray arising out of or resulting from Cooper's Steel's negligent acts or omissions or Cooper's Steel's failure to comply with applicable laws, ordinances, rules, regulations or requirements.

49.    Mr. and Mrs. Piggott have asserted claims of negligence and wantonness related to the design and construction of the Hwashin facility arising from the work performed by Cooper's Steel under its subcontract with Gray.

50.    Cooper's Steel negligently provided shop drawings, designs and specifications regarding the structural framing of the Hwashin facility.    Cooper's Steel's negligence specifically includes, but is not limited to, its failure to design the girders, joists and structural steel to comply with the drawings and specifications and national and local prevailing codes and its failure to design the office to support the loads and uneven loads caused by the office roof drainage system.

51.    Gray has been caused to suffer and will continue to suffer damages as a result of Cooper's Steel refusal to defend and indemnify Gray for the claims asserted by Mr. and Mrs. Piggott.

**WHEREFORE**, Gray demands judgment against Cooper's Steel for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

## COUNT FIVE FOR CONTRACTUAL INDEMNITY AS TO ALL-SOUTH

52.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 49 of this Third-Party Complaint.

53.    All-South contractually agreed to indemnify and hold harmless Gray for claims against Gray arising out of or resulting from All-South's negligent acts or omissions or All-South's failure to comply with applicable laws, ordinances, rules, regulations or requirements.

54.    Mr. and Mrs. Piggott have asserted claims of negligence and wantonness related to the design and construction of the Hwashin facility arising from the work performed by All-South under its subcontract with Gray.

55.    All-South negligently failed to install the office roof in accordance with the drawings and specifications, the roof manufacturer's specifications and/ or national and local prevailing codes. All-South's negligent acts specifically include, but are not limited to, the improper installation of the roof membrane around office drains, which restricted the drain openings and substantially diminished the drainage system's ability to drain water from the office roof and its failure to install a secondary drainage system in accordance with the drawings and specifications.

56.    Gray has been caused to suffer and will continue to suffer damages as a result of All-South's refusal to defend and indemnify Gray for the claims asserted by Mr. and Mrs. Piggott.

**WHEREFORE**, Gray demands judgment against All-South for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

## COUNT SIX FOR COMMON LAW INDEMNITY AS TO HWASHIN

57.     Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 54 of this Third-Party Complaint.

58.     Hwashin is the owner of the Hwashin facility and was responsible for maintaining the roof drainage system at the Hwashin facility after construction.

59.     Hwashin negligently failed to maintain the roof drainage system at the Hwashin facility by allowing debris to clog the roof drains over the office area and negligently failed to perform periodic maintenance on the roof drains, which substantially diminished the drainage system's ability to drain water from the roof and directly led to the collapse of the roof.

60.     Hwashin was actively negligent in its breach of its duties and was the active cause of the roof collapse.

61.     As a proximate result of Hwashin's active negligence, Gray has been caused to suffer and will continue to suffer damages as a result of Hwashin's refusal to defend and indemnify Gray for Hwashin's active negligence.

**WHEREFORE**, Gray demands judgment against Hwashin for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

## COUNT SEVEN FOR COMMON LAW INDEMNITY AS TO LATTA

62.     Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 59 of this Third-Party Complaint.

63.     Latta provided materials, labor or services related to the design and/or construction of the Hwashin facility, including, but not limited to installation of the pipes incorporated into the office roof drainage system.

474053_16.DOC                                    13

64.    Mr. and Mrs. Piggott assert claims against Gray arise from the design and work performed by Latta.

65.    Latta was actively negligent in its breach of its duties and was the active cause of the roof collapse.

66.    Latta's negligence specifically includes, but is not limited to, its failure to correctly install the drain pipes and leaders with the appropriate downward slope as to drain the office roof and its failure to install a properly functioning primary and secondary drainage system.

67.    As a proximate result of Latta's active negligence, Gray has been caused to suffer and will continue to suffer as a result of Latta's refusal to indemnify Gray for Latta's active negligence.

**WHEREFORE**, Gray demands judgment against Latta for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

## COUNT EIGHT FOR BREACH OF CONTRACT AS TO FREELAND-HARRIS

68.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 65 of this Third-Party Complaint.

69.    Freeland-Harris contracted with Gray to supply and install the structural steel, girders, joists, bridging, roof decking, roof frames and other steel products used in the construction of the Hwashin facility.

70.    Freeland-Harris' contract states that "all work shall be performed in accordance with plans and specifications as prepared by James N. Gray Company and GNF Architects and Engineers and national and local prevailing Codes."

474053_16.DOC                                    14

71.    Freeland-Harris breached its contract with Gray by failing to perform its work in accordance with the plans and specifications and national and local prevailing Codes.

72.    Freeland –Harris breached its contract by failing to design and engineer the Hwashin facility, including the girders, joists and structural steel supporting the office roof, and/or failing to review the design of others in accordance with its contractual obligations. Freeland-Harris' breach of contract specifically includes, but is not limited to, its failure to design and engineer the office facility to accommodate the loads and uneven loads that resulted from the office roof interior drainage system.

73.    As a result of Freeland-Harris breaches of contract, Gray has been proximately damaged.

**WHEREFORE**, Gray demands judgment against Freeland-Harris for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

### COUNT NINE FOR BREACH OF CONTRACT AS TO COOPER'S STEEL

74.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 71 of this Third-Party Complaint.

75.    Cooper's Steel contracted with Gray to supply and install the structural steel, girders, joists, bridging, roof decking, roof frames and other steel products used in the construction of the Hwashin facility.

76.    Cooper's Steel's contract states that "all work shall be performed in accordance with plans and specifications as prepared by James N. Gray Company and GNF Architects and Engineers and national and local prevailing Codes."

77.    Cooper's Steel breached its contract with Gray by failing to perform its work in accordance with the plans and specifications and national and local prevailing Codes.

78.    Coopers' Steel breached its contract with Gray by failing to provide shop drawings, designs and specifications regarding the structural framing of the Hwashin facility in accordance with its contract with Gray. Cooper's Steel's breach of contract specifically includes, but is not limited to, its failure to design the girders, joists and structural steel to comply with the drawings and specifications and national and local prevailing codes and its failure to design the office to support the loads and uneven loads caused by the office roof drainage system.

79.    As a result of Cooper's Steel's breaches of contract, Gray has been proximately damaged.

**WHEREFORE**, Gray demands judgment against Cooper's Steel for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

### COUNT TEN FOR BREACH OF CONTRACT AS TO HARDY

80.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 77 of this Third-Party Complaint.

81.    Hardy entered into a contract with Gray to provide design and construction services for the mechanical systems, including the design and installation of the roof drainage system, for the Hwashin facility.

82.    Hardy's contract required "all work is to be performed in accordance with all prevailing local and national Codes, ordinances and requirements."

83.    Hardy breached its contract with Gray by failing to perform its work in accordance with the plans and specifications and national and local prevailing Codes.

84.    Hardy breached its contract with Gray by failing to design and install roof drainage systems in accordance with its contract with Gray. Hardy's breach of contract specifically includes, but is not limited to, its failure to design and install a proper primary and secondary drainage system to service the office roof, failure to design and install a primary and secondary drainage system capable of draining the office roof and failure to supervise and inspect the work of its subcontractors.

85.    As a result of Hardy's breaches of contract, Gray has been proximately damaged.

**WHEREFORE**, Gray demands judgment against Hardy for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

## COUNT ELEVEN FOR BREACH OF CONTRACT AS TO ALL-SOUTH

86.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 83 of this Third-Party Complaint.

87.    All-South entered into a contract with Gray to provide engineering, materials, labor, equipment, services, taxes, cartage and all other items necessary to complete the roofing scope of work for the Hwashin facility.

88.    All-South's contract provides "all work shall be performed in accordance with plans and specifications as prepared by James N. Gray Company, GNF Architects and Engineers, PSC and national and local prevailing Codes."

89.     All-South breached its contract with Gray by failing to perform its work in accordance with the plans and specifications and national and local prevailing Codes would constitute a breach of contract.

90.     All-South breached its contract with Gray by failing to install the office roof in accordance with its contract with Gray. All-South's breach of contract specifically includes, but is not limited to, the improper installation of the roof membrane around office drains, which restricted the drain openings and substantially diminished the drainage system's ability to drain water from the office roof and its failure to install a secondary drainage system in accordance with the drawings and specifications.

91.     As a result of All-South's breaches of contract, Gray has been proximately damaged.

**WHEREFORE,** Gray demands judgment against All-South for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

## COUNT TWELVE FOR THIRD-PARTY BENEFICIARY BREACH OF CONTRACT AS TO LATTA

92.     Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 89 of this Third-Party Complaint.

93.     Latta contracted with Hardy to install all plumbing, including the roof drains and components.

94.     Gray was an intended third-party beneficiary of the contract between Latta and Hardy.

95.    Latta breached its contract with Hardy, to which Gray was an intended third-party beneficiary, by improperly installing the drainage pipes and components of the office roof drainage system and by failing to do its work in accordance with the plans and specifications and failing to comply with all national and local prevailing codes.

96.    As a proximate result of Latta's breaches of contract, Gray has been proximately damaged.

**WHEREFORE**, Gray demands judgment against Latta for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

## COUNT THIRTEEN FOR BREACH OF EXPRESS WARRANTY AS TO HARDY

97.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 94 of this Third-Party Complaint.

98.    Hardy expressly warranted to Gray that the materials and work they provided in connection with the design and construction of the Hwashin facility would be of good quality, free from defects, conform to the designs and specifications for the Hwashin facility and comply with all applicable Codes, regulations and federal, state and local statutes and ordinances.

99.    Hardy breached its express warranty by failing to design and install roof drainage systems in accordance with the drawings and specifications and in accordance with national and local codes.  Hardy's breach of express warranty specifically includes, but is not limited to, its failure to design and install a proper primary and secondary drainage system to service the office roof, failure to design and install a primary and secondary drainage system capable of draining the office roof and failure to supervise and inspect the work of its subcontractors.

100.    As a proximate result of Hardy's breach of express warranties, Gray has been caused to suffer damages, and will continue to suffer damages.

**WHEREFORE**, Gray demands judgment against Hardy for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

## COUNT FOURTEEN FOR BREACH OF EXPRESS WARRANTY AS TO COOPER'S STEEL

101.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 98 of this Third-Party Complaint.

102.    Cooper's Steel expressly warranted to Gray that the materials and work they provided in connection with the design and construction of the Hwashin facility would be of good quality, free from defects, conform to the designs and specifications for the Hwashin facility and comply with all applicable Codes, regulations and federal, state and local statutes and ordinances.

103.    Cooper's Steel breached its express warranty by failing to provide shop drawings, designs and specifications regarding the structural framing of the Hwashin facility in accordance with the drawings and specifications and national and local prevailing codes. Cooper's Steel's breach of express warranty specifically includes, but is not limited to, its failure to design the girders, joists and structural steel to comply with the drawings and specifications and national and local prevailing codes and its failure to design the office to support the loads and uneven loads caused by the office roof drainage system.

104.    As a proximate result of Cooper's Steel's breach of express warranties, Gray has been caused to suffer damages, and will continue to suffer damages.

474053_16.DOC                              20

**WHEREFORE**, Gray demands judgment against Cooper's Steel for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

### COUNT FIFTEEN FOR BREACH OF EXPRESS WARRANTY AS TO ALL-SOUTH

105. Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 102 of this Third-Party Complaint.

106. All-South expressly warranted to Gray that the materials and work they provided in connection with the design and construction of the Hwashin facility would be of good quality, free from defects, conform to the designs and specifications for the Hwashin facility and comply with all applicable Codes, regulations and federal, state and local statutes and ordinances.

107. All-South breached its express warranty by failing to install the office roof in accordance with the drawings and specifications, the roof manufacturer's specifications and/ or national and local prevailing codes. All-South's breach of express warranty specifically include, but is not limited to, the improper installation of the roof membrane around office drains, which restricted the drain openings and substantially diminished the drainage system's ability to drain water from the office roof and its failure to install a secondary drainage system in accordance with the drawings and specifications.

108. As a proximate result of All-South's breach of express warranties, Gray has been caused to suffer damages, and will continue to suffer damages.

**WHEREFORE**, Gray demands judgment against All-South for compensatory damages in an amount to be determined by a jury, together with interest from the date of injury, costs of this proceeding and attorney's fees.

## COUNT SIXTEEN FOR NEGLIGENCE AS TO FREELAND-HARRIS

109.    Gray realleges as if fully set out each and every allegation contained in Paragraph
Nos. 1 through 106 of this Third-Party Complaint.

110.    Freeland-Harris owed a duty to Gray to engineer the Hwashin facility in such a
manner as to ensure its structural integrity and stability and prevent its collapse and in
accordance with all building codes and requirements.

111.    Freeland-Harris negligently failed to design and engineer the Hwashin facility,
including the girders, joists and structural steel supporting the office roof, and/or negligently
failed to review the design of others.  Freeland-Harris' negligence specifically includes, but is
not limited to, its failure to design and engineer the office facility to accommodate the loads and
uneven loads that resulted from the office roof interior drainage system.

112.    As a proximate result of Freeland-Harris' breach of duties, Gray has been
proximately caused to suffer damages, and will continue to suffer damages.

**WHEREFORE**, Gray respectfully requests this Honorable Court grant judgment against
Freeland-Harris and award compensatory damages in an amount to be determined by struck jury.

## COUNT SEVENTEEN FOR NEGLIGENCE AS TO HARDY

113.    Gray realleges as if fully set out each and every allegation contained in Paragraph
Nos. 1 through 110 of this Third-Party Complaint.

114.    Hardy owed a duty to Gray to engineer the Hwashin facility and its drainage
systems in such a manner as to ensure its structural integrity and stability and prevent its collapse
and in accordance with all building codes and requirements.

115.    Hardy negligently failed to design and install roof drainage systems in accordance
with the drawings and specifications and in accordance with national and local codes.  Hardy's

negligence specifically includes, but is not limited to, its failure to design and install a proper primary and secondary drainage system to service the office roof, failure to design and install a primary and secondary drainage system capable of draining the office roof and failure to supervise and inspect the work of its subcontractors.

116.    As a proximate result of Hardy's breach of duties, Gray has been proximately caused to suffer damages, and will continue to suffer damages.

**WHEREFORE**, Gray respectfully requests this Honorable Court grant judgment against Hardy and award compensatory damages in an amount to be determined by struck jury.

## COUNT EIGHTEEN FOR NEGLIGENCE AS TO COOPER'S STEEL

117.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 114 of this Third-Party Complaint.

118.    Cooper's Steel owed a duty to Gray to design and install the structural steel, joists and girders at the Hwashin facility in such a manner as to ensure the Hwashin facility's structural integrity and stability and prevent its collapse and in accordance with all building codes and requirements.

119.    Cooper's Steel negligently provided shop drawings, designs and specifications regarding the structural framing of the Hwashin facility.   Cooper's Steel's negligence specifically includes, but is not limited to, its failure to design the girders, joists and structural steel to comply with the drawings and specifications and national and local prevailing codes and its failure to design the office to support the loads and uneven loads caused by the office roof drainage system.

120.    As a proximate result of Cooper's Steel's breach of duties, Gray has been proximately caused to suffer damages, and will continue to suffer damages.

**WHEREFORE,** Gray respectfully requests this Honorable Court grant judgment against Cooper's Steel and award compensatory damages in an amount to be determined by struck jury.

## COUNT NINETEEN FOR NEGLIGENCE AS TO ALL-SOUTH

121.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 118 of this Third-Party Complaint.

122.    All-South owed a duty to Gray to design and construct the roof and roof drains of the Hwashin facility in such a manner as to ensure its structural integrity and stability and prevent its collapse and in accordance with all building codes and requirements.

123.    All-South negligently failed to install the office roof in accordance with the drawings and specifications, the roof manufacturer's specifications and/ or national and local prevailing codes.  All-South's negligent acts specifically include, but are not limited to, the improper installation of the roof membrane around office drains, which restricted the drain openings and substantially diminished the drainage system's ability to drain water from the office roof and its failure to install a secondary drainage system in accordance with the drawings and specifications.

124.    As a proximate result of All-South's breach of duties, Gray has been proximately caused to suffer damages, and will continue to suffer damages.

**WHEREFORE,** Gray respectfully requests this Honorable Court grant judgment against All-South and award compensatory damages in an amount to be determined by struck jury.

## COUNT TWENTY FOR NEGLIGENCE AS TO LATTA

125.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 122 of this Third-Party Complaint.

474053_16.DOC                          24

126.    Latta owed a duty to Gray to install the pipes and other components of the Hwashin facility's roof drainage system in such a manner as to ensure its structural integrity and stability and prevent its collapse and in accordance with all building codes and requirements.

127.    Latta negligently installed the drain pipes and other components of the office roof drainage system. Latta's negligence specifically includes, but is not limited to, its failure to correctly install the drain pipes and rain leaders with the appropriate downward slope as to drain the office roof and its failure to install a properly functioning primary and secondary drainage system.

128.    As a proximate result of Latta's breach of duties, Gray has been proximately caused to suffer damages, and will continue to suffer damages.

**WHEREFORE,** Gray respectfully requests this Honorable Court grant judgment against Latta and award compensatory damages in an amount to be determined by struck jury.

## COUNT TWENTY-ONE FOR NEGLIGENCE AS TO FIRESTONE

129.    Gray realleges as if fully set out each and every allegation contained in Paragraph Nos. 1 through 128 of this Third-Party Complaint.

130.    Firestone owed a duty to inspect the office roof of the Hwashin facility and verify that the roof had been installed properly.

131.    Firestone negligently inspected the office roof of the Hwashin facility. Firestone's negligence specifically includes, but is not limited to, its failure to recognize that All-South had not properly cut the roof membrane around the drain openings.

132.    As a proximate result of Firestone's breach of duties, Gray has been caused to suffer damages and will continue to suffer damages.

**WHEREFORE,** Gray respectfully requests this Court grant judgment against Firestone and award compensatory damages in an amount to be determined by struck jury.

## TRIAL BY STRUCK JURY IS REQUESTED

DATED this the 7th day of June, 2007.

By: *s/Brian M. McClendon*
E. Britton Monroe (MON032)
Mickey B. Wright (WRI048)
Brian M. McClendon (MCC133)
Attorneys for Defendant/ Third Party
Plaintiff Gray Construction, Inc.

**OF COUNSEL:**
LLOYD, GRAY & WHITEHEAD, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama 35223
Telephone: (205) 967-8822
Facsimile: (205) 967-2380

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed and served upon the following on this the 7th day of June, 2007:

Jere L. Beasley, Esq.
Julia Ann Beasley, Esq.
Beasley, Allen, Crow, Methvin, Portis & Miles
P.O. Box 4160
Montgomery, AL 36103-4160

W. Christopher Waller, Jr., Esq.
James A. Rives, Esq.
Ball, Ball, Matthews & Novak
P.O. Box 2148
Montgomery, AL 36102-2148

s/*Brian M. McClendon*
OF COUNSEL

**THIRD-PARTY PLAINTIFF REQUESTS THE FOLLOWING BE SERVED BY CERTIFIED MAIL:**

Freeland-Harris Consulting Engineers of Georgia, Inc.
c/o The Corporation Company
2000 Interstate Park Dr., Suite 204
Montgomery, AL 36109

Freeland-Harris Consulting Engineers of Kentucky, Inc.
c/o The Corporation Company
2000 Interstate Park Dr., Suite 204
Montgomery, AL 36109

Cooper's Steel Fabricators, Inc.
c/o The Corporation Company
2000 Interstate Park Dr., Suite 204
Montgomery, AL 36109

The Hardy Corporation
c/o Craig E. Westendorf
430 12th Street south
Birmingham, AL 35233

All-South Subcontractors, Inc.
c/o CSC Lawyers Incorporating Service, Inc.
150 South Perry Street
Montgomery, AL 36104

Latta Plumbing and Construction Co., Inc.
c/o Rex Latta
2605 Decatur Highway
Gardendale, AL 35071

Hwashin America Corporation
c/o Michael B. O'Conner
105 Tallapoosa Street, Suite 101
Montgomery, AL 36104

Firestone Building Products Company, LLC
c/o National Registered Agents, Inc.
150 S. Perry Street
Montgomery, AL   36104

s/Brian M. McClendon
OF COUNSEL

**THE DAILY REPORT IS THE MOST IMPORTANT RECORD DOCUMENT ON THE PROJECT.
PLEASE BE SPECIFIC AND ANSWER ALL QUESTIONS!**

| Project Name: | HWASHIN_207005 | Report # | 1 |
|---|---|---|---|
| Date: | / Q/17/2006 | Submitted by: | Jason Mosakowski |

| **WEATHER:** | 7:00 a.m. | 1:00 p.m. | | **Amt.** |
|---|---|---|---|---|
| Temperature | 50's | 80's | Precipitation | This morning a anywhere from 1-3 inches of rain |
| Sunny | | | | |
| Cloudy | x | x | | |

| **PERSONNEL:** | Emp # | Total HRS |
|---|---|---|
| Gray Personnel | 7 | 62 |

Subcontractor Personnel on-site:

| | Contractor | # of Emp | Total HRS | | Contractor | # of Emp | Total HRS |
|---|---|---|---|---|---|---|---|
| 02 Site Work: | | | | 09 Finishes | 4-Star | 0 | 0 |
| 03 Concrete: | | | | 10 Specialties | | | |
| 04 Masonry | | | | 11 Equipment | | | |
| 05 Steel | Cooper | 3 | 15 | 15 Mechanical | RJ Mechanical | 2 | 16 |
| 06 Carpentry | | | | 16 Electrical | Dotson | | |
| 07 Roofing | Standard | | | 17 Fire Prot. | American FPS | | |
| | South States | 6 | 30 | | | | |
| 08 Glass/Doors | | | | Other: | Serv-Pro | 6 | 48 |

| | |
|---|---|
| Total # of personnel on site: | 17 |
| Total # of daily hours: | 109 |

Quantities completed today (approx.):

| Mass Excav: | None | Blocks | None |
|---|---|---|---|
| Concrete | None | Steel Erect | None |
|    Foundation | None | Paving | None |
|    Slab | None |    Asphalt | None |
|    Misc. | None |    Concrete | None |
| Decking: | None | Roof: | None |
| | | Siding: | None |

Were there any safety concerns on the job today?

This morning the roof in the office area of Hwashin failed causing the entire office to flood.  First response from our subcontractors were turning off all utilities to this area making it as safe as possible.

Was there any delay to the job today?        If so, detail what and why.

No

Were there any inspections and/or tests:  What tests?    What results?

Just initial assesments of the roof failure

Did you request/receive/send any information or clarification from/to the architect, engineer, or owner representatives?  If so, what?

No

Did architect, engineer, owner, someone else, give instructions to proceed on work not described, or not clear in the plans or specifications?  What was it?  Did you receive written clarification?

No

Did you execute a work order for out of scope work performed?

No

Describe activity on the job site today (Please be specific and list by division).

**Jason Mosakowski's notes**

-Roughly 9:40am the roof over the office area between column lines 5.5 to 8.5 and from A to CC failed. Between 9:45am and 10:00am the Birmingham office received a call concerning the roof at Hwashin. We were told that a section of the roof over the office area had collapsed and flooded the office area. As a first response Chris Allen headed down to the site. Jason Mosakowski and David Hird left the office and headed for the site around 12:00pm. Chris arrived on the site between 1:30pm and 2:00pm and at that time water was completely covering the office floors and overflowing into the manufacturing area. Due to the water in the manufacturing area Hwashin stopped production from 9:30am until around 4:00pm to help dry the floor in the manufacturing area. Jason and David arrived around 3:00pm and continued calling subcontractors for support. Anthony Roy arrived on site between 4:00pm and 6:00pm.

-Around 8:00pm Anthony Roy, David Hird, Chris Allen, and Jason Mosakowski met with Mr. Parks and Rhonda Simmons from Hwashin to discuss clean up and what is being done to get utilities turned back on in the offices.

-Gray construction ordered sandbags and lined door openings 104, 121, 122, and 123 with them in an attempt to prevent more water from running into the manufacturing area.

**Serve-Pro**

-arrived on site between 5:00pm and 6:00pm and started placing fans and dehumidifiers throughout the office area to start the drying out process.

-Monitoring fans and dehumidifiers throughout night

**Cooper Steel**

-on site helping relocated office equipment and recover personal items.

**South States**

Benny's crew placed tarp over damaged area in attempt to keep out any additional rain and started prep work for downspout extensions over office roof.

**Dotson Electric**

-Dotson electric relocated the fire alarm panel to the manufacturing side of A line. They were on site until 4:30am getting the fire alarm system back in service.


**Anthony Roy's Notes**

On 10/17/06 Chris Allen received a phone concerning the roof failure at the Hwashin plant. The call came in around 9:45 am CST. Chris called me and gather his team from the AL office and headed to the project site. We put together a team from Lexington office that consisted of Steve Higgins, Roger Powell, Ed Henery and myself. We arrived at the site around 3:30 pm local time. Ted Harris the structural engineer was on site.

Chris had contact several subs to come for support and help. They were Cooper Steel, South State Contractors, Dotson Electrical, RJ Mechanical, American Fire Protection, Service Pro, Standard Roofing.

When we arrived we found out there was only one injury and it was a women and the customer representative said it was not a life threating injury. This was Rhonda Simmons the HR, person with Hwashin.

The front office wall on west side was leaning in. The roof had fail in and the was 2 inches of water in the entire office floor and there was water 1 to 2 inches covering around 60 % of the production area floor. There was working from the city and county there helping with clean up of the water. The fire marshell had shut the entire plant and around 4pm local time he had released Hwashin to start back up production. The production start back around 4:30 pm local time.

Work continued on removing water and getting power restored through the night.

Representatives from Gray were, Anthony Roy, Chris Allen, roger Powel, Steve Higgins, Ed Henery, David Hird, Jason Mosakowski,

**Supervisor's Signature** _____    **Date:** _____









# SUBCONTRACT AGREEMENT

## BETWEEN

## GRAY CONSTRUCTION, INC.

## AND

American Fire Protection, Inc.



PROJECT NAME:                      **Hwashin Storm Damage**
SUBCONTRACT NUMBER:                207005-17-100S

SUBCONTRACT AGREEMENT

Gray Construction, Inc.

## TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| 1. AGREEMENT | 1 |
| 2. SCOPE OF WORK | 2 |
| 3. SCHEDULE OF WORK AND COMPLETION | 4 |
| 4. SUBCONTRACT PRICE | 5 |
| 5. PAYMENT | 5 |
| 6. CHANGES, CLAIMS AND DELAYS | 9 |
| 7. GRAY'S AUTHORIZED REPRESENTATIVES | 11 |
| 8. DESIGN-BUILD SUBCONTRACTOR'S OBLIGATIONS | 11 |
| 9. SUBCONTRACT BONDS | 16 |
| 10. WARRANTY AND CORRECTION OF WORK | 17 |
| 11. RECOURSE BY GRAY | 18 |
| 12. SUSPENSION OR TERMINATION BY OWNER | 19 |
| 13. LABOR RELATIONS | 20 |
| 14. INDEMNIFICATION | 21 |
| 15. INSURANCE | 22 |
| 16. DISPUTE RESOLUTION | 24 |
| 17. MISCELLANEOUS PROVISIONS | 25 |
| 18. SPECIAL PROVISIONS | 26 |
| 19. SIGNATURE PAGE | 28 |

## ·SUBCONTRACT AGREEMENT

Gray Construction, Inc. # **207005-17-100S**

## SECTION 1

### AGREEMENT

This is the Subcontract Agreement (hereinafter "Agreement") made 10/17/06 by and between GRAY CONSTRUCTION, INC., 10 Quality Street, Lexington, Kentucky 40507-1450 (hereinafter referred to as "Gray"), and the Subcontractor named below (hereinafter referred to as the "Subcontractor") to perform part of the work on the following project.

1.1    SUBCONTRACTOR                              **American Fire Protection, Inc.**

| Mailing Address: | Remit to Address: |
|---|---|
| **P.O. Box 10785** | **112 40th Place North** |
| **Birmingham, AL  35202** | **Birmingham, AL  35222** |

| | | | |
|---|---|---|---|
| Telephone # | **205-591-9111** | **205-591-9111** | |
| Fax # | **205-591-9990** | **205-591-9990** | |

Subcontractor  **X**  is  ____ is not  a Corporation:      FEIN#  **20-0549480**

1.2    AUTHORIZED REPRESENTATIVES
    a.   For Gray (see section 7)
       On site:   **Daniel Phillips**
       Off site:   **David Hird**
    b.   For Subcontractor (see section 8.8)
       On site:   **TBD**
       Off site:  **Matt Mullinax**

1.3    PROJECT
    **Hwashin Storm Damage**
    **Greenville, Alabama**

1.4    OWNER
    **Hwashin America Corporation**
    **Gyeongbuk, Korea**

1.5    COMPLETION OF SUBCONTRACTOR'S WORK (see section 3.2)
    a.   Date of Substantial Completion:      **TBD**
    b.   Date of Final Completion:              **TBD**

1.6    SUBCONTRACT PRICE (see          **$3,916.00**
    section 4)
             **Three thousand nine hundred sixteen and 00/100**    Dollars

1.7    RETAINAGE (see section          **10**  %
    5.2.2)

1.8    PROGRESS PAYMENT APPLICATION DATE
_____ 25th   day of each calendar month  (see section 5.2.3)

1.9    PERFORMANCE BOND & LABOR & MATERIAL PAYMENT BOND
_____ Are ___x___ Are Not   required  (see section 9.1)

1.10   PROFESSIONAL LIABILITY INSURANCE (Errors and Omissions)
____x____ Is   _____ Is Not   required  (see section 15.1.4)

1.11   REQUIREMENTS FOR EXCESS OR UMBRELLA LIABILITY INSURANCE
__$5,000,000__ Occurrence and Aggregate  (see section 15.1.5)

1.12   BUILDER'S RISK INSURANCE
If Gray Construction, Inc. is furnishing the builder's risk insurance under the terms of the
contract between Gray and the Owner, the subcontractor will be added as an additional
named insured to the policy.  This policy will cover the insurable interest the subcontractor
has in the project up to the limit of coverage.  This insurance does not cover personal
tools and equipment.  The subcontractor shall be responsible for payment of any
deductible, or its equivalent, resulting from a claim that is due to the fault or negligence of
the subcontractor, whether in whole or in part, and whether or not the Builder's Risk is
being provided by Gray or the Owner.

1.13   UTILIZATION OF SMALL BUSINESS CONCERNS
Subcontractor is certified/recognized as one of the following: _x_ Small Business ____
Small Disadvantaged Business ___ Woman-Owned Small Business ___ HUBZone
Small Business ___ Veteran-Owned Small Business ___ Service Disabled Veteran-
Owned Small Business ___ None of the Above

1.14   DESIGN SERVICES are being furnished by American Fire Protection, Inc. via a
subconsultant agreement with Design/Build Subcontractor or in-house, by a design
professional licensed in the state of Alabama as the design professional in responsible
charge of the Design/Build Subcontractor's Work.  Design/Build Subcontractor shall not
terminate or change the design professional in responsible charge of the Work without
prior written notice to Gray, and written confirmation of Professional Liability coverage of
the replacement design professional

## SECTION 2

### SCOPE OF WORK

2.1    DESIGN/BUILD SUBCONTRACTOR'S WORK.  Gray contracts with the Design/Build
Subcontractor as an independent contractor to perform the work described in the Scope of Work attached as
Exhibit A in strict accordance with the Subcontract Documents.  The Design/Build Subcontractor shall perform
such work (the "Work") under the general direction of Gray and in accordance with this Agreement and the
Subcontract Documents.  The Design/Build Subcontractor shall perform each activity necessary or incidental to
complete the work, which is described more particularly, but not exclusively, in Exhibit A.  The provisions of this
Agreement and Exhibit A are intended to complement each other, but if there is any inconsistency, Exhibit A shall
govern.

2.2    SUBCONTRACT DOCUMENTS.  In addition to this Agreement, the documents which form this
Subcontract and which are binding on the Design/Build Subcontractor (collectively the "Subcontract Documents")
include the Contract Documents identified in the Contract between Gray and the Owner, which are incorporated

by reference, and the Subcontract Documents set forth in Section 18.5. In case of an inconsistency between this Agreement and the Contract Documents, this Agreement shall govern.

2.2.1    DRAWINGS, PLANS AND SPECIFICATIONS. Gray has furnished Design/Build Subcontractor with one set of Criteria Documents, and if available, Drawings, Plans and Specifications included in the Subcontract Documents. Additional copies will be furnished, on request, at the Design/Build Subcontractor's expense. Design/Build Subcontractor shall furnish the design for its portion of the work so as to coordinate with the Work as a whole, and with other trade Design/Build Subcontractors. To the extent that the Design/Build Subcontractor fails to properly interpret the Criteria Documents or the Preliminary Design Documents, Design/Build Subcontractor shall be responsible to correct all errors at its own expense.

2.2.2    COPIES OF P.O.'S AND SUB-SUBS FOR MAJOR SCOPE ITEMS. Upon receipt of written approval of material and/or equipment shop drawings or brochures by the Owner or Architect, Subcontractor shall immediately furnish the following additional information to Gray for each item of equipment, fixture or material:

.1    Contact or representative of both manufacturer and supplier

.2    Subcontractor's Purchase Order Numbers

.3    Manufacturer's Order Number

.4    Supplier's Order Number

.5    Scheduled delivery date.

2.2.3    Subcontractor's superintendent, foreman, or other designated individual shall deliver a report, in form and content specified by Gray to Gray's office before the end of each shift, whenever Subcontractor has employees working at the Project site. The report will state the number of employees Subcontractor has on the Project that shift, subdividing into categories (foremen, tradesmen, laborers, etc.). Subcontractor shall also list the equipment on site, and any material deliveries.

2.3    EXAMINATION OF CONTRACT AND SUBCONTRACT DOCUMENTS; SITE INSPECTION. The Design/Build Subcontractor warrants and represents that it has visited the site of the proposed Work, has familiarized itself with existing conditions and the character of the operations to be carried on under this Agreement and that it fully understands the facilities, difficulties and restrictions attending the execution of the Work. The Design/Build Subcontractor acknowledges that it has examined all Subcontract Documents, and the requirements of the various governmental agencies, departments and bureaus having jurisdiction over the Project, and from its own investigation has satisfied itself as to the nature and location of the Work, the general local conditions, and all matters which in any way affect the Design/Build Subcontractor's Work or its performance thereof. The Design/Build Subcontractor further acknowledges that having made said visitation and examination, it is not aware of any existing conditions, circumstances, or requirements that will necessitate change in the scope of the Work, the Subcontract Price, or the Schedule of Work.

2.4    DESIGN SCOPE OF WORK. Design/Build Subcontractor agrees to timely provide design documents for its Scope at intervals determined by Gray; and Design/Build Subcontractor further agrees to timely provide stamped drawings with the original signature of the licensed design professional in responsible charge of the Work. Design/Build Subcontractor shall also provide, as a condition precedent to Final Payment hereunder, a set of Record Drawings, fully and completely depicting the finally-installed state of the Work including all changes.

2.5    OWNERSHIP AND USE OF DOCUMENTS. The drawings, specifications and other documents furnished by the Design/Build Subcontractor are instruments of services and shall become the property of Gray and the Owner upon payment by the Owner and Gray. The Design/Build Subcontractor shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the

copyright, to the extent not modified herein. Reproducible copies, including diskettes, may be retained by the Owner and Gray, whether the Project for which they were made is executed or not, and both are entitled to make and retain copies and reproduce them for their own use. Submission or distribution of documents to meet official regulatory requirements or for other purposes in connection with the Project is not to be construed as publication in derogation of the Design/Build Subcontractor's common law copyrights or other reserved rights.

## SECTION 3

### SCHEDULE OF WORK AND COMPLETION

3.1     TIME IS OF THE ESSENCE. Time is of the essence for both parties, and they mutually agree to see to the performance of their respective work and the work of their Design/Build Subcontractors so that the entire project may be completed in accordance with the Subcontract Documents and the Schedule of Work. Gray shall revise such Schedule and sequence of events as the Work progresses. No extension of time for Design/Build Subcontractor's Work will be valid without Gray's written consent.

3.2     DUTY TO BE BOUND. The Design/Build Subcontractor shall be bound by the Schedule of Work including, without limitation, the dates for Substantial Completion and Final Completion stated in Section 1.5 and revisions to the Schedule. The Design/Build Subcontractor shall provide Gray with any requested scheduling information for the Design/Build Subcontractor's Work. The Schedule of Work and all subsequent changes thereto shall be submitted to the Design/Build Subcontractor in advance of the required performance.

3.3     SCHEDULE CHANGES. The Design/Build Subcontractor acknowledges that as construction progresses it may be necessary for Gray to change the sequential order and duration of the various activities, including those contemplated by this Agreement, to account for unanticipated delays, occurrences and other factors which act to alter Gray's original schedule. Gray may require Subcontractor, at no additional cost to Gray and Owner, to prosecute Subcontractor's Work in such sequence as the progress of other subcontractors and the Project schedule dictates. It is expressly understood and agreed that the scheduling and sequencing of the Work is an exclusive right of Gray and that Gray reserves the right to reschedule and resequence Subcontractor's Work from time to time as the demands of the Project require without any additional cost or expense to be paid to the Subcontractor.

Subcontractor shall carry on its Work promptly, efficiently, and at a speed that will not cause delay in the progress of Gray's Work or Work of other Subcontractors. If, in the opinion of Gray, Subcontractor falls behind in the progress of the Work, Subcontractor may be directed to take such steps as deemed necessary to improve the rate of progress. These steps may include, without limitation, requiring Subcontractor to increase the number of shifts, personnel overtime operations, days of Work, equipment, plant, or other remedies. Subcontractor shall submit to Gray for Gray's approval a schedule demonstrating how the required rate of progress will be regained without additional costs to the Owner or Gray.

3.4 ——PRIORITY OF WORK. Gray shall have the right to decide on the time, order and priority in which the various portions of Work shall be performed and all other matters relative to the timely and orderly conduct of the Design/Build Subcontractor's Work. The Work will be performed as required by the composite construction schedule, which may be changed periodically by the project superintendent in order to maintain the overall schedule of Work.

3.5     COOPERATION. The Design/Build Subcontractor shall cooperate with Gray by scheduling and performing Design/Build Subcontractor's work so as to avoid conflict, delay in, or interference with the work of Gray, other Design/Build Subcontractors or Owner's own forces. Design/Build Subcontractor shall participate, as requested by Gray, in inspections related to Substantial and Final Completion.

3.6     COMMENCEMENT OF WORK. The Design/Build Subcontractor shall commence Work within three (3) calendar days from Gray's notice to proceed. If interrupted for any reason, the Design/Build Subcontractor shall resume the work within three (3) working days from Gray's notice to do so.

# SECTION 4

## SUBCONTRACT PRICE

Gray agrees to pay the Design/Build Subcontractor for the satisfactory performance of the Design/Build Subcontractor's Work the sum of identified in Section 1.6 (the "Subcontract Price") in accordance with Section 5, subject to additions or deductions as provided in Section 6.

Unit prices, if any, are stated in Design/Build Subcontractor's Scope of Work, Exhibit A.

# SECTION 5

## PAYMENT

5.1    GENERAL PROVISIONS.

5.1.1    SCHEDULE OF VALUES.  The Design/Build Subcontractor has provided Gray with a schedule of values which shall be revised, if necessary for approval by Gray and the Owner, no later than the date of the Design/Build Subcontractor's first application for payment.

5.1.2    PAYMENT USE RESTRICTION.  No payment received by the Design/Build Subcontractor shall be used to satisfy or secure any indebtedness other than one owed by the Design/Build Subcontractor for labor or materials furnished in performing the Design/Build Subcontractor's Work on this Project.

5.1.3    PAYMENT USE VERIFICATION.  Gray shall have the right at all times to contact the Design/Build Subcontractor's lower tier Design/Build Subcontractors and suppliers to ensure that the same are being paid by the Design/Build Subcontractor for labor or materials furnished for use in performing the Design/Build Subcontractor's Work on this Project.

5.1.4    CONDITIONS PRECEDENT TO PARTIAL PAYMENT.  Progress payments due under this Agreement will not be released until all of the following conditions have been met:

.1    Subcontract Agreement has been signed, returned and approved.

.2    Insurance Certificates satisfying the requirements of this Agreement have been received.

.3    A schedule of values has been received in the form and content specified by Gray.

.4    Certified payrolls, if required by the Owner, received in the appropriate format.

.5    Waivers of lien from all tier subcontractors and materialmen evidencing payments through the previous month.

.6    If requested by Gray, Subcontractor agrees to likewise provide Gray with evidence satisfactory to Gray showing payment by Subcontractor of any and all contributions made by Subcontractor for health and welfare payments as shown on the certified payroll, as well as payment of payroll taxes and other contributions that may be required by law.

5.1.5    PARTIAL LIEN WAIVERS AND AFFIDAVITS.  As set forth above, as a prerequisite for payment, the Design/Build Subcontractor shall provide, in a form satisfactory to the Owner and Gray, partial lien or claim waivers and affidavits from the Design/Build Subcontractor, and its sub-Design/Build Subcontractors and suppliers for the completed Design/Build Subcontractor's Work.  Such waivers may be made conditional upon payment of a specific amount stated therein.  The Design/Build Subcontractor's

Authorized Representative(s) designated in Section 1.2(b) of this Agreement are hereby designated as authorized agents of Design/Build Subcontractor to execute all lien waivers required of Design/Build Subcontractor.

5.1.6    DESIGN/BUILD SUBCONTRACTOR PAYMENT FAILURE.  In the event Gray has reason to believe that labor, material or other obligations incurred in the performance of the Design/Build Subcontractor's Work are not being paid for, Gray shall give written notice of such claim or lien to the Design/Build Subcontractor to insure that any progress payment shall be utilized to pay such obligations.

If upon receipt of said notice, the Design/Build Subcontractor does not:

(a)    Supply evidence to the satisfaction of Gray that the monies owing to the claimant have been paid; or

(b)    Post a bond in a form and with surety satisfactory to Gray indemnifying the Owner, Gray, Gray's surety, if any, and the premises from such claim or lien;

then Gray shall have the right to exercise any or all of the following rights, until the claim or lien has been satisfied by the Design/Build Subcontractor:

(1)    Retain out of any payments due or to become due to the Design/Build Subcontractor for this Project or any other Gray project a reasonable amount to protect Gray from any and all loss, damage or expense including attorney's fees arising out of or relating to any such claim or lien;

(2)    Issue joint checks in payment of any payments due or to become due to the Design/Build Subcontractor, payable to the Design/Build Subcontractor and the claimant;

(3)    Make direct payments of sums due the Design/Build Subcontractor to the claimant.

(4)    May (but has no obligation to) bond off the lien, and backcharge all costs, attorneys' fees and other expenses involved in bonding off the lien to the Design/Build Subcontractor.

5.1.7    PAYMENT NOT ACCEPTANCE.  Payment to the Design/Build Subcontractor is specifically agreed not to constitute or imply acceptance by Gray or the Owner of any portion of the Design/Build Subcontractor's Work.

5.2    PROGRESS PAYMENTS.

5.2.1    APPLICATION.  For Work performed during a payment period, the Design/Build Subcontractor shall apply for a progress payment using Gray's standard Application For Payment and Lien Waiver form, a copy of which is attached as Exhibit E.  Applications shall be submitted to Gray at P.O. Box 8330, Lexington, Kentucky 40533-8330.  The application shall be for work performed up to and including the last day of the pay period, indicating work completed and, to the extent allowed under Section 5.2.4, materials suitably stored and protected during the payment period.  Applications shall be accompanied by lien waivers from all sub-Design/Build Subcontractors and suppliers whose labor or materials are covered by the application; such waivers shall be in the form of attached Exhibit F.

5.2.2    RETAINAGE.  Regardless of any agreements between the Owner and Gray, or arrangements made by them, for the withholding or release of Gray's retainage, retainage shall be withheld by Gray from all progress payments made to Design/Build Subcontractor.  The amount of retainage withheld from each payment shall be equal to the amount of payment earned, multiplied by the percentage identified in Section 1.7 of this Agreement.  Retainage shall be released to Design/Build Subcontractor only upon completion of all requirements for final payment as provided in Section 5.3 of this Agreement.

| Issue Date: | 08/01/03 |
| --- | --- |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

5.2.3    TIME OF APPLICATION.  "Pay period" as used herein is defined as beginning with the first day of each calendar month, and ending with the last day of each calendar month.  The Design/Build Subcontractor shall submit progress payment applications to Gray no later than the day of each payment period specified in Section 1.8 of this Agreement.

5.2.4    STORED MATERIALS.  Unless otherwise provided in the Subcontract Documents, and if approved in advance by the Owner, applications for payment may include materials and equipment not incorporated in the Design/Build Subcontractor's Work but delivered and suitably stored and protected at the site or at some other location agreed upon in writing.  Approval of payment application for such stored items on or off the site shall be conditioned upon submission by the Design/Build Subcontractor of bills of sale and applicable insurance or such other procedures satisfactory to the Owner and Gray to establish the Owner's title to such materials and equipment or otherwise protect the Owner's and Gray's interest therein, including transportation to the site.

5.2.5    TIME OF PAYMENT.  Receipt of payment by Gray from Owner for Design/Build Subcontractor's work is a condition precedent to all progress payments by Gray to Design/Build Subcontractor.  Progress payments to the Design/Build Subcontractor for satisfactory performance of the Design/Build Subcontractor's Work shall be made seven (7) days after receipt by Gray of payment from the Owner for such Design/Build Subcontractor's Work.

5.2.6    GROUNDS FOR WITHHOLDING PAYMENT.  Gray may withhold from monthly progress payments an amount sufficient to protect Gray because:

.1    Defective work has not been remedied; materials have not been furnished; clean up has not been performed;

.2    Subcontractor has damaged any portion of the work of others;

.3    Claims, levies, attachments, stop notices or court orders have been filed or reasonable evidence indicates the probable filing of such claims, levies, attachments, notices or orders, including claims covered by insurance until such claims are accepted by the insurance carrier;

.4    Subcontractor has failed to make payments properly to its subcontractors or for labor, including fringe benefits, materials or equipment, transportation or shipping costs, taxes, fees or any other claims arising out of the Subcontractor's Work;

.5    There exists reasonable doubt that Subcontractor's Work can be completed for the unpaid balance of the Subcontract Price;

.6    There exists reasonable doubt that Subcontractor's Work, due to its own action or inaction, will be completed on schedule or in accordance with the schedule;

.7    Subcontractor is not satisfactorily prosecuting the Work of this Agreement;

.8    Subcontractor has failed to deliver insurance certificates, bonds, "as-built" or record drawings, written guarantees or warranties or the approvals required of the Subcontractor's Work by any authority having jurisdiction;

.9    A petition for bankruptcy or reorganization has been filed by or against Subcontractor or Subcontractor has made an assignment without the prior written consent of Contractor;

.10    Any other material breach of this Agreement by Subcontractor which has not been cured after notice from Gray.

| | |
|---|---|
| | Issue Date:    08/01/03 |
| | Revision No.:    3 |
| Design-Build Subcontract Agreement | Revision Issue Date:    05/23/06 |

Amounts then due shall be paid or credited to Subcontractor when Subcontractor removes the above grounds for withholding payment.

5.3     <u>FINAL PAYMENT.</u>

5.3.1     <u>APPLICATION</u>.  Upon acceptance of the Design/Build Subcontractor's Work by the Owner, and Gray, and upon the Design/Build Subcontractor furnishing evidence of fulfillment of Design/Build Subcontractor's obligations in accordance with the Subcontract Documents and Section 5.3.2, Gray shall, without delay, forward the Design/Build Subcontractor's application for final payment to the Owner.

5.3.2     <u>REQUIREMENTS</u>.  Before Gray shall be required to forward the Design/Build Subcontractor's application for final payment to the Owner, the Design/Build Subcontractor shall submit to Gray:

(a)     an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Design/Build Subcontractor's Work for which the Owner or his property or Gray or Gray's surety might in any way be liable, have been paid or otherwise satisfied;

(b)     consent of surety, if any, to final payment;

(c)     satisfaction of required closeout procedures;

(d)     other data if required by Gray or Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be designated by Gray or Owner; and

(e)     written warranties of Design/Build Subcontractor's materials, labor and equipment furnished under this Agreement and the Subcontract Documents.

(f)     a complete and accurate set of Record Drawings, together with Final Design drawings, appropriately stamped and originally signed by the design professional in responsible charge of the Work, and licensed in the state in which the Project was constructed.

Final payment shall constitute a waiver and release of all claims by the Design/Build Subcontractor relating to the Design/Build Subcontractor's Work, but shall in no way relieve the Design/Build Subcontractor of liability for the obligations assumed under Section 10 hereof, or for faulty or defective work appearing after final payment.

5.3.3     <u>TIME OF PAYMENT</u>.  Final payment of the balance due of the contract price shall be made to the Design/Build Subcontractor:

(a)     upon receipt of the Owner's waiver of all claims related to the Design/Build Subcontractor's Work except for unsettled liens, unknown defective work, and noncompliance with the Subcontract Documents or warranties; and

(b)     seven (7) days after receipt by Gray of final payment from the Owner for such Design/Build Subcontractor's Work, such receipt being a condition precedent for final payment to the Design/Build Subcontractor.

5.4     <u>NON-PAYMENT BY OWNER.</u>

5.4.1     <u>ASSUMPTION OF RISK; CONDITION PRECEDENT</u>.  The Design/Build Subcontractor agrees that Gray shall have no obligation to pay the Design/Build Subcontractor for any work done on this Project until Gray has been paid by the Owner.  The provisions of Sections 5.2 and 5.3 stating the time

and amount of progress and final payments are subject to the condition that Gray shall receive from the Owner progress or final payments in at least the amounts payable to the Design/Build Subcontractor on account of work done by the Design/Build Subcontractor on this Project. The time when such payments shall be due the Design/Build Subcontractor shall be postponed until Gray has received same from the Owner. The Design/Build Subcontractor expressly agrees to accept the risk that it will not be paid for work performed by him in the event that Gray, for whatever reason, is not paid by the Owner for such work. The Design/Build Subcontractor acknowledges that it relies for payment on the credit and ability to pay of the Owner, and not of Gray. The Design/Build Subcontractor agrees that payment by the Owner to Gray for work performed by the Design/Build Subcontractor shall be a condition precedent to any payment obligation of Gray to the Design/Build Subcontractor. The Design/Build Subcontractor agrees that the liability of the surety on Gray's payment bond, if any, is subject to the same conditions precedent as are applicable to Gray's liability to the Design/Build Subcontractor.

      5.4.2    REMEDY. If the Owner or its designated agent does not authorize payment or Gray does not receive a payment due hereunder for any cause which is not the fault of the Design/Build Subcontractor, Gray shall promptly inform the Design/Build Subcontractor in writing. Gray may also diligently pursue, with the assistance of the Design/Build Subcontractor, the release by the Owner of the payment due for the Design/Build Subcontractor's Work. At the Design/Build Subcontractor's request, Gray may institute all reasonable legal remedies to mitigate the damages and pursue full payment of the Design/Build Subcontractor's application for payment including interest thereon. In that event, the cost for pursuing the Design/Build Subcontractor's remedies shall be Design/Build Subcontractor's responsibility. Gray, at its discretion, may require that the Design/Build Subcontractor make financial arrangements satisfactory to Gray before undertaking this effort and at all times during the progress thereof.

## SECTION 6

### CHANGES, CLAIMS AND DELAYS

      6.1    CHANGES. Without nullifying this Agreement, Gray may by written Subcontract Work Authorization or Subcontract Change Order make changes in the Work within the general scope of this Agreement and the Design/Build Subcontractor shall perform such changes. Adjustments in the Subcontract Price or Schedule of Work, if any, resulting from such changes shall be set forth in a Subcontract Change Order. . A Subcontract Change Order is a written instrument prepared by Gray and signed by the Design/Build Subcontractor stating their agreement upon the change in the scope of the Work, adjustment in the Subcontract Price or Schedule of Work. A Subcontract Work Authorization is a written instrument prepared by Gray directing a change in the Work and stating a proposed adjustment, if any, in the Subcontract Price or Schedule of Work or both. A Subcontract Work Authorization shall be used in the absence of agreement on the terms of a Subcontract Change Order.

      No adjustment shall be made for additional Work performed by Design/Build Subcontractor that resulted from the Design/Build Subcontractor's failure to properly interpret the Criteria Documents furnished or as a result of Design/Build Subcontractor's failure to properly coordinate it design with the other trade Design/Build Subcontractors.

      No adjustment shall be made for any changes performed by Design/Build Subcontractor that have not been so ordered by Gray, and approved by the Owner. If Design/Build Subcontractor proceeds with additional work without the required Change Order or Work Authorization, Design/Build Subcontractor does so at its own risk, and must track all actual costs incurred, including but not limited to signed time sheets, additional supervision, actual material invoices and actual equipment costs, if any. If the additional work performed without the requisite Change Order or Work Authorization from Gray results in the necessity of an extension of time, the time extension may be granted by Gray only on proof that the work affected was on the critical path. In no event shall compensation or time be forthcoming from Gray unless these requirements are met, as well as the requisite notice set forth in Sections 6.2 and 6.3 below.

---

6.2    CLAIMS RELATING TO OWNER. ·The Design/Build Subcontractor agrees to make all claims for which the Owner is or may be liable in the manner provided in the Contract Documents for like claims by Gray upon the Owner.

Written notice of such claims shall be given by the Design/Build Subcontractor to Gray within sufficient time for Gray to make such claims against the Owner in accordance with the Contract Documents or within five (5) calendar days prior to the beginning of the Design/Build Subcontractor's Work or the event for which such claim is to be made, whichever shall first occur, otherwise such claims shall be deemed waived.

6.3    CLAIMS RELATING TO GRAY.  The Design/Build Subcontractor shall give Gray written notice of all claims not included in Section 6.2 within five (5) calendar days of the beginning of the event for which claim is made; otherwise, such claims shall be deemed waived.

All unresolved claims, disputes and other matters in question between Gray and the Design/Build Subcontractor not relating to claims included in Section 6.2 shall be resolved in the manner provided in Section 16 herein.

6.4    ADJUSTMENT IN SUBCONTRACT PRICE.  If a Subcontract Change Order or Subcontract Work Authorization requires an adjustment in the Subcontract Price, the adjustment shall be established by one of the following methods:

(a)    mutual agreement on a lump sum with sufficient substantiating data to permit evaluation;

(b)    unit prices already established in the Subcontract Documents or if not established by the Subcontract Documents, then established by mutual agreement for this adjustment; or

(c)    to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee.

6.5    SUBSTANTIATION OF ADJUSTMENT.  If the Design/Build Subcontractor does not respond promptly or disputes the method of adjustment under Section 6.4, the method and the adjustment shall be determined by Gray on the basis of reasonable costs and savings of those performing the Work attributable to the change, including, in the case of an increase in the Subcontract Price, an allowance for overhead and profit proportionate to Gray's recovery of overhead and profit, if any, under the Contract Documents.

The Design/Build Subcontractor shall maintain for Gray's review and approval an appropriately itemized and substantiated accounting of the following items attributable to the Subcontract Change Order or Subcontract Work Authorization, and shall maintain time sheets signed daily by an authorized representative of Gray relating to the additional work performed:

(a)    labor costs, including Social Security, health, welfare, retirement and other fringe benefits as normally required, and state workers' compensation insurance;

(b)    costs of materials supplies and equipment, whether incorporated in the Work or consumed, including transportation costs;

(c)    costs of renting, either from Gray or from others, of machinery and equipment other than hand tools;

(d)    costs of bond and insurance premiums, permit fees and taxes attributable to the change; and

(e)    costs of additional supervision and field office personnel services necessitated by the change.

| | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

6.6    DELAY.  If the progress of the Design/Build Subcontractor's Work is substantially delayed, disrupted, impacted or interfered with, without the fault or responsibility of the Design/Build Subcontractor, then the time for the Design/Build Subcontractor's Work shall be extended by Change Order to the extent obtained by Gray under the Subcontract Documents and the Schedule of Work shall be revised accordingly.

Gray shall not be liable to the Design/Build Subcontractor for any damages or additional compensation as a consequence of delays caused by any person not a party to this Agreement unless Gray has first recovered the same on behalf of the Design/Build Subcontractor from said person, and then to the extent of such recovery after payment of all attorney's fees and other expenses relating thereto, it being understood and agreed by the Design/Build Subcontractor that apart from recovery from said person, the Design/Build Subcontractor's sole and exclusive remedy for delay regardless of cause shall be an extension in time for performance of the Design/Build Subcontractor's Work.

In jurisdictions where the second paragraph herein is not enforceable, the Design/Build Subcontractor agrees that it may only seek delay damages to the extent documented by actual costs and entitlement demonstrated, and the Design/Build Subcontractor shall not be entitled to seek from Gray damages for actual or alleged loss of efficiency, constructive acceleration, lost productivity, stacking of trades, home office overhead, expectant underrun, season change, extended overhead, impact damages, profit upon damages for delay or similar damages calculated by formula or trade data or studies.

6.7    LIQUIDATED DAMAGES.  If the Contract Documents between the Owner and Gray permit the Owner to assess Gray for liquidated or other damages for delay beyond the completion date set forth in the Contract Documents, and such damages are so assessed, then Gray shall be entitled to assess same against the Design/Build Subcontractor in proportion to the Design/Build Subcontractor's share of the responsibility for such delay.

## SECTION 7

### GRAY'S AUTHORIZED REPRESENTATIVES

Gray has designated one or more persons in Section 1.2(a) of this Agreement who shall be Gray's authorized on-site and off-site representative(s).  Such authorized representative(s) shall be the only person(s) the Design/Build Subcontractor shall look to for instructions, orders and/or directions, except in an emergency.

## SECTION 8

### DESIGN/BUILD SUBCONTRACTOR'S OBLIGATIONS

8.1    OBLIGATIONS DERIVATIVE.  The Design/Build Subcontractor shall be bound to Gray by the terms of this Agreement and by the conditions of the Contract Documents between the Owner and Gray, and shall assume toward Gray all the obligations and responsibilities which Gray, by those documents, assumes toward the Owner.

8.2    RESPONSIBILITIES.  The Design/Build Subcontractor shall provide timely design services in compliance with all applicable codes, laws and regulations of the locality,  shall work with the local and state regulatory agencies with respect to building permits and other permits relating to the Design/Build Subcontractor's Work, and shall furnish and pay for all of the labor, supervision, materials, tools, equipment, services, and incidentals necessary for the proper performance of the Design/Build Subcontractor's Work.

The Design/Build Subcontractor shall provide a list of proposed sub-Subcontractors, subconsultants, and suppliers, be responsible for taking field dimensions, providing tests, ordering of materials and all other actions as required to meet the Schedule of Work.  If any sub-subcontractors are providing design work, then Design/Build Subcontractor shall furnish the name(s), licenses in the state in which the Work is being performed and the Professional Liability certificates from the sub-Design/Build Subcontractor.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

8.3    WORKMANSHIP. Every part of the Design/Build Subcontractor's Work shall be executed in strict accordance with the Subcontract Documents in the most sound, workmanlike, and substantial manner. All workmanship shall be the best of its kind performed by others engaged in the same trade. All materials used in the Design/Build Subcontractor's Work shall be furnished in ample quantities to facilitate the proper and expeditious execution of the Work, and shall be new except such materials as may be expressly provided in the Subcontract Documents to be otherwise

8.4    Design/Build Subcontractor shall provide design services in accordance with the best skill and professional judgment, and in no event shall the skill and professional judgment provided with the design services be less than that expected from a highly skilled design professional performing similar work in the locality.

8.5    TEMPORARY SERVICES. The Design/Build Subcontractor shall furnish all temporary services and facilities necessary to perform its work, including, but not limited to, heat, electrical (power), telephone, water, and other utilities necessary.

8.6    COORDINATION. The Design/Build Subcontractor shall:

(a)    cooperate with Gray and all others whose work is dependent upon the progress of the Design/Build Subcontractor's Work'

(b)    specifically note and immediately advise Gray of any interference with the Design/Build Subcontractor's Work;

(c)    design the Work in coordination with the other trade Design/Build subcontractors, as well as the overall intent of the Criteria Documents, and

(d)    participate in the preparation of coordination drawings and work schedules in areas of congestion.

8.7    SHOP DRAWINGS AND SUBMITTALS. The Design/Build Subcontractor shall submit shop drawings, product data, samples, and any other submittals required by the Subcontract Documents expeditiously and in such manner and sequence so as to avoid delay in the progress of the Work or the activities of Gray or other Design/Build Subcontractors. The Design/Build Subcontractor shall be responsible for accuracy and conformity with the Subcontract Documents and other submittals. Unless specifically noted by Gray, action on shop drawings and submittals by Gray shall not be deemed to authorize deviation from the Subcontract Documents.

8.8    PROGRESS REPORTS AND MEETINGS. The Design/Build Subcontractor shall furnish periodic progress reports on the Work including information on the status of materials and equipment which may be in the course of preparation or manufacture.

8.9    DESIGN REVIEW AND COMMENTS MEETINGS. To the extent required by the Owner or Gray, Design/Build Subcontractor shall attend and participate, with its design professional in responsible charge of the design, in design review meetings during the course of the Project. Design/Build Subcontractor shall incorporate the comments and corrections resulting from such meetings in a timely and expeditious manner, so as not to delay the Work. Design/Builder shall coordinate its design with that of the other subcontractors.

8.10    AUTHORIZED REPRESENTATIVE AND NOTICE. The Design/Build Subcontractor shall designate one or more persons who shall be the authorized Design/Build Subcontractor's representative(s): (a) on-site and (b) off-site. Such authorized representative(s) shall be the only person(s) to whom Gray shall issue instructions, orders or directions, except in an emergency. Notices as required by this Agreement and other communications made to any one of the Design/Build Subcontractor's Authorized Representative(s) shall be binding as if given to the Design/Build Subcontractor. The authorized representative shall attend project meetings as required.

8.11    PROVISION FOR INSPECTION. The Design/Build Subcontractor shall notify Gray when portions of the Design/Build Subcontractor's Work are ready for inspection. The Design/Build Subcontractor shall at all times furnish Gray, the Owner, and their representatives adequate means and facilities for inspecting the Work, including materials at the site or any place where materials under this Agreement may be in the course of preparation, process, manufacture or treatment.

8.12    HOLD HARMLESS. Design/Build Subcontractor shall hold Gray harmless and defend Gray from any and all consequences, losses, damages, claims or other expense of whatever nature, resulting from Design/Build Subcontractor's design on this Project.

8.13    CLEAN-UP. The Design/Build Subcontractor shall follow Gray's clean-up directives and those of the Subcontract Documents, and

(a)    at all times keep the building and premises free from debris and unsafe conditions resulting from the Design/Build Subcontractor's Work; and

(b)    broom clean each work area daily prior to discontinuing work in the same.

Should Design/Build Subcontractor fail, after 24 hours notice from Gray, to appropriately clean an area as required by this Section, Gray shall assess the Design/Build Subcontractor for the actual daily clean-up cost or a daily charge of $150.00, whichever is greater, for each day such condition is not remedied.

8.14    SAFETY PRECAUTIONS AND PROCEDURES.

8.14.1    The Design/Build Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by Gray and, in addition, comply with occupational safety and other applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons or property and in accordance with the requirements of the Subcontract Documents. The Design/Build Subcontractor shall report to Gray within 24 hours any personal injury or property damage occurring at the site.

8.14.2    Design/Build Subcontractor shall comply with Gray's Safety Requirements – Exhibit G attached.

8.14.3    ALCOHOL AND DRUG FREE PROJECT. The Design/Build Subcontractor recognizes that an alcohol and drug free Project is necessary to ensure the safety of the persons employed at the Project site by the Owner, Gray, the Design/Build Subcontractor and others, and to protect the health and safety of the community. The Design/Build Subcontractor agrees that its employees shall not distribute, be under the influence of, or be in possession of, any form of alcohol or unlawful drug while at the Project site or while in the performance of Project-related activities. Design/Build Subcontractor's employees shall also be prohibited from using or being subject to the effects of any lawful drug while at the Project site or in the performance of Project-related activities without approval of the employee's supervisor. The Design/Build Subcontractor acknowledges that it is familiar with Gray's Alcohol and Drug Free Project Policy for Design/Build Subcontractors. The Design/Build Subcontractor represents that it has established written procedures for compliance with Gray's policy and agrees that it will implement and enforce the policy throughout the course of the Project. The Design/Build Subcontractor shall indemnify and hold the Owner and Gray harmless from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or related to Design/Build Subcontractor's implementation, application or enforcement of compliance procedures.

8.15    ENVIRONMENTAL MATTERS.

8.15.1    If a Hazardous Chemicals of a type of which an employer is required by law to notify its employees will be used on the Project site by the Design/Build Subcontractor, the Design/Build Subcontractor's sub-Design/Build Subcontractors or anyone directly or indirectly employed by them, the

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 3 |
| Revision Issue Date: | | 05/23/06 |

Design/Build Subcontractor shall, prior to the Hazardous Chemical being at the site, provide a current copy of the Material Safety Data Sheet (MSDS) for such Hazardous Chemical in sufficient time to permit compliance with such laws by Gray, other Design/Build Subcontractors and other employers on the site.

8.15.2   The Design/Build Subcontractor shall be responsible for the prompt removal of any Hazardous Chemicals and Hazardous Substances which are brought to Project site in connection with the Work but are not used or consumed and all waste generated from the Work.  The removal of any Hazardous Chemical, Hazardous Substance, or waste shall be done in accordance with all federal, state, and local laws, regulations and ordinances.

8.15.3   The Work shall be conducted in such a manner to avoid the discharge, dispersal, escape, release or saturation of any pollutant into the atmosphere or any body of water or on, onto, upon, in or into the surface or subsurface of land unless allowed by federal, state or local law, regulations, ordinance or permit.

8.15.4   In the event the Design/Build Subcontractor encounters on the site material reasonably believed to be asbestos, polychlorinated biphenyl ("PCB"), or other Hazardous Substances which have not been rendered harmless, the Design/Build Subcontractor shall immediately stop Work in the area affected and report the condition to Gray in writing.  The Work in the affected area shall resume in the absence of asbestos, PCB, or other Hazardous Substances, or when it has been rendered harmless, or by begin reduced to a safe level or concentration, by written agreement of Gray and Design/Build Subcontractor, or by arbitration as provided in this Agreement.  The Design/Build Subcontractor shall not be required pursuant to Article 5 to perform without consent any Work relating to asbestos, PCB, or other Hazardous Substances.

8.15.5   To the fullest extent permitted by law, the Design/Build Subcontractor shall indemnify and hold harmless Gray, other Design/Build Subcontractors, and their respective agents and employees, from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Work in the affected area if in fact the material is asbestos, PCB, or other Hazardous Chemical or Hazardous Substance and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to damage to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by failure to comply with Sections 8.15.1 or 8.15.2 or by negligent acts or omissions of the Design/Build Subcontractor, anyone directly or indirectly employed by it, or anyone for whose acts it may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.  Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 8.15.3.

8.15.6   For purposes of this Agreement, (a) the term "Hazardous Chemical" means any chemical defined as hazardous in the Hazardous Communication Standard, 29 C.F.R. § 1926.59 or 29 C.F.R. § 1910.1200, promulgated pursuant to the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; (b) the term "Hazardous Substances" means any substance, including solid, liquid or gaseous material, which is listed or defined as a "hazardous substance" in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S. § 9601, et seq., or regulations promulgated pursuant thereto, but does include petroleum, including crude oil or any fraction thereof; oil and oil waste as those terms are defined in the Clean Water Act, 33 U.S.C. § 1251, et seq., or regulations promulgated pursuant thereto; and source, special nuclear, or by-product material as defined by the Atomic Energy Act of 1954, 42 U.S.C. § 3011, et seq., or regulations promulgated pursuant thereto; and includes any other substance defined by federal, state or local statute, regulation or ordinance as a hazardous, toxic or dangerous waste or substance where "state" means the State in which the Work is being performed and "local" means the local jurisdiction (i.e., county, parish, city, borough, municipality, village, town, etc.) in which the Work is being performed; and (c) "pollutant" shall mean any solid, liquid, gaseous, or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and shall include any Hazardous Substance.

Design-Build Subcontract Agreement

Issue Date:                         08/01/03

Revision No.:                       3
Revision Issue Date:        05/23/06

8.16   PROTECTION OF THE WORK AND PROPERTY.  The Design/Build Subcontractor shall take all necessary precautions to properly protect the Design/Build Subcontractor's Work and the work of others from damage caused by the Design/Build Subcontractor's operations.  Should the Design/Build Subcontractor cause damage to the Work or property of the Owner, Gray or others, the Design/Build Subcontractor shall promptly remedy such damage to the satisfaction of Gray, or Gray may so remedy and deduct the cost thereof from any amounts due or to become due the Design/Build Subcontractor.

8.17   COMPLIANCE WITH LAWS.  The Design/Build Subcontractor shall, at all times and at its own cost, comply with all federal, state and local statutes, codes, rules, regulations, ordinances, executive orders and other laws relating to the Project and the Work.  The Design/Build Subcontractor warrants and represents that it is authorized to transact business in the state and local jurisdictions where the Project is located, that it holds any and all licenses necessary to perform the Work, and that it is not currently in violation of any statutes, codes, rules, regulations, ordinances, orders, or other laws on any projects in which Design/Build Subcontractor is presently engaged.

8.18   PERMITS, FEES AND LICENSES.  The Design/Build Subcontractor shall give adequate notices to authorities pertaining to the Design/Build Subcontractor's Work and secure and pay for all permits, fees, licenses, assessments, inspections and taxes necessary for performance, completion or use of the Design/Build Subcontractor's Work.

To the extent paid to Gray under the Contract with the Owner, the Design/Build Subcontractor shall be compensated for additional costs resulting from laws, ordinances, rules, regulations and taxes enacted after the date of the Agreement.

8.19   TAXES, WAGES, FRINGE BENEFITS, ASSESSMENTS.  The Design/Build Subcontractor shall timely comply with all requirements applicable to payment of taxes, wages, fringe benefits, retirement benefits, unemployment compensation and other assessments, and shall upon request furnish Gray and the Owner with satisfactory proof of compliance.

8.20   LAYOUT RESPONSIBILITY AND LEVELS.  Gray shall establish principal axis lines of the building and site whereupon the Design/Build Subcontractor shall lay out and be strictly responsible for the accuracy of the Design/Build Subcontractor's Work and for any loss or damage to Gray or others by reason of the Design/Build Subcontractor's failure to set out or perform its work correctly.  The Design/Build Subcontractor shall exercise prudence so that actual final conditions and details shall result in perfect alignment of finish surfaces.

8.21   MATERIALS FURNISHED BY OTHERS.  In the event the scope of the Design/Build Subcontractor's Work includes installation of materials or equipment furnished by others, it shall be the responsibility of the Design/Build Subcontractor to examine the items so provided and thereupon handle, store and install the items with such skill and care as to ensure satisfactory and proper installation.  Loss or damage due to acts of the Design/Build Subcontractor shall be deducted from any amounts due or to become due the Design/Build Subcontractor.

8.22   SUBSTITUTIONS.  No substitutions shall be made in the Design/Build Subcontractor's Work unless permitted in the Subcontract Documents and only then upon the Design/Build Subcontractor first receiving all approvals required under the Subcontract Documents for substitutions.  The Design/Build Subcontractor shall indemnify Gray for any increased costs incurred by Gray as a result of such substitutions, whether or not the Design/Build Subcontractor has obtained approval thereof.

8.23   USE OF GRAY'S EQUIPMENT.  The Design/Build Subcontractor, its agents, employees, Design/Build Subcontractors or suppliers shall not use Gray's equipment without the express written permission of Gray's authorized representative.

If the Design/Build Subcontractor or any of its agents, employees, suppliers or lower tier Design/Build Subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items owned, leased, or under the control of Gray, the Design/Build Subcontractor shall be liable to Gray as provided in Section 14 for any

| Issue Date: | 08/01/03 |
| --- | --- |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be found to have been due solely and exclusively to the negligence of Gray's employees operating such equipment.

8.24    ASSIGNMENT AND SUBCONTRACTING.  The Design/Build Subcontractor shall not assign this Agreement, nor its proceeds, nor subcontract the whole or any part of the Design/Build Subcontractor's Work, without the prior written approval of Gray.

8.25    NON-CONTRACTED SERVICES.  The Design/Build Subcontractor agrees that no claim for non-contracted construction services rendered or materials furnished shall be valid unless the Design/Build Subcontractor provides Gray notice:

      (a)    prior to furnishing of the services or materials, except in an emergency affecting the safety of persons or property;

      (b)    in writing of such claim within three (3) days of first furnishing such services or materials; and

      (c)    the written charge for such services or materials to Gray no later than the fifteenth day (15th) of the calendar month following that in which the claim originated.

8.26    COORDINATION.  Design/Build Subcontractor is responsible for coordinating its work areas and schedule with other trades in order to perform the overall project as a team.

8.27    NORMAL WORK WEEK.  Unless otherwise directed in writing by Gray, the Design/Build Subcontractor's Work shall be performed during a five (5) day work week extending from Monday through Friday. If the Design/Build Subcontractor's work becomes behind schedule, the Design/Build Subcontractor shall work overtime during the normal work week and be at no cost to Gray if Gray is not at fault for the Design/Build Subcontractor being behind schedule.

## SECTION 9

### SUBCONTRACT BONDS

9.1    PERFORMANCE AND LABOR AND MATERIAL PAYMENT BONDS.  Unless otherwise provided at Section 1.9 of this Agreement, the Design/Build Subcontractor shall provide separate Performance and Labor and Material Payment Bonds, in a form and with surety, satisfactory to Gray in the full amount of this Subcontract. The premiums for these Bonds shall be paid by the Design/Build Subcontractor and the cost thereof is included in the Subcontract Price.

9.2——ASSURANCE OF PERFORMANCE.  If Performance and Payment Bonds are not required of the Design/Build Subcontractor under Section 9.1, then throughout the duration of this Agreement, Gray may require such bonds or a letter of credit and the Design/Build Subcontractor shall provide same.  Said Bonds shall be in the full amount of this Agreement in a form and by a surety satisfactory to Gray.  The Design/Build Subcontractor shall be compensated for the cost of same pursuant to progress payments made hereunder after the Design/Build Subcontractor furnishes the required bonds or a letter of credit.  The reimbursement amount for the bonds or a letter of credit shall not exceed the manual rate for such instruments.  In the event the Design/Build Subcontractor shall fail to promptly provide such requested bonds or a letter of credit, Gray may terminate this Agreement and re-let the work to another Design/Build Subcontractor and all Gray costs and expenses incurred thereby shall be paid by the Design/Build Subcontractor.

## SECTION 10

### WARRANTY AND CORRECTION OF WORK

10.1   WARRANTY.

10.1.1   The Design/Build Subcontractor warrants to the Owner and Gray that materials and equipment furnished under this Subcontract will be of good quality and new unless otherwise required or permitted by the Subcontract Documents, that the Work will be performed in a good, workmanlike manner, be free from defects in materials and workmanship, and that the Work will conform with the requirements of the Subcontract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective in the sole judgment of Gray. This warranty shall be in addition to and not in limitation of any other warranty or remedy provided by law or by the Subcontract Documents. Design/Build Subcontractor shall warrant its work for a period of One (1) Year following Substantial Completion. If the warranty period is not specifically designated, then the parties agree that the warranty period shall extend for the period set forth in the agreement between Gray and the Owner.

10.1.2   The Design/Build Subcontractor further agrees to execute any additional guarantees or warranties specified in the Subcontract Documents.

10.2   CORRECTION OF WORK.

10.2.1   The Design/Build Subcontractor shall promptly correct Work rejected by Gray or failing to conform to the requirements of the Subcontract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed.

10.2.2   The Design/Build Subcontractor shall be obligated to correct work that is found not to be in accordance with the Subcontract Documents after Substantial Completion to the same extent that Gray is bound to the Owner for correction of said Work. The Design/Build Subcontractor shall begin the corrective work immediately after receipt of written notice from Gray to do so. This obligation shall survive acceptance of the Work and termination of the Subcontract. This obligation is in addition to, and not in limitation of, the warranty obligations under Section 10.1, it being the intent of this Agreement that warranty obligations are not restricted by Design/Build Subcontractor's obligations to correct defective work.

10.2.3   If the Owner chooses to correct the Work without notice and opportunity to cure to Gray, and the Owner backcharges Gray for the cost to correct the Work, the Design/Build Subcontractor shall be likewise bound to the backcharge that the Owner has assessed Gray for the Design/Build Subcontractor's Work.

10.3   SATISFACTION OF WARRANTY AND CORRECTIVE WORK OBLIGATIONS. The Design/Build Subcontractor agrees to satisfy warranty and corrective work obligations without cost to the Owner or Gray. In the event of Design/Build Subcontractor's failure to satisfy these obligations, all costs for design, labor, supervision, materials, travel (including meals, lodging and mileage), equipment and overhead (at 18% of costs) incurred by Gray in the investigation, review, redesign and correction of such problem shall be paid to Gray by Design/Build Subcontractor. Design and service team costs shall be computed using Gray's standard hourly rates. A verbal request for corrective action by Gray to the Design/Build Subcontractor, together with a written confirmation of the action requested, will be provided. If corrective action is not initiated or completed within a time reasonable under all the circumstances, Gray will itself commence investigation and implement corrective measures at the Design/Build Subcontractor's expense. Gray's rights hereunder are in addition to all other rights and remedies pursuant to the Subcontract, and the institution of such measures by Gray shall in no way relieve Design/Build Subcontractor of its primary responsibility for performing and warranting the Work in accord with the Subcontract Documents.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

## SECTION 11

### RECOURSE BY GRAY

11.1     DEFAULT; NOTICE TO CURE.  If the Design/Build Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or fails to achieve Substantial or Final Completion, or it fails to make prompt payment for its workers, sub–Design/Build Subcontractors or suppliers, disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or fails to indemnify Gray as required by this Agreement or by law, or otherwise is guilty of a breach of any provision of this Agreement, and fails within three (3) working days after receipt of written notice to commence and continue satisfactory correction of such default with diligence and promptness, then Gray, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:

(a)     supply such number of workers and quantity of materials, equipment and other facilities as Gray deems necessary for the completion of the Design/Build Subcontractor's Work, or any part thereof which the Design/Build Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Design/Build Subcontractor, who shall be liable for the payment of such costs, including reasonable overhead, profit, as well as for other damages, and attorney's fees and dispute resolution costs;

(b)     contract with one or more additional contractors to perform such part of the Design/Build Subcontractor's Work as Gray shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Design/Build Subcontractor;

(c)     withhold payment of any monies due the Design/Build Subcontractor pending corrective action or completion of the Design/Build Subcontractor's Work to the extent required by and to the satisfaction of Gray; and

(d)     set-off Gray's damages attributable to Design/Build Subcontractor's default against any monies due Design/Build Subcontractor under this Agreement or under any other contract between Gray and the Design/Build Subcontractor.

(e)     terminate the Subcontract Agreement as set forth below.

In the event of an emergency affecting the safety of persons or property, Gray may proceed as above without notice.

11.2     TERMINATION BY GRAY.  If the Design/Build Subcontractor fails to commence and satisfactorily continue correction of a default within three (3) working days after receipt by the Design/Build Subcontractor of the notice issued under Section 11.1, then Gray may terminate this Agreement by written notice to the Design/Build Subcontractor and its surety, if any, and use any materials, equipment and/or employ such workers or Design/Build Subcontractors as Gray deems necessary to complete the Work.

All of the costs incurred by Gray in so performing the Design/Build Subcontractor's Work, including reasonable overhead, profit and attorney's fees shall be deducted from any monies due or to become due the Design/Build Subcontractor.  The Design/Build Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the subcontract price.

11.3     BANKRUPTCY.

11.3.1     TERMINATION ABSENT CURE.  If Design/Build Subcontractor files a petition under the Bankruptcy Code, this Agreement shall terminate if the Design/Build Subcontractor or the Design/Build Subcontractor's trustee (a) rejects the Agreement, or (b) if there has been a default, the Design/Build

Subcontractor is unable to give adequate assurance that the Design/Build Subcontractor will perform as required by this Agreement, or (c) is otherwise unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

11.3.2  INTERIM REMEDIES.  If the Design/Build Subcontractor is not performing in accordance with the Schedule of Work at the time a petition in bankruptcy is filed, or at any subsequent time, Gray, while awaiting the decision of the Design/Build Subcontractor or its trustee to reject or to assume this Agreement and provide adequate assurance of its ability to perform hereunder, may take such steps as are reasonably necessary to maintain the Schedule of Work.  Gray may offset against any sums due or to become due the Design/Build Subcontractor all costs incurred in pursuing any of the remedies provided hereunder, including, but not limited to, reasonable overhead, profit and attorneys' fees.  The Design/Build Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Price.

11.4  SUSPENSION BY GRAY.  Gray may order the Design/Build Subcontractor in writing to suspend, delay, or interrupt all or any part of the Design/Build Subcontractor's Work for such period of time as may be determined to be appropriate for the convenience of G ray.  Phased or interrupted Work when required shall not be deemed a suspension of Work.

The Design/Build Subcontractor shall notify Gray in writing within five (5) calendar days after receipt of Gray's order of the effect of such order upon the Design/Build Subcontractor's Work.  To the extent, and only to the extent, allowed Gray under the Contract Documents, the Subcontract Price or Schedule of Work shall be adjusted by Subcontract Change Order for any increase in the time or cost of performance of this Agreement caused by such suspension, delay, or interruption.

Neither the Subcontract Price nor the Schedule of Work shall be adjusted under this Section for any suspension, delay or interruption to the extent that performance would have been so suspended, delayed or interrupted by the fault or negligence of the Design/Build Subcontractor or by a cause for which the Design/Build Subcontractor would have been responsible.

11.5  WRONGFUL EXERCISE.  If Gray wrongfully exercises any option under this Section 11, Gray shall be liable to the Design/Build Subcontractor solely for the reasonable value of work performed by the Design/Build Subcontractor prior to Gray's wrongful action, including reasonable overhead and profit, less prior payments made.  Design/Build Subcontractor shall not be entitled to recover any other incidental or consequential damages, including but not limited to profits attributable to unperformed Work.

11.6  REMEDIES CUMULATIVE.  All the rights and remedies of Gray in the event of a default by Design/Build Subcontractor under this Agreement shall be cumulative to the greatest extent permitted by law and shall be in addition to all other rights and remedies available to Gray at or in equity.

## SECTION 12

### SUSPENSION OR TERMINATION BY OWNER

12.1  SUSPENSION BY OWNER.  Should the Owner suspend Gray's contract or any part of Gray's contract which includes the Design/Build Subcontractor's Work, Gray shall so notify the Design/Build Subcontractor in writing and, upon receipt of said notice, the Design/Build Subcontractor shall immediately suspend the Work.

12.2  TERMINATION BY OWNER.  If the Owner, for any reason, terminates Gray's contract or any part that includes the Design/Build Subcontractor's Work, Gray shall so notify the Design/Build Subcontractor in writing and upon receipt of said notice, this Agreement shall also be terminated and the Design/Build Subcontractor shall immediately stop the Work.

Issue Date:                                           08/01/03

Revision No.:                                               3
Revision Issue Date:                              05/23/06

12.3    CLAIMS FOR OWNER SUSPENSION OR TERMINATION. In the event of such Owner suspension or termination, Gray's obligation to the Design/Build Subcontractor is limited to the extent of Gray's recovery, on the Design/Build Subcontractor's behalf, under the Contract Documents. Gray agrees to cooperate with the Design/Build Subcontractor, at the Design/Build Subcontractor's expense, in the prosecution of any Design/Build Subcontractor claim arising out of an Owner suspension and to permit the Design/Build Subcontractor to prosecute said claim, in the name of Gray, for the use and benefit of the Design/Build Subcontractor. Administrative and overhead costs, attorney's fees and other expenses incurred by Gray while assisting the Design/Build Subcontractor in the prosecution of such claim shall be deducted from any recovery paid to Design/Build Subcontractor.

12.4    STIPULATION. The provisions of this Section 12 shall not be construed to create any obligation upon Gray to pursue any claim or litigation on behalf of the Design/Build Subcontractor.

## SECTION 13

### LABOR RELATIONS AND IMMIGRATION

13.1    ICOMPLIANCE WITH IMMIGRATION REFORM AND CONTROL ACT OF 1986 ("IRCA"). Gray and Design/Build Subcontractor agree that Design/Build Subcontractor shall be obligated to comply with all requirements imposed on employers under IRCA with regard to every Design/Build Subcontractor employee ("Contract Worker") who will perform services for Design/Build Subcontractor, where such service is provided in connection with Design/Build Subcontractor's performance of this Subcontract. Design/Build Subcontractor further agrees that Design/Build Subcontractor is the "employer" as that term is defined at 8 C.F.R. Section 274a.1(g), and that Gray is not the "employer" as so defined, with regard to such Contract Workers. In furtherance of its duties as employer under IRCA, Design/Build Subcontractor agrees to do the following:

A.    Complete USCIS Form I-9 for all Contract Workers. Design/Build Subcontractor agrees that it has sole responsibility for completing Form I-9 for all Contract Workers who provide services as a part of Design/Build Subcontractor's performance of this subcontract, and that it will do so and will further update such Form to the extent required by law. Design/Build Subcontractor further warrants that all of Design/Build Subcontractor's agents and/or employees who complete Form I-9 for such Contract Workers will be knowledgeable of all Form I-9 requirements, including but not limited to, knowledge of which documents do and do not satisfy the requirements of Form I-9, and that such agents and employees will otherwise complete Form I-9, and that such agents and employees will otherwise complete Form I-9 in full compliance with IRCA.

B.    Design/Build Subcontractor's Warranty of Employment Authorization for all Contract Workers. Design/Build Subcontractor hereby warrants that no Contract Worker will provide services pursuant to this subcontract until Design/Build Subcontractor has completed Form I-9 for such Contract Worker in the manner required by IRCA. Design/Build Subcontractor further warrants that it will not permit any Contract Worker to perform services under this subcontract who Design/Build Subcontractor knows or has reason to believe is not authorized to work in the United States, regardless of whether such individual is able to produce documents which satisfy the requirements of Form I-9. Design/Build Subcontractor understands that Gray is acting in reliance on Design/Build Subcontractor's warranty as described in this subparagraph and further states that without Design/Build Subcontractor's warranty that it has taken all necessary steps to comply with IRCA and that Design/Build Subcontractor believes all Contract Workers are authorized to work in the United States.

C.    Removal of Contract Workers not Authorized for Employment in the United States. Design/Build Subcontractor agrees that if at any time after it assigns a Contract Worker to perform services under this subcontract, Design/Build Subcontractor learns or has reason to believe that any Contract Worker is not authorized to work in the United States, Design/Build Subcontractor shall immediately so inform Gray and Design/Build Subcontractor shall cease assigning work to such Contract Worker providing services under this Subcontract.

D.    Indemnification and Hold Harmless. Design/Build Subcontractor agrees that in any event any government agency determines that any Contract Worker hired by Design/Build Subcontractor to perform

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

duties under this subcontract is not authorized for employment in the United States, Design/Build Subcontractor shall indemnify and hold harmless Gray and any of Gray's agents, employees, officers, directors, trustees, or other persons acting on Gray's behalf, from any liability incurred by Gray as a result of such determination. Such indemnification shall include, by way of example but not in any way limited to, any civil or criminal fines or penalties assessed, alleged and any costs incurred in responding to or participating in any government investigation, finding, recommendation, hearing, appeal or any other proceeding, including attorneys' fees and costs.

13.2   LABOR HARMONY.  Design/Build Subcontractor and its lower tier Design/Build Subcontractors shall not employ anyone in the Design/Build Subcontractor's Work whose employment may be objectionable to Gray or the Owner.  All labor used throughout the Work by Design/Build Subcontractor or any of its lower tier Design/Build Subcontractors shall be of a standing or affiliation that will permit the Project to be carried on harmoniously and without delay, and that will not, in any case, or under any circumstances, cause any disturbance, interference or delay to the progress of the Project.

13.3   LABOR DISPUTES.  Design/Build Subcontractor and all persons in privity with it agree that, where its Work or any of the Work of Gray or other Design/Build Subcontractors is stopped or delayed or interfered with by strikes, slow-downs or work interruptions or the threats thereof, resulting from an act or failure to act of Design/Build Subcontractor and/or those in privity with it, or any of their employees or agents, then Gray, at its sole option, shall afford Design/Build Subcontractor twenty-four (24) hours notice wherein Design/Build Subcontractor shall take action to maintain the harmony of the Work, or make such other arrangements, satisfactory to Gray that will ensure the harmonious continuation of the Work.  Design/Build Subcontractor's failure to so comply within the allotted time shall be an event of default, for which Gray may, at its sole option, terminate this Agreement pursuant to Section 11.1.

# SECTION 14

## INDEMNIFICATION

14.1   DESIGN/BUILD SUBCONTRACTOR'S PERFORMANCE.  To the fullest extent permitted by law, the Design/Build Subcontractor shall indemnify and hold harmless the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors and Design/Build Subcontractors and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of the Design/Build Subcontractor's Work provided that:

(a)   any such claim, damage, loss or expense is attributable to bodily injury, personal injury, sickness, disease or death, or to damage to or destruction of tangible property including the loss of use resulting therefrom, to the extent caused or alleged to be caused by any negligent act or omission of the Design/Build Subcontractor or any person directly or indirectly employed by the Design/Build Subcontractor or anyone for whose acts the Design/Build Subcontractor may be liable (including sub-Design/Build Subcontractors and suppliers of Design/Build Subcontractor).

(b)   litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the work or materials or processes used by Design/Build Subcontractor, or its subcontractors, subconsultants and/or suppliers.

(c)   claims against or through Gray or liability for claims and liens for labor performed or materials used or furnished through or under Design/Build Subcontractor on the Project.

(d)   liability or claims against or through to Gray resulting from Design/Build Subcontractor's failure to comply with applicable licensing requirements or Code requirements.

(e)   liability imposed upon Gray directly or indirectly by Design/Build Subcontractor's failure or the failure of any of its employees to comply with law, ordinances, rules, regulations or

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

requirements, including any Occupational Safety and Health Administration violations and any penalties, including enhancements, resulting in whole or in part by Design/Build Subcontractor's acts or omissions.

(f)    such obligation shall not be construed to negate, or abridge, or otherwise reduce any other right or obligation of indemnity under this Agreement or which would otherwise exist as to any party or person described in this Section 14.

14.2    NO LIMITATION OF LIABILITY.  In any and all claims against the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors or Design/Build Subcontractors, or any of their agents or employees, by any employee of the Design/Build Subcontractor, anyone directly or indirectly employed by the Design/Build Subcontractor or anyone for whose acts the Design/Build Subcontractor may be liable, the indemnification obligation under this Section 14 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Design/Build Subcontractor under worker's or workmen's compensation acts, disability benefit acts or other employee benefit acts.

## SECTION 15

### INSURANCE

15.1    DESIGN/BUILD SUBCONTRACTOR'S INSURANCE.  Prior to beginning the Work, the Design/Build Subcontractor shall procure for its Work, and furnish proof of, Workers' Compensation Insurance, Employer's Liability Insurance, Commercial (Comprehensive) General Liability Insurance (including contractual liability insurance covering Design/Build Subcontractor's obligations under Section 14), Comprehensive Automobile Liability Insurance, and all other insurance and extensions thereof required of Gray insofar as the requirements relate to Design/Build Subcontractor's Work.  Gray shall be named as an additional insured on the Design/Build Subcontractor's Commercial (Comprehensive) General Liability policy.  Design/Build Subcontractor shall procure and maintain at all times during the course of the Work (including corrective or warranty work) the required insurance with limits of liability not less than those listed below.  Policies shall be in a form satisfactory to Gray and issued by insurers licensed to do business in the state where the Project is located and who are rated no lower than A by Best Insurance Guide.

15.1.1   WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY.

(a)    Statutory coverage in each state in which Subcontractor's employees are engaged in the performance of the Work;

(b)    Employer's Liability:
$100,000    -    bodily injury for each accident
$500,000    -    policy limit for bodily injury by disease
$100,000    -    for each employee for bodily injury by disease

15.1.2   COMMERCIAL GENERAL LIABILITY.

(a)    Limits of Liability:

$1,000,000    -    general aggregate
$1,000,000    -    products and completed operations aggregate
$1,000,000    -    personal and advertising injury
$1,000,000    -    each occurrence

(b)    Coverage Details:

Coverage shall be by Standard Commercial General Liability Occurrence Form including:

| Page 22 | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

> Personal and Advertising Injury, Contractual Liability, Explosion, Collapse and Underground Liability (if applicable), Broad Form Property Damage, Independent Contractors, and Products and Completed Operations.

This policy shall add Gray as an insured thereunder by proper endorsement.

15.1.3  AUTOMOBILE LIABILITY.

(a)    Limits of liability:  $1,000,000 per accident

(b)    Coverage details:

All owned, non-owned and hired vehicles.

15.1.4  PROFESSIONAL LIABILITY.

Professional Liability (Errors and Omissions) coverage with a minimum limit of $250,000 each claim and $250,000 in the aggregate, if required by Section 1.10.

15.1.5  EXCESS OR UMBRELLA LIABILITY. Subcontractor shall include Excess or Umbrella Liability Insurance in an amount not less than indicated in Section 1.11.

15.1.6  CERTIFICATE OF INSURANCE.  Design/Build Subcontractor has furnished Gray with a certificate of insurance (or certified copies of its insurance policies), which Design/Build Subcontractor warrants and represents is a true and accurate representation of Design/Build Subcontractor's existing insurance coverage.  This certificate shall indicate all endorsements, including Gray, and Owner if applicable, as additional insured by standard endorsements CG2010 (07/04) and CG2037 (07/04).

15.2    CANCELLATION, RENEWAL OR MODIFICATION.  All insurance policies shall contain a provision that the coverages afforded thereunder shall not be cancelled or not renewed, nor restrictive modifications added, until at least thirty (30) days prior written notice has been given to Gray unless otherwise specifically required in the Subcontract Documents.

No progress payment will be made unless Gray has been furnished evidence of required coverages and endorsements as required by this Subcontract.

In the event the Design/Build Subcontractor fails to obtain or maintain any insurance coverage required under this Agreement, Gray may purchase such coverage and charge the expense thereof to the Design/Build Subcontractor, or terminate this Agreement.

15.3    WAIVER OF RIGHTS.  Gray and Design/Build Subcontractor waive all rights against each other and the Owner, separate contractors, and all other Design/Build Subcontractors for loss or damage to the extent covered by Builder's Risk or other similar insurance covering improvements or materials at the Project site, except such rights as they may have to the proceeds of such insurance.

If not covered under the Builder's Risk policy of insurance or any other property or equipment insurance required by the Subcontract Documents, the Design/Build Subcontractor shall procure and maintain at the Design/Build Subcontractor's own expense property and equipment insurance for portions of the Design/Build Subcontractor's Work stored off the site or in transit, when such portions of the Design/Build Subcontractor's Work are to be included in an application for payment under Section 5.

15.4    ENDORSEMENT.  If the policies of insurance referred to in this Article require an endorsement to provide for continued coverage where there is a waiver of subrogation, the owners of such policies will cause them to be so endorsed.

15.5    <u>PRIMARY COVERAGE</u>.  The insurance required of Design/Build Subcontractor must be primary and non-contributory with Gray's insurance program.

## SECTION 16

## DISPUTE RESOLUTION

16.1    <u>DISPUTE RESOLUTION</u>.  All claims, disputes and matters in question arising out of, or relating to, this Agreement or the breach thereof, except for claims which have been waived by the making or acceptance of final payment and the claims excluded or limited by Sections 6.2 and 6.6, shall be resolved by mediation, arbitration and/or litigation at Gray's sole option.  The provisions for  arbitration shall be specifically enforceable under the Federal Arbitration Act.  The site for mediation, litigation or arbitration shall be at the Project site or Lexington, Kentucky, as selected by Gray, unless required otherwise by Gray's agreement with Owner.

16.2    <u>DISPUTE RESOLUTION PROCEDURE</u>.  Prior to a demand for arbitration, or initiation of litigation of claims, the parties shall proceed as follows, as an express condition precedent to commencing formal claims against the other relating to or arising out of the dispute:

(a)     The party asserting a claim shall do so in writing and within the notice period, if any, established for such claims by the Subcontract Documents.  In the absence of a notice period set by the Subcontract Documents, the notice of claim shall be given as soon as practicable but in no event later than five (5) calendar days after the claimant is aware of the event from which the claim arises.

(b)     The parties shall then attempt in good faith to negotiate a resolution of disputed claims during the next twenty (20) calendar days before pursuing any other means of dispute resolution.

(c)     If claims remain unresolved, the parties shall endeavor to resolve disputes by proceeding at the instance of either to non-binding mediation conducted under such  rules as the parties may agree to employ.  The parties shall divide the cost of the mediator evenly among them.

(d)     <u>DISPUTES RELATING TO GRAY</u>.  Notwithstanding anything stated above, if any dispute shall arise between Gray and the Subcontractor pertaining in any manner to the construction or interpretation of this Agreement, or to the rights or obligations of the parties, or to the breach of this Agreement, which the parties are unable to settle by mutual agreement, Gray shall have the exclusive option either to have the dispute determined by a court or by arbitration in accordance with the Arbitration Rules of the Center for Public Resources.  Gray, Subcontractor and Subcontractor's surety agree that all claims, disputes, and other matters in controversy between Gray and Subcontractor, arising out of or relating to the Subcontract, or the breach thereof, except as provided in the Contract Documents, shall be resolved in the appropriate forum in the County of Fayette, Kentucky.  Gray shall exercise its exclusive option by commencing a court action or by commencing an arbitration proceeding.  If Subcontractor first commences a court action with respect to a dispute which Gray desires to have determined by an arbitration proceeding, or if Subcontractor first commences an arbitration proceeding which Gray desires to have determined by a court, Gray shall commence the arbitration proceeding or court action desired by Gray within thirty days after receiving service of Subcontractor's complaint or arbitration demand.  If, at any time, even after suit may have been filed by either party, but prior to commencement of trial, Gray becomes involved in litigation or arbitration with another party or parties involving questions of fact or law common to the dispute between Gray and Subcontractor to the extent that (a) in Subcontractor's absence, complete relief cannot be accorded among those already parties, or (b) disposition of such other action may as a practical matter, impair or impede

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

Gray's or Subcontractor's ability to fully prevent its incurring multiple or otherwise inconsistent obligations, Subcontractor agrees that Subcontractor may be joined by Gray in such other litigation or arbitration proceedings for complete resolution of all disputes and controversies arising under this Agreement and that upon such joinder, any pending action between Gray and Subcontractor shall be dismissed.

(e)    If Gray chooses to have the matter resolved by arbitration, then it shall proceed in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes, as modified by this Agreement. The arbitration panel shall consist of three independent and impartial persons who have experience in the construction industry or construction law. The Design/Build Subcontractor and Gray shall each appoint one member of the panel and the third member shall be appointed according to the aforementioned Rules.

16.3    AWARD. If Gray chooses to arbitrate, then the arbitration award shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof, subject to any restrictions set forth in the Federal Arbitration Act.

16.4    WORK CONTINUATION AND PAYMENT. Unless otherwise agreed in writing, the Design/Build Subcontractor shall continue on which the Work and maintain the Schedule of Work pending arbitration, and if so, Gray shall continue to make payments earned by the Design/Build Subcontractor in accordance with this Agreement.

16.5    DOCUMENT PRODUCTION AND EXCHANGE OF ARBITRATION EXHIBITS. After a demand for arbitration, and if Gray consents to arbitrate, each party shall have the right to immediate production of the records of the other party relating to the Project for inspection and copying except for those portions which are covered by an unwaived attorney-client privilege or which were prepared in anticipation of arbitration or litigation. No later than 15 days prior to the arbitration hearing, the parties shall make available to each other, for inspection and copying, the exhibits, photographs, and other documents which they intend to introduce or refer to during the arbitration.

16.6    ATTORNEY'S FEES, ARBITRATION COSTS, AND COURT COSTS.

(a)    Attorney's fees and expenses shall be awarded to the prevailing party if a claim or dispute is found to have been asserted or defended unreasonably or in bad faith.

(b)    The prevailing party in arbitration shall recover its attorney's fees and court costs incurred in any judicial proceedings necessary, including those fees necessary to obtain (i) enforcement of this arbitration clause or (ii) confirmation, enforcement, or collection of an arbitration award or court judgment.

## SECTION 17

### MISCELLANEOUS PROVISIONS

17.1    GOVERNING LAW. This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Kentucky applicable to agreements executed, delivered, and to be performed solely within the Commonwealth of Kentucky.

17.2    SEVERABILITY AND WAIVER. The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision. The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

17.3    TITLES.  The titles given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any other purpose.

17.4    ATTORNEYS' FEES.  The Design/Build Subcontractor shall reimburse Gray for all of Gray's attorney's fees, court costs and other expenses incurred in enforcing or declaring the Design/Build Subcontractor's obligations under this Agreement, incurred in exercising any right or remedy hereunder or under law or equity in the event of a default by the Design/Build Subcontractor, or incurred in any litigation or arbitration in which Gray, without its fault, becomes involved by reason of the existence of this Agreement.

17.5    WRITTEN NOTICES.  Written notices to Gray required by this Agreement shall be addressed to 10 Quality Street, Lexington, Kentucky  40507-1450.  Written notices to Design/Build Subcontractor required by this Agreement shall be sent to the address given in Section 1.1 of this Agreement.  Any notice sent by mail shall be deemed to have been received the third calendar day after the date of mailing.  Notice may also be delivered by hand delivery or fax, in which event notice shall be deemed effective on the date such notice is given.

17.6    ENTIRE AGREEMENT.  This Agreement is solely for the benefit of the signatories hereto and represents the entire and integrated agreement between the parties hereto and supersedes all prior contemporaneous negotiations, representations, understandings or agreements, either written or oral.  This Agreement shall not be modified except by a written instrument signed by the parties.

## SECTION 18

### SPECIAL PROVISIONS

18.1    BINDING EFFECT.  This Agreement shall be binding upon and inure to the benefit of Gray, Design/Build Subcontractor, and their successors and assigns.

18.2    PRECEDENCE.  It is understood the Work to be performed under this Agreement, including the terms and conditions thereof, is as described in Section 1 through 17 herein together with the following Scope of Work, which are intended to complement same.  However, in the event of an inconsistency, these Scope of Work shall govern.

18.3    INCONSISTENCIES AND OMISSIONS.  Should inconsistencies or omissions appear in the Subcontract Documents, it shall be the duty of the Design/Build Subcontractor to so notify Gray in writing within three (3) working days of the Design/Build Subcontractor's discovery thereof.  Upon receipt of said notice, Gray shall instruct the Design/Build Subcontractor as to the measures to be taken and the Design/Build Subcontractor shall comply with Gray's instructions.

18.4    CROSS REFERENCE OF DOCUMENTS.  Design/Build Subcontractor shall review all specifications, drawings, reports and existing conditions which affect the relationship of Design/Build Subcontractor's Work to the complete project, and be responsible for that relationship.  By way of example, a roofing Design/Build Subcontractor shall be responsible for including and performing mechanical and plumbing roof penetrations, which may or may not be detailed on the roof plans and details, but may be shown on the mechanical drawings.

18.5    SUBCONTRACT DOCUMENTS.  The Subcontract Documents are identified as follows and incorporated by reference:

(a)    Scope of Work – Exhibit A

(b)    Drawing List – Exhibit B

(c)    Specifications & Other Documents – Exhibit C

(d)    Other Provisions – Exhibit D

Design-Build Subcontract Agreement

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

(e)     Application for Payment – Exhibit E

(f)     Sub-Subcontractor/Materialmen's Waiver of Lien – Exhibit F

(g)     Subcontractor Safety Orientation Manual – Exhibit G

(h)     This Agreement

(i)     The Contract Documents identified in the contract between the Owner and Gray, including but not limited to the signed agreement between the Owner and Gray, conditions of the contract (general, supplementary, special and other conditions), drawings, specifications, addenda, change orders, other written modifications, and other documents enumerated therein;

| Issue Date: | 08/01/03 |
|---|---|
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

WITNESS WHEREOF, The parties have caused this Agreement to be executed by their duly authorized

representatives, under seal, as of the day and year first above written.

**CONTRACTOR**

GRAY CONSTRUCTION, INC.

_____
Project Manager

_____
Executed By

EXECUTIVE V.P. AUTOMOTIVE MARKET
Title

(Seal)
**Attest:**

_____

_____
Title

**SUBCONTRACTOR**

AMERICAN FIRE PROTECTION, INC.
Company Name

_____
Signature

MATT MULLINAX
Printed Name

VICE PRESIDENT
Title

(Seal)

Attest:

_____

_____
Title

*If applicable, complete certificate on the following page.*

| Issue Date: | 08/01/03 |
|---|---|
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

**CERTIFICATE**
(Certificate DOES NOT need to be completed IF subcontractor is a Sole Proprietorship.  Notary Public section must be completed by all entities.)

I, _____, certify that I am an/a

_____ of _____
       (Officer/Member/Partner)                          (Name of Subcontractor Entity)

and that I am authorized and empowered by valid resolutions of the _____
                                                                  (Partners/ Board of Directors/ Managers)

of said _____ to execute this Subcontract for and on its behalf.
       (Partnership/Corporation/Limited Liability Company)

This _____ day of _____, 20_____.

                                         _____
                                                         Officer

State of _____

County of _____

       Subscribed, sworn to and acknowledged before me by _____

This _____ day of _____, 20_____.

                                         _____
                                                    Notary Public

                   My Commission Expires: _____

| | | |
|---|---|---|
| | Issue Date: | 08/01/03 |
| Design-Build Subcontract Agreement | Revision No.: | 3 |
| | Revision Issue Date: | 05/23/06 |



**Gray Construction**

## EXHIBIT A
## SCOPE OF WORK
## SUBCONTRACT AGREEMENT NO.: 207005-17-100S

<u>American Fire Protection, Inc.</u> shall provide all engineering, materials, labor, equipment and other services necessary to complete <u>Design/Build Division 17, Fire Protection</u>. All work shall be performed in accordance with the documents listed in Exhibit B,C & D of this package, collectively known as the "Criteria Documents".

The Design/Build Subcontractor is responsible for complete engineering and construction of the fire protection systems for the project. All engineering and construction must strictly conform to all requirements of the criteria documents. If there is a conflict between the provisions of the criteria documents and the project as constructed, or the Design/Build Subcontractors construction documents, the provisions of the criteria documents shall govern unless amended by Change Order.

Engineering services provided under the provisions of this contract shall be in accordance with the standards of skill, care, and knowledge of the fire protection engineering profession. Furthermore, engineering shall be performed by professionals licensed to practice in Alabama and shall fully comply with all applicable codes, statutes, ordinances, and regulations governing Greenville, AL. The design shall comply with the authority having jurisdiction. Furthermore, comply with NFPA 13 regarding exterior canopy protection as required by the authority having jurisdiction.

The professional services and work shall be performed to the full satisfaction of Gray Construction and the Customer. The Design/Build subcontractor attests that all of the documents and plans comprising the criteria documents have been read and the Design/Build subcontractor is fully familiarized with all of the requirements for the full and complete performance of the work included in this contract. The Design/Build subcontractor agrees to be bound and obligated to Gray, to the extent of the work included in this contract, as fully and completely as Gray is bound and obligated to the Customer.

Furthermore, the scope of work shall be more specifically defined but shall in no way be limited to the following:

### DESIGN/ENGINEERING SCOPE

1.  The Design/Build subcontractor shall provide plans and specifications to convey the intent of the engineering. Each release of plans and specifications shall be prepared using the standards and conventions set forth by Gray. This shall include but is not limited to the following:

    - All drawing shall be produced using AutoCAD release 2004.
    - There will be no plotting by Gray. If, for some reason plotting is required of Gray then the design-build subcontractor will be charged by Gray for all labor and material required to provide this service.
    - All specifications shall be produced using Microsoft Word 2000.

Exhibit A - Design-Build Subcontract Agreement

- The format for specifications shall follow the standards established by Gray for headers, footers and margins.
- The font for specifications shall be Arial 12 point.

2. For each release of documents (plans and specifications) the design-build subcontractor shall provide to Gray's design manager the following in strict accordance with the schedule defined by Gray's design manager:

- One complete set of full size blackline drawings.
- One complete set of half size blackline drawings.
- Electronic media of plans and specifications on CD-R or via internet/e-mail. AutoCAD drawings must be complete with all external references, including dwgs, fonts, shape files, x-refs, plotter definition files (.ctb and .pcp) etc. Electronic files for specifications shall be Microsoft Word 2000.
- A .pdf file of drawings and specifications. Individual files shall be combined into one file. A separate "combined" file shall be provided for drawings and specifications.

3. When providing record documents the Design/Build subcontractor shall also provide, in addition to the above, a complete set of "Bound" .dwg files that are independent of x-ref files.

4. Attend and participate in design review and coordination meetings as scheduled by Gray.

5. Provide progress prints of the documents as requested by Gray.

6. Submit drawings and specifications for review with the seal and original signature of the registered professional responsible for the engineering to regulatory agencies having jurisdiction over the project. Review fees pertinent to the Design/Build subcontractor's area of responsibility, are the responsibility of the Design/Build subcontractor.

7. Maintain a complete set of documents at the project site. This set shall be used for notations of as constructed conditions, which differ from the information shown on the documents as they were issued "FOR CONSTRUCTION". These as constructed markings shall be used to generate Record Drawings.

8. Design/Build Subcontractor is responsible for timely and complete coordination of all elements of design and engineering pertinent to this trade as well as coordination with Architectural, Civil, Structural, Process, and other Design Build Subcontractor design and engineering (i.e., Mechanical, Plumbing and Electrical).

9. Coordination as required in item 6 above shall include timely notification of the design/builder of any potential conflicts or interference's that would impact the design/build subcontractor's ability to design and engineer this scope of work according to the criteria documents. Failure to provide timely notification to the design/builder of potential conflicts or interference's shall result in the design/build subcontractor assuming any cost or damages resulting from conflicts or interference's that prevent the design/build subcontractor from constructing this scope of work according to the criteria documents.

10. Gray shall determine the sequencing and timing for the release of design documents that shall include documents prepared by the Design/Build Subcontractor. The Design/Build Subcontractor shall cooperate with Gray by providing interim releases of design documents.

Exhibit A - Design-Build Subcontract Agreement

## CONSTRUCTION REQUIREMENTS:

1.   The Subcontractor shall review all systems for leaks.

2.   The Subcontractor shall abandon and reroute sprinkler systems as directed by Gray.

3.   The Subcontractor shall coordinate sprinkler piping and head locations with other trades.  It is the responsibility of the Subcontractor to coordinate these locations prior to installation and rectify any overhead conflicts during the installation.

## GENERAL REQUIREMENTS:

1.   It is the Subcontractors responsibility to supply the project with enough manpower and equipment to meet the Schedule.

2.   The Subcontractor shall prepare and submit all shop drawings and material specifications required for the work.  Only after review and approval, or authorization from Gray's authorized representative can work proceed.

3.   Subcontractor to conform to and enforce all items in Gray safety policy.

4.   Subcontractor is to send a representative to site meetings weekly.

5.   The Subcontractor shall provide all field layout for the execution of this scope of work. Design/builder will provide permanent benchmarks.  Field verification of all existing conditions will be required.

6.   The Subcontractor shall clean any piping prior to installation.  Any excessively dirty pipe installed shall be wiped clean by the Subcontractor.

7.   Subcontractor is responsible for the cleaning of debris and residue deposited on public roads as a result of its operations.

8.   Invoices will be due to Gray by the 25th of each month, with work projected through the end of the month.  A 10% retainage will be withheld from each month's invoice.

9.   The Subcontractor (and tiered subcontractors/suppliers, when applicable) shall comply with Gray Construction project reporting procedures in regards to Daily Reports, Safety Reports, HAZ. Com., and Safety Training Reports, QA/QC verifications, and two week look ahead schedules.

10.  The Subcontractor and tiered subcontractors/suppliers shall embrace and abide by the **Gray Construction Alcohol and Drug Free Project Policy for Subcontractors.**

11.  The Subcontractor and tiered subcontractor/suppliers shall comply with the **safety requirements of Gray Construction,** including 100% tie-off requirements, 100% eye protection, State, Federal, OSHA and all regulatory agencies having jurisdiction.

12.  The Subcontractors and tiered subcontractor/suppliers shall be responsible for all applicable taxes, fees, insurance and permits for their scope of work.

Exhibit A - Design-Build Subcontract Agreement

13.   All Subcontractors and tiered subcontractors/suppliers shall provide the required insurance certificates before initiating any work on site. Gray Construction is to be listed as an additional insured on Certificate of Insurance. Builders Risk Insurance will be by others.

14.   Parking will be restricted to assigned areas. Only company vehicles delivering materials or equipment will be allowed on site and only in areas where designated by the Contractor.

15.   The Subcontractor (and tiered subcontractors/suppliers when applicable) shall provide and maintain competent on-site supervisors during the execution of the work as well as a sufficient number of qualified workers to properly service the project schedule.

16.   Gray shall provide temporary toilets for this subcontractors use. We do not include any special provisions for union agreements. Any additionally required toilets will need to be provided by this Subcontractor.

17.   The Subcontractor shall also provide the following as necessary for their scope of work:

     a.  Ice and drinking water for his employees.
     b.  Storage sheds and trailers, and office facilities including telephone, fax, copier, and any other support elements as required for their own use.

18.   The Subcontractor shall remove all temporary facilities and restore areas to original condition before final acceptance of the work.

19.   The Subcontractor shall provide a complete system in accordance with the intent of the drawings, specifications, and contract documents. It is understood that there will be no revisions to the contract amount as long as the scope of work and the intent as referenced is not altered.

20.   The Subcontractor will cooperate with Grays "0" punch list initiative.

21.   All material will be staged in designated areas and on sufficient dunnage to ensure the material is maintained in a clean manner, free from mud and debris prior to and after installation. No stoned staging areas will be provided, and this is the Subcontractors responsibility if required to meet schedule.

22.   Clean up of work daily to dumpster, located centrally, by Gray.

23.   Provide all hoisting, dunnage, tools, personnel lifts and equipment necessary to unload, stage, and install this scope of work.

Exhibit A - Design-Build Subcontract Agreement

**PRICE BREAKDOWN:**

Please submit quantities for the following items of work. Prices shall include all labor, material, taxes, insurance, payroll overhead, benefits, overhead and profit. Gray reserves the right to reject any or all unit prices.

| Description | Unit | Quantity | Rate | Amount Including Sales Tax |
|---|---|---|---|---|
| Phase I | | | | $3,916.00 |
| Phase II | | | | TBD |
| Phase III | | | | TBD |
| Total | | | | $3,916.00 |

Monthly billings submitted by the Subcontractor must be broken down and charged against the following code(s).

| COST CODE | DESCRIPTION | AMOUNT |
|---|---|---|
| 207005-17-100S | Design Build Fire Protection | $3,916.00 |

Page 5

Exhibit A - Design-Build Subcontract Agreement

 **Gray Construction**

### EXHIBIT B
### DRAWING LIST
### SUBCONTRACT AGREEMENT NO.: 207005-17-100S

| Drawing No. | Drawing Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit B - Design-Build Subcontract Agreement



**Gray Construction**

## EXHIBIT C
## SPECIFICATIONS & OTHER DOCUMENTS
## SUBCONTRACT AGREEMENT NO.: 207005-17-100S

| Document No. | Document Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit C - Design-Build Subcontract Agreement

 **Gray Construction**

EXHIBIT D
OTHER PROVISIONS
SUBCONTRACT AGREEMENT NO.: 207005-17-100S

Not applicable.

Exhibit D - Design-Build Subcontract Agreement

**Exhibit E**                     APPLICATION FOR PAYMENT                     **GRAY**

*REMIT TO:*
**GRAY CONSTRUCTION, INC.**
**Post Office Box 8330**
**Lexington, Kentucky 40533-8330**

| | |
|---|---|
| Date: | Gray Project: |
| Subcontractor Name: | Gray Project No.: |
| Remit To Address: | Subcontractor Project Number: |
| City, State, Zip: | Date of Subcontract: |
| Contact Person: | Application No.: |
| Phone:                Fax: | Billing Period: From:                To: |

Interim ☐        Final ☐        Retention ☐

## STATEMENT OF SUBCONTRACT

Original Subcontract Amount                                $ _____

**APPROVED** Change Order #1 Thru _____            $ _____

Adjusted Subcontract Amount to Date                     $ _____

## JOB TO DATE APPLICATION CALCULATIONS

| | | Totals to Date |
|---|---|---|
| Total Value of Work Complete & Mat'l Stored (per breakdown)... | A | $ |
| Less _____ % Retainage | B | $ |
| Total to Date Less Retainage (Line A - Line B) | C | $ |
| Less Previous Applications | D | $ |
| Amount of This Application (Line C - Line D) | E | $ |

**FOR GRAY USE ONLY**

Approved by: _____

Date: _____

Pay with money from Customer Billing Est. # _____

Change Order Needed: _____

Insurance Needed: _____

Other Payment Instructions: _____

_____

Page 1
Exhibit E – Design-Build Subcontract Agreement

Rev: 8/03

**Exhibit E**                    VALUE OF WORK COMPLETE BREAKDOWN                    **GRAY**

| A | B | C | D | E | F | G | H* | I |
|---|---|---|---|---|---|---|---|---|
| Cost Code(s) | Description | Original Contract Amount | Approved Change Order(s) Amount | Current Contract Amount (C+D) | Value of Work Complete | Materials Stored | Total Value of Work Cmpl & Mat'l Stored (F+G) | % Cmpl |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | TOTALS —— | | | | | | | |

\* Must include subtotals by cost code for both original contract value and change orders.

Exhibit E – Design-Build Subcontract Agreement

**Exhibit E**　　　LIST OF SUB-SUBCONTRACTOR/MATERIAL SUPPLIERS PERFORMING WORK UNDER YOUR SUBCONTRACT　　　**GRAY**

**(Attach separate list if necessary)**

Listed below is each and every Sub-subcontractor and/or Material Supplier who has performed work for this Subcontractor on the aforementioned project, together with payments which have been made to each Sub-subcontractor and/or Material Supplier and the unpaid amounts claimed by each, through the billing period for this Application for Payment.

| Sub-Subcontractors and/or Material Suppliers | Address/Phone No. | Description of Work | Previous Amount Paid | Unpaid Amount Claimed | Lien Waiver Attached ☑ |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Exhibit E**　　　　SUBCONTRACTOR AFFIDAVIT AND WAIVER OF LIEN - ACKNOWLEDGMENT OF PAYMENT　　　**GRAY**

Subcontractor, having a Subcontract with Gray Construction, Inc. on the aforementioned project, has performed work and/or furnished materials, equipment, and/or machinery or has fabricated materials especially for the Project, during the Billing Period described on page 1 of this Application for Payment.

Subcontractor has paid in full all bills or obligations for labor, sub-subcontract work, payroll taxes, material, (whether or not specifically fabricated for this project), equipment, and/or machinery, which are due or payable on or before the last day of the Billing Period.

The Subcontractor further certifies that it has complied with all federal, state and local tax and employment laws, including, but not limited to, Social Security, Unemployment and worker's compensation laws, applicable to its contract and work on the Project through the Billing Period.

The Subcontractor hereby waives and releases all rights to liens and claims against the Owner, Gray, and any surety for the performance of his contract from inception through the Billing Period of this Application for Payment, except for (a) retention which is unpaid to date and (b) work which has been performed which is not the subject of an approved change order <u>and</u> which has been described in an attached document. The Subcontractor further states that no other person has any right to a lien or claim against the Owner on account of work performed or for material, equipment, and/or machinery, or for material especially fabricated for the Project, furnished to the Subcontractor through the Billing Period of this Application for Payment.

This waiver and release is given with the understanding that Gray Construction, Inc. and others will rely upon it, and to induce Gray to make payments to the Subcontractor. The waiver and release will become effective immediately upon the receipt of the amount shown in Line E of "Job to Date Application Calculations".

If this amount is a final payment request, there are attached hereto final waivers and releases for liens from all sub-subcontractors and material suppliers.

The Subcontractor hereby certifies that the foregoing Application for Payment is true and accurate and properly describes the work performed and materials, equipment, machinery or materials furnished or fabricated especially for the Project during the period covered and the payments to which the undersigned is entitled under the contract and applicable change orders as a result.

State of: _____    County of: _____

Subscribed and sworn before me this _____ day of _____, _____ by

_____, the _____ of

_____, a _____ corporation (or partnership or sole
proprietorship), on behalf of the Subcontractor.

_____ Notary Public   My commission expires: _____

_____
Subcontractor

_____
Signature/Title

_____
Printed Name

Exhibit E – Design-Build Subcontract Agreement

## EXHIBIT F
## SUB-SUBCONTRACTOR OR MATERIAL SUPPLIER
## WAIVER OF MECHANICS AND/OR MATERIALMEN'S LIEN

Project Name: _____ Location: _____
(hereinafter THE PROJECT)

Subcontractor to Gray: _____
(hereinafter SUBCONTRACTOR)

Sub-Subcontractor or Supplier
to above listed Subcontractor: _____
(hereinafter SUB-SUBCONTRACTOR/SUPPLIER)

      WHEREAS, GRAY CONSTRUCTION, INC. is the General Contractor (hereinafter GRAY) for the construction of a facility for THE PROJECT referenced above, and,

      WHEREAS, the undersigned has furnished and received payment for materials and/or labor in the amount of $_____ to the SUBCONTRACTOR for incorporation into said project.

      NOW, THEREFORE, as an inducement to GRAY to make certain progress payments to SUBCONTRACTOR, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT prior to the _____ day of _____, 20 _____.

**Final Waiver of Lien**: By initialing in this space the undersigned represents that it has furnished and received FULL AND FINAL payment for materials and/or labor from the SUBCONTRACTOR which was incorporated into said project. THEREFORE, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT.

_____
(Name of sub-subcontractor/material supplier)

_____
(Address)

_____
(Phone)

_____
(Signature)

State of: _____
County of: _____

Subscribed and sworn to before me this _____ day of _____, 20 _____ by
_____, the _____ of _____,
a ___ corporation ___ partnership ___ sole proprietorship, on behalf of the said entity.

_____ Notary Public  My commission expires: _____

Rev. 8/03

Exhibit F -- Design-Build Subcontract Agreement

## SUBCONTRACT AGREEMENT

### BETWEEN

### GRAY CONSTRUCTION, INC.

### AND

### Cooper's Steel Fabricators, Inc.



**PROJECT NAME:**      **Hwashin Storm Damage**

**SUBCONTRACT NUMBER:**      **207005-05-100**



| | | |
|---|---|---|
| Standard Subcontract Agreement | Issue Date: | 08/01/03 |
| | Revision No.: | 4 |
| | Revision Issue Date: | 05/23/06 |

**SUBCONTRACT AGREEMENT**

**Gray Construction, Inc.**

**TABLE OF CONTENTS**

| SECTION | PAGE |
|---|---|
| 1. AGREEMENT | 1 |
| 2. SCOPE OF WORK | 3 |
| 3. SCHEDULE OF WORK AND COMPLETION | 4 |
| 4. SUBCONTRACT PRICE | 5 |
| 5. PAYMENT | 5 |
| 6. CHANGES, CLAIMS AND DELAYS | 9 |
| 7. GRAY'S AUTHORIZED REPRESENTATIVES | 11 |
| 8. SUBCONTRACTOR'S OBLIGATIONS | 11 |
| 9. SUBCONTRACT BONDS | 15 |
| 10. WARRANTY AND CORRECTION OF WORK | 16 |
| 11. RECOURSE BY GRAY | 17 |
| 12. SUSPENSION OR TERMINATION BY OWNER | 18 |
| 13. LABOR RELATIONS | 19 |
| 14. INDEMNIFICATION | 20 |
| 15. INSURANCE | 21 |
| 16. DISPUTE RESOLUTIONS | 22 |
| 17. MISCELLANEOUS PROVISIONS | 24 |
| 18. SPECIAL PROVISIONS | 25 |
| 19. SIGNATURE PAGE | 26 |

SUBCONTRACT AGREEMENT

Gray Construction, Inc. # <u>207005-05-100</u>

## SECTION 1

### AGREEMENT

This is the Subcontract Agreement (hereinafter "Agreement") made 10/17/06 by and between GRAY CONSTRUCTION, INC., 10 Quality Street, Lexington, Kentucky 40507-1450 (hereinafter referred to as "Gray"), and the Subcontractor named below (hereinafter referred to as the "Subcontractor") to perform part of the work on the following project.

1.1    SUBCONTRACTOR                    **Cooper's Steel Fabricators, Inc.**

    Mailing Address:                                 Remit to Address:
    **503 North Hillcrest Drive**                     **503 North Hillcrest Drive**
    **Shelbyville, TN  37160**                        **Shelbyville, TN  37160**

    Telephone #    **931-684-7962**                  **931-684-7962**
    Fax #          **931-684-7968**                  **931-684-7968**

    Subcontractor  **X** is        is not  a Corporation:    FEIN#  **62-1040167**

1.2    AUTHORIZED REPRESENTATIVES
    a.  For Gray (see section 7)
        On site:   **Daniel Phillips**
        Off site:  **David Hird**
    b.  For Subcontractor (see section 8.8)
        On site:   **TBD**
        Off site:  **Mike Branch**

1.3    PROJECT
    **Hwashin Storm Damage**
    **Greenville, Alabama**

1.4    OWNER
    **Hwashin America Corporation**
    **Gyeongbuk, Korea**

1.5    COMPLETION OF SUBCONTRACTOR'S WORK (see section 3.2)
    a.  Date of Substantial Completion:    **TBD**
    b.  Date of Final Completion:          **TBD**

1.6    SUBCONTRACT PRICE (see          **$13,762.00**
    section 4)
    **Thirteen thousand seven hundred sixty-two and 00/100**    Dollars

1.7    RETAINAGE (see section          ~~10~~ %  _[handwritten notations]_
    5.2.2)

1.8    PROGRESS PAYMENT APPLICATION DATE  _[handwritten: PHASE 1 ONLY]_
           25th  day of each calendar month  (see section 5.2.3)

---

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

1.9    PERFORMANCE BOND & LABOR & MATERIAL PAYMENT BOND
_____ Are ___x___ Are Not    required  (see section 9.1)

1.10   PROFESSIONAL LIABILITY INSURANCE (Errors and Omissions)
_____ Is ___x___ Is Not    required  (see section 15.1.4)

1.11   REQUIREMENTS FOR EXCESS OR UMBRELLA LIABILITY INSURANCE
___**$5,000,000**___  Occurrence and Aggregate  (see section 15.1.5)

1.12   BUILDER'S RISK INSURANCE
If Gray Construction, Inc. is furnishing the builder's risk insurance under the terms of the contract between Gray and the Owner, the subcontractor will be added as an additional named insured to the policy.  This policy will cover the insurable interest the subcontractor has in the project up to the limit of coverage.  This insurance does not cover personal tools and equipment.  The subcontractor shall be responsible for payment of any deductible, or its equivalent, resulting from a claim that is due to the fault or negligence of the subcontractor, whether in whole or in part, and  whether or not the Builder's Risk is being provided by Gray or the Owner.

1.13   UTILIZATION OF SMALL BUSINESS CONCERNS
Subcontractor is certified/recognized as one of the following: ___ Small Business ___ Small Disadvantaged Business ___ Woman-Owned Small Business ___ HUBZone Small Business ___ Veteran-Owned Small Business ___ Service Disabled Veteran-Owned Small Business _x_ None of the Above

# SECTION 2

## SCOPE OF WORK

2.1    SUBCONTRACTOR'S WORK. Gray contracts with the Subcontractor as an independent contractor to perform the work described in the Scope of Work attached as Exhibit A in strict accordance with the Subcontract Documents. The Subcontractor shall perform such work (the "Work") under the general direction of Gray and in accordance with this Agreement and the Subcontract Documents. The Subcontractor shall perform each activity necessary or incidental to complete the work, which is described more particularly, but not exclusively, in Exhibit A. The provisions of this Agreement and Exhibit A are intended to complement each other, but if there is any inconsistency, Exhibit A shall govern.

2.2    SUBCONTRACT DOCUMENTS. In addition to this Agreement, the documents which form this Subcontract and which are binding on the Subcontractor (collectively the "Subcontract Documents") include the Contract Documents identified in the Contract between Gray and the Owner, which are incorporated by reference, and the Subcontract Documents set forth in Section 18.5. In case of an inconsistency between this Agreement and the Contract Documents, this Agreement shall govern.

2.2.1    DRAWINGS, PLANS AND SPECIFICATIONS. Gray has furnished Subcontractor with one set of Criteria Documents, and if available, Drawings, Plans and Specifications included in the Subcontract Documents. Additional copies will be furnished, on request, at the Subcontractor's expense. Subcontractor shall furnish the design for its portion of the work so as to coordinate with the Work as a whole, and with other trade Subcontractors. To the extent that the Subcontractor fails to properly interpret the Criteria Documents or the Preliminary Design Documents, Subcontractor shall be responsible to correct all errors at its own expense.

2.2.2    COPIES OF P.O.'S AND SUB-SUBS FOR MAJOR SCOPE ITEMS. Upon receipt of written approval of material and/or equipment shop drawings or brochures by the Owner or Architect, Subcontractor shall immediately furnish the following additional information to Gray for each item of equipment, fixture or material:

.1    Contact or representative of both manufacturer and supplier

.2    Subcontractor's Purchase Order Numbers

.3    Manufacturer's Order Number

.4    Supplier's Order Number

.5    Scheduled delivery date.

2.2.3    Subcontractor's superintendent, foreman, or other designated individual shall deliver a report, in form and content specified by Gray to Gray's office before the end of each shift, whenever Subcontractor has employees working on the Project site. The report will state the number of employees Subcontractor has on the Project that shift, subdividing into categories (foremen, tradesmen, laborers, etc.). Subcontractor shall also list the equipment on site, and any material deliveries.

2.3    EXAMINATION OF CONTRACT AND SUBCONTRACT DOCUMENTS; SITE INSPECTION. The Subcontractor warrants and represents that it has visited the site of the proposed Work, has familiarized itself with existing conditions and the character of the operations to be carried on under this Agreement and that it fully understands the facilities, difficulties and restrictions attending the execution of the Work. The Subcontractor acknowledges that it has examined all Subcontract Documents, and the requirements of the various governmental agencies, departments and bureaus having jurisdiction over the Project, and from its own investigation has satisfied itself as to the nature and location of the Work, the general local conditions, and all

matters which in any way affect the Subcontractor's Work or its performance thereof. The Subcontractor further acknowledges that having made said visitation and examination, it is not aware of any existing conditions, circumstances, or requirements that will necessitate change in the scope of the Work, the Subcontract Price, or the Schedule of Work.

2.4     OWNERSHIP AND USE OF DOCUMENTS. The drawings, specifications and other documents furnished by the Subcontractor are instruments of services and shall become the property of Gray and the Owner upon payment by the Owner and Gray. The Subcontractor shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright, to the extent not modified herein. Reproducible copies, including diskettes, may be retained by the Owner and Gray, whether the Project for which they were made is executed or not, and both are entitled to make and retain copies and reproduce them for their own use. Submission or distribution of documents to meet official regulatory requirements or for other purposes in connection with the Project is not to be construed as publication in derogation of the Subcontractor's common law copyrights or other reserved rights.

## SECTION 3

### SCHEDULE OF WORK AND COMPLETION

3.1     TIME IS OF THE ESSENCE. Time is of the essence for both parties, and they mutually agree to see to the performance of their respective work and the work of their Subcontractors so that the entire project may be completed in accordance with the Subcontract Documents and the Schedule of Work. Gray shall revise such Schedule and sequence of events as the Work progresses. No extension of time for Subcontractor's Work will be valid without Gray's written consent.

3.2     DUTY TO BE BOUND. The Subcontractor shall be bound by the Schedule of Work including, without limitation, the dates for Substantial Completion and Final Completion stated in Section 1.5 and revisions to the Schedule. The Subcontractor shall provide Gray with any requested scheduling information for the Subcontractor's Work. The Schedule of Work and all subsequent changes thereto shall be submitted to the Subcontractor in advance of the required performance.

3.3     SCHEDULE CHANGES. Subcontractor acknowledges that as construction progresses it may be necessary for Gray to change the sequential order and duration of the various activities, including those contemplated by this Agreement, to account for unanticipated delays, occurrences and other factors which act to alter Gray's original schedule. Gray may require Subcontractor, at no additional cost to Gray and Owner, to prosecute Subcontractor's Work in such sequence as the progress of other subcontractors and the Project schedule dictates. It is expressly understood and agreed that the scheduling and sequencing of the Work is an exclusive right of Gray and that Gray reserves the right to reschedule and resequence Subcontractor's Work from time to time as the demands of the Project require without any additional cost or expense to be paid to the Subcontractor.

Subcontractor shall carry on its Work promptly, efficiently, and at a speed that will not cause delay in the progress of Gray's Work or Work of other Subcontractors. If, in the opinion of Gray, Subcontractor falls behind in the progress of the Work, Subcontractor may be directed to take such steps as deemed necessary to improve the rate of progress. These steps may include, without limitation, requiring Subcontractor to increase the number of shifts, personnel overtime operations, days of Work, equipment, plant, or other remedies. Subcontractor shall submit to Gray for Gray's approval a schedule demonstrating how the required rate of progress will be regained without additional costs to the Owner or Gray.

3.4     PRIORITY OF WORK. Gray shall have the right to decide on the time, order and priority in which the various portions of Work shall be performed and all other matters relative to the timely and orderly conduct of the Subcontractor's Work. The Work will be performed as required by the composite construction schedule, which may be changed periodically by the project superintendent in order to maintain the overall schedule of Work.

3.5    COOPERATION. The Subcontractor shall cooperate with Gray by scheduling and performing Subcontractor's work so as to avoid conflict, delay in, or interference with the work of Gray, other Subcontractors or Owner's own forces.  Subcontractor shall participate, as requested by Gray, in inspections related to Substantial and Final Completion.

3.6    COMMENCEMENT OF WORK. The Subcontractor shall commence Work within three (3) calendar days from Gray's notice to proceed.  If interrupted for any reason, the Subcontractor shall resume the work within three (3) working days from Gray's notice to do so.

## SECTION 4

### SUBCONTRACT PRICE

Gray agrees to pay the Subcontractor for the satisfactory performance of the Subcontractor's Work the sum of identified in Section 1.6 (the "Subcontract Price") in accordance with Section 5, subject to additions or deductions as provided in Section 6.

Unit prices, if any, are stated in Subcontractor's Scope of Work, Exhibit A.

## SECTION 5

### PAYMENT

5.1    GENERAL PROVISIONS.

5.1.1    SCHEDULE OF VALUES. The Subcontractor has provided Gray with a schedule of values which shall be revised, if necessary for approval by Gray and the Owner, no later than the date of the Subcontractor's first application for payment.

5.1.2    PAYMENT USE RESTRICTION. No payment received by the Subcontractor shall be used to satisfy or secure any indebtedness other than one owed by the Subcontractor for labor or materials furnished in performing the Subcontractor's Work on this Project.

5.1.3    PAYMENT USE VERIFICATION. Gray shall have the right at all times to contact the Subcontractor's lower tier Subcontractors and suppliers to ensure that the same are being paid by the Subcontractor for labor or materials furnished for use in performing the Subcontractor's Work on this Project.

5.1.4    CONDITIONS PRECEDENT TO PARTIAL PAYMENT. Progress payments due under this Agreement will not be released until all of the following conditions have been met:

.1    Subcontract Agreement has been signed, returned and approved.

.2    Insurance Certificates satisfying the requirements of this Agreement have been received.

.3    A schedule of values has been received in the form and content specified by Gray.

.4    Certified payrolls, if required by Owner, received in the appropriate format.

.5    Waivers of lien from all tier subcontractors and materialmen evidencing payments through the previous month.

.6    If requested by Gray, Subcontractor agrees to likewise provide Gray with evidence satisfactory to Gray showing payment by Subcontractor of any and all contributions made

---

by Subcontractor for health and welfare payments as shown on the certified payroll, as well as payment of payroll taxes and other contributions that may be required by law.

5.1.5    PARTIAL LIEN WAIVERS AND AFFIDAVITS. As a prerequisite for payment, the Subcontractor shall provide, in a form satisfactory to the Owner and Gray, partial lien or claim waivers and affidavits from the Subcontractor, and its sub-Subcontractors and suppliers for the completed Subcontractor's Work. Such waivers may be made conditional upon payment of a specific amount stated therein. The Subcontractor's Authorized Representative(s) designated in Section 1.2(b) of this Agreement are hereby designated as authorized agents of Subcontractor to execute all lien waivers required of Subcontractor.

5.1.6    SUBCONTRACTOR PAYMENT FAILURE. In the event Gray has reason to believe that labor, material or other obligations incurred in the performance of the Subcontractor's Work are not being paid for, Gray shall give written notice of such claim or lien to the Subcontractor to insure that any progress payment shall be utilized to pay such obligations.

If upon receipt of said notice, the Subcontractor does not:

(a)    Supply evidence to the satisfaction of Gray that the monies owing to the claimant have been paid; or

(b)    Post a bond in a form and with surety satisfactory to Gray indemnifying the Owner, Gray, Gray's surety, if any, and the premises from such claim or lien;

then Gray shall have the right to exercise any or all of the following rights, until the claim or lien has been satisfied by the Subcontractor:

(1)    Retain out of any payments due or to become due to the Subcontractor for this Project or any other Gray project a reasonable amount to protect Gray from any and all loss, damage or expense including attorney's fees arising out of or relating to any such claim or lien

(2)    issue joint checks in payment of any payments due or to become due to the Subcontractor, payable to the Subcontractor and the claimant;

(3)    make direct payments of sums due the Subcontractor to the claimant.

(4)    may (but has no obligation to) bond off the lien, and backcharge all costs, attorneys' fees and other expenses involved in bonding off the lien of the Claimant.

5.1.7    PAYMENT NOT ACCEPTANCE. Payment to the Subcontractor is specifically agreed not to constitute or imply acceptance by Gray or the Owner of any portion of the Subcontractor's Work.

5.2    PROGRESS PAYMENTS.

5.2.1    APPLICATION. For Work performed during a payment period, the Subcontractor shall apply for a progress payment using Gray's standard Application For Payment and Lien Waiver form, a copy of which is attached as Exhibit E. Applications shall be submitted to Gray at P.O. Box 8330, Lexington, Kentucky 40533-8330. The application shall be for work performed up to and including the last day of the pay period, indicating work completed and, to the extent allowed under Section 5.2.4, materials suitably stored and protected during the payment period. Applications shall be accompanied by lien waivers from all sub-Subcontractors and suppliers whose labor or materials are covered by the application; such waivers shall be in the form of attached Exhibit E.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

5.2.2    RETAINAGE.  Regardless of any agreements between the Owner and Gray, or arrangements made by them, for the withholding or release of Gray's retainage, retainage shall be withheld by Gray from all progress payments made to Subcontractor.  The amount of retainage withheld from each payment shall be equal to the amount of payment earned, multiplied by the percentage identified in Section 1.7 of this Agreement.  Retainage shall be released to Subcontractor only upon completion of all requirements for final payment as provided in Section 5.3 of this Agreement.

5.2.3    TIME OF APPLICATION.  "Pay period" as used herein is defined as beginning with the first day of each calendar month, and ending with the last day of each calendar month.  The Subcontractor shall submit progress payment applications to Gray no later than the day of each payment period specified in Section 1.8 of this Agreement.

5.2.4    STORED MATERIALS.  Unless otherwise provided in the Subcontract Documents, and if approved in advance by the Owner, applications for payment may include materials and equipment not incorporated in the Subcontractor's Work but delivered and suitably stored and protected at the site or at some other location agreed upon in writing.  Approval of payment application for such stored items on or off the site shall be conditioned upon submission by the Subcontractor of bills of sale and applicable insurance or such other procedures satisfactory to the Owner and Gray to establish the Owner's title to such materials and equipment or otherwise protect the Owner's and Gray's interest therein, including transportation to the site.

5.2.5    TIME OF PAYMENT.  Receipt of payment by Gray from Owner for Subcontractor's work is a condition precedent to all progress payments by Gray to Subcontractor.  Progress payments to the Subcontractor for satisfactory performance of the Subcontractor's Work shall be made seven (7) days after receipt by Gray of payment from the Owner for such Subcontractor's Work.

5.2.6    GROUNDS FOR WITHHOLDING PAYMENT.  Gray may withhold from monthly progress payments an amount sufficient to protect Gray because:

.1    Defective work has not been remedied; materials have not been furnished; clean up has not been performed;

.2    Subcontractor has damaged any portion of the work of others;

.3    Claims, levies, attachments, stop notices or court orders have been filed or reasonable evidence indicates the probable filing of such claims, levies, attachments, notices or orders, including claims covered by insurance until such claims are accepted by the insurance carrier;

.4    Subcontractor has failed to make payments properly to its subcontractors or for labor, including fringe benefits, materials or equipment, transportation or shipping costs, taxes, fees or any other claims arising out of the Subcontractor's Work;

.5    There exists reasonable doubt that Subcontractor's Work can be completed for the unpaid balance of the Subcontract Price;

.6    There exists reasonable doubt that Subcontractor's Work, due to its own action or inaction, will be completed on schedule or in accordance with the schedule;

.7    Subcontractor is not satisfactorily prosecuting the Work of this Agreement;

.8    Subcontractor has failed to deliver insurance certificates, bonds, "as-built" or record drawings, written guarantees or warranties or the approvals required of the Subcontractor's Work by any authority having jurisdiction;

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

.9  A petition for bankruptcy or reorganization has been filed by or against Subcontractor or Subcontractor has made an assignment without the prior written consent of Contractor;

.10  Any other material breach of this Agreement by Subcontractor which has not been cured after notice from Gray.

Amounts then due shall be paid or credited to Subcontractor when Subcontractor removes the above grounds for withholding payment.

5.3    FINAL PAYMENT.

5.3.1    APPLICATION.  Upon acceptance of the Subcontractor's Work by the Owner, and Gray, and upon the Subcontractor furnishing evidence of fulfillment of Subcontractor's obligations in accordance with the Subcontract Documents and Section 5.3.2, Gray shall, without delay, forward the Subcontractor's application for final payment to the Owner.

5.3.2    REQUIREMENTS.  Before Gray shall be required to forward the Subcontractor's application for final payment to the Owner, the Subcontractor shall submit to Gray:

(a)  an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Subcontractor's Work for which the Owner or his property or Gray or Gray's surety might in any way be liable, have been paid or otherwise satisfied;

(b)  consent of surety, if any, to final payment;

(c)  satisfaction of required closeout procedures;

(d)  other data if required by Gray or Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be designated by Gray or Owner; and

(e)  written warranties of Subcontractor's materials, labor and equipment furnished under this Agreement and the Subcontract Documents.

(f)  a complete and accurate set of Record Drawings, together with Final Design drawings, appropriately stamped and originally signed by the design professional in responsible charge of the Work, and licensed in the state in which the Project was constructed.

Final payment shall constitute a waiver and release of all claims by the Subcontractor relating to the Subcontractor's Work, but shall in no way relieve the Subcontractor of liability for the obligations assumed under Section 10 hereof, or for faulty or defective work appearing after final payment.

5.3.3    TIME OF PAYMENT.  Final payment of the balance due of the contract price shall be made to the Subcontractor:

(a)  upon receipt of the Owner's waiver of all claims related to the Subcontractor's Work except for unsettled liens, unknown defective work, and noncompliance with the Subcontract Documents or warranties; and

(b)  seven (7) days after receipt by Gray of final payment from the Owner for such Subcontractor's Work, such receipt being a condition precedent for final payment to the Subcontractor.

5.4    NON-PAYMENT BY OWNER.

---

| Issue Date: | 08/01/03 |
| --- | --- |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

5.4.1    ASSUMPTION OF RISK; CONDITION PRECEDENT. The Subcontractor agrees that Gray shall have no obligation to pay the Subcontractor for any work done on this Project until Gray has been paid by the Owner. The provisions of Sections 5.2 and 5.3 stating the time and amount of progress and final payments are subject to the condition that Gray shall receive from the Owner progress or final payments in at least the amounts payable to the Subcontractor on account of work done by the Subcontractor on this Project. The time when such payments shall be due the Subcontractor shall be postponed until Gray has received same from the Owner. The Subcontractor expressly agrees to accept the risk that it will not be paid for work performed by him in the event that Gray, for whatever reason, is not paid by the Owner for such work. The Subcontractor acknowledges that it relies for payment on the credit and ability to pay of the Owner, and not of Gray. The Subcontractor agrees that payment by the Owner to Gray for work performed by the Subcontractor shall be a condition precedent to any payment obligation of Gray to the Subcontractor. The Subcontractor agrees that the liability of the surety on Gray's payment bond, if any, is subject to the same conditions precedent as are applicable to Gray's liability to the Subcontractor.

5.4.2    REMEDY. If the Owner or its designated agent does not authorize payment or Gray does not receive a payment due hereunder for any cause which is not the fault of the Subcontractor, Gray shall promptly inform the Subcontractor in writing. Gray may also diligently pursue, with the assistance of the Subcontractor, the release by the Owner of the payment due for the Subcontractor's Work. At the Subcontractor's request, Gray may institute all reasonable legal remedies to mitigate the damages and pursue full payment of the Subcontractor's application for payment including interest thereon. In that event, the cost for pursuing the Subcontractor's remedies shall be Subcontractor's responsibility. Gray, at its discretion, may require that the Subcontractor make financial arrangements satisfactory to Gray before undertaking this effort and at all times during the progress thereof.

## SECTION 6

### CHANGES, CLAIMS AND DELAYS

6.1    CHANGES. Without nullifying this Agreement, Gray may by written Subcontract Work Authorization or Subcontract Change Order make changes in the Work within the general scope of this Agreement and the Subcontractor shall perform such changes. Adjustments in the Subcontract Price or Schedule of Work, if any, resulting from such changes shall be set forth in a Subcontract Change Order. . A Subcontract Change Order is a written instrument prepared by Gray and signed by the Subcontractor stating their agreement upon the change in the scope of the Work, adjustment in the Subcontract Price or Schedule of Work. A Subcontract Work Authorization is a written instrument prepared by Gray directing a change in the Work and stating a proposed adjustment, if any, in the Subcontract Price or Schedule of Work or both. A Subcontract Work Authorization shall be used in the absence of agreement on the terms of a Subcontract Change Order.

No such adjustment shall be made for any such changes performed by Subcontractor that have not been so ordered by Gray, and approved by the Owner. If Subcontractor proceeds with additional work without the required Change Order or Work Authorization, Subcontractor does so at its own risk, and must track all actual costs incurred, including but not limited to signed time sheets, additional supervision, actual material invoices and actual equipment costs, if any. If the additional work performed without the requisite Change Order or Work Authorization from Gray results in the necessity of an extension of time, the time extension may be granted by Gray only on proof that the work affected was on the critical path. In no event shall compensation be forthcoming from Gray unless these requirements are met, as well as the requisite notice set forth in Sections 6.2 and 6.3 below.

6.2    CLAIMS RELATING TO OWNER. The Subcontractor agrees to make all claims for which the Owner is or may be liable in the manner provided in the Contract Documents for like claims by Gray upon the Owner.

Written notice of such claims shall be given by the Subcontractor to Gray within sufficient time for Gray to make such claims against the Owner in accordance with the Contract Documents or within five (5) calendar days



prior to the beginning of the Subcontractor's Work or the event for which such claim is to be made, whichever shall first occur, otherwise such claims shall be deemed waived.

6.3   CLAIMS RELATING TO GRAY. The Subcontractor shall give Gray written notice of all claims not included in Section 6.2 within five (5) calendar days of the beginning of the event for which claim is made; otherwise, such claims shall be deemed waived.

All unresolved claims, disputes and other matters in question between Gray and the Subcontractor not relating to claims included in Section 6.2 shall be resolved in the manner provided in Section 16 herein.

6.4   ADJUSTMENT IN SUBCONTRACT PRICE. If a Subcontract Change Order or Subcontract Work Authorization requires an adjustment in the Subcontract Price, the adjustment shall be established by one of the following methods:

    (a)   mutual agreement on a lump sum with sufficient substantiating data to permit evaluation;

    (b)   unit prices already established in the Subcontract Documents or if not established by the Subcontract Documents, then established by mutual agreement for this adjustment; or

    (c)   to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee.

6.5   SUBSTANTIATION OF ADJUSTMENT. If the Subcontractor does not respond promptly or disputes the method of adjustment under Section 6.4, the method and the adjustment shall be determined by Gray on the basis of reasonable costs and savings of those performing the Work attributable to the change, including, in the case of an increase in the Subcontract Price, an allowance for overhead and profit proportionate to Gray's recovery of overhead and profit, if any, under the Contract Documents.

The Subcontractor shall maintain for Gray's review and approval an appropriately itemized and substantiated accounting of the following items attributable to the Subcontract Change Order or Subcontract Work Authorization:

    (a)   labor costs, including Social Security, health, welfare, retirement and other fringe benefits as normally required, and state workers' compensation insurance;

    (b)   costs of materials supplies and equipment, whether incorporated in the Work or consumed, including transportation costs;

    (c)   costs of renting, either from Gray or from others, of machinery and equipment other than hand tools;

    (d)   costs of bond and insurance premiums, permit fees and taxes attributable to the change; and

    (e)   costs of additional supervision and field office personnel services necessitated by the change.

6.6   DELAY. If the progress of the Subcontractor's Work is substantially delayed without the fault or responsibility of the Subcontractor, then the time for the Subcontractor's Work shall be extended by Change Order to the extent obtained by Gray under the Subcontract Documents and the Schedule of Work shall be revised accordingly.

Gray shall not be liable to the Subcontractor for any damages or additional compensation as a consequence of delays caused by any person not a party to this Agreement unless Gray has first recovered the same on behalf of the Subcontractor from said person, and then to the extent of such recovery after payment of

all attorney's fees and other expenses relating thereto, it being understood and agreed by the Subcontractor that apart from recovery from said person, the Subcontractor's sole and exclusive remedy for delay regardless of cause shall be an extension in time for performance of the Subcontractor's Work.

In jurisdictions where the second paragraph herein is not enforceable, the Subcontractor agrees that it may only seek delay damages to the extent documented by actual costs and entitlement demonstrated, and the Subcontractor shall not be entitled to seek from Gray damages for actual or alleged loss of efficiency, constructive acceleration, lost productivity, stacking of trades, home office overhead, expectant underrun, season change, extended overhead, impact damages, profit upon damages for delay or similar damages calculated by formula or trade data or studies.

6.7    LIQUIDATED DAMAGES.  If the Contract Documents between the Owner and Gray permit the Owner to assess Gray for liquidated or other damages for delay beyond the completion date set forth in the Contract Documents, and such damages are so assessed, then Gray shall be entitled to assess same against the Subcontractor in proportion to the Subcontractor's share of the responsibility for such delay.

## SECTION 7

### GRAY'S AUTHORIZED REPRESENTATIVES

Gray has designated one or more persons in Section 1.2(a) of this Agreement who shall be Gray's authorized on-site and off-site representative(s).  Such authorized representative(s) shall be the only person(s) the Subcontractor shall look to for instructions, orders and/or directions, except in an emergency.

## SECTION 8

### SUBCONTRACTOR'S OBLIGATIONS

8.1    OBLIGATIONS DERIVATIVE.  The Subcontractor shall be bound to Gray by the terms of this Agreement and by the conditions of the Contract Documents between the Owner and Gray, and shall assume toward Gray all the obligations and responsibilities which Gray, by those documents, assumes toward the Owner.

8.2    RESPONSIBILITIES.  The Subcontractor shall provide timely design services in accordance with all applicable codes, laws and regulations of the locality, and shall work with the local and state regulatory agencies with respect to building permits and other permits relating to the Subcontractor's Work, and shall furnish and pay for all of the labor, supervision, materials, tools, equipment, services, and incidentals necessary for the proper performance of the Subcontractor's Work.

The Subcontract shall provide a list of proposed sub-subcontractors, and suppliers, be responsible for taking field dimensions, providing tests, order of materials and all other actions as required to meet the Schedule of Work.

8.3    WORKMANSHIP.  Every part of the Subcontractor's Work shall be executed in strict accordance with the Subcontract Documents in the most sound, workmanlike, and substantial manner.  All workmanship shall be the best of its kind performed by others engaged in the same trade.  All materials used in the Subcontractor's Work shall be furnished in ample quantities to facilitate the proper and expeditious execution of the Work, and shall be new except such materials as may be expressly provided in the Subcontract Documents to be otherwise

8.4    TEMPORARY SERVICES.  The Subcontractor shall furnish all temporary services and facilities necessary to perform its work, including, but not limited to, heat, electrical (power), telephone, water, and other utilities necessary.

8.5    COORDINATION.  The Subcontractor shall:

(a)    cooperate with Gray and all others whose work is dependent upon the progress of the Subcontractor's Work'

(b)    specifically note and immediately advise Gray of any interference with the Subcontractor's Work;

(c)    participate in the preparation of coordination drawings and work schedules in areas of congestion.

8.6    SHOP DRAWINGS AND SUBMITTALS. The Subcontractor shall submit shop drawings, product data, samples, and any other submittals required by the Subcontract Documents expeditiously and in such manner and sequence so as to avoid delay in the progress of the Work or the activities of Gray or other Subcontractors. The Subcontractor shall be responsible for accuracy and conformity with the Subcontract Documents and other submittals. Unless specifically noted by Gray, action on shop drawings and submittals by Gray shall not be deemed to authorize deviation from the Subcontract Documents.

8.7    PROGRESS REPORTS AND MEETINGS. The Subcontractor shall furnish periodic progress reports on the Work including information on the status of materials and equipment which may be in the course of preparation or manufacture.

8.8    AUTHORIZED REPRESENTATIVE AND NOTICE. The Subcontractor shall designate one or more persons who shall be the authorized Subcontractor's representative(s): (a) on-site and (b) off-site. Such authorized representative(s) shall be the only person(s) to whom Gray shall issue instructions, orders or directions, except in an emergency. Notices as required by this Agreement and other communications made to any one of the Subcontractor's Authorized Representative(s) shall be binding as if given to the Subcontractor. The authorized representative shall attend project meetings as required.

8.9    PROVISION FOR INSPECTION. The Subcontractor shall notify Gray when portions of the Subcontractor's Work are ready for inspection. The Subcontractor shall at all times furnish Gray, the Owner, and their representatives adequate means and facilities for inspecting the Work, including materials at the site or any place where materials under this Agreement may be in the course of preparation, process, manufacture or treatment.

8.10    CLEAN-UP. The Subcontractor shall follow Gray's clean-up directives and those of the Subcontract Documents, and

(a)    at all times keep the building and premises free from debris and unsafe conditions resulting from the Subcontractor's Work; and

(b)    broom clean each work area daily prior to discontinuing work in the same.

Should Subcontractor fail, after 24 hours notice from Gray, to appropriately clean an area as required by this Section, Gray shall assess the Subcontractor for the actual daily clean-up cost or a daily charge of $150.00, whichever is greater, for each day such condition is not remedied.

8.11    SAFETY PRECAUTIONS AND PROCEDURES.

8.11.1    The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by Gray and, in addition, comply with occupational safety and other applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons or property and in accordance with the requirements of the Subcontract Documents. The Subcontractor shall report to Gray within 24 hours any personal injury or property damage occurring at the site.

8.11.2    Subcontractor shall comply with Gray's Safety Requirements.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

8.11.3  <u>ALCOHOL AND DRUG FREE PROJECT</u>.  The Subcontractor recognizes that an alcohol and drug free Project is necessary to ensure the safety of the persons employed at the Project site by the Owner, Gray, the Subcontractor and others, and to protect the health and safety of the community.  The Subcontractor agrees that its employees shall not distribute, be under the influence of, or be in possession of, any form of alcohol or unlawful drug while at the Project site or while in the performance of Project-related activities.  Subcontractor's employees shall also be prohibited from using or being subject to the effects of any lawful drug while at the Project site or in the performance of Project-related activities without approval of the employee's supervisor.  The Subcontractor acknowledges that it is familiar with Gray's Alcohol and Drug Free Project Policy for Subcontractors.  The Subcontractor represents that it has established written procedures for compliance with Gray's policy and agrees that it will implement and enforce the policy throughout the course of the Project.  The Subcontractor shall indemnify and hold the Owner and Gray harmless from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or related to Subcontractor's implementation, application or enforcement of compliance procedures.

8.12    <u>ENVIRONMENTAL MATTERS</u>.

8.12.1  If a Hazardous Chemicals of a type of which an employer is required by law to notify its employees will be used on the Project site by the Subcontractor, the Subcontractor's sub-subcontractors or anyone directly or indirectly employed by them, the Subcontractor shall, prior to the Hazardous Chemical being at the site, provide a current copy of the Material Safety Data Sheet (MSDS) for such Hazardous Chemical in sufficient time to permit compliance with such laws by Gray, other subcontractors and other employers on the site.

8.12.2  The Subcontractor shall be responsible for the prompt removal of any Hazardous Chemicals and Hazardous Substances which are brought to Project site in connection with the Work but are not used or consumed and all waste generated from the Work.  The removal of any Hazardous Chemical, Hazardous Substance, or waste shall be done in accordance with all federal, state and local laws, regulations and ordinances

8.12.3  The Work shall be conducted in such a manner to avoid the discharge, dispersal, escape, release or saturation of any pollutant into the atmosphere or any body of water or on, onto, upon, in or into the surface or subsurface of land unless allowed by federal, state or local law, regulations, ordinance or permit.

8.12.4    In the event the Subcontractor encounters on the site material reasonably believed to be asbestos, polychlorinated biphenyl ("PCB"), or other Hazardous Substances which have not been rendered harmless, the Subcontractor shall immediately stop Work in the area affected and report the condition to Gray in writing.  The Work in the affected area shall resume in the absence of asbestos, PCB, or other Hazardous Substances, or when it has been rendered harmless, or by being reduced to a safe level or concentration, by written agreement of Gray and Subcontractor, or by arbitration as provided in this Agreement.  The Subcontractor shall not be required pursuant to Article 5 to perform without consent any Work relating to asbestos, PCB, or other Hazardous Substances.

8.12.5    To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless Gray, other subcontractors, and their respective agents and employees, from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Work in the affected area if in fact the material is asbestos, PCB, or other Hazardous Chemical or Hazardous Substance and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to damage to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by failure to comply with Sections 8.12.1 or 8.12.2 or by negligent acts or omissions of the Subcontractor, anyone directly or indirectly employed by it, or anyone for whose acts it may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.  Such obligation shall not be construed to

Issue Date:                08/01/03

Revision No.:                          4
Revision Issue Date:        05/23/06

negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 8.12.3.

8.12.6    For purposes of this Agreement, (a) the term "Hazardous Chemical" means any chemical defined as hazardous in the Hazardous Communication Standard, 29 C.F.R. § 1926.59 or 29 C.F.R. § 1910.1200, promulgated pursuant to the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; (b) the term "Hazardous Substances" means any substance, including solid, liquid or gaseous material, which is listed or defined as a "hazardous substance" in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S. § 9601, et seq., or regulations promulgated pursuant thereto, but does include petroleum, including crude oil or any fraction thereof, oil and oil waste as those terms are defined in the Clean Water Act, 33 U.S.C. § 1251, et seq., or regulations promulgated pursuant thereto; and source, special nuclear, or by-product material as defined by the Atomic Energy Act of 1954, 42 U.S.C. § 3011, et seq., or regulations promulgated pursuant thereto; and includes any other substance defined by federal, state or local statute, regulation or ordinance as a hazardous, toxic or dangerous waste or substance where "state" means the State in which the Work is being performed and "local" means the local jurisdiction (i.e., county, parish, city, borough, municipality, village, town, etc.) in which the Work is being performed; and (c) "pollutant" shall mean any solid, liquid, gaseous, or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and shall include any Hazardous Substance.

8.13    PROTECTION OF THE WORK AND PROPERTY.  The Subcontractor shall take all necessary precautions to properly protect the Subcontractor's Work and the work of others from damage caused by the Subcontractor's operations.  Should the Subcontractor cause damage to the Work or property of the Owner, Gray or others, the Subcontractor shall promptly remedy such damage to the satisfaction of Gray, or Gray may so remedy and deduct the cost thereof from any amounts due or to become due the Subcontractor.

8.14    COMPLIANCE WITH LAWS.  The Subcontractor shall, at all times and at its own cost, comply with all federal, state and local statutes, codes, rules, regulations, ordinances, executive orders and other laws relating to the Project and the Work.  The Subcontractor warrants and represents that it is authorized to transact business in the state and local jurisdictions where the Project is located, that it holds any and all licenses necessary to perform the Work, and that it is not currently in violation of any statutes, codes, rules, regulations, ordinances, orders, or other laws on any projects in which Subcontractor is presently engaged.

8.15    PERMITS, FEES AND LICENSES.  The Subcontractor shall give adequate notices to authorities pertaining to the Subcontractor's Work and secure and pay for all permits, fees, licenses, assessments, inspections and taxes necessary for performance, completion or use of the Subcontractor's Work.

To the extent paid to Gray under the Contract with the Owner, the Subcontractor shall be compensated for additional costs resulting from laws, ordinances, rules, regulations and taxes enacted after the date of the Agreement.

8.16    TAXES, WAGES, FRINGE BENEFITS, ASSESSMENTS.  The Subcontractor shall timely comply with all requirements applicable to payment of taxes, wages, fringe benefits, retirement benefits, unemployment compensation and other assessments, and shall upon request furnish Gray and the Owner with satisfactory proof of compliance.

8.17    LAYOUT RESPONSIBILITY AND LEVELS.  Gray shall establish principal axis lines of the building and site whereupon the Subcontractor shall lay out and be strictly responsible for the accuracy of the Subcontractor's Work and for any loss or damage to Gray or others by reason of the Subcontractor's failure to set out or perform its work correctly.  The Subcontractor shall exercise prudence so that actual final conditions and details shall result in perfect alignment of finish surfaces.

8.18    MATERIALS FURNISHED BY OTHERS.  In the event the scope of the Subcontractor's Work includes installation of materials or equipment furnished by others, it shall be the responsibility of the Subcontractor to examine the items so provided and thereupon handle, store and install the items with such skill

---

and care as to ensure satisfactory and proper installation. Loss or damage due to acts of the Subcontractor shall be deducted from any amounts due or to become due the Subcontractor.

8.19    SUBSTITUTIONS. No substitutions shall be made in the Subcontractor's Work unless permitted in the Subcontract Documents and only then upon the Subcontractor first receiving all approvals required under the Subcontract Documents for substitutions. The Subcontractor shall indemnify Gray for any increased costs incurred by Gray as a result of such substitutions, whether or not the Subcontractor has obtained approval thereof.

8.20    USE OF GRAY'S EQUIPMENT. The Subcontractor, its agents, employees, Subcontractors or suppliers shall not use Gray's equipment without the express written permission of Gray's authorized representative.

If the Subcontractor or any of its agents, employees, suppliers or lower tier Subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items owned, leased, or under the control of Gray, the Subcontractor shall be liable to Gray as provided in Section 14 for any loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be found to have been due solely and exclusively to the negligence of Gray's employees operating such equipment.

8.21    ASSIGNMENT AND SUBCONTRACTING. The Subcontractor shall not assign this Agreement, nor its proceeds, nor subcontract the whole or any part of the Subcontractor's Work, without the prior written approval of Gray.

8.22    NON-CONTRACTED SERVICES. The Subcontractor agrees that no claim for non-contracted construction services rendered or materials furnished shall be valid unless the Subcontractor provides Gray notice:

(a)    prior to furnishing of the services or materials, except in an emergency affecting the safety of persons or property;

(b)    in writing of such claim within three (3) days of first furnishing such services or materials; and

(c)    the written charge for such services or materials to Gray no later than the fifteenth day (15th) of the calendar month following that in which the claim originated.

8.23    COORDINATION. Subcontractor is responsible for coordinating its work areas and schedule with other trades in order to perform the overall project as a team.

8.24    NORMAL WORK WEEK. Unless otherwise directed in writing by Gray, the Subcontractor's Work shall be performed during a five (5) day work week extending from Monday through Friday. If the Subcontractor's work becomes behind schedule, the Subcontractor shall work overtime during the normal work week and be at no cost to Gray if Gray is not at fault for the Subcontractor being behind schedule.

## SECTION 9

### SUBCONTRACT BONDS

9.1    PERFORMANCE AND LABOR AND MATERIAL PAYMENT BONDS. Unless otherwise provided at Section 1.9 of this Agreement, the Subcontractor shall provide separate Performance and Labor and Material Payment Bonds, in a form and with surety, satisfactory to Gray in the full amount of this Subcontract. The premiums for these Bonds shall be paid by the Subcontractor and the cost thereof is included in the Subcontract Price.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

9.2    ASSURANCE OF PERFORMANCE.  If Performance and Payment Bonds are not required of the Subcontractor under Section 9.1, then throughout the duration of this Agreement, Gray may require such bonds or a letter of credit and the Subcontractor shall provide same.  Said Bonds shall be in the full amount of this Agreement in a form and by a surety satisfactory to Gray.  The Subcontractor shall be compensated for the cost of same pursuant to progress payments made hereunder after the Subcontractor furnishes the required bonds or letter of credit.  The reimbursement amount for the bonds or letter of credit shall not exceed the manual rate for such instruments.  In the event the Subcontractor shall fail to promptly provide such requested bonds or letter of credit, Gray may terminate this Agreement and re-let the work to another Subcontractor and all Gray costs and expenses incurred thereby shall be paid by the Subcontractor.

## SECTION 10

### WARRANTY AND CORRECTION OF WORK

10.1    WARRANTY.

10.1.1  The Subcontractor warrants to the Owner and Gray that materials and equipment furnished under this Subcontract will be of good quality and new unless otherwise required or permitted by the Subcontract Documents, that the Work will be performed in a good, workmanlike manner, be free from defects in materials and workmanship, and that the Work will conform with the requirements of the Subcontract Documents.  Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective in the sole judgment of Gray.  This warranty shall be in addition to and not in limitation of any other warranty or remedy provided by law or by the Subcontract Documents.  The warranty shall extend for the period agreed to by Gray in the contract between Gray and the Owner.

10.1.2  The Subcontractor further agrees to execute any additional guarantees or warranties specified in the Subcontract Documents.

10.2    CORRECTION OF WORK.

10.2.1  The Subcontractor shall promptly correct Work rejected by Gray or failing to conform to the requirements of the Subcontract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed.

10.2.2  The Subcontractor shall be obligated to correct work that is found not to be in accordance with the Subcontract Documents after substantial completion to the same extent that Gray is bound to the Owner for correction of said Work.  The Subcontractor shall begin the corrective work immediately after receipt of written notice from Gray to do so.  This obligation shall survive acceptance of the Work and termination of the Subcontract.  This obligation is in addition to, and not in limitation of, the warranty obligations under Section 10.1, it being the intent of this Agreement that warranty obligations are not restricted by Subcontractor's obligations to correct defective work.

If the Owner chooses to correct the Work without notice to Gray and opportunity for cure, the Subcontractor shall be obligated to Gray for any backcharge that the Owner has assessed Gray resulting from the Subcontractor's Work.

10.3    SATISFACTION OF WARRANTY AND CORRECTIVE WORK OBLIGATIONS.  The Subcontractor agrees to satisfy warranty and corrective work obligations without cost to the Owner or Gray.  In the event of Subcontractor's failure to satisfy these obligations, all costs for design, labor, supervision, materials, travel (including meals, lodging and mileage), equipment and overhead (at 18% of costs) incurred by Gray in the investigation, review, redesign and correction of such problem shall be paid to Gray by Subcontractor.  Design and service team costs shall be computed using Gray's standard hourly rates.  A verbal request for corrective action by Gray to the Subcontractor, together with a written confirmation of the action requested, will be provided.  If corrective action is not initiated or completed within a time reasonable under all the circumstances, Gray will

| | | |
|---|---|---|
| | Issue Date: | 08/01/03 |
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

itself commence investigation and implement corrective measures at the Subcontractor's expense. Gray's rights hereunder are in addition to all other rights and remedies pursuant to the Subcontract, and the institution of such measures by Gray shall in no way relieve Subcontractor of its primary responsibility for performing and warranting the Work in accord with the Subcontract Documents.

## SECTION 11

### RECOURSE BY GRAY

11.1    DEFAULT; NOTICE TO CURE. If the Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or fails to achieve Substantial or Final Completion, or it fails to make prompt payment for its workers, sub- Subcontractors or suppliers, disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or fails to indemnify Gray as required by this Agreement or by law, or otherwise is guilty of a breach of any provision of this Agreement, and fails within three (3) working days after receipt of written notice to commence and continue satisfactory correction of such default with diligence and promptness, then Gray, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:

(a)      supply such number of workers and quantity of materials, equipment and other facilities as Gray deems necessary for the completion of the Subcontractor's Work, or any part thereof which the Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Subcontractor, who shall be liable for the payment of such costs, including reasonable overhead, profit, as well as for other damages, and attorney's fees and dispute resolution costs;

(b)      contract with one or more additional contractors to perform such part of the Subcontractor's Work as Gray shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Subcontractor;

(c)      withhold payment of any monies due the Subcontractor pending corrective action or completion of the Subcontractor's Work to the extent required by and to the satisfaction of Gray;

(d)      set-off Gray's damages attributable to Subcontractor's default against any monies due Subcontractor under this Agreement or under any other contract between Gray and the Subcontractor; and

(e)      terminate the Subcontract Agreement as set forth below.

In the event of an emergency affecting the safety of persons or property, Gray may proceed as above without notice.

11.2    TERMINATION BY GRAY. If the Subcontractor fails to commence and satisfactorily continue correction of a default within three (3) working days after receipt by the Subcontractor of the notice issued under Section 11.1, then Gray may terminate this Agreement by written notice to the Subcontractor and its surety, if any, and use any materials, equipment and/or employ such workers or Subcontractors as Gray deems necessary to complete the Work.

All of the costs incurred by Gray in so performing the Subcontractor's Work, including reasonable overhead, profit and attorney's fees shall be deducted from any monies due or to become due the Subcontractor. The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the subcontract price.

11.3    BANKRUPTCY.

Standard Subcontract Agreement

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 4 |
| Revision Issue Date: | | 05/23/06 |

11.3.1   <u>TERMINATION ABSENT CURE</u>.  If  Subcontractor files a petition under the Bankruptcy Code, this Agreement shall terminate if the  Subcontractor or the  Subcontractor's trustee (a) rejects the Agreement, or (b) if there has been a default, the  Subcontractor is unable to give adequate assurance that the  Subcontractor will perform as required by this Agreement, or (c) is otherwise unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

11.3.2   <u>INTERIM REMEDIES</u>.  If the  Subcontractor is not performing in accordance with the Schedule of Work at the time a petition in bankruptcy is filed, or at any subsequent time, Gray, while awaiting the decision of the  Subcontractor or its trustee to reject or to assume this Agreement and provide adequate assurance of its ability to perform hereunder, may take such steps as are reasonably necessary to maintain the Schedule of Work.  Gray may offset against any sums due or to become due the  Subcontractor all costs incurred in pursuing any of the remedies provided hereunder, including, but not limited to, reasonable overhead, profit and attorneys' fees.  The  Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Price.

11.4   <u>SUSPENSION BY GRAY</u>.  Gray may order the  Subcontractor in writing to suspend, delay, or interrupt all or any part of the  Subcontractor's Work for such period of time as may be determined to be appropriate for the convenience of G ray.  Phased or interrupted Work when required shall not be deemed a suspension of Work.

The Subcontractor shall notify Gray in writing within five (5) calendar days after receipt of Gray's order of the effect of such order upon the  Subcontractor's Work.  To the extent, and only to the extent, allowed Gray under the Contract Documents, the Subcontract Price or Schedule of Work shall be adjusted by Subcontract Change Order for any increase in the time or cost of performance of this Agreement caused by such suspension, delay, or interruption.

Neither the Subcontract Price nor the Schedule of Work shall be adjusted under this Section for any suspension, delay or interruption to the extent that performance would have been so suspended, delayed or interrupted by the fault or negligence of the  Subcontractor or by a cause for which the  Subcontractor would have been responsible.

11.5   <u>WRONGFUL EXERCISE</u>.  If Gray wrongfully exercises any option under this Section 11, Gray shall be liable to the  Subcontractor solely for the reasonable value of work performed by the  Subcontractor prior to Gray's wrongful action, including reasonable overhead and profit, less prior payments made.  Subcontractor shall not be entitled to recover any other incidental or consequential damages, including but not limited to profits attributable to unperformed Work.

11.6   <u>REMEDIES CUMULATIVE</u>.  All the rights and remedies of Gray in the event of a default by Subcontractor under this Agreement shall be cumulative to the greatest extent permitted by law and shall be in addition to all other rights and remedies available to Gray at or  in equity.

## SECTION 12

### SUSPENSION OR TERMINATION BY OWNER

12.1   <u>SUSPENSION BY OWNER</u>.  Should the Owner suspend Gray's contract or any part of Gray's contract which includes the  Subcontractor's Work, Gray shall so notify the  Subcontractor in writing and, upon receipt of said notice, the  Subcontractor shall immediately suspend the Work.

12.2   <u>TERMINATION BY OWNER</u>.  If the Owner, for any reason, terminates Gray's contract or any part that includes the  Subcontractor's Work, Gray shall so notify the  Subcontractor in writing and upon receipt of said notice, this Agreement shall also be terminated and the  Subcontractor shall immediately stop the Work.

12.3    CLAIMS FOR OWNER SUSPENSION OR TERMINATION.  In the event of such Owner suspension or termination, Gray's obligation to the Subcontractor is limited to the extent of Gray's recovery, on the Subcontractor's behalf, under the Contract Documents.  Gray agrees to cooperate with the Subcontractor, at the Subcontractor's expense, in the prosecution of any Subcontractor claim arising out of an Owner suspension and to permit the Subcontractor to prosecute said claim, in the name of Gray, for the use and benefit of the Subcontractor.  Administrative and overhead costs, attorney's fees and other expenses incurred by Gray while assisting the Subcontractor in the prosecution of such claim shall be deducted from any recovery paid to Subcontractor.

12.4    STIPULATION.  The provisions of this Section 12 shall not be construed to create any obligation upon Gray to pursue any claim or litigation on behalf of the Subcontractor.

## SECTION 13

### LABOR RELATIONS AND IMMIGRATON

13.1    ICOMPLIANCE WITH IMMIGRATION REFORM AND CONTROL ACT OF 1986 ("IRCA").  Gray and Subcontractor agree that Subcontractor shall be obligated to comply with all requirements imposed on employers under IRCA with regard to every Subcontractor employee ("Contract Worker") who will perform services for Subcontractor, where such service is provided in connection with Subcontractor's performance of this Subcontract.  Subcontractor further agrees that Subcontractor is the "employer" as that term is defined at 8 C.F.R. Section 274a.1(g), and that Gray is not the "employer" as so defined, with regard to such Contract Workers.  In furtherance of its duties as employer under IRCA, Subcontractor agrees to do the following:

A.    Complete USCIS Form I-9 for all Contract Workers.  Subcontractor agrees that it has sole responsibility for completing Form I-9 for all Contract Workers who provide services as a part of Subcontractor's performance of this subcontract, and that it will do so and will further update such Form to the extent required by law.  Subcontractor further warrants that all of Subcontractor's agents and/or employees who complete Form I-9 for such Contract Workers will be knowledgeable of all Form I-9 requirements, including but not limited to, knowledge of which documents do and do not satisfy the requirements of Form I-9, and that such agents and employees will otherwise complete Form I-9, and that such agents and employees will otherwise complete Form I-9 in full compliance with IRCA.

B.    Subcontractor's Warranty of Employment Authorization for all Contract Workers. Subcontractor hereby warrants that no Contract Worker will provide services pursuant to this subcontract until Subcontractor has completed Form I-9 for such Contract Worker in the manner required by IRCA.  Subcontractor further warrants that it will not permit any Contract Worker to perform services under this subcontract who Subcontractor knows or has reason to believe is not authorized to work in the United States, regardless of whether such individual is able to produce documents which satisfy the requirements of Form I-9.  Subcontractor understands that Gray is acting in reliance on Subcontractor's warranty as described in this subparagraph and further states that without Subcontractor's warranty that it has taken all necessary steps to comply with IRCA and that Subcontractor believes all Contract Workers are authorized to work in the United States.

C.    Removal of Contract Workers not Authorized for Employment in the United States. Subcontractor agrees that if at any time after it assigns a Contract Worker to perform services under this subcontract, Subcontractor learns or has reason to believe that any Contract Worker is not authorized to work in the United States, Subcontractor shall immediately so inform Gray and Subcontractor shall cease assigning work to such Contract Worker providing services under this Subcontract.

D.    Indemnification and Hold Harmless.  Subcontractor agrees that in any event any government agency determines that any Contract Worker hired by Subcontractor to perform duties under this subcontract is not authorized for employment in the United States, Subcontractor shall indemnify and hold harmless Gray and any of Gray's agents, employees, officers, directors, trustees, or other persons acting on Gray's behalf, from any liability incurred by Gray as a result of such determination.  Such indemnification shall include, by way of example but not in any way limited to, any civil or criminal fines or penalties assessed, alleged

| Page 19 | | Issue Date: | 08/01/03 |
| --- | --- | --- | --- |
| | | Revision No.: | 4 |
| Standard Subcontract Agreement | | Revision Issue Date: | 05/23/06 |

and any costs incurred in responding to or participating in any government investigation, finding, recommendation, hearing, appeal or any other proceeding, including attorneys' fees and costs.

13.2    LABOR HARMONY.    Subcontractor and its lower tier Subcontractors shall not employ anyone in the Subcontractor's Work whose employment may be objectionable to Gray or the Owner. All labor used throughout the Work by Subcontractor or any of its lower tier Subcontractors shall be of a standing or affiliation that will permit the Project to be carried on harmoniously and without delay, and that will not, in any case, or under any circumstances, cause any disturbance, interference or delay to the progress of the Project.

13.3    LABOR DISPUTES.    Subcontractor and all persons in privity with it agree that, where its Work or any of the Work of Gray or other Subcontractors is stopped or delayed or interfered with by strikes, slow-downs or work interruptions or the threats thereof, resulting from an act or failure to act of Subcontractor and/or those in privity with it, or any of their employees or agents, then Gray, at its sole option, shall afford Subcontractor twenty-four (24) hours notice wherein Subcontractor shall take action to maintain the harmony of the Work, or make such other arrangements, satisfactory to Gray that will ensure the harmonious continuation of the Work. Subcontractor's failure to so comply within the allotted time shall be an event of default, for which Gray may, at its sole option, terminate this Agreement pursuant to Section 11.1.

## SECTION 14

### INDEMNIFICATION

14.1    SUBCONTRACTOR'S PERFORMANCE.    To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors and Subcontractors and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of the Subcontractor's Work provided that:

(a)    any such claim, damage, loss or expense is attributable to bodily injury, personal injury, sickness, disease or death, or to damage to or destruction of tangible property including the loss of use resulting therefrom, to the extent caused or alleged to be caused by any negligent act or omission of the Subcontractor or any person directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable (including sub-Subcontractors and suppliers of Subcontractor).

(b)    litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the work or materials or processes used by the Subcontractor, or its subcontractors and/or suppliers

(c)    claims against or through Gray or liability for claims and liens for labor performed or materials used or furnished through or under Subcontractor on the Project.

(d)    liability or claims against or through to Gray resulting from the Subcontractor's failure to comply with applicable licensing requirements or Code requirements.

(e)    liability imposed upon Gray directly or indirectly by Subcontractor's failure or the failure of any of its employees to comply with law, ordinances, rules, regulations or requirements, including Occupational Safety and Health Administration violations and any penalties, including enhancements, resulting in whole or in part from Subcontractor's acts or omissions.

(f)    such obligations shall not be construed to negate, or abridge, or otherwise reduce any other right or obligation of indemnity under this Agreement or which would otherwise exist as to any party or person described in this Section 14.

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

14.2     NO LIMITATION OF LIABILITY.  In any and all claims against the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors or Subcontractors, or any of their agents or employees, by any employee of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, the indemnification obligation under this Section 14 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under worker's or workmen's compensation acts, disability benefit acts or other employee benefit acts.

## SECTION 15

### INSURANCE

15.1     SUBCONTRACTOR'S INSURANCE.  Prior to beginning the Work, the Subcontractor shall procure for its Work, and furnish proof of, Workers' Compensation Insurance, Employer's Liability Insurance, Commercial (Comprehensive) General Liability Insurance (including contractual liability insurance covering Subcontractor's obligations under Section 14), Comprehensive Automobile Liability Insurance, and all other insurance and extensions thereof required of Gray insofar as the requirements relate to Subcontractor's Work. Gray shall be named as an additional insured on the Subcontractor's Commercial (Comprehensive) General Liability policy.  Subcontractor shall procure and maintain at all times during the course of the Work (including corrective or warranty work) the required insurance with limits of liability not less than those listed below. Policies shall be in a form satisfactory to Gray and issued by insurers licensed to do business in the state where the Project is located and who are rated no lower than A by Best Insurance Guide.

15.1.1   WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY.

(a)     Statutory coverage in each state in which Subcontractor's employees are engaged in the performance of the Work;

(b)     Employer's Liability:

| $100,000 | - | bodily injury for each accident |
| $500,000 | - | policy limit for bodily injury by disease |
| $100,000 | - | for each employee for bodily injury by disease. |

15.1.2   COMMERCIAL GENERAL LIABILITY.

(a)     Limits of Liability:

| $1,000,000 | - | general aggregate |
| $1,000,000 | - | products and completed operations aggregate |
| $1,000,000 | - | personal and advertising injury |
| $1,000,000 | - | each occurrence |

(b)     Coverage Details:

Coverage shall be by Standard Commercial General Liability Occurrence Form including:

Personal and Advertising Injury, Contractual Liability, Explosion, Collapse and Underground Liability (if applicable), Broad Form Property Damage, Independent Contractors, and Products and Completed Operations.

This policy shall add Gray as an insured thereunder by proper endorsement.

15.1.3   AUTOMOBILE LIABILITY

| | | |
|---|---|---|
| Page 21 | Issue Date: | 08/01/03 |
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |



(a)    Limits of liability: $1,000,000 per accident

(b)    Coverage details:

All owned, non-owned and hired vehicles.

15.1.4  PROFESSIONAL LIABILITY.  Professional Liability (Errors and Omissions) coverage with a minimum limit of $250,000 each claim and $250,000 in the aggregate, if required by Section 1.10.

15.1.5  EXCESS OR UMBRELLA LIABILITY. Subcontractor shall include Excess or Umbrella Liability Insurance in an amount not less than indicated in Section 1.11.

15.1.6  CERTIFICATE OF INSURANCE.  Subcontractor shall furnish Gray with a certificate of insurance (or certified copies of its insurance policies), which Subcontractor warrants and represents is a true and accurate representation of Subcontractor's existing insurance coverage. This certificate shall indicate all endorsements, including Gray, and Owner if applicable, as additional insured by standard endorsements CG2010 (07/04) and CG2037 (07/04).

15.2    CANCELLATION, RENEWAL OR MODIFICATION. All insurance policies shall contain a provision that the coverages afforded thereunder shall not be cancelled or not renewed, nor restrictive modifications added, until at least thirty (30) days prior written notice has been given to Gray unless otherwise specifically required in the Subcontract Documents.

No progress payment will be made unless Gray has been furnished evidence of required coverages and endorsements as required by this Subcontract.

In the event the Subcontractor fails to obtain or maintain any insurance coverage required under this Agreement, Gray may purchase such coverage and charge the expense thereof to the Subcontractor, or terminate this Agreement.

15.3    WAIVER OF RIGHTS.  Gray and Subcontractor waive all rights against each other and the Owner, separate contractors, and all other Subcontractors for loss or damage to the extent covered by Builder's Risk or other similar insurance covering improvements or materials at the Project site, except such rights as they may have to the proceeds of such insurance.

If not covered under the Builder's Risk policy of insurance or any other property or equipment insurance required by the Subcontract Documents, the Subcontractor shall procure and maintain at the Subcontractor's own expense property and equipment insurance for portions of the Subcontractor's Work stored off the site or in transit, when such portions of the Subcontractor's Work are to be included in an application for payment under Section 5.

15.4    ENDORSEMENT.  If the policies of insurance referred to in this Article require an endorsement to provide for continued coverage where there is a waiver of subrogation, the owners of such policies will cause them to be so endorsed.

15.5    PRIMARY COVERAGE.  The insurance required of Subcontractor must be primary and non-contributory with Gray's insurance program.

## SECTION 16

### DISPUTE RESOLUTION

16.1    DISPUTE RESOLUTION.  All claims, disputes and matters in question arising out of, or relating to, this Agreement or the breach thereof, except for claims which have been waived by the making or acceptance

of final payment and the claims excluded or limited by Sections 6.2 and 6.6, shall be resolved by mediation, arbitration and/or litigation at Gray's sole option. The provisions for arbitration shall be specifically enforceable under the Federal Arbitration Act. The site for mediation, litigation or arbitration shall be at the Project site or Lexington, Kentucky, as selected by Gray, unless required otherwise by Gray's agreement with Owner.

   16.2    DISPUTE RESOLUTION PROCEDURE. Prior to a demand for arbitration, or initiation of litigation of claims, the parties shall proceed as follows, as an express condition precedent to commencing formal claims against the other relating to or arising out of the dispute:

   (a)    The party asserting a claim shall do so in writing and within the notice period, if any, established for such claims by the Subcontract Documents. In the absence of a notice period set by the Subcontract Documents, the notice of claim shall be given as soon as practicable but in no event later than five (5) calendar days after the claimant is aware of the event from which the claim arises.

   (b)    The parties shall then attempt in good faith to negotiate a resolution of disputed claims during the next twenty (20) calendar days before pursuing any other means of dispute resolution.

   (c)    If claims remain unresolved, the parties shall endeavor to resolve disputes by proceeding at the instance of either to non-binding mediation conducted under such rules as the parties may agree to employ. The parties shall divide the cost of the mediator evenly among them.

   (d)    DISPUTES RELATING TO GRAY. Notwithstanding anything stated above, if any dispute shall arise between Gray and the Subcontractor pertaining in any manner to the construction or interpretation of this Agreement, or to the rights or obligations of the parties, or to the breach of this Agreement, which the parties are unable to settle by mutual agreement, Gray shall have the exclusive option either to have the dispute determined by a court or by arbitration in accordance with the Arbitration Rules of the Center for Public Resources. Gray, Subcontractor and Subcontractor's surety agree that all claims, disputes, and other matters in controversy between Gray and Subcontractor, arising out of or relating to the Subcontract, or the breach thereof, except as provided in the Contract Documents, shall be resolved in the appropriate forum in the County of Fayette, Kentucky. Gray shall exercise its exclusive option by commencing a court action or by commencing an arbitration proceeding. If Subcontractor first commences a court action with respect to a dispute which Gray desires to have determined by an arbitration proceeding, or if Subcontractor first commences an arbitration proceeding which Gray desires to have determined by a court, Gray shall commence the arbitration proceeding or court action desired by Gray within thirty days after receiving service of Subcontractor's complaint or arbitration demand. If, at any time, even after suit may have been filed by either party, but prior to commencement of trial, Gray becomes involved in litigation or arbitration with another party or parties involving questions of fact or law common to the dispute between Gray and Subcontractor to the extent that (a) in Subcontractor's absence, complete relief cannot be accorded among those already parties, or (b) disposition of such other action may as a practical matter, impair or impede Gray's or Subcontractor's ability to fully prevent its incurring multiple or otherwise inconsistent obligations, Subcontractor agrees that Subcontractor may be joined by Gray in such other litigation or arbitration proceedings for complete resolution of all disputes and controversies arising under this Agreement and that upon such joinder, any pending action between Gray and Subcontractor shall be dismissed.

   (e)    If Gray chooses to have the matter resolved by arbitration, then it shall proceed in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes, as modified by this Agreement. The arbitration panel shall consist

| | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

of three independent and impartial persons who have experience in the construction industry or construction law. The Subcontractor and Gray shall each appoint one member of the panel and the third member shall be appointed according to the aforementioned Rules.

(f)    If Gray chooses to arbitrate, then the arbitration award shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof, subject to any restrictions set forth in the Federal Arbitration Act

16.3    WORK CONTINUATION AND PAYMENT. Unless otherwise agreed in writing, the Subcontractor shall continue on which the Work and maintain the Schedule of Work pending arbitration, and if so, Gray shall continue to make payments earned by the Subcontractor in accordance with this Agreement.

16.4    DOCUMENT PRODUCTION AND EXCHANGE OF ARBITRATION EXHIBITS. If Gray consents to arbitrate, each party shall have the right to immediate production of the records of the other party relating to the Project for inspection and copying except for those portions which are covered by an unwaived attorney-client privilege or which were prepared in anticipation of arbitration or litigation. No later than 15 days prior to the arbitration hearing, the parties shall make available to each other, for inspection and copying, the exhibits, photographs, and other documents which they intend to introduce or refer to during the arbitration.

16.5    ATTORNEY'S FEES, ARBITRATION COSTS, AND/OR COURT COSTS.

(a)    Attorney's fees and expenses shall be awarded to the prevailing party if a claim or dispute is found to have been asserted or defended unreasonably or in bad faith.

(b)    The prevailing party in arbitration or court proceeding shall recover its attorney's fees and court costs incurred in any judicial proceedings necessary, including those fees necessary to obtain (i) enforcement of this arbitration clause or (ii) confirmation, enforcement, or collection of an arbitration award or court judgment.

## SECTION 17

### MISCELLANEOUS PROVISIONS

17.1    GOVERNING LAW. This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Kentucky applicable to agreements executed, delivered, and to be performed solely within the Commonwealth of Kentucky.

17.2    SEVERABILITY AND WAIVER. The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision. The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

17.3    TITLES. The titles given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any other purpose.

17.4    ATTORNEYS' FEES. The Subcontractor shall reimburse Gray for all of Gray's attorney's fees, court costs and other expenses incurred in enforcing or declaring the Subcontractor's obligations under this Agreement, incurred in exercising any right or remedy hereunder or under law or equity in the event of a default by the Subcontractor, or incurred in any litigation or arbitration in which Gray, without its fault, becomes involved by reason of the existence of this Agreement.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

17.5   <u>WRITTEN NOTICES.</u>  Written notices to Gray required by this Agreement shall be addressed to 10 Quality Street, Lexington, Kentucky 40507-1450.  Written notices to Subcontractor required by this Agreement shall be sent to the address given in Section 1.1 of this Agreement.  Any notice sent by mail shall be deemed to have been received the third calendar day after the date of mailing.  Notice may also be delivered by hand delivery or fax, in which event notice shall be deemed effective on the date such notice is given.

17.6   <u>ENTIRE AGREEMENT.</u>  This Agreement is solely for the benefit of the signatories hereto and represents the entire and integrated agreement between the parties hereto and supersedes all prior contemporaneous negotiations, representations, understandings or agreements, either written or oral.  This Agreement shall not be modified except by a written instrument signed by the parties.

## SECTION 18

### SPECIAL PROVISIONS

18.1   <u>BINDING EFFECT.</u>  This Agreement shall be binding upon and inure to the benefit of Gray, Subcontractor, and their successors and assigns.

18.2   <u>PRECEDENCE.</u>  It is understood the Work to be performed under this Agreement, including the terms and conditions thereof, is as described in Section 1 through 17 herein together with the following Scope of Work, which are intended to complement same.  However, in the event of an inconsistency, these Special Provisions shall govern.

18.3   <u>INCONSISTENCIES AND OMISSIONS.</u>  Should inconsistencies or omissions appear in the Subcontract Documents, it shall be the duty of the Subcontractor to so notify Gray in writing within three (3) working days of the Subcontractor's discovery thereof.  Upon receipt of said notice, Gray shall instruct the Subcontractor as to the measures to be taken and the Subcontractor shall comply with Gray's instructions.

18.4   <u>CROSS REFERENCE OF DOCUMENTS.</u>  Subcontractor shall review all specifications, drawings, reports and existing conditions which affect the relationship of Subcontractor's Work to the complete project, and be responsible for that relationship.  By way of example, a roofing Subcontractor shall be responsible for including and performing mechanical and plumbing roof penetrations, which may or may not be detailed on the roof plans and details, but may be shown on the mechanical drawings.

18.5   <u>SUBCONTRACT DOCUMENTS.</u>  The Subcontract Documents are identified as follows and incorporated by reference:

(a)     Scope of Work – Exhibit A

(b)     Drawing List – Exhibit B

(c)     Specifications & Other Documents – Exhibit C

(d)     Other Provisions – Exhibit D

(e)     Application for Payment – Exhibit E

(f)     Sub-Subcontractors/Materialmen's Waiver of Lien – Exhibit F

(g)     Subcontractor Safety Orientation Manual – Exhibit G

(h)     This Agreement

(i)     The Contract Documents identified in the contract between the Owner and Gray, including but not limited to the signed agreement between the Owner and Gray,

conditions of the contract (general, supplementary, special and other conditions), drawings, specifications, addenda, change orders, other written modifications, and other documents enumerated therein;

WITNESS WHEREOF, The parties have caused this Agreement to be executed by their duly authorized representatives, under seal, as of the day and year first above written.

**CONTRACTOR**

GRAY CONSTRUCTION, INC.

_____
Project Manager

_____
Executed By

EXECUTIVE V.P. AUTOMOTIVE MARKET
Title

(Seal)
Attest: _____

_____
Title

**SUBCONTRACTOR**

Cooper's Steel Fabricators, Inc
Company Name

_____
Signature

GARY K. COOPER
Printed Name

VICE PRESIDENT
Title

(Seal)

Attest: _____

_____
Title

## If applicable, complete certificate on the following page.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

## CERTIFICATE

(Certificate DOES NOT need to be completed IF subcontractor is a Sole Proprietorship. Notary Public section must be completed by all entities.)

I, _GARY K. COOPER_ , certify that I am an/a

_OFFICER_ of _Cooper's Steel Fabricators, Inc_
(Officer/Member/Partner)                    (Name of Subcontractor Entity)

and that I am authorized and empowered by valid resolutions of the _Board Of Directors_
(Partners/ Board of Directors/ Managers)

of said _Corporation_ to execute this Subcontract for and on its behalf.
(Partnership/Corporation/Limited Liability Company)

This _20th_ day of _November_ , 20 _06_

_____
Officer

State of _Tennessee_

County of _Cheatham_

Subscribed, sworn to and acknowledged before me by _Gary K. Cooper_

This _20th_ day of _November_ , 20 _06_ .

_____
Notary Public

My Commission Expires: _04-04-07_



**Gray Construction**

## EXHIBIT A
## SCOPE OF WORK
### SUBCONTRACT AGREEMENT NO.: 207005-05-100

Cooper's Steel Fabricators, Inc. shall provide all materials, labor, equipment and other services necessary to complete the structural steel work for the above referenced project. All work shall be performed in accordance with plans and specifications as prepared by Gray Construction.

Furthermore, the scope of work shall be more specifically defined but shall in no way be limited to the following:

1.    This scope of work includes but is not limited to temporary shoring and selective demolition.

2.    Provide all hoisting, dunnage, tools, personnel lifts and equipment necessary to unload, stage, and install this scope of work.

3.    All lifts used on slabs should have diapers. If leaks are discovered, lifts will be replaced or repaired within one week.

4.    All necessary access to work areas for this scope shall be provided by this Subcontractor.

5.    The Subcontractor shall provide certification of all employees engaged in welding of steel members for this scope of work.

6.    The Subcontractor shall remove and/or relocate office modules, furniture, computer equipment, and files as directed by Gray from damaged and dangerous areas to a location determined by Gray.

7.    The Subcontractor shall provide and install cable and accessories for securing the damaged area of the building from further collapse.

8.    The Subcontractor shall assist in cutting wall girts to allow future water to exit the building.

9.    The Subcontractor shall have a full-time safety officer on site during the erection of the steel. If the erection portion is subcontracted out, the Subcontractor shall insure that the Sub-Subcontractor provides

10.   Subcontractor is responsible for the cleaning of debris and residue deposited on public roads as a result of its operations.

11.   Invoices will be due to Gray by the 25th of each month, with work projected through the end of the month. A 10% retainage will be withheld from each month's invoice.

---

Page 1

Exhibit A - Standard Subcontract Agreement

12. The Subcontractor (and tiered subcontractors/suppliers, when applicable) shall comply with **Gray Construction project reporting procedures** in regards to Daily Reports, Safety Reports, HAZ. Com., and Safety Training Reports, QA/QC verifications, and two week look ahead schedules.

13. The Subcontractor and tiered subcontractors/suppliers shall embrace and abide by the **Gray Construction Alcohol and Drug Free Project Policy for Subcontractors.**

14. The Subcontractor and tiered subcontractor/suppliers shall comply with the **safety requirements of Gray Construction**, including 100% tie-off requirements, 100% eye protection, State, Federal, OSHA and all regulatory agencies having jurisdiction.

15. The Subcontractors and tiered subcontractor/suppliers shall be responsible for all applicable taxes, fees, insurance and permits for their scope of work.

16. All Subcontractors and tiered subcontractors/suppliers shall provide the required **insurance certificates** before initiating any work on site. Gray Construction is to be listed as an additional insured on Certificate of Insurance. Builders Risk Insurance will be by others.

17. Parking will be restricted to assigned areas. Only company vehicles delivering materials or equipment will be allowed on site and only in areas where designated by the Contractor.

18. The Subcontractor (and tiered subcontractors/suppliers when applicable) shall provide and maintain competent on-site supervisors during the execution of the work as well as a sufficient number of qualified workers to properly service the project schedule.

19. Gray shall provide temporary toilets for this subcontractors use. We do not include any special provisions for union agreements. Any additionally required toilets will need to be provided by this Subcontractor.

20. The Subcontractor shall also provide the following as necessary for their scope of work:
    - Ice and drinking water for his employees.
    - Storage sheds and trailers, and office facilities including telephone, fax, copier, and any other support elements as required for their own use.

21. The Subcontractor shall remove all temporary facilities and restore areas to original condition before final acceptance of the work.

22. The Subcontractor shall provide a complete system in accordance with the intent of the drawings, specifications, and contract documents. It is understood that there will be no revisions to the contract amount as long as the scope of work and the intent as referenced is not altered.

23. The Subcontractor will cooperate with Grays "0" punch list initiative.

24. All material will be staged in designated areas and on sufficient dunnage to ensure the material is maintained in a clean manner, free from mud and debris prior to and after installation. No stoned staging areas will be provided, and this is the Subcontractors responsibility if required to meet schedule.

Page 2

Exhibit A - Standard Subcontract Agreement



25. Clean up of work daily to dumpster, located centrally, by Gray.

26. Provide all hoisting, dunnage, tools, personnel lifts and equipment necessary to unload, stage, and install this scope of work.

**PRICE BREAKDOWN:**

Please submit quantities for the following items of work. Prices shall include all labor, material, taxes, insurance, payroll overhead, benefits, overhead and profit. Gray reserves the right to reject any or all unit prices.

| Description | Unit | Base Bid Quantity | Amount Including Tax |
|---|---|---|---|
| Phase I Work | | | $13,762.00 |
| Phase II Work | | | TBD |
| Phase III Work | | | TBD |
| Total Bid | LS | | $13,762.00 |

Monthly billings submitted by the Subcontractor must be broken down and charged against the following code(s).

| COST CODE | DESCRIPTION | AMOUNT |
|---|---|---|
| 207005-05-100 | Structural Steel | $13,762.00 |

Page 3

Exhibit A - Standard Subcontract Agreement



**Gray Construction**

## EXHIBIT B
## DRAWING LIST
## SUBCONTRACT AGREEMENT NO.: 207005-05-100

| Drawing No. | Drawing Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit B - Standard Subcontract Agreement



**Gray Construction**

EXHIBIT C
SPECIFICATIONS & OTHER DOCUMENTS
SUBCONTRACT AGREEMENT NO.: 207005-05-100

| Document No. | Document Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit C – Standard Subcontract Agreement



**Gray Construction**

## EXHIBIT D
## OTHER PROVISIONS
## SUBCONTRACT AGREEMENT NO.: 207005-05-100

Not applicable at this time.

Exhibit D – Standard Subcontract Agreement

**Exhibit E**                      **APPLICATION FOR PAYMENT**                      **GRAY**

*REMIT TO:*
**GRAY CONSTRUCTION, INC.**
**Post Office Box 8330**
**Lexington, Kentucky  40533-8330**

| | |
|---|---|
| Date: | Gray Project: |
| Subcontractor Name: | Gray Project No.: |
| Remit To Address: | Subcontractor Project Number: |
| City, State, Zip: | Date of Subcontract: |
| Contact Person: | Application No.: |
| Phone:                    Fax: | Billing Period: From:                    To: |

Interim  ☐          Final  ☐          Retention  ☐

**⌐TEMENT OF SUBCONTRACT**

⌐ginal Subcontract Amount                          $ _____

**APPROVED** Change Order #1 Thru _____          $ _____

Adjusted Subcontract Amount to Date                $ _____

**JOB TO DATE APPLICATION CALCULATIONS**

| | | Totals to Date |
|---|---|---|
| Total Value of Work Complete & Mat'l Stored (per breakdown)... | A | $ |
| Less _____ % Retainage | B | $ |
| Total to Date Less Retainage (Line A - Line B) | C | $ |
| Less Previous Applications | D | $ |
| Amount of This Application  (Line C - Line D) | E | $ |

Page 1 Exhibit E

---

**FOR GRAY USE ONLY**

Approved by: _____

Date: _____

Pay with money from Customer Billing Est. #_____

Change Order Needed: _____

Insurance Needed: _____

Other Payment Instructions:_____

_____

---

Rev. 08/03

**Exhibit E**                           VALUE OF WORK COMPLETE BREAKDOWN                           **GRAY**

| A | B | C | D | E | F | G | H* | I |
|---|---|---|---|---|---|---|---|---|
| Cost Code(s) | Description | Original Contract Amount | Approved Change Order(s) Amount | Current Contract Amount (C+D) | Value of Work Complete | Materials Stored | Total Value of Work Cmpl & Mat'l Stored (F+G) | % Cmpl |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | TOTALS |  |  |  |  |  |  |  |

* Must include subtotals by cost code for both original contract value and change orders.
Page 2 Exhibit E                                                                 Rev. 08/03

**Exhibit E      LIST OF SUB-SUBCONTRACTOR/MATERIAL SUPPLIERS PERFORMING WORK UNDER YOUR SUBCONTRACT      GRAY**

**(Attach separate list if necessary)**

Listed below is each and every Sub-subcontractor and/or Material Supplier who has performed work for this Subcontractor on the aforementioned project, together with payments which have been made to each Sub-subcontractor and/or Material Supplier and the unpaid amounts claimed by each, through the billing period for this Application for Payment.

| Sub-Subcontractors and/or Material Suppliers | Address/Phone No. | Description of Work | Previous Amount Paid | Unpaid Amount Claimed | Lien Waiver Attached ☑ |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Page 3 Exhibit E                                                                          Rev. 08/03



**Exhibit E**          SUBCONTRACTOR AFFIDAVIT AND WAIVER OF LIEN - ACKNOWLEDGMENT OF PAYMENT                **GRAY**

Subcontractor, having a Subcontract with Gray Construction, Inc. on the aforementioned project, has performed work and/or furnished materials, equipment, and/or machinery or has fabricated materials especially for the Project, during the Billing Period described on page 1 of this Application for Payment.

Subcontractor has paid in full all bills or obligations for labor, sub-subcontract work, payroll taxes, material, (whether or not specifically fabricated for this project), equipment, and/or machinery, which are due or payable on or before the last day of the Billing Period.

The Subcontractor further certifies that it has complied with all federal, state and local tax and employment laws, including, but not limited to, Social Security, Unemployment and worker's compensation laws, applicable to its contract and work on the Project through the Billing Period.

The Subcontractor hereby waives and releases all rights to liens and claims against the Owner, Gray, and any surety for the performance of his contract from inception through the Billing Period of this Application for Payment, except for (a) retention which is unpaid to date and (b) work which has been performed which is not the subject of an approved change order <u>and</u> which has been described in an attached document. The Subcontractor further states that no other person has any right to a lien or claim against the Owner on account of work performed or for material, equipment, and/or machinery, or for material especially fabricated for the Project, furnished to the Subcontractor through the Billing Period of this Application for Payment.

waiver and release is given with the understanding that Gray Construction, Inc. and others will rely upon it, and to induce Gray to make payments to the ontractor. The waiver and release will become effective immediately upon the receipt of the amount shown in Line E of "Job to Date Application Calculations".

If this amount is a final payment request, there are attached hereto final waivers and releases for liens from all sub-subcontractors and material suppliers.

The Subcontractor hereby certifies that the foregoing Application for Payment is true and accurate and properly describes the work performed and materials, equipment, machinery or materials furnished or fabricated especially for the Project during the period covered and the payments to which the undersigned is entitled under the contract and applicable change orders as a result.

State of: _____          County of: _____

Subscribed and sworn before me this _____ day of _____ _____, _____ by

_____, the _____ of

_____, a _____ corporation (or partnership or sole proprietorship), on behalf of the Subcontractor.

_____ Notary Public   My commission expires: _____

Subcontractor
_____

Signature/Title
_____

Printed Name
_____

Page 4 Exhibit E                                                          Rev. 08/03



**EXHIBIT F**
## SUB-SUBCONTRACTOR OR MATERIAL SUPPLIER
## WAIVER OF MECHANICS AND/OR MATERIALMEN'S LIEN

Project Name: _____ Location: _____
(hereinafter THE PROJECT)

Subcontractor to Gray: _____
(hereinafter SUBCONTRACTOR)

Sub-Subcontractor or Supplier
to above listed Subcontractor: _____
(hereinafter SUB-SUBCONTRACTOR/SUPPLIER)

WHEREAS, GRAY CONSTRUCTION, INC. is the General Contractor (hereinafter GRAY) for the construction of a facility for THE PROJECT referenced above, and,

WHEREAS, the undersigned has furnished and received payment for materials and/or labor in the amount of $_____ to the SUBCONTRACTOR for incorporation into said project.

NOW, THEREFORE, as an inducement to GRAY to make certain progress payments to SUBCONTRACTOR, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT prior to the _____ day of _____, 20 _____.

**Final Waiver of Lien:** By initialing in this space the undersigned represents that it has furnished and received FULL AND FINAL payment for materials and/or labor from the SUBCONTRACTOR which was incorporated into said project. THEREFORE, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT.

_____
(Name of sub-subcontractor/material supplier)

_____
(Address)

_____
(Phone)

_____
(Signature)

State of: _____
County of: _____

Subscribed and sworn to before me this _____ day of _____, 20 _____ by
_____, the _____ of _____,
a ___ corporation ___ partnership ___ sole proprietorship, on behalf of the said entity.

_____ Notary Public  My commission expires: _____

Exhibit F – Standard Subcontract Agreement

# SUBCONTRACT AGREEMENT

## BETWEEN

## GRAY CONSTRUCTION, INC.

## AND

## Dotson Electric Company, Inc.



**PROJECT NAME:**          **Hwashin Storm Damage**
**SUBCONTRACT NUMBER:**    **207005-16-100S**

## SUBCONTRACT AGREEMENT

Gray Construction, Inc.

## TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| 1. AGREEMENT | 1 |
| 2. SCOPE OF WORK | 2 |
| 3. SCHEDULE OF WORK AND COMPLETION | 4 |
| 4. SUBCONTRACT PRICE | 5 |
| 5. PAYMENT | 5 |
| 6. CHANGES, CLAIMS AND DELAYS | 9 |
| 7. GRAY'S AUTHORIZED REPRESENTATIVES | 11 |
| 8. DESIGN-BUILD SUBCONTRACTOR'S OBLIGATIONS | 11 |
| 9. SUBCONTRACT BONDS | 16 |
| 10. WARRANTY AND CORRECTION OF WORK | 17 |
| 11. RECOURSE BY GRAY | 18 |
| 12. SUSPENSION OR TERMINATION BY OWNER | 19 |
| 13. LABOR RELATIONS | 20 |
| 14. INDEMNIFICATION | 21 |
| 15. INSURANCE | 22 |
| 16. DISPUTE RESOLUTION | 24 |
| 17. MISCELLANEOUS PROVISIONS | 25 |
| 18. SPECIAL PROVISIONS | 26 |
| 19. SIGNATURE PAGE | 28 |

## SUBCONTRACT AGREEMENT

### Gray Construction, Inc. # 207005-16-100S

## SECTION 1

### AGREEMENT

This is the Subcontract Agreement (hereinafter "Agreement") made 11/01/06 by and between GRAY CONSTRUCTION, INC., 10 Quality Street, Lexington, Kentucky 40507-1450 (hereinafter referred to as "Gray"), and the Subcontractor named below (hereinafter referred to as the "Subcontractor") to perform part of the work on the following project.

1.1  SUBCONTRACTOR _____  **Dotson Electric Company, Inc.**

Mailing Address:             Remit to Address:
**551 Cal Batsel Road**           **551 Cal Batsel Road**
**Bowling Green, KY 42104**       **Bowling Green, KY 42104**

Telephone #   **270-782-5083**       **270-782-5083**
Fax #        **270-781-5141**       **270-781-5141**

Subcontractor **X** is ____ is not a Corporation:    FEIN# **62-1321397**

1.2  AUTHORIZED REPRESENTATIVES
     a.  For Gray (see section 7)
         On site:   **Daniel Phillips**
         Off site:   **David Hird**
     b.  For Subcontractor (see section 8.8)
         On site:   **TBD**
         Off site:   **Larry Dotson**

1.3  PROJECT
     **Hwashin Storm Damage**
     **Greenville, Alabama**

1.4  OWNER
     **Hwashin America Corporation**
     **Gyeongbuk, Korea**

1.5  COMPLETION OF SUBCONTRACTOR'S WORK (see section 3.2)
     a.  Date of Substantial Completion:    **TBD**
     b.  Date of Final Completion:         **TBD**

1.6  SUBCONTRACT PRICE (see    **$59,000.00**
     section 4)
                          **Fifty-nine thousand and 00/100**   Dollars

1.7  RETAINAGE (see section    **10** %
     5.2.2)

Design-Build Subcontract Agreement

Issue Date:                  08/01/03

Revision No.:               3
Revision Issue Date:       05/23/06

1.8    PROGRESS PAYMENT APPLICATION DATE
_____    25th    day of each calendar month  (see section 5.2.3)

1.9    PERFORMANCE BOND & LABOR & MATERIAL PAYMENT BOND
_____    Are    __x__    Are Not    required  (see section 9.1)

1.10   PROFESSIONAL LIABILITY INSURANCE (Errors and Omissions)
__x__    Is    _____    Is Not    required  (see section 15.1.4)

1.11   REQUIREMENTS FOR EXCESS OR UMBRELLA LIABILITY INSURANCE
__**$5,000,000**__   Occurrence and Aggregate  (see section 15.1.5)

1.12   BUILDER'S RISK INSURANCE
If Gray Construction, Inc. is furnishing the builder's risk insurance under the terms of the contract between Gray and the Owner, the subcontractor will be added as an additional named insured to the policy.  This policy will cover the insurable interest the subcontractor has in the project up to the limit of coverage.  This insurance does not cover personal tools and equipment.  The subcontractor shall be responsible for payment of any deductible, or its equivalent, resulting from a claim that is due to the fault or negligence of the subcontractor, whether in whole or in part, and whether or not the Builder's Risk is being provided by Gray or the Owner.

1.13   UTILIZATION OF SMALL BUSINESS CONCERNS
Subcontractor is certified/recognized as one of the following: _x_ Small Business ____ Small Disadvantaged Business ____ Woman-Owned Small Business ____ HUBZone Small Business ____ Veteran-Owned Small Business ____ Service Disabled Veteran-Owned Small Business ___ None of the Above

1.14   DESIGN SERVICES are being furnished by Dotson Electric Company, Inc. via a subconsultant agreement with Design/Build Subcontractor or in-house, by a design professional licensed in the state of Alabama as the design professional in responsible charge of the Design/Build Subcontractor's Work.  Design/Build Subcontractor shall not terminate or change the design professional in responsible charge of the Work without prior written notice to Gray, and written confirmation of Professional Liability coverage of the replacement design professional

## SECTION 2

### SCOPE OF WORK

2.1    DESIGN/BUILD SUBCONTRACTOR'S WORK.  Gray contracts with the Design/Build Subcontractor as an independent contractor to perform the work described in the Scope of Work attached as Exhibit A in strict accordance with the Subcontract Documents.  The Design/Build Subcontractor shall perform such work (the "Work") under the general direction of Gray and in accordance with this Agreement and the Subcontract Documents.  The Design/Build Subcontractor shall perform each activity necessary or incidental to complete the work, which is described more particularly, but not exclusively, in Exhibit A.  The provisions of this Agreement and Exhibit A are intended to complement each other, but if there is any inconsistency, Exhibit A shall govern.

2.2    SUBCONTRACT DOCUMENTS.  In addition to this Agreement, the documents which form this Subcontract and which are binding on the Design/Build Subcontractor (collectively the "Subcontract Documents") include the Contract Documents identified in the Contract between Gray and the Owner, which are incorporated

by reference, and the Subcontract Documents set forth in Section 18.5. In case of an inconsistency between this Agreement and the Contract Documents, this Agreement shall govern.

   2.2.1   DRAWINGS, PLANS AND SPECIFICATIONS.  Gray has furnished Design/Build Subcontractor with one set of Criteria Documents, and if available, Drawings, Plans and Specifications included in the Subcontract Documents.  Additional copies will be furnished, on request, at the Design/Build Subcontractor's expense.  Design/Build Subcontractor shall furnish the design for its portion of the work so as to coordinate with the Work as a whole, and with other trade Design/Build Subcontractors.  To the extent that the Design/Build Subcontractor fails to properly interpret the Criteria Documents or the Preliminary Design Documents, Design/Build Subcontractor shall be responsible to correct all errors at its own expense.

   2.2.2   COPIES OF P.O.'S AND SUB-SUBS FOR MAJOR SCOPE ITEMS.  Upon receipt of written approval of material and/or equipment shop drawings or brochures by the Owner or Architect, Subcontractor shall immediately furnish the following additional information to Gray for each item of equipment, fixture or material:

   .1   Contact or representative of both manufacturer and supplier

   .2   Subcontractor's Purchase Order Numbers

   .3   Manufacturer's Order Number

   .4   Supplier's Order Number

   .5   Scheduled delivery date.

   2.2.3   Subcontractor's superintendent, foreman, or other designated individual shall deliver a report, in form and content specified by Gray to Gray's office before the end of each shift, whenever Subcontractor has employees working at the Project site. The report will state the number of employees Subcontractor has on the Project that shift, subdividing into categories (foremen, tradesmen, laborers, etc.). Subcontractor shall also list the equipment on site, and any material deliveries.

   2.3   EXAMINATION OF CONTRACT AND SUBCONTRACT DOCUMENTS; SITE INSPECTION.  The Design/Build Subcontractor warrants and represents that it has visited the site of the proposed Work, has familiarized itself with existing conditions and the character of the operations to be carried on under this Agreement and that it fully understands the facilities, difficulties and restrictions attending the execution of the Work.  The Design/Build Subcontractor acknowledges that it has examined all Subcontract Documents, and the requirements of the various governmental agencies, departments and bureaus having jurisdiction over the Project, and from its own investigation has satisfied itself as to the nature and location of the Work, the general local conditions, and all matters which in any way affect the Design/Build Subcontractor's Work or its performance thereof. The Design/Build Subcontractor further acknowledges that having made said visitation and examination, it is not aware of any existing conditions, circumstances, or requirements that will necessitate change in the scope of the Work, the Subcontract Price, or the Schedule of Work.

   2.4   DESIGN SCOPE OF WORK.  Design/Build Subcontractor agrees to timely provide design documents for its Scope at intervals determined by Gray; and Design/Build Subcontractor further agrees to timely provide stamped drawings with the original signature of the licensed design professional in responsible charge of the Work.  Design/Build Subcontractor shall also provide, as a condition precedent to Final Payment hereunder, a set of Record Drawings, fully and completely depicting the finally-installed state of the Work including all changes.

   2.5   OWNERSHIP AND USE OF DOCUMENTS.  The drawings, specifications and other documents furnished by the Design/Build Subcontractor are instruments of services and shall become the property of Gray and the Owner upon payment by the Owner and Gray.  The Design/Build Subcontractor shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the

copyright, to the extent not modified herein. Reproducible copies, including diskettes, may be retained by the Owner and Gray, whether the Project for which they were made is executed or not, and both are entitled to make and retain copies and reproduce them for their own use. Submission or distribution of documents to meet official regulatory requirements or for other purposes in connection with the Project is not to be construed as publication in derogation of the Design/Build Subcontractor's common law copyrights or other reserved rights.

## SECTION 3

### SCHEDULE OF WORK AND COMPLETION

3.1     TIME IS OF THE ESSENCE. Time is of the essence for both parties, and they mutually agree to see to the performance of their respective work and the work of their Design/Build Subcontractors so that the entire project may be completed in accordance with the Subcontract Documents and the Schedule of Work. Gray shall revise such Schedule and sequence of events as the Work progresses. No extension of time for Design/Build Subcontractor's Work will be valid without Gray's written consent.

3.2     DUTY TO BE BOUND. The Design/Build Subcontractor shall be bound by the Schedule of Work including, without limitation, the dates for Substantial Completion and Final Completion stated in Section 1.5 and revisions to the Schedule. The Design/Build Subcontractor shall provide Gray with any requested scheduling information for the Design/Build Subcontractor's Work. The Schedule of Work and all subsequent changes thereto shall be submitted to the Design/Build Subcontractor in advance of the required performance.

3.3     SCHEDULE CHANGES. The Design/Build Subcontractor acknowledges that as construction progresses it may be necessary for Gray to change the sequential order and duration of the various activities, including those contemplated by this Agreement, to account for unanticipated delays, occurrences and other factors which act to alter Gray's original schedule. Gray may require Subcontractor, at no additional cost to Gray and Owner, to prosecute Subcontractor's Work in such sequence as the progress of other subcontractors and the Project schedule dictates. It is expressly understood and agreed that the scheduling and sequencing of the Work is an exclusive right of Gray and that Gray reserves the right to reschedule and resequence Subcontractor's Work from time to time as the demands of the Project require without any additional cost or expense to be paid to the Subcontractor.

Subcontractor shall carry on its Work promptly, efficiently, and at a speed that will not cause delay in the progress of Gray's Work or Work of other Subcontractors. If, in the opinion of Gray, Subcontractor falls behind in the progress of the Work, Subcontractor may be directed to take such steps as deemed necessary to improve the rate of progress. These steps may include, without limitation, requiring Subcontractor to increase the number of shifts, personnel overtime operations, days of Work, equipment, plant, or other remedies. Subcontractor shall submit to Gray for Gray's approval a schedule demonstrating how the required rate of progress will be regained without additional costs to the Owner or Gray.

3.4     PRIORITY OF WORK. Gray shall have the right to decide on the time, order and priority in which the various portions of Work shall be performed and all other matters relative to the timely and orderly conduct of the Design/Build Subcontractor's Work. The Work will be performed as required by the composite construction schedule, which may be changed periodically by the project superintendent in order to maintain the overall schedule of Work.

3.5     COOPERATION. The Design/Build Subcontractor shall cooperate with Gray by scheduling and performing Design/Build Subcontractor's work so as to avoid conflict, delay in, or interference with the work of Gray, other Design/Build Subcontractors or Owner's own forces. Design/Build Subcontractor shall participate, as requested by Gray, in inspections related to Substantial and Final Completion.

3.6     COMMENCEMENT OF WORK. The Design/Build Subcontractor shall commence Work within three (3) calendar days from Gray's notice to proceed. If interrupted for any reason, the Design/Build Subcontractor shall resume the work within three (3) working days from Gray's notice to do so.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

# SECTION 4

## SUBCONTRACT PRICE

Gray agrees to pay the Design/Build Subcontractor for the satisfactory performance of the Design/Build Subcontractor's Work the sum of identified in Section 1.6 (the "Subcontract Price") in accordance with Section 5, subject to additions or deductions as provided in Section 6.

Unit prices, if any, are stated in Design/Build Subcontractor's Scope of Work, Exhibit A.

# SECTION 5

## PAYMENT

5.1    GENERAL PROVISIONS.

   5.1.1    SCHEDULE OF VALUES.  The Design/Build Subcontractor has provided Gray with a schedule of values which shall be revised, if necessary for approval by Gray and the Owner, no later than the date of the Design/Build Subcontractor's first application for payment.

   5.1.2    PAYMENT USE RESTRICTION.  No payment received by the Design/Build Subcontractor shall be used to satisfy or secure any indebtedness other than one owed by the Design/Build Subcontractor for labor or materials furnished in performing the Design/Build Subcontractor's Work on this Project.

   5.1.3    PAYMENT USE VERIFICATION.  Gray shall have the right at all times to contact the Design/Build Subcontractor's lower tier Design/Build Subcontractors and suppliers to ensure that the same are being paid by the Design/Build Subcontractor for labor or materials furnished for use in performing the Design/Build Subcontractor's Work on this Project.

   5.1.4    CONDITIONS PRECEDENT TO PARTIAL PAYMENT.  Progress payments due under this Agreement will not be released until all of the following conditions have been met:

   .1      Subcontract Agreement has been signed, returned and approved.

   .2      Insurance Certificates satisfying the requirements of this Agreement have been received.

   .3      A schedule of values has been received in the form and content specified by Gray.

   .4      Certified payrolls, if required by the Owner, received in the appropriate format.

   .5      Waivers of lien from all tier subcontractors and materialmen evidencing payments through the previous month.

   .6      If requested by Gray, Subcontractor agrees to likewise provide Gray with evidence satisfactory to Gray showing payment by Subcontractor of any and all contributions made by Subcontractor for health and welfare payments as shown on the certified payroll, as well as payment of payroll taxes and other contributions that may be required by law.

   5.1.5    PARTIAL LIEN WAIVERS AND AFFIDAVITS.  As set forth above, as a prerequisite for payment, the Design/Build Subcontractor shall provide, in a form satisfactory to the Owner and Gray, partial lien or claim waivers and affidavits from the Design/Build Subcontractor, and its sub-Design/Build Subcontractors and suppliers for the completed Design/Build Subcontractor's Work.  Such waivers may be made conditional upon payment of a specific amount stated therein.  The Design/Build Subcontractor's

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 3 |
| Revision Issue Date: | | 05/23/06 |

Authorized Representative(s) designated in Section 1.2(b) of this Agreement are hereby designated as authorized agents of Design/Build Subcontractor to execute all lien waivers required of Design/Build Subcontractor.

5.1.6    DESIGN/BUILD SUBCONTRACTOR PAYMENT FAILURE. In the event Gray has reason to believe that labor, material or other obligations incurred in the performance of the Design/Build Subcontractor's Work are not being paid for, Gray shall give written notice of such claim or lien to the Design/Build Subcontractor to insure that any progress payment shall be utilized to pay such obligations.

If upon receipt of said notice, the Design/Build Subcontractor does not:

(a)    Supply evidence to the satisfaction of Gray that the monies owing to the claimant have been paid; or

(b)    Post a bond in a form and with surety satisfactory to Gray indemnifying the Owner, Gray, Gray's surety, if any, and the premises from such claim or lien;

then Gray shall have the right to exercise any or all of the following rights, until the claim or lien has been satisfied by the Design/Build Subcontractor:

(1)    Retain out of any payments due or to become due to the Design/Build Subcontractor for this Project or any other Gray project a reasonable amount to protect Gray from any and all loss, damage or expense including attorney's fees arising out of or relating to any such claim or lien;

(2)    Issue joint checks in payment of any payments due or to become due to the Design/Build Subcontractor, payable to the Design/Build Subcontractor and the claimant;

(3)    Make direct payments of sums due the Design/Build Subcontractor to the claimant.

(4)    May (but has no obligation to) bond off the lien, and backcharge all costs, attorneys' fees and other expenses involved in bonding off the lien to the Design/Build Subcontractor.

5.1.7    PAYMENT NOT ACCEPTANCE. Payment to the Design/Build Subcontractor is specifically agreed not to constitute or imply acceptance by Gray or the Owner of any portion of the Design/Build Subcontractor's Work.

5.2    PROGRESS PAYMENTS.

5.2.1    APPLICATION. For Work performed during a payment period, the Design/Build Subcontractor shall apply for a progress payment using Gray's standard Application For Payment and Lien Waiver form, a copy of which is attached as Exhibit E. Applications shall be submitted to Gray at P.O. Box 8330, Lexington, Kentucky 40533-8330. The application shall be for work performed up to and including the last day of the pay period, indicating work completed and, to the extent allowed under Section 5.2.4, materials suitably stored and protected during the payment period. Applications shall be accompanied by lien waivers from all sub-Design/Build Subcontractors and suppliers whose labor or materials are covered by the application; such waivers shall be in the form of attached Exhibit F.

5.2.2    RETAINAGE. Regardless of any agreements between the Owner and Gray, or arrangements made by them, for the withholding or release of Gray's retainage, retainage shall be withheld by Gray from all progress payments made to Design/Build Subcontractor. The amount of retainage withheld from each payment shall be equal to the amount of payment earned, multiplied by the percentage identified in Section 1.7 of this Agreement. Retainage shall be released to Design/Build Subcontractor only upon completion of all requirements for final payment as provided in Section 5.3 of this Agreement.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

5.2.3    TIME OF APPLICATION.  "Pay period" as used herein is defined as beginning with the first day of each calendar month, and ending with the last day of each calendar month.  The Design/Build Subcontractor shall submit progress payment applications to Gray no later than the day of each payment period specified in Section 1.8 of this Agreement.

5.2.4    STORED MATERIALS.  Unless otherwise provided in the Subcontract Documents, and if approved in advance by the Owner, applications for payment may include materials and equipment not incorporated in the Design/Build Subcontractor's Work but delivered and suitably stored and protected at the site or at some other location agreed upon in writing.  Approval of payment application for such stored items on or off the site shall be conditioned upon submission by the Design/Build Subcontractor of bills of sale and applicable insurance or such other procedures satisfactory to the Owner and Gray to establish the Owner's title to such materials and equipment or otherwise protect the Owner's and Gray's interest therein, including transportation to the site.

5.2.5    TIME OF PAYMENT.  Receipt of payment by Gray from Owner for Design/Build Subcontractor's work is a condition precedent to all progress payments by Gray to Design/Build Subcontractor.  Progress payments to the Design/Build Subcontractor for satisfactory performance of the Design/Build Subcontractor's Work shall be made seven (7) days after receipt by Gray of payment from the Owner for such Design/Build Subcontractor's Work.

5.2.6    GROUNDS FOR WITHHOLDING PAYMENT.  Gray may withhold from monthly progress payments an amount sufficient to protect Gray because:

.1    Defective work has not been remedied; materials have not been furnished; clean up has not been performed;

.2    Subcontractor has damaged any portion of the work of others;

.3    Claims, levies, attachments, stop notices or court orders have been filed or reasonable evidence indicates the probable filing of such claims, levies, attachments, notices or orders, including claims covered by insurance until such claims are accepted by the insurance carrier;

.4    Subcontractor has failed to make payments properly to its subcontractors or for labor, including fringe benefits, materials or equipment, transportation or shipping costs, taxes, fees or any other claims arising out of the Subcontractor's Work;

.5    There exists reasonable doubt that Subcontractor's Work can be completed for the unpaid balance of the Subcontract Price;

.6    There exists reasonable doubt that Subcontractor's Work, due to its own action or inaction, will be completed on schedule or in accordance with the schedule;

.7    Subcontractor is not satisfactorily prosecuting the Work of this Agreement;

.8    Subcontractor has failed to deliver insurance certificates, bonds, "as-built" or record drawings, written guarantees or warranties or the approvals required of the Subcontractor's Work by any authority having jurisdiction;

.9    A petition for bankruptcy or reorganization has been filed by or against Subcontractor or Subcontractor has made an assignment without the prior written consent of Contractor;

.10    Any other material breach of this Agreement by Subcontractor which has not been cured after notice from Gray.

Amounts then due shall be paid or credited to Subcontractor when Subcontractor removes the above grounds for withholding payment.

5.3    FINAL PAYMENT.

5.3.1    APPLICATION.  Upon acceptance of the Design/Build Subcontractor's Work by the Owner, and Gray, and upon the Design/Build Subcontractor furnishing evidence of fulfillment of Design/Build Subcontractor's obligations in accordance with the Subcontract Documents and Section 5.3.2, Gray shall, without delay, forward the Design/Build Subcontractor's application for final payment to the Owner.

5.3.2    REQUIREMENTS.  Before Gray shall be required to forward the Design/Build Subcontractor's application for final payment to the Owner, the Design/Build Subcontractor shall submit to Gray:

(a)    an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Design/Build Subcontractor's Work for which the Owner or his property or Gray or Gray's surety might in any way be liable, have been paid or otherwise satisfied;

(b)    consent of surety, if any, to final payment;

(c)    satisfaction of required closeout procedures;

(d)    other data if required by Gray or Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be designated by Gray or Owner; and

(e)    written warranties of Design/Build Subcontractor's materials, labor and equipment furnished under this Agreement and the Subcontract Documents.

(f)    a complete and accurate set of Record Drawings, together with Final Design drawings, appropriately stamped and originally signed by the design professional in responsible charge of the Work, and licensed in the state in which the Project was constructed.

Final payment shall constitute a waiver and release of all claims by the Design/Build Subcontractor relating to the Design/Build Subcontractor's Work, but shall in no way relieve the Design/Build Subcontractor of liability for the obligations assumed under Section 10 hereof, or for faulty or defective work appearing after final payment.

5.3.3    TIME OF PAYMENT.  Final payment of the balance due of the contract price shall be made to the Design/Build Subcontractor:

(a)    upon receipt of the Owner's waiver of all claims related to the Design/Build Subcontractor's Work except for unsettled liens, unknown defective work, and noncompliance with the Subcontract Documents or warranties; and

(b)    seven (7) days after receipt by Gray of final payment from the Owner for such Design/Build Subcontractor's Work, such receipt being a condition precedent for final payment to the Design/Build Subcontractor.

5.4    NON-PAYMENT BY OWNER.

5.4.1    ASSUMPTION OF RISK; CONDITION PRECEDENT.  The Design/Build Subcontractor agrees that Gray shall have no obligation to pay the Design/Build Subcontractor for any work done on this Project until Gray has been paid by the Owner.  The provisions of Sections 5.2 and 5.3 stating the time

and amount of progress and final payments are subject to the condition that Gray shall receive from the Owner progress or final payments in at least the amounts payable to the Design/Build Subcontractor on account of work done by the Design/Build Subcontractor on this Project. The time when such payments shall be due the Design/Build Subcontractor shall be postponed until Gray has received same from the Owner. The Design/Build Subcontractor expressly agrees to accept the risk that it will not be paid for work performed by him in the event that Gray, for whatever reason, is not paid by the Owner for such work. The Design/Build Subcontractor acknowledges that it relies for payment on the credit and ability to pay of the Owner, and not of Gray. The Design/Build Subcontractor agrees that payment by the Owner to Gray for work performed by the Design/Build Subcontractor shall be a condition precedent to any payment obligation of Gray to the Design/Build Subcontractor. The Design/Build Subcontractor agrees that the liability of the surety on Gray's payment bond, if any, is subject to the same conditions precedent as are applicable to Gray's liability to the Design/Build Subcontractor.

   5.4.2   REMEDY. If the Owner or its designated agent does not authorize payment or Gray does not receive a payment due hereunder for any cause which is not the fault of the Design/Build Subcontractor, Gray shall promptly inform the Design/Build Subcontractor in writing. Gray may also diligently pursue, with the assistance of the Design/Build Subcontractor, the release by the Owner of the payment due for the Design/Build Subcontractor's Work. At the Design/Build Subcontractor's request, Gray may institute all reasonable legal remedies to mitigate the damages and pursue full payment of the Design/Build Subcontractor's application for payment including interest thereon. In that event, the cost for pursuing the Design/Build Subcontractor's remedies shall be Design/Build Subcontractor's responsibility. Gray, at its discretion, may require that the Design/Build Subcontractor make financial arrangements satisfactory to Gray before undertaking this effort and at all times during the progress thereof.

## SECTION 6

### CHANGES, CLAIMS AND DELAYS

   6.1   CHANGES. Without nullifying this Agreement, Gray may by written Subcontract Work Authorization or Subcontract Change Order make changes in the Work within the general scope of this Agreement and the Design/Build Subcontractor shall perform such changes. Adjustments in the Subcontract Price or Schedule of Work, if any, resulting from such changes shall be set forth in a Subcontract Change Order. A Subcontract Change Order is a written instrument prepared by Gray and signed by the Design/Build Subcontractor stating their agreement upon the change in the scope of the Work, adjustment in the Subcontract Price or Schedule of Work. A Subcontract Work Authorization is a written instrument prepared by Gray directing a change in the Work and stating a proposed adjustment, if any, in the Subcontract Price or Schedule of Work or both. A Subcontract Work Authorization shall be used in the absence of agreement on the terms of a Subcontract Change Order.

   No adjustment shall be made for additional Work performed by Design/Build Subcontractor that resulted from the Design/Build Subcontractor's failure to properly interpret the Criteria Documents furnished or as a result of Design/Build Subcontractor's failure to properly coordinate it design with the other trade Design/Build Subcontractors.

   No adjustment shall be made for any changes performed by Design/Build Subcontractor that have not been so ordered by Gray, and approved by the Owner. If Design/Build Subcontractor proceeds with additional work without the required Change Order or Work Authorization, Design/Build Subcontractor does so at its own risk, and must track all actual costs incurred, including but not limited to signed time sheets, additional supervision, actual material invoices and actual equipment costs, if any. If the additional work performed without the requisite Change Order or Work Authorization from Gray results in the necessity of an extension of time, the time extension may be granted by Gray only on proof that the work affected was on the critical path. In no event shall compensation or time be forthcoming from Gray unless these requirements are met, as well as the requisite notice set forth in Sections 6.2 and 6.3 below.

6.2    CLAIMS RELATING TO OWNER.  The Design/Build Subcontractor agrees to make all claims for which the Owner is or may be liable in the manner provided in the Contract Documents for like claims by Gray upon the Owner.

Written notice of such claims shall be given by the Design/Build Subcontractor to Gray within sufficient time for Gray to make such claims against the Owner in accordance with the Contract Documents or within five (5) calendar days prior to the beginning of the Design/Build Subcontractor's Work or the event for which such claim is to be made, whichever shall first occur, otherwise such claims shall be deemed waived.

6.3    CLAIMS RELATING TO GRAY.  The Design/Build Subcontractor shall give Gray written notice of all claims not included in Section 6.2 within five (5) calendar days of the beginning of the event for which claim is made; otherwise, such claims shall be deemed waived.

All unresolved claims, disputes and other matters in question between Gray and the Design/Build Subcontractor not relating to claims included in Section 6.2 shall be resolved in the manner provided in Section 16 herein.

6.4    ADJUSTMENT IN SUBCONTRACT PRICE.  If a Subcontract Change Order or Subcontract Work Authorization requires an adjustment in the Subcontract Price, the adjustment shall be established by one of the following methods:

    (a)    mutual agreement on a lump sum with sufficient substantiating data to permit evaluation;

    (b)    unit prices already established in the Subcontract Documents or if not established by the Subcontract Documents, then established by mutual agreement for this adjustment; or

    (c)    to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee.

6.5    SUBSTANTIATION OF ADJUSTMENT.  If the Design/Build Subcontractor does not respond promptly or disputes the method of adjustment under Section 6.4, the method and the adjustment shall be determined by Gray on the basis of reasonable costs and savings of those performing the Work attributable to the change, including, in the case of an increase in the Subcontract Price, an allowance for overhead and profit proportionate to Gray's recovery of overhead and profit, if any, under the Contract Documents.

The Design/Build Subcontractor shall maintain for Gray's review and approval an appropriately itemized and substantiated accounting of the following items attributable to the Subcontract Change Order or Subcontract Work Authorization, and shall maintain time sheets signed daily by an authorized representative of Gray relating to the additional work performed:

    (a)    labor costs, including Social Security, health, welfare, retirement and other fringe benefits as normally required, and state workers' compensation insurance;

    (b)    costs of materials supplies and equipment, whether incorporated in the Work or consumed, including transportation costs;

    (c)    costs of renting, either from Gray or from others, of machinery and equipment other than hand tools;

    (d)    costs of bond and insurance premiums, permit fees and taxes attributable to the change; and

    (e)    costs of additional supervision and field office personnel services necessitated by the change.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

6.6     DELAY.  If the progress of the Design/Build Subcontractor's Work is substantially delayed, disrupted, impacted or interfered with, without the fault or responsibility of the Design/Build Subcontractor, then the time for the Design/Build Subcontractor's Work shall be extended by Change Order to the extent obtained by Gray under the Subcontract Documents and the Schedule of Work shall be revised accordingly.

Gray shall not be liable to the Design/Build Subcontractor for any damages or additional compensation as a consequence of delays caused by any person not a party to this Agreement unless Gray has first recovered the same on behalf of the Design/Build Subcontractor from said person, and then to the extent of such recovery after payment of all attorney's fees and other expenses relating thereto, it being understood and agreed by the Design/Build Subcontractor that apart from recovery from said person, the Design/Build Subcontractor's sole and exclusive remedy for delay regardless of cause shall be an extension in time for performance of the Design/Build Subcontractor's Work.

In jurisdictions where the second paragraph herein is not enforceable, the Design/Build Subcontractor agrees that it may only seek delay damages to the extent documented by actual costs and entitlement demonstrated, and the Design/Build Subcontractor shall not be entitled to seek from Gray damages for actual or alleged loss of efficiency, constructive acceleration, lost productivity, stacking of trades, home office overhead, expectant underrun, season change, extended overhead, impact damages, profit upon damages for delay or similar damages calculated by formula or trade data or studies.

6.7     LIQUIDATED DAMAGES.  If the Contract Documents between the Owner and Gray permit the Owner to assess Gray for liquidated or other damages for delay beyond the completion date set forth in the Contract Documents, and such damages are so assessed, then Gray shall be entitled to assess same against the Design/Build Subcontractor in proportion to the Design/Build Subcontractor's share of the responsibility for such delay.

## SECTION 7

### GRAY'S AUTHORIZED REPRESENTATIVES

Gray has designated one or more persons in Section 1.2(a) of this Agreement who shall be Gray's authorized on-site and off-site representative(s).  Such authorized representative(s) shall be the only person(s) the Design/Build Subcontractor shall look to for instructions, orders and/or directions, except in an emergency.

## SECTION 8

### DESIGN/BUILD SUBCONTRACTOR'S OBLIGATIONS

8.1     OBLIGATIONS DERIVATIVE.  The Design/Build Subcontractor shall be bound to Gray by the terms of this Agreement and by the conditions of the Contract Documents between the Owner and Gray, and shall assume toward Gray all the obligations and responsibilities which Gray, by those documents, assumes toward the Owner.

8.2     RESPONSIBILITIES.  The Design/Build Subcontractor shall provide timely design services in compliance with all applicable codes, laws and regulations of the locality,  shall work with the local and state regulatory agencies with respect to building permits and other permits relating to the Design/Build Subcontractor's Work, and shall furnish and pay for all of the labor, supervision, materials, tools, equipment, services, and incidentals necessary for the proper performance of the Design/Build Subcontractor's Work.

The Design/Build Subcontractor shall provide a list of proposed sub-Subcontractors, subconsultants, and suppliers, be responsible for taking field dimensions, providing tests, ordering of materials and all other actions as required to meet the Schedule of Work.  If any sub-subcontractors are providing design work, then Design/Build Subcontractor shall furnish the name(s), licenses in the state in which the Work is being performed and the Professional Liability certificates from the sub-Design/Build Subcontractor.

8.3    WORKMANSHIP. Every part of the Design/Build Subcontractor's Work shall be executed in strict accordance with the Subcontract Documents in the most sound, workmanlike, and substantial manner. All workmanship shall be the best of its kind performed by others engaged in the same trade. All materials used in the Design/Build Subcontractor's Work shall be furnished in ample quantities to facilitate the proper and expeditious execution of the Work, and shall be new except such materials as may be expressly provided in the Subcontract Documents to be otherwise

8.4    Design/Build Subcontractor shall provide design services in accordance with the best skill and professional judgment, and in no event shall the skill and professional judgment provided with the design services be less than that expected from a highly skilled design professional performing similar work in the locality.

8.5    TEMPORARY SERVICES. The Design/Build Subcontractor shall furnish all temporary services and facilities necessary to perform its work, including, but not limited to, heat, electrical (power), telephone, water, and other utilities necessary.

8.6    COORDINATION. The Design/Build Subcontractor shall:

(a)    cooperate with Gray and all others whose work is dependent upon the progress of the Design/Build Subcontractor's Work'

(b)    specifically note and immediately advise Gray of any interference with the Design/Build Subcontractor's Work;

(c)    design the Work in coordination with the other trade Design/Build subcontractors, as well as the overall intent of the Criteria Documents, and

(d)    participate in the preparation of coordination drawings and work schedules in areas of congestion.

8.7    SHOP DRAWINGS AND SUBMITTALS. The Design/Build Subcontractor shall submit shop drawings, product data, samples, and any other submittals required by the Subcontract Documents expeditiously and in such manner and sequence so as to avoid delay in the progress of the Work or the activities of Gray or other Design/Build Subcontractors. The Design/Build Subcontractor shall be responsible for accuracy and conformity with the Subcontract Documents and other submittals. Unless specifically noted by Gray, action on shop drawings and submittals by Gray shall not be deemed to authorize deviation from the Subcontract Documents.

8.8    PROGRESS REPORTS AND MEETINGS. The Design/Build Subcontractor shall furnish periodic progress reports on the Work including information on the status of materials and equipment which may be in the course of preparation or manufacture.

8.9    DESIGN REVIEW AND COMMENTS MEETINGS. To the extent required by the Owner or Gray, Design/Build Subcontractor shall attend and participate, with its design professional in responsible charge of the design, in design review meetings during the course of the Project. Design/Build Subcontractor shall incorporate the comments and corrections resulting from such meetings in a timely and expeditious manner, so as not to delay the Work. Design/Builder shall coordinate its design with that of the other subcontractors.

8.10    AUTHORIZED REPRESENTATIVE AND NOTICE. The Design/Build Subcontractor shall designate one or more persons who shall be the authorized Design/Build Subcontractor's representative(s): (a) on-site and (b) off-site. Such authorized representative(s) shall be the only person(s) to whom Gray shall issue instructions, orders or directions, except in an emergency. Notices as required by this Agreement and other communications made to any one of the Design/Build Subcontractor's Authorized Representative(s) shall be binding as if given to the Design/Build Subcontractor. The authorized representative shall attend project meetings as required.

---

8.11    PROVISION FOR INSPECTION.  The Design/Build Subcontractor shall notify Gray when portions of the Design/Build Subcontractor's Work are ready for inspection.  The Design/Build Subcontractor shall at all times furnish Gray, the Owner, and their representatives adequate means and facilities for inspecting the Work, including materials at the site or any place where materials under this Agreement may be in the course of preparation, process, manufacture or treatment.

8.12    HOLD HARMLESS.  Design/Build Subcontractor shall hold Gray harmless and defend Gray from any and all consequences, losses, damages, claims or other expense of whatever nature, resulting from Design/Build Subcontractor's design on this Project.

8.13    CLEAN-UP.  The Design/Build Subcontractor shall follow Gray's clean-up directives and those of the Subcontract Documents, and

        (a)    at all times keep the building and premises free from debris and unsafe conditions resulting from the Design/Build Subcontractor's Work; and

        (b)    broom clean each work area daily prior to discontinuing work in the same.

Should Design/Build Subcontractor fail, after 24 hours notice from Gray, to appropriately clean an area as required by this Section, Gray shall assess the Design/Build Subcontractor for the actual daily clean-up cost or a daily charge of $150.00, whichever is greater, for each day such condition is not remedied.

8.14    SAFETY PRECAUTIONS AND PROCEDURES.

        8.14.1  The Design/Build Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by Gray and, in addition, comply with occupational safety and other applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons or property and in accordance with the requirements of the Subcontract Documents.  The Design/Build Subcontractor shall report to Gray within 24 hours any personal injury or property damage occurring at the site.

        8.14.2  Design/Build Subcontractor shall comply with Gray's Safety Requirements – Exhibit G attached.

        8.14.3  ALCOHOL AND DRUG FREE PROJECT.  The Design/Build Subcontractor recognizes that an alcohol and drug free Project is necessary to ensure the safety of the persons employed at the Project site by the Owner, Gray, the Design/Build Subcontractor and others, and to protect the health and safety of the community.  The Design/Build Subcontractor agrees that its employees shall not distribute, be under the influence of, or be in possession of, any form of alcohol or unlawful drug while at the Project site or while in the performance of Project-related activities.  Design/Build Subcontractor's employees shall also be prohibited from using or being subject to the effects of any lawful drug while at the Project site or in the performance of Project-related activities without approval of the employee's supervisor.  The Design/Build Subcontractor acknowledges that it is familiar with Gray's Alcohol and Drug Free Project Policy for Design/Build Subcontractors.  The Design/Build Subcontractor represents that it has established written procedures for compliance with Gray's policy and agrees that it will implement and enforce the policy throughout the course of the Project.  The Design/Build Subcontractor shall indemnify and hold the Owner and Gray harmless from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or related to Design/Build Subcontractor's implementation, application or enforcement of compliance procedures.

8.15    ENVIRONMENTAL MATTERS.

        8.15.1  If a Hazardous Chemicals of a type of which an employer is required by law to notify its employees will be used on the Project site by the Design/Build Subcontractor, the Design/Build Subcontractor's sub-Design/Build Subcontractors or anyone directly or indirectly employed by them, the

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

8.16    PROTECTION OF THE WORK AND PROPERTY.  The Design/Build Subcontractor shall take all necessary precautions to properly protect the Design/Build Subcontractor's Work and the work of others from damage caused by the Design/Build Subcontractor's operations.  Should the Design/Build Subcontractor cause damage to the Work or property of the Owner, Gray or others, the Design/Build Subcontractor shall promptly remedy such damage to the satisfaction of Gray, or Gray may so remedy and deduct the cost thereof from any amounts due or to become due the Design/Build Subcontractor.

8.17    COMPLIANCE WITH LAWS.  The Design/Build Subcontractor shall, at all times and at its own cost, comply with all federal, state and local statutes, codes, rules, regulations, ordinances, executive orders and other laws relating to the Project and the Work.  The Design/Build Subcontractor warrants and represents that it is authorized to transact business in the state and local jurisdictions where the Project is located, that it holds any and all licenses necessary to perform the Work, and that it is not currently in violation of any statutes, codes, rules, regulations, ordinances, orders, or other laws on any projects in which Design/Build Subcontractor is presently engaged.

8.18    PERMITS, FEES AND LICENSES.  The Design/Build Subcontractor shall give adequate notices to authorities pertaining to the Design/Build Subcontractor's Work and secure and pay for all permits, fees, licenses, assessments, inspections and taxes necessary for performance, completion or use of the Design/Build Subcontractor's Work.

To the extent paid to Gray under the Contract with the Owner, the Design/Build Subcontractor shall be compensated for additional costs resulting from laws, ordinances, rules, regulations and taxes enacted after the date of the Agreement.

8.19    TAXES, WAGES, FRINGE BENEFITS, ASSESSMENTS.  The Design/Build Subcontractor shall timely comply with all requirements applicable to payment of taxes, wages, fringe benefits, retirement benefits, unemployment compensation and other assessments, and shall upon request furnish Gray and the Owner with satisfactory proof of compliance.

8.20    LAYOUT RESPONSIBILITY AND LEVELS.  Gray shall establish principal axis lines of the building and site whereupon the Design/Build Subcontractor shall lay out and be strictly responsible for the accuracy of the Design/Build Subcontractor's Work and for any loss or damage to Gray or others by reason of the Design/Build Subcontractor's failure to set out or perform its work correctly.  The Design/Build Subcontractor shall exercise prudence so that actual final conditions and details shall result in perfect alignment of finish surfaces.

8.21    MATERIALS FURNISHED BY OTHERS.  In the event the scope of the Design/Build Subcontractor's Work includes installation of materials or equipment furnished by others, it shall be the responsibility of the Design/Build Subcontractor to examine the items so provided and thereupon handle, store and install the items with such skill and care as to ensure satisfactory and proper installation.  Loss or damage due to acts of the Design/Build Subcontractor shall be deducted from any amounts due or to become due the Design/Build Subcontractor.

8.22    SUBSTITUTIONS.  No substitutions shall be made in the Design/Build Subcontractor's Work unless permitted in the Subcontract Documents and only then upon the Design/Build Subcontractor first receiving all approvals required under the Subcontract Documents for substitutions.  The Design/Build Subcontractor shall indemnify Gray for any increased costs incurred by Gray as a result of such substitutions, whether or not the Design/Build Subcontractor has obtained approval thereof.

8.23    USE OF GRAY'S EQUIPMENT.  The Design/Build Subcontractor, its agents, employees, Design/Build Subcontractors or suppliers shall not use Gray's equipment without the express written permission of Gray's authorized representative.

If the Design/Build Subcontractor or any of its agents, employees, suppliers or lower tier Design/Build Subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items owned, leased, or under the control of Gray, the Design/Build Subcontractor shall be liable to Gray as provided in Section 14 for any

loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be found to have been due solely and exclusively to the negligence of Gray's employees operating such equipment.

8.24    ASSIGNMENT AND SUBCONTRACTING.  The Design/Build Subcontractor shall not assign this Agreement, nor its proceeds, nor subcontract the whole or any part of the Design/Build Subcontractor's Work, without the prior written approval of Gray.

8.25    NON-CONTRACTED SERVICES.  The Design/Build Subcontractor agrees that no claim for non-contracted construction services rendered or materials furnished shall be valid unless the Design/Build Subcontractor provides Gray notice:

    (a)    prior to furnishing of the services or materials, except in an emergency affecting the safety of persons or property;

    (b)    in writing of such claim within three (3) days of first furnishing such services or materials; and

    (c)    the written charge for such services or materials to Gray no later than the fifteenth day (15th) of the calendar month following that in which the claim originated.

8.26    COORDINATION.  Design/Build Subcontractor is responsible for coordinating its work areas and schedule with other trades in order to perform the overall project as a team.

8.27    NORMAL WORK WEEK.  Unless otherwise directed in writing by Gray, the Design/Build Subcontractor's Work shall be performed during a five (5) day work week extending from Monday through Friday. If the Design/Build Subcontractor's work becomes behind schedule, the Design/Build Subcontractor shall work overtime during the normal work week and be at no cost to Gray if Gray is not at fault for the Design/Build Subcontractor being behind schedule.

# SECTION 9

## SUBCONTRACT BONDS

9.1    PERFORMANCE AND LABOR AND MATERIAL PAYMENT BONDS.  Unless otherwise provided at Section 1.9 of this Agreement, the Design/Build Subcontractor shall provide separate Performance and Labor and Material Payment Bonds, in a form and with surety, satisfactory to Gray in the full amount of this Subcontract. The premiums for these Bonds shall be paid by the Design/Build Subcontractor and the cost thereof is included in the Subcontract Price.

9.2    ASSURANCE OF PERFORMANCE.  If Performance and Payment Bonds are not required of the Design/Build Subcontractor under Section 9.1, then throughout the duration of this Agreement, Gray may require such bonds or a letter of credit and the Design/Build Subcontractor shall provide same.  Said Bonds shall be in the full amount of this Agreement in a form and by a surety satisfactory to Gray.  The Design/Build Subcontractor shall be compensated for the cost of same pursuant to progress payments made hereunder after the Design/Build Subcontractor furnishes the required bonds or a letter of credit.  The reimbursement amount for the bonds or a letter of credit shall not exceed the manual rate for such instruments.  In the event the Design/Build Subcontractor shall fail to promptly provide such requested bonds or a letter of credit, Gray may terminate this Agreement and re-let the work to another Design/Build Subcontractor and all Gray costs and expenses incurred thereby shall be paid by the Design/Build Subcontractor.

# SECTION 10

## WARRANTY AND CORRECTION OF WORK

---

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

10.1   WARRANTY.

10.1.1   The Design/Build Subcontractor warrants to the Owner and Gray that materials and equipment furnished under this Subcontract will be of good quality and new unless otherwise required or permitted by the Subcontract Documents, that the Work will be performed in a good, workmanlike manner, be free from defects in materials and workmanship, and that the Work will conform with the requirements of the Subcontract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective in the sole judgment of Gray. This warranty shall be in addition to and not in limitation of any other warranty or remedy provided by law or by the Subcontract Documents. Design/Build Subcontractor shall warrant its work for a period of One (1) Year following Substantial Completion. If the warranty period is not specifically designated, then the parties agree that the warranty period shall extend for the period set forth in the agreement between Gray and the Owner.

10.1.2   The Design/Build Subcontractor further agrees to execute any additional guarantees or warranties specified in the Subcontract Documents.

10.2   CORRECTION OF WORK.

10.2.1   The Design/Build Subcontractor shall promptly correct Work rejected by Gray or failing to conform to the requirements of the Subcontract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed.

10.2.2   The Design/Build Subcontractor shall be obligated to correct work that is found not to be in accordance with the Subcontract Documents after Substantial Completion to the same extent that Gray is bound to the Owner for correction of said Work. The Design/Build Subcontractor shall begin the corrective work immediately after receipt of written notice from Gray to do so. This obligation shall survive acceptance of the Work and termination of the Subcontract. This obligation is in addition to, and not in limitation of, the warranty obligations under Section 10.1, it being the intent of this Agreement that warranty obligations are not restricted by Design/Build Subcontractor's obligations to correct defective work.

10.2.3   If the Owner chooses to correct the Work without notice and opportunity to cure to Gray, and the Owner backcharges Gray for the cost to correct the Work, the Design/Build Subcontractor shall be likewise bound to the backcharge that the Owner has assessed Gray for the Design/Build Subcontractor's Work.

10.3   SATISFACTION OF WARRANTY AND CORRECTIVE WORK OBLIGATIONS. The Design/Build Subcontractor agrees to satisfy warranty and corrective work obligations without cost to the Owner or Gray. In the event of Design/Build Subcontractor's failure to satisfy these obligations, all costs for design, labor, supervision, materials, travel (including meals, lodging and mileage), equipment and overhead (at 18% of costs) incurred by Gray in the investigation, review, redesign and correction of such problem shall be paid to Gray by Design/Build Subcontractor. Design and service team costs shall be computed using Gray's standard hourly rates. A verbal request for corrective action by Gray to the Design/Build Subcontractor, together with a written confirmation of the action requested, will be provided. If corrective action is not initiated or completed within a time reasonable under all the circumstances, Gray will itself commence investigation and implement corrective measures at the Design/Build Subcontractor's expense. Gray's rights hereunder are in addition to all other rights and remedies pursuant to the Subcontract, and the institution of such measures by Gray shall in no way relieve Design/Build Subcontractor of its primary responsibility for performing and warranting the Work in accord with the Subcontract Documents.

## SECTION 11

### RECOURSE BY GRAY

11.1   DEFAULT; NOTICE TO CURE.  If the Design/Build Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or fails to achieve Substantial or Final Completion, or it fails to make prompt payment for its workers, sub-Design/Build Subcontractors or suppliers, disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or fails to indemnify Gray as required by this Agreement or by law, or otherwise is guilty of a breach of any provision of this Agreement, and fails within three (3) working days after receipt of written notice to commence and continue satisfactory correction of such default with diligence and promptness, then Gray, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:

(a)     supply such number of workers and quantity of materials, equipment and other facilities as Gray deems necessary for the completion of the Design/Build Subcontractor's Work, or any part thereof which the Design/Build Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Design/Build Subcontractor, who shall be liable for the payment of such costs, including reasonable overhead, profit, as well as for other damages, and attorney's fees and dispute resolution costs;

(b)     contract with one or more additional contractors to perform such part of the Design/Build Subcontractor's Work as Gray shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Design/Build Subcontractor;

(c)     withhold payment of any monies due the Design/Build Subcontractor pending corrective action or completion of the Design/Build Subcontractor's Work to the extent required by and to the satisfaction of Gray; and

(d)     set-off Gray's damages attributable to Design/Build Subcontractor's default against any monies due Design/Build Subcontractor under this Agreement or under any other contract between Gray and the Design/Build Subcontractor.

(e)     terminate the Subcontract Agreement as set forth below.

In the event of an emergency affecting the safety of persons or property, Gray may proceed as above without notice.

11.2   TERMINATION BY GRAY.  If the Design/Build Subcontractor fails to commence and satisfactorily continue correction of a default within three (3) working days after receipt by the Design/Build Subcontractor of the notice issued under Section 11.1, then Gray may terminate this Agreement by written notice to the Design/Build Subcontractor and its surety, if any, and use any materials, equipment and/or employ such workers or Design/Build Subcontractors as Gray deems necessary to complete the Work.

All of the costs incurred by Gray in so performing the Design/Build Subcontractor's Work, including reasonable overhead, profit and attorney's fees shall be deducted from any monies due or to become due the Design/Build Subcontractor.  The Design/Build Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the subcontract price.

11.3   BANKRUPTCY.

11.3.1  TERMINATION ABSENT CURE.  If Design/Build Subcontractor files a petition under the Bankruptcy Code, this Agreement shall terminate if the Design/Build Subcontractor or the Design/Build Subcontractor's trustee (a) rejects the Agreement, or (b) if there has been a default, the Design/Build

Subcontractor is unable to give adequate assurance that the Design/Build Subcontractor will perform as required by this Agreement, or (c) is otherwise unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

11.3.2  **INTERIM REMEDIES.**  If the Design/Build Subcontractor is not performing in accordance with the Schedule of Work at the time a petition in bankruptcy is filed, or at any subsequent time, Gray, while awaiting the decision of the Design/Build Subcontractor or its trustee to reject or to assume this Agreement and provide adequate assurance of its ability to perform hereunder, may take such steps as are reasonably necessary to maintain the Schedule of Work. Gray may offset against any sums due or to become due the Design/Build Subcontractor all costs incurred in pursuing any of the remedies provided hereunder, including, but not limited to, reasonable overhead, profit and attorneys' fees. The Design/Build Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Price.

11.4  **SUSPENSION BY GRAY.**  Gray may order the Design/Build Subcontractor in writing to suspend, delay, or interrupt all or any part of the Design/Build Subcontractor's Work for such period of time as may be determined to be appropriate for the convenience of Gray. Phased or interrupted Work when required shall not be deemed a suspension of Work.

The Design/Build Subcontractor shall notify Gray in writing within five (5) calendar days after receipt of Gray's order of the effect of such order upon the Design/Build Subcontractor's Work. To the extent, and only to the extent, allowed Gray under the Contract Documents, the Subcontract Price or Schedule of Work shall be adjusted by Subcontract Change Order for any increase in the time or cost of performance of this Agreement caused by such suspension, delay, or interruption.

Neither the Subcontract Price nor the Schedule of Work shall be adjusted under this Section for any suspension, delay or interruption to the extent that performance would have been so suspended, delayed or interrupted by the fault or negligence of the Design/Build Subcontractor or by a cause for which the Design/Build Subcontractor would have been responsible.

11.5  **WRONGFUL EXERCISE.**  If Gray wrongfully exercises any option under this Section 11, Gray shall be liable to the Design/Build Subcontractor solely for the reasonable value of work performed by the Design/Build Subcontractor prior to Gray's wrongful action, including reasonable overhead and profit, less prior payments made. Design/Build Subcontractor shall not be entitled to recover any other incidental or consequential damages, including but not limited to profits attributable to unperformed Work.

11.6  **REMEDIES CUMULATIVE.**  All the rights and remedies of Gray in the event of a default by Design/Build Subcontractor under this Agreement shall be cumulative to the greatest extent permitted by law and shall be in addition to all other rights and remedies available to Gray at or in equity.

## SECTION 12

### SUSPENSION OR TERMINATION BY OWNER

12.1  **SUSPENSION BY OWNER.**  Should the Owner suspend Gray's contract or any part of Gray's contract which includes the Design/Build Subcontractor's Work, Gray shall so notify the Design/Build Subcontractor in writing and, upon receipt of said notice, the Design/Build Subcontractor shall immediately suspend the Work.

12.2  **TERMINATION BY OWNER.**  If the Owner, for any reason, terminates Gray's contract or any part that includes the Design/Build Subcontractor's Work, Gray shall so notify the Design/Build Subcontractor in writing and upon receipt of said notice, this Agreement shall also be terminated and the Design/Build Subcontractor shall immediately stop the Work.

12.3    CLAIMS FOR OWNER SUSPENSION OR TERMINATION. In the event of such Owner suspension or termination, Gray's obligation to the Design/Build Subcontractor is limited to the extent of Gray's recovery, on the Design/Build Subcontractor's behalf, under the Contract Documents. Gray agrees to cooperate with the Design/Build Subcontractor, at the Design/Build Subcontractor's expense, in the prosecution of any Design/Build Subcontractor claim arising out of an Owner suspension and to permit the Design/Build Subcontractor to prosecute said claim, in the name of Gray, for the use and benefit of the Design/Build Subcontractor. Administrative and overhead costs, attorney's fees and other expenses incurred by Gray while assisting the Design/Build Subcontractor in the prosecution of such claim shall be deducted from any recovery paid to Design/Build Subcontractor.

12.4    STIPULATION. The provisions of this Section 12 shall not be construed to create any obligation upon Gray to pursue any claim or litigation on behalf of the Design/Build Subcontractor.

## SECTION 13

### LABOR RELATIONS AND IMMIGRATION

13.1    ICOMPLIANCE WITH IMMIGRATION REFORM AND CONTROL ACT OF 1986 ("IRCA"). Gray and Design/Build Subcontractor agree that Design/Build Subcontractor shall be obligated to comply with all requirements imposed on employers under IRCA with regard to every Design/Build Subcontractor employee ("Contract Worker") who will perform services for Design/Build Subcontractor, where such service is provided in connection with Design/Build Subcontractor's performance of this Subcontract. Design/Build Subcontractor further agrees that Design/Build Subcontractor is the "employer" as that term is defined at 8 C.F.R. Section 274a.1(g), and that Gray is not the "employer" as so defined, with regard to such Contract Workers. In furtherance of its duties as employer under IRCA, Design/Build Subcontractor agrees to do the following:

A.    Complete USCIS Form I-9 for all Contract Workers. Design/Build Subcontractor agrees that it has sole responsibility for completing Form I-9 for all Contract Workers who provide services as a part of Design/Build Subcontractor's performance of this subcontract, and that it will do so and will further update such Form to the extent required by law. Design/Build Subcontractor further warrants that all of Design/Build Subcontractor's agents and/or employees who complete Form I-9 for such Contract Workers will be knowledgeable of all Form I-9 requirements, including but not limited to, knowledge of which documents do and do not satisfy the requirements of Form I-9, and that such agents and employees will otherwise complete Form I-9, and that such agents and employees will otherwise complete Form I-9 in full compliance with IRCA.

B.    Design/Build Subcontractor's Warranty of Employment Authorization for all Contract Workers. Design/Build Subcontractor hereby warrants that no Contract Worker will provide services pursuant to this subcontract until Design/Build Subcontractor has completed Form I-9 for such Contract Worker in the manner required by IRCA. Design/Build Subcontractor further warrants that it will not permit any Contract Worker to perform services under this subcontract who Design/Build Subcontractor knows or has reason to believe is not authorized to work in the United States, regardless of whether such individual is able to produce documents which satisfy the requirements of Form I-9. Design/Build Subcontractor understands that Gray is acting in reliance on Design/Build Subcontractor's warranty as described in this subparagraph and further states that without Design/Build Subcontractor's warranty that it has taken all necessary steps to comply with IRCA and that Design/Build Subcontractor believes all Contract Workers are authorized to work in the United States.

C.    Removal of Contract Workers not Authorized for Employment in the United States. Design/Build Subcontractor agrees that if at any time after it assigns a Contract Worker to perform services under this subcontract, Design/Build Subcontractor learns or has reason to believe that any Contract Worker is not authorized to work in the United States, Design/Build Subcontractor shall immediately so inform Gray and Design/Build Subcontractor shall cease assigning work to such Contract Worker providing services under this Subcontract.

D.    Indemnification and Hold Harmless. Design/Build Subcontractor agrees that in any event any government agency determines that any Contract Worker hired by Design/Build Subcontractor to perform

| Page 20 | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

duties under this subcontract is not authorized for employment in the United States, Design/Build Subcontractor shall indemnify and hold harmless Gray and any of Gray's agents, employees, officers, directors, trustees, or other persons acting on Gray's behalf, from any liability incurred by Gray as a result of such determination. Such indemnification shall include, by way of example but not in any way limited to, any civil or criminal fines or penalties assessed, alleged and any costs incurred in responding to or participating in any government investigation, finding, recommendation, hearing, appeal or any other proceeding, including attorneys' fees and costs.

13.2    LABOR HARMONY.  Design/Build Subcontractor and its lower tier Design/Build Subcontractors shall not employ anyone in the Design/Build Subcontractor's Work whose employment may be objectionable to Gray or the Owner.  All labor used throughout the Work by Design/Build Subcontractor or any of its lower tier Design/Build Subcontractors shall be of a standing or affiliation that will permit the Project to be carried on harmoniously and without delay, and that will not, in any case, or under any circumstances, cause any disturbance, interference or delay to the progress of the Project.

13.3    LABOR DISPUTES.  Design/Build Subcontractor and all persons in privity with it agree that, where its Work or any of the Work of Gray or other Design/Build Subcontractors is stopped or delayed or interfered with by strikes, slow-downs or work interruptions or the threats thereof, resulting from an act or failure to act of Design/Build Subcontractor and/or those in privity with it, or any of their employees or agents, then Gray, at its sole option, shall afford Design/Build Subcontractor twenty-four (24) hours notice wherein Design/Build Subcontractor shall take action to maintain the harmony of the Work, or make such other arrangements, satisfactory to Gray that will ensure the harmonious continuation of the Work.  Design/Build Subcontractor's failure to so comply within the allotted time shall be an event of default, for which Gray may, at its sole option, terminate this Agreement pursuant to Section 11.1.

## SECTION 14

### INDEMNIFICATION

14.1    DESIGN/BUILD SUBCONTRACTOR'S PERFORMANCE.  To the fullest extent permitted by law, the Design/Build Subcontractor shall indemnify and hold harmless the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors and Design/Build Subcontractors and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of the Design/Build Subcontractor's Work provided that:

(a)    any such claim, damage, loss or expense is attributable to bodily injury, personal injury, sickness, disease or death, or to damage to or destruction of tangible property including the loss of use resulting therefrom, to the extent caused or alleged to be caused by any negligent act or omission of the Design/Build Subcontractor or any person directly or indirectly employed by the Design/Build Subcontractor or anyone for whose acts the Design/Build Subcontractor may be liable (including sub-Design/Build Subcontractors and suppliers of Design/Build Subcontractor).

(b)    litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the work or materials or processes used by Design/Build Subcontractor, or its subcontractors, subconsultants and/or suppliers.

(c)    claims against or through Gray or liability for claims and liens for labor performed or materials used or furnished through or under Design/Build Subcontractor on the Project.

(d)    liability or claims against or through to Gray resulting from Design/Build Subcontractor's failure to comply with applicable licensing requirements or Code requirements.

(e)    liability imposed upon Gray directly or indirectly by Design/Build Subcontractor's failure or the failure of any of its employees to comply with law, ordinances, rules, regulations or

requirements, including any Occupational Safety and Health Administration violations and any penalties, including enhancements, resulting in whole or in part by Design/Build Subcontractor's acts or omissions.

(f)    such obligation shall not be construed to negate, or abridge, or otherwise reduce any other right or obligation of indemnity under this Agreement or which would otherwise exist as to any party or person described in this Section 14.

14.2    <u>NO LIMITATION OF LIABILITY</u>.  In any and all claims against the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors or Design/Build Subcontractors, or any of their agents or employees, by any employee of the Design/Build Subcontractor, anyone directly or indirectly employed by the Design/Build Subcontractor or anyone for whose acts the Design/Build Subcontractor may be liable, the indemnification obligation under this Section 14 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Design/Build Subcontractor under worker's or workmen's compensation acts, disability benefit acts or other employee benefit acts.

## SECTION 15

### INSURANCE

15.1    <u>DESIGN/BUILD SUBCONTRACTOR'S INSURANCE</u>.  Prior to beginning the Work, the Design/Build Subcontractor shall procure for its Work, and furnish proof of, Workers' Compensation Insurance, Employer's Liability Insurance, Commercial (Comprehensive) General Liability Insurance (including contractual liability insurance covering Design/Build Subcontractor's obligations under Section 14), Comprehensive Automobile Liability Insurance, and all other insurance and extensions thereof required of Gray insofar as the requirements relate to Design/Build Subcontractor's Work.  Gray shall be named as an additional insured on the Design/Build Subcontractor's Commercial (Comprehensive) General Liability policy.  Design/Build Subcontractor shall procure and maintain at all times during the course of the Work (including corrective or warranty work) the required insurance with limits of liability not less than those listed below. Policies shall be in a form satisfactory to Gray and issued by insurers licensed to do business in the state where the Project is located and who are rated no lower than A by Best Insurance Guide.

15.1.1    <u>WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY</u>.

(a)    Statutory coverage in each state in which  Subcontractor's employees are engaged in the performance of the Work;

(b)    Employer's Liability:

| | | |
|---|---|---|
| $100,000 | - | bodily injury for each accident |
| $500,000 | - | policy limit for bodily injury by disease |
| $100,000 | - | for each employee for bodily injury by disease |

15.1.2    <u>COMMERCIAL GENERAL LIABILITY</u>.

(a)    Limits of Liability:

| | | |
|---|---|---|
| $1,000,000 | - | general aggregate |
| $1,000,000 | - | products and completed operations aggregate |
| $1,000,000 | - | personal and advertising injury |
| $1,000,000 | - | each occurrence |

(b)    Coverage Details:

Coverage shall be by Standard Commercial General Liability Occurrence Form including:

Personal and Advertising Injury, Contractual Liability, Explosion, Collapse and Underground Liability (if applicable), Broad Form Property Damage, Independent Contractors, and Products and Completed Operations.

This policy shall add Gray as an insured thereunder by proper endorsement.

15.1.3  AUTOMOBILE LIABILITY.

(a)     Limits of liability:  $1,000,000 per accident

(b)     Coverage details:

        All owned, non-owned and hired vehicles.

15.1.4  PROFESSIONAL LIABILITY.

Professional Liability (Errors and Omissions) coverage with a minimum limit of $250,000 each claim and $250,000 in the aggregate, if required by Section 1.10.

15.1.5  EXCESS OR UMBRELLA LIABILITY. Subcontractor shall include Excess or Umbrella Liability Insurance in an amount not less than indicated in Section 1.11.

15.1.6  CERTIFICATE OF INSURANCE.  Design/Build Subcontractor has furnished Gray with a certificate of insurance (or certified copies of its insurance policies), which Design/Build Subcontractor warrants and represents is a true and accurate representation of Design/Build Subcontractor's existing insurance coverage.  This certificate shall indicate all endorsements, including Gray, and Owner if applicable, as additional insured by standard endorsements CG2010 (07/04) and CG2037 (07/04).

15.2    CANCELLATION, RENEWAL OR MODIFICATION.  All insurance policies shall contain a provision that the coverages afforded thereunder shall not be cancelled or not renewed, nor restrictive modifications added, until at least thirty (30) days prior written notice has been given to Gray unless otherwise specifically required in the Subcontract Documents.

No progress payment will be made unless Gray has been furnished evidence of required coverages and endorsements as required by this Subcontract.

In the event the Design/Build Subcontractor fails to obtain or maintain any insurance coverage required under this Agreement, Gray may purchase such coverage and charge the expense thereof to the Design/Build Subcontractor, or terminate this Agreement.

15.3    WAIVER OF RIGHTS.  Gray and Design/Build Subcontractor waive all rights against each other and the Owner, separate contractors, and all other Design/Build Subcontractors for loss or damage to the extent covered by Builder's Risk or other similar insurance covering improvements or materials at the Project site, except such rights as they may have to the proceeds of such insurance.

If not covered under the Builder's Risk policy of insurance or any other property or equipment insurance required by the Subcontract Documents, the Design/Build Subcontractor shall procure and maintain at the Design/Build Subcontractor's own expense property and equipment insurance for portions of the Design/Build Subcontractor's Work stored off the site or in transit, when such portions of the Design/Build Subcontractor's Work are to be included in an application for payment under Section 5.

15.4    ENDORSEMENT.  If the policies of insurance referred to in this Article require an endorsement to provide for continued coverage where there is a waiver of subrogation, the owners of such policies will cause them to be so endorsed.

| Page 23 | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

15.5    PRIMARY COVERAGE.  The insurance required of Design/Build Subcontractor must be primary and non-contributory with Gray's insurance program.

# SECTION 16

# DISPUTE RESOLUTION

16.1    DISPUTE RESOLUTION.  All claims, disputes and matters in question arising out of, or relating to, this Agreement or the breach thereof, except for claims which have been waived by the making or acceptance of final payment and the claims excluded or limited by Sections 6.2 and 6.6, shall be resolved by mediation, arbitration and/or litigation at Gray's sole option.  The provisions for arbitration shall be specifically enforceable under the Federal Arbitration Act.  The site for mediation, litigation or arbitration shall be at the Project site or Lexington, Kentucky, as selected by Gray, unless required otherwise by Gray's agreement with Owner.

16.2    DISPUTE RESOLUTION PROCEDURE.  Prior to a demand for arbitration, or initiation of litigation of claims, the parties shall proceed as follows, as an express condition precedent to commencing formal claims against the other relating to or arising out of the dispute:

(a)    The party asserting a claim shall do so in writing and within the notice period, if any, established for such claims by the Subcontract Documents.  In the absence of a notice period set by the Subcontract Documents, the notice of claim shall be given as soon as practicable but in no event later than five (5) calendar days after the claimant is aware of the event from which the claim arises.

(b)    The parties shall then attempt in good faith to negotiate a resolution of disputed claims during the next twenty (20) calendar days before pursuing any other means of dispute resolution.

(c)    If claims remain unresolved, the parties shall endeavor to resolve disputes by proceeding at the instance of either to non-binding mediation conducted under such rules as the parties may agree to employ.  The parties shall divide the cost of the mediator evenly among them.

(d)    DISPUTES RELATING TO GRAY.  Notwithstanding anything stated above, if any dispute shall arise between Gray and the Subcontractor pertaining in any manner to the construction or interpretation of this Agreement, or to the rights or obligations of the parties, or to the breach of this Agreement, which the parties are unable to settle by mutual agreement, Gray shall have the exclusive option either to have the dispute determined by a court or by arbitration in accordance with the Arbitration Rules of the Center for Public Resources.  Gray, Subcontractor and Subcontractor's surety agree that all claims, disputes, and other matters in controversy between Gray and Subcontractor, arising out of or relating to the Subcontract, or the breach thereof, except as provided in the Contract Documents, shall be resolved in the appropriate forum in the County of Fayette, Kentucky.  Gray shall exercise its exclusive option by commencing a court action or by commencing an arbitration proceeding.  If Subcontractor first commences a court action with respect to a dispute which Gray desires to have determined by an arbitration proceeding, or if Subcontractor first commences an arbitration proceeding which Gray desires to have determined by a court, Gray shall commence the arbitration proceeding or court action desired by Gray within thirty days after receiving service of Subcontractor's complaint or arbitration demand.  If, at any time, even after suit may have been filed by either party, but prior to commencement of trial, Gray becomes involved in litigation or arbitration with another party or parties involving questions of fact or law common to the dispute between Gray and Subcontractor to the extent that (a) in Subcontractor's absence, complete relief cannot be accorded among those already parties, or (b) disposition of such other action may as a practical matter, impair or impede

| Page 24 | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

Gray's or Subcontractor's ability to fully prevent its incurring multiple or otherwise inconsistent obligations, Subcontractor agrees that Subcontractor may be joined by Gray in such other litigation or arbitration proceedings for complete resolution of all disputes and controversies arising under this Agreement and that upon such joinder, any pending action between Gray and Subcontractor shall be dismissed.

(e)     If Gray chooses to have the matter resolved by arbitration, then it shall proceed in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes, as modified by this Agreement. The arbitration panel shall consist of three independent and impartial persons who have experience in the construction industry or construction law. The Design/Build Subcontractor and Gray shall each appoint one member of the panel and the third member shall be appointed according to the aforementioned Rules.

16.3     AWARD. If Gray chooses to arbitrate, then the arbitration award shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof, subject to any restrictions set forth in the Federal Arbitration Act.

16.4     WORK CONTINUATION AND PAYMENT. Unless otherwise agreed in writing, the Design/Build Subcontractor shall continue on which the Work and maintain the Schedule of Work pending arbitration, and if so, Gray shall continue to make payments earned by the Design/Build Subcontractor in accordance with this Agreement.

16.5     DOCUMENT PRODUCTION AND EXCHANGE OF ARBITRATION EXHIBITS. After a demand for arbitration, and if Gray consents to arbitrate, each party shall have the right to immediate production of the records of the other party relating to the Project for inspection and copying except for those portions which are covered by an unwaived attorney-client privilege or which were prepared in anticipation of arbitration or litigation. No later than 15 days prior to the arbitration hearing, the parties shall make available to each other, for inspection and copying, the exhibits, photographs, and other documents which they intend to introduce or refer to during the arbitration.

16.6     ATTORNEY'S FEES, ARBITRATION COSTS, AND COURT COSTS.

(a)     Attorney's fees and expenses shall be awarded to the prevailing party if a claim or dispute is found to have been asserted or defended unreasonably or in bad faith.

(b)     The prevailing party in arbitration shall recover its attorney's fees and court costs incurred in any judicial proceedings necessary, including those fees necessary to obtain (i) enforcement of this arbitration clause or (ii) confirmation, enforcement, or collection of an arbitration award or court judgment.

## SECTION 17

### MISCELLANEOUS PROVISIONS

17.1     GOVERNING LAW. This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Kentucky applicable to agreements executed, delivered, and to be performed solely within the Commonwealth of Kentucky.

17.2     SEVERABILITY AND WAIVER. The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision. The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

| Page 25 | Issue Date: | 08/01/03 |
| --- | --- | --- |
| | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

17.3    TITLES. The titles given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any other purpose.

17.4    ATTORNEYS' FEES. The Design/Build Subcontractor shall reimburse Gray for all of Gray's attorney's fees, court costs and other expenses incurred in enforcing or declaring the Design/Build Subcontractor's obligations under this Agreement, incurred in exercising any right or remedy hereunder or under law or equity in the event of a default by the Design/Build Subcontractor, or incurred in any litigation or arbitration in which Gray, without its fault, becomes involved by reason of the existence of this Agreement.

17.5    WRITTEN NOTICES. Written notices to Gray required by this Agreement shall be addressed to 10 Quality Street, Lexington, Kentucky 40507-1450. Written notices to Design/Build Subcontractor required by this Agreement shall be sent to the address given in Section 1.1 of this Agreement. Any notice sent by mail shall be deemed to have been received the third calendar day after the date of mailing. Notice may also be delivered by hand delivery or fax, in which event notice shall be deemed effective on the date such notice is given.

17.6    ENTIRE AGREEMENT. This Agreement is solely for the benefit of the signatories hereto and represents the entire and integrated agreement between the parties hereto and supersedes all prior contemporaneous negotiations, representations, understandings or agreements, either written or oral. This Agreement shall not be modified except by a written instrument signed by the parties.

## SECTION 18

### SPECIAL PROVISIONS

18.1    BINDING EFFECT. This Agreement shall be binding upon and inure to the benefit of Gray, Design/Build Subcontractor, and their successors and assigns.

18.2    PRECEDENCE. It is understood the Work to be performed under this Agreement, including the terms and conditions thereof, is as described in Section 1 through 17 herein together with the following Scope of Work, which are intended to complement same. However, in the event of an inconsistency, these Scope of Work shall govern.

18.3    INCONSISTENCIES AND OMISSIONS. Should inconsistencies or omissions appear in the Subcontract Documents, it shall be the duty of the Design/Build Subcontractor to so notify Gray in writing within three (3) working days of the Design/Build Subcontractor's discovery thereof. Upon receipt of said notice, Gray shall instruct the Design/Build Subcontractor as to the measures to be taken and the Design/Build Subcontractor shall comply with Gray's instructions.

18.4    CROSS REFERENCE OF DOCUMENTS. Design/Build Subcontractor shall review all specifications, drawings, reports and existing conditions which affect the relationship of Design/Build Subcontractor's Work to the complete project, and be responsible for that relationship. By way of example, a roofing Design/Build Subcontractor shall be responsible for including and performing mechanical and plumbing roof penetrations, which may or may not be detailed on the roof plans and details, but may be shown on the mechanical drawings.

18.5    SUBCONTRACT DOCUMENTS. The Subcontract Documents are identified as follows and incorporated by reference:

    (a)    Scope of Work – Exhibit A

    (b)    Drawing List – Exhibit B

    (c)    Specifications & Other Documents – Exhibit C

    (d)    Other Provisions – Exhibit D

| | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

(e)    Application for Payment – Exhibit E

(f)    Sub-Subcontractor/Materialmen's Waiver of Lien – Exhibit F

(g)    Subcontractor Safety Orientation Manual – Exhibit G

(h)    This Agreement

(i)    The Contract Documents identified in the contract between the Owner and Gray, including but not limited to the signed agreement between the Owner and Gray, conditions of the contract (general, supplementary, special and other conditions), drawings, specifications, addenda, change orders, other written modifications, and other documents enumerated therein;

WITNESS WHEREOF, The parties have caused this Agreement to be executed by their duly authorized

representatives, under seal, as of the day and year first above written.

**CONTRACTOR**

GRAY CONSTRUCTION, INC.

_____
Project Manager

_____
Executed By

EXECUTIVE V.P. AUTOMOTIVE MARKET
_____
Title

(Seal)
Attest:

_____

_____
Title

**SUBCONTRACTOR**

Dotson Electric
_____
Company Name

_____
Signature

Larry Dotson
_____
Printed Name

President
_____
Title

(Seal)

Attest:

_____

Office Manager
_____
Title

## *If applicable, complete certificate on the following page.*

## CERTIFICATE

(Certificate DOES NOT need to be completed IF subcontractor is a Sole Proprietorship.  Notary Public section must be completed by all entities.)

I, _Larry Dotson_ , certify that I am an/a

_Officer_ of _Dotson Electric Co._
(Officer/Member/Partner)                    (Name of Subcontractor Entity)

and that I am authorized and empowered by valid resolutions of the _Board_
(Partners/ Board of Directors/ Managers)

of said _Corporation_ to execute this Subcontract for and on its behalf.
(Partnership/Corporation/Limited Liability Company)

This _3rd_ day of _January_, 20 _07_

_____
Officer

State of _Ky_

County of _Warrn_

Subscribed, sworn to and acknowledged before me by _Larry Dotson_

This _3rd_ day of _January_, 20 _07_.

_____
Notary Public

My Commission Expires: _5-12-09_

| | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |



**Gray Construction**

## EXHIBIT A
## SCOPE OF WORK
### SUBCONTRACT AGREEMENT NO.: 207005-16-100S

<u>Dotson Electric Company, Inc.</u> shall provide all engineering, materials, labor, equipment and other services necessary to complete <u>Design/Build Division 16, Electrical</u>.

The Design/Build Subcontractor is responsible for complete engineering and construction of the electrical systems for the project. All engineering and construction must strictly conform to all requirements of the criteria documents. If there is a conflict between the provisions of the criteria documents and the project as constructed, or the Design/Build Subcontractors construction documents, the provisions of the criteria documents shall govern unless amended by Change Order.

Engineering services provided under the provisions of this contract shall be in accordance with the standards of skill, care, and knowledge of the electrical engineering profession. Furthermore, engineering shall be performed by professionals licensed to practice in Alabama and shall fully comply with all applicable codes, statutes, ordinances, and regulations governing Greenville, AL.

The professional services and work shall be performed to the full satisfaction of Gray Construction and the Customer. The Design/Build subcontractor attests that all of the documents and plans comprising the criteria documents have been read and the Design/Build subcontractor is fully familiarized with all of the requirements for the full and complete performance of the work included in this contract. The Design/Build subcontractor agrees to be bound and obligated to Gray, to the extent of the work included in this contract, as fully and completely as Gray is bound and obligated to the Customer.

Furthermore, the scope of work shall be more specifically defined but shall in no way be limited to the following:

### DESIGN/ENGINEERING SCOPE

1.  The Design/Build subcontractor shall provide plans and specifications to convey the intent of the engineering. Each release of plans and specifications shall be prepared using the standards and conventions set forth by Gray. This shall include but is not limited to the following:

    - All drawing shall be produced using AutoCAD release 2004.
    - There will be no plotting by Gray. If, for some reason plotting is required of Gray then the design-build subcontractor will be charged by Gray for all labor and material required to provide this service.
    - All specifications shall be produced using Microsoft Word 2000.
    - The format for specifications shall follow the standards established by Gray for headers, footers and margins.
    - The font for specifications shall be Arial 12 point.

Page 1

Exhibit A - Design-Build Subcontract Agreement

- For each release of documents (plans and specifications) the design-build subcontractor shall provide to Gray's design manager the following in strict accordance with the schedule defined by Gray's design manager:

    A. One complete set of full size blackline drawings.
    B. One complete set of half size blackline drawings.
    C. Electronic media of plans and specifications on CD-R or via internet/e-mail. AutoCAD drawings must be complete with all external references, including dwgs, fonts, shape files, x-refs, plotter definition files (.ctb and .pcp) etc. Electronic files for specifications shall be Microsoft Word 2000.
    D. A .pdf file of drawings and specifications. Individual files shall be combined into one file. A separate "combined" file shall be provided for drawings and specifications.

    - When providing record documents the Design/Build subcontractor shall also provide, in addition to the above, a complete set of "Bound" .dwg files that are independent of x-ref files.

2. Attend and participate in design review and coordination meetings as scheduled by Gray.

3. Provide progress prints of the documents as requested by Gray.

4. Submit drawings and specifications for review with the seal and original signature of the registered professional responsible for the engineering to regulatory agencies having jurisdiction over the project. Review fees pertinent to the Design/Build subcontractor's area of responsibility, are the responsibility of the Design/Build subcontractor.

5. Maintain a complete set of documents at the project site. This set shall be used for notations of as constructed conditions which differ from the information shown on the documents as they were issued "FOR CONSTRUCTION". These as constructed markings shall be used to generate Record Drawings.

6. Design/Build Subcontractor is responsible for timely and complete coordination of all elements of design and engineering pertinent to this trade as well as coordination with Architectural, Civil, Structural, Process, and other Design Build Subcontractor design and engineering (i.e., Mechanical, Plumbing and Fire Protection).

7. Gray shall determine the sequencing and timing for the release of design documents that shall include documents prepared by the Design/Build Subcontractor. The Design/Build Subcontractor shall cooperate with Gray by providing interim releases of design documents.

## CONSTRUCTION SCOPE

1. Provide all labor and material necessary for the complete installation of the electrical as indicated on the drawings and described here.

2. Subcontractor shall coordinate with Alabama Power to get the power restored to the facility.

3. Subcontractor shall secure cap off all live circuits.

4. Subcontractor shall demo the fire alarm panel from the damaged area and relocate.

Exhibit A - Design-Build Subcontract Agreement

5.   Subcontractor shall provide electrical distribution system for temporary trailers.

6.   Subcontractor shall provide feeders to temporary trailers.

7.   Subcontractor shall provide temporary feeders to the roof top units and control system.

8.   Subcontractor shall provide feeders back to electric duct heaters.

9.   Subcontractor shall provide feeders to UPS and computer room equipment.

10.  Subcontractor shall provide any electrical assistance that is deemed necessary to keep the Hwashin facility in operation and safe as best possible under the current conditions.

11.  The Subcontractor shall provide perimeter fall protection for their employees that are exposed to the leading edge of the roof.  This fall protection must comply with Gray safety requirements and OSHA requirements.

12.  Subcontractor to conform to and enforce all items in Gray safety policy.

13.  Subcontractor is to send a representative to site meetings weekly.

14.  The Subcontractor shall provide all field layout for the execution of this scope of work. Design/builder will provide permanent benchmarks.  Field verification of all existing conditions will be required.

15.  Subcontractor is responsible for the cleaning of debris and residue deposited on public roads as a result of its operations.

16.  Invoices will be due to Gray by the 25th of each month, with work projected through the end of the month.  A 10% retainage will be withheld from each month's invoice.

17.  The Subcontractor (and tiered subcontractors/suppliers, when applicable) shall comply with **Gray Construction project reporting procedures** in regards to Daily Reports, Safety Reports, HAZ. Com., and Safety Training Reports, QA/QC verifications, and two week look ahead schedules.

18.  The Subcontractor and tiered subcontractors/suppliers shall embrace and abide by the **Gray Construction Alcohol and Drug Free Project Policy for Subcontractors**.

19.  The Subcontractor and tiered subcontractor/suppliers shall comply with the **safety requirements of Gray Construction**, including 100% tie-off requirements, 100% eye protection, State, Federal, OSHA and all regulatory agencies having jurisdiction.

20.  The Subcontractors and tiered subcontractor/suppliers shall be responsible for all applicable taxes, fees, insurance and permits for their scope of work.

21.  All Subcontractors and tiered subcontractors/suppliers shall provide the required **insurance certificates** before initiating any work on site.  Gray Construction is to be listed as an additional insured on Certificate of Insurance.  Builders Risk Insurance will be by others.

Page 3

Exhibit A – Design-Build Subcontract Agreement

22. Parking will be restricted to assigned areas. Only company vehicles delivering materials or equipment will be allowed on site and only in areas where designated by the Contractor.

23. The Subcontractor (and tiered subcontractors/suppliers when applicable) shall provide and maintain competent on-site supervisors during the execution of the work as well as a sufficient number of qualified workers to properly service the project schedule.

24. Gray shall provide temporary toilets for this subcontractors use. We do not include any special provisions for union agreements. Any additionally required toilets will need to be provided by this Subcontractor.

25. The Subcontractor shall also provide the following as necessary for their scope of work:
    a. Ice and drinking water for his employees.
    b. Storage sheds and trailers, and office facilities including telephone, fax, copier, and any other support elements as required for their own use.

26. The Subcontractor shall remove all temporary facilities and restore areas to original condition before final acceptance of the work.

27. The Subcontractor shall provide a complete system in accordance with the intent of the drawings, specifications, and contract documents. It is understood that there will be no revisions to the contract amount as long as the scope of work and the intent as referenced is not altered.

28. The Subcontractor will cooperate with Grays "0" punch list initiative.

29. All material will be staged in designated areas and on sufficient dunnage to ensure the material is maintained in a clean manner, free from mud and debris prior to and after installation. No stoned staging areas will be provided, and this is the Subcontractors responsibility if required to meet schedule.

30. Clean up of work daily to dumpster, located centrally, by Gray.

31. Provide all hoisting, dunnage, tools, personnel lifts and equipment necessary to unload, stage, and install this scope of work.

**PRICE BREAKDOWN:**

Prices include all labor, material, taxes, insurance, payroll overhead, benefits, overhead and profit.

| Description | | Amount Including Sales Tax |
|---|---|---|
| PHASE I WORK | | $59,000.00 |
| PHASE II WORK | | TBD |
| PHASE III WORK | | TBD |
| TOTAL | | $59,000.00 |

Monthly billings submitted by the Subcontractor must be broken down and charged against the following code(s).

| COST CODE | DESCRIPTION | AMOUNT |
|---|---|---|
| 207005-16-100S | Design Build Electrical | $59,000.00 |

Exhibit A - Design-Build Subcontract Agreement



**Gray Construction**

## EXHIBIT B
## DRAWING LIST
## SUBCONTRACT AGREEMENT NO.: 207005-16-100S

| Drawing No. | Drawing Title | Date | Description |
|---|---|---|---|
|  | Not applicable at this time. |  |  |

Page 1

Exhibit B - Design-Build Subcontract Agreement



**Gray Construction**

## EXHIBIT C
### SPECIFICATIONS & OTHER DOCUMENTS
### SUBCONTRACT AGREEMENT NO.: 207005-16-100S

| Document No. | Document Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit C - Design-Build Subcontract Agreement



**Gray Construction**

EXHIBIT D
OTHER PROVISIONS
SUBCONTRACT AGREEMENT NO.: 207005-16-100S

Not applicable.

**Exhibit E**                                **APPLICATION FOR PAYMENT**                                **GRAY**

*REMIT TO:*
**GRAY CONSTRUCTION, INC.**
Post Office Box 8330
Lexington, Kentucky  40533-8330

| | |
|---|---|
| Date: | Gray Project: |
| Subcontractor Name: | Gray Project No.: |
| Remit To Address: | Subcontractor Project Number: |
| City, State, Zip: | Date of Subcontract: |
| Contact Person: | Application No.: |
| Phone:                        Fax: | Billing Period: From:                          To: |

Interim ☐        Final ☐        Retention ☐

## STATEMENT OF SUBCONTRACT

Original Subcontract Amount                          $ _____

APPROVED Change Order #1 Thru _____        $ _____

Adjusted Subcontract Amount to Date                $ _____

## JOB TO DATE APPLICATION CALCULATIONS

| | | Totals to Date |
|---|---|---|
| Total Value of Work Complete & Mat'l Stored (per breakdown)... | A | $ |
| Less _____ % Retainage | B | $ |
| Total to Date Less Retainage  (Line A - Line B) | C | $ |
| Less Previous Applications | D | $ |
| Amount of This Application  (Line C - Line D) | E | $ |

**FOR GRAY USE ONLY**

Approved by: _____

Date: _____

Pay with money from Customer Billing Est. # _____

Change Order Needed: _____

Insurance Needed: _____

Other Payment Instructions: _____

_____

Page 1
Exhibit E – Design-Build Subcontract Agreement

Rev: 8/03

**Exhibit E**              VALUE OF WORK COMPLETE BREAKDOWN              **GRAY**

| A | B | C | D | E | F | G | H* | I |
|---|---|---|---|---|---|---|---|---|
| Cost Code(s) | Description | Original Contract Amount | Approved Change Order(s) Amount | Current Contract Amount (C+D) | Value of Work Complete | Materials Stored | Total Value of Work Cmpl & Mat'l Stored (F+G) | % Cmpl |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  | TOTALS |  |  |  |  |  |  |  |

* Must include subtotals by cost code for both original contract value and change orders.

Exhibit E -- Design-Build Subcontract Agreement

**Exhibit E**    LIST OF SUB-SUBCONTRACTOR/MATERIAL SUPPLIERS PERFORMING WORK UNDER YOUR SUBCONTRACT    **GRAY**

(Attach separate list if necessary)

Listed below is each and every Sub-subcontractor and/or Material Supplier who has performed work for this Subcontractor on the aforementioned project, together with payments which have been made to each Sub-subcontractor and/or Material Supplier and the unpaid amounts claimed by each, through the billing period for this Application for Payment.

| Sub-Subcontractors and/or Material Suppliers | Address/Phone No. | Description of Work | Previous Amount Paid | Unpaid Amount Claimed | Lien Waiver Attached ☑ |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Page 3                                                                                             Rev: 8/03

Exhibit E – Design-Build Subcontract Agreement

**Exhibit E**          SUBCONTRACTOR AFFIDAVIT AND WAIVER OF LIEN - ACKNOWLEDGMENT OF PAYMENT          **GRAY**

Subcontractor, having a Subcontract with Gray Construction, Inc. on the aforementioned project, has performed work and/or furnished materials, equipment, and/or machinery or has fabricated materials especially for the Project, during the Billing Period described on page 1 of this Application for Payment.

Subcontractor has paid in full all bills or obligations for labor, sub-subcontract work, payroll taxes, material, (whether or not specifically fabricated for this project), equipment, and/or machinery, which are due or payable on or before the last day of the Billing Period.

The Subcontractor further certifies that it has complied with all federal, state and local tax and employment laws, including, but not limited to, Social Security, Unemployment and worker's compensation laws, applicable to its contract and work on the Project through the Billing Period.

The Subcontractor hereby waives and releases all rights to liens and claims against the Owner, Gray, and any surety for the performance of his contract from inception through the Billing Period of this Application for Payment, except for (a) retention which is unpaid to date and (b) work which has been performed which is not the subject of an approved change order and which has been described in an attached document. The Subcontractor further states that no other person has any right to a lien or claim against the Owner on account of work performed or for material, equipment, and/or machinery, or for material especially fabricated for the Project, furnished to the Subcontractor through the Billing Period of this Application for Payment.

waiver and release is given with the understanding that Gray Construction, Inc. and others will rely upon it, and to induce Gray to make payments to the contractor. The waiver and release will become effective immediately upon the receipt of the amount shown in Line E of "Job to Date Application Calculations".

If this amount is a final payment request, there are attached hereto final waivers and releases for liens from all sub-subcontractors and material suppliers.

The Subcontractor hereby certifies that the foregoing Application for Payment is true and accurate and properly describes the work performed and materials, equipment, machinery or materials furnished or fabricated especially for the Project during the period covered and the payments to which the undersigned is entitled under the contract and applicable change orders as a result.

State of: _____    County of: _____

Subscribed and sworn before me this _____ day of _____, _____ by

_____, the _____ of

_____, a _____ corporation (or partnership or sole proprietorship), on behalf of the Subcontractor.

_____ Notary Public    My commission expires: _____

Subcontractor
_____

Signature/Title
_____

Printed Name
_____

---

Page 4                                                                                    Rev: 8/03

Exhibit E – Design-Build Subcontract Agreement

**EXHIBIT F**
**SUB-SUBCONTRACTOR OR MATERIAL SUPPLIER**
**WAIVER OF MECHANICS AND/OR MATERIALMEN'S LIEN**

Project Name: _____     Location: _____ _____
(hereinafter THE PROJECT)

Subcontractor to Gray: _____
(hereinafter SUBCONTRACTOR)

Sub-Subcontractor or Supplier
to above listed Subcontractor: _____
(hereinafter SUB-SUBCONTRACTOR/SUPPLIER)

     WHEREAS, GRAY CONSTRUCTION, INC. is the General Contractor (hereinafter GRAY) for the construction of a facility for THE PROJECT referenced above, and,

     WHEREAS, the undersigned has furnished and received payment for materials and/or labor in the amount of $_____ to the SUBCONTRACTOR for incorporation into said project.

     NOW, THEREFORE, as an inducement to GRAY to make certain progress payments to SUBCONTRACTOR, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT prior to the _____ day of _____, 20 _____.

**Final Waiver of Lien:** By initialing in this space the undersigned represents that it has furnished and received FULL AND FINAL payment for materials and/or labor from the SUBCONTRACTOR which was incorporated into said project. THEREFORE, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT.

_____
(Name of sub-subcontractor/material supplier)

_____
(Address)

_____
(Phone)

_____
(Signature)

State of: _____
County of: _____

Subscribed and sworn to before me this _____ day of _____, 20 _____ by
_____, the _____ of _____,
a ____ corporation ____ partnership ____ sole proprietorship, on behalf of the said entity.

_____ Notary Public My commission expires: _____

Rev. 8/03

Exhibit F – Design-Build Subcontract Agreement

**SUBCONTRACT AGREEMENT**

**BETWEEN**

**GRAY CONSTRUCTION, INC.**

**AND**

**MT & R Enterprises Inc. dba Four Star Interior Construction**



| | |
|---|---|
| **PROJECT NAME:** | **Hwashin Storm Damage** |
| **SUBCONTRACT NUMBER:** | **207005-09-500** |

**SUBCONTRACT AGREEMENT**

**Gray Construction, Inc.**

**TABLE OF CONTENTS**

| SECTION | PAGE |
|---|---|
| 1. AGREEMENT | 1 |
| 2. SCOPE OF WORK | 3 |
| 3. SCHEDULE OF WORK AND COMPLETION | 4 |
| 4. SUBCONTRACT PRICE | 5 |
| 5. PAYMENT | 5 |
| 6. CHANGES, CLAIMS AND DELAYS | 9 |
| 7. GRAY'S AUTHORIZED REPRESENTATIVES | 11 |
| 8. SUBCONTRACTOR'S OBLIGATIONS | 11 |
| 9. SUBCONTRACT BONDS | 15 |
| 10. WARRANTY AND CORRECTION OF WORK | 16 |
| 11. RECOURSE BY GRAY | 17 |
| 12. SUSPENSION OR TERMINATION BY OWNER | 18 |
| 13. LABOR RELATIONS | 19 |
| 14. INDEMNIFICATION | 20 |
| 15. INSURANCE | 21 |
| 16. DISPUTE RESOLUTIONS | 22 |
| 17. MISCELLANEOUS PROVISIONS | 24 |
| 18. SPECIAL PROVISIONS | 25 |
| 19. SIGNATURE PAGE | 26 |

## SUBCONTRACT AGREEMENT

Gray Construction, Inc. # **207005-09-500**

## SECTION 1

### AGREEMENT

This is the Subcontract Agreement (hereinafter "Agreement") made 10/17/06 by and between GRAY CONSTRUCTION, INC., 10 Quality Street, Lexington, Kentucky 40507-1450 (hereinafter referred to as "Gray"), and the Subcontractor named below (hereinafter referred to as the "Subcontractor") to perform part of the work on the following project.

1.1    SUBCONTRACTOR     **MT & R Enterprises Inc. dba Four Star Interior Construction**

     Mailing Address:                                       Remit to Address:
     **12112 Highway 78E**                          **P. O. Box 279**
     **Riverside, AL 35135**                      **Riverside, AL 35135-0279**

     Telephone #    **205-814-5484**                 **205-814-5484**
     Fax #          **205-338-8973**                 **205-338-8973**

     Subcontractor    **X**   is        is not    a Corporation:      FEIN#   **63-1261216**

1.2    AUTHORIZED REPRESENTATIVES
     a.    For Gray (see section 7)
         On site:   **Daniel Phillips**
         Off site:   **David Hird**
     b.    For Subcontractor (see section 8.8)
         On site:   **TBD**
         Off site:   **Mark Gallups**

1.3    PROJECT
     **Hwashin Storm Damage**
     **Greenville, Alabama**

1.4    OWNER
     **Hwashin America Corporation**
     **Gyeongbuk, Korea**

1.5    COMPLETION OF SUBCONTRACTOR'S WORK (see section 3.2)
     a.    Date of Substantial Completion:     **TBD**
     b.    Date of Final Completion:         **TBD**

1.6    SUBCONTRACT PRICE (see      **$28,955.00**
     section 4)
         **Twenty-eight thousand nine hundred fifty-five and 00/100**    Dollars

1.7    RETAINAGE (see section      **10**   %
     5.2.2)

1.8    PROGRESS PAYMENT APPLICATION DATE
           **25th**   day of each calendar month   (see section 5.2.3)

| | |
|---|---|
| | Issue Date:      08/01/03 |
| Standard Subcontract Agreement | Revision No.:      4 |
| | Revision Issue Date:    05/23/06 |

1.9   PERFORMANCE BOND & LABOR & MATERIAL PAYMENT BOND
        _____ Are    __x__  Are Not   required (see section 9.1)

1.10  PROFESSIONAL LIABILITY INSURANCE (Errors and Omissions)
        _____ Is    __x__  Is Not    required (see section 15.1.4)

1.11  REQUIREMENTS FOR EXCESS OR UMBRELLA LIABILITY INSURANCE
        __**$1,000,000**__  Occurrence and Aggregate  (see section 15.1.5)

1.12  BUILDER'S RISK INSURANCE
      If Gray Construction, Inc. is furnishing the builder's risk insurance under the terms of the
      contract between Gray and the Owner, the subcontractor will be added as an additional
      named insured to the policy. This policy will cover the insurable interest the subcontractor
      has in the project up to the limit of coverage. This insurance does not cover personal
      tools and equipment. The subcontractor shall be responsible for payment of any
      deductible, or its equivalent, resulting from a claim that is due to the fault or negligence of
      the subcontractor, whether in whole or in part, and whether or not the Builder's Risk is
      being provided by Gray or the Owner.

1.13  UTILIZATION OF SMALL BUSINESS CONCERNS
      Subcontractor is certified/recognized as one of the following: _x_ Small Business ____
      Small Disadvantaged Business ____ Woman-Owned Small Business ____ HUBZone
      Small Business ____ Veteran-Owned Small Business ____ Service Disabled Veteran-
      Owned Small Business __ None of the Above

| Page 2 | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

## SECTION 2

### SCOPE OF WORK

2.1    SUBCONTRACTOR'S WORK.  Gray contracts with the Subcontractor as an independent contractor to perform the work described in the Scope of Work attached as Exhibit A in strict accordance with the Subcontract Documents.  The Subcontractor shall perform such work (the "Work") under the general direction of Gray and in accordance with this Agreement and the Subcontract Documents.  The Subcontractor shall perform each activity necessary or incidental to complete the work, which is described more particularly, but not exclusively, in Exhibit A.  The provisions of this Agreement and Exhibit A are intended to complement each other, but if there is any inconsistency, Exhibit A shall govern.

2.2    SUBCONTRACT DOCUMENTS.  In addition to this Agreement, the documents which form this Subcontract and which are binding on the Subcontractor (collectively the "Subcontract Documents") include the Contract Documents identified in the Contract between Gray and the Owner, which are incorporated by reference, and the Subcontract Documents set forth in Section 18.5.  In case of an inconsistency between this Agreement and the Contract Documents, this Agreement shall govern.

2.2.1    DRAWINGS, PLANS AND SPECIFICATIONS.  Gray has furnished Subcontractor with one set of Criteria Documents, and if available, Drawings, Plans and Specifications included in the Subcontract Documents.  Additional copies will be furnished, on request, at the Subcontractor's expense.  Subcontractor shall furnish the design for its portion of the work so as to coordinate with the Work as a whole, and with other trade Subcontractors.  To the extent that the Subcontractor fails to properly interpret the Criteria Documents or the Preliminary Design Documents, Subcontractor shall be responsible to correct all errors at its own expense.

2.2.2    COPIES OF P.O.'S AND SUB-SUBS FOR MAJOR SCOPE ITEMS.  Upon receipt of written approval of material and/or equipment shop drawings or brochures by the Owner or Architect, Subcontractor shall immediately furnish the following additional information to Gray for each item of equipment, fixture or material:

.1    Contact or representative of both manufacturer and supplier

.2    Subcontractor's Purchase Order Numbers

.3    Manufacturer's Order Number

.4    Supplier's Order Number

.5    Scheduled delivery date.

2.2.3    Subcontractor's superintendent, foreman, or other designated individual shall deliver a report, in form and content specified by Gray to Gray's office before the end of each shift, whenever Subcontractor has employees working at the Project site.  The report will state the number of employees Subcontractor has on the Project that shift, subdividing into categories (foremen, tradesmen, laborers, etc.).  Subcontractor shall also list the equipment on site, and any material deliveries.

2.3    EXAMINATION OF CONTRACT AND SUBCONTRACT DOCUMENTS; SITE INSPECTION.  The Subcontractor warrants and represents that it has visited the site of the proposed Work, has familiarized itself with existing conditions and the character of the operations to be carried on under this Agreement and that it fully understands the facilities, difficulties and restrictions attending the execution of the Work.  The Subcontractor acknowledges that it has examined all Subcontract Documents, and the requirements of the various governmental agencies, departments and bureaus having jurisdiction over the Project, and from its own investigation has satisfied itself as to the nature and location of the Work, the general local conditions, and all

matters which in any way affect the Subcontractor's Work or its performance thereof. The Subcontractor further acknowledges that having made said visitation and examination, it is not aware of any existing conditions, circumstances, or requirements that will necessitate change in the scope of the Work, the Subcontract Price, or the Schedule of Work.

2.4     OWNERSHIP AND USE OF DOCUMENTS. The drawings, specifications and other documents furnished by the Subcontractor are instruments of services and shall become the property of Gray and the Owner upon payment by the Owner and Gray. The Subcontractor shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright, to the extent not modified herein. Reproducible copies, including diskettes, may be retained by the Owner and Gray, whether the Project for which they were made is executed or not, and both are entitled to make and retain copies and reproduce them for their own use. Submission or distribution of documents to meet official regulatory requirements or for other purposes in connection with the Project is not to be construed as publication in derogation of the Subcontractor's common law copyrights or other reserved rights.

## SECTION 3

### SCHEDULE OF WORK AND COMPLETION

3.1     TIME IS OF THE ESSENCE. Time is of the essence for both parties, and they mutually agree to see to the performance of their respective work and the work of their Subcontractors so that the entire project may be completed in accordance with the Subcontract Documents and the Schedule of Work. Gray shall revise such Schedule and sequence of events as the Work progresses. No extension of time for Subcontractor's Work will be valid without Gray's written consent.

3.2     DUTY TO BE BOUND. The Subcontractor shall be bound by the Schedule of Work including, without limitation, the dates for Substantial Completion and Final Completion stated in Section 1.5 and revisions to the Schedule. The Subcontractor shall provide Gray with any requested scheduling information for the Subcontractor's Work. The Schedule of Work and all subsequent changes thereto shall be submitted to the Subcontractor in advance of the required performance.

3.3     SCHEDULE CHANGES. Subcontractor acknowledges that as construction progresses it may be necessary for Gray to change the sequential order and duration of the various activities, including those contemplated by this Agreement, to account for unanticipated delays, occurrences and other factors which act to alter Gray's original schedule. Gray may require Subcontractor, at no additional cost to Gray and Owner, to prosecute Subcontractor's Work in such sequence as the progress of other subcontractors and the Project schedule dictates. It is expressly understood and agreed that the scheduling and sequencing of the Work is an exclusive right of Gray and that Gray reserves the right to reschedule and resequence Subcontractor's Work from time to time as the demands of the Project require without any additional cost or expense to be paid to the Subcontractor.

Subcontractor shall carry on its Work promptly, efficiently, and at a speed that will not cause delay in the progress of Gray's Work or Work of other Subcontractors. If, in the opinion of Gray, Subcontractor falls behind in the progress of the Work, Subcontractor may be directed to take such steps as deemed necessary to improve the rate of progress. These steps may include, without limitation, requiring Subcontractor to increase the number of shifts, personnel overtime operations, days of Work, equipment, plant, or other remedies. Subcontractor shall submit to Gray for Gray's approval a schedule demonstrating how the required rate of progress will be regained without additional costs to the Owner or Gray.

3.4     PRIORITY OF WORK. Gray shall have the right to decide on the time, order and priority in which the various portions of Work shall be performed and all other matters relative to the timely and orderly conduct of the Subcontractor's Work. The Work will be performed as required by the composite construction schedule, which may be changed periodically by the project superintendent in order to maintain the overall schedule of Work.

3.5    COOPERATION. The Subcontractor shall cooperate with Gray by scheduling and performing Subcontractor's work so as to avoid conflict, delay in, or interference with the work of Gray, other Subcontractors or Owner's own forces.   Subcontractor shall participate, as requested by Gray, in inspections related to Substantial and Final Completion.

3.6    COMMENCEMENT OF WORK. The Subcontractor shall commence Work within three (3) calendar days from Gray's notice to proceed. If interrupted for any reason, the Subcontractor shall resume the work within three (3) working days from Gray's notice to do so.

## SECTION 4

### SUBCONTRACT PRICE

Gray agrees to pay the Subcontractor for the satisfactory performance of the Subcontractor's Work the sum of identified in Section 1.6 (the "Subcontract Price") in accordance with Section 5, subject to additions or deductions as provided in Section 6.

Unit prices, if any, are stated in Subcontractor's Scope of Work, Exhibit A.

## SECTION 5

### PAYMENT

5.1    GENERAL PROVISIONS.

5.1.1    SCHEDULE OF VALUES. The Subcontractor has provided Gray with a schedule of values which shall be revised, if necessary for approval by Gray and the Owner, no later than the date of the Subcontractor's first application for payment.

5.1.2    PAYMENT USE RESTRICTION. No payment received by the Subcontractor shall be used to satisfy or secure any indebtedness other than one owed by the Subcontractor for labor or materials furnished in performing the Subcontractor's Work on this Project.

5.1.3    PAYMENT USE VERIFICATION. Gray shall have the right at all times to contact the Subcontractor's lower tier Subcontractors and suppliers to ensure that the same are being paid by the Subcontractor for labor or materials furnished for use in performing the Subcontractor's Work on this Project.

5.1.4    CONDITIONS PRECEDENT TO PARTIAL PAYMENT. Progress payments due under this Agreement will not be released until all of the following conditions have been met:

.1    Subcontract Agreement has been signed, returned and approved.

.2    Insurance Certificates satisfying the requirements of this Agreement have been received.

.3    A schedule of values has been received in the form and content specified by Gray.

.4    Certified payrolls, if required by Owner, received in the appropriate format.

.5    Waivers of lien from all tier subcontractors and materialmen evidencing payments through the previous month.

.6    If requested by Gray, Subcontractor agrees to likewise provide Gray with evidence satisfactory to Gray showing payment by Subcontractor of any and all contributions made

by Subcontractor for health and welfare payments as shown on the certified payroll, as well as payment of payroll taxes and other contributions that may be required by law.

5.1.5    PARTIAL LIEN WAIVERS AND AFFIDAVITS.  As a prerequisite for payment, the Subcontractor shall provide, in a form satisfactory to the Owner and Gray, partial lien or claim waivers and affidavits from the Subcontractor, and its sub- Subcontractors and suppliers for the completed Subcontractor's Work.  Such waivers may be made conditional upon payment of a specific amount stated therein.  The Subcontractor's Authorized Representative(s) designated in Section 1.2(b) of this Agreement are hereby designated as authorized agents of Subcontractor to execute all lien waivers required of Subcontractor.

5.1.6    SUBCONTRACTOR PAYMENT FAILURE.  In the event Gray has reason to believe that labor, material or other obligations incurred in the performance of the Subcontractor's Work are not being paid for, Gray shall give written notice of such claim or lien to the Subcontractor to insure that any progress payment shall be utilized to pay such obligations.

If upon receipt of said notice, the Subcontractor does not:

(a)    Supply evidence to the satisfaction of Gray that the monies owing to the claimant have been paid; or

(b)    Post a bond in a form and with surety satisfactory to Gray indemnifying the Owner, Gray, Gray's surety, if any, and the premises from such claim or lien;

then Gray shall have the right to exercise any or all of the following rights, until the claim or lien has been satisfied by the Subcontractor:

(1)    Retain out of any payments due or to become due to the Subcontractor for this Project or any other Gray project a reasonable amount to protect Gray from any and all loss, damage or expense including attorney's fees arising out of or relating to any such claim or lien

(2)    issue joint checks in payment of any payments due or to become due to the Subcontractor, payable to the Subcontractor and the claimant;

(3)    make direct payments of sums due the Subcontractor to the claimant.

(4)    may (but has no obligation to) bond off the lien, and backcharge all costs, attorneys' fees and other expenses involved in bonding off the lien of the Claimant.

5.1.7    PAYMENT NOT ACCEPTANCE.  Payment to the Subcontractor is specifically agreed not to constitute or imply acceptance by Gray or the Owner of any portion of the Subcontractor's Work.

5.2    PROGRESS PAYMENTS.

5.2.1    APPLICATION.  For Work performed during a payment period, the Subcontractor shall apply for a progress payment using Gray's standard Application For Payment and Lien Waiver form, a copy of which is attached as Exhibit E.  Applications shall be submitted to Gray at P.O. Box 8330, Lexington, Kentucky 40533-8330.  The application shall be for work performed up to and including the last day of the pay period, indicating work completed and, to the extent allowed under Section 5.2.4, materials suitably stored and protected during the payment period.  Applications shall be accompanied by lien waivers from all sub- Subcontractors and suppliers whose labor or materials are covered by the application; such waivers shall be in the form of attached Exhibit E.

5.2.2   RETAINAGE.  Regardless of any agreements between the Owner and Gray, or arrangements made by them, for the withholding or release of Gray's retainage, retainage shall be withheld by Gray from all progress payments made to Subcontractor.  The amount of retainage withheld from each payment shall be equal to the amount of payment earned, multiplied by the percentage identified in Section 1.7 of this Agreement.  Retainage shall be released to Subcontractor only upon completion of all requirements for final payment as provided in Section 5.3 of this Agreement.

5.2.3   TIME OF APPLICATION.  "Pay period" as used herein is defined as beginning with the first day of each calendar month, and ending with the last day of each calendar month.  The Subcontractor shall submit progress payment applications to Gray no later than the day of each payment period specified in Section 1.8 of this Agreement.

5.2.4   STORED MATERIALS.  Unless otherwise provided in the Subcontract Documents, and if approved in advance by the Owner, applications for payment may include materials and equipment not incorporated in the Subcontractor's Work but delivered and suitably stored and protected at the site or at some other location agreed upon in writing.  Approval of payment application for such stored items on or off the site shall be conditioned upon submission by the Subcontractor of bills of sale and applicable insurance or such other procedures satisfactory to the Owner and Gray to establish the Owner's title to such materials and equipment or otherwise protect the Owner's and Gray's interest therein, including transportation to the site.

5.2.5   TIME OF PAYMENT.  Receipt of payment by Gray from Owner for Subcontractor's work is a condition precedent to all progress payments by Gray to Subcontractor.  Progress payments to the Subcontractor for satisfactory performance of the Subcontractor's Work shall be made seven (7) days after receipt by Gray of payment from the Owner for such Subcontractor's Work.

5.2.6   GROUNDS FOR WITHHOLDING PAYMENT.  Gray may withhold from monthly progress payments an amount sufficient to protect Gray because:

.1      Defective work has not been remedied; materials have not been furnished; clean up has not been performed;

.2      Subcontractor has damaged any portion of the work of others;

.3      Claims, levies, attachments, stop notices or court orders have been filed or reasonable evidence indicates the probable filing of such claims, levies, attachments, notices or orders, including claims covered by insurance until such claims are accepted by the insurance carrier;

.4      Subcontractor has failed to make payments properly to its subcontractors or for labor, including fringe benefits, materials or equipment, transportation or shipping costs, taxes, fees or any other claims arising out of the Subcontractor's Work;

.5      There exists reasonable doubt that Subcontractor's Work can be completed for the unpaid balance of the Subcontract Price;

.6      There exists reasonable doubt that Subcontractor's Work, due to its own action or inaction, will be completed on schedule or in accordance with the schedule;

.7      Subcontractor is not satisfactorily prosecuting the Work of this Agreement;

.8      Subcontractor has failed to deliver insurance certificates, bonds, "as-built" or record drawings, written guarantees or warranties or the approvals required of the Subcontractor's Work by any authority having jurisdiction;

.9    A petition for bankruptcy or reorganization has been filed by or against Subcontractor or Subcontractor has made an assignment without the prior written consent of Contractor;

.10    Any other material breach of this Agreement by Subcontractor which has not been cured after notice from Gray.

Amounts then due shall be paid or credited to Subcontractor when Subcontractor removes the above grounds for withholding payment.

5.3    <u>FINAL PAYMENT</u>.

    5.3.1    <u>APPLICATION</u>. Upon acceptance of the Subcontractor's Work by the Owner, and Gray, and upon the Subcontractor furnishing evidence of fulfillment of Subcontractor's obligations in accordance with the Subcontract Documents and Section 5.3.2, Gray shall, without delay, forward the Subcontractor's application for final payment to the Owner.

    5.3.2    <u>REQUIREMENTS</u>. Before Gray shall be required to forward the Subcontractor's application for final payment to the Owner, the Subcontractor shall submit to Gray:

(a)    an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Subcontractor's Work for which the Owner or his property or Gray or Gray's surety might in any way be liable, have been paid or otherwise satisfied;

(b)    consent of surety, if any, to final payment;

(c)    satisfaction of required closeout procedures;

(d)    other data if required by Gray or Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be designated by Gray or Owner; and

(e)    written warranties of Subcontractor's materials, labor and equipment furnished under this Agreement and the Subcontract Documents.

(f)    a complete and accurate set of Record Drawings, together with Final Design drawings, appropriately stamped and originally signed by the design professional in responsible charge of the Work, and licensed in the state in which the Project was constructed.

Final payment shall constitute a waiver and release of all claims by the Subcontractor relating to the Subcontractor's Work, but shall in no way relieve the Subcontractor of liability for the obligations assumed under Section 10 hereof, or for faulty or defective work appearing after final payment.

    5.3.3    <u>TIME OF PAYMENT</u>. Final payment of the balance due of the contract price shall be made to the Subcontractor:

(a)    upon receipt of the Owner's waiver of all claims related to the Subcontractor's Work except for unsettled liens, unknown defective work, and noncompliance with the Subcontract Documents or warranties; and

(b)    seven (7) days after receipt by Gray of final payment from the Owner for such Subcontractor's Work, such receipt being a condition precedent for final payment to the Subcontractor.

5.4    <u>NON-PAYMENT BY OWNER</u>.

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 4 |
| Revision Issue Date: | | 05/23/06 |

5.4.1  ASSUMPTION OF RISK; CONDITION PRECEDENT. The Subcontractor agrees that Gray shall have no obligation to pay the Subcontractor for any work done on this Project until Gray has been paid by the Owner. The provisions of Sections 5.2 and 5.3 stating the time and amount of progress and final payments are subject to the condition that Gray shall receive from the Owner progress or final payments in at least the amounts payable to the Subcontractor on account of work done by the Subcontractor on this Project. The time when such payments shall be due the Subcontractor shall be postponed until Gray has received same from the Owner. The Subcontractor expressly agrees to accept the risk that it will not be paid for work performed by him in the event that Gray, for whatever reason, is not paid by the Owner for such work. The Subcontractor acknowledges that it relies for payment on the credit and ability to pay of the Owner, and not of Gray. The Subcontractor agrees that payment by the Owner to Gray for work performed by the Subcontractor shall be a condition precedent to any payment obligation of Gray to the Subcontractor. The Subcontractor agrees that the liability of the surety on Gray's payment bond, if any, is subject to the same conditions precedent as are applicable to Gray's liability to the Subcontractor.

5.4.2  REMEDY. If the Owner or its designated agent does not authorize payment or Gray does not receive a payment due hereunder for any cause which is not the fault of the Subcontractor, Gray shall promptly inform the Subcontractor in writing. Gray may also diligently pursue, with the assistance of the Subcontractor, the release by the Owner of the payment due for the Subcontractor's Work. At the Subcontractor's request, Gray may institute all reasonable legal remedies to mitigate the damages and pursue full payment of the Subcontractor's application for payment including interest thereon. In that event, the cost for pursuing the Subcontractor's remedies shall be Subcontractor's responsibility. Gray, at its discretion, may require that the Subcontractor make financial arrangements satisfactory to Gray before undertaking this effort and at all times during the progress thereof.

## SECTION 6

### CHANGES, CLAIMS AND DELAYS

6.1  CHANGES. Without nullifying this Agreement, Gray may by written Subcontract Work Authorization or Subcontract Change Order make changes in the Work within the general scope of this Agreement and the Subcontractor shall perform such changes. Adjustments in the Subcontract Price or Schedule of Work, if any, resulting from such changes shall be set forth in a Subcontract Change Order. . A Subcontract Change Order is a written instrument prepared by Gray and signed by the Subcontractor stating their agreement upon the change in the scope of the Work, adjustment in the Subcontract Price or Schedule of Work. A Subcontract Work Authorization is a written instrument prepared by Gray directing a change in the Work and stating a proposed adjustment, if any, in the Subcontract Price or Schedule of Work or both. A Subcontract Work Authorization shall be used in the absence of agreement on the terms of a Subcontract Change Order.

No such adjustment shall be made for any such changes performed by Subcontractor that have not been so ordered by Gray, and approved by the Owner. If Subcontractor proceeds with additional work without the required Change Order or Work Authorization, Subcontractor does so at its own risk, and must track all actual costs incurred, including but not limited to signed time sheets, additional supervision, actual material invoices and actual equipment costs, if any. If the additional work performed without the requisite Change Order or Work Authorization from Gray results in the necessity of an extension of time, the time extension may be granted by Gray only on proof that the work affected was on the critical path. In no event shall compensation be forthcoming from Gray unless these requirements are met, as well as the requisite notice set forth in Sections 6.2 and 6.3 below.

6.2  CLAIMS RELATING TO OWNER. The Subcontractor agrees to make all claims for which the Owner is or may be liable in the manner provided in the Contract Documents for like claims by Gray upon the Owner.

Written notice of such claims shall be given by the Subcontractor to Gray within sufficient time for Gray to make such claims against the Owner in accordance with the Contract Documents or within five (5) calendar days

| Page 9 | Issue Date: | 08/01/03 |
|--------|-------------|----------|
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

prior to the beginning of the Subcontractor's Work or the event for which such claim is to be made, whichever shall first occur, otherwise such claims shall be deemed waived.

6.3   CLAIMS RELATING TO GRAY.  The Subcontractor shall give Gray written notice of all claims not included in Section 6.2 within five (5) calendar days of the beginning of the event for which claim is made; otherwise, such claims shall be deemed waived.

All unresolved claims, disputes and other matters in question between Gray and the Subcontractor not relating to claims included in Section 6.2 shall be resolved in the manner provided in Section 16 herein.

6.4   ADJUSTMENT IN SUBCONTRACT PRICE.  If a Subcontract Change Order or Subcontract Work Authorization requires an adjustment in the Subcontract Price, the adjustment shall be established by one of the following methods:

(a)   mutual agreement on a lump sum with sufficient substantiating data to permit evaluation;

(b)   unit prices already established in the Subcontract Documents or if not established by the Subcontract Documents, then established by mutual agreement for this adjustment; or

(c)   to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee.

6.5   SUBSTANTIATION OF ADJUSTMENT.  If the Subcontractor does not respond promptly or disputes the method of adjustment under Section 6.4, the method and the adjustment shall be determined by Gray on the basis of reasonable costs and savings of those performing the Work attributable to the change, including, in the case of an increase in the Subcontract Price, an allowance for overhead and profit proportionate to Gray's recovery of overhead and profit, if any, under the Contract Documents.

The Subcontractor shall maintain for Gray's review and approval an appropriately itemized and substantiated accounting of the following items attributable to the Subcontract Change Order or Subcontract Work Authorization:

(a)   labor costs, including Social Security, health, welfare, retirement and other fringe benefits as normally required, and state workers' compensation insurance;

(b)   costs of materials supplies and equipment, whether incorporated in the Work or consumed, including transportation costs;

(c)   costs of renting, either from Gray or from others, of machinery and equipment other than hand tools;

(d)   costs of bond and insurance premiums, permit fees and taxes attributable to the change; and

(e)   costs of additional supervision and field office personnel services necessitated by the change.

6.6   DELAY.  If the progress of the Subcontractor's Work is substantially delayed without the fault or responsibility of the Subcontractor, then the time for the Subcontractor's Work shall be extended by Change Order to the extent obtained by Gray under the Subcontract Documents and the Schedule of Work shall be revised accordingly.

Gray shall not be liable to the Subcontractor for any damages or additional compensation as a consequence of delays caused by any person not a party to this Agreement unless Gray has first recovered the same on behalf of the Subcontractor from said person, and then to the extent of such recovery after payment of

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

all attorney's fees and other expenses relating thereto, it being understood and agreed by the Subcontractor that apart from recovery from said person, the Subcontractor's sole and exclusive remedy for delay regardless of cause shall be an extension in time for performance of the Subcontractor's Work.

In jurisdictions where the second paragraph herein is not enforceable, the Subcontractor agrees that it may only seek delay damages to the extent documented by actual costs and entitlement demonstrated, and the Subcontractor shall not be entitled to seek from Gray damages for actual or alleged loss of efficiency, constructive acceleration, lost productivity, stacking of trades, home office overhead, expectant underrun, season change, extended overhead, impact damages, profit upon damages for delay or similar damages calculated by formula or trade data or studies.

6.7    LIQUIDATED DAMAGES.  If the Contract Documents between the Owner and Gray permit the Owner to assess Gray for liquidated or other damages for delay beyond the completion date set forth in the Contract Documents, and such damages are so assessed, then Gray shall be entitled to assess same against the Subcontractor in proportion to the Subcontractor's share of the responsibility for such delay.

## SECTION 7

### GRAY'S AUTHORIZED REPRESENTATIVES

Gray has designated one or more persons in Section 1.2(a) of this Agreement who shall be Gray's authorized on-site and off-site representative(s).  Such authorized representative(s) shall be the only person(s) the Subcontractor shall look to for instructions, orders and/or directions, except in an emergency.

## SECTION 8

### SUBCONTRACTOR'S OBLIGATIONS

8.1    OBLIGATIONS DERIVATIVE.  The Subcontractor shall be bound to Gray by the terms of this Agreement and by the conditions of the Contract Documents between the Owner and Gray, and shall assume toward Gray all the obligations and responsibilities which Gray, by those documents, assumes toward the Owner.

8.2    RESPONSIBILITIES.  The Subcontractor shall provide timely design services in accordance with all applicable codes, laws and regulations of the locality, and shall work with the local and state regulatory agencies with respect to building permits and other permits relating to the Subcontractor's Work, and shall furnish and pay for all of the labor, supervision, materials, tools, equipment, services, and incidentals necessary for the proper performance of the Subcontractor's Work.

The Subcontract shall provide a list of proposed sub-subcontractors, and suppliers, be responsible for taking field dimensions, providing tests, order of materials and all other actions as required to meet the Schedule of Work.

8.3    WORKMANSHIP.  Every part of the Subcontractor's Work shall be executed in strict accordance with the Subcontract Documents in the most sound, workmanlike, and substantial manner.  All workmanship shall be the best of its kind performed by others engaged in the same trade.  All materials used in the Subcontractor's Work shall be furnished in ample quantities to facilitate the proper and expeditious execution of the Work, and shall be new except such materials as may be expressly provided in the Subcontract Documents to be otherwise

8.4    TEMPORARY SERVICES.  The Subcontractor shall furnish all temporary services and facilities necessary to perform its work, including, but not limited to, heat, electrical (power), telephone, water, and other utilities necessary.

8.5    COORDINATION.  The Subcontractor shall:

| Page 11 | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

(a)    cooperate with Gray and all others whose work is dependent upon the progress of the Subcontractor's Work'

(b)    specifically note and immediately advise Gray of any interference with the Subcontractor's Work;

(c)    participate in the preparation of coordination drawings and work schedules in areas of congestion.

8.6    SHOP DRAWINGS AND SUBMITTALS. The Subcontractor shall submit shop drawings, product data, samples, and any other submittals required by the Subcontract Documents expeditiously and in such manner and sequence so as to avoid delay in the progress of the Work or the activities of Gray or other Subcontractors. The Subcontractor shall be responsible for accuracy and conformity with the Subcontract Documents and other submittals. Unless specifically noted by Gray, action on shop drawings and submittals by Gray shall not be deemed to authorize deviation from the Subcontract Documents.

8.7    PROGRESS REPORTS AND MEETINGS. The Subcontractor shall furnish periodic progress reports on the Work including information on the status of materials and equipment which may be in the course of preparation or manufacture.

8.8    AUTHORIZED REPRESENTATIVE AND NOTICE. The Subcontractor shall designate one or more persons who shall be the authorized Subcontractor's representative(s): (a) on-site and (b) off-site. Such authorized representative(s) shall be the only person(s) to whom Gray shall issue instructions, orders or directions, except in an emergency. Notices as required by this Agreement and other communications made to any one of the Subcontractor's Authorized Representative(s) shall be binding as if given to the Subcontractor. The authorized representative shall attend project meetings as required.

8.9    PROVISION FOR INSPECTION. The Subcontractor shall notify Gray when portions of the Subcontractor's Work are ready for inspection. The Subcontractor shall at all times furnish Gray, the Owner, and their representatives adequate means and facilities for inspecting the Work, including materials at the site or any place where materials under this Agreement may be in the course of preparation, process, manufacture or treatment.

8.10    CLEAN-UP. The Subcontractor shall follow Gray's clean-up directives and those of the Subcontract Documents, and

(a)    at all times keep the building and premises free from debris and unsafe conditions resulting from the Subcontractor's Work; and

(b)    broom clean each work area daily prior to discontinuing work in the same.

Should Subcontractor fail, after 24 hours notice from Gray, to appropriately clean an area as required by this Section, Gray shall assess the Subcontractor for the actual daily clean-up cost or a daily charge of $150.00, whichever is greater, for each day such condition is not remedied.

8.11    SAFETY PRECAUTIONS AND PROCEDURES.

8.11.1    The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by Gray and, in addition, comply with occupational safety and other applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons or property and in accordance with the requirements of the Subcontract Documents. The Subcontractor shall report to Gray within 24 hours any personal injury or property damage occurring at the site.

8.11.2    Subcontractor shall comply with Gray's Safety Requirements.

Standard Subcontract Agreement

| Issue Date: | 08/01/03 |
|---|---|
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

8.11.3.  ALCOHOL AND DRUG FREE PROJECT.  The Subcontractor recognizes that an alcohol and drug free Project is necessary to ensure the safety of the persons employed at the Project site by the Owner, Gray, the Subcontractor and others, and to protect the health and safety of the community.  The Subcontractor agrees that its employees shall not distribute, be under the influence of, or be in possession of, any form of alcohol or unlawful drug while at the Project site or while in the performance of Project-related activities.  Subcontractor's employees shall also be prohibited from using or being subject to the effects of any lawful drug while at the Project site or in the performance of Project-related activities without approval of the employee's supervisor.  The Subcontractor acknowledges that it is familiar with Gray's Alcohol and Drug Free Project Policy for Subcontractors.  The Subcontractor represents that it has established written procedures for compliance with Gray's policy and agrees that it will implement and enforce the policy throughout the course of the Project.  The Subcontractor shall indemnify and hold the Owner and Gray harmless from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or related to Subcontractor's implementation, application or enforcement of compliance procedures.

8.12    ENVIRONMENTAL MATTERS.

8.12.1  If a Hazardous Chemicals of a type of which an employer is required by law to notify its employees will be used on the Project site by the Subcontractor, the Subcontractor's sub-subcontractors or anyone directly or indirectly employed by them, the Subcontractor shall, prior to the Hazardous Chemical being at the site, provide a current copy of the Material Safety Data Sheet (MSDS) for such Hazardous Chemical in sufficient time to permit compliance with such laws by Gray, other subcontractors and other employers on the site.

8.12.2  The Subcontractor shall be responsible for the prompt removal of any Hazardous Chemicals and Hazardous Substances which are brought to Project site in connection with the Work but are not used or consumed and all waste generated from the Work.  The removal of any Hazardous Chemical, Hazardous Substance, or waste shall be done in accordance with all federal, state and local laws, regulations and ordinances

8.12.3  The Work shall be conducted in such a manner to avoid the discharge, dispersal, escape, release or saturation of any pollutant into the atmosphere or any body of water or on, onto, upon, in or into the surface or subsurface of land unless allowed by federal, state or local law, regulations, ordinance or permit.

8.12.4    In the event the Subcontractor encounters on the site material reasonably believed to be asbestos, polychlorinated biphenyl ("PCB"), or other Hazardous Substances which have not been rendered harmless, the Subcontractor shall immediately stop Work in the area affected and report the condition to Gray in writing.  The Work in the affected area shall resume in the absence of asbestos, PCB, or other Hazardous Substances, or when it has been rendered harmless, or by being reduced to a safe level or concentration, by written agreement of Gray and Subcontractor, or by arbitration as provided in this Agreement.  The Subcontractor shall not be required pursuant to Article 5 to perform without consent any Work relating to asbestos, PCB, or other Hazardous Substances.

8.12.5    To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless Gray, other subcontractors, and their respective agents and employees, from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Work in the affected area if in fact the material is asbestos, PCB, or other Hazardous Chemical or Hazardous Substance and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to damage to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by failure to comply with Sections 8.12.1 or 8.12.2 or by negligent acts or omissions of the Subcontractor, anyone directly or indirectly employed by it, or anyone for whose acts it may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.  Such obligation shall not be construed to

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 8.12.3.

8.12.6    For purposes of this Agreement, (a) the term "Hazardous Chemical" means any chemical defined as hazardous in the Hazardous Communication Standard, 29 C.F.R. § 1926.59 or 29 C.F.R. § 1910.1200, promulgated pursuant to the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; (b) the term "Hazardous Substances" means any substance, including solid, liquid or gaseous material, which is listed or defined as a "hazardous substance" in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S. § 9601, et seq., or regulations promulgated pursuant thereto, but does include petroleum, including crude oil or any fraction thereof; oil and oil waste as those terms are defined in the Clean Water Act, 33 U.S.C. § 1251, et seq., or regulations promulgated pursuant thereto; and source, special nuclear, or by-product material as defined by the Atomic Energy Act of 1954, 42 U.S.C. § 3011, et seq., or regulations promulgated pursuant thereto; and includes any other substance defined by federal, state or local statute, regulation or ordinance as a hazardous, toxic or dangerous waste or substance where "state" means the State in which the Work is being performed and "local" means the local jurisdiction (i.e., county, parish, city, borough, municipality, village, town, etc.) in which the Work is being performed; and (c) "pollutant" shall mean any solid, liquid, gaseous, or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and shall include any Hazardous Substance.

8.13    PROTECTION OF THE WORK AND PROPERTY.  The Subcontractor shall take all necessary precautions to properly protect the Subcontractor's Work and the work of others from damage caused by the Subcontractor's operations.  Should the Subcontractor cause damage to the Work or property of the Owner, Gray or others, the Subcontractor shall promptly remedy such damage to the satisfaction of Gray, or Gray may so remedy and deduct the cost thereof from any amounts due or to become due the Subcontractor.

8.14    COMPLIANCE WITH LAWS.  The Subcontractor shall, at all times and at its own cost, comply with all federal, state and local statutes, codes, rules, regulations, ordinances, executive orders and other laws relating to the Project and the Work.  The Subcontractor warrants and represents that it is authorized to transact business in the state and local jurisdictions where the Project is located, that it holds any and all licenses necessary to perform the Work, and that it is not currently in violation of any statutes, codes, rules, regulations, ordinances, orders, or other laws on any projects in which Subcontractor is presently engaged.

8.15    PERMITS, FEES AND LICENSES.  The Subcontractor shall give adequate notices to authorities pertaining to the Subcontractor's Work and secure and pay for all permits, fees, licenses, assessments, inspections and taxes necessary for performance, completion or use of the Subcontractor's Work.

To the extent paid to Gray under the Contract with the Owner, the Subcontractor shall be compensated for additional costs resulting from laws, ordinances, rules, regulations and taxes enacted after the date of the Agreement.

8.16    TAXES, WAGES, FRINGE BENEFITS, ASSESSMENTS.  The Subcontractor shall timely comply with all requirements applicable to payment of taxes, wages, fringe benefits, retirement benefits, unemployment compensation and other assessments, and shall upon request furnish Gray and the Owner with satisfactory proof of compliance.

8.17    LAYOUT RESPONSIBILITY AND LEVELS.  Gray shall establish principal axis lines of the building and site whereupon the Subcontractor shall lay out and be strictly responsible for the accuracy of the Subcontractor's Work and for any loss or damage to Gray or others by reason of the Subcontractor's failure to set out or perform its work correctly.  The Subcontractor shall exercise prudence so that actual final conditions and details shall result in perfect alignment of finish surfaces.

8.18    MATERIALS FURNISHED BY OTHERS.  In the event the scope of the Subcontractor's Work includes installation of materials or equipment furnished by others, it shall be the responsibility of the Subcontractor to examine the items so provided and thereupon handle, store and install the items with such skill

| | | |
|---|---|---|
| | Issue Date: | 08/01/03 |
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

and care as to ensure satisfactory and proper installation. Loss or damage due to acts of the Subcontractor shall be deducted from any amounts due or to become due the Subcontractor.

8.19    SUBSTITUTIONS. No substitutions shall be made in the Subcontractor's Work unless permitted in the Subcontract Documents and only then upon the Subcontractor first receiving all approvals required under the Subcontract Documents for substitutions. The Subcontractor shall indemnify Gray for any increased costs incurred by Gray as a result of such substitutions, whether or not the Subcontractor has obtained approval thereof.

8.20    USE OF GRAY'S EQUIPMENT. The Subcontractor, its agents, employees, Subcontractors or suppliers shall not use Gray's equipment without the express written permission of Gray's authorized representative.

If the Subcontractor or any of its agents, employees, suppliers or lower tier Subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items owned, leased, or under the control of Gray, the Subcontractor shall be liable to Gray as provided in Section 14 for any loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be found to have been due solely and exclusively to the negligence of Gray's employees operating such equipment.

8.21    ASSIGNMENT AND SUBCONTRACTING. The Subcontractor shall not assign this Agreement, nor its proceeds, nor subcontract the whole or any part of the Subcontractor's Work, without the prior written approval of Gray.

8.22    NON-CONTRACTED SERVICES. The Subcontractor agrees that no claim for non-contracted construction services rendered or materials furnished shall be valid unless the Subcontractor provides Gray notice:

(a)    prior to furnishing of the services or materials, except in an emergency affecting the safety of persons or property;

(b)    in writing of such claim within three (3) days of first furnishing such services or materials; and

(c)    the written charge for such services or materials to Gray no later than the fifteenth day (15th) of the calendar month following that in which the claim originated.

8.23    COORDINATION. Subcontractor is responsible for coordinating its work areas and schedule with other trades in order to perform the overall project as a team.

8.24    NORMAL WORK WEEK. Unless otherwise directed in writing by Gray, the Subcontractor's Work shall be performed during a five (5) day work week extending from Monday through Friday. If the Subcontractor's work becomes behind schedule, the Subcontractor shall work overtime during the normal work week and be at no cost to Gray if Gray is not at fault for the Subcontractor being behind schedule.

## SECTION 9

### SUBCONTRACT BONDS

9.1    PERFORMANCE AND LABOR AND MATERIAL PAYMENT BONDS. Unless otherwise provided at Section 1.9 of this Agreement, the Subcontractor shall provide separate Performance and Labor and Material Payment Bonds, in a form and with surety, satisfactory to Gray in the full amount of this Subcontract. The premiums for these Bonds shall be paid by the Subcontractor and the cost thereof is included in the Subcontract Price.

9.2   ASSURANCE OF PERFORMANCE.  If Performance and Payment Bonds are not required of the Subcontractor under Section 9.1, then throughout the duration of this Agreement, Gray may require such bonds or a letter of credit and the Subcontractor shall provide same.  Said Bonds shall be in the full amount of this Agreement in a form and by a surety satisfactory to Gray.  The Subcontractor shall be compensated for the cost of same pursuant to progress payments made hereunder after the Subcontractor furnishes the required bonds or letter of credit.  The reimbursement amount for the bonds or letter of credit shall not exceed the manual rate for such instruments.  In the event the Subcontractor shall fail to promptly provide such requested bonds or letter of credit, Gray may terminate this Agreement and re-let the work to another Subcontractor and all Gray costs and expenses incurred thereby shall be paid by the Subcontractor.

## SECTION 10

### WARRANTY AND CORRECTION OF WORK

10.1   WARRANTY.

10.1.1   The Subcontractor warrants to the Owner and Gray that materials and equipment furnished under this Subcontract will be of good quality and new unless otherwise required or permitted by the Subcontract Documents, that the Work will be performed in a good, workmanlike manner, be free from defects in materials and workmanship, and that the Work will conform with the requirements of the Subcontract Documents.  Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective in the sole judgment of Gray.  This warranty shall be in addition to and not in limitation of any other warranty or remedy provided by law or by the Subcontract Documents.  The warranty shall extend for the period agreed to by Gray in the contract between Gray and the Owner.

10.1.2   The Subcontractor further agrees to execute any additional guarantees or warranties specified in the Subcontract Documents.

10.2   CORRECTION OF WORK.

10.2.1   The Subcontractor shall promptly correct Work rejected by Gray or failing to conform to the requirements of the Subcontract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed.

10.2.2   The Subcontractor shall be obligated to correct work that is found not to be in accordance with the Subcontract Documents after substantial completion to the same extent that Gray is bound to the Owner for correction of said Work.  The Subcontractor shall begin the corrective work immediately after receipt of written notice from Gray to do so.  This obligation shall survive acceptance of the Work and termination of the Subcontract.  This obligation is in addition to, and not in limitation of, the warranty obligations under Section 10.1, it being the intent of this Agreement that warranty obligations are not restricted by Subcontractor's obligations to correct defective work.

If the Owner chooses to correct the Work without notice to Gray and opportunity for cure, the Subcontractor shall be obligated to Gray for any backcharge that the Owner has assessed Gray resulting from the Subcontractor's Work.

10.3   SATISFACTION OF WARRANTY AND CORRECTIVE WORK OBLIGATIONS.  The Subcontractor agrees to satisfy warranty and corrective work obligations without cost to the Owner or Gray.  In the event of Subcontractor's failure to satisfy these obligations, all costs for design, labor, supervision, materials, travel (including meals, lodging and mileage), equipment and overhead (at 18% of costs) incurred by Gray in the investigation, review, redesign and correction of such problem shall be paid to Gray by Subcontractor.  Design and service team costs shall be computed using Gray's standard hourly rates.  A verbal request for corrective action by Gray to the Subcontractor, together with a written confirmation of the action requested, will be provided.  If corrective action is not initiated or completed within a time reasonable under all the circumstances, Gray will

| Page 16 | | Issue Date: | 08/01/03 |
|---|---|---|---|
| | | Revision No.: | 4 |
| Standard Subcontract Agreement | | Revision Issue Date: | 05/23/06 |

itself commence investigation and implement corrective measures at the Subcontractor's expense. Gray's rights hereunder are in addition to all other rights and remedies pursuant to the Subcontract, and the institution of such measures by Gray shall in no way relieve Subcontractor of its primary responsibility for performing and warranting the Work in accord with the Subcontract Documents.

## SECTION 11

### RECOURSE BY GRAY

11.1    DEFAULT; NOTICE TO CURE. If the Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or fails to achieve Substantial or Final Completion, or it fails to make prompt payment for its workers, sub- Subcontractors or suppliers, disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or fails to indemnify Gray as required by this Agreement or by law, or otherwise is guilty of a breach of any provision of this Agreement, and fails within three (3) working days after receipt of written notice to commence and continue satisfactory correction of such default with diligence and promptness, then Gray, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:

(a)    supply such number of workers and quantity of materials, equipment and other facilities as Gray deems necessary for the completion of the Subcontractor's Work, or any part thereof which the Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Subcontractor, who shall be liable for the payment of such costs, including reasonable overhead, profit, as well as for other damages, and attorney's fees and dispute resolution costs;

(b)    contract with one or more additional contractors to perform such part of the Subcontractor's Work as Gray shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Subcontractor;

(c)    withhold payment of any monies due the Subcontractor pending corrective action or completion of the Subcontractor's Work to the extent required by and to the satisfaction of Gray;

(d)    set-off Gray's damages attributable to Subcontractor's default against any monies due Subcontractor under this Agreement or under any other contract between Gray and the Subcontractor; and

(e)    terminate the Subcontract Agreement as set forth below.

In the event of an emergency affecting the safety of persons or property, Gray may proceed as above without notice.

11.2    TERMINATION BY GRAY. If the Subcontractor fails to commence and satisfactorily continue correction of a default within three (3) working days after receipt by the Subcontractor of the notice issued under Section 11.1, then Gray may terminate this Agreement by written notice to the Subcontractor and its surety, if any, and use any materials, equipment and/or employ such workers or Subcontractors as Gray deems necessary to complete the Work.

All of the costs incurred by Gray in so performing the Subcontractor's Work, including reasonable overhead, profit and attorney's fees shall be deducted from any monies due or to become due the Subcontractor. The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the subcontract price.

11.3    BANKRUPTCY.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

11.3.1  <u>TERMINATION ABSENT CURE</u>.  If Subcontractor files a petition under the Bankruptcy Code, this Agreement shall terminate if the Subcontractor or the Subcontractor's trustee (a) rejects the Agreement, or (b) if there has been a default, the Subcontractor is unable to give adequate assurance that the Subcontractor will perform as required by this Agreement, or (c) is otherwise unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

11.3.2  <u>INTERIM REMEDIES</u>.  If the Subcontractor is not performing in accordance with the Schedule of Work at the time a petition in bankruptcy is filed, or at any subsequent time, Gray, while awaiting the decision of the Subcontractor or its trustee to reject or to assume this Agreement and provide adequate assurance of its ability to perform hereunder, may take such steps as are reasonably necessary to maintain the Schedule of Work.  Gray may offset against any sums due or to become due the Subcontractor all costs incurred in pursuing any of the remedies provided hereunder, including, but not limited to, reasonable overhead, profit and attorneys' fees.  The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Price.

11.4  <u>SUSPENSION BY GRAY</u>.  Gray may order the Subcontractor in writing to suspend, delay, or interrupt all or any part of the Subcontractor's Work for such period of time as may be determined to be appropriate for the convenience of G ray.  Phased or interrupted Work when required shall not be deemed a suspension of Work.

The Subcontractor shall notify Gray in writing within five (5) calendar days after receipt of Gray's order of the effect of such order upon the Subcontractor's Work.  To the extent, and only to the extent, allowed Gray under the Contract Documents, the Subcontract Price or Schedule of Work shall be adjusted by Subcontract Change Order for any increase in the time or cost of performance of this Agreement caused by such suspension, delay, or interruption.

Neither the Subcontract Price nor the Schedule of Work shall be adjusted under this Section for any suspension, delay or interruption to the extent that performance would have been so suspended, delayed or interrupted by the fault or negligence of the Subcontractor or by a cause for which the Subcontractor would have been responsible.

11.5  <u>WRONGFUL EXERCISE</u>.  If Gray wrongfully exercises any option under this Section 11, Gray shall be liable to the Subcontractor solely for the reasonable value of work performed by the Subcontractor prior to Gray's wrongful action, including reasonable overhead and profit, less prior payments made.  Subcontractor shall not be entitled to recover any other incidental or consequential damages, including but not limited to profits attributable to unperformed Work.

11.6  <u>REMEDIES CUMULATIVE</u>.  All the rights and remedies of Gray in the event of a default by Subcontractor under this Agreement shall be cumulative to the greatest extent permitted by law and shall be in addition to all other rights and remedies available to Gray at or in equity.

## SECTION 12

### SUSPENSION OR TERMINATION BY OWNER

12.1  <u>SUSPENSION BY OWNER</u>.  Should the Owner suspend Gray's contract or any part of Gray's contract which includes the Subcontractor's Work, Gray shall so notify the Subcontractor in writing and, upon receipt of said notice, the Subcontractor shall immediately suspend the Work.

12.2  <u>TERMINATION BY OWNER</u>.  If the Owner, for any reason, terminates Gray's contract or any part that includes the Subcontractor's Work, Gray shall so notify the Subcontractor in writing and upon receipt of said notice, this Agreement shall also be terminated and the Subcontractor shall immediately stop the Work.

12.3    CLAIMS FOR OWNER SUSPENSION OR TERMINATION. In the event of such Owner suspension or termination, Gray's obligation to the Subcontractor is limited to the extent of Gray's recovery, on the Subcontractor's behalf, under the Contract Documents. Gray agrees to cooperate with the Subcontractor, at the Subcontractor's expense, in the prosecution of any Subcontractor claim arising out of an Owner suspension and to permit the Subcontractor to prosecute said claim, in the name of Gray, for the use and benefit of the Subcontractor. Administrative and overhead costs, attorney's fees and other expenses incurred by Gray while assisting the Subcontractor in the prosecution of such claim shall be deducted from any recovery paid to Subcontractor.

12.4    STIPULATION. The provisions of this Section 12 shall not be construed to create any obligation upon Gray to pursue any claim or litigation on behalf of the Subcontractor.

## SECTION 13

### LABOR RELATIONS AND IMMIGRATON

13.1    ICOMPLIANCE WITH IMMIGRATION REFORM AND CONTROL ACT OF 1986 ("IRCA"). Gray and Subcontractor agree that Subcontractor shall be obligated to comply with all requirements imposed on employers under IRCA with regard to every Subcontractor employee ("Contract Worker") who will perform services for Subcontractor, where such service is provided in connection with Subcontractor's performance of this Subcontract. Subcontractor further agrees that Subcontractor is the "employer" as that term is defined at 8 C.F.R. Section 274a.1(g), and that Gray is not the "employer" as so defined, with regard to such Contract Workers. In furtherance of its duties as employer under IRCA, Subcontractor agrees to do the following:

A.    Complete USCIS Form I-9 for all Contract Workers. Subcontractor agrees that it has sole responsibility for completing Form I-9 for all Contract Workers who provide services as a part of Subcontractor's performance of this subcontract, and that it will do so and will further update such Form to the extent required by law. Subcontractor further warrants that all of Subcontractor's agents and/or employees who complete Form I-9 for such Contract Workers will be knowledgeable of all Form I-9 requirements, including but not limited to, knowledge of which documents do and do not satisfy the requirements of Form I-9, and that such agents and employees will otherwise complete Form I-9, and that such agents and employees will otherwise complete Form I-9 in full compliance with IRCA.

B.    Subcontractor's Warranty of Employment Authorization for all Contract Workers. Subcontractor hereby warrants that no Contract Worker will provide services pursuant to this subcontract until Subcontractor has completed Form I-9 for such Contract Worker in the manner required by IRCA. Subcontractor further warrants that it will not permit any Contract Worker to perform services under this subcontract who Subcontractor knows or has reason to believe is not authorized to work in the United States, regardless of whether such individual is able to produce documents which satisfy the requirements of Form I-9. Subcontractor understands that Gray is acting in reliance on Subcontractor's warranty as described in this subparagraph and further states that without Subcontractor's warranty that it has taken all necessary steps to comply with IRCA and that Subcontractor believes all Contract Workers are authorized to work in the United States.

C.    Removal of Contract Workers not Authorized for Employment in the United States. Subcontractor agrees that if at any time after it assigns a Contract Worker to perform services under this subcontract, Subcontractor learns or has reason to believe that any Contract Worker is not authorized to work in the United States, Subcontractor shall immediately so inform Gray and Subcontractor shall cease assigning work to such Contract Worker providing services under this Subcontract.

D.    Indemnification and Hold Harmless. Subcontractor agrees that in any event any government agency determines that any Contract Worker hired by Subcontractor to perform duties under this subcontract is not authorized for employment in the United States, Subcontractor shall indemnify and hold harmless Gray and any of Gray's agents, employees, officers, directors, trustees, or other persons acting on Gray's behalf, from any liability incurred by Gray as a result of such determination. Such indemnification shall include, by way of example but not in any way limited to, any civil or criminal fines or penalties assessed, alleged

and any costs incurred in responding to or participating in any government investigation, finding, recommendation, hearing, appeal or any other proceeding, including attorneys' fees and costs.

13.2    LABOR HARMONY.  Subcontractor and its lower tier Subcontractors shall not employ anyone in the Subcontractor's Work whose employment may be objectionable to Gray or the Owner.  All labor used throughout the Work by Subcontractor or any of its lower tier Subcontractors shall be of a standing or affiliation that will permit the Project to be carried on harmoniously and without delay, and that will not, in any case, or under any circumstances, cause any disturbance, interference or delay to the progress of the Project.

13.3    LABOR DISPUTES.  Subcontractor and all persons in privity with it agree that, where its Work or any of the Work of Gray or other Subcontractors is stopped or delayed or interfered with by strikes, slow-downs or work interruptions or the threats thereof, resulting from an act or failure to act of Subcontractor and/or those in privity with it, or any of their employees or agents, then Gray, at its sole option, shall afford Subcontractor twenty-four (24) hours notice wherein Subcontractor shall take action to maintain the harmony of the Work, or make such other arrangements, satisfactory to Gray that will ensure the harmonious continuation of the Work. Subcontractor's failure to so comply within the allotted time shall be an event of default, for which Gray may, at its sole option, terminate this Agreement pursuant to Section 11.1.

## SECTION 14

### INDEMNIFICATION

14.1    SUBCONTRACTOR'S PERFORMANCE.  To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors and Subcontractors and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of the Subcontractor's Work provided that:

(a)    any such claim, damage, loss or expense is attributable to bodily injury, personal injury, sickness, disease or death, or to damage to or destruction of tangible property including the loss of use resulting therefrom, to the extent caused or alleged to be caused by any negligent act or omission of the Subcontractor or any person directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable (including sub-Subcontractors and suppliers of Subcontractor).

(b)    litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the work or materials or processes used by the Subcontractor, or its subcontractors and/or suppliers

(c)    claims against or through Gray or liability for claims and liens for labor performed or materials used or furnished through or under Subcontractor on the Project.

(d)    liability or claims against or through to Gray resulting from the Subcontractor's failure to comply with applicable licensing requirements or Code requirements.

(e)    liability imposed upon Gray directly or indirectly by Subcontractor's failure or the failure of any of its employees to comply with law, ordinances, rules, regulations or requirements, including Occupational Safety and Health Administration violations and any penalties, including enhancements, resulting in whole or in part from Subcontractor's acts or omissions.

(f)    such obligations shall not be construed to negate, or abridge, or otherwise reduce any other right or obligation of indemnity under this Agreement or which would otherwise exist as to any party or person described in this Section 14.

14.2    NO LIMITATION OF LIABILITY.  In any and all claims against the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors or Subcontractors, or any of their agents or employees, by any employee of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, the indemnification obligation under this Section 14 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under worker's or workmen's compensation acts, disability benefit acts or other employee benefit acts.

## SECTION 15

### INSURANCE

15.1    SUBCONTRACTOR'S INSURANCE.  Prior to beginning the Work, the Subcontractor shall procure for its Work, and furnish proof of, Workers' Compensation Insurance, Employer's Liability Insurance, Commercial (Comprehensive) General Liability Insurance (including contractual liability insurance covering Subcontractor's obligations under Section 14), Comprehensive Automobile Liability Insurance, and all other insurance and extensions thereof required of Gray insofar as the requirements relate to Subcontractor's Work. Gray shall be named as an additional insured on the Subcontractor's Commercial (Comprehensive) General Liability policy.  Subcontractor shall procure and maintain at all times during the course of the Work (including corrective or warranty work) the required insurance with limits of liability not less than those listed below. Policies shall be in a form satisfactory to Gray and issued by insurers licensed to do business in the state where the Project is located and who are rated no lower than A by Best Insurance Guide.

15.1.1    WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY.

(a)    Statutory coverage in each state in which Subcontractor's employees are engaged in the performance of the Work;

(b)    Employer's Liability:

| | | |
|---|---|---|
| $100,000 | - | bodily injury for each accident |
| $500,000 | - | policy limit for bodily injury by disease |
| $100,000 | - | for each employee for bodily injury by disease. |

15.1.2    COMMERCIAL GENERAL LIABILITY.

(a)    Limits of Liability:

| | | |
|---|---|---|
| $1,000,000 | - | general aggregate |
| $1,000,000 | - | products and completed operations aggregate |
| $1,000,000 | - | personal and advertising injury |
| $1,000,000 | - | each occurrence |

(b)    Coverage Details:

Coverage shall be by Standard Commercial General Liability Occurrence Form including:

Personal and Advertising Injury, Contractual Liability, Explosion, Collapse and Underground Liability (if applicable), Broad Form Property Damage, Independent Contractors, and Products and Completed Operations.

This policy shall add Gray as an insured thereunder by proper endorsement.

15.1.3    AUTOMOBILE LIABILITY

(a)    Limits of liability:  $1,000,000 per accident

(b)    Coverage details:

All owned, non-owned and hired vehicles.

15.1.4  PROFESSIONAL LIABILITY.  Professional Liability (Errors and Omissions) coverage with a minimum limit of $250,000 each claim and $250,000 in the aggregate, if required by Section 1.10.

15.1.5  <u>EXCESS OR UMBRELLA LIABILITY</u>. Subcontractor shall include Excess or Umbrella Liability Insurance in an amount not less than indicated in Section 1.11.

15.1.6  <u>CERTIFICATE OF INSURANCE</u>.  Subcontractor shall furnish Gray with a certificate of insurance (or certified copies of its insurance policies), which  Subcontractor warrants and represents is a true and accurate representation of  Subcontractor's existing insurance coverage.  This certificate shall indicate all endorsements, including Gray, and Owner if applicable, as additional insured by standard endorsements CG2010 (07/04) and CG2037 (07/04).

15.2  <u>CANCELLATION, RENEWAL OR MODIFICATION</u>.  All insurance policies shall contain a provision that the coverages afforded thereunder shall not be cancelled or not renewed, nor restrictive modifications added, until at least thirty (30) days prior written notice has been given to Gray unless otherwise specifically required in the Subcontract Documents.

No progress payment will be made unless Gray has been furnished evidence of required coverages and endorsements as required by this Subcontract.

In the event the Subcontractor fails to obtain or maintain any insurance coverage required under this Agreement, Gray may purchase such coverage and charge the expense thereof to the  Subcontractor, or terminate this Agreement.

15.3  <u>WAIVER OF RIGHTS</u>.  Gray and  Subcontractor waive all rights against each other and the Owner, separate contractors, and all other  Subcontractors for loss or damage to the extent covered by Builder's Risk or other similar insurance covering improvements or materials at the Project site, except such rights as they may have to the proceeds of such insurance.

If not covered under the Builder's Risk policy of insurance or any other property or equipment insurance required by the Subcontract Documents, the  Subcontractor shall procure and maintain at the  Subcontractor's own expense property and equipment insurance for portions of the  Subcontractor's Work stored off the site or in transit, when such portions of the  Subcontractor's Work are to be included in an application for payment under Section 5.

15.4  <u>ENDORSEMENT</u>.  If the policies of insurance referred to in this Article require an endorsement to provide for continued coverage where there is a waiver of subrogation, the owners of such policies will cause them to be so endorsed.

15.5  <u>PRIMARY COVERAGE</u>.   The insurance required of Subcontractor must be primary and non-contributory with Gray's insurance program.

## SECTION 16

### DISPUTE RESOLUTION

16.1  <u>DISPUTE RESOLUTION</u>.  All claims, disputes and matters in question arising out of, or relating to, this Agreement or the breach thereof, except for claims which have been waived by the making or acceptance

of final payment and the claims excluded or limited by Sections 6.2 and 6.6, shall be resolved by mediation, arbitration and/or litigation at Gray's sole option. The provisions for arbitration shall be specifically enforceable under the Federal Arbitration Act. The site for mediation, litigation or arbitration shall be at the Project site or Lexington, Kentucky, as selected by Gray, unless required otherwise by Gray's agreement with Owner.

16.2    DISPUTE RESOLUTION PROCEDURE. Prior to a demand for arbitration, or initiation of litigation of claims, the parties shall proceed as follows, as an express condition precedent to commencing formal claims against the other relating to or arising out of the dispute:

(a)     The party asserting a claim shall do so in writing and within the notice period, if any, established for such claims by the Subcontract Documents. In the absence of a notice period set by the Subcontract Documents, the notice of claim shall be given as soon as practicable but in no event later than five (5) calendar days after the claimant is aware of the event from which the claim arises.

(b)     The parties shall then attempt in good faith to negotiate a resolution of disputed claims during the next twenty (20) calendar days before pursuing any other means of dispute resolution.

(c)     If claims remain unresolved, the parties shall endeavor to resolve disputes by proceeding at the instance of either to non-binding mediation conducted under such rules as the parties may agree to employ. The parties shall divide the cost of the mediator evenly among them.

(d)     DISPUTES RELATING TO GRAY. Notwithstanding anything stated above, if any dispute shall arise between Gray and the Subcontractor pertaining in any manner to the construction or interpretation of this Agreement, or to the rights or obligations of the parties, or to the breach of this Agreement, which the parties are unable to settle by mutual agreement, Gray shall have the exclusive option either to have the dispute determined by a court or by arbitration in accordance with the Arbitration Rules of the Center for Public Resources. Gray, Subcontractor and Subcontractor's surety agree that all claims, disputes, and other matters in controversy between Gray and Subcontractor, arising out of or relating to the Subcontract, or the breach thereof, except as provided in the Contract Documents, shall be resolved in the appropriate forum in the County of Fayette, Kentucky. Gray shall exercise its exclusive option by commencing a court action or by commencing an arbitration proceeding. If Subcontractor first commences a court action with respect to a dispute which Gray desires to have determined by an arbitration proceeding, or if Subcontractor first commences an arbitration proceeding which Gray desires to have determined by a court, Gray shall commence the arbitration proceeding or court action desired by Gray within thirty days after receiving service of Subcontractor's complaint or arbitration demand. If, at any time, even after suit may have been filed by either party, but prior to commencement of trial, Gray becomes involved in litigation or arbitration with another party or parties involving questions of fact or law common to the dispute between Gray and Subcontractor to the extent that (a) in Subcontractor's absence, complete relief cannot be accorded among those already parties, or (b) disposition of such other action may as a practical matter, impair or impede Gray's or Subcontractor's ability to fully prevent its incurring multiple or otherwise inconsistent obligations, Subcontractor agrees that Subcontractor may be joined by Gray in such other litigation or arbitration proceedings for complete resolution of all disputes and controversies arising under this Agreement and that upon such joinder, any pending action between Gray and Subcontractor shall be dismissed.

(e)     If Gray chooses to have the matter resolved by arbitration, then it shall proceed in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes, as modified by this Agreement. The arbitration panel shall consist

of three independent and impartial persons who have experience in the construction industry or construction law. The Subcontractor and Gray shall each appoint one member of the panel and the third member shall be appointed according to the aforementioned Rules.

(f)    If Gray chooses to arbitrate, then the arbitration award shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof, subject to any restrictions set forth in the Federal Arbitration Act

16.3    WORK CONTINUATION AND PAYMENT. Unless otherwise agreed in writing, the Subcontractor shall continue on which the Work and maintain the Schedule of Work pending arbitration, and if so, Gray shall continue to make payments earned by the Subcontractor in accordance with this Agreement.

16.4    DOCUMENT PRODUCTION AND EXCHANGE OF ARBITRATION EXHIBITS. If Gray consents to arbitrate, each party shall have the right to immediate production of the records of the other party relating to the Project for inspection and copying except for those portions which are covered by an unwaived attorney-client privilege or which were prepared in anticipation of arbitration or litigation. No later than 15 days prior to the arbitration hearing, the parties shall make available to each other, for inspection and copying, the exhibits, photographs, and other documents which they intend to introduce or refer to during the arbitration.

16.5    ATTORNEY'S FEES, ARBITRATION COSTS, AND/OR COURT COSTS.

(a)    Attorney's fees and expenses shall be awarded to the prevailing party if a claim or dispute is found to have been asserted or defended unreasonably or in bad faith.

(b)    The prevailing party in arbitration or court proceeding shall recover its attorney's fees and court costs incurred in any judicial proceedings necessary, including those fees necessary to obtain (i) enforcement of this arbitration clause or (ii) confirmation, enforcement, or collection of an arbitration award or court judgment.

## SECTION 17

### MISCELLANEOUS PROVISIONS

17.1    GOVERNING LAW. This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Kentucky applicable to agreements executed, delivered, and to be performed solely within the Commonwealth of Kentucky.

17.2    SEVERABILITY AND WAIVER. The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision. The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

17.3    TITLES. The titles given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any other purpose.

17.4    ATTORNEYS' FEES. The Subcontractor shall reimburse Gray for all of Gray's attorney's fees, court costs and other expenses incurred in enforcing or declaring the Subcontractor's obligations under this Agreement, incurred in exercising any right or remedy hereunder or under law or equity in the event of a default by the Subcontractor, or incurred in any litigation or arbitration in which Gray, without its fault, becomes involved by reason of the existence of this Agreement.

17.5    <u>WRITTEN NOTICES</u>.  Written notices to Gray required by this Agreement shall be addressed to 10 Quality Street, Lexington, Kentucky 40507-1450.  Written notices to Subcontractor required by this Agreement shall be sent to the address given in Section 1.1 of this Agreement.  Any notice sent by mail shall be deemed to have been received the third calendar day after the date of mailing.  Notice may also be delivered by hand delivery or fax, in which event notice shall be deemed effective on the date such notice is given.

17.6    <u>ENTIRE AGREEMENT</u>.  This Agreement is solely for the benefit of the signatories hereto and represents the entire and integrated agreement between the parties hereto and supersedes all prior contemporaneous negotiations, representations, understandings or agreements, either written or oral.  This Agreement shall not be modified except by a written instrument signed by the parties.

## SECTION 18

### SPECIAL PROVISIONS

18.1    <u>BINDING EFFECT</u>.  This Agreement shall be binding upon and inure to the benefit of Gray, Subcontractor, and their successors and assigns.

18.2    <u>PRECEDENCE</u>.  It is understood the Work to be performed under this Agreement, including the terms and conditions thereof, is as described in Section 1 through 17 herein together with the following Scope of Work, which are intended to complement same.  However, in the event of an inconsistency, these Special Provisions shall govern.

18.3    <u>INCONSISTENCIES AND OMISSIONS</u>.  Should inconsistencies or omissions appear in the Subcontract Documents, it shall be the duty of the Subcontractor to so notify Gray in writing within three (3) working days of the Subcontractor's discovery thereof.  Upon receipt of said notice, Gray shall instruct the Subcontractor as to the measures to be taken and the Subcontractor shall comply with Gray's instructions.

18.4    <u>CROSS REFERENCE OF DOCUMENTS</u>.  Subcontractor shall review all specifications, drawings, reports and existing conditions which affect the relationship of Subcontractor's Work to the complete project, and be responsible for that relationship.  By way of example, a roofing Subcontractor shall be responsible for including and performing mechanical and plumbing roof penetrations, which may or may not be detailed on the roof plans and details, but may be shown on the mechanical drawings.

18.5    <u>SUBCONTRACT DOCUMENTS</u>.  The Subcontract Documents are identified as follows and incorporated by reference:

(a)    Scope of Work – Exhibit A

(b)    Drawing List – Exhibit B

(c)    Specifications & Other Documents – Exhibit C

(d)    Other Provisions – Exhibit D

(e)    Application for Payment – Exhibit E

(f)    Sub-Subcontractors/Materialmen's Waiver of Lien – Exhibit F

(g)    Subcontractor Safety Orientation Manual – Exhibit G

(h)    This Agreement

(i)    The Contract Documents identified in the contract between the Owner and Gray, including but not limited to the signed agreement between the Owner and Gray,

conditions of the contract (general, supplementary, special and other conditions), drawings, specifications, addenda, change orders, other written modifications, and other documents enumerated therein;

WITNESS WHEREOF, The parties have caused this Agreement to be executed by their duly authorized representatives, under seal, as of the day and year first above written.

**CONTRACTOR**

GRAY CONSTRUCTION, INC.

Project Manager

Executed By

*EXECUTIVE V.P. AUTOMOTIVE MARKET*
Title

(Seal)
**Attest:**

Admin Assistant
Title

**SUBCONTRACTOR**

M T & R Enterprises, Inc.
(DBA) Four Star Interior-Cons.
Company Name

Signature

Rita G. Donahoo
Printed Name

President
Title

(Seal)

**Attest:**

Office Manager
Title

# *If applicable, complete certificate on the following page.*

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 4 |
| Revision Issue Date: | | 05/23/06 |

**CERTIFICATE**

(Certificate DOES NOT need to be completed IF subcontractor is a Sole Proprietorship. Notary Public section must be completed by all entities.)

I, _Rita G Donahoo_, certify that I am an/a

_Officer_ of _M T & R Enterprises Inc_
  (Officer/Member/Partner)                    (Name of Subcontractor Entity)

and that I am authorized and empowered by valid resolutions of the _Board of Directors_
                                                                  (Partners/ Board of Directors/ Managers)

of said _Corportation_ to execute this Subcontract for and on its behalf.
         (Partnership/Corporation/Limited Liability Company)

This _9th_ day of _November_ 20 _06_

                                              _Rita J Dr_
                                              Officer

State of _AL_

County of _St. Clair_

Subscribed, sworn to and acknowledged before me by _Rita G Donahoo_

This _9th_ day of _Nov._ 20 _06_

                                              Notary Public

My Commission Expires: _MY COMMISSION EXPIRES AUGUST 1, 2008_

| | | |
|---|---|---|
| Page 27 | Issue Date: | 08/01/03 |
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |



**Gray Construction**

## EXHIBIT A
### SCOPE OF WORK
### SUBCONTRACT AGREEMENT NO.: 207005-09-500

<u>MT & R Enterprises Inc. dba Four Star Interior Construction</u> shall provide all materials, labor, equipment and other services necessary to complete the <u>Gypsum Board, Metal Studwork, Insulation and Acoustical Tile Work</u> for the <u>Hwashin</u> Project in <u>Greenville, Alabama</u>. All work shall be performed in accordance with plans and specifications as prepared by Gray Construction.

Furthermore, the scope of work shall be more specifically defined but shall in no way be limited to the following:

1.   This scope of work includes but is not limited to selective demolition, metal stud and drywall construction, acoustical ceiling installation, and general carpentry.

2.   Clean up daily to a central dumpster.

3.   It is the Subcontractor's responsibility to supply the project with enough manpower and equipment to meet the Schedule.

4.   The Subcontractor shall prepare and submit all shop drawings and material specifications required for the work. Only after review and approval, or authorization from Gray's authorized representative may work proceed.

5.   Subcontractor to conform to and enforce all items in Gray safety policy.

6.   Subcontractor is to send a representative to site meetings weekly.

7.   The Subcontractor shall provide all field layout for the execution of this scope of work. Design/builder will provide permanent benchmarks. Field verification of all existing conditions will be required.

8.   Subcontractor is responsible for the cleaning of debris and residue deposited on public roads as a result of its operation.

9.   Invoices will be due to Gray by the 25th of each month, with work projected through the end of the month. A 10% retainage will be withheld from each month's invoice.

10.  The Subcontractor (and tiered subcontractors/suppliers, when applicable) shall comply with **Gray Construction project reporting procedures** in regards to Daily Reports, Safety Reports, HAZ. Com., and Safety Training Reports, QA/QC verifications, and two week look ahead schedules.

---

Page 1

Exhibit A - Standard Subcontract Agreement

11. The Subcontractor and tiered subcontractors/suppliers shall embrace and abide by the **Gray Construction Alcohol and Drug Free Project Policy for Subcontractors.**

12. The Subcontractor and tiered subcontractor/suppliers shall comply with the **safety requirements of Gray Construction,** including 100% tie-off requirements, 100% eye protection, State, Federal, OSHA and all regulatory agencies having jurisdiction.

13. The Subcontractors and tiered subcontractor/suppliers shall be responsible for all applicable taxes, fees, insurance and permits for their scope of work.

14. All Subcontractors and tiered subcontractors/suppliers shall provide the required **insurance certificates** before initiating any work on site. Gray Construction is to be listed as an additional insured on Certificate of Insurance. Builders Risk Insurance will be by others.

15. Parking will be restricted to assigned areas. Only company vehicles delivering materials or equipment will be allowed on site and only in areas where designated by the Contractor.

16. The Subcontractor (and tiered subcontractors/suppliers when applicable) shall provide and maintain competent on-site supervisors during the execution of the work as well as a sufficient number of qualified workers to properly service the project schedule.

17. Gray shall provide temporary toilets for this subcontractors use. We do not include any special provisions for union agreements. Any additionally required toilets will need to be provided by this Subcontractor.

18. The Subcontractor shall also provide the following as necessary for their scope of work:

    • Ice and drinking water for his employees.
    • Storage sheds and trailers, and office facilities including telephone, fax, copier, and any other support elements as required for their own use.

19. The Subcontractor shall remove all temporary facilities and restore areas to original condition before final acceptance of the work.

20. The Subcontractor shall provide a complete system in accordance with the intent of the drawings, specifications, and contract documents. It is understood that there will be no revisions to the contract amount as long as the scope of work and the intent as referenced are not altered.

21. The Subcontractor will cooperate with Grays "0" punch list initiative.

22. All material will be staged in designated areas and on sufficient dunnage to ensure the material is maintained in a clean manner, free from mud and debris prior to and after installation. No stoned staging areas will be provided, and this is the Subcontractors responsibility if required to meet schedule.

23. Clean up of work daily to dumpster, located centrally, by Gray.

24. Provide all hoisting, dunnage, tools, personnel lifts and equipment necessary to unload, stage, and install this scope of work.

Exhibit A - Standard Subcontract Agreement

**PRICE BREAKDOWN:**

Please submit quantities for the following items of work.  Prices shall include all labor, material, taxes, insurance, payroll overhead, benefits, overhead and profit.  Gray reserves the right to reject any or all unit prices.  Unit prices shall serve as a basis for any and all field/design directed changes.

| Description | Unit | Base Bid Quantity | Total cost for Item |
|---|---|---|---|
| Phase I | | | $28,955.00 |
| Phase II | | | TBD |
| Phase III | | | TBD |
| Total Bid | LS | | $28,955.00 |

Monthly billings submitted by the Subcontractor must be broken down and charged against the following code(s).

| COST CODE | DESCRIPTION | AMOUNT |
|---|---|---|
| 207005-09-500 | Gypsum Board, Metal Studwork, Insulation and Acoustical Tile | $28,955.00 |

Exhibit A - Standard Subcontract Agreement



**Gray Construction**

EXHIBIT B
DRAWING LIST
SUBCONTRACT AGREEMENT NO.: 207005-09-500

| Drawing No. | Drawing Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit B - Standard Subcontract Agreement



**Gray Construction**

## EXHIBIT C
### SPECIFICATIONS & OTHER DOCUMENTS
### SUBCONTRACT AGREEMENT NO.: 207005-09-500

| Document No. | Document Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit C – Standard Subcontract Agreement



**Gray Construction**

EXHIBIT D
OTHER PROVISIONS
SUBCONTRACT AGREEMENT NO.: 207005-09-500

Not applicable at this time.

| Exhibit E | APPLICATION FOR PAYMENT | GRAY |

**REMIT TO:**
**GRAY CONSTRUCTION, INC.**
**Post Office Box 8330**
**Lexington, Kentucky 40533-8330**

| Date: | | Gray Project: | |
| Subcontractor Name: | | Gray Project No.: | |
| Remit To Address: | | Subcontractor Project Number: | |
| City, State, Zip: | | Date of Subcontract: | |
| Contact Person: | | Application No.: | |
| Phone: | Fax: | Billing Period: From: | To: |

Interim ☐     Final ☐     Retention ☐

**STATEMENT OF SUBCONTRACT**

Original Subcontract Amount ........................ $ _____

APPROVED Change Order #1 Thru _____ $ _____

Adjusted Subcontract Amount to Date ............ $ _____

**JOB TO DATE APPLICATION CALCULATIONS**

|  | | Totals to Date |
| Total Value of Work Complete & Mat'l Stored (per breakdown)... | A | $ _____ |
| Less _____ % Retainage | B | $ _____ |
| Total to Date Less Retainage (Line A - Line B) | C | $ _____ |
| Less Previous Applications | D | $ _____ |
| Amount of This Application (Line C - Line D) | E | $ _____ |

**FOR GRAY USE ONLY**

Approved by: _____

Date: _____

Pay with money from Customer Billing Est. # _____

Change Order Needed: _____

Insurance Needed: _____

Other Payment Instructions: _____

_____

Page 1 Exhibit E

Rev. 08/03

**Exhibit E**                    VALUE OF WORK COMPLETE BREAKDOWN                    **GRAY**

| A | B | C | D | E | F | G | H* | I |
|---|---|---|---|---|---|---|---|---|
| Cost Code(s) | Description | Original Contract Amount | Approved Change Order(s) Amount | Current Contract Amount (C+D) | Value of Work Complete | Materials Stored | Total Value of Work Cmpl & Mat'l Stored (F+G) | % Cmpl |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | TOTALS | | | | | | | |

* Must include subtotals by cost code for both original contract value and change orders.
Page 2 Exhibit E

Rev. 08/03

**Exhibit E**    LIST OF SUB-SUBCONTRACTOR/MATERIAL SUPPLIERS PERFORMING WORK UNDER YOUR SUBCONTRACT    **GRAY**

**(Attach separate list if necessary)**

Listed below is each and every Sub-subcontractor and/or Material Supplier who has performed work for this Subcontractor on the aforementioned project, together with payments which have been made to each Sub-subcontractor and/or Material Supplier and the unpaid amounts claimed by each, through the billing period for this Application for Payment.

| Sub-Subcontractors and/or Material Suppliers | Address/Phone No. | Description of Work | Previous Amount Paid | Unpaid Amount Claimed | Lien Waiver Attached ☑ |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Page 3 Exhibit E                                                                 Rev. 08/03

**Exhibit E**          SUBCONTRACTOR AFFIDAVIT AND WAIVER OF LIEN - ACKNOWLEDGMENT OF PAYMENT          **GRAY**

Subcontractor, having a Subcontract with Gray Construction, Inc. on the aforementioned project, has performed work and/or furnished materials, equipment, and/or machinery or has fabricated materials especially for the Project, during the Billing Period described on page 1 of this Application for Payment.

Subcontractor has paid in full all bills or obligations for labor, sub-subcontract work, payroll taxes, material, (whether or not specifically fabricated for this project), equipment, and/or machinery, which are due or payable on or before the last day of the Billing Period.

The Subcontractor further certifies that it has complied with all federal, state and local tax and employment laws, including, but not limited to, Social Security, Unemployment and worker's compensation laws, applicable to its contract and work on the Project through the Billing Period.

The Subcontractor hereby waives and releases all rights to liens and claims against the Owner, Gray, and any surety for the performance of his contract from inception through the Billing Period of this Application for Payment, except for (a) retention which is unpaid to date and (b) work which has been performed which is not the subject of an approved change order and which has been described in an attached document. The Subcontractor further states that no other person has any right to a lien or claim against the Owner on account of work performed or for material, equipment, and/or machinery, or for material especially fabricated for the Project, furnished to the Subcontractor through the Billing Period of this Application for Payment.

waiver and release is given with the understanding that Gray Construction, Inc. and others will rely upon it, and to induce Gray to make payments to the contractor. The waiver and release will become effective immediately upon the receipt of the amount shown in Line E of "Job to Date Application Calculations".

If this amount is a final payment request, there are attached hereto final waivers and releases for liens from all sub-subcontractors and material suppliers.

The Subcontractor hereby certifies that the foregoing Application for Payment is true and accurate and properly describes the work performed and materials, equipment, machinery or materials furnished or fabricated especially for the Project during the period covered and the payments to which the undersigned is entitled under the contract and applicable change orders as a result.

State of: _____     County of: _____          _____

Subscribed and sworn before me this _____ day of _____, _____ by          **Subcontractor**

_____, the _____ of          _____

_____, a _____ corporation (or partnership or sole          **Signature/Title**
proprietorship), on behalf of the Subcontractor.

          _____

          **Printed Name**

_____ Notary Public   My commission expires: _____

Page 4 Exhibit E                                                                                          Rev. 08/03

**EXHIBIT F**
## SUB-SUBCONTRACTOR OR MATERIAL SUPPLIER
## WAIVER OF MECHANICS AND/OR MATERIALMEN'S LIEN

Project Name: _____ Location: _____
(hereinafter THE PROJECT)

Subcontractor to Gray: _____
(hereinafter SUBCONTRACTOR)

Sub-Subcontractor or Supplier
to above listed Subcontractor: _____
(hereinafter SUB-SUBCONTRACTOR/SUPPLIER)

WHEREAS, GRAY CONSTRUCTION, INC. is the General Contractor (hereinafter GRAY) for the construction of a facility for THE PROJECT referenced above, and,

WHEREAS, the undersigned has furnished and received payment for materials and/or labor in the amount of $_____ to the SUBCONTRACTOR for incorporation into said project.

NOW, THEREFORE, as an inducement to GRAY to make certain progress payments to SUBCONTRACTOR, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT prior to the _____ day of _____, 20 _____.

> **Final Waiver of Lien:** By initialing in this space the undersigned represents that it has furnished and received FULL AND FINAL payment for materials and/or labor from the SUBCONTRACTOR which was incorporated into said project. THEREFORE, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT.

_____
(Name of sub-subcontractor/material supplier)

_____
(Address)

_____
(Phone)

_____
(Signature)

State of: _____
County of: _____

Subscribed and sworn to before me this _____ day of _____, 20 _____ by
_____, the _____ of _____,
a ___ corporation ___ partnership ___ sole proprietorship, on behalf of the said entity.

_____ Notary Public  My commission expires: _____

Page 1                                                                      Rev. 8/03

Exhibit F – Standard Subcontract Agreement

# SUBCONTRACT AGREEMENT

## BETWEEN

## GRAY CONSTRUCTION, INC.

## AND

## RJ Mechanical, Inc.



**PROJECT NAME:**     **Hwashin Storm Damage**
**SUBCONTRACT NUMBER:**     **207005-15-100S**

SUBCONTRACT AGREEMENT

Gray Construction, Inc.

## TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| 1. AGREEMENT | 1 |
| 2. SCOPE OF WORK | 2 |
| 3. SCHEDULE OF WORK AND COMPLETION | 4 |
| 4. SUBCONTRACT PRICE | 5 |
| 5. PAYMENT | 5 |
| 6. CHANGES, CLAIMS AND DELAYS | 9 |
| 7. GRAY'S AUTHORIZED REPRESENTATIVES | 11 |
| 8. DESIGN-BUILD SUBCONTRACTOR'S OBLIGATIONS | 11 |
| 9. SUBCONTRACT BONDS | 16 |
| 10. WARRANTY AND CORRECTION OF WORK | 17 |
| 11. RECOURSE BY GRAY | 18 |
| 12. SUSPENSION OR TERMINATION BY OWNER | 19 |
| 13. LABOR RELATIONS | 20 |
| 14. INDEMNIFICATION | 21 |
| 15. INSURANCE | 22 |
| 16. DISPUTE RESOLUTION | 24 |
| 17. MISCELLANEOUS PROVISIONS | 25 |
| 18. SPECIAL PROVISIONS | 26 |
| 19. SIGNATURE PAGE | 28 |

SUBCONTRACT AGREEMENT

Gray Construction, Inc. # <u>207005-15-100S</u>

## <u>SECTION 1</u>

### AGREEMENT

This is the Subcontract Agreement (hereinafter "Agreement") made 10/17/06 by and between GRAY CONSTRUCTION, INC., 10 Quality Street, Lexington, Kentucky 40507-1450 (hereinafter referred to as "Gray"), and the Subcontractor named below (hereinafter referred to as the "Subcontractor") to perform part of the work on the following project.

1.1    SUBCONTRACTOR                                          **RJ Mechanical, Inc.**

Mailing Address:                                          Remit to Address:
**3153 Bellwood Drive**                                     **3153 Bellwood Drive**
**Birmingham, AL  35243**                                  **Birmingham, AL  35243**

Telephone #    **205-968-0991**                              **205-968-0991**
Fax #              **205-968-3424**                            **205-968-3424**

Subcontractor   **X** is        is not   a Corporation:      FEIN#  **63-1197649**

1.2    AUTHORIZED REPRESENTATIVES
   a.   For Gray (see section 7)
         On site:   **Daniel Phillips**
         Off site:   **David Hird**
   b.   For Subcontractor (see section 8.8)
         On site:   **TBD**
         Off site:   **Dustin Boyd / Russell Sandlin**

1.3    PROJECT
        **Hwashin Storm Damage**
        **Greenville, Alabama**

1.4    OWNER
        **Hwashin America Corporation**
        **Gyeongbuk, Korea**

1.5    COMPLETION OF SUBCONTRACTOR'S WORK (see section 3.2)
   a.   Date of Substantial Completion:   **TBD**
   b.   Date of Final Completion:           **TBD**

1.6    SUBCONTRACT PRICE (see           **$9,598.00**
        section 4)
                                          **Nine thousand five hundred ninety-eight and 00/100**    Dollars

1.7    RETAINAGE (see section           **10**  %
        5.2.2)

1.8    PROGRESS PAYMENT APPLICATION DATE
_____ 25th   day of each calendar month  (see section 5.2.3)

1.9    PERFORMANCE BOND & LABOR & MATERIAL PAYMENT BOND
_____ Are    x    Are Not   required (see section 9.1)

1.10   PROFESSIONAL LIABILITY INSURANCE (Errors and Omissions)
___x___ Is    _____ Is Not    required (see section 15.1.4)

1.11   REQUIREMENTS FOR EXCESS OR UMBRELLA LIABILITY INSURANCE
**$5,000,000**  Occurrence and Aggregate (see section 15.1.5)

1.12   BUILDER'S RISK INSURANCE
If Gray Construction, Inc. is furnishing the builder's risk insurance under the terms of the
contract between Gray and the Owner, the subcontractor will be added as an additional
named insured to the policy.  This policy will cover the insurable interest the subcontractor
has in the project up to the limit of coverage.  This insurance does not cover personal
tools and equipment.  The subcontractor shall be responsible for payment of any
deductible, or its equivalent, resulting from a claim that is due to the fault or negligence of
the subcontractor, whether in whole or in part, and whether or not the Builder's Risk is
being provided by Gray or the Owner.

1.13   UTILIZATION OF SMALL BUSINESS CONCERNS
Subcontractor is certified/recognized as one of the following: ___ Small Business ___
Small Disadvantaged Business  ___ Woman-Owned Small Business  ___ HUBZone
Small Business  ___ Veteran-Owned Small Business  ___ Service Disabled Veteran-
Owned Small Business  _x_ None of the Above

1.14   DESIGN SERVICES are being furnished by RJ Mechanical, Inc. via a subconsultant
agreement with Design/Build Subcontractor or in-house, by a design professional
licensed in the state of Alabama as the design professional in responsible charge of the
Design/Build Subcontractor's Work.  Design/Build Subcontractor shall not terminate or
change the design professional in responsible charge of the Work without prior written
notice to Gray, and written confirmation of Professional Liability coverage of the
replacement design professional

## SECTION 2

### SCOPE OF WORK

2.1    DESIGN/BUILD SUBCONTRACTOR'S WORK.  Gray contracts with the Design/Build
Subcontractor as an independent contractor to perform the work described in the Scope of Work attached as
Exhibit A in strict accordance with the Subcontract Documents.  The Design/Build Subcontractor shall perform
such work (the "Work") under the general direction of Gray and in accordance with this Agreement and the
Subcontract Documents.  The Design/Build Subcontractor shall perform each activity necessary or incidental to
complete the work, which is described more particularly, but not exclusively, in Exhibit A.  The provisions of this
Agreement and Exhibit A are intended to complement each other, but if there is any inconsistency, Exhibit A shall
govern.

2.2    SUBCONTRACT DOCUMENTS.  In addition to this Agreement, the documents which form this
Subcontract and which are binding on the Design/Build Subcontractor (collectively the "Subcontract Documents")
include the Contract Documents identified in the Contract between Gray and the Owner, which are incorporated

by reference, and the Subcontract Documents set forth in Section 18.5. In case of an inconsistency between this Agreement and the Contract Documents, this Agreement shall govern.

2.2.1    DRAWINGS, PLANS AND SPECIFICATIONS. Gray has furnished Design/Build Subcontractor with one set of Criteria Documents, and if available, Drawings, Plans and Specifications included in the Subcontract Documents. Additional copies will be furnished, on request, at the Design/Build Subcontractor's expense. Design/Build Subcontractor shall furnish the design for its portion of the work so as to coordinate with the Work as a whole, and with other trade Design/Build Subcontractors. To the extent that the Design/Build Subcontractor fails to properly interpret the Criteria Documents or the Preliminary Design Documents, Design/Build Subcontractor shall be responsible to correct all errors at its own expense.

2.2.2    COPIES OF P.O.'S AND SUB-SUBS FOR MAJOR SCOPE ITEMS. Upon receipt of written approval of material and/or equipment shop drawings or brochures by the Owner or Architect, Subcontractor shall immediately furnish the following additional information to Gray for each item of equipment, fixture or material:

.1    Contact or representative of both manufacturer and supplier

.2    Subcontractor's Purchase Order Numbers

.3    Manufacturer's Order Number

.4    Supplier's Order Number

.5    Scheduled delivery date.

2.2.3    Subcontractor's superintendent, foreman, or other designated individual shall deliver a report, in form and content specified by Gray to Gray's office before the end of each shift, whenever Subcontractor has employees working at the Project site. The report will state the number of employees Subcontractor has on the Project that shift, subdividing into categories (foremen, tradesmen, laborers, etc.). Subcontractor shall also list the equipment on site, and any material deliveries.

2.3    EXAMINATION OF CONTRACT AND SUBCONTRACT DOCUMENTS; SITE INSPECTION. The Design/Build Subcontractor warrants and represents that it has visited the site of the proposed Work, has familiarized itself with existing conditions and the character of the operations to be carried on under this Agreement and that it fully understands the facilities, difficulties and restrictions attending the execution of the Work. The Design/Build Subcontractor acknowledges that it has examined all Subcontract Documents, and the requirements of the various governmental agencies, departments and bureaus having jurisdiction over the Project, and from its own investigation has satisfied itself as to the nature and location of the Work, the general local conditions, and all matters which in any way affect the Design/Build Subcontractor's Work or its performance thereof. The Design/Build Subcontractor further acknowledges that having made said visitation and examination, it is not aware of any existing conditions, circumstances, or requirements that will necessitate change in the scope of the Work, the Subcontract Price, or the Schedule of Work.

2.4    DESIGN SCOPE OF WORK. Design/Build Subcontractor agrees to timely provide design documents for its Scope at intervals determined by Gray; and Design/Build Subcontractor further agrees to timely provide stamped drawings with the original signature of the licensed design professional in responsible charge of the Work. Design/Build Subcontractor shall also provide, as a condition precedent to Final Payment hereunder, a set of Record Drawings, fully and completely depicting the finally-installed state of the Work including all changes.

2.5    OWNERSHIP AND USE OF DOCUMENTS. The drawings, specifications and other documents furnished by the Design/Build Subcontractor are instruments of services and shall become the property of Gray and the Owner upon payment by the Owner and Gray. The Design/Build Subcontractor shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the

copyright, to the extent not modified herein. Reproducible copies, including diskettes, may be retained by the Owner and Gray, whether the Project for which they were made is executed or not, and both are entitled to make and retain copies and reproduce them for their own use. Submission or distribution of documents to meet official regulatory requirements or for other purposes in connection with the Project is not to be construed as publication in derogation of the Design/Build Subcontractor's common law copyrights or other reserved rights.

## SECTION 3

### SCHEDULE OF WORK AND COMPLETION

3.1    TIME IS OF THE ESSENCE. Time is of the essence for both parties, and they mutually agree to see to the performance of their respective work and the work of their Design/Build Subcontractors so that the entire project may be completed in accordance with the Subcontract Documents and the Schedule of Work. Gray shall revise such Schedule and sequence of events as the Work progresses. No extension of time for Design/Build Subcontractor's Work will be valid without Gray's written consent.

3.2    DUTY TO BE BOUND. The Design/Build Subcontractor shall be bound by the Schedule of Work including, without limitation, the dates for Substantial Completion and Final Completion stated in Section 1.5 and revisions to the Schedule. The Design/Build Subcontractor shall provide Gray with any requested scheduling information for the Design/Build Subcontractor's Work. The Schedule of Work and all subsequent changes thereto shall be submitted to the Design/Build Subcontractor in advance of the required performance.

3.3    SCHEDULE CHANGES. The Design/Build Subcontractor acknowledges that as construction progresses it may be necessary for Gray to change the sequential order and duration of the various activities, including those contemplated by this Agreement, to account for unanticipated delays, occurrences and other factors which act to alter Gray's original schedule. Gray may require Subcontractor, at no additional cost to Gray and Owner, to prosecute Subcontractor's Work in such sequence as the progress of other subcontractors and the Project schedule dictates. It is expressly understood and agreed that the scheduling and sequencing of the Work is an exclusive right of Gray and that Gray reserves the right to reschedule and resequence Subcontractor's Work from time to time as the demands of the Project require without any additional cost or expense to be paid to the Subcontractor.

Subcontractor shall carry on its Work promptly, efficiently, and at a speed that will not cause delay in the progress of Gray's Work or Work of other Subcontractors. If, in the opinion of Gray, Subcontractor falls behind in the progress of the Work, Subcontractor may be directed to take such steps as deemed necessary to improve the rate of progress. These steps may include, without limitation, requiring Subcontractor to increase the number of shifts, personnel overtime operations, days of Work, equipment, plant, or other remedies. Subcontractor shall submit to Gray for Gray's approval a schedule demonstrating how the required rate of progress will be regained without additional costs to the Owner or Gray.

3.4    PRIORITY OF WORK. Gray shall have the right to decide on the time, order and priority in which the various portions of Work shall be performed and all other matters relative to the timely and orderly conduct of the Design/Build Subcontractor's Work. The Work will be performed as required by the composite construction schedule, which may be changed periodically by the project superintendent in order to maintain the overall schedule of Work.

3.5    COOPERATION. The Design/Build Subcontractor shall cooperate with Gray by scheduling and performing Design/Build Subcontractor's work so as to avoid conflict, delay in, or interference with the work of Gray, other Design/Build Subcontractors or Owner's own forces. Design/Build Subcontractor shall participate, as requested by Gray, in inspections related to Substantial and Final Completion.

3.6    COMMENCEMENT OF WORK. The Design/Build Subcontractor shall commence Work within three (3) calendar days from Gray's notice to proceed. If interrupted for any reason, the Design/Build Subcontractor shall resume the work within three (3) working days from Gray's notice to do so.

---

# SECTION 4

## SUBCONTRACT PRICE

Gray agrees to pay the Design/Build Subcontractor for the satisfactory performance of the Design/Build Subcontractor's Work the sum of identified in Section 1.6 (the "Subcontract Price") in accordance with Section 5, subject to additions or deductions as provided in Section 6.

Unit prices, if any, are stated in Design/Build Subcontractor's Scope of Work, Exhibit A.

# SECTION 5

## PAYMENT

5.1    GENERAL PROVISIONS.

5.1.1    SCHEDULE OF VALUES.  The Design/Build Subcontractor has provided Gray with a schedule of values which shall be revised, if necessary for approval by Gray and the Owner, no later than the date of the Design/Build Subcontractor's first application for payment.

5.1.2    PAYMENT USE RESTRICTION.  No payment received by the Design/Build Subcontractor shall be used to satisfy or secure any indebtedness other than one owed by the Design/Build Subcontractor for labor or materials furnished in performing the Design/Build Subcontractor's Work on this Project.

5.1.3    PAYMENT USE VERIFICATION.  Gray shall have the right at all times to contact the Design/Build Subcontractor's lower tier Design/Build Subcontractors and suppliers to ensure that the same are being paid by the Design/Build Subcontractor for labor or materials furnished for use in performing the Design/Build Subcontractor's Work on this Project.

5.1.4    CONDITIONS PRECEDENT TO PARTIAL PAYMENT.  Progress payments due under this Agreement will not be released until all of the following conditions have been met:

.1    Subcontract Agreement has been signed, returned and approved.

.2    Insurance Certificates satisfying the requirements of this Agreement have been received.

.3    A schedule of values has been received in the form and content specified by Gray.

.4    Certified payrolls, if required by the Owner, received in the appropriate format.

.5    Waivers of lien from all tier subcontractors and materialmen evidencing payments through the previous month.

.6    If requested by Gray, Subcontractor agrees to likewise provide Gray with evidence satisfactory to Gray showing payment by Subcontractor of any and all contributions made by Subcontractor for health and welfare payments as shown on the certified payroll, as well as payment of payroll taxes and other contributions that may be required by law.

5.1.5    PARTIAL LIEN WAIVERS AND AFFIDAVITS.  As set forth above, as a prerequisite for payment, the Design/Build Subcontractor shall provide, in a form satisfactory to the Owner and Gray, partial lien or claim waivers and affidavits from the Design/Build Subcontractor, and its sub-Design/Build Subcontractors and suppliers for the completed Design/Build Subcontractor's Work.  Such waivers may be made conditional upon payment of a specific amount stated therein.  The Design/Build Subcontractor's

Authorized Representative(s) designated in Section 1.2(b) of this Agreement are hereby designated as authorized agents of Design/Build Subcontractor to execute all lien waivers required of Design/Build Subcontractor.

    5.1.6   DESIGN/BUILD SUBCONTRACTOR PAYMENT FAILURE. In the event Gray has reason to believe that labor, material or other obligations incurred in the performance of the Design/Build Subcontractor's Work are not being paid for, Gray shall give written notice of such claim or lien to the Design/Build Subcontractor to insure that any progress payment shall be utilized to pay such obligations.

    If upon receipt of said notice, the Design/Build Subcontractor does not:

    (a)    Supply evidence to the satisfaction of Gray that the monies owing to the claimant have been paid; or

    (b)    Post a bond in a form and with surety satisfactory to Gray indemnifying the Owner, Gray, Gray's surety, if any, and the premises from such claim or lien;

then Gray shall have the right to exercise any or all of the following rights, until the claim or lien has been satisfied by the Design/Build Subcontractor:

    (1)    Retain out of any payments due or to become due to the Design/Build Subcontractor for this Project or any other Gray project a reasonable amount to protect Gray from any and all loss, damage or expense including attorney's fees arising out of or relating to any such claim or lien;

    (2)    Issue joint checks in payment of any payments due or to become due to the Design/Build Subcontractor, payable to the Design/Build Subcontractor and the claimant;

    (3)    Make direct payments of sums due the Design/Build Subcontractor to the claimant.

    (4)    May (but has no obligation to) bond off the lien, and backcharge all costs, attorneys' fees and other expenses involved in bonding off the lien to the Design/Build Subcontractor.

    5.1.7   PAYMENT NOT ACCEPTANCE. Payment to the Design/Build Subcontractor is specifically agreed not to constitute or imply acceptance by Gray or the Owner of any portion of the Design/Build Subcontractor's Work.

5.2    PROGRESS PAYMENTS.

    5.2.1   APPLICATION. For Work performed during a payment period, the Design/Build Subcontractor shall apply for a progress payment using Gray's standard Application For Payment and Lien Waiver form, a copy of which is attached as Exhibit E. Applications shall be submitted to Gray at P.O. Box 8330, Lexington, Kentucky 40533-8330. The application shall be for work performed up to and including the last day of the pay period, indicating work completed and, to the extent allowed under Section 5.2.4, materials suitably stored and protected during the payment period. Applications shall be accompanied by lien waivers from all sub-Design/Build Subcontractors and suppliers whose labor or materials are covered by the application; such waivers shall be in the form of attached Exhibit F.

    5.2.2   RETAINAGE. Regardless of any agreements between the Owner and Gray, or arrangements made by them, for the withholding or release of Gray's retainage, retainage shall be withheld by Gray from all progress payments made to Design/Build Subcontractor. The amount of retainage withheld from each payment shall be equal to the amount of payment earned, multiplied by the percentage identified in Section 1.7 of this Agreement. Retainage shall be released to Design/Build Subcontractor only upon completion of all requirements for final payment as provided in Section 5.3 of this Agreement.

5.2.3   TIME OF APPLICATION.  "Pay period" as used herein is defined as beginning with the first day of each calendar month, and ending with the last day of each calendar month.  The Design/Build Subcontractor shall submit progress payment applications to Gray no later than the day of each payment period specified in Section 1.8 of this Agreement.

5.2.4   STORED MATERIALS.  Unless otherwise provided in the Subcontract Documents, and if approved in advance by the Owner, applications for payment may include materials and equipment not incorporated in the Design/Build Subcontractor's Work but delivered and suitably stored and protected at the site or at some other location agreed upon in writing.  Approval of payment application for such stored items on or off the site shall be conditioned upon submission by the Design/Build Subcontractor of bills of sale and applicable insurance or such other procedures satisfactory to the Owner and Gray to establish the Owner's title to such materials and equipment or otherwise protect the Owner's and Gray's interest therein, including transportation to the site.

5.2.5   TIME OF PAYMENT.  Receipt of payment by Gray from Owner for Design/Build Subcontractor's work is a condition precedent to all progress payments by Gray to Design/Build Subcontractor.  Progress payments to the Design/Build Subcontractor for satisfactory performance of the Design/Build Subcontractor's Work shall be made seven (7) days after receipt by Gray of payment from the Owner for such Design/Build Subcontractor's Work.

5.2.6   GROUNDS FOR WITHHOLDING PAYMENT.  Gray may withhold from monthly progress payments an amount sufficient to protect Gray because:

.1     Defective work has not been remedied; materials have not been furnished; clean up has not been performed;

.2     Subcontractor has damaged any portion of the work of others;

.3     Claims, levies, attachments, stop notices or court orders have been filed or reasonable evidence indicates the probable filing of such claims, levies, attachments, notices or orders, including claims covered by insurance until such claims are accepted by the insurance carrier;

.4     Subcontractor has failed to make payments properly to its subcontractors or for labor, including fringe benefits, materials or equipment, transportation or shipping costs, taxes, fees or any other claims arising out of the Subcontractor's Work;

.5     There exists reasonable doubt that Subcontractor's Work can be completed for the unpaid balance of the Subcontract Price;

.6     There exists reasonable doubt that Subcontractor's Work, due to its own action or inaction, will be completed on schedule or in accordance with the schedule;

.7     Subcontractor is not satisfactorily prosecuting the Work of this Agreement;

.8     Subcontractor has failed to deliver insurance certificates, bonds, "as-built" or record drawings, written guarantees or warranties or the approvals required of the Subcontractor's Work by any authority having jurisdiction;

.9     A petition for bankruptcy or reorganization has been filed by or against Subcontractor or Subcontractor has made an assignment without the prior written consent of Contractor;

.10    Any other material breach of this Agreement by Subcontractor which has not been cured after notice from Gray.

---

Amounts then due shall be paid or credited to Subcontractor when Subcontractor removes the above grounds for withholding payment.

5.3     FINAL PAYMENT.

5.3.1     APPLICATION.  Upon acceptance of the Design/Build Subcontractor's Work by the Owner, and Gray, and upon the Design/Build Subcontractor furnishing evidence of fulfillment of Design/Build Subcontractor's obligations in accordance with the Subcontract Documents and Section 5.3.2, Gray shall, without delay, forward the Design/Build Subcontractor's application for final payment to the Owner.

5.3.2     REQUIREMENTS.  Before Gray shall be required to forward the Design/Build Subcontractor's application for final payment to the Owner, the Design/Build Subcontractor shall submit to Gray:

(a)     an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Design/Build Subcontractor's Work for which the Owner or his property or Gray or Gray's surety might in any way be liable, have been paid or otherwise satisfied;

(b)     consent of surety, if any, to final payment;

(c)     satisfaction of required closeout procedures;

(d)     other data if required by Gray or Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be designated by Gray or Owner; and

(e)     written warranties of Design/Build Subcontractor's materials, labor and equipment furnished under this Agreement and the Subcontract Documents.

(f)     a complete and accurate set of Record Drawings, together with Final Design drawings, appropriately stamped and originally signed by the design professional in responsible charge of the Work, and licensed in the state in which the Project was constructed.

Final payment shall constitute a waiver and release of all claims by the Design/Build Subcontractor relating to the Design/Build Subcontractor's Work, but shall in no way relieve the Design/Build Subcontractor of liability for the obligations assumed under Section 10 hereof, or for faulty or defective work appearing after final payment.

5.3.3     TIME OF PAYMENT.  Final payment of the balance due of the contract price shall be made to the Design/Build Subcontractor:

(a)     upon receipt of the Owner's waiver of all claims related to the Design/Build Subcontractor's Work except for unsettled liens, unknown defective work, and noncompliance with the Subcontract Documents or warranties; and

(b)     seven (7) days after receipt by Gray of final payment from the Owner for such Design/Build Subcontractor's Work, such receipt being a condition precedent for final payment to the Design/Build Subcontractor.

5.4     NON-PAYMENT BY OWNER.

5.4.1     ASSUMPTION OF RISK; CONDITION PRECEDENT.  The Design/Build Subcontractor agrees that Gray shall have no obligation to pay the Design/Build Subcontractor for any work done on this Project until Gray has been paid by the Owner.  The provisions of Sections 5.2 and 5.3 stating the time

---

and amount of progress and final payments are subject to the condition that Gray shall receive from the Owner progress or final payments in at least the amounts payable to the Design/Build Subcontractor on account of work done by the Design/Build Subcontractor on this Project. The time when such payments shall be due the Design/Build Subcontractor shall be postponed until Gray has received same from the Owner. The Design/Build Subcontractor expressly agrees to accept the risk that it will not be paid for work performed by him in the event that Gray, for whatever reason, is not paid by the Owner for such work. The Design/Build Subcontractor acknowledges that it relies for payment on the credit and ability to pay of the Owner, and not of Gray. The Design/Build Subcontractor agrees that payment by the Owner to Gray for work performed by the Design/Build Subcontractor shall be a condition precedent to any payment obligation of Gray to the Design/Build Subcontractor. The Design/Build Subcontractor agrees that the liability of the surety on Gray's payment bond, if any, is subject to the same conditions precedent as are applicable to Gray's liability to the Design/Build Subcontractor.

5.4.2    REMEDY. If the Owner or its designated agent does not authorize payment or Gray does not receive a payment due hereunder for any cause which is not the fault of the Design/Build Subcontractor, Gray shall promptly inform the Design/Build Subcontractor in writing. Gray may also diligently pursue, with the assistance of the Design/Build Subcontractor, the release by the Owner of the payment due for the Design/Build Subcontractor's Work. At the Design/Build Subcontractor's request, Gray may institute all reasonable legal remedies to mitigate the damages and pursue full payment of the Design/Build Subcontractor's application for payment including interest thereon. In that event, the cost for pursuing the Design/Build Subcontractor's remedies shall be Design/Build Subcontractor's responsibility. Gray, at its discretion, may require that the Design/Build Subcontractor make financial arrangements satisfactory to Gray before undertaking this effort and at all times during the progress thereof.

## SECTION 6

### CHANGES, CLAIMS AND DELAYS

6.1    CHANGES. Without nullifying this Agreement, Gray may by written Subcontract Work Authorization or Subcontract Change Order make changes in the Work within the general scope of this Agreement and the Design/Build Subcontractor shall perform such changes. Adjustments in the Subcontract Price or Schedule of Work, if any, resulting from such changes shall be set forth in a Subcontract Change Order. A Subcontract Change Order is a written instrument prepared by Gray and signed by the Design/Build Subcontractor stating their agreement upon the change in the scope of the Work, adjustment in the Subcontract Price or Schedule of Work. A Subcontract Work Authorization is a written instrument prepared by Gray directing a change in the Work and stating a proposed adjustment, if any, in the Subcontract Price or Schedule of Work or both. A Subcontract Work Authorization shall be used in the absence of agreement on the terms of a Subcontract Change Order.

No adjustment shall be made for additional Work performed by Design/Build Subcontractor that resulted from the Design/Build Subcontractor's failure to properly interpret the Criteria Documents furnished or as a result of Design/Build Subcontractor's failure to properly coordinate it design with the other trade Design/Build Subcontractors.

No adjustment shall be made for any changes performed by Design/Build Subcontractor that have not been so ordered by Gray, and approved by the Owner. If Design/Build Subcontractor proceeds with additional work without the required Change Order or Work Authorization, Design/Build Subcontractor does so at its own risk, and must track all actual costs incurred, including but not limited to signed time sheets, additional supervision, actual material invoices and actual equipment costs, if any. If the additional work performed without the requisite Change Order or Work Authorization from Gray results in the necessity of an extension of time, the time extension may be granted by Gray only on proof that the work affected was on the critical path. In no event shall compensation or time be forthcoming from Gray unless these requirements are met, as well as the requisite notice set forth in Sections 6.2 and 6.3 below.

| | | |
|---|---|---|
| | Issue Date: | 08/01/03 |
| | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

6.2    CLAIMS RELATING TO OWNER.  The Design/Build Subcontractor agrees to make all claims for which the Owner is or may be liable in the manner provided in the Contract Documents for like claims by Gray upon the Owner.

Written notice of such claims shall be given by the Design/Build Subcontractor to Gray within sufficient time for Gray to make such claims against the Owner in accordance with the Contract Documents or within five (5) calendar days prior to the beginning of the Design/Build Subcontractor's Work or the event for which such claim is to be made, whichever shall first occur, otherwise such claims shall be deemed waived.

6.3    CLAIMS RELATING TO GRAY.  The Design/Build Subcontractor shall give Gray written notice of all claims not included in Section 6.2 within five (5) calendar days of the beginning of the event for which claim is made; otherwise, such claims shall be deemed waived.

All unresolved claims, disputes and other matters in question between Gray and the Design/Build Subcontractor not relating to claims included in Section 6.2 shall be resolved in the manner provided in Section 16 herein.

6.4    ADJUSTMENT IN SUBCONTRACT PRICE.  If a Subcontract Change Order or Subcontract Work Authorization requires an adjustment in the Subcontract Price, the adjustment shall be established by one of the following methods:

(a)    mutual agreement on a lump sum with sufficient substantiating data to permit evaluation;

(b)    unit prices already established in the Subcontract Documents or if not established by the Subcontract Documents, then established by mutual agreement for this adjustment; or

(c)    to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee.

6.5    SUBSTANTIATION OF ADJUSTMENT.  If the Design/Build Subcontractor does not respond promptly or disputes the method of adjustment under Section 6.4, the method and the adjustment shall be determined by Gray on the basis of reasonable costs and savings of those performing the Work attributable to the change, including, in the case of an increase in the Subcontract Price, an allowance for overhead and profit proportionate to Gray's recovery of overhead and profit, if any, under the Contract Documents.

The Design/Build Subcontractor shall maintain for Gray's review and approval an appropriately itemized and substantiated accounting of the following items attributable to the Subcontract Change Order or Subcontract Work Authorization, and shall maintain time sheets signed daily by an authorized representative of Gray relating to the additional work performed:

(a)    labor costs, including Social Security, health, welfare, retirement and other fringe benefits as normally required, and state workers' compensation insurance;

(b)    costs of materials supplies and equipment, whether incorporated in the Work or consumed, including transportation costs;

(c)    costs of renting, either from Gray or from others, of machinery and equipment other than hand tools;

(d)    costs of bond and insurance premiums, permit fees and taxes attributable to the change; and

(e)    costs of additional supervision and field office personnel services necessitated by the change.

Design-Build Subcontract Agreement

| Issue Date: | 08/01/03 |
| --- | --- |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

6.6    DELAY. If the progress of the Design/Build Subcontractor's Work is substantially delayed, disrupted, impacted or interfered with, without the fault or responsibility of the Design/Build Subcontractor, then the time for the Design/Build Subcontractor's Work shall be extended by Change Order to the extent obtained by Gray under the Subcontract Documents and the Schedule of Work shall be revised accordingly.

Gray shall not be liable to the Design/Build Subcontractor for any damages or additional compensation as a consequence of delays caused by any person not a party to this Agreement unless Gray has first recovered the same on behalf of the Design/Build Subcontractor from said person, and then to the extent of such recovery after payment of all attorney's fees and other expenses relating thereto, it being understood and agreed by the Design/Build Subcontractor that apart from recovery from said person, the Design/Build Subcontractor's sole and exclusive remedy for delay regardless of cause shall be an extension in time for performance of the Design/Build Subcontractor's Work.

In jurisdictions where the second paragraph herein is not enforceable, the Design/Build Subcontractor agrees that it may only seek delay damages to the extent documented by actual costs and entitlement demonstrated, and the Design/Build Subcontractor shall not be entitled to seek from Gray damages for actual or alleged loss of efficiency, constructive acceleration, lost productivity, stacking of trades, home office overhead, expectant underrun, season change, extended overhead, impact damages, profit upon damages for delay or similar damages calculated by formula or trade data or studies.

6.7    LIQUIDATED DAMAGES. If the Contract Documents between the Owner and Gray permit the Owner to assess Gray for liquidated or other damages for delay beyond the completion date set forth in the Contract Documents, and such damages are so assessed, then Gray shall be entitled to assess same against the Design/Build Subcontractor in proportion to the Design/Build Subcontractor's share of the responsibility for such delay.

## SECTION 7

### GRAY'S AUTHORIZED REPRESENTATIVES

Gray has designated one or more persons in Section 1.2(a) of this Agreement who shall be Gray's authorized on-site and off-site representative(s). Such authorized representative(s) shall be the only person(s) the Design/Build Subcontractor shall look to for instructions, orders and/or directions, except in an emergency.

## SECTION 8

### DESIGN/BUILD SUBCONTRACTOR'S OBLIGATIONS

8.1    OBLIGATIONS DERIVATIVE. The Design/Build Subcontractor shall be bound to Gray by the terms of this Agreement and by the conditions of the Contract Documents between the Owner and Gray, and shall assume toward Gray all the obligations and responsibilities which Gray, by those documents, assumes toward the Owner.

8.2    RESPONSIBILITIES. The Design/Build Subcontractor shall provide timely design services in compliance with all applicable codes, laws and regulations of the locality,  shall work with the local and state regulatory agencies with respect to building permits and other permits relating to the Design/Build Subcontractor's Work, and shall furnish and pay for all of the labor, supervision, materials, tools, equipment, services, and incidentals necessary for the proper performance of the Design/Build Subcontractor's Work.

The Design/Build Subcontractor shall provide a list of proposed sub-Subcontractors, subconsultants, and suppliers, be responsible for taking field dimensions, providing tests, ordering of materials and all other actions as required to meet the Schedule of Work. If any sub-subcontractors are providing design work, then Design/Build Subcontractor shall furnish the name(s), licenses in the state in which the Work is being performed and the Professional Liability certificates from the sub-Design/Build Subcontractor.

8.3    WORKMANSHIP.  Every part of the Design/Build Subcontractor's Work shall be executed in strict accordance with the Subcontract Documents in the most sound, workmanlike, and substantial manner.  All workmanship shall be the best of its kind performed by others engaged in the same trade.  All materials used in the Design/Build Subcontractor's Work shall be furnished in ample quantities to facilitate the proper and expeditious execution of the Work, and shall be new except such materials as may be expressly provided in the Subcontract Documents to be otherwise

8.4    Design/Build Subcontractor shall provide design services in accordance with the best skill and professional judgment, and in no event shall the skill and professional judgment provided with the design services be less than that expected from a highly skilled design professional performing similar work in the locality.

8.5    TEMPORARY SERVICES.  The Design/Build Subcontractor shall furnish all temporary services and facilities necessary to perform its work, including, but not limited to, heat, electrical (power), telephone, water, and other utilities necessary.

8.6    COORDINATION.  The Design/Build Subcontractor shall:

(a)    cooperate with Gray and all others whose work is dependent upon the progress of the Design/Build Subcontractor's Work'

(b)    specifically note and immediately advise Gray of any interference with the Design/Build Subcontractor's Work;

(c)    design the Work in coordination with the other trade Design/Build subcontractors, as well as the overall intent of the Criteria Documents, and

(d)    participate in the preparation of coordination drawings and work schedules in areas of congestion.

8.7    SHOP DRAWINGS AND SUBMITTALS.  The Design/Build Subcontractor shall submit shop drawings, product data, samples, and any other submittals required by the Subcontract Documents expeditiously and in such manner and sequence so as to avoid delay in the progress of the Work or the activities of Gray or other Design/Build Subcontractors.  The Design/Build Subcontractor shall be responsible for accuracy and conformity with the Subcontract Documents and other submittals.  Unless specifically noted by Gray, action on shop drawings and submittals by Gray shall not be deemed to authorize deviation from the Subcontract Documents.

8.8    PROGRESS REPORTS AND MEETINGS.  The Design/Build Subcontractor shall furnish periodic progress reports on the Work including information on the status of materials and equipment which may be in the course of preparation or manufacture.

8.9    DESIGN REVIEW AND COMMENTS MEETINGS.  To the extent required by the Owner or Gray, Design/Build Subcontractor shall attend and participate, with its design professional in responsible charge of the design, in design review meetings during the course of the Project.  Design/Build Subcontractor shall incorporate the comments and corrections resulting from such meetings in a timely and expeditious manner, so as not to delay the Work.  Design/Builder shall coordinate its design with that of the other subcontractors.

8.10    AUTHORIZED REPRESENTATIVE AND NOTICE.  The Design/Build Subcontractor shall designate one or more persons who shall be the authorized Design/Build Subcontractor's representative(s): (a) on-site and (b) off-site.  Such authorized representative(s) shall be the only person(s) to whom Gray shall issue instructions, orders or directions, except in an emergency.  Notices as required by this Agreement and other communications made to any one of the Design/Build Subcontractor's Authorized Representative(s) shall be binding as if given to the Design/Build Subcontractor.  The authorized representative shall attend project meetings as required.

8.11    PROVISION FOR INSPECTION.  The Design/Build Subcontractor shall notify Gray when portions of the Design/Build Subcontractor's Work are ready for inspection.  The Design/Build Subcontractor shall at all times furnish Gray, the Owner, and their representatives adequate means and facilities for inspecting the Work, including materials at the site or any place where materials under this Agreement may be in the course of preparation, process, manufacture or treatment.

8.12    HOLD HARMLESS.  Design/Build Subcontractor shall hold Gray harmless and defend Gray from any and all consequences, losses, damages, claims or other expense of whatever nature, resulting from Design/Build Subcontractor's design on this Project.

8.13    CLEAN-UP.  The Design/Build Subcontractor shall follow Gray's clean-up directives and those of the Subcontract Documents, and

(a)    at all times keep the building and premises free from debris and unsafe conditions resulting from the Design/Build Subcontractor's Work; and

(b)    broom clean each work area daily prior to discontinuing work in the same.

Should Design/Build Subcontractor fail, after 24 hours notice from Gray, to appropriately clean an area as required by this Section, Gray shall assess the Design/Build Subcontractor for the actual daily clean-up cost or a daily charge of $150.00, whichever is greater, for each day such condition is not remedied.

8.14    SAFETY PRECAUTIONS AND PROCEDURES.

8.14.1  The Design/Build Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by Gray and, in addition, comply with occupational safety and other applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons or property and in accordance with the requirements of the Subcontract Documents.  The Design/Build Subcontractor shall report to Gray within 24 hours any personal injury or property damage occurring at the site.

8.14.2  Design/Build Subcontractor shall comply with Gray's Safety Requirements – Exhibit G attached.

8.14.3  ALCOHOL AND DRUG FREE PROJECT.  The Design/Build Subcontractor recognizes that an alcohol and drug free Project is necessary to ensure the safety of the persons employed at the Project site by the Owner, Gray, the Design/Build Subcontractor and others, and to protect the health and safety of the community.  The Design/Build Subcontractor agrees that its employees shall not distribute, be under the influence of, or be in possession of, any form of alcohol or unlawful drug while at the Project site or while in the performance of Project-related activities.  Design/Build Subcontractor's employees shall also be prohibited from using or being subject to the effects of any lawful drug while at the Project site or in the performance of Project-related activities without approval of the employee's supervisor.  The Design/Build Subcontractor acknowledges that it is familiar with Gray's Alcohol and Drug Free Project Policy for Design/Build Subcontractors.  The Design/Build Subcontractor represents that it has established written procedures for compliance with Gray's policy and agrees that it will implement and enforce the policy throughout the course of the Project.  The Design/Build Subcontractor shall indemnify and hold the Owner and Gray harmless from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or related to Design/Build Subcontractor's implementation, application or enforcement of compliance procedures.

8.15    ENVIRONMENTAL MATTERS.

8.15.1  If a Hazardous Chemicals of a type of which an employer is required by law to notify its employees will be used on the Project site by the Design/Build Subcontractor, the Design/Build Subcontractor's sub-Design/Build Subcontractors or anyone directly or indirectly employed by them, the

---

Design/Build Subcontractor shall, prior to the Hazardous Chemical being at the site, provide a current copy of the Material Safety Data Sheet (MSDS) for such Hazardous Chemical in sufficient time to permit compliance with such laws by Gray, other Design/Build Subcontractors and other employers on the site.

8.15.2   The Design/Build Subcontractor shall be responsible for the prompt removal of any Hazardous Chemicals and Hazardous Substances which are brought to Project site in connection with the Work but are not used or consumed and all waste generated from the Work.  The removal of any Hazardous Chemical, Hazardous Substance, or waste shall be done in accordance with all federal, state, and local laws, regulations and ordinances.

8.15.3   The Work shall be conducted in such a manner to avoid the discharge, dispersal, escape, release or saturation of any pollutant into the atmosphere or any body of water or on, onto, upon, in or into the surface or subsurface of land unless allowed by federal, state or local law, regulations, ordinance or permit.

8.15.4   In the event the Design/Build Subcontractor encounters on the site material reasonably believed to be asbestos, polychlorinated biphenyl ("PCB"), or other Hazardous Substances which have not been rendered harmless, the Design/Build Subcontractor shall immediately stop Work in the area affected and report the condition to Gray in writing.  The Work in the affected area shall resume in the absence of asbestos, PCB, or other Hazardous Substances, or when it has been rendered harmless, or by begin reduced to a safe level or concentration, by written agreement of Gray and Design/Build Subcontractor, or by arbitration as provided in this Agreement.  The Design/Build Subcontractor shall not be required pursuant to Article 5 to perform without consent any Work relating to asbestos, PCB, or other Hazardous Substances.

8.15.5   To the fullest extent permitted by law, the Design/Build Subcontractor shall indemnify and hold harmless Gray, other Design/Build Subcontractors, and their respective agents and employees, from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Work in the affected area if in fact the material is asbestos, PCB, or other Hazardous Chemical or Hazardous Substance and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to damage to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by failure to comply with Sections 8.15.1 or 8.15.2 or by negligent acts or omissions of the Design/Build Subcontractor, anyone directly or indirectly employed by it, or anyone for whose acts it may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.  Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 8.15.3.

8.15.6   For purposes of this Agreement, (a) the term "Hazardous Chemical" means any chemical defined as hazardous in the Hazardous Communication Standard, 29 C.F.R. § 1926.59 or 29 C.F.R. § 1910.1200, promulgated pursuant to the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; (b) the term "Hazardous Substances" means any substance, including solid, liquid or gaseous material, which is listed or defined as a "hazardous substance" in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S. § 9601, et seq., or regulations promulgated pursuant thereto, but does include petroleum, including crude oil or any fraction thereof; oil and oil waste as those terms are defined in the Clean Water Act, 33 U.S.C. § 1251, et seq., or regulations promulgated pursuant thereto; and source, special nuclear, or by-product material as defined by the Atomic Energy Act of 1954, 42 U.S.C. § 3011, et seq., or regulations promulgated pursuant thereto; and includes any other substance defined by federal, state or local statute, regulation or ordinance as a hazardous, toxic or dangerous waste or substance where "state" means the State in which the Work is being performed and "local" means the local jurisdiction (i.e., county, parish, city, borough, municipality, village, town, etc.) in which the Work is being performed; and (c) "pollutant" shall mean any solid, liquid, gaseous, or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and shall include any Hazardous Substance.

| Page 14 | Issue Date: | 08/01/03 |
| --- | --- | --- |
|  | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

8.16   PROTECTION OF THE WORK AND PROPERTY. The Design/Build Subcontractor shall take all necessary precautions to properly protect the Design/Build Subcontractor's Work and the work of others from damage caused by the Design/Build Subcontractor's operations. Should the Design/Build Subcontractor cause damage to the Work or property of the Owner, Gray or others, the Design/Build Subcontractor shall promptly remedy such damage to the satisfaction of Gray, or Gray may so remedy and deduct the cost thereof from any amounts due or to become due the Design/Build Subcontractor.

8.17   COMPLIANCE WITH LAWS. The Design/Build Subcontractor shall, at all times and at its own cost, comply with all federal, state and local statutes, codes, rules, regulations, ordinances, executive orders and other laws relating to the Project and the Work. The Design/Build Subcontractor warrants and represents that it is authorized to transact business in the state and local jurisdictions where the Project is located, that it holds any and all licenses necessary to perform the Work, and that it is not currently in violation of any statutes, codes, rules, regulations, ordinances, orders, or other laws on any projects in which Design/Build Subcontractor is presently engaged.

8.18   PERMITS, FEES AND LICENSES. The Design/Build Subcontractor shall give adequate notices to authorities pertaining to the Design/Build Subcontractor's Work and secure and pay for all permits, fees, licenses, assessments, inspections and taxes necessary for performance, completion or use of the Design/Build Subcontractor's Work.

To the extent paid to Gray under the Contract with the Owner, the Design/Build Subcontractor shall be compensated for additional costs resulting from laws, ordinances, rules, regulations and taxes enacted after the date of the Agreement.

8.19   TAXES, WAGES, FRINGE BENEFITS, ASSESSMENTS. The Design/Build Subcontractor shall timely comply with all requirements applicable to payment of taxes, wages, fringe benefits, retirement benefits, unemployment compensation and other assessments, and shall upon request furnish Gray and the Owner with satisfactory proof of compliance.

8.20   LAYOUT RESPONSIBILITY AND LEVELS. Gray shall establish principal axis lines of the building and site whereupon the Design/Build Subcontractor shall lay out and be strictly responsible for the accuracy of the Design/Build Subcontractor's Work and for any loss or damage to Gray or others by reason of the Design/Build Subcontractor's failure to set out or perform its work correctly. The Design/Build Subcontractor shall exercise prudence so that actual final conditions and details shall result in perfect alignment of finish surfaces.

8.21   MATERIALS FURNISHED BY OTHERS. In the event the scope of the Design/Build Subcontractor's Work includes installation of materials or equipment furnished by others, it shall be the responsibility of the Design/Build Subcontractor to examine the items so provided and thereupon handle, store and install the items with such skill and care as to ensure satisfactory and proper installation. Loss or damage due to acts of the Design/Build Subcontractor shall be deducted from any amounts due or to become due the Design/Build Subcontractor.

8.22   SUBSTITUTIONS. No substitutions shall be made in the Design/Build Subcontractor's Work unless permitted in the Subcontract Documents and only then upon the Design/Build Subcontractor first receiving all approvals required under the Subcontract Documents for substitutions. The Design/Build Subcontractor shall indemnify Gray for any increased costs incurred by Gray as a result of such substitutions, whether or not the Design/Build Subcontractor has obtained approval thereof.

8.23   USE OF GRAY'S EQUIPMENT. The Design/Build Subcontractor, its agents, employees, Design/Build Subcontractors or suppliers shall not use Gray's equipment without the express written permission of Gray's authorized representative.

If the Design/Build Subcontractor or any of its agents, employees, suppliers or lower tier Design/Build Subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items owned, leased, or under the control of Gray, the Design/Build Subcontractor shall be liable to Gray as provided in Section 14 for any

loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be found to have been due solely and exclusively to the negligence of Gray's employees operating such equipment.

8.24    ASSIGNMENT AND SUBCONTRACTING.  The Design/Build Subcontractor shall not assign this Agreement, nor its proceeds, nor subcontract the whole or any part of the Design/Build Subcontractor's Work, without the prior written approval of Gray.

8.25    NON-CONTRACTED SERVICES.  The Design/Build Subcontractor agrees that no claim for non-contracted construction services rendered or materials furnished shall be valid unless the Design/Build Subcontractor provides Gray notice:

(a)    prior to furnishing of the services or materials, except in an emergency affecting the safety of persons or property;

(b)    in writing of such claim within three (3) days of first furnishing such services or materials; and

(c)    the written charge for such services or materials to Gray no later than the fifteenth day (15th) of the calendar month following that in which the claim originated.

8.26    COORDINATION.  Design/Build Subcontractor is responsible for coordinating its work areas and schedule with other trades in order to perform the overall project as a team.

8.27    NORMAL WORK WEEK.  Unless otherwise directed in writing by Gray, the Design/Build Subcontractor's Work shall be performed during a five (5) day work week extending from Monday through Friday. If the Design/Build Subcontractor's work becomes behind schedule, the Design/Build Subcontractor shall work overtime during the normal work week and be at no cost to Gray if Gray is not at fault for the Design/Build Subcontractor being behind schedule.

## SECTION 9

### SUBCONTRACT BONDS

9.1    PERFORMANCE AND LABOR AND MATERIAL PAYMENT BONDS.  Unless otherwise provided at Section 1.9 of this Agreement, the Design/Build Subcontractor shall provide separate Performance and Labor and Material Payment Bonds, in a form and with surety, satisfactory to Gray in the full amount of this Subcontract. The premiums for these Bonds shall be paid by the Design/Build Subcontractor and the cost thereof is included in the Subcontract Price.

9.2    ASSURANCE OF PERFORMANCE.  If Performance and Payment Bonds are not required of the Design/Build Subcontractor under Section 9.1, then throughout the duration of this Agreement, Gray may require such bonds or a letter of credit and the Design/Build Subcontractor shall provide same.  Said Bonds shall be in the full amount of this Agreement in a form and by a surety satisfactory to Gray.  The Design/Build Subcontractor shall be compensated for the cost of same pursuant to progress payments made hereunder after the Design/Build Subcontractor furnishes the required bonds or a letter of credit.  The reimbursement amount for the bonds or a letter of credit shall not exceed the manual rate for such instruments.  In the event the Design/Build Subcontractor shall fail to promptly provide such requested bonds or a letter of credit, Gray may terminate this Agreement and re-let the work to another Design/Build Subcontractor and all Gray costs and expenses incurred thereby shall be paid by the Design/Build Subcontractor.

## SECTION 10

### WARRANTY AND CORRECTION OF WORK

| Page 16 | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

10.1   WARRANTY.

10.1.1   The Design/Build Subcontractor warrants to the Owner and Gray that materials and equipment furnished under this Subcontract will be of good quality and new unless otherwise required or permitted by the Subcontract Documents, that the Work will be performed in a good, workmanlike manner, be free from defects in materials and workmanship, and that the Work will conform with the requirements of the Subcontract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective in the sole judgment of Gray. This warranty shall be in addition to and not in limitation of any other warranty or remedy provided by law or by the Subcontract Documents. Design/Build Subcontractor shall warrant its work for a period of One (1) Year following Substantial Completion. If the warranty period is not specifically designated, then the parties agree that the warranty period shall extend for the period set forth in the agreement between Gray and the Owner.

10.1.2   The Design/Build Subcontractor further agrees to execute any additional guarantees or warranties specified in the Subcontract Documents.

10.2   CORRECTION OF WORK.

10.2.1   The Design/Build Subcontractor shall promptly correct Work rejected by Gray or failing to conform to the requirements of the Subcontract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed.

10.2.2   The Design/Build Subcontractor shall be obligated to correct work that is found not to be in accordance with the Subcontract Documents after Substantial Completion to the same extent that Gray is bound to the Owner for correction of said Work. The Design/Build Subcontractor shall begin the corrective work immediately after receipt of written notice from Gray to do so. This obligation shall survive acceptance of the Work and termination of the Subcontract. This obligation is in addition to, and not in limitation of, the warranty obligations under Section 10.1, it being the intent of this Agreement that warranty obligations are not restricted by Design/Build Subcontractor's obligations to correct defective work.

10.2.3   If the Owner chooses to correct the Work without notice and opportunity to cure to Gray, and the Owner backcharges Gray for the cost to correct the Work, the Design/Build Subcontractor shall be likewise bound to the backcharge that the Owner has assessed Gray for the Design/Build Subcontractor's Work.

10.3   SATISFACTION OF WARRANTY AND CORRECTIVE WORK OBLIGATIONS. The Design/Build Subcontractor agrees to satisfy warranty and corrective work obligations without cost to the Owner or Gray. In the event of Design/Build Subcontractor's failure to satisfy these obligations, all costs for design, labor, supervision, materials, travel (including meals, lodging and mileage), equipment and overhead (at 18% of costs) incurred by Gray in the investigation, review, redesign and correction of such problem shall be paid to Gray by Design/Build Subcontractor. Design and service team costs shall be computed using Gray's standard hourly rates. A verbal request for corrective action by Gray to the Design/Build Subcontractor, together with a written confirmation of the action requested, will be provided. If corrective action is not initiated or completed within a time reasonable under all the circumstances, Gray will itself commence investigation and implement corrective measures at the Design/Build Subcontractor's expense. Gray's rights hereunder are in addition to all other rights and remedies pursuant to the Subcontract, and the institution of such measures by Gray shall in no way relieve Design/Build Subcontractor of its primary responsibility for performing and warranting the Work in accord with the Subcontract Documents.

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

## SECTION 11

### RECOURSE BY GRAY

11.1    DEFAULT; NOTICE TO CURE.  If the Design/Build Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or fails to achieve Substantial or Final Completion, or it fails to make prompt payment for its workers, sub-Design/Build Subcontractors or suppliers, disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or fails to indemnify Gray as required by this Agreement or by law, or otherwise is guilty of a breach of any provision of this Agreement, and fails within three (3) working days after receipt of written notice to commence and continue satisfactory correction of such default with diligence and promptness, then Gray, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:

    (a)    supply such number of workers and quantity of materials, equipment and other facilities as Gray deems necessary for the completion of the Design/Build Subcontractor's Work, or any part thereof which the Design/Build Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Design/Build Subcontractor, who shall be liable for the payment of such costs, including reasonable overhead, profit, as well as for other damages, and attorney's fees and dispute resolution costs;

    (b)    contract with one or more additional contractors to perform such part of the Design/Build Subcontractor's Work as Gray shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Design/Build Subcontractor;

    (c)    withhold payment of any monies due the Design/Build Subcontractor pending corrective action or completion of the Design/Build Subcontractor's Work to the extent required by and to the satisfaction of Gray; and

    (d)    set-off Gray's damages attributable to Design/Build Subcontractor's default against any monies due Design/Build Subcontractor under this Agreement or under any other contract between Gray and the Design/Build Subcontractor.

    (e)    terminate the Subcontract Agreement as set forth below.

In the event of an emergency affecting the safety of persons or property, Gray may proceed as above without notice.

11.2    TERMINATION BY GRAY.  If the Design/Build Subcontractor fails to commence and satisfactorily continue correction of a default within three (3) working days after receipt by the Design/Build Subcontractor of the notice issued under Section 11.1, then Gray may terminate this Agreement by written notice to the Design/Build Subcontractor and its surety, if any, and use any materials, equipment and/or employ such workers or Design/Build Subcontractors as Gray deems necessary to complete the Work.

All of the costs incurred by Gray in so performing the Design/Build Subcontractor's Work, including reasonable overhead, profit and attorney's fees shall be deducted from any monies due or to become due the Design/Build Subcontractor.  The Design/Build Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the subcontract price.

11.3    BANKRUPTCY.

11.3.1    TERMINATION ABSENT CURE.  If Design/Build Subcontractor files a petition under the Bankruptcy Code, this Agreement shall terminate if the Design/Build Subcontractor or the Design/Build Subcontractor's trustee (a) rejects the Agreement, or (b) if there has been a default, the Design/Build

Issue Date:                                                 08/01/03

Revision No.:                                                 3
Revision Issue Date:                                  05/23/06

Subcontractor is unable to give adequate assurance that the Design/Build Subcontractor will perform as required by this Agreement, or (c) is otherwise unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

11.3.2    INTERIM REMEDIES.  If the Design/Build Subcontractor is not performing in accordance with the Schedule of Work at the time a petition in bankruptcy is filed, or at any subsequent time, Gray, while awaiting the decision of the Design/Build Subcontractor or its trustee to reject or to assume this Agreement and provide adequate assurance of its ability to perform hereunder, may take such steps as are reasonably necessary to maintain the Schedule of Work.  Gray may offset against any sums due or to become due the Design/Build Subcontractor all costs incurred in pursuing any of the remedies provided hereunder, including, but not limited to, reasonable overhead, profit and attorneys' fees.  The Design/Build Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Price.

11.4    SUSPENSION BY GRAY.  Gray may order the Design/Build Subcontractor in writing to suspend, delay, or interrupt all or any part of the Design/Build Subcontractor's Work for such period of time as may be determined to be appropriate for the convenience of G ray.  Phased or interrupted Work when required shall not be deemed a suspension of Work.

The Design/Build Subcontractor shall notify Gray in writing within five (5) calendar days after receipt of Gray's order of the effect of such order upon the Design/Build Subcontractor's Work.  To the extent, and only to the extent, allowed Gray under the Contract Documents, the Subcontract Price or Schedule of Work shall be adjusted by Subcontract Change Order for any increase in the time or cost of performance of this Agreement caused by such suspension, delay, or interruption.

Neither the Subcontract Price nor the Schedule of Work shall be adjusted under this Section for any suspension, delay or interruption to the extent that performance would have been so suspended, delayed or interrupted by the fault or negligence of the Design/Build Subcontractor or by a cause for which the Design/Build Subcontractor would have been responsible.

11.5    WRONGFUL EXERCISE.  If Gray wrongfully exercises any option under this Section 11, Gray shall be liable to the Design/Build Subcontractor solely for the reasonable value of work performed by the Design/Build Subcontractor prior to Gray's wrongful action, including reasonable overhead and profit, less prior payments made.  Design/Build Subcontractor shall not be entitled to recover any other incidental or consequential damages, including but not limited to profits attributable to unperformed Work.

11.6    REMEDIES CUMULATIVE.  All the rights and remedies of Gray in the event of a default by Design/Build Subcontractor under this Agreement shall be cumulative to the greatest extent permitted by law and shall be in addition to all other rights and remedies available to Gray at or in equity.

## SECTION 12

### SUSPENSION OR TERMINATION BY OWNER

12.1    SUSPENSION BY OWNER.  Should the Owner suspend Gray's contract or any part of Gray's contract which includes the Design/Build Subcontractor's Work, Gray shall so notify the Design/Build Subcontractor in writing and, upon receipt of said notice, the Design/Build Subcontractor shall immediately suspend the Work.

12.2    TERMINATION BY OWNER.  If the Owner, for any reason, terminates Gray's contract or any part that includes the Design/Build Subcontractor's Work, Gray shall so notify the Design/Build Subcontractor in writing and upon receipt of said notice, this Agreement shall also be terminated and the Design/Build Subcontractor shall immediately stop the Work.

12.3    CLAIMS FOR OWNER SUSPENSION OR TERMINATION. In the event of such Owner suspension or termination, Gray's obligation to the Design/Build Subcontractor is limited to the extent of Gray's recovery, on the Design/Build Subcontractor's behalf, under the Contract Documents. Gray agrees to cooperate with the Design/Build Subcontractor, at the Design/Build Subcontractor's expense, in the prosecution of any Design/Build Subcontractor claim arising out of an Owner suspension and to permit the Design/Build Subcontractor to prosecute said claim, in the name of Gray, for the use and benefit of the Design/Build Subcontractor. Administrative and overhead costs, attorney's fees and other expenses incurred by Gray while assisting the Design/Build Subcontractor in the prosecution of such claim shall be deducted from any recovery paid to Design/Build Subcontractor.

12.4    STIPULATION. The provisions of this Section 12 shall not be construed to create any obligation upon Gray to pursue any claim or litigation on behalf of the Design/Build Subcontractor.

## SECTION 13

### LABOR RELATIONS AND IMMIGRATION

13.1    ICOMPLIANCE WITH IMMIGRATION REFORM AND CONTROL ACT OF 1986 ("IRCA"). Gray and Design/Build Subcontractor agree that Design/Build Subcontractor shall be obligated to comply with all requirements imposed on employers under IRCA with regard to every Design/Build Subcontractor employee ("Contract Worker") who will perform services for Design/Build Subcontractor, where such service is provided in connection with Design/Build Subcontractor's performance of this Subcontract. Design/Build Subcontractor further agrees that Design/Build Subcontractor is the "employer" as that term is defined at 8 C.F.R. Section 274a.1(g), and that Gray is not the "employer" as so defined, with regard to such Contract Workers. In furtherance of its duties as employer under IRCA, Design/Build Subcontractor agrees to do the following:

A.    Complete USCIS Form I-9 for all Contract Workers. Design/Build Subcontractor agrees that it has sole responsibility for completing Form I-9 for all Contract Workers who provide services as a part of Design/Build Subcontractor's performance of this subcontract, and that it will do so and will further update such Form to the extent required by law. Design/Build Subcontractor further warrants that all of Design/Build Subcontractor's agents and/or employees who complete Form I-9 for such Contract Workers will be knowledgeable of all Form I-9 requirements, including but not limited to, knowledge of which documents do and do not satisfy the requirements of Form I-9, and that such agents and employees will otherwise complete Form I-9, and that such agents and employees will otherwise complete Form I-9 in full compliance with IRCA.

B.    Design/Build Subcontractor's Warranty of Employment Authorization for all Contract Workers. Design/Build Subcontractor hereby warrants that no Contract Worker will provide services pursuant to this subcontract until Design/Build Subcontractor has completed Form I-9 for such Contract Worker in the manner required by IRCA. Design/Build Subcontractor further warrants that it will not permit any Contract Worker to perform services under this subcontract who Design/Build Subcontractor knows or has reason to believe is not authorized to work in the United States, regardless of whether such individual is able to produce documents which satisfy the requirements of Form I-9. Design/Build Subcontractor understands that Gray is acting in reliance on Design/Build Subcontractor's warranty as described in this subparagraph and further states that without Design/Build Subcontractor's warranty that it has taken all necessary steps to comply with IRCA and that Design/Build Subcontractor believes all Contract Workers are authorized to work in the United States.

C.    Removal of Contract Workers not Authorized for Employment in the United States. Design/Build Subcontractor agrees that if at any time after it assigns a Contract Worker to perform services under this subcontract, Design/Build Subcontractor learns or has reason to believe that any Contract Worker is not authorized to work in the United States, Design/Build Subcontractor shall immediately so inform Gray and Design/Build Subcontractor shall cease assigning work to such Contract Worker providing services under this Subcontract.

D.    Indemnification and Hold Harmless. Design/Build Subcontractor agrees that in any event any government agency determines that any Contract Worker hired by Design/Build Subcontractor to perform

---

Page 20                                                    Issue Date:                    08/01/03

                                                          Revision No.:                        3
Design-Build Subcontract Agreement                        Revision Issue Date:           05/23/06

duties under this subcontract is not authorized for employment in the United States, Design/Build Subcontractor shall indemnify and hold harmless Gray and any of Gray's agents, employees, officers, directors, trustees, or other persons acting on Gray's behalf, from any liability incurred by Gray as a result of such determination. Such indemnification shall include, by way of example but not in any way limited to, any civil or criminal fines or penalties assessed, alleged and any costs incurred in responding to or participating in any government investigation, finding, recommendation, hearing, appeal or any other proceeding, including attorneys' fees and costs.

   13.2    LABOR HARMONY.  Design/Build Subcontractor and its lower tier Design/Build Subcontractors shall not employ anyone in the Design/Build Subcontractor's Work whose employment may be objectionable to Gray or the Owner.  All labor used throughout the Work by Design/Build Subcontractor or any of its lower tier Design/Build Subcontractors shall be of a standing or affiliation that will permit the Project to be carried on harmoniously and without delay, and that will not, in any case, or under any circumstances, cause any disturbance, interference or delay to the progress of the Project.

   13.3    LABOR DISPUTES.  Design/Build Subcontractor and all persons in privity with it agree that, where its Work or any of the Work of Gray or other Design/Build Subcontractors is stopped or delayed or interfered with by strikes, slow-downs or work interruptions or the threats thereof, resulting from an act or failure to act of Design/Build Subcontractor and/or those in privity with it, or any of their employees or agents, then Gray, at its sole option, shall afford Design/Build Subcontractor twenty-four (24) hours notice wherein Design/Build Subcontractor shall take action to maintain the harmony of the Work, or make such other arrangements, satisfactory to Gray that will ensure the harmonious continuation of the Work.  Design/Build Subcontractor's failure to so comply within the allotted time shall be an event of default, for which Gray may, at its sole option, terminate this Agreement pursuant to Section 11.1.

## SECTION 14

### INDEMNIFICATION

   14.1    DESIGN/BUILD SUBCONTRACTOR'S PERFORMANCE.  To the fullest extent permitted by law, the Design/Build Subcontractor shall indemnify and hold harmless the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors and Design/Build Subcontractors and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of the Design/Build Subcontractor's Work provided that:

   (a)    any such claim, damage, loss or expense is attributable to bodily injury, personal injury, sickness, disease or death, or to damage to or destruction of tangible property including the loss of use resulting therefrom, to the extent caused or alleged to be caused by any negligent act or omission of the Design/Build Subcontractor or any person directly or indirectly employed by the Design/Build Subcontractor or anyone for whose acts the Design/Build Subcontractor may be liable (including sub-Design/Build Subcontractors and suppliers of Design/Build Subcontractor).

   (b)    litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the work or materials or processes used by Design/Build Subcontractor, or its subcontractors, subconsultants and/or suppliers.

   (c)    claims against or through Gray or liability for claims and liens for labor performed or materials used or furnished through or under Design/Build Subcontractor on the Project.

   (d)    liability or claims against or through to Gray resulting from Design/Build Subcontractor's failure to comply with applicable licensing requirements or Code requirements.

   (e)    liability imposed upon Gray directly or indirectly by Design/Build Subcontractor's failure or the failure of any of its employees to comply with law, ordinances, rules, regulations or

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |

requirements, including any Occupational Safety and Health Administration violations and any penalties, including enhancements, resulting in whole or in part by Design/Build Subcontractor's acts or omissions.

(f)     such obligation shall not be construed to negate, or abridge, or otherwise reduce any other right or obligation of indemnity under this Agreement or which would otherwise exist as to any party or person described in this Section 14.

14.2    NO LIMITATION OF LIABILITY.  In any and all claims against the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors or Design/Build Subcontractors, or any of their agents or employees, by any employee of the Design/Build Subcontractor, anyone directly or indirectly employed by the Design/Build Subcontractor or anyone for whose acts the Design/Build Subcontractor may be liable, the indemnification obligation under this Section 14 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Design/Build Subcontractor under worker's or workmen's compensation acts, disability benefit acts or other employee benefit acts.

## SECTION 15

### INSURANCE

15.1    DESIGN/BUILD SUBCONTRACTOR'S INSURANCE.  Prior to beginning the Work, the Design/Build Subcontractor shall procure for its Work, and furnish proof of, Workers' Compensation Insurance, Employer's Liability Insurance, Commercial (Comprehensive) General Liability Insurance (including contractual liability insurance covering Design/Build Subcontractor's obligations under Section 14), Comprehensive Automobile Liability Insurance, and all other insurance and extensions thereof required of Gray insofar as the requirements relate to Design/Build Subcontractor's Work. Gray shall be named as an additional insured on the Design/Build Subcontractor's Commercial (Comprehensive) General Liability policy.  Design/Build Subcontractor shall procure and maintain at all times during the course of the Work (including corrective or warranty work) the required insurance with limits of liability not less than those listed below. Policies shall be in a form satisfactory to Gray and issued by insurers licensed to do business in the state where the Project is located and who are rated no lower than A by Best Insurance Guide.

15.1.1  WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY.

(a)     Statutory coverage in each state in which  Subcontractor's employees are engaged in the performance of the Work;

(b)     Employer's Liability:
        $100,000        -       bodily injury for each accident
        $500,000        -       policy limit for bodily injury by disease
        $100,000        -       for each employee for bodily injury by disease

15.1.2  COMMERCIAL GENERAL LIABILITY.

(a)     Limits of Liability:

        $1,000,000      -       general aggregate
        $1,000,000      -       products and completed operations aggregate
        $1,000,000      -       personal and advertising injury
        $1,000,000      -       each occurrence

(b)     Coverage Details:

        Coverage shall be by Standard Commercial General Liability Occurrence Form including:

| Page 22 | Issue Date: | 08/01/03 |
|---|---|---|
|  | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

Personal and Advertising Injury, Contractual Liability, Explosion, Collapse and Underground Liability (if applicable), Broad Form Property Damage, Independent Contractors, and Products and Completed Operations.

This policy shall add Gray as an insured thereunder by proper endorsement.

15.1.3  <u>AUTOMOBILE LIABILITY</u>.

(a)     Limits of liability:  $1,000,000 per accident

(b)     Coverage details:

All owned, non-owned and hired vehicles.

15.1.4  <u>PROFESSIONAL LIABILITY</u>.

Professional Liability (Errors and Omissions) coverage with a minimum limit of $250,000 each claim and $250,000 in the aggregate, if required by Section 1.10.

15.1.5  <u>EXCESS OR UMBRELLA LIABILITY</u>. Subcontractor shall include Excess or Umbrella Liability Insurance in an amount not less than indicated in Section 1.11.

15.1.6  <u>CERTIFICATE OF INSURANCE</u>. Design/Build Subcontractor has furnished Gray with a certificate of insurance (or certified copies of its insurance policies), which Design/Build Subcontractor warrants and represents is a true and accurate representation of Design/Build Subcontractor's existing insurance coverage. This certificate shall indicate all endorsements, including Gray, and Owner if applicable, as additional insured by standard endorsements CG2010 (07/04) and CG2037 (07/04).

15.2    <u>CANCELLATION, RENEWAL OR MODIFICATION</u>. All insurance policies shall contain a provision that the coverages afforded thereunder shall not be cancelled or not renewed, nor restrictive modifications added, until at least thirty (30) days prior written notice has been given to Gray unless otherwise specifically required in the Subcontract Documents.

No progress payment will be made unless Gray has been furnished evidence of required coverages and endorsements as required by this Subcontract.

In the event the Design/Build Subcontractor fails to obtain or maintain any insurance coverage required under this Agreement, Gray may purchase such coverage and charge the expense thereof to the Design/Build Subcontractor, or terminate this Agreement.

15.3    <u>WAIVER OF RIGHTS</u>. Gray and Design/Build Subcontractor waive all rights against each other and the Owner, separate contractors, and all other Design/Build Subcontractors for loss or damage to the extent covered by Builder's Risk or other similar insurance covering improvements or materials at the Project site, except such rights as they may have to the proceeds of such insurance.

If not covered under the Builder's Risk policy of insurance or any other property or equipment insurance required by the Subcontract Documents, the Design/Build Subcontractor shall procure and maintain at the Design/Build Subcontractor's own expense property and equipment insurance for portions of the Design/Build Subcontractor's Work stored off the site or in transit, when such portions of the Design/Build Subcontractor's Work are to be included in an application for payment under Section 5.

15.4    <u>ENDORSEMENT</u>. If the policies of insurance referred to in this Article require an endorsement to provide for continued coverage where there is a waiver of subrogation, the owners of such policies will cause them to be so endorsed.

| | | |
|---|---|---|
| | Issue Date: | 08/01/03 |
| | Revision No.: | 3 |
| Design-Build Subcontract Agreement | Revision Issue Date: | 05/23/06 |

15.5    PRIMARY COVERAGE. The insurance required of Design/Build Subcontractor must be primary and non-contributory with Gray's insurance program.

## SECTION 16

## DISPUTE RESOLUTION

16.1    DISPUTE RESOLUTION. All claims, disputes and matters in question arising out of, or relating to, this Agreement or the breach thereof, except for claims which have been waived by the making or acceptance of final payment and the claims excluded or limited by Sections 6.2 and 6.6, shall be resolved by mediation, arbitration and/or litigation at Gray's sole option. The provisions for arbitration shall be specifically enforceable under the Federal Arbitration Act. The site for mediation, litigation or arbitration shall be at the Project site or Lexington, Kentucky, as selected by Gray, unless required otherwise by Gray's agreement with Owner.

16.2    DISPUTE RESOLUTION PROCEDURE. Prior to a demand for arbitration, or initiation of litigation of claims, the parties shall proceed as follows, as an express condition precedent to commencing formal claims against the other relating to or arising out of the dispute:

    (a)    The party asserting a claim shall do so in writing and within the notice period, if any, established for such claims by the Subcontract Documents. In the absence of a notice period set by the Subcontract Documents, the notice of claim shall be given as soon as practicable but in no event later than five (5) calendar days after the claimant is aware of the event from which the claim arises.

    (b)    The parties shall then attempt in good faith to negotiate a resolution of disputed claims during the next twenty (20) calendar days before pursuing any other means of dispute resolution.

    (c)    If claims remain unresolved, the parties shall endeavor to resolve disputes by proceeding at the instance of either to non-binding mediation conducted under such rules as the parties may agree to employ. The parties shall divide the cost of the mediator evenly among them.

    (d)    DISPUTES RELATING TO GRAY. Notwithstanding anything stated above, if any dispute shall arise between Gray and the Subcontractor pertaining in any manner to the construction or interpretation of this Agreement, or to the rights or obligations of the parties, or to the breach of this Agreement, which the parties are unable to settle by mutual agreement, Gray shall have the exclusive option either to have the dispute determined by a court or by arbitration in accordance with the Arbitration Rules of the Center for Public Resources. Gray, Subcontractor and Subcontractor's surety agree that all claims, disputes, and other matters in controversy between Gray and Subcontractor, arising out of or relating to the Subcontract, or the breach thereof, except as provided in the Contract Documents, shall be resolved in the appropriate forum in the County of Fayette, Kentucky. Gray shall exercise its exclusive option by commencing a court action or by commencing an arbitration proceeding. If Subcontractor first commences a court action with respect to a dispute which Gray desires to have determined by an arbitration proceeding, or if Subcontractor first commences an arbitration proceeding which Gray desires to have determined by a court, Gray shall commence the arbitration proceeding or court action desired by Gray within thirty days after receiving service of Subcontractor's complaint or arbitration demand. If, at any time, even after suit may have been filed by either party, but prior to commencement of trial, Gray becomes involved in litigation or arbitration with another party or parties involving questions of fact or law common to the dispute between Gray and Subcontractor to the extent that (a) in Subcontractor's absence, complete relief cannot be accorded among those already parties, or (b) disposition of such other action may as a practical matter, impair or impede

Gray's or Subcontractor's ability to fully prevent its incurring multiple or otherwise inconsistent obligations, Subcontractor agrees that Subcontractor may be joined by Gray in such other litigation or arbitration proceedings for complete resolution of all disputes and controversies arising under this Agreement and that upon such joinder, any pending action between Gray and Subcontractor shall be dismissed.

(e)     If Gray chooses to have the matter resolved by arbitration, then it shall proceed in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes, as modified by this Agreement. The arbitration panel shall consist of three independent and impartial persons who have experience in the construction industry or construction law. The Design/Build Subcontractor and Gray shall each appoint one member of the panel and the third member shall be appointed according to the aforementioned Rules.

16.3     AWARD. If Gray chooses to arbitrate, then the arbitration award shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof, subject to any restrictions set forth in the Federal Arbitration Act.

16.4     WORK CONTINUATION AND PAYMENT. Unless otherwise agreed in writing, the Design/Build Subcontractor shall continue on which the Work and maintain the Schedule of Work pending arbitration, and if so, Gray shall continue to make payments earned by the Design/Build Subcontractor in accordance with this Agreement.

16.5     DOCUMENT PRODUCTION AND EXCHANGE OF ARBITRATION EXHIBITS. After a demand for arbitration, and if Gray consents to arbitrate, each party shall have the right to immediate production of the records of the other party relating to the Project for inspection and copying except for those portions which are covered by an unwaived attorney-client privilege or which were prepared in anticipation of arbitration or litigation. No later than 15 days prior to the arbitration hearing, the parties shall make available to each other, for inspection and copying, the exhibits, photographs, and other documents which they intend to introduce or refer to during the arbitration.

16.6     ATTORNEY'S FEES, ARBITRATION COSTS, AND COURT COSTS.

(a)     Attorney's fees and expenses shall be awarded to the prevailing party if a claim or dispute is found to have been asserted or defended unreasonably or in bad faith.

(b)     The prevailing party in arbitration shall recover its attorney's fees and court costs incurred in any judicial proceedings necessary, including those fees necessary to obtain (i) enforcement of this arbitration clause or (ii) confirmation, enforcement, or collection of an arbitration award or court judgment.

## SECTION 17

### MISCELLANEOUS PROVISIONS

17.1     GOVERNING LAW. This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Kentucky applicable to agreements executed, delivered, and to be performed solely within the Commonwealth of Kentucky.

17.2     SEVERABILITY AND WAIVER. The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision. The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

17.3   TITLES. The titles given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any other purpose.

17.4   ATTORNEYS' FEES. The Design/Build Subcontractor shall reimburse Gray for all of Gray's attorney's fees, court costs and other expenses incurred in enforcing or declaring the Design/Build Subcontractor's obligations under this Agreement, incurred in exercising any right or remedy hereunder or under law or equity in the event of a default by the Design/Build Subcontractor, or incurred in any litigation or arbitration in which Gray, without its fault, becomes involved by reason of the existence of this Agreement.

17.5   WRITTEN NOTICES. Written notices to Gray required by this Agreement shall be addressed to 10 Quality Street, Lexington, Kentucky 40507-1450. Written notices to Design/Build Subcontractor required by this Agreement shall be sent to the address given in Section 1.1 of this Agreement. Any notice sent by mail shall be deemed to have been received the third calendar day after the date of mailing. Notice may also be delivered by hand delivery or fax, in which event notice shall be deemed effective on the date such notice is given.

17.6   ENTIRE AGREEMENT. This Agreement is solely for the benefit of the signatories hereto and represents the entire and integrated agreement between the parties hereto and supersedes all prior contemporaneous negotiations, representations, understandings or agreements, either written or oral. This Agreement shall not be modified except by a written instrument signed by the parties.

## SECTION 18

### SPECIAL PROVISIONS

18.1   BINDING EFFECT. This Agreement shall be binding upon and inure to the benefit of Gray, Design/Build Subcontractor, and their successors and assigns.

18.2   PRECEDENCE. It is understood the Work to be performed under this Agreement, including the terms and conditions thereof, is as described in Section 1 through 17 herein together with the following Scope of Work, which are intended to complement same. However, in the event of an inconsistency, these Scope of Work shall govern.

18.3   INCONSISTENCIES AND OMISSIONS. Should inconsistencies or omissions appear in the Subcontract Documents, it shall be the duty of the Design/Build Subcontractor to so notify Gray in writing within three (3) working days of the Design/Build Subcontractor's discovery thereof. Upon receipt of said notice, Gray shall instruct the Design/Build Subcontractor as to the measures to be taken and the Design/Build Subcontractor shall comply with Gray's instructions.

18.4   CROSS REFERENCE OF DOCUMENTS. Design/Build Subcontractor shall review all specifications, drawings, reports and existing conditions which affect the relationship of Design/Build Subcontractor's Work to the complete project, and be responsible for that relationship. By way of example, a roofing Design/Build Subcontractor shall be responsible for including and performing mechanical and plumbing roof penetrations, which may or may not be detailed on the roof plans and details, but may be shown on the mechanical drawings.

18.5   SUBCONTRACT DOCUMENTS. The Subcontract Documents are identified as follows and incorporated by reference:

(a)     Scope of Work – Exhibit A

(b)     Drawing List – Exhibit B

(c)     Specifications & Other Documents – Exhibit C

(d)     Other Provisions – Exhibit D

Design-Build Subcontract Agreement

Issue Date:                         08/01/03

Revision No.:                              3
Revision Issue Date:         05/23/06

(e)     Application for Payment – Exhibit E

(f)     Sub-Subcontractor/Materialmen's Waiver of Lien – Exhibit F

(g)     Subcontractor Safety Orientation Manual – Exhibit G

(h)     This Agreement

(i)     The Contract Documents identified in the contract between the Owner and Gray, including but not limited to the signed agreement between the Owner and Gray, conditions of the contract (general, supplementary, special and other conditions), drawings, specifications, addenda, change orders, other written modifications, and other documents enumerated therein;

WITNESS WHEREOF, The parties have caused this Agreement to be executed by their duly authorized

representatives, under seal, as of the day and year first above written.

**CONTRACTOR**

GRAY CONSTRUCTION, INC.

_____
Project Manager

_____
Executed By

EXECUTIVE V.P. AUTOMOTIVE MARKET
_____
Title

(Seal)
Attest:

_____
Title

**SUBCONTRACTOR**

RJ Mechanical, Inc.
_____
Company Name

_____
Signature

Russell K. Sandlin
_____
Printed Name

President
_____
Title

(Seal)

Attest:

_____
office mgr.
Title

*If applicable, complete certificate on the following page.*

Design-Build Subcontract Agreement

Issue Date:                          08/01/03

Revision No.:                        3
Revision Issue Date:                 05/23/06

**CERTIFICATE**

(Certificate DOES NOT need to be completed IF subcontractor is a Sole Proprietorship. Notary Public section must be completed by all entities.)

I, _____Russell K. Sandlin_____, certify that I am an/a

_____Officer_____ of ____RJ Mechanical, Inc._____
     (Officer/Member/Partner)             (Name of Subcontractor Entity)

and that I am authorized and empowered by valid resolutions of the ____Board of Directors_____
                                           (Partners/ Board of Directors/ Managers)

of said _____Corporation_____ to execute this Subcontract for and on its behalf.
     (Partnership/Corporation/Limited Liability Company)

This ____12th____ day of ____February____ , 20__06__

                                             Officer

State of ____Alabama_____

County of __Jefferson_____

     Subscribed, sworn to and acknowledged before me by ____Ann C. Jarvis_____

This _____12th_____ day of _____February_____ , 20__06__

                                     Notary Public

         My Commission Expires: ____10/13/08_____

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 3 |
| Revision Issue Date: | 05/23/06 |



**Gray Construction**

## EXHIBIT A
## SCOPE OF WORK
## SUBCONTRACT AGREEMENT NO.: 207005-15-100S

<u>RJ Mechanical, Inc.</u> shall provide all engineering, materials, labor, equipment and other services necessary to complete <u>Design/Build Division 15, Mechanical</u>. All work shall be performed in accordance with the documents listed in Exhibit B, C & D of this package, collectively known as the "Criteria Documents".

The Design/Build Subcontractor is responsible for complete engineering and construction of the mechanical systems for the project. All engineering and construction must strictly conform to all requirements of the criteria documents. If there is a conflict between the provisions of the criteria documents and the project as constructed, or the Design/Build Subcontractors construction documents, the provisions of the criteria documents shall govern unless amended by Change Order.

Engineering services provided under the provisions of this contract shall be in accordance with the standards of skill, care, and knowledge of the mechanical engineering profession. Furthermore, engineering shall be performed by professionals licensed to practice in the State of Alabama and shall fully comply with all applicable codes, statutes, ordinances, and regulations governing Greenville, AL.

The professional services and work shall be performed to the full satisfaction of Gray Construction and the Customer. The Design/Build subcontractor attests that all of the documents and plans comprising the criteria documents have been read and the Design/Build subcontractor is fully familiarized with all of the requirements for the full and complete performance of the work included in this contract. The Design/Build subcontractor agrees to be bound and obligated to Gray, to the extent of the work included in this contract, as fully and completely as Gray is bound and obligated to the Customer.

Furthermore, the scope of work shall be more specifically defined but shall in no way be limited to the following:

### DESIGN/ENGINEERING SCOPE

1.  The Design/Build subcontractor shall provide plans and specifications to convey the intent of the engineering. Each release of plans and specifications shall be prepared using the standards and conventions set forth by Gray. This shall include but is not limited to the following:

    *   All drawing shall be produced using AutoCAD release 2004.
    *   There will be no plotting by Gray. If, for some reason plotting is required of Gray then the design-build subcontractor will be charged by Gray for all labor and material required to provide this service.
    *   All specifications shall be produced using Microsoft Word 2000.

Page 1

Exhibit A - Design-Build Subcontract Agreement

- The format for specifications shall follow the standards established by Gray for headers, footers and margins.
- The font for specifications shall be Arial 12 point.
- For each release of documents (plans and specifications) the design-build subcontractor shall provide to Gray's design manager the following in strict accordance with the schedule defined by Gray's design manager:

  A. One complete set of full size blackline drawings.
  B. One complete set of half size blackline drawings.
  C. Electronic media of plans and specifications on CD-R or via internet/e-mail. AutoCAD drawings must be complete with all external references, including dwgs, fonts, shape files, x-refs, plotter definition files (.ctb and .pcp) etc. Electronic files for specifications shall be Microsoft Word 2000.
  D. A .pdf file of drawings and specifications. Individual files shall be combined into one file. A separate "combined" file shall be provided for drawings and specifications.

- When providing record documents the Design/Build subcontractor shall also provide, in addition to the above, a complete set of "Bound" .dwg files that are independent of x-ref files.

2.  Attend and participate in design review and coordination meetings as scheduled by Gray.

3.  Provide progress prints of the documents as requested by Gray.

4.  Submit drawings and specifications for review with the seal and original signature of the registered professional responsible for the engineering to regulatory agencies having jurisdiction over the project. Review fees pertinent to the Design/Build subcontractor's area of responsibility, are the responsibility of the Design/Build subcontractor.

5.  Maintain a complete set of documents at the project site. This set shall be used for notations of as constructed conditions, which differ from the information shown on the documents as they were issued "FOR CONSTRUCTION". These as constructed markings shall be used to generate Record Drawings.

6.  Design/Build Subcontractor is responsible for timely and complete coordination of all elements of design and engineering pertinent to this trade as well as coordination with Architectural, Civil, Structural, Process, and other Design Build Subcontractor design and engineering (i.e., Electrical and Fire Protection).

7.  Gray shall determine the sequencing and timing for the release of design documents that shall include documents prepared by the Design/Build Subcontractor. The Design/Build Subcontractor shall cooperate with Gray by providing interim releases of design documents.

Exhibit A - Design-Build Subcontract Agreement

**GENERAL REQUIREMENTS:**

Furthermore, the scope of work shall be more specifically defined but shall in no way be limited to the following:

1.  The scope of work shall include but not necessarily limited to selective demolition, disconnection and reconnection of existing utilities, rework of existing HVAC, and temporary trailer utility work.

2.  It is the Subcontractors responsibility to supply the project with enough manpower and equipment to meet the Schedule.

3.  The Subcontractor acknowledges that Criteria and Specifications have been read and understands that the guidelines set forth by these documents are used as a basis of this Subcontractor's proposal.

4.  The Subcontractor shall prepare and submit all shop drawings and material specifications required for the work. Only after review and approval, or authorization from Gray's authorized representative can work proceed.

5.  Subcontractor to conform to and enforce all items in Gray safety policy.

6.  Subcontractor is to send a representative to site meetings weekly.

7.  The Subcontractor shall provide all field layout for the execution of this scope of work. Design/builder will provide permanent benchmarks. Field verification of all existing conditions will be required.

8.  Subcontractor is responsible for the cleaning of debris and residue deposited on public roads as a result of its operations.

9.  Invoices will be due to Gray by the 25th of each month, with work projected through the end of the month. A 10% retainage will be withheld from each month's invoice.

10. The Subcontractor (and tiered subcontractors/suppliers, when applicable) shall comply with **Gray Construction project reporting procedures** in regards to Daily Reports, Safety Reports, HAZ. Com., and Safety Training Reports, QA/QC verifications, and two week look ahead schedules.

11. The Subcontractor and tiered subcontractors/suppliers shall embrace and abide by the **Gray Construction Alcohol and Drug Free Project Policy for Subcontractors**.

12. The Subcontractor and tiered subcontractor/suppliers shall comply with the **safety requirements of Gray Construction**, including 100% tie-off requirements, 100% eye protection, State, Federal, OSHA and all regulatory agencies having jurisdiction.

13. The Subcontractors and tiered subcontractor/suppliers shall be responsible for all applicable taxes, fees, insurance and permits for their scope of work.

Exhibit A - Design-Build Subcontract Agreement

14. All Subcontractors and tiered-subcontractors/suppliers shall provide the required **insurance certificates** before initiating any work on site. Gray Construction is to be listed as an additional insured on Certificate of Insurance. Builders Risk Insurance will be by others.

15. Parking will be restricted to assigned areas. Only company vehicles delivering materials or equipment will be allowed on site and only in areas where designated by the Contractor.

16. The Subcontractor (and tiered subcontractors/suppliers when applicable) shall provide and maintain competent on-site supervisors during the execution of the work as well as a sufficient number of qualified workers to properly service the project schedule.

17. Gray shall provide temporary toilets for this subcontractors use. We do not include any special provisions for union agreements. Any additionally required toilets will need to be provided by this Subcontractor.

18. The Subcontractor shall also provide the following as necessary for their scope of work:
    a. Ice and drinking water for his employees.
    b. Storage sheds and trailers, and office facilities including telephone, fax, copier, and any other support elements as required for their own use.

19. The Subcontractor shall remove all temporary facilities and restore areas to original condition before final acceptance of the work.

20. The Subcontractor shall provide a complete system in accordance with the intent of the drawings, specifications, and contract documents. It is understood that there will be no revisions to the contract amount as long as the scope of work and the intent as referenced is not altered.

21. The Subcontractor will cooperate with Grays "0" punch list initiative.

22. All material will be staged in designated areas and on sufficient dunnage to ensure the material is maintained in a clean manner, free from mud and debris prior to and after installation. No stoned staging areas will be provided, and this is the Subcontractors responsibility if required to meet schedule.

23. Clean up of work daily to dumpster, located centrally, by Gray.

24. Provide all hoisting, dunnage, tools, personnel lifts and equipment necessary to unload, stage, and install this scope of work.

Exhibit A - Design-Build Subcontract Agreement

**PRICE BREAKDOWN:**

Prices include all labor, material, taxes, insurance, payroll overhead, benefits, overhead and profit.

| Description | Unit | Quantity | Rate | Amount Including Sales Tax |
|---|---|---|---|---|
| Phase I | | | | $9,598.00 |
| Phase II | | | | TBD |
| Phase III | | | | TBD |
| TOTAL | | | | $9,598.00 |

Monthly billings submitted by the Subcontractor must be broken down and charged against the following code(s).

| COST CODE | DESCRIPTION | AMOUNT |
|---|---|---|
| 207005-15-100S | Design Build Mechanical | $9,598.00 |

Exhibit A - Design-Build Subcontract Agreement



**Gray Construction**

**EXHIBIT B**
**DRAWING LIST**
**SUBCONTRACT AGREEMENT NO.: 207005-15-100S**

| Drawing No. | Drawing Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit B - Design-Build Subcontract Agreement



**Gray Construction**

### EXHIBIT C
### SPECIFICATIONS & OTHER DOCUMENTS
### SUBCONTRACT AGREEMENT NO.: 207005-15-100S

| Document No. | Document Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit C - Design-Build Subcontract Agreement



**· Gray Construction**

EXHIBIT D
OTHER PROVISIONS
SUBCONTRACT AGREEMENT NO.: 207005-15-100S

Not applicable.

Exhibit D - Design-Build Subcontract Agreement

**Exhibit E**                          **APPLICATION FOR PAYMENT**                          **GRAY**

*REMIT TO:*
**GRAY CONSTRUCTION, INC.**
**Post Office Box 8330**
**Lexington, Kentucky  40533-8330**

| | |
|---|---|
| Date: | Gray Project: |
| Subcontractor Name: | Gray Project No.: |
| Remit To Address: | Subcontractor Project Number: |
| City, State, Zip: | Date of Subcontract: |
| Contact Person: | Application No.: |
| Phone:    Fax: | Billing Period: From:    To: |

Interim ☐        Final ☐        Retention ☐

## STATEMENT OF SUBCONTRACT

Original Subcontract Amount                          $ _____

**APPROVED** Change Order #1 Thru _____                          $ _____

Adjusted Subcontract Amount to Date                          $ _____

| **FOR GRAY USE ONLY** |
|---|
| Approved by: _____ |
| Date: _____ |
| Pay with money from Customer Billing Est. # _____ |
| Change Order Needed: _____ |
| Insurance Needed: _____ |
| Other Payment Instructions:_____ |
| _____ |

## JOB TO DATE APPLICATION CALCULATIONS

| | | Totals to Date |
|---|---|---|
| Total Value of Work Complete & Mat'l Stored (per breakdown)... | A | $ |
| Less _____ % Retainage | B | $ |
| Total to Date Less Retainage  (Line A - Line B) | C | $ |
| Less Previous Applications | D | $ |
| **Amount** of This Application  (Line C - Line D) | E | $ |

Page 1
Exhibit E – Design-Build Subcontract Agreement

Rev: 8/03

**Exhibit E**                                    VALUE OF WORK COMPLETE BREAKDOWN                                    **GRAY**

| A | B | C | D | E | F | G | H* | I |
|---|---|---|---|---|---|---|---|---|
| Cost Code(s) | Description | Original Contract Amount | Approved Change Order(s) Amount | Current Contract Amount (C+D) | Value of Work Complete | Materials Stored | Total Value of Work Cmpl & Mat'l Stored (F+G) | % Cmpl |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **TOTALS** | | | | | | | | |

\* Must include subtotals by cost code for both original contract value and change orders.

Rev: 8/03

Exhibit E – Design-Build Subcontract Agreement

**Exhibit E**      LIST OF SUB-SUBCONTRACTOR/MATERIAL SUPPLIERS PERFORMING WORK UNDER YOUR SUBCONTRACT      **GRAY**

(Attach separate list if necessary)

Listed below is each and every Sub-subcontractor and/or Material Supplier who has performed work for this Subcontractor on the aforementioned project, together with payments which have been made to each Sub-subcontractor and/or Material Supplier and the unpaid amounts claimed by each, through the billing period for this Application for Payment.

| Sub-Subcontractors and/or Material Suppliers | Address/Phone No. | Description of Work | Previous Amount Paid | Unpaid Amount Claimed | Lien Waiver Attached ☑ |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Page 3                                                                                    Rev. 8/03

Exhibit E – Design-Build Subcontract Agreement

**Exhibit E**          SUBCONTRACTOR AFFIDAVIT AND WAIVER OF LIEN - ACKNOWLEDGMENT OF PAYMENT                 **GRAY**

Subcontractor, having a Subcontract with Gray Construction, Inc. on the aforementioned project, has performed work and/or furnished materials, equipment, and/or machinery or has fabricated materials especially for the Project, during the Billing Period described on page 1 of this Application for Payment.

Subcontractor has paid in full all bills or obligations for labor, sub-subcontract work, payroll taxes, material, (whether or not specifically fabricated for this project), equipment, and/or machinery, which are due or payable on or before the last day of the Billing Period.

The Subcontractor further certifies that it has complied with all federal, state and local tax and employment laws, including, but not limited to, Social Security, Unemployment and worker's compensation laws, applicable to its contract and work on the Project through the Billing Period.

The Subcontractor hereby waives and releases all rights to liens and claims against the Owner, Gray, and any surety for the performance of his contract from inception through the Billing Period of this Application for Payment, except for (a) retention which is unpaid to date and (b) work which has been performed which is not the subject of an approved change order and which has been described in an attached document. The Subcontractor further states that no other person has any right to a lien or claim against the Owner on account of work performed or for material, equipment, and/or machinery, or for material especially fabricated for the Project, furnished to the Subcontractor through the Billing Period of this Application for Payment.

This waiver and release is given with the understanding that Gray Construction, Inc. and others will rely upon it, and to induce Gray to make payments to the ontractor. The waiver and release will become effective immediately upon the receipt of the amount shown in Line E of "Job to Date Application Calculations".

If this amount is a final payment request, there are attached hereto final waivers and releases for liens from all sub-subcontractors and material suppliers.

The Subcontractor hereby certifies that the foregoing Application for Payment is true and accurate and properly describes the work performed and materials, equipment, machinery or materials furnished or fabricated especially for the Project during the period covered and the payments to which the undersigned is entitled under the contract and applicable change orders as a result.

State of: _____    County of: _____

Subscribed and sworn before me this _____ day of _____, _____ by

_____, the _____ of

_____, a _____ corporation (or partnership or sole
proprietorship), on behalf of the Subcontractor.

_____ Notary Public    My commission expires: _____

Subcontractor
_____

Signature/Title
_____

Printed Name
_____

Page 4                                                                                    Rev: 8/03

Exhibit E – Design-Build Subcontract Agreement

**EXHIBIT F**
## SUB-SUBCONTRACTOR OR MATERIAL SUPPLIER
## WAIVER OF MECHANICS AND/OR MATERIALMEN'S LIEN

Project Name: _____ Location: _____
(hereinafter THE PROJECT)

Subcontractor to Gray: _____
(hereinafter SUBCONTRACTOR)

Sub-Subcontractor or Supplier
to above listed Subcontractor: _____
(hereinafter SUB-SUBCONTRACTOR/SUPPLIER)

       WHEREAS, GRAY CONSTRUCTION, INC. is the General Contractor (hereinafter GRAY) for the construction of a facility for THE PROJECT referenced above, and,

       WHEREAS, the undersigned has furnished and received payment for materials and/or labor in the amount of $_____ to the SUBCONTRACTOR for incorporation into said project.

       NOW, THEREFORE, as an inducement to GRAY to make certain progress payments to SUBCONTRACTOR, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT prior to the _____ day of _____, 20 _____.

| | **Final Waiver of Lien:** By initialing in this space the undersigned represents that it has furnished and received FULL AND FINAL payment for materials and/or labor from the SUBCONTRACTOR which was incorporated into said project. THEREFORE, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT. |
|---|---|

 

_____
(Name of sub-subcontractor/material supplier)

_____
(Address)

_____
(Phone)

_____
(Signature)

State of: _____
County of: _____

Subscribed and sworn to before me this _____ day of _____, 20 _____ by
_____, the _____ of _____,
a ___ corporation ___ partnership ___ sole proprietorship, on behalf of the said entity.

_____ Notary Public My commission expires: _____

     Rev. 8/03

Exhibit F – Design-Build Subcontract Agreement

# SUBCONTRACT AGREEMENT

## BETWEEN

## GRAY CONSTRUCTION, INC.

### AND

### South State Contractors, Inc.



**PROJECT NAME:**            **Hwashin Storm Damage**
**SUBCONTRACT NUMBER:**      **207005-07-700**

**SUBCONTRACT AGREEMENT**

**Gray Construction, Inc.**

**TABLE OF CONTENTS**

| SECTION | PAGE |
|---|---|
| 1. AGREEMENT | 1 |
| 2. SCOPE OF WORK | 3 |
| 3. SCHEDULE OF WORK AND COMPLETION | 4 |
| 4. SUBCONTRACT PRICE | 5 |
| 5. PAYMENT | 5 |
| 6. CHANGES, CLAIMS AND DELAYS | 9 |
| 7. GRAY'S AUTHORIZED REPRESENTATIVES | 11 |
| 8. SUBCONTRACTOR'S OBLIGATIONS | 11 |
| 9. SUBCONTRACT BONDS | 15 |
| 10. WARRANTY AND CORRECTION OF WORK | 16 |
| 11. RECOURSE BY GRAY | 17 |
| 12. SUSPENSION OR TERMINATION BY OWNER | 18 |
| 13. LABOR RELATIONS | 19 |
| 14. INDEMNIFICATION | 20 |
| 15. INSURANCE | 21 |
| 16. DISPUTE RESOLUTIONS | 22 |
| 17. MISCELLANEOUS PROVISIONS | 24 |
| 18. SPECIAL PROVISIONS | 25 |
| 19. SIGNATURE PAGE | 26 |

## SUBCONTRACT AGREEMENT

Gray Construction, Inc. # **207005-07-700**

## SECTION 1

### AGREEMENT

This is the Subcontract Agreement (hereinafter "Agreement") made 10/17/06 by and between GRAY CONSTRUCTION, INC., 10 Quality Street, Lexington, Kentucky 40507-1450 (hereinafter referred to as "Gray"), and the Subcontractor named below (hereinafter referred to as the "Subcontractor") to perform part of the work on the following project.

1.1    SUBCONTRACTOR _____ **South State Contractors, Inc.** _____

Mailing Address:                          Remit to Address:
**4780 Bristow Road**                      **4780 Bristow Road**
**Bowling Green, KY  42103**               **Bowling Green, KY  42103**

Telephone #    **270-781-7700**             **270-781-7700**
Fax #          **270-782-5419**             **270-782-5419**

Subcontractor   **X** is ___ is not   a Corporation:    FEIN#  **61-1010054**

1.2    AUTHORIZED REPRESENTATIVES
    a.    For Gray (see section 7)
        On site:   **Daniel Phillips**
        Off site:  **David Hird**
    b.    For Subcontractor (see section 8.8)
        On site:   **TBD**
        Off site:  **John Harrell**

1.3    PROJECT
    **Hwashin Storm Damage**
    **Greenville, Alabama**

1.4    OWNER
    **Hwashin America Corporation**
    **Gyeongbuk, Korea**

1.5    COMPLETION OF SUBCONTRACTOR'S WORK (see section 3.2)
    a.    Date of Substantial Completion:    **TBD**
    b.    Date of Final Completion:          **TBD**

1.6    SUBCONTRACT PRICE (see        **$9,858.00**
    section 4)
    _____ **Nine thousand eight hundred fifty-eight and 00/100**    Dollars

1.7    RETAINAGE (see section          **10**  %
    5.2.2)

1.8    PROGRESS PAYMENT APPLICATION DATE
    _____ **25th**  day of each calendar month  (see section 5.2.3)

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 4 |
| Revision Issue Date: | | 05/23/06 |

1.9     PERFORMANCE BOND & LABOR & MATERIAL PAYMENT BOND
_____     Are     **x**     Are Not     required  (see section 9.1)

1.10    PROFESSIONAL LIABILITY INSURANCE (Errors and Omissions)
_____     Is     **x**     Is Not     required  (see section 15.1.4)

1.11    REQUIREMENTS FOR EXCESS OR UMBRELLA LIABILITY INSURANCE
__**$1,000,000**__  Occurrence and Aggregate  (see section 15.1.5)

1.12    BUILDER'S RISK INSURANCE
If Gray Construction, Inc. is furnishing the builder's risk insurance under the terms of the
contract between Gray and the Owner, the subcontractor will be added as an additional
named insured to the policy.  This policy will cover the insurable interest the subcontractor
has in the project up to the limit of coverage.  This insurance does not cover personal
tools and equipment.  The subcontractor shall be responsible for payment of any
deductible, or its equivalent, resulting from a claim that is due to the fault or negligence of
the subcontractor, whether in whole or in part, and  whether or not the Builder's Risk is
being provided by Gray or the Owner.

1.13    UTILIZATION OF SMALL BUSINESS CONCERNS
Subcontractor is certified/recognized as one of the following: __ Small Business  ____
Small Disadvantaged Business  ____ Woman-Owned Small Business  ___ HUBZone
Small Business  _x_ Veteran-Owned Small Business  ___ Service Disabled Veteran-
Owned Small Business  __ None of the Above

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 4 |
| Revision Issue Date: | | 05/23/06 |

## SECTION 2

### SCOPE OF WORK

2.1   SUBCONTRACTOR'S WORK.  Gray contracts with the Subcontractor as an independent contractor to perform the work described in the Scope of Work attached as Exhibit A in strict accordance with the Subcontract Documents.  The Subcontractor shall perform such work (the "Work") under the general direction of Gray and in accordance with this Agreement and the Subcontract Documents.  The Subcontractor shall perform each activity necessary or incidental to complete the work, which is described more particularly, but not exclusively, in Exhibit A.  The provisions of this Agreement and Exhibit A are intended to complement each other, but if there is any inconsistency, Exhibit A shall govern.

2.2   SUBCONTRACT DOCUMENTS.  In addition to this Agreement, the documents which form this Subcontract and which are binding on the Subcontractor (collectively the "Subcontract Documents") include the Contract Documents identified in the Contract between Gray and the Owner, which are incorporated by reference, and the Subcontract Documents set forth in Section 18.5.  In case of an inconsistency between this Agreement and the Contract Documents, this Agreement shall govern.

2.2.1   DRAWINGS, PLANS AND SPECIFICATIONS.  Gray has furnished Subcontractor with one set of Criteria Documents, and if available, Drawings, Plans and Specifications included in the Subcontract Documents.  Additional copies will be furnished, on request, at the Subcontractor's expense.  Subcontractor shall furnish the design for its portion of the work so as to coordinate with the Work as a whole, and with other trade Subcontractors.  To the extent that the Subcontractor fails to properly interpret the Criteria Documents or the Preliminary Design Documents,  Subcontractor shall be responsible to correct all errors at its own expense.

2.2.2   COPIES OF P.O.'S AND SUB-SUBS FOR MAJOR SCOPE ITEMS.  Upon receipt of written approval of material and/or equipment shop drawings or brochures by the Owner or Architect, Subcontractor shall immediately furnish the following additional information to Gray for each item of equipment, fixture or material:

    .1      Contact or representative of both manufacturer and supplier

    .2      Subcontractor's Purchase Order Numbers

    .3      Manufacturer's Order Number

    .4      Supplier's Order Number

    .5      Scheduled delivery date.

2.2.3   Subcontractor's superintendent, foreman, or other designated individual shall deliver a report, in form and content specified by Gray to Gray's office before the end of each shift, whenever Subcontractor has employees working at the Project site.  The report will state the number of employees Subcontractor has on the Project that shift, subdividing into categories (foremen, tradesmen, laborers, etc.).  Subcontractor shall also list the equipment on site, and any material deliveries.

2.3   EXAMINATION OF CONTRACT AND SUBCONTRACT DOCUMENTS; SITE INSPECTION.  The Subcontractor warrants and represents that it has visited the site of the proposed Work, has familiarized itself with existing conditions and the character of the operations to be carried on under this Agreement and that it fully understands the facilities, difficulties and restrictions attending the execution of the Work.  The Subcontractor acknowledges that it has examined all Subcontract Documents, and the requirements of the various governmental agencies, departments and bureaus having jurisdiction over the Project, and from its own investigation has satisfied itself as to the nature and location of the Work, the general local conditions, and all

matters which in any way affect the Subcontractor's Work or its performance thereof. The Subcontractor further acknowledges that having made said visitation and examination, it is not aware of any existing conditions, circumstances, or requirements that will necessitate change in the scope of the Work, the Subcontract Price, or the Schedule of Work.

2.4    OWNERSHIP AND USE OF DOCUMENTS. The drawings, specifications and other documents furnished by the Subcontractor are instruments of services and shall become the property of Gray and the Owner upon payment by the Owner and Gray. The Subcontractor shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright, to the extent not modified herein. Reproducible copies, including diskettes, may be retained by the Owner and Gray, whether the Project for which they were made is executed or not, and both are entitled to make and retain copies and reproduce them for their own use. Submission or distribution of documents to meet official regulatory requirements or for other purposes in connection with the Project is not to be construed as publication in derogation of the Subcontractor's common law copyrights or other reserved rights.

## SECTION 3

### SCHEDULE OF WORK AND COMPLETION

3.1    TIME IS OF THE ESSENCE. Time is of the essence for both parties, and they mutually agree to see to the performance of their respective work and the work of their Subcontractors so that the entire project may be completed in accordance with the Subcontract Documents and the Schedule of Work. Gray shall revise such Schedule and sequence of events as the Work progresses. No extension of time for Subcontractor's Work will be valid without Gray's written consent.

3.2    DUTY TO BE BOUND. The Subcontractor shall be bound by the Schedule of Work including, without limitation, the dates for Substantial Completion and Final Completion stated in Section 1.5 and revisions to the Schedule. The Subcontractor shall provide Gray with any requested scheduling information for the Subcontractor's Work. The Schedule of Work and all subsequent changes thereto shall be submitted to the Subcontractor in advance of the required performance.

3.3    SCHEDULE CHANGES. Subcontractor acknowledges that as construction progresses it may be necessary for Gray to change the sequential order and duration of the various activities, including those contemplated by this Agreement, to account for unanticipated delays, occurrences and other factors which act to alter Gray's original schedule. Gray may require Subcontractor, at no additional cost to Gray and Owner, to prosecute Subcontractor's Work in such sequence as the progress of other subcontractors and the Project schedule dictates. It is expressly understood and agreed that the scheduling and sequencing of the Work is an exclusive right of Gray and that Gray reserves the right to reschedule and resequence Subcontractor's Work from time to time as the demands of the Project require without any additional cost or expense to be paid to the Subcontractor.

Subcontractor shall carry on its Work promptly, efficiently, and at a speed that will not cause delay in the progress of Gray's Work or Work of other Subcontractors. If, in the opinion of Gray, Subcontractor falls behind in the progress of the Work, Subcontractor may be directed to take such steps as deemed necessary to improve the rate of progress. These steps may include, without limitation, requiring Subcontractor to increase the number of shifts, personnel overtime operations, days of Work, equipment, plant, or other remedies. Subcontractor shall submit to Gray for Gray's approval a schedule demonstrating how the required rate of progress will be regained without additional costs to the Owner or Gray.

3.4    PRIORITY OF WORK. Gray shall have the right to decide on the time, order and priority in which the various portions of Work shall be performed and all other matters relative to the timely and orderly conduct of the Subcontractor's Work. The Work will be performed as required by the composite construction schedule, which may be changed periodically by the project superintendent in order to maintain the overall schedule of Work.

· 3.5    COOPERATION.· The Subcontractor shall cooperate with Gray by scheduling and performing Subcontractor's work so as to avoid conflict, delay in, or interference with the work of Gray, other Subcontractors or Owner's own forces.  Subcontractor shall participate, as requested by Gray, in inspections related to Substantial and Final Completion.

3.6    COMMENCEMENT OF WORK.  The Subcontractor shall commence Work within three (3) calendar days from Gray's notice to proceed.  If interrupted for any reason, the Subcontractor shall resume the work within three (3) working days from Gray's notice to do so.

## SECTION 4

### SUBCONTRACT PRICE

Gray agrees to pay the Subcontractor for the satisfactory performance of the Subcontractor's Work the sum of identified in Section 1.6 (the "Subcontract Price") in accordance with Section 5, subject to additions or deductions as provided in Section 6.

Unit prices, if any, are stated in Subcontractor's Scope of Work, Exhibit A.

## SECTION 5

### PAYMENT

5.1    GENERAL PROVISIONS.

5.1.1    SCHEDULE OF VALUES.  The Subcontractor has provided Gray with a schedule of values which shall be revised, if necessary for approval by Gray and the Owner, no later than the date of the Subcontractor's first application for payment.

5.1.2    PAYMENT USE RESTRICTION.  No payment received by the Subcontractor shall be used to satisfy or secure any indebtedness other than one owed by the Subcontractor for labor or materials furnished in performing the Subcontractor's Work on this Project.

5.1.3    PAYMENT USE VERIFICATION.  Gray shall have the right at all times to contact the Subcontractor's lower tier Subcontractors and suppliers to ensure that the same are being paid by the Subcontractor for labor or materials furnished for use in performing the Subcontractor's Work on this Project.

5.1.4    CONDITIONS PRECEDENT TO PARTIAL PAYMENT.  Progress payments due under this Agreement will not be released until all of the following conditions have been met:

.1    Subcontract Agreement has been signed, returned and approved.

.2    Insurance Certificates satisfying the requirements of this Agreement have been received.

.3    A schedule of values has been received in the form and content specified by Gray.

.4    Certified payrolls, if required by Owner, received in the appropriate format.

.5    Waivers of lien from all tier subcontractors and materialmen evidencing payments through the previous month.

.6    If requested by Gray, Subcontractor agrees to likewise provide Gray with evidence satisfactory to Gray showing payment by Subcontractor of any and all contributions made

by Subcontractor for health and welfare payments as shown on the certified payroll, as well as payment of payroll taxes and other contributions that may be required by law.

5.1.5    PARTIAL LIEN WAIVERS AND AFFIDAVITS.  As a prerequisite for payment, the Subcontractor shall provide, in a form satisfactory to the Owner and Gray, partial lien or claim waivers and affidavits from the Subcontractor, and its sub- Subcontractors and suppliers for the completed Subcontractor's Work.  Such waivers may be made conditional upon payment of a specific amount stated therein.  The Subcontractor's Authorized Representative(s) designated in Section 1.2(b) of this Agreement are hereby designated as authorized agents of Subcontractor to execute all lien waivers required of Subcontractor.

5.1.6    SUBCONTRACTOR PAYMENT FAILURE.  In the event Gray has reason to believe that labor, material or other obligations incurred in the performance of the Subcontractor's Work are not being paid for, Gray shall give written notice of such claim or lien to the Subcontractor to insure that any progress payment shall be utilized to pay such obligations.

If upon receipt of said notice, the Subcontractor does not:

(a)    Supply evidence to the satisfaction of Gray that the monies owing to the claimant have been paid; or

(b)    Post a bond in a form and with surety satisfactory to Gray indemnifying the Owner, Gray, Gray's surety, if any, and the premises from such claim or lien;

then Gray shall have the right to exercise any or all of the following rights, until the claim or lien has been satisfied by the Subcontractor:

(1)    Retain out of any payments due or to become due to the Subcontractor for this Project or any other Gray project a reasonable amount to protect Gray from any and all loss, damage or expense including attorney's fees arising out of or relating to any such claim or lien

(2)    issue joint checks in payment of any payments due or to become due to the Subcontractor, payable to the Subcontractor and the claimant;

(3)    make direct payments of sums due the Subcontractor to the claimant.

(4)    may (but has no obligation to) bond off the lien, and backcharge all costs, attorneys' fees and other expenses involved in bonding off the lien of the Claimant.

5.1.7    PAYMENT NOT ACCEPTANCE.  Payment to the Subcontractor is specifically agreed not to constitute or imply acceptance by Gray or the Owner of any portion of the Subcontractor's Work.

5.2    PROGRESS PAYMENTS.

5.2.1    APPLICATION.  For Work performed during a payment period, the Subcontractor shall apply for a progress payment using Gray's standard Application For Payment and Lien Waiver form, a copy of which is attached as Exhibit E.  Applications shall be submitted to Gray at P.O. Box 8330, Lexington, Kentucky 40533-8330.  The application shall be for work performed up to and including the last day of the pay period, indicating work completed and, to the extent allowed under Section 5.2.4, materials suitably stored and protected during the payment period.  Applications shall be accompanied by lien waivers from all sub- Subcontractors and suppliers whose labor or materials are covered by the application; such waivers shall be in the form of attached Exhibit E.

5.2.2    RETAINAGE.  Regardless of any agreements between the Owner and Gray, or arrangements made by them, for the withholding or release of Gray's retainage, retainage shall be withheld by Gray from all progress payments made to Subcontractor.  The amount of retainage withheld from each payment shall be equal to the amount of payment earned, multiplied by the percentage identified in Section 1.7 of this Agreement.  Retainage shall be released to Subcontractor only upon completion of all requirements for final payment as provided in Section 5.3 of this Agreement.

5.2.3    TIME OF APPLICATION.  "Pay period" as used herein is defined as beginning with the first day of each calendar month, and ending with the last day of each calendar month.  The Subcontractor shall submit progress payment applications to Gray no later than the day of each payment period specified in Section 1.8 of this Agreement.

5.2.4    STORED MATERIALS.  Unless otherwise provided in the Subcontract Documents, and if approved in advance by the Owner, applications for payment may include materials and equipment not incorporated in the Subcontractor's Work but delivered and suitably stored and protected at the site or at some other location agreed upon in writing.  Approval of payment application for such stored items on or off the site shall be conditioned upon submission by the Subcontractor of bills of sale and applicable insurance or such other procedures satisfactory to the Owner and Gray to establish the Owner's title to such materials and equipment or otherwise protect the Owner's and Gray's interest therein, including transportation to the site.

5.2.5    TIME OF PAYMENT.  Receipt of payment by Gray from Owner for Subcontractor's work is a condition precedent to all progress payments by Gray to Subcontractor.  Progress payments to the Subcontractor for satisfactory performance of the Subcontractor's Work shall be made seven (7) days after receipt by Gray of payment from the Owner for such Subcontractor's Work.

5.2.6    GROUNDS FOR WITHHOLDING PAYMENT.  Gray may withhold from monthly progress payments an amount sufficient to protect Gray because:

.1      Defective work has not been remedied; materials have not been furnished; clean up has not been performed;

.2      Subcontractor has damaged any portion of the work of others;

.3      Claims, levies, attachments, stop notices or court orders have been filed or reasonable evidence indicates the probable filing of such claims, levies, attachments, notices or orders, including claims covered by insurance until such claims are accepted by the insurance carrier;

.4      Subcontractor has failed to make payments properly to its subcontractors or for labor, including fringe benefits, materials or equipment, transportation or shipping costs, taxes, fees or any other claims arising out of the Subcontractor's Work;

.5      There exists reasonable doubt that Subcontractor's Work can be completed for the unpaid balance of the Subcontract Price;

.6      There exists reasonable doubt that Subcontractor's Work, due to its own action or inaction, will be completed on schedule or in accordance with the schedule;

.7      Subcontractor is not satisfactorily prosecuting the Work of this Agreement;

.8      Subcontractor has failed to deliver insurance certificates, bonds, "as-built" or record drawings, written guarantees or warranties or the approvals required of the Subcontractor's Work by any authority having jurisdiction;

.9      A petition for bankruptcy or reorganization has been filed by or against Subcontractor or Subcontractor has made an assignment without the prior written consent of Contractor;

.10     Any other material breach of this Agreement by Subcontractor which has not been cured after notice from Gray.

Amounts then due shall be paid or credited to Subcontractor when Subcontractor removes the above grounds for withholding payment.

## 5.3    FINAL PAYMENT.

5.3.1    APPLICATION.  Upon acceptance of the Subcontractor's Work by the Owner, and Gray, and upon the Subcontractor furnishing evidence of fulfillment of Subcontractor's obligations in accordance with the Subcontract Documents and Section 5.3.2, Gray shall, without delay, forward the Subcontractor's application for final payment to the Owner.

5.3.2    REQUIREMENTS.  Before Gray shall be required to forward the Subcontractor's application for final payment to the Owner, the Subcontractor shall submit to Gray:

(a)    an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Subcontractor's Work for which the Owner or his property or Gray or Gray's surety might in any way be liable, have been paid or otherwise satisfied;

(b)    consent of surety, if any, to final payment;

(c)    satisfaction of required closeout procedures;

(d)    other data if required by Gray or Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be designated by Gray or Owner; and

(e)    written warranties of Subcontractor's materials, labor and equipment furnished under this Agreement and the Subcontract Documents.

(f)    a complete and accurate set of Record Drawings, together with Final Design drawings, appropriately stamped and originally signed by the design professional in responsible charge of the Work, and licensed in the state in which the Project was constructed.

Final payment shall constitute a waiver and release of all claims by the Subcontractor relating to the Subcontractor's Work, but shall in no way relieve the Subcontractor of liability for the obligations assumed under Section 10 hereof, or for faulty or defective work appearing after final payment.

5.3.3    TIME OF PAYMENT.  Final payment of the balance due of the contract price shall be made to the Subcontractor:

(a)    upon receipt of the Owner's waiver of all claims related to the Subcontractor's Work except for unsettled liens, unknown defective work, and noncompliance with the Subcontract Documents or warranties; and

(b)    seven (7) days after receipt by Gray of final payment from the Owner for such Subcontractor's Work, such receipt being a condition precedent for final payment to the Subcontractor.

## 5.4    NON-PAYMENT BY OWNER.

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 4 |
| Revision Issue Date: | | 05/23/06 |

5.4.1    ASSUMPTION OF RISK; CONDITION PRECEDENT. The Subcontractor agrees that Gray shall have no obligation to pay the Subcontractor for any work done on this Project until Gray has been paid by the Owner. The provisions of Sections 5.2 and 5.3 stating the time and amount of progress and final payments are subject to the condition that Gray shall receive from the Owner progress or final payments in at least the amounts payable to the Subcontractor on account of work done by the Subcontractor on this Project. The time when such payments shall be due the Subcontractor shall be postponed until Gray has received same from the Owner. The Subcontractor expressly agrees to accept the risk that it will not be paid for work performed by him in the event that Gray, for whatever reason, is not paid by the Owner for such work. The Subcontractor acknowledges that it relies for payment on the credit and ability to pay of the Owner, and not of Gray. The Subcontractor agrees that payment by the Owner to Gray for work performed by the Subcontractor shall be a condition precedent to any payment obligation of Gray to the Subcontractor. The Subcontractor agrees that the liability of the surety on Gray's payment bond, if any, is subject to the same conditions precedent as are applicable to Gray's liability to the Subcontractor.

5.4.2    REMEDY. If the Owner or its designated agent does not authorize payment or Gray does not receive a payment due hereunder for any cause which is not the fault of the Subcontractor, Gray shall promptly inform the Subcontractor in writing. Gray may also diligently pursue, with the assistance of the Subcontractor, the release by the Owner of the payment due for the Subcontractor's Work. At the Subcontractor's request, Gray may institute all reasonable legal remedies to mitigate the damages and pursue full payment of the Subcontractor's application for payment including interest thereon. In that event, the cost for pursuing the Subcontractor's remedies shall be Subcontractor's responsibility. Gray, at its discretion, may require that the Subcontractor make financial arrangements satisfactory to Gray before undertaking this effort and at all times during the progress thereof.

## SECTION 6

### CHANGES, CLAIMS AND DELAYS

6.1    CHANGES. Without nullifying this Agreement, Gray may by written Subcontract Work Authorization or Subcontract Change Order make changes in the Work within the general scope of this Agreement and the Subcontractor shall perform such changes. Adjustments in the Subcontract Price or Schedule of Work, if any, resulting from such changes shall be set forth in a Subcontract Change Order. . A Subcontract Change Order is a written instrument prepared by Gray and signed by the Subcontractor stating their agreement upon the change in the scope of the Work, adjustment in the Subcontract Price or Schedule of Work. A Subcontract Work Authorization is a written instrument prepared by Gray directing a change in the Work and stating a proposed adjustment, if any, in the Subcontract Price or Schedule of Work or both. A Subcontract Work Authorization shall be used in the absence of agreement on the terms of a Subcontract Change Order.

No such adjustment shall be made for any such changes performed by Subcontractor that have not been so ordered by Gray, and approved by the Owner. If Subcontractor proceeds with additional work without the required Change Order or Work Authorization, Subcontractor does so at its own risk, and must track all actual costs incurred, including but not limited to signed time sheets, additional supervision, actual material invoices and actual equipment costs, if any. If the additional work performed without the requisite Change Order or Work Authorization from Gray results in the necessity of an extension of time, the time extension may be granted by Gray only on proof that the work affected was on the critical path. In no event shall compensation be forthcoming from Gray unless these requirements are met, as well as the requisite notice set forth in Sections 6.2 and 6.3 below.

6.2    CLAIMS RELATING TO OWNER. The Subcontractor agrees to make all claims for which the Owner is or may be liable in the manner provided in the Contract Documents for like claims by Gray upon the Owner.

Written notice of such claims shall be given by the Subcontractor to Gray within sufficient time for Gray to make such claims against the Owner in accordance with the Contract Documents or within five (5) calendar days

---

prior to the beginning of the Subcontractor's Work or the event for which such claim is to be made, whichever shall first occur, otherwise such claims shall be deemed waived.

6.3    CLAIMS RELATING TO GRAY. The Subcontractor shall give Gray written notice of all claims not included in Section 6.2 within five (5) calendar days of the beginning of the event for which claim is made; otherwise, such claims shall be deemed waived.

All unresolved claims, disputes and other matters in question between Gray and the Subcontractor not relating to claims included in Section 6.2 shall be resolved in the manner provided in Section 16 herein.

6.4    ADJUSTMENT IN SUBCONTRACT PRICE. If a Subcontract Change Order or Subcontract Work Authorization requires an adjustment in the Subcontract Price, the adjustment shall be established by one of the following methods:

(a)    mutual agreement on a lump sum with sufficient substantiating data to permit evaluation;

(b)    unit prices already established in the Subcontract Documents or if not established by the Subcontract Documents, then established by mutual agreement for this adjustment; or

(c)    to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee.

6.5    SUBSTANTIATION OF ADJUSTMENT. If the Subcontractor does not respond promptly or disputes the method of adjustment under Section 6.4, the method and the adjustment shall be determined by Gray on the basis of reasonable costs and savings of those performing the Work attributable to the change, including, in the case of an increase in the Subcontract Price, an allowance for overhead and profit proportionate to Gray's recovery of overhead and profit, if any, under the Contract Documents.

The Subcontractor shall maintain for Gray's review and approval an appropriately itemized and substantiated accounting of the following items attributable to the Subcontract Change Order or Subcontract Work Authorization:

(a)    labor costs, including Social Security, health, welfare, retirement and other fringe benefits as normally required, and state workers' compensation insurance;

(b)    costs of materials supplies and equipment, whether incorporated in the Work or consumed, including transportation costs;

(c)    costs of renting, either from Gray or from others, of machinery and equipment other than hand tools;

(d)    costs of bond and insurance premiums, permit fees and taxes attributable to the change; and

(e)    costs of additional supervision and field office personnel services necessitated by the change.

6.6    DELAY. If the progress of the Subcontractor's Work is substantially delayed without the fault or responsibility of the Subcontractor, then the time for the Subcontractor's Work shall be extended by Change Order to the extent obtained by Gray under the Subcontract Documents and the Schedule of Work shall be revised accordingly.

Gray shall not be liable to the Subcontractor for any damages or additional compensation as a consequence of delays caused by any person not a party to this Agreement unless Gray has first recovered the same on behalf of the Subcontractor from said person, and then to the extent of such recovery after payment of

all attorney's fees and other expenses relating thereto, it being understood and agreed by the Subcontractor that apart from recovery from said person, the Subcontractor's sole and exclusive remedy for delay regardless of cause shall be an extension in time for performance of the Subcontractor's Work.

In jurisdictions where the second paragraph herein is not enforceable, the Subcontractor agrees that it may only seek delay damages to the extent documented by actual costs and entitlement demonstrated, and the Subcontractor shall not be entitled to seek from Gray damages for actual or alleged loss of efficiency, constructive acceleration, lost productivity, stacking of trades, home office overhead, expectant underrun, season change, extended overhead, impact damages, profit upon damages for delay or similar damages calculated by formula or trade data or studies.

6.7    LIQUIDATED DAMAGES.  If the Contract Documents between the Owner and Gray permit the Owner to assess Gray for liquidated or other damages for delay beyond the completion date set forth in the Contract Documents, and such damages are so assessed, then Gray shall be entitled to assess same against the Subcontractor in proportion to the Subcontractor's share of the responsibility for such delay.

## SECTION 7

### GRAY'S AUTHORIZED REPRESENTATIVES

Gray has designated one or more persons in Section 1.2(a) of this Agreement who shall be Gray's authorized on-site and off-site representative(s).  Such authorized representative(s) shall be the only person(s) the Subcontractor shall look to for instructions, orders and/or directions, except in an emergency.

## SECTION 8

### SUBCONTRACTOR'S OBLIGATIONS

8.1    OBLIGATIONS DERIVATIVE.  The Subcontractor shall be bound to Gray by the terms of this Agreement and by the conditions of the Contract Documents between the Owner and Gray, and shall assume toward Gray all the obligations and responsibilities which Gray, by those documents, assumes toward the Owner.

8.2    RESPONSIBILITIES.  The Subcontractor shall provide timely design services in accordance with all applicable codes, laws and regulations of the locality, and shall work with the local and state regulatory agencies with respect to building permits and other permits relating to the Subcontractor's Work, and shall furnish and pay for all of the labor, supervision, materials, tools, equipment, services, and incidentals necessary for the proper performance of the Subcontractor's Work.

The Subcontract shall provide a list of proposed sub-subcontractors, and suppliers, be responsible for taking field dimensions, providing tests, order of materials and all other actions as required to meet the Schedule of Work.

8.3    WORKMANSHIP.  Every part of the Subcontractor's Work shall be executed in strict accordance with the Subcontract Documents in the most sound, workmanlike, and substantial manner.  All workmanship shall be the best of its kind performed by others engaged in the same trade.  All materials used in the Subcontractor's Work shall be furnished in ample quantities to facilitate the proper and expeditious execution of the Work, and shall be new except such materials as may be expressly provided in the Subcontract Documents to be otherwise

8.4    TEMPORARY SERVICES.  The Subcontractor shall furnish all temporary services and facilities necessary to perform its work, including, but not limited to, heat, electrical (power), telephone, water, and other utilities necessary.

8.5    COORDINATION.  The Subcontractor shall:

| | | |
|---|---|---|
| Page 11 | Issue Date: | 08/01/03 |
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

(a)    cooperate with Gray and all others whose work is dependent upon the progress of the Subcontractor's Work'

(b)    specifically note and immediately advise Gray of any interference with the Subcontractor's Work;

(c)    participate in the preparation of coordination drawings and work schedules in areas of congestion.

8.6    SHOP DRAWINGS AND SUBMITTALS. The Subcontractor shall submit shop drawings, product data, samples, and any other submittals required by the Subcontract Documents expeditiously and in such manner and sequence so as to avoid delay in the progress of the Work or the activities of Gray or other Subcontractors. The Subcontractor shall be responsible for accuracy and conformity with the Subcontract Documents and other submittals. Unless specifically noted by Gray, action on shop drawings and submittals by Gray shall not be deemed to authorize deviation from the Subcontract Documents.

8.7    PROGRESS REPORTS AND MEETINGS. The Subcontractor shall furnish periodic progress reports on the Work including information on the status of materials and equipment which may be in the course of preparation or manufacture.

8.8    AUTHORIZED REPRESENTATIVE AND NOTICE. The Subcontractor shall designate one or more persons who shall be the authorized Subcontractor's representative(s): (a) on-site and (b) off-site. Such authorized representative(s) shall be the only person(s) to whom Gray shall issue instructions, orders or directions, except in an emergency. Notices as required by this Agreement and other communications made to any one of the Subcontractor's Authorized Representative(s) shall be binding as if given to the Subcontractor. The authorized representative shall attend project meetings as required.

8.9    PROVISION FOR INSPECTION. The Subcontractor shall notify Gray when portions of the Subcontractor's Work are ready for inspection. The Subcontractor shall at all times furnish Gray, the Owner, and their representatives adequate means and facilities for inspecting the Work, including materials at the site or any place where materials under this Agreement may be in the course of preparation, process, manufacture or treatment.

8.10    CLEAN-UP. The Subcontractor shall follow Gray's clean-up directives and those of the Subcontract Documents, and

(a)    at all times keep the building and premises free from debris and unsafe conditions resulting from the Subcontractor's Work; and

(b)    broom clean each work area daily prior to discontinuing work in the same.

Should Subcontractor fail, after 24 hours notice from Gray, to appropriately clean an area as required by this Section, Gray shall assess the Subcontractor for the actual daily clean-up cost or a daily charge of $150.00, whichever is greater, for each day such condition is not remedied.

8.11    SAFETY PRECAUTIONS AND PROCEDURES.

8.11.1    The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by Gray and, in addition, comply with occupational safety and other applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons or property and in accordance with the requirements of the Subcontract Documents. The Subcontractor shall report to Gray within 24 hours any personal injury or property damage occurring at the site.

8.11.2    Subcontractor shall comply with Gray's Safety Requirements.

8.11.3  ALCOHOL AND DRUG FREE PROJECT.  The Subcontractor recognizes that an alcohol and drug free Project is necessary to ensure the safety of the persons employed at the Project site by the Owner, Gray, the  Subcontractor and others, and to protect the health and safety of the community.  The Subcontractor agrees that its employees shall not distribute, be under the influence of, or be in possession of, any form of alcohol or unlawful drug while at the Project site or while in the performance of Project-related activities.   Subcontractor's employees shall also be prohibited from using or being subject to the effects of any lawful drug while at the Project site or in the performance of Project-related activities without approval of the employee's supervisor.  The  Subcontractor acknowledges that it is familiar with Gray's Alcohol and Drug Free Project Policy for  Subcontractors.  The  Subcontractor represents that it has established written procedures for compliance with Gray's policy and agrees that it will implement and enforce the policy throughout the course of the Project.  The  Subcontractor shall indemnify and hold the Owner and Gray harmless from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or related to  Subcontractor's implementation, application or enforcement of compliance procedures.

8.12   ENVIRONMENTAL MATTERS.

8.12.1  If a Hazardous Chemicals of a type of which an employer is required by law to notify its employees will be used on the Project site by the Subcontractor, the Subcontractor's sub-subcontractors or anyone directly or indirectly employed by them, the Subcontractor shall, prior to the Hazardous Chemical being at the site, provide a current copy of the Material Safety Data Sheet (MSDS) for such Hazardous Chemical in sufficient time to permit compliance with such laws by Gray, other subcontractors and other employers on the site.

8.12.2  The Subcontractor shall be responsible for the prompt removal of any Hazardous Chemicals and Hazardous Substances which are brought to Project site in connection with the Work but are not used or consumed and all waste generated from the Work.  The removal of any Hazardous Chemical, Hazardous Substance, or waste shall be done in accordance with all federal, state and local laws, regulations and ordinances

8.12.3  The Work shall be conducted in such a manner to avoid the discharge, dispersal, escape, release or saturation of any pollutant into the atmosphere or any body of water or on, onto, upon, in or into the surface or subsurface of land unless allowed by federal, state or local law, regulations, ordinance or permit.

8.12.4   In the event the Subcontractor encounters on the site material reasonably believed to be asbestos, polychlorinated biphenyl ("PCB"), or other Hazardous Substances which have not been rendered harmless, the Subcontractor shall immediately stop Work in the area affected and report the condition to Gray in writing.  The Work in the affected area shall resume in the absence of asbestos, PCB, or other Hazardous Substances, or when it has been rendered harmless, or by being reduced to a safe level or concentration, by written agreement of Gray and Subcontractor, or by arbitration as provided in this Agreement.  The Subcontractor shall not be required pursuant to Article 5 to perform without consent any Work relating to asbestos, PCB, or other Hazardous Substances.

8.12.5   To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless Gray, other subcontractors, and their respective agents and employees, from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Work in the affected area if in fact the material is asbestos, PCB, or other Hazardous Chemical or Hazardous Substance and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to damage to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by failure to comply with Sections 8.12.1 or 8.12.2 or by negligent acts or omissions of the Subcontractor, anyone directly or indirectly employed by it, or anyone for whose acts it may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.  Such obligation shall not be construed to

negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 8.12.3.

8.12.6    For purposes of this Agreement, (a) the term "Hazardous Chemical" means any chemical defined as hazardous in the Hazardous Communication Standard, 29 C.F.R. § 1926.59 or 29 C.F.R. § 1910.1200, promulgated pursuant to the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; (b) the term "Hazardous Substances" means any substance, including solid, liquid or gaseous material, which is listed or defined as a "hazardous substance" in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S. § 9601, et seq., or regulations promulgated pursuant thereto, but does include petroleum, including crude oil or any fraction thereof; oil and oil waste as those terms are defined in the Clean Water Act, 33 U.S.C. § 1251, et seq., or regulations promulgated pursuant thereto; and source, special nuclear, or by-product material as defined by the Atomic Energy Act of 1954, 42 U.S.C. § 3011, et seq., or regulations promulgated pursuant thereto; and includes any other substance defined by federal, state or local statute, regulation or ordinance as a hazardous, toxic or dangerous waste or substance where "state" means the State in which the Work is being performed and "local" means the local jurisdiction (i.e., county, parish, city, borough, municipality, village, town, etc.) in which the Work is being performed; and (c) "pollutant" shall mean any solid, liquid, gaseous, or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and shall include any Hazardous Substance.

8.13    PROTECTION OF THE WORK AND PROPERTY.  The Subcontractor shall take all necessary precautions to properly protect the Subcontractor's Work and the work of others from damage caused by the Subcontractor's operations.  Should the Subcontractor cause damage to the Work or property of the Owner, Gray or others, the Subcontractor shall promptly remedy such damage to the satisfaction of Gray, or Gray may so remedy and deduct the cost thereof from any amounts due or to become due the Subcontractor.

8.14    COMPLIANCE WITH LAWS.  The Subcontractor shall, at all times and at its own cost, comply with all federal, state and local statutes, codes, rules, regulations, ordinances, executive orders and other laws relating to the Project and the Work.  The Subcontractor warrants and represents that it is authorized to transact business in the state and local jurisdictions where the Project is located, that it holds any and all licenses necessary to perform the Work, and that it is not currently in violation of any statutes, codes, rules, regulations, ordinances, orders, or other laws on any projects in which Subcontractor is presently engaged.

8.15    PERMITS, FEES AND LICENSES.  The Subcontractor shall give adequate notices to authorities pertaining to the Subcontractor's Work and secure and pay for all permits, fees, licenses, assessments, inspections and taxes necessary for performance, completion or use of the Subcontractor's Work.

To the extent paid to Gray under the Contract with the Owner, the Subcontractor shall be compensated for additional costs resulting from laws, ordinances, rules, regulations and taxes enacted after the date of the Agreement.

8.16    TAXES, WAGES, FRINGE BENEFITS, ASSESSMENTS.  The Subcontractor shall timely comply with all requirements applicable to payment of taxes, wages, fringe benefits, retirement benefits, unemployment compensation and other assessments, and shall upon request furnish Gray and the Owner with satisfactory proof of compliance.

8.17    LAYOUT RESPONSIBILITY AND LEVELS.  Gray shall establish principal axis lines of the building and site whereupon the Subcontractor shall lay out and be strictly responsible for the accuracy of the Subcontractor's Work and for any loss or damage to Gray or others by reason of the Subcontractor's failure to set out or perform its work correctly.  The Subcontractor shall exercise prudence so that actual final conditions and details shall result in perfect alignment of finish surfaces.

8.18    MATERIALS FURNISHED BY OTHERS.  In the event the scope of the Subcontractor's Work includes installation of materials or equipment furnished by others, it shall be the responsibility of the Subcontractor to examine the items so provided and thereupon handle, store and install the items with such skill

and care as to ensure satisfactory and proper installation. Loss or damage due to acts of the Subcontractor shall be deducted from any amounts due or to become due the Subcontractor.

8.19    SUBSTITUTIONS. No substitutions shall be made in the Subcontractor's Work unless permitted in the Subcontract Documents and only then upon the Subcontractor first receiving all approvals required under the Subcontract Documents for substitutions. The Subcontractor shall indemnify Gray for any increased costs incurred by Gray as a result of such substitutions, whether or not the Subcontractor has obtained approval thereof.

8.20    USE OF GRAY'S EQUIPMENT. The Subcontractor, its agents, employees, Subcontractors or suppliers shall not use Gray's equipment without the express written permission of Gray's authorized representative.

If the Subcontractor or any of its agents, employees, suppliers or lower tier Subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items owned, leased, or under the control of Gray, the Subcontractor shall be liable to Gray as provided in Section 14 for any loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be found to have been due solely and exclusively to the negligence of Gray's employees operating such equipment.

8.21    ASSIGNMENT AND SUBCONTRACTING. The Subcontractor shall not assign this Agreement, nor its proceeds, nor subcontract the whole or any part of the Subcontractor's Work, without the prior written approval of Gray.

8.22    NON-CONTRACTED SERVICES. The Subcontractor agrees that no claim for non-contracted construction services rendered or materials furnished shall be valid unless the Subcontractor provides Gray notice:

  (a) prior to furnishing of the services or materials, except in an emergency affecting the safety of persons or property;

  (b) in writing of such claim within three (3) days of first furnishing such services or materials; and

  (c) the written charge for such services or materials to Gray no later than the fifteenth day (15th) of the calendar month following that in which the claim originated.

8.23    COORDINATION. Subcontractor is responsible for coordinating its work areas and schedule with other trades in order to perform the overall project as a team.

8.24    NORMAL WORK WEEK. Unless otherwise directed in writing by Gray, the Subcontractor's Work shall be performed during a five (5) day work week extending from Monday through Friday. If the Subcontractor's work becomes behind schedule, the Subcontractor shall work overtime during the normal work week and be at no cost to Gray if Gray is not at fault for the Subcontractor being behind schedule.

## SECTION 9

### SUBCONTRACT BONDS

9.1    PERFORMANCE AND LABOR AND MATERIAL PAYMENT BONDS. Unless otherwise provided at Section 1.9 of this Agreement, the Subcontractor shall provide separate Performance and Labor and Material Payment Bonds, in a form and with surety, satisfactory to Gray in the full amount of this Subcontract. The premiums for these Bonds shall be paid by the Subcontractor and the cost thereof is included in the Subcontract Price.

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 4 |
| Revision Issue Date: | | 05/23/06 |

9.2     ASSURANCE OF PERFORMANCE. If Performance and Payment Bonds are not required of the Subcontractor under Section 9.1, then throughout the duration of this Agreement, Gray may require such bonds or a letter of credit and the Subcontractor shall provide same. Said Bonds shall be in the full amount of this Agreement in a form and by a surety satisfactory to Gray. The Subcontractor shall be compensated for the cost of same pursuant to progress payments made hereunder after the Subcontractor furnishes the required bonds or letter of credit. The reimbursement amount for the bonds or letter of credit shall not exceed the manual rate for such instruments. In the event the Subcontractor shall fail to promptly provide such requested bonds or letter of credit, Gray may terminate this Agreement and re-let the work to another Subcontractor and all Gray costs and expenses incurred thereby shall be paid by the Subcontractor.

## SECTION 10

### WARRANTY AND CORRECTION OF WORK

10.1     WARRANTY.

10.1.1  The Subcontractor warrants to the Owner and Gray that materials and equipment furnished under this Subcontract will be of good quality and new unless otherwise required or permitted by the Subcontract Documents, that the Work will be performed in a good, workmanlike manner, be free from defects in materials and workmanship, and that the Work will conform with the requirements of the Subcontract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective in the sole judgment of Gray. This warranty shall be in addition to and not in limitation of any other warranty or remedy provided by law or by the Subcontract Documents. The warranty shall extend for the period agreed to by Gray in the contract between Gray and the Owner.

10.1.2  The Subcontractor further agrees to execute any additional guarantees or warranties specified in the Subcontract Documents.

10.2     CORRECTION OF WORK.

10.2.1  The Subcontractor shall promptly correct Work rejected by Gray or failing to conform to the requirements of the Subcontract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed.

10.2.2  The Subcontractor shall be obligated to correct work that is found not to be in accordance with the Subcontract Documents after substantial completion to the same extent that Gray is bound to the Owner for correction of said Work. The Subcontractor shall begin the corrective work immediately after receipt of written notice from Gray to do so. This obligation shall survive acceptance of the Work and termination of the Subcontract. This obligation is in addition to, and not in limitation of, the warranty obligations under Section 10.1, it being the intent of this Agreement that warranty obligations are not restricted by Subcontractor's obligations to correct defective work.

If the Owner chooses to correct the Work without notice to Gray and opportunity for cure, the Subcontractor shall be obligated to Gray for any backcharge that the Owner has assessed Gray resulting from the Subcontractor's Work.

10.3     SATISFACTION OF WARRANTY AND CORRECTIVE WORK OBLIGATIONS. The Subcontractor agrees to satisfy warranty and corrective work obligations without cost to the Owner or Gray. In the event of Subcontractor's failure to satisfy these obligations, all costs for design, labor, supervision, materials, travel (including meals, lodging and mileage), equipment and overhead (at 18% of costs) incurred by Gray in the investigation, review, redesign and correction of such problem shall be paid to Gray by Subcontractor. Design and service team costs shall be computed using Gray's standard hourly rates. A verbal request for corrective action by Gray to the Subcontractor, together with a written confirmation of the action requested, will be provided. If corrective action is not initiated or completed within a time reasonable under all the circumstances, Gray will

---

Issue Date:                          08/01/03

Revision No.:                              4
Revision Issue Date:        05/23/06

itself commence investigation and implement corrective measures at the Subcontractor's expense. Gray's rights hereunder are in addition to all other rights and remedies pursuant to the Subcontract, and the institution of such measures by Gray shall in no way relieve Subcontractor of its primary responsibility for performing and warranting the Work in accord with the Subcontract Documents.

## SECTION 11

### RECOURSE BY GRAY

11.1    DEFAULT; NOTICE TO CURE.  If the Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or fails to achieve Substantial or Final Completion, or it fails to make prompt payment for its workers, sub- Subcontractors or suppliers, disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or fails to indemnify Gray as required by this Agreement or by law, or otherwise is guilty of a breach of any provision of this Agreement, and fails within three (3) working days after receipt of written notice to commence and continue satisfactory correction of such default with diligence and promptness, then Gray, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:

(a)    supply such number of workers and quantity of materials, equipment and other facilities as Gray deems necessary for the completion of the Subcontractor's Work, or any part thereof which the Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Subcontractor, who shall be liable for the payment of such costs, including reasonable overhead, profit, as well as for other damages, and attorney's fees and dispute resolution costs;

(b)    contract with one or more additional contractors to perform such part of the Subcontractor's Work as Gray shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Subcontractor;

(c)    withhold payment of any monies due the Subcontractor pending corrective action or completion of the Subcontractor's Work to the extent required by and to the satisfaction of Gray;

(d)    set-off Gray's damages attributable to Subcontractor's default against any monies due Subcontractor under this Agreement or under any other contract between Gray and the Subcontractor; and

(e)    terminate the Subcontract Agreement as set forth below.

In the event of an emergency affecting the safety of persons or property, Gray may proceed as above without notice.

11.2    TERMINATION BY GRAY.  If the Subcontractor fails to commence and satisfactorily continue correction of a default within three (3) working days after receipt by the Subcontractor of the notice issued under Section 11.1, then Gray may terminate this Agreement by written notice to the Subcontractor and its surety, if any, and use any materials, equipment and/or employ such workers or Subcontractors as Gray deems necessary to complete the Work.

All of the costs incurred by Gray in so performing the Subcontractor's Work, including reasonable overhead, profit and attorney's fees shall be deducted from any monies due or to become due the Subcontractor. The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the subcontract price.

11.3    BANKRUPTCY.

| Page 17 | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

11.3.1  <u>TERMINATION ABSENT CURE</u>. If Subcontractor files a petition under the Bankruptcy Code, this Agreement shall terminate if the Subcontractor or the Subcontractor's trustee (a) rejects the Agreement, or (b) if there has been a default, the Subcontractor is unable to give adequate assurance that the Subcontractor will perform as required by this Agreement, or (c) is otherwise unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

11.3.2  <u>INTERIM REMEDIES</u>. If the Subcontractor is not performing in accordance with the Schedule of Work at the time a petition in bankruptcy is filed, or at any subsequent time, Gray, while awaiting the decision of the Subcontractor or its trustee to reject or to assume this Agreement and provide adequate assurance of its ability to perform hereunder, may take such steps as are reasonably necessary to maintain the Schedule of Work. Gray may offset against any sums due or to become due the Subcontractor all costs incurred in pursuing any of the remedies provided hereunder, including, but not limited to, reasonable overhead, profit and attorneys' fees. The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Price.

11.4  <u>SUSPENSION BY GRAY</u>. Gray may order the Subcontractor in writing to suspend, delay, or interrupt all or any part of the Subcontractor's Work for such period of time as may be determined to be appropriate for the convenience of G ray. Phased or interrupted Work when required shall not be deemed a suspension of Work.

The Subcontractor shall notify Gray in writing within five (5) calendar days after receipt of Gray's order of the effect of such order upon the Subcontractor's Work. To the extent, and only to the extent, allowed Gray under the Contract Documents, the Subcontract Price or Schedule of Work shall be adjusted by Subcontract Change Order for any increase in the time or cost of performance of this Agreement caused by such suspension, delay, or interruption.

Neither the Subcontract Price nor the Schedule of Work shall be adjusted under this Section for any suspension, delay or interruption to the extent that performance would have been so suspended, delayed or interrupted by the fault or negligence of the Subcontractor or by a cause for which the Subcontractor would have been responsible.

11.5  <u>WRONGFUL EXERCISE</u>. If Gray wrongfully exercises any option under this Section 11, Gray shall be liable to the Subcontractor solely for the reasonable value of work performed by the Subcontractor prior to Gray's wrongful action, including reasonable overhead and profit, less prior payments made. Subcontractor shall not be entitled to recover any other incidental or consequential damages, including but not limited to profits attributable to unperformed Work.

11.6  <u>REMEDIES CUMULATIVE</u>. All the rights and remedies of Gray in the event of a default by Subcontractor under this Agreement shall be cumulative to the greatest extent permitted by law and shall be in addition to all other rights and remedies available to Gray at or in equity.

## SECTION 12

### SUSPENSION OR TERMINATION BY OWNER

12.1  <u>SUSPENSION BY OWNER</u>. Should the Owner suspend Gray's contract or any part of Gray's contract which includes the Subcontractor's Work, Gray shall so notify the Subcontractor in writing and, upon receipt of said notice, the Subcontractor shall immediately suspend the Work.

12.2  <u>TERMINATION BY OWNER</u>. If the Owner, for any reason, terminates Gray's contract or any part that includes the Subcontractor's Work, Gray shall so notify the Subcontractor in writing and upon receipt of said notice, this Agreement shall also be terminated and the Subcontractor shall immediately stop the Work.

12.3    CLAIMS FOR OWNER SUSPENSION OR TERMINATION. In the event of such Owner suspension or termination, Gray's obligation to the Subcontractor is limited to the extent of Gray's recovery, on the Subcontractor's behalf, under the Contract Documents. Gray agrees to cooperate with the Subcontractor, at the Subcontractor's expense, in the prosecution of any Subcontractor claim arising out of an Owner suspension and to permit the Subcontractor to prosecute said claim, in the name of Gray, for the use and benefit of the Subcontractor. Administrative and overhead costs, attorney's fees and other expenses incurred by Gray while assisting the Subcontractor in the prosecution of such claim shall be deducted from any recovery paid to Subcontractor.

12.4    STIPULATION. The provisions of this Section 12 shall not be construed to create any obligation upon Gray to pursue any claim or litigation on behalf of the Subcontractor.

## SECTION 13

### LABOR RELATIONS AND IMMIGRATON

13.1    ICOMPLIANCE WITH IMMIGRATION REFORM AND CONTROL ACT OF 1986 ("IRCA"). Gray and Subcontractor agree that Subcontractor shall be obligated to comply with all requirements imposed on employers under IRCA with regard to every Subcontractor employee ("Contract Worker") who will perform services for Subcontractor, where such service is provided in connection with Subcontractor's performance of this Subcontract. Subcontractor further agrees that Subcontractor is the "employer" as that term is defined at 8 C.F.R. Section 274a.1(g), and that Gray is not the "employer" as so defined, with regard to such Contract Workers. In furtherance of its duties as employer under IRCA, Subcontractor agrees to do the following:

A.    Complete USCIS Form I-9 for all Contract Workers. Subcontractor agrees that it has sole responsibility for completing Form I-9 for all Contract Workers who provide services as a part of Subcontractor's performance of this subcontract, and that it will do so and will further update such Form to the extent required by law. Subcontractor further warrants that all of Subcontractor's agents and/or employees who complete Form I-9 for such Contract Workers will be knowledgeable of all Form I-9 requirements, including but not limited to, knowledge of which documents do and do not satisfy the requirements of Form I-9, and that such agents and employees will otherwise complete Form I-9, and that such agents and employees will otherwise complete Form I-9 in full compliance with IRCA.

B.    Subcontractor's Warranty of Employment Authorization for all Contract Workers. Subcontractor hereby warrants that no Contract Worker will provide services pursuant to this subcontract until Subcontractor has completed Form I-9 for such Contract Worker in the manner required by IRCA. Subcontractor further warrants that it will not permit any Contract Worker to perform services under this subcontract who Subcontractor knows or has reason to believe is not authorized to work in the United States, regardless of whether such individual is able to produce documents which satisfy the requirements of Form I-9. Subcontractor understands that Gray is acting in reliance on Subcontractor's warranty as described in this subparagraph and further states that without Subcontractor's warranty that it has taken all necessary steps to comply with IRCA and that Subcontractor believes all Contract Workers are authorized to work in the United States.

C.    Removal of Contract Workers not Authorized for Employment in the United States. Subcontractor agrees that if at any time after it assigns a Contract Worker to perform services under this subcontract, Subcontractor learns or has reason to believe that any Contract Worker is not authorized to work in the United States, Subcontractor shall immediately so inform Gray and Subcontractor shall cease assigning work to such Contract Worker providing services under this Subcontract.

D.    Indemnification and Hold Harmless. Subcontractor agrees that in any event any government agency determines that any Contract Worker hired by Subcontractor to perform duties under this subcontract is not authorized for employment in the United States, Subcontractor shall indemnify and hold harmless Gray and any of Gray's agents, employees, officers, directors, trustees, or other persons acting on Gray's behalf, from any liability incurred by Gray as a result of such determination. Such indemnification shall include, by way of example but not in any way limited to, any civil or criminal fines or penalties assessed, alleged

| Page 19 | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

and any costs incurred in responding to or participating in any government investigation, finding, recommendation, hearing, appeal or any other proceeding, including attorneys' fees and costs.

13.2    LABOR HARMONY.  Subcontractor and its lower tier Subcontractors shall not employ anyone in the Subcontractor's Work whose employment may be objectionable to Gray or the Owner.  All labor used throughout the Work by Subcontractor or any of its lower tier Subcontractors shall be of a standing or affiliation that will permit the Project to be carried on harmoniously and without delay, and that will not, in any case, or under any circumstances, cause any disturbance, interference or delay to the progress of the Project.

13.3    LABOR DISPUTES.  Subcontractor and all persons in privity with it agree that, where its Work or any of the Work of Gray or other Subcontractors is stopped or delayed or interfered with by strikes, slow-downs or work interruptions or the threats thereof, resulting from an act or failure to act of Subcontractor and/or those in privity with it, or any of their employees or agents, then Gray, at its sole option, shall afford Subcontractor twenty-four (24) hours notice wherein Subcontractor shall take action to maintain the harmony of the Work, or make such other arrangements, satisfactory to Gray that will ensure the harmonious continuation of the Work. Subcontractor's failure to so comply within the allotted time shall be an event of default, for which Gray may, at its sole option, terminate this Agreement pursuant to Section 11.1.

## SECTION 14

### INDEMNIFICATION

14.1    SUBCONTRACTOR'S PERFORMANCE.  To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors and Subcontractors and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of the Subcontractor's Work provided that:

(a)    any such claim, damage, loss or expense is attributable to bodily injury, personal injury, sickness, disease or death, or to damage to or destruction of tangible property including the loss of use resulting therefrom, to the extent caused or alleged to be caused by any negligent act or omission of the Subcontractor or any person directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable (including sub- Subcontractors and suppliers of Subcontractor).

(b)    litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the work or materials or processes used by the Subcontractor, or its subcontractors and/or suppliers

(c)    claims against or through Gray or liability for claims and liens for labor performed or materials used or furnished through or under Subcontractor on the Project.

(d)    liability or claims against or through to Gray resulting from the Subcontractor's failure to comply with applicable licensing requirements or Code requirements.

(e)    liability imposed upon Gray directly or indirectly by Subcontractor's failure or the failure of any of its employees to comply with law, ordinances, rules, regulations or requirements, including Occupational Safety and Health Administration violations and any penalties, including enhancements, resulting in whole or in part from Subcontractor's acts or omissions.

(f)    such obligations shall not be construed to negate, or abridge, or otherwise reduce any other right or obligation of indemnity under this Agreement or which would otherwise exist as to any party or person described in this Section 14.

| Issue Date: | 08/01/03 |
| --- | --- |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

14.2    NO LIMITATION OF LIABILITY.  In any and all claims against the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors or Subcontractors, or any of their agents or employees, by any employee of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, the indemnification obligation under this Section 14 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under worker's or workmen's compensation acts, disability benefit acts or other employee benefit acts.

## SECTION 15

### INSURANCE

15.1    SUBCONTRACTOR'S INSURANCE.  Prior to beginning the Work, the Subcontractor shall procure for its Work, and furnish proof of, Workers' Compensation Insurance, Employer's Liability Insurance, Commercial (Comprehensive) General Liability Insurance (including contractual liability insurance covering Subcontractor's obligations under Section 14), Comprehensive Automobile Liability Insurance, and all other insurance and extensions thereof required of Gray insofar as the requirements relate to Subcontractor's Work. Gray shall be named as an additional insured on the Subcontractor's Commercial (Comprehensive) General Liability policy.  Subcontractor shall procure and maintain at all times during the course of the Work (including corrective or warranty work) the required insurance with limits of liability not less than those listed below. Policies shall be in a form satisfactory to Gray and issued by insurers licensed to do business in the state where the Project is located and who are rated no lower than A by Best Insurance Guide.

15.1.1   WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY.

(a)     Statutory coverage in each state in which  Subcontractor's employees are engaged in the performance of the Work;

(b)     Employer's Liability:
$100,000     -    bodily injury for each accident
$500,000     -    policy limit for bodily injury by disease
$100,000     -    for each employee for bodily injury by disease.

15.1.2   COMMERCIAL GENERAL LIABILITY.

(a)     Limits of Liability:

$1,000,000     -    general aggregate
$1,000,000     -    products and completed operations aggregate
$1,000,000     -    personal and advertising injury
$1,000,000     -    each occurrence

(b)     Coverage Details:

Coverage shall be by Standard Commercial General Liability Occurrence Form including:

Personal and Advertising Injury, Contractual Liability, Explosion, Collapse and Underground Liability (if applicable), Broad Form Property Damage, Independent Contractors, and Products and Completed Operations.

This policy shall add Gray as an insured thereunder by proper endorsement.

15.1.3   AUTOMOBILE LIABILITY

Issue Date:                08/01/03

Revision No.:                      4
Revision Issue Date:      05/23/06

(a)    Limits of liability:  $1,000,000 per accident

(b)    Coverage details:

All owned, non-owned and hired vehicles.

15.1.4  PROFESSIONAL LIABILITY.  Professional Liability (Errors and Omissions) coverage with a minimum limit of $250,000 each claim and $250,000 in the aggregate, if required by Section 1.10.

15.1.5  <u>EXCESS OR UMBRELLA LIABILITY</u>. Subcontractor shall include Excess or Umbrella Liability Insurance in an amount not less than indicated in Section 1.11.

15.1.6  <u>CERTIFICATE OF INSURANCE</u>.  Subcontractor shall furnish Gray with a certificate of insurance (or certified copies of its insurance policies), which Subcontractor warrants and represents is a true and accurate representation of Subcontractor's existing insurance coverage. This certificate shall indicate all endorsements, including Gray, and Owner if applicable, as additional insured by standard endorsements CG2010 (07/04) and CG2037 (07/04).

15.2    <u>CANCELLATION, RENEWAL OR MODIFICATION</u>.  All insurance policies shall contain a provision that the coverages afforded thereunder shall not be cancelled or not renewed, nor restrictive modifications added, until at least thirty (30) days prior written notice has been given to Gray unless otherwise specifically required in the Subcontract Documents.

No progress payment will be made unless Gray has been furnished evidence of required coverages and endorsements as required by this Subcontract.

In the event the Subcontractor fails to obtain or maintain any insurance coverage required under this Agreement, Gray may purchase such coverage and charge the expense thereof to the Subcontractor, or terminate this Agreement.

15.3    <u>WAIVER OF RIGHTS</u>.  Gray and Subcontractor waive all rights against each other and the Owner, separate contractors, and all other Subcontractors for loss or damage to the extent covered by Builder's Risk or other similar insurance covering improvements or materials at the Project site, except such rights as they may have to the proceeds of such insurance.

If not covered under the Builder's Risk policy of insurance or any other property or equipment insurance required by the Subcontract Documents, the Subcontractor shall procure and maintain at the Subcontractor's own expense property and equipment insurance for portions of the Subcontractor's Work stored off the site or in transit, when such portions of the Subcontractor's Work are to be included in an application for payment under Section 5.

15.4    <u>ENDORSEMENT</u>.  If the policies of insurance referred to in this Article require an endorsement to provide for continued coverage where there is a waiver of subrogation, the owners of such policies will cause them to be so endorsed.

15.5    <u>PRIMARY COVERAGE.</u>   The insurance required of Subcontractor must be primary and non-contributory with Gray's insurance program.

## SECTION 16

### DISPUTE RESOLUTION

16.1    <u>DISPUTE RESOLUTION</u>.  All claims, disputes and matters in question arising out of, or relating to, this Agreement or the breach thereof, except for claims which have been waived by the making or acceptance

of final payment and the claims excluded or limited by Sections 6.2 and 6.6, shall be resolved by mediation, arbitration and/or litigation at Gray's sole option. The provisions for arbitration shall be specifically enforceable under the Federal Arbitration Act. The site for mediation, litigation or arbitration shall be at the Project site or Lexington, Kentucky, as selected by Gray, unless required otherwise by Gray's agreement with Owner.

16.2    DISPUTE RESOLUTION PROCEDURE. Prior to a demand for arbitration, or initiation of litigation of claims, the parties shall proceed as follows, as an express condition precedent to commencing formal claims against the other relating to or arising out of the dispute:

(a)    The party asserting a claim shall do so in writing and within the notice period, if any, established for such claims by the Subcontract Documents. In the absence of a notice period set by the Subcontract Documents, the notice of claim shall be given as soon as practicable but in no event later than five (5) calendar days after the claimant is aware of the event from which the claim arises.

(b)    The parties shall then attempt in good faith to negotiate a resolution of disputed claims during the next twenty (20) calendar days before pursuing any other means of dispute resolution.

(c)    If claims remain unresolved, the parties shall endeavor to resolve disputes by proceeding at the instance of either to non-binding mediation conducted under such rules as the parties may agree to employ. The parties shall divide the cost of the mediator evenly among them.

(d)    DISPUTES RELATING TO GRAY. Notwithstanding anything stated above, if any dispute shall arise between Gray and the Subcontractor pertaining in any manner to the construction or interpretation of this Agreement, or to the rights or obligations of the parties, or to the breach of this Agreement, which the parties are unable to settle by mutual agreement, Gray shall have the exclusive option either to have the dispute determined by a court or by arbitration in accordance with the Arbitration Rules of the Center for Public Resources. Gray, Subcontractor and Subcontractor's surety agree that all claims, disputes, and other matters in controversy between Gray and Subcontractor, arising out of or relating to the Subcontract, or the breach thereof, except as provided in the Contract Documents, shall be resolved in the appropriate forum in the County of Fayette, Kentucky. Gray shall exercise its exclusive option by commencing a court action or by commencing an arbitration proceeding. If Subcontractor first commences a court action with respect to a dispute which Gray desires to have determined by an arbitration proceeding, or if Subcontractor first commences an arbitration proceeding which Gray desires to have determined by a court, Gray shall commence the arbitration proceeding or court action desired by Gray within thirty days after receiving service of Subcontractor's complaint or arbitration demand. If, at any time, even after suit may have been filed by either party, but prior to commencement of trial, Gray becomes involved in litigation or arbitration with another party or parties involving questions of fact or law common to the dispute between Gray and Subcontractor to the extent that (a) in Subcontractor's absence, complete relief cannot be accorded among those already parties, or (b) disposition of such other action may as a practical matter, impair or impede Gray's or Subcontractor's ability to fully prevent its incurring multiple or otherwise inconsistent obligations, Subcontractor agrees that Subcontractor may be joined by Gray in such other litigation or arbitration proceedings for complete resolution of all disputes and controversies arising under this Agreement and that upon such joinder, any pending action between Gray and Subcontractor shall be dismissed.

(e)    If Gray chooses to have the matter resolved by arbitration, then it shall proceed in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes, as modified by this Agreement. The arbitration panel shall consist

of three independent and impartial persons who have experience in the construction industry or construction law. The Subcontractor and Gray shall each appoint one member of the panel and the third member shall be appointed according to the aforementioned Rules.

(f)    If Gray chooses to arbitrate, then the arbitration award shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof, subject to any restrictions set forth in the Federal Arbitration Act

16.3    WORK CONTINUATION AND PAYMENT. Unless otherwise agreed in writing, the Subcontractor shall continue on which the Work and maintain the Schedule of Work pending arbitration, and if so, Gray shall continue to make payments earned by the Subcontractor in accordance with this Agreement.

16.4    DOCUMENT PRODUCTION AND EXCHANGE OF ARBITRATION EXHIBITS. If Gray consents to arbitrate, each party shall have the right to immediate production of the records of the other party relating to the Project for inspection and copying except for those portions which are covered by an unwaived attorney-client privilege or which were prepared in anticipation of arbitration or litigation. No later than 15 days prior to the arbitration hearing, the parties shall make available to each other, for inspection and copying, the exhibits, photographs, and other documents which they intend to introduce or refer to during the arbitration.

16.5    ATTORNEY'S FEES, ARBITRATION COSTS, AND/OR COURT COSTS.

(a)    Attorney's fees and expenses shall be awarded to the prevailing party if a claim or dispute is found to have been asserted or defended unreasonably or in bad faith.

(b)    The prevailing party in arbitration or court proceeding shall recover its attorney's fees and court costs incurred in any judicial proceedings necessary, including those fees necessary to obtain (i) enforcement of this arbitration clause or (ii) confirmation, enforcement, or collection of an arbitration award or court judgment.

## SECTION 17

### MISCELLANEOUS PROVISIONS

17.1    GOVERNING LAW. This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Kentucky applicable to agreements executed, delivered, and to be performed solely within the Commonwealth of Kentucky.

17.2    SEVERABILITY AND WAIVER. The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision. The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

17.3    TITLES. The titles given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any other purpose.

17.4    ATTORNEYS' FEES. The Subcontractor shall reimburse Gray for all of Gray's attorney's fees, court costs and other expenses incurred in enforcing or declaring the Subcontractor's obligations under this Agreement, incurred in exercising any right or remedy hereunder or under law or equity in the event of a default by the Subcontractor, or incurred in any litigation or arbitration in which Gray, without its fault, becomes involved by reason of the existence of this Agreement.

| Issue Date: | 08/01/03 |
| --- | --- |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

·17.5    WRITTEN NOTICES.  Written notices to Gray required by this Agreement shall be addressed to 10 Quality Street, Lexington, Kentucky  40507-1450.  Written notices to Subcontractor required by this Agreement shall be sent to the address given in Section 1.1 of this Agreement.  Any notice sent by mail shall be deemed to have been received the third calendar day after the date of mailing.  Notice may also be delivered by hand delivery or fax, in which event notice shall be deemed effective on the date such notice is given.

17.6    ENTIRE AGREEMENT.  This Agreement is solely for the benefit of the signatories hereto and represents the entire and integrated agreement between the parties hereto and supersedes all prior contemporaneous negotiations, representations, understandings or agreements, either written or oral.  This Agreement shall not be modified except by a written instrument signed by the parties.

## SECTION 18

### SPECIAL PROVISIONS

18.1    BINDING EFFECT.  This Agreement shall be binding upon and inure to the benefit of Gray, Subcontractor, and their successors and assigns.

18.2    PRECEDENCE.  It is understood the Work to be performed under this Agreement, including the terms and conditions thereof, is as described in Section 1 through 17 herein together with the following Scope of Work, which are intended to complement same.  However, in the event of an inconsistency, these Special Provisions shall govern.

18.3    INCONSISTENCIES AND OMISSIONS.  Should inconsistencies or omissions appear in the Subcontract Documents, it shall be the duty of the Subcontractor to so notify Gray in writing within three (3) working days of the Subcontractor's discovery thereof.  Upon receipt of said notice, Gray shall instruct the Subcontractor as to the measures to be taken and the Subcontractor shall comply with Gray's instructions.

18.4    CROSS REFERENCE OF DOCUMENTS.  Subcontractor shall review all specifications, drawings, reports and existing conditions which affect the relationship of Subcontractor's Work to the complete project, and be responsible for that relationship.  By way of example, a roofing Subcontractor shall be responsible for including and performing mechanical and plumbing roof penetrations, which may or may not be detailed on the roof plans and details, but may be shown on the mechanical drawings.

18.5    SUBCONTRACT DOCUMENTS.  The Subcontract Documents are identified as follows and incorporated by reference:

      (a)    Scope of Work – Exhibit A

      (b)    Drawing List – Exhibit B

      (c)    Specifications & Other Documents – Exhibit C

      (d)    Other Provisions – Exhibit D

      (e)    Application for Payment – Exhibit E

      (f)    Sub-Subcontractors/Materialmen's Waiver of Lien – Exhibit F

      (g)    Subcontractor Safety Orientation Manual – Exhibit G

      (h)    This Agreement

      (i)    The Contract Documents identified in the contract between the Owner and Gray, including but not limited to the signed agreement between the Owner and Gray,

conditions of the contract (general, supplementary, special and other conditions), drawings, specifications, addenda, change orders, other written modifications, and other documents enumerated therein;

WITNESS WHEREOF, The parties have caused this Agreement to be executed by their duly authorized representatives, under seal, as of the day and year first above written.

**CONTRACTOR**

GRAY CONSTRUCTION, INC.

_____
Project Manager

_____
Executed By

EXECUTIVE V.P. AUTOMOTIVE MARKET
Title

(Seal)
Attest: _____

_____
Title

**SUBCONTRACTOR**

SOUTH STATE CONTRACTORS INC
Company Name

_____
Signature

O'NEIL HARRELL
Printed Name

PResidenT
Title

(Seal)

Attest: _____
Deborah K. Hunt

Secretary
Title

*If applicable, complete certificate on the following page.*

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

## CERTIFICATE

(Certificate DOES NOT need to be completed IF subcontractor is a Sole Proprietorship. Notary Public section must be completed by all entities.)

I, O'Neil Harrell , certify that I am an/a

Officer of South State Contractors, Inc.
(Officer/Member/Partner)                           (Name of Subcontractor Entity)

and that I am authorized and empowered by valid resolutions of the Board of Directors
                                                      (Partners/ Board of Directors/ Managers)

of said Corporation to execute this Subcontract for and on its behalf.
(Partnership/Corporation/Limited Liability Company)

This 13th day of November , 20 06

                                                      O'Neil Harrell
                                                      Officer

State of KY at Large

County of Warren

Subscribed, sworn to and acknowledged before me by O'Neil Harrell

This 13th day of November , 20 06

                                                      Deborah K Hunt
                                                      Notary Public

My Commission Expires: 9/6/09

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |



**Gray Construction**

## EXHIBIT A
## SCOPE OF WORK
### SUBCONTRACT AGREEMENT NO.: 207005-07-700

South State Contractors, Inc. shall provide all necessary supervision, labor, materials, tools, equipment, services, insurance, taxes, cartage and all other items necessary to complete the **siding work** for the **Hwashin Project** in **Greenville, Alabama** as described in the drawings and specifications and as outlined in the contract documents by Gray Construction.

Furthermore, the scope of work shall be more specifically defined but shall in no way be limited to the following:

1.   Provide all equipment, supervision and labor necessary for selective demolition and construction of temporary facilities.

2.   All lifts used on slabs should have diapers. If leaks are discovered, lifts will be replaced or repaired within one week.

3.   The Subcontractor shall provide all field layout for the execution of this scope of work. Permanent benchmarks will be provided by Gray. Field verification of all existing conditions will be required.

4.   Provide all hoisting, dunnage, tools, personnel lifts and equipment necessary to unload, stage, and install this scope of work.

5.   All necessary access to work areas for this scope shall be provided by this Subcontractor for this scope.

6.   The Subcontractor shall provide all field layout for the execution of this scope of work. Gray will provide permanent benchmarks. Field verification of all existing conditions will be required.

7.   The Subcontractors (and tiered subcontractors/suppliers when applicable) shall provide and maintain competent on-site supervisors during the execution of the work as well as a sufficient number of qualified workers to properly service the construction schedule.

8.   All work shall comply with all applicable local, state, federal and industry codes and standards.

9.   The Subcontractor shall provide daily clean up of all work areas. Large quantities of waste will be disposed of by the subcontractor, small amounts of waste may be deposited directly into Gray's waste removal dumpster, provided that the waste is suitable for normal disposal.

10.  Subcontractor is responsible for the cleaning of debris and residue deposited on public roads as a result of its operations.

Exhibit A - Standard Subcontract Agreement

11.  Invoices will be due to Gray by the 25th of each month, with work projected through the end of the month.  A 10% retainage will be withheld from each month's invoice.

12.  The Subcontractor and tiered subcontractors/suppliers shall embrace and abide by Gray Construction., Inc. **Alcohol and Drug Free Project Policy** for Subcontractors.

13.  The Subcontractor and tiered subcontractor/suppliers shall comply with the **safety requirements** of James N. Gray, including 100% tie-off requirements, 100% eye protection, State, Federal, OSHA and all regulatory agencies having jurisdiction.

14.  The subcontractor (and tiered subcontractor/suppliers, when applicable) shall comply with Gray Construction project reporting procedures in regards to Daily Reports, Safety Reports, HAZ Com., and Safety Training Records, QA/QC verifications, and two week look ahead schedules.

15.  The Subcontractors and tiered subcontractor/suppliers shall be responsible for all applicable taxes, fees, insurance and permits for their scope of work.

16.  All Subcontractors and tiered subcontractors/suppliers shall provide the required insurance certificates before initiating any work on site.  Gray Construction is to be listed as an additional insured on Certificate of Insurance.  Builders Risk Insurance will be by others.

17.  Parking will be restricted to assigned areas.  Only company vehicles delivering materials or equipment will be allowed on site and only in areas where designated by the Contractor.

18.  Temporary toilets for use of all workmen on the project will be provided by others.

19.  The Subcontractor shall also provide the following as necessary for their scope of work:
   - Ice and drinking water for his employees.
   - Storage sheds and trailers, and office facilities including telephone, fax, copier, and any other support elements as required for their own use.

20.  The Subcontractor shall remove all temporary facilities and restore areas to original condition before final acceptance of the work.

21.  The Subcontractor shall provide a complete system in accordance with the intent of the drawings, specifications, and contract documents.  It is understood that there will be no revisions to the contract amount as long as the scope of work and the intent as referenced is not altered.

22.  The Subcontractor will cooperate with Gray's 0 punch list initiative.

Exhibit A - Standard Subcontract Agreement

## PRICE BREAKDOWN:

Please submit quantities for the following items of work. Prices shall include all labor, material, tax, insurance, payroll overhead, benefits, overhead and profit. Gray reserves the right to reject any or all unit prices.

| Description | Amount Including Tax |
|-------------|---------------------:|
| Phase I | $9,858.00 |
| Phase II | TBD |
| Phase III | TBD |
| Total | $9,858.00 |

Monthly billings submitted by the Subcontractor must be broken down and charged against the following code(s).

| COST CODE | DESCRIPTION | AMOUNT |
|-----------|-------------|-------:|
| 207005-07-700 | Siding | $9,858.00 |

Exhibit A - Standard Subcontract Agreement



**Gray Construction**

EXHIBIT B
DRAWING LIST
SUBCONTRACT AGREEMENT NO.: 207005-07-700

| Drawing No. | Drawing Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit B - Standard Subcontract Agreement



**Gray Construction**

EXHIBIT C
SPECIFICATIONS & OTHER DOCUMENTS
SUBCONTRACT AGREEMENT NO.: 207005-07-700

| Document No. | Document Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit C – Standard Subcontract Agreement



**Gray Construction**

EXHIBIT D
OTHER PROVISIONS
SUBCONTRACT AGREEMENT NO.: 207005-07-700

Not applicable at this time.

Exhibit D – Standard Subcontract Agreement

**Exhibit E**                     **APPLICATION FOR PAYMENT**                     **GRAY**

**REMIT TO:**
**GRAY CONSTRUCTION, INC.**
**Post Office Box 8330**
**Lexington, Kentucky  40533-8330**

| | |
|---|---|
| Date: | Gray Project: |
| Subcontractor Name: | Gray Project No.: |
| Remit To Address: | Subcontractor Project Number: |
| City, State, Zip: | Date of Subcontract: |
| Contact Person: | Application No.: |
| Phone:                     Fax: | Billing Period: From:                     To: |

Interim [  ]      Final [  ]      Retention [  ]

**TEMENT OF SUBCONTRACT**

Original Subcontract Amount                     $ _____

**APPROVED** Change Order #1 Thru _____                     $ _____

Adjusted Subcontract Amount to Date                     $ _____

**JOB TO DATE APPLICATION CALCULATIONS**

| | | Totals to Date |
|---|---|---|
| Total Value of Work Complete & Mat'l Stored (per breakdown)... | A | $ |
| Less _____ % Retainage | B | $ |
| Total to Date Less Retainage  (Line A - Line B) | C | $ |
| Less Previous Applications | D | $ |
| **Amount** of This Application  (Line C - Line D) | E | $ |

**FOR GRAY USE ONLY**

Approved by: _____

Date: _____

Pay with money from Customer Billing Est. # _____

Change Order Needed: _____

Insurance Needed: _____

Other Payment Instructions: _____

_____

Page 1 Exhibit E                                         Rev. 08/03

**Exhibit E**                              VALUE OF WORK COMPLETE BREAKDOWN                              **GRAY**

| A | B | C | D | E | F | G | H* | I |
|---|---|---|---|---|---|---|---|---|
| Cost Code(s) | Description | Original Contract Amount | Approved Change Order(s) Amount | Current Contract Amount (C+D) | Value of Work Complete | Materials Stored | Total Value of Work Cmpl & Mat'l Stored (F+G) | % Cmpl |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | **TOTALS** | | | | | | | |

* Must include subtotals by cost code for both original contract value and change orders.
Page 2 Exhibit E

Rev. 08/03

**Exhibit E**    LIST OF SUB-SUBCONTRACTOR/MATERIAL SUPPLIERS PERFORMING WORK UNDER YOUR SUBCONTRACT    GRAY

(Attach separate list if necessary)

Listed below is each and every Sub-subcontractor and/or Material Supplier who has performed work for this Subcontractor on the aforementioned project, together with payments which have been made to each Sub-subcontractor and/or Material Supplier and the unpaid amounts claimed by each, through the billing period for this Application for Payment.

| Sub-Subcontractors and/or Material Suppliers | Address/Phone No. | Description of Work | Previous Amount Paid | Unpaid Amount Claimed | Lien Waiver Attached ☑ |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Page 3 Exhibit E

Rev. 08/03

**Exhibit E**         SUBCONTRACTOR AFFIDAVIT AND WAIVER OF LIEN - ACKNOWLEDGMENT OF PAYMENT         **GRAY**

Subcontractor, having a Subcontract with Gray Construction, Inc. on the aforementioned project, has performed work and/or furnished materials, equipment, and/or machinery or has fabricated materials especially for the Project, during the Billing Period described on page 1 of this Application for Payment.

Subcontractor has paid in full all bills or obligations for labor, sub-subcontract work, payroll taxes, material, (whether or not specifically fabricated for this project), equipment, and/or machinery, which are due or payable on or before the last day of the Billing Period.

The Subcontractor further certifies that it has complied with all federal, state and local tax and employment laws, including, but not limited to, Social Security, Unemployment and worker's compensation laws, applicable to its contract and work on the Project through the Billing Period.

The Subcontractor hereby waives and releases all rights to liens and claims against the Owner, Gray, and any surety for the performance of his contract from inception through the Billing Period of this Application for Payment, except for (a) retention which is unpaid to date and (b) work which has been performed which is not the subject of an approved change order and which has been described in an attached document. The Subcontractor further states that no other person has any right to a lien or claim against the Owner on account of work performed or for material, equipment, and/or machinery, or for material especially fabricated for the Project, furnished to the Subcontractor through the Billing Period of this Application for Payment.

waiver and release is given with the understanding that Gray Construction, Inc. and others will rely upon it, and to induce Gray to make payments to the Subcontractor. The waiver and release will become effective immediately upon the receipt of the amount shown in Line E of "Job to Date Application Calculations".

If this amount is a final payment request, there are attached hereto final waivers and releases for liens from all sub-subcontractors and material suppliers.

The Subcontractor hereby certifies that the foregoing Application for Payment is true and accurate and properly describes the work performed and materials, equipment, machinery or materials furnished or fabricated especially for the Project during the period covered and the payments to which the undersigned is entitled under the contract and applicable change orders as a result.

State of: _____    County of: _____

Subscribed and sworn before me this _____ day of _____, _____ by

_____, the _____ of

_____, a _____ corporation (or partnership or sole
proprietorship), on behalf of the Subcontractor.

_____ Notary Public   My commission expires: _____

_____
Subcontractor

_____
Signature/Title

_____
Printed Name

Page 4 Exhibit E                                                                                    Rev. 08/03

# EXHIBIT F
## SUB-SUBCONTRACTOR OR MATERIAL SUPPLIER
## WAIVER OF MECHANICS AND/OR MATERIALMEN'S LIEN

Project Name: _____    Location: _____
(hereinafter THE PROJECT)

Subcontractor to Gray: _____
(hereinafter SUBCONTRACTOR)

Sub-Subcontractor or Supplier
to above listed Subcontractor: _____
(hereinafter SUB-SUBCONTRACTOR/SUPPLIER)

     WHEREAS, GRAY CONSTRUCTION, INC. is the General Contractor (hereinafter GRAY) for the construction of a facility for THE PROJECT referenced above, and,

     WHEREAS, the undersigned has furnished and received payment for materials and/or labor in the amount of $_____ to the SUBCONTRACTOR for incorporation into said project.

     NOW, THEREFORE, as an inducement to GRAY to make certain progress payments to SUBCONTRACTOR, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT prior to the _____ day of _____, 20 _____.

**Final Waiver of Lien:** By initialing in this space the undersigned represents that it has furnished and received FULL AND FINAL payment for materials and/or labor from the SUBCONTRACTOR which was incorporated into said project. THEREFORE, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT.

_____
(Name of sub-subcontractor/material supplier)

_____
(Address)

_____
(Phone)

_____
(Signature)

State of: _____
County of: _____

Subscribed and sworn to before me this _____ day of _____, 20 _____ by
_____, the _____ of _____,
a ___ corporation ___ partnership ___ sole proprietorship, on behalf of the said entity.

_____ Notary Public  My commission expires: _____

Page 1                                                                                    Rev. 8/03

Exhibit F – Standard Subcontract Agreement

**SUBCONTRACT AGREEMENT**

**BETWEEN**

**GRAY CONSTRUCTION, INC.**

**AND**

**Standard Roofing of Montgomery, Inc.**



**PROJECT NAME:**     **Hwashin Storm Damage**
**SUBCONTRACT NUMBER:**     **207005-07-100**

Standard Subcontract Agreement

Issue Date:     08/01/03
Revision No.:     4
Revision Issue Date:     05/23/06

## SUBCONTRACT AGREEMENT

### Gray Construction, Inc.

### TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| 1. AGREEMENT | 1 |
| 2. SCOPE OF WORK | 3 |
| 3. SCHEDULE OF WORK AND COMPLETION | 4 |
| 4. SUBCONTRACT PRICE | 5 |
| 5. PAYMENT | 5 |
| 6. CHANGES, CLAIMS AND DELAYS | 9 |
| 7. GRAY'S AUTHORIZED REPRESENTATIVES | 11 |
| 8. SUBCONTRACTOR'S OBLIGATIONS | 11 |
| 9. SUBCONTRACT BONDS | 15 |
| 10. WARRANTY AND CORRECTION OF WORK | 16 |
| 11. RECOURSE BY GRAY | 17 |
| 12. SUSPENSION OR TERMINATION BY OWNER | 18 |
| 13. LABOR RELATIONS | 19 |
| 14. INDEMNIFICATION | 20 |
| 15. INSURANCE | 21 |
| 16. DISPUTE RESOLUTIONS | 22 |
| 17. MISCELLANEOUS PROVISIONS | 24 |
| 18. SPECIAL PROVISIONS | 25 |
| 19. SIGNATURE PAGE | 26 |

### SUBCONTRACT AGREEMENT

Gray Construction, Inc. # **207005-07-100**

## SECTION 1

### AGREEMENT

This is the Subcontract Agreement (hereinafter "Agreement") made 10/17/06 by and between GRAY CONSTRUCTION, INC., 10 Quality Street, Lexington, Kentucky 40507-1450 (hereinafter referred to as "Gray"), and the Subcontractor named below (hereinafter referred to as the "Subcontractor") to perform part of the work on the following project.

1.1  SUBCONTRACTOR **Standard Roofing of Montgomery, Inc.**

Mailing Address:
**516 N. McDonough Street**
**Montgomery, AL  36104**

Remit to Address:
**P.O. Box 1309**
**Montgomery, AL  36102**

Telephone #  **334-265-1262**
Fax #  **334-834-0239**

**334-265-1262**
**334-834-0239**

Subcontractor  **X**  is  ____ is not  a Corporation:     FEIN#  **63-0848973**

1.2  AUTHORIZED REPRESENTATIVES
a.  For Gray (see section 7)
On site:  **Daniel Phillips**
Off site:  **David Hird**
b.  For Subcontractor (see section 8.8)
On site:  **TBD**
Off site:  **Jimmy Franks / Pete Taylor**

1.3  PROJECT
**Hwashin Storm Damage**
**Greenville, Alabama**

1.4  OWNER
**Hwashin America Corporation**
**Gyeongbuk, Korea**

1.5  COMPLETION OF SUBCONTRACTOR'S WORK (see section 3.2)
a.  Date of Substantial Completion:  **TBD**
b.  Date of Final Completion:  **TBD**

1.6  SUBCONTRACT PRICE (see section 4)     **$17,778.67**
**Seventeen thousand seven hundred seventy-eight and 67/100**  Dollars

1.7  RETAINAGE (see section 5.2.2)     **10**  %

1.8  PROGRESS PAYMENT APPLICATION DATE
**25th**  day of each calendar month  (see section 5.2.3)

1.9 · PERFORMANCE BOND & LABOR & MATERIAL PAYMENT BOND
_____ Are ___x___ Are Not   required  (see section 9.1)

1.10 PROFESSIONAL LIABILITY INSURANCE (Errors and Omissions)
_____ Is ___x___ Is Not   required  (see section 15.1.4)

1.11 REQUIREMENTS FOR EXCESS OR UMBRELLA LIABILITY INSURANCE
___**$1,000,000**___ Occurrence and Aggregate  (see section 15.1.5)

1.12 BUILDER'S RISK INSURANCE
If Gray Construction, Inc. is furnishing the builder's risk insurance under the terms of the contract between Gray and the Owner, the subcontractor will be added as an additional named insured to the policy.  This policy will cover the insurable interest the subcontractor has in the project up to the limit of coverage.  This insurance does not cover personal tools and equipment.  The subcontractor shall be responsible for payment of any deductible, or its equivalent, resulting from a claim that is due to the fault or negligence of the subcontractor, whether in whole or in part, and  whether or not the Builder's Risk is being provided by Gray or the Owner.

1.13 UTILIZATION OF SMALL BUSINESS CONCERNS
Subcontractor is certified/recognized as one of the following: __ Small Business ____ Small Disadvantaged Business ____ Woman-Owned Small Business ____ HUBZone Small Business __ Veteran-Owned Small Business ____ Service Disabled Veteran-Owned Small Business _x_ None of the Above

## SECTION 2

### SCOPE OF WORK

2.1     SUBCONTRACTOR'S WORK.  Gray contracts with the Subcontractor as an independent contractor to perform the work described in the Scope of Work attached as Exhibit A in strict accordance with the Subcontract Documents.  The Subcontractor shall perform such work (the "Work") under the general direction of Gray and in accordance with this Agreement and the Subcontract Documents.  The Subcontractor shall perform each activity necessary or incidental to complete the work, which is described more particularly, but not exclusively, in Exhibit A.  The provisions of this Agreement and Exhibit A are intended to complement each other, but if there is any inconsistency, Exhibit A shall govern.

2.2     SUBCONTRACT DOCUMENTS.  In addition to this Agreement, the documents which form this Subcontract and which are binding on the Subcontractor (collectively the "Subcontract Documents") include the Contract Documents identified in the Contract between Gray and the Owner, which are incorporated by reference, and the Subcontract Documents set forth in Section 18.5.  In case of an inconsistency between this Agreement and the Contract Documents, this Agreement shall govern.

2.2.1     DRAWINGS, PLANS AND SPECIFICATIONS.  Gray has furnished Subcontractor with one set of Criteria Documents, and if available, Drawings, Plans and Specifications included in the Subcontract Documents.  Additional copies will be furnished, on request, at the Subcontractor's expense.  Subcontractor shall furnish the design for its portion of the work so as to coordinate with the Work as a whole, and with other trade Subcontractors.  To the extent that the Subcontractor fails to properly interpret the Criteria Documents or the Preliminary Design Documents, Subcontractor shall be responsible to correct all errors at its own expense.

2.2.2     COPIES OF P.O.'S AND SUB-SUBS FOR MAJOR SCOPE ITEMS.  Upon receipt of written approval of material and/or equipment shop drawings or brochures by the Owner or Architect, Subcontractor shall immediately furnish the following additional information to Gray for each item of equipment, fixture or material:

.1     Contact or representative of both manufacturer and supplier

.2     Subcontractor's Purchase Order Numbers

.3     Manufacturer's Order Number

.4     Supplier's Order Number

.5     Scheduled delivery date.

2.2.3     Subcontractor's superintendent, foreman, or other designated individual shall deliver a report, in form and content specified by Gray to Gray's office before the end of each shift, whenever Subcontractor has employees working at the Project site.  The report will state the number of employees Subcontractor has on the Project that shift, subdividing into categories (foremen, tradesmen, laborers, etc.).  Subcontractor shall also list the equipment on site, and any material deliveries.

2.3     EXAMINATION OF CONTRACT AND SUBCONTRACT DOCUMENTS; SITE INSPECTION.  The Subcontractor warrants and represents that it has visited the site of the proposed Work, has familiarized itself with existing conditions and the character of the operations to be carried on under this Agreement and that it fully understands the facilities, difficulties and restrictions attending the execution of the Work.  The Subcontractor acknowledges that it has examined all Subcontract Documents, and the requirements of the various governmental agencies, departments and bureaus having jurisdiction over the Project, and from its own investigation has satisfied itself as to the nature and location of the Work, the general local conditions, and all

| | | |
|---|---|---|
| | Issue Date: | 08/01/03 |
| | | |
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

matters which in any way affect the Subcontractor's Work or its performance thereof. The Subcontractor further acknowledges that having made said visitation and examination, it is not aware of any existing conditions, circumstances, or requirements that will necessitate change in the scope of the Work, the Subcontract Price, or the Schedule of Work.

2.4    OWNERSHIP AND USE OF DOCUMENTS. The drawings, specifications and other documents furnished by the Subcontractor are instruments of services and shall become the property of Gray and the Owner upon payment by the Owner and Gray. The Subcontractor shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright, to the extent not modified herein. Reproducible copies, including diskettes, may be retained by the Owner and Gray, whether the Project for which they were made is executed or not, and both are entitled to make and retain copies and reproduce them for their own use. Submission or distribution of documents to meet official regulatory requirements or for other purposes in connection with the Project is not to be construed as publication in derogation of the Subcontractor's common law copyrights or other reserved rights.

## SECTION 3

### SCHEDULE OF WORK AND COMPLETION

3.1    TIME IS OF THE ESSENCE. Time is of the essence for both parties, and they mutually agree to see to the performance of their respective work and the work of their Subcontractors so that the entire project may be completed in accordance with the Subcontract Documents and the Schedule of Work. Gray shall revise such Schedule and sequence of events as the Work progresses. No extension of time for Subcontractor's Work will be valid without Gray's written consent.

3.2    DUTY TO BE BOUND. The Subcontractor shall be bound by the Schedule of Work including, without limitation, the dates for Substantial Completion and Final Completion stated in Section 1.5 and revisions to the Schedule. The Subcontractor shall provide Gray with any requested scheduling information for the Subcontractor's Work. The Schedule of Work and all subsequent changes thereto shall be submitted to the Subcontractor in advance of the required performance.

3.3    SCHEDULE CHANGES. Subcontractor acknowledges that as construction progresses it may be necessary for Gray to change the sequential order and duration of the various activities, including those contemplated by this Agreement, to account for unanticipated delays, occurrences and other factors which act to alter Gray's original schedule. Gray may require Subcontractor, at no additional cost to Gray and Owner, to prosecute Subcontractor's Work in such sequence as the progress of other subcontractors and the Project schedule dictates. It is expressly understood and agreed that the scheduling and sequencing of the Work is an exclusive right of Gray and that Gray reserves the right to reschedule and resequence Subcontractor's Work from time to time as the demands of the Project require without any additional cost or expense to be paid to the Subcontractor.

Subcontractor shall carry on its Work promptly, efficiently, and at a speed that will not cause delay in the progress of Gray's Work or Work of other Subcontractors. If, in the opinion of Gray, Subcontractor falls behind in the progress of the Work, Subcontractor may be directed to take such steps as deemed necessary to improve the rate of progress. These steps may include, without limitation, requiring Subcontractor to increase the number of shifts, personnel overtime operations, days of Work, equipment, plant, or other remedies. Subcontractor shall submit to Gray for Gray's approval a schedule demonstrating how the required rate of progress will be regained without additional costs to the Owner or Gray.

3.4    PRIORITY OF WORK. Gray shall have the right to decide on the time, order and priority in which the various portions of Work shall be performed and all other matters relative to the timely and orderly conduct of the Subcontractor's Work. The Work will be performed as required by the composite construction schedule, which may be changed periodically by the project superintendent in order to maintain the overall schedule of Work.

3.5    ·COOPERATION.  The Subcontractor shall cooperate with Gray by scheduling and performing Subcontractor's work so as to avoid conflict, delay in, or interference with the work of Gray, other Subcontractors or Owner's own forces.   Subcontractor shall participate, as requested by Gray, in inspections related to Substantial and Final Completion.

3.6    COMMENCEMENT OF WORK.  The Subcontractor shall commence Work within three (3) calendar days from Gray's notice to proceed.  If interrupted for any reason, the Subcontractor shall resume the work within three (3) working days from Gray's notice to do so.

## SECTION 4

### SUBCONTRACT PRICE

Gray agrees to pay the Subcontractor for the satisfactory performance of the Subcontractor's Work the sum of identified in Section 1.6 (the "Subcontract Price") in accordance with Section 5, subject to additions or deductions as provided in Section 6.

Unit prices, if any, are stated in Subcontractor's Scope of Work, Exhibit A.

## SECTION 5

### PAYMENT

5.1    GENERAL PROVISIONS.

5.1.1    SCHEDULE OF VALUES.  The Subcontractor has provided Gray with a schedule of values which shall be revised, if necessary for approval by Gray and the Owner, no later than the date of the Subcontractor's first application for payment.

5.1.2    PAYMENT USE RESTRICTION.  No payment received by the Subcontractor shall be used to satisfy or secure any indebtedness other than one owed by the Subcontractor for labor or materials furnished in performing the Subcontractor's Work on this Project.

5.1.3    PAYMENT USE VERIFICATION.  Gray shall have the right at all times to contact the Subcontractor's lower tier Subcontractors and suppliers to ensure that the same are being paid by the Subcontractor for labor or materials furnished for use in performing the Subcontractor's Work on this Project.

5.1.4    CONDITIONS PRECEDENT TO PARTIAL PAYMENT.  Progress payments due under this Agreement will not be released until all of the following conditions have been met:

.1    Subcontract Agreement has been signed, returned and approved.

.2    Insurance Certificates satisfying the requirements of this Agreement have been received.

.3    A schedule of values has been received in the form and content specified by Gray.

.4    Certified payrolls, if required by Owner, received in the appropriate format.

.5    Waivers of lien from all tier subcontractors and materialmen evidencing payments through the previous month.

.6    If requested by Gray, Subcontractor agrees to likewise provide Gray with evidence satisfactory to Gray showing payment by Subcontractor of any and all contributions made

by Subcontractor for health and welfare payments as shown on the certified payroll, as well as payment of payroll taxes and other contributions that may be required by law.

5.1.5    PARTIAL LIEN WAIVERS AND AFFIDAVITS.  As a prerequisite for payment, the Subcontractor shall provide, in a form satisfactory to the Owner and Gray, partial lien or claim waivers and affidavits from the Subcontractor, and its sub-Subcontractors and suppliers for the completed Subcontractor's Work.  Such waivers may be made conditional upon payment of a specific amount stated therein.  The Subcontractor's Authorized Representative(s) designated in Section 1.2(b) of this Agreement are hereby designated as authorized agents of Subcontractor to execute all lien waivers required of Subcontractor.

5.1.6    SUBCONTRACTOR PAYMENT FAILURE.  In the event Gray has reason to believe that labor, material or other obligations incurred in the performance of the Subcontractor's Work are not being paid for, Gray shall give written notice of such claim or lien to the Subcontractor to insure that any progress payment shall be utilized to pay such obligations.

If upon receipt of said notice, the Subcontractor does not:

(a)    Supply evidence to the satisfaction of Gray that the monies owing to the claimant have been paid; or

(b)    Post a bond in a form and with surety satisfactory to Gray indemnifying the Owner, Gray, Gray's surety, if any, and the premises from such claim or lien;

then Gray shall have the right to exercise any or all of the following rights, until the claim or lien has been satisfied by the Subcontractor:

(1)    Retain out of any payments due or to become due to the Subcontractor for this Project or any other Gray project a reasonable amount to protect Gray from any and all loss, damage or expense including attorney's fees arising out of or relating to any such claim or lien

(2)    issue joint checks in payment of any payments due or to become due to the Subcontractor, payable to the Subcontractor and the claimant;

(3)    make direct payments of sums due the Subcontractor to the claimant.

(4)    may (but has no obligation to) bond off the lien, and backcharge all costs, attorneys' fees and other expenses involved in bonding off the lien of the Claimant.

5.1.7    PAYMENT NOT ACCEPTANCE.  Payment to the Subcontractor is specifically agreed not to constitute or imply acceptance by Gray or the Owner of any portion of the Subcontractor's Work.

5.2    PROGRESS PAYMENTS.

5.2.1    APPLICATION.  For Work performed during a payment period, the Subcontractor shall apply for a progress payment using Gray's standard Application For Payment and Lien Waiver form, a copy of which is attached as Exhibit E.  Applications shall be submitted to Gray at P.O. Box 8330, Lexington, Kentucky 40533-8330.  The application shall be for work performed up to and including the last day of the pay period, indicating work completed and, to the extent allowed under Section 5.2.4, materials suitably stored and protected during the payment period.  Applications shall be accompanied by lien waivers from all sub-Subcontractors and suppliers whose labor or materials are covered by the application; such waivers shall be in the form of attached Exhibit E.

---

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

5.2.2   RETAINAGE.  Regardless of any agreements between the Owner and Gray, or arrangements made by them, for the withholding or release of Gray's retainage, retainage shall be withheld by Gray from all progress payments made to Subcontractor.  The amount of retainage withheld from each payment shall be equal to the amount of payment earned, multiplied by the percentage identified in Section 1.7 of this Agreement.  Retainage shall be released to Subcontractor only upon completion of all requirements for final payment as provided in Section 5.3 of this Agreement.

5.2.3   TIME OF APPLICATION.  "Pay period" as used herein is defined as beginning with the first day of each calendar month, and ending with the last day of each calendar month.  The Subcontractor shall submit progress payment applications to Gray no later than the day of each payment period specified in Section 1.8 of this Agreement.

5.2.4   STORED MATERIALS.  Unless otherwise provided in the Subcontract Documents, and if approved in advance by the Owner, applications for payment may include materials and equipment not incorporated in the Subcontractor's Work but delivered and suitably stored and protected at the site or at some other location agreed upon in writing.  Approval of payment application for such stored items on or off the site shall be conditioned upon submission by the Subcontractor of bills of sale and applicable insurance or such other procedures satisfactory to the Owner and Gray to establish the Owner's title to such materials and equipment or otherwise protect the Owner's and Gray's interest therein, including transportation to the site.

5.2.5   TIME OF PAYMENT.  Receipt of payment by Gray from Owner for Subcontractor's work is a condition precedent to all progress payments by Gray to Subcontractor.  Progress payments to the Subcontractor for satisfactory performance of the Subcontractor's Work shall be made seven (7) days after receipt by Gray of payment from the Owner for such Subcontractor's Work.

5.2.6   GROUNDS FOR WITHHOLDING PAYMENT.  Gray may withhold from monthly progress payments an amount sufficient to protect Gray because:

.1      Defective work has not been remedied; materials have not been furnished; clean up has not been performed;

.2      Subcontractor has damaged any portion of the work of others;

.3      Claims, levies, attachments, stop notices or court orders have been filed or reasonable evidence indicates the probable filing of such claims, levies, attachments, notices or orders, including claims covered by insurance until such claims are accepted by the insurance carrier;

.4      Subcontractor has failed to make payments properly to its subcontractors or for labor, including fringe benefits, materials or equipment, transportation or shipping costs, taxes, fees or any other claims arising out of the Subcontractor's Work;

.5      There exists reasonable doubt that Subcontractor's Work can be completed for the unpaid balance of the Subcontract Price;

.6      There exists reasonable doubt that Subcontractor's Work, due to its own action or inaction, will be completed on schedule or in accordance with the schedule;

.7      Subcontractor is not satisfactorily prosecuting the Work of this Agreement;

.8      Subcontractor has failed to deliver insurance certificates, bonds, "as-built" or record drawings, written guarantees or warranties or the approvals required of the Subcontractor's Work by any authority having jurisdiction;

.9     A petition for bankruptcy or reorganization has been filed by or against Subcontractor or Subcontractor has made an assignment without the prior written consent of Contractor;

.10    Any other material breach of this Agreement by Subcontractor which has not been cured after notice from Gray.

Amounts then due shall be paid or credited to Subcontractor when Subcontractor removes the above grounds for withholding payment.

5.3     FINAL PAYMENT.

5.3.1     APPLICATION.  Upon acceptance of the Subcontractor's Work by the Owner, and Gray, and upon the Subcontractor furnishing evidence of fulfillment of Subcontractor's obligations in accordance with the Subcontract Documents and Section 5.3.2, Gray shall, without delay, forward the Subcontractor's application for final payment to the Owner.

5.3.2     REQUIREMENTS.  Before Gray shall be required to forward the Subcontractor's application for final payment to the Owner, the Subcontractor shall submit to Gray:

(a)     an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Subcontractor's Work for which the Owner or his property or Gray or Gray's surety might in any way be liable, have been paid or otherwise satisfied;

(b)     consent of surety, if any, to final payment;

(c)     satisfaction of required closeout procedures;

(d)     other data if required by Gray or Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be designated by Gray or Owner; and

(e)     written warranties of Subcontractor's materials, labor and equipment furnished under this Agreement and the Subcontract Documents.

(f)     a complete and accurate set of Record Drawings, together with Final Design drawings, appropriately stamped and originally signed by the design professional in responsible charge of the Work, and licensed in the state in which the Project was constructed.

Final payment shall constitute a waiver and release of all claims by the Subcontractor relating to the Subcontractor's Work, but shall in no way relieve the Subcontractor of liability for the obligations assumed under Section 10 hereof, or for faulty or defective work appearing after final payment.

5.3.3     TIME OF PAYMENT.  Final payment of the balance due of the contract price shall be made to the Subcontractor:

(a)     upon receipt of the Owner's waiver of all claims related to the Subcontractor's Work except for unsettled liens, unknown defective work, and noncompliance with the Subcontract Documents or warranties; and

(b)     seven (7) days after receipt by Gray of final payment from the Owner for such Subcontractor's Work, such receipt being a condition precedent for final payment to the Subcontractor.

5.4     NON-PAYMENT BY OWNER.

Issue Date:                      08/01/03

Revision No.:                          4
Revision Issue Date:        05/23/06

5.4.1    ASSUMPTION OF RISK; CONDITION PRECEDENT. The Subcontractor agrees that Gray shall have no obligation to pay the Subcontractor for any work done on this Project until Gray has been paid by the Owner. The provisions of Sections 5.2 and 5.3 stating the time and amount of progress and final payments are subject to the condition that Gray shall receive from the Owner progress or final payments in at least the amounts payable to the Subcontractor on account of work done by the Subcontractor on this Project. The time when such payments shall be due the Subcontractor shall be postponed until Gray has received same from the Owner. The Subcontractor expressly agrees to accept the risk that it will not be paid for work performed by him in the event that Gray, for whatever reason, is not paid by the Owner for such work. The Subcontractor acknowledges that it relies for payment on the credit and ability to pay of the Owner, and not of Gray. The Subcontractor agrees that payment by the Owner to Gray for work performed by the Subcontractor shall be a condition precedent to any payment obligation of Gray to the Subcontractor. The Subcontractor agrees that the liability of the surety on Gray's payment bond, if any, is subject to the same conditions precedent as are applicable to Gray's liability to the Subcontractor.

5.4.2    REMEDY. If the Owner or its designated agent does not authorize payment or Gray does not receive a payment due hereunder for any cause which is not the fault of the Subcontractor, Gray shall promptly inform the Subcontractor in writing. Gray may also diligently pursue, with the assistance of the Subcontractor, the release by the Owner of the payment due for the Subcontractor's Work. At the Subcontractor's request, Gray may institute all reasonable legal remedies to mitigate the damages and pursue full payment of the Subcontractor's application for payment including interest thereon. In that event, the cost for pursuing the Subcontractor's remedies shall be Subcontractor's responsibility. Gray, at its discretion, may require that the Subcontractor make financial arrangements satisfactory to Gray before undertaking this effort and at all times during the progress thereof.

## SECTION 6

### CHANGES, CLAIMS AND DELAYS

6.1    CHANGES. Without nullifying this Agreement, Gray may by written Subcontract Work Authorization or Subcontract Change Order make changes in the Work within the general scope of this Agreement and the Subcontractor shall perform such changes. Adjustments in the Subcontract Price or Schedule of Work, if any, resulting from such changes shall be set forth in a Subcontract Change Order. . A Subcontract Change Order is a written instrument prepared by Gray and signed by the Subcontractor stating their agreement upon the change in the scope of the Work, adjustment in the Subcontract Price or Schedule of Work. A Subcontract Work Authorization is a written instrument prepared by Gray directing a change in the Work and stating a proposed adjustment, if any, in the Subcontract Price or Schedule of Work or both. A Subcontract Work Authorization shall be used in the absence of agreement on the terms of a Subcontract Change Order.

No such adjustment shall be made for any such changes performed by Subcontractor that have not been so ordered by Gray, and approved by the Owner. If Subcontractor proceeds with additional work without the required Change Order or Work Authorization, Subcontractor does so at its own risk, and must track all actual costs incurred, including but not limited to signed time sheets, additional supervision, actual material invoices and actual equipment costs, if any. If the additional work performed without the requisite Change Order or Work Authorization from Gray results in the necessity of an extension of time, the time extension may be granted by Gray only on proof that the work affected was on the critical path. In no event shall compensation be forthcoming from Gray unless these requirements are met, as well as the requisite notice set forth in Sections 6.2 and 6.3 below.

6.2    CLAIMS RELATING TO OWNER. The Subcontractor agrees to make all claims for which the Owner is or may be liable in the manner provided in the Contract Documents for like claims by Gray upon the Owner.

Written notice of such claims shall be given by the Subcontractor to Gray within sufficient time for Gray to make such claims against the Owner in accordance with the Contract Documents or within five (5) calendar days

prior to the beginning of the Subcontractor's Work or the event for which such claim is to be made, whichever · shall first occur, otherwise such claims shall be deemed waived.

6.3    CLAIMS RELATING TO GRAY. The Subcontractor shall give Gray written notice of all claims not included in Section 6.2 within five (5) calendar days of the beginning of the event for which claim is made; otherwise, such claims shall be deemed waived.

All unresolved claims, disputes and other matters in question between Gray and the Subcontractor not relating to claims included in Section 6.2 shall be resolved in the manner provided in Section 16 herein.

6.4    ADJUSTMENT IN SUBCONTRACT PRICE. If a Subcontract Change Order or Subcontract Work Authorization requires an adjustment in the Subcontract Price, the adjustment shall be established by one of the following methods:

      (a)    mutual agreement on a lump sum with sufficient substantiating data to permit evaluation;

      (b)    unit prices already established in the Subcontract Documents or if not established by the Subcontract Documents, then established by mutual agreement for this adjustment; or

      (c)    to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee.

6.5    SUBSTANTIATION OF ADJUSTMENT. If the Subcontractor does not respond promptly or disputes the method of adjustment under Section 6.4, the method and the adjustment shall be determined by Gray on the basis of reasonable costs and savings of those performing the Work attributable to the change, including, in the case of an increase in the Subcontract Price, an allowance for overhead and profit proportionate to Gray's recovery of overhead and profit, if any, under the Contract Documents.

The Subcontractor shall maintain for Gray's review and approval an appropriately itemized and substantiated accounting of the following items attributable to the Subcontract Change Order or Subcontract Work Authorization:

      (a)    labor costs, including Social Security, health, welfare, retirement and other fringe benefits as normally required, and state workers' compensation insurance;

      (b)    costs of materials supplies and equipment, whether incorporated in the Work or consumed, including transportation costs;

      (c)    costs of renting, either from Gray or from others, of machinery and equipment other than hand tools;

      (d)    costs of bond and insurance premiums, permit fees and taxes attributable to the change; and

      (e)    costs of additional supervision and field office personnel services necessitated by the change.

6.6    DELAY. If the progress of the Subcontractor's Work is substantially delayed without the fault or responsibility of the Subcontractor, then the time for the Subcontractor's Work shall be extended by Change Order to the extent obtained by Gray under the Subcontract Documents and the Schedule of Work shall be revised accordingly.

Gray shall not be liable to the Subcontractor for any damages or additional compensation as a consequence of delays caused by any person not a party to this Agreement unless Gray has first recovered the same on behalf of the Subcontractor from said person, and then to the extent of such recovery after payment of

all attorney's fees and other expenses relating thereto, it being understood and agreed by the Subcontractor that apart from recovery from said person, the Subcontractor's sole and exclusive remedy for delay regardless of cause shall be an extension in time for performance of the Subcontractor's Work.

In jurisdictions where the second paragraph herein is not enforceable, the Subcontractor agrees that it may only seek delay damages to the extent documented by actual costs and entitlement demonstrated, and the Subcontractor shall not be entitled to seek from Gray damages for actual or alleged loss of efficiency, constructive acceleration, lost productivity, stacking of trades, home office overhead, expectant underrun, season change, extended overhead, impact damages, profit upon damages for delay or similar damages calculated by formula or trade data or studies.

6.7     LIQUIDATED DAMAGES.  If the Contract Documents between the Owner and Gray permit the Owner to assess Gray for liquidated or other damages for delay beyond the completion date set forth in the Contract Documents, and such damages are so assessed, then Gray shall be entitled to assess same against the Subcontractor in proportion to the Subcontractor's share of the responsibility for such delay.

## SECTION 7

### GRAY'S AUTHORIZED REPRESENTATIVES

Gray has designated one or more persons in Section 1.2(a) of this Agreement who shall be Gray's authorized on-site and off-site representative(s).  Such authorized representative(s) shall be the only person(s) the Subcontractor shall look to for instructions, orders and/or directions, except in an emergency.

## SECTION 8

### SUBCONTRACTOR'S OBLIGATIONS

8.1     OBLIGATIONS DERIVATIVE.  The Subcontractor shall be bound to Gray by the terms of this Agreement and by the conditions of the Contract Documents between the Owner and Gray, and shall assume toward Gray all the obligations and responsibilities which Gray, by those documents, assumes toward the Owner.

8.2     RESPONSIBILITIES.  The Subcontractor shall provide timely design services in accordance with all applicable codes, laws and regulations of the locality, and shall work with the local and state regulatory agencies with respect to building permits and other permits relating to the Subcontractor's Work, and shall furnish and pay for all of the labor, supervision, materials, tools, equipment, services, and incidentals necessary for the proper performance of the Subcontractor's Work.

The Subcontract shall provide a list of proposed sub-subcontractors, and suppliers, be responsible for taking field dimensions, providing tests, order of materials and all other actions as required to meet the Schedule of Work.

8.3     WORKMANSHIP.  Every part of the Subcontractor's Work shall be executed in strict accordance with the Subcontract Documents in the most sound, workmanlike, and substantial manner.  All workmanship shall be the best of its kind performed by others engaged in the same trade.  All materials used in the Subcontractor's Work shall be furnished in ample quantities to facilitate the proper and expeditious execution of the Work, and shall be new except such materials as may be expressly provided in the Subcontract Documents to be otherwise

8.4     TEMPORARY SERVICES.  The Subcontractor shall furnish all temporary services and facilities necessary to perform its work, including, but not limited to, heat, electrical (power), telephone, water, and other utilities necessary.

8.5     COORDINATION.  The Subcontractor shall:

| Page 11 | | Issue Date: | 08/01/03 |
|---|---|---|---|
| | | Revision No.: | 4 |
| Standard Subcontract Agreement | | Revision Issue Date: | 05/23/06 |

    (a)    cooperate with Gray and all others whose work is dependent upon the progress of the Subcontractor's Work'

    (b)    specifically note and immediately advise Gray of any interference with the Subcontractor's Work;

    (c)    participate in the preparation of coordination drawings and work schedules in areas of congestion.

8.6    SHOP DRAWINGS AND SUBMITTALS. The Subcontractor shall submit shop drawings, product data, samples, and any other submittals required by the Subcontract Documents expeditiously and in such manner and sequence so as to avoid delay in the progress of the Work or the activities of Gray or other Subcontractors. The Subcontractor shall be responsible for accuracy and conformity with the Subcontract Documents and other submittals. Unless specifically noted by Gray, action on shop drawings and submittals by Gray shall not be deemed to authorize deviation from the Subcontract Documents.

8.7    PROGRESS REPORTS AND MEETINGS. The Subcontractor shall furnish periodic progress reports on the Work including information on the status of materials and equipment which may be in the course of preparation or manufacture.

8.8    AUTHORIZED REPRESENTATIVE AND NOTICE. The Subcontractor shall designate one or more persons who shall be the authorized Subcontractor's representative(s): (a) on-site and (b) off-site. Such authorized representative(s) shall be the only person(s) to whom Gray shall issue instructions, orders or directions, except in an emergency. Notices as required by this Agreement and other communications made to any one of the Subcontractor's Authorized Representative(s) shall be binding as if given to the Subcontractor. The authorized representative shall attend project meetings as required.

8.9    PROVISION FOR INSPECTION. The Subcontractor shall notify Gray when portions of the Subcontractor's Work are ready for inspection. The Subcontractor shall at all times furnish Gray, the Owner, and their representatives adequate means and facilities for inspecting the Work, including materials at the site or any place where materials under this Agreement may be in the course of preparation, process, manufacture or treatment.

8.10    CLEAN-UP. The Subcontractor shall follow Gray's clean-up directives and those of the Subcontract Documents, and

    (a)    at all times keep the building and premises free from debris and unsafe conditions resulting from the Subcontractor's Work; and

    (b)    broom clean each work area daily prior to discontinuing work in the same.

Should Subcontractor fail, after 24 hours notice from Gray, to appropriately clean an area as required by this Section, Gray shall assess the Subcontractor for the actual daily clean-up cost or a daily charge of $150.00, whichever is greater, for each day such condition is not remedied.

8.11    SAFETY PRECAUTIONS AND PROCEDURES.

8.11.1 The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by Gray and, in addition, comply with occupational safety and other applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons or property and in accordance with the requirements of the Subcontract Documents. The Subcontractor shall report to Gray within 24 hours any personal injury or property damage occurring at the site.

8.11.2 Subcontractor shall comply with Gray's Safety Requirements.

· 8.11.3  ALCOHOL AND DRUG FREE PROJECT. The Subcontractor recognizes that an alcohol and drug free Project is necessary to ensure the safety of the persons employed at the Project site by the Owner, Gray, the Subcontractor and others, and to protect the health and safety of the community. The Subcontractor agrees that its employees shall not distribute, be under the influence of, or be in possession of, any form of alcohol or unlawful drug while at the Project site or while in the performance of Project-related activities. Subcontractor's employees shall also be prohibited from using or being subject to the effects of any lawful drug while at the Project site or in the performance of Project-related activities without approval of the employee's supervisor. The Subcontractor acknowledges that it is familiar with Gray's Alcohol and Drug Free Project Policy for Subcontractors. The Subcontractor represents that it has established written procedures for compliance with Gray's policy and agrees that it will implement and enforce the policy throughout the course of the Project. The Subcontractor shall indemnify and hold the Owner and Gray harmless from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or related to Subcontractor's implementation, application or enforcement of compliance procedures.

8.12     ENVIRONMENTAL MATTERS.

8.12.1  If a Hazardous Chemicals of a type of which an employer is required by law to notify its employees will be used on the Project site by the Subcontractor, the Subcontractor's sub-subcontractors or anyone directly or indirectly employed by them, the Subcontractor shall, prior to the Hazardous Chemical being at the site, provide a current copy of the Material Safety Data Sheet (MSDS) for such Hazardous Chemical in sufficient time to permit compliance with such laws by Gray, other subcontractors and other employers on the site.

8.12.2  The Subcontractor shall be responsible for the prompt removal of any Hazardous Chemicals and Hazardous Substances which are brought to Project site in connection with the Work but are not used or consumed and all waste generated from the Work. The removal of any Hazardous Chemical, Hazardous Substance, or waste shall be done in accordance with all federal, state and local laws, regulations and ordinances

8.12.3  The Work shall be conducted in such a manner to avoid the discharge, dispersal, escape, release or saturation of any pollutant into the atmosphere or any body of water or on, onto, upon, in or into the surface or subsurface of land unless allowed by federal, state or local law, regulations, ordinance or permit.

8.12.4     In the event the Subcontractor encounters on the site material reasonably believed to be asbestos, polychlorinated biphenyl ("PCB"), or other Hazardous Substances which have not been rendered harmless, the Subcontractor shall immediately stop Work in the area affected and report the condition to Gray in writing. The Work in the affected area shall resume in the absence of asbestos, PCB, or other Hazardous Substances, or when it has been rendered harmless, or by being reduced to a safe level or concentration, by written agreement of Gray and Subcontractor, or by arbitration as provided in this Agreement. The Subcontractor shall not be required pursuant to Article 5 to perform without consent any Work relating to asbestos, PCB, or other Hazardous Substances.

8.12.5     To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless Gray, other subcontractors, and their respective agents and employees, from and against claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from performance of the Work in the affected area if in fact the material is asbestos, PCB, or other Hazardous Chemical or Hazardous Substance and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to damage to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by failure to comply with Sections 8.12.1 or 8.12.2 or by negligent acts or omissions of the Subcontractor, anyone directly or indirectly employed by it, or anyone for whose acts it may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to

negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 8.12.3.

8.12.6    For purposes of this Agreement, (a) the term "Hazardous Chemical" means any chemical defined as hazardous in the Hazardous Communication Standard, 29 C.F.R. § 1926.59 or 29 C.F.R. § 1910.1200, promulgated pursuant to the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.; (b) the term "Hazardous Substances" means any substance, including solid, liquid or gaseous material, which is listed or defined as a "hazardous substance" in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S. § 9601, et seq., or regulations promulgated pursuant thereto, but does include petroleum, including crude oil or any fraction thereof; oil and oil waste as those terms are defined in the Clean Water Act, 33 U.S.C. § 1251, et seq., or regulations promulgated pursuant thereto; and source, special nuclear, or by-product material as defined by the Atomic Energy Act of 1954, 42 U.S.C. § 3011, et seq., or regulations promulgated pursuant thereto; and includes any other substance defined by federal, state or local statute, regulation or ordinance as a hazardous, toxic or dangerous waste or substance where "state" means the State in which the Work is being performed and "local" means the local jurisdiction (i.e., county, parish, city, borough, municipality, village, town, etc.) in which the Work is being performed; and (c) "pollutant" shall mean any solid, liquid, gaseous, or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and shall include any Hazardous Substance.

8.13    PROTECTION OF THE WORK AND PROPERTY.  The Subcontractor shall take all necessary precautions to properly protect the Subcontractor's Work and the work of others from damage caused by the Subcontractor's operations.  Should the Subcontractor cause damage to the Work or property of the Owner, Gray or others, the Subcontractor shall promptly remedy such damage to the satisfaction of Gray, or Gray may so remedy and deduct the cost thereof from any amounts due or to become due the Subcontractor.

8.14    COMPLIANCE WITH LAWS.  The Subcontractor shall, at all times and at its own cost, comply with all federal, state and local statutes, codes, rules, regulations, ordinances, executive orders and other laws relating to the Project and the Work.  The Subcontractor warrants and represents that it is authorized to transact business in the state and local jurisdictions where the Project is located, that it holds any and all licenses necessary to perform the Work, and that it is not currently in violation of any statutes, codes, rules, regulations, ordinances, orders, or other laws on any projects in which Subcontractor is presently engaged.

8.15    PERMITS, FEES AND LICENSES.  The Subcontractor shall give adequate notices to authorities pertaining to the Subcontractor's Work and secure and pay for all permits, fees, licenses, assessments, inspections and taxes necessary for performance, completion or use of the Subcontractor's Work.

To the extent paid to Gray under the Contract with the Owner, the Subcontractor shall be compensated for additional costs resulting from laws, ordinances, rules, regulations and taxes enacted after the date of the Agreement.

8.16    TAXES, WAGES, FRINGE BENEFITS, ASSESSMENTS.  The Subcontractor shall timely comply with all requirements applicable to payment of taxes, wages, fringe benefits, retirement benefits, unemployment compensation and other assessments, and shall upon request furnish Gray and the Owner with satisfactory proof of compliance.

8.17    LAYOUT RESPONSIBILITY AND LEVELS.  Gray shall establish principal axis lines of the building and site whereupon the Subcontractor shall lay out and be strictly responsible for the accuracy of the Subcontractor's Work and for any loss or damage to Gray or others by reason of the Subcontractor's failure to set out or perform its work correctly.  The Subcontractor shall exercise prudence so that actual final conditions and details shall result in perfect alignment of finish surfaces.

8.18    MATERIALS FURNISHED BY OTHERS.  In the event the scope of the Subcontractor's Work includes installation of materials or equipment furnished by others, it shall be the responsibility of the Subcontractor to examine the items so provided and thereupon handle, store and install the items with such skill

| Page 14 | Issue Date: | 08/01/03 |
|---|---|---|
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

and care as to ensure satisfactory and proper installation. Loss or damage due to acts of the Subcontractor shall be deducted from any amounts due or to become due the Subcontractor.

8.19    SUBSTITUTIONS. No substitutions shall be made in the Subcontractor's Work unless permitted in the Subcontract Documents and only then upon the Subcontractor first receiving all approvals required under the Subcontract Documents for substitutions. The Subcontractor shall indemnify Gray for any increased costs incurred by Gray as a result of such substitutions, whether or not the Subcontractor has obtained approval thereof.

8.20    USE OF GRAY'S EQUIPMENT. The Subcontractor, its agents, employees, Subcontractors or suppliers shall not use Gray's equipment without the express written permission of Gray's authorized representative.

If the Subcontractor or any of its agents, employees, suppliers or lower tier Subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items owned, leased, or under the control of Gray, the Subcontractor shall be liable to Gray as provided in Section 14 for any loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be found to have been due solely and exclusively to the negligence of Gray's employees operating such equipment.

8.21    ASSIGNMENT AND SUBCONTRACTING. The Subcontractor shall not assign this Agreement, nor its proceeds, nor subcontract the whole or any part of the Subcontractor's Work, without the prior written approval of Gray.

8.22    NON-CONTRACTED SERVICES. The Subcontractor agrees that no claim for non-contracted construction services rendered or materials furnished shall be valid unless the Subcontractor provides Gray notice:

(a)    prior to furnishing of the services or materials, except in an emergency affecting the safety of persons or property;

(b)    in writing of such claim within three (3) days of first furnishing such services or materials; and

(c)    the written charge for such services or materials to Gray no later than the fifteenth day (15th) of the calendar month following that in which the claim originated.

8.23    COORDINATION. Subcontractor is responsible for coordinating its work areas and schedule with other trades in order to perform the overall project as a team.

8.24    NORMAL WORK WEEK. Unless otherwise directed in writing by Gray, the Subcontractor's Work shall be performed during a five (5) day work week extending from Monday through Friday. If the Subcontractor's work becomes behind schedule, the Subcontractor shall work overtime during the normal work week and be at no cost to Gray if Gray is not at fault for the Subcontractor being behind schedule.

## SECTION 9

### SUBCONTRACT BONDS

9.1    PERFORMANCE AND LABOR AND MATERIAL PAYMENT BONDS. Unless otherwise provided at Section 1.9 of this Agreement, the Subcontractor shall provide separate Performance and Labor and Material Payment Bonds, in a form and with surety, satisfactory to Gray in the full amount of this Subcontract. The premiums for these Bonds shall be paid by the Subcontractor and the cost thereof is included in the Subcontract Price.

9.2     ASSURANCE OF PERFORMANCE. If Performance and Payment Bonds are not required of the Subcontractor under Section 9.1, then throughout the duration of this Agreement, Gray may require such bonds or a letter of credit and the Subcontractor shall provide same. Said Bonds shall be in the full amount of this Agreement in a form and by a surety satisfactory to Gray. The Subcontractor shall be compensated for the cost of same pursuant to progress payments made hereunder after the Subcontractor furnishes the required bonds or letter of credit. The reimbursement amount for the bonds or letter of credit shall not exceed the manual rate for such instruments. In the event the Subcontractor shall fail to promptly provide such requested bonds or letter of credit, Gray may terminate this Agreement and re-let the work to another Subcontractor and all Gray costs and expenses incurred thereby shall be paid by the Subcontractor.

## SECTION 10

### WARRANTY AND CORRECTION OF WORK

10.1     WARRANTY.

10.1.1 The Subcontractor warrants to the Owner and Gray that materials and equipment furnished under this Subcontract will be of good quality and new unless otherwise required or permitted by the Subcontract Documents, that the Work will be performed in a good, workmanlike manner, be free from defects in materials and workmanship, and that the Work will conform with the requirements of the Subcontract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective in the sole judgment of Gray. This warranty shall be in addition to and not in limitation of any other warranty or remedy provided by law or by the Subcontract Documents. The warranty shall extend for the period agreed to by Gray in the contract between Gray and the Owner.

10.1.2 The Subcontractor further agrees to execute any additional guarantees or warranties specified in the Subcontract Documents.

10.2     CORRECTION OF WORK.

10.2.1 The Subcontractor shall promptly correct Work rejected by Gray or failing to conform to the requirements of the Subcontract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed.

10.2.2 The Subcontractor shall be obligated to correct work that is found not to be in accordance with the Subcontract Documents after substantial completion to the same extent that Gray is bound to the Owner for correction of said Work. The Subcontractor shall begin the corrective work immediately after receipt of written notice from Gray to do so. This obligation shall survive acceptance of the Work and termination of the Subcontract. This obligation is in addition to, and not in limitation of, the warranty obligations under Section 10.1, it being the intent of this Agreement that warranty obligations are not restricted by Subcontractor's obligations to correct defective work.

If the Owner chooses to correct the Work without notice to Gray and opportunity for cure, the Subcontractor shall be obligated to Gray for any backcharge that the Owner has assessed Gray resulting from the Subcontractor's Work.

10.3     SATISFACTION OF WARRANTY AND CORRECTIVE WORK OBLIGATIONS. The Subcontractor agrees to satisfy warranty and corrective work obligations without cost to the Owner or Gray. In the event of Subcontractor's failure to satisfy these obligations, all costs for design, labor, supervision, materials, travel (including meals, lodging and mileage), equipment and overhead (at 18% of costs) incurred by Gray in the investigation, review, redesign and correction of such problem shall be paid to Gray by Subcontractor. Design and service team costs shall be computed using Gray's standard hourly rates. A verbal request for corrective action by Gray to the Subcontractor, together with a written confirmation of the action requested, will be provided. If corrective action is not initiated or completed within a time reasonable under all the circumstances, Gray will

| Issue Date: | 08/01/03 |
| --- | --- |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

itself commence investigation and implement corrective measures at the Subcontractor's expense. Gray's rights hereunder are in addition to all other rights and remedies pursuant to the Subcontract, and the institution of such measures by Gray shall in no way relieve Subcontractor of its primary responsibility for performing and warranting the Work in accord with the Subcontract Documents.

## SECTION 11

### RECOURSE BY GRAY

11.1    <u>DEFAULT; NOTICE TO CURE</u>. If the Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or maintain the Schedule of Work, or fails to achieve Substantial or Final Completion, or it fails to make prompt payment for its workers, sub- Subcontractors or suppliers, disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or fails to indemnify Gray as required by this Agreement or by law, or otherwise is guilty of a breach of any provision of this Agreement, and fails within three (3) working days after receipt of written notice to commence and continue satisfactory correction of such default with diligence and promptness, then Gray, without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:

(a)    supply such number of workers and quantity of materials, equipment and other facilities as Gray deems necessary for the completion of the Subcontractor's Work, or any part thereof which the Subcontractor has failed to complete or perform after the aforesaid notice, and charge the cost thereof to the Subcontractor, who shall be liable for the payment of such costs, including reasonable overhead, profit, as well as for other damages, and attorney's fees and dispute resolution costs;

(b)    contract with one or more additional contractors to perform such part of the Subcontractor's Work as Gray shall determine will provide the most expeditious completion of the total Work and charge the cost thereof to the Subcontractor;

(c)    withhold payment of any monies due the Subcontractor pending corrective action or completion of the Subcontractor's Work to the extent required by and to the satisfaction of Gray;

(d)    set-off Gray's damages attributable to Subcontractor's default against any monies due Subcontractor under this Agreement or under any other contract between Gray and the Subcontractor; and

(e)    terminate the Subcontract Agreement as set forth below.

In the event of an emergency affecting the safety of persons or property, Gray may proceed as above without notice.

11.2    <u>TERMINATION BY GRAY</u>. If the Subcontractor fails to commence and satisfactorily continue correction of a default within three (3) working days after receipt by the Subcontractor of the notice issued under Section 11.1, then Gray may terminate this Agreement by written notice to the Subcontractor and its surety, if any, and use any materials, equipment and/or employ such workers or Subcontractors as Gray deems necessary to complete the Work.

All of the costs incurred by Gray in so performing the Subcontractor's Work, including reasonable overhead, profit and attorney's fees shall be deducted from any monies due or to become due the Subcontractor. The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the subcontract price.

11.3    <u>BANKRUPTCY</u>.

| Page 17 | | Issue Date: | 08/01/03 |
|---------|--|-------------|----------|
| | | Revision No.: | 4 |
| Standard Subcontract Agreement | | Revision Issue Date: | 05/23/06 |

11.3.1  <u>TERMINATION ABSENT CURE</u>.  If Subcontractor files a petition under the Bankruptcy Code, this Agreement shall terminate if the Subcontractor or the Subcontractor's trustee (a) rejects the Agreement, or (b) if there has been a default, the Subcontractor is unable to give adequate assurance that the Subcontractor will perform as required by this Agreement, or (c) is otherwise unable to comply with the requirements for assuming this Agreement under the applicable provisions of the Bankruptcy Code.

11.3.2  <u>INTERIM REMEDIES</u>.  If the Subcontractor is not performing in accordance with the Schedule of Work at the time a petition in bankruptcy is filed, or at any subsequent time, Gray, while awaiting the decision of the Subcontractor or its trustee to reject or to assume this Agreement and provide adequate assurance of its ability to perform hereunder, may take such steps as are reasonably necessary to maintain the Schedule of Work.  Gray may offset against any sums due or to become due the Subcontractor all costs incurred in pursuing any of the remedies provided hereunder, including, but not limited to, reasonable overhead, profit and attorneys' fees.  The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Subcontract Price.

11.4  <u>SUSPENSION BY GRAY</u>.  Gray may order the Subcontractor in writing to suspend, delay, or interrupt all or any part of the Subcontractor's Work for such period of time as may be determined to be appropriate for the convenience of G ray.  Phased or interrupted Work when required shall not be deemed a suspension of Work.

The Subcontractor shall notify Gray in writing within five (5) calendar days after receipt of Gray's order of the effect of such order upon the Subcontractor's Work.  To the extent, and only to the extent, allowed Gray under the Contract Documents, the Subcontract Price or Schedule of Work shall be adjusted by Subcontract Change Order for any increase in the time or cost of performance of this Agreement caused by such suspension, delay, or interruption.

Neither the Subcontract Price nor the Schedule of Work shall be adjusted under this Section for any suspension, delay or interruption to the extent that performance would have been so suspended, delayed or interrupted by the fault or negligence of the Subcontractor or by a cause for which the Subcontractor would have been responsible.

11.5  <u>WRONGFUL EXERCISE</u>.  If Gray wrongfully exercises any option under this Section 11, Gray shall be liable to the Subcontractor solely for the reasonable value of work performed by the Subcontractor prior to Gray's wrongful action, including reasonable overhead and profit, less prior payments made.  Subcontractor shall not be entitled to recover any other incidental or consequential damages, including but not limited to profits attributable to unperformed Work.

11.6  <u>REMEDIES CUMULATIVE</u>.  All the rights and remedies of Gray in the event of a default by Subcontractor under this Agreement shall be cumulative to the greatest extent permitted by law and shall be in addition to all other rights and remedies available to Gray at or in equity.

## SECTION 12

### SUSPENSION OR TERMINATION BY OWNER

12.1  <u>SUSPENSION BY OWNER</u>.  Should the Owner suspend Gray's contract or any part of Gray's contract which includes the Subcontractor's Work, Gray shall so notify the Subcontractor in writing and, upon receipt of said notice, the Subcontractor shall immediately suspend the Work.

12.2  <u>TERMINATION BY OWNER</u>.  If the Owner, for any reason, terminates Gray's contract or any part that includes the Subcontractor's Work, Gray shall so notify the Subcontractor in writing and upon receipt of said notice, this Agreement shall also be terminated and the Subcontractor shall immediately stop the Work.

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 4 |
| Revision Issue Date: | | 05/23/06 |

12.3 ·   CLAIMS FOR OWNER SUSPENSION OR TERMINATION. In the event of such Owner suspension or termination, Gray's obligation to the Subcontractor is limited to the extent of Gray's recovery, on the Subcontractor's behalf, under the Contract Documents. Gray agrees to cooperate with the Subcontractor, at the Subcontractor's expense, in the prosecution of any Subcontractor claim arising out of an Owner suspension and to permit the Subcontractor to prosecute said claim, in the name of Gray, for the use and benefit of the Subcontractor. Administrative and overhead costs, attorney's fees and other expenses incurred by Gray while assisting the Subcontractor in the prosecution of such claim shall be deducted from any recovery paid to Subcontractor.

12.4     STIPULATION. The provisions of this Section 12 shall not be construed to create any obligation upon Gray to pursue any claim or litigation on behalf of the Subcontractor.

## SECTION 13

### LABOR RELATIONS AND IMMIGRATON

13.1     ICOMPLIANCE WITH IMMIGRATION REFORM AND CONTROL ACT OF 1986 ("IRCA"). Gray and Subcontractor agree that Subcontractor shall be obligated to comply with all requirements imposed on employers under IRCA with regard to every Subcontractor employee ("Contract Worker") who will perform services for Subcontractor, where such service is provided in connection with Subcontractor's performance of this Subcontract. Subcontractor further agrees that Subcontractor is the "employer" as that term is defined at 8 C.F.R. Section 274a.1(g), and that Gray is not the "employer" as so defined, with regard to such Contract Workers. In furtherance of its duties as employer under IRCA, Subcontractor agrees to do the following:

A.     Complete USCIS Form I-9 for all Contract Workers. Subcontractor agrees that it has sole responsibility for completing Form I-9 for all Contract Workers who provide services as a part of Subcontractor's performance of this subcontract, and that it will do so and will further update such Form to the extent required by law. Subcontractor further warrants that all of Subcontractor's agents and/or employees who complete Form I-9 for such Contract Workers will be knowledgeable of all Form I-9 requirements, including but not limited to, knowledge of which documents do and do not satisfy the requirements of Form I-9, and that such agents and employees will otherwise complete Form I-9, and that such agents and employees will otherwise complete Form I-9 in full compliance with IRCA.

B.     Subcontractor's Warranty of Employment Authorization for all Contract Workers. Subcontractor hereby warrants that no Contract Worker will provide services pursuant to this subcontract until Subcontractor has completed Form I-9 for such Contract Worker in the manner required by IRCA. Subcontractor further warrants that it will not permit any Contract Worker to perform services under this subcontract who Subcontractor knows or has reason to believe is not authorized to work in the United States, regardless of whether such individual is able to produce documents which satisfy the requirements of Form I-9. Subcontractor understands that Gray is acting in reliance on Subcontractor's warranty as described in this subparagraph and further states that without Subcontractor's warranty that it has taken all necessary steps to comply with IRCA and·.- that Subcontractor believes all Contract Workers are authorized to work in the United States.

C.     Removal of Contract Workers not Authorized for Employment in the United States. Subcontractor agrees that if at any time after it assigns a Contract Worker to perform services under this subcontract, Subcontractor learns or has reason to believe that any Contract Worker is not authorized to work in the United States, Subcontractor shall immediately so inform Gray and Subcontractor shall cease assigning work to such Contract Worker providing services under this subcontract.

D.     Indemnification and Hold Harmless. Subcontractor agrees that in any event any government agency determines that any Contract Worker hired by Subcontractor to perform duties under this subcontract is not authorized for employment in the United States, Subcontractor shall indemnify and hold harmless Gray and any of Gray's agents, employees, officers, directors, trustees, or other persons acting on Gray's behalf, from any liability incurred by Gray as a result of such determination. Such indemnification shall include, by way of example but not in any way limited to, any civil or criminal fines or penalties assessed, alleged

| Page 19 | | Issue Date: | 08/01/03 |
|---|---|---|---|
| | | Revision No.: | 4 |
| Standard Subcontract Agreement | | Revision Issue Date: | 05/23/06 |

and any costs incurred in responding to or participating in any government investigation, finding, recommendation, hearing, appeal or any other proceeding, including attorneys' fees and costs.

    13.2    <u>LABOR HARMONY</u>.  Subcontractor and its lower tier Subcontractors shall not employ anyone in the Subcontractor's Work whose employment may be objectionable to Gray or the Owner.  All labor used throughout the Work by Subcontractor or any of its lower tier Subcontractors shall be of a standing or affiliation that will permit the Project to be carried on harmoniously and without delay, and that will not, in any case, or under any circumstances, cause any disturbance, interference or delay to the progress of the Project.

    13.3    <u>LABOR DISPUTES</u>.  Subcontractor and all persons in privity with it agree that, where its Work or any of the Work of Gray or other Subcontractors is stopped or delayed or interfered with by strikes, slow-downs or work interruptions or the threats thereof, resulting from an act or failure to act of Subcontractor and/or those in privity with it, or any of their employees or agents, then Gray, at its sole option, shall afford Subcontractor twenty-four (24) hours notice wherein Subcontractor shall take action to maintain the harmony of the Work, or make such other arrangements, satisfactory to Gray that will ensure the harmonious continuation of the Work. Subcontractor's failure to so comply within the allotted time shall be an event of default, for which Gray may, at its sole option, terminate this Agreement pursuant to Section 11.1.

# SECTION 14

## INDEMNIFICATION

    14.1    <u>SUBCONTRACTOR'S PERFORMANCE</u>.  To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors and Subcontractors and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of the Subcontractor's Work provided that:

    (a)    any such claim, damage, loss or expense is attributable to bodily injury, personal injury, sickness, disease or death, or to damage to or destruction of tangible property including the loss of use resulting therefrom, to the extent caused or alleged to be caused by any negligent act or omission of the Subcontractor or any person directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable (including sub-Subcontractors and suppliers of Subcontractor).

    (b)    litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the work or materials or processes used by the Subcontractor, or its subcontractors and/or suppliers

    (c)    claims against or through Gray or liability for claims and liens for labor performed or materials used or furnished through or under Subcontractor on the Project.

    (d)    liability or claims against or through to Gray resulting from the Subcontractor's failure to comply with applicable licensing requirements or Code requirements.

    (e)    liability imposed upon Gray directly or indirectly by Subcontractor's failure or the failure of any of its employees to comply with law, ordinances, rules, regulations or requirements, including Occupational Safety and Health Administration violations and any penalties, including enhancements, resulting in whole or in part from Subcontractor's acts or omissions.

    (f)    such obligations shall not be construed to negate, or abridge, or otherwise reduce any other right or obligation of indemnity under this Agreement or which would otherwise exist as to any party or person described in this Section 14.

| | | |
|---|---|---|
| Issue Date: | | 08/01/03 |
| Revision No.: | | 4 |
| Revision Issue Date: | | 05/23/06 |

14.2   NO LIMITATION OF LIABILITY.   In any and all claims against the Owner, Gray (including its affiliates, parents and subsidiaries) and other contractors or Subcontractors, or any of their agents or employees, by any employee of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, the indemnification obligation under this Section 14 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under worker's or workmen's compensation acts, disability benefit acts or other employee benefit acts.

## SECTION 15

### INSURANCE

15.1   SUBCONTRACTOR'S INSURANCE.   Prior to beginning the Work, the Subcontractor shall procure for its Work, and furnish proof of, Workers' Compensation Insurance, Employer's Liability Insurance, Commercial (Comprehensive) General Liability Insurance (including contractual liability insurance covering Subcontractor's obligations under Section 14), Comprehensive Automobile Liability Insurance, and all other insurance and extensions thereof required of Gray insofar as the requirements relate to Subcontractor's Work. Gray shall be named as an additional insured on the Subcontractor's Commercial (Comprehensive) General Liability policy.   Subcontractor shall procure and maintain at all times during the course of the Work (including corrective or warranty work) the required insurance with limits of liability not less than those listed below. Policies shall be in a form satisfactory to Gray and issued by insurers licensed to do business in the state where the Project is located and who are rated no lower than A by Best Insurance Guide.

15.1.1   WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY.

(a)   Statutory coverage in each state in which Subcontractor's employees are engaged in the performance of the Work;

(b)   Employer's Liability:

| | | |
|---|---|---|
| $100,000 | - | bodily injury for each accident |
| $500,000 | - | policy limit for bodily injury by disease |
| $100,000 | - | for each employee for bodily injury by disease. |

15.1.2   COMMERCIAL GENERAL LIABILITY.

(a)   Limits of Liability:

| | | |
|---|---|---|
| $1,000,000 | - | general aggregate |
| $1,000,000 | - | products and completed operations aggregate |
| $1,000,000 | - | personal and advertising injury |
| $1,000,000 | - | each occurrence |

(b)   Coverage Details:

Coverage shall be by Standard Commercial General Liability Occurrence Form including:

Personal and Advertising Injury, Contractual Liability, Explosion, Collapse and Underground Liability (if applicable), Broad Form Property Damage, Independent Contractors, and Products and Completed Operations.

This policy shall add Gray as an insured thereunder by proper endorsement.

15.1.3   AUTOMOBILE LIABILITY

(a)     Limits of liability:  $1,000,000 per accident

(b)     Coverage details:

All owned, non-owned and hired vehicles.

15.1.4  PROFESSIONAL LIABILITY.  Professional Liability (Errors and Omissions) coverage with a minimum limit of $250,000 each claim and $250,000 in the aggregate, if required by Section 1.10.

15.1.5  EXCESS OR UMBRELLA LIABILITY.  Subcontractor shall include Excess or Umbrella Liability Insurance in an amount not less than indicated in Section 1.11.

15.1.6  CERTIFICATE OF INSURANCE.  Subcontractor shall furnish Gray with a certificate of insurance (or certified copies of its insurance policies), which  Subcontractor warrants and represents is a true and accurate representation of  Subcontractor's existing insurance coverage.  This certificate shall indicate all endorsements, including Gray, and Owner if applicable, as additional insured by standard endorsements CG2010 (07/04) and CG2037 (07/04).

15.2     CANCELLATION, RENEWAL OR MODIFICATION.  All insurance policies shall contain a provision that the coverages afforded thereunder shall not be cancelled or not renewed, nor restrictive modifications added, until at least thirty (30) days prior written notice has been given to Gray unless otherwise specifically required in the Subcontract Documents.

No progress payment will be made unless Gray has been furnished evidence of required coverages and endorsements as required by this Subcontract.

In the event the Subcontractor fails to obtain or maintain any insurance coverage required under this Agreement, Gray may purchase such coverage and charge the expense thereof to the  Subcontractor, or terminate this Agreement.

15.3     WAIVER OF RIGHTS.  Gray and  Subcontractor waive all rights against each other and the Owner, separate contractors, and all other  Subcontractors for loss or damage to the extent covered by Builder's Risk or other similar insurance covering improvements or materials at the Project site, except such rights as they may have to the proceeds of such insurance.

If not covered under the Builder's Risk policy of insurance or any other property or equipment insurance required by the Subcontract Documents, the  Subcontractor shall procure and maintain at the  Subcontractor's own expense property and equipment insurance for portions of the  Subcontractor's Work stored off the site or in transit, when such portions of the  Subcontractor's Work are to be included in an application for payment under Section 5.

15.4     ENDORSEMENT.  If the policies of insurance referred to in this Article require an endorsement to provide for continued coverage where there is a waiver of subrogation, the owners of such policies will cause them to be so endorsed.

15.5     PRIMARY COVERAGE.   The insurance required of Subcontractor must be primary and non-contributory with Gray's insurance program.

## SECTION 16

### DISPUTE RESOLUTION

16.1     DISPUTE RESOLUTION.  All claims, disputes and matters in question arising out of, or relating to, this Agreement or the breach thereof, except for claims which have been waived by the making or acceptance

of final payment and the claims excluded or limited by Sections 6.2 and 6.6, shall be resolved by mediation, arbitration and/or litigation at Gray's sole option. The provisions for arbitration shall be specifically enforceable under the Federal Arbitration Act. The site for mediation, litigation or arbitration shall be at the Project site or Lexington, Kentucky, as selected by Gray, unless required otherwise by Gray's agreement with Owner.

16.2     <u>DISPUTE RESOLUTION PROCEDURE</u>. Prior to a demand for arbitration, or initiation of litigation of claims, the parties shall proceed as follows, as an express condition precedent to commencing formal claims against the other relating to or arising out of the dispute:

    (a)     The party asserting a claim shall do so in writing and within the notice period, if any, established for such claims by the Subcontract Documents. In the absence of a notice period set by the Subcontract Documents, the notice of claim shall be given as soon as practicable but in no event later than five (5) calendar days after the claimant is aware of the event from which the claim arises.

    (b)     The parties shall then attempt in good faith to negotiate a resolution of disputed claims during the next twenty (20) calendar days before pursuing any other means of dispute resolution.

    (c)     If claims remain unresolved, the parties shall endeavor to resolve disputes by proceeding at the instance of either to non-binding mediation conducted under such rules as the parties may agree to employ. The parties shall divide the cost of the mediator evenly among them.

    (d)     <u>DISPUTES RELATING TO GRAY</u>. Notwithstanding anything stated above, if any dispute shall arise between Gray and the Subcontractor pertaining in any manner to the construction or interpretation of this Agreement, or to the rights or obligations of the parties, or to the breach of this Agreement, which the parties are unable to settle by mutual agreement, Gray shall have the exclusive option either to have the dispute determined by a court or by arbitration in accordance with the Arbitration Rules of the Center for Public Resources. Gray, Subcontractor and Subcontractor's surety agree that all claims, disputes, and other matters in controversy between Gray and Subcontractor, arising out of or relating to the Subcontract, or the breach thereof, except as provided in the Contract Documents, shall be resolved in the appropriate forum in the County of Fayette, Kentucky. Gray shall exercise its exclusive option by commencing a court action or by commencing an arbitration proceeding. If Subcontractor first commences a court action with respect to a dispute which Gray desires to have determined by an arbitration proceeding, or if Subcontractor first commences an arbitration proceeding which Gray desires to have determined by a court, Gray shall commence the arbitration proceeding or court action desired by Gray within thirty days after receiving service of Subcontractor's complaint or arbitration demand. If, at any time, even after suit may have been filed by either party, but prior to commencement of trial, Gray becomes involved in litigation or arbitration with another party or parties involving questions of fact or law common to the dispute between Gray and Subcontractor to the extent that (a) in Subcontractor's absence, complete relief cannot be accorded among those already parties, or (b) disposition of such other action may as a practical matter, impair or impede Gray's or Subcontractor's ability to fully prevent its incurring multiple or otherwise inconsistent obligations, Subcontractor agrees that Subcontractor may be joined by Gray in such other litigation or arbitration proceedings for complete resolution of all disputes and controversies arising under this Agreement and that upon such joinder, any pending action between Gray and Subcontractor shall be dismissed.

    (e)     If Gray chooses to have the matter resolved by arbitration, then it shall proceed in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes, as modified by this Agreement. The arbitration panel shall consist

of three independent and impartial persons who have experience in the construction industry or construction law. The Subcontractor and Gray shall each appoint one member of the panel and the third member shall be appointed according to the aforementioned Rules.

(f)     If Gray chooses to arbitrate, then the arbitration award shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof, subject to any restrictions set forth in the Federal Arbitration Act

16.3    WORK CONTINUATION AND PAYMENT. Unless otherwise agreed in writing, the Subcontractor shall continue on which the Work and maintain the Schedule of Work pending arbitration, and if so, Gray shall continue to make payments earned by the Subcontractor in accordance with this Agreement.

16.4    DOCUMENT PRODUCTION AND EXCHANGE OF ARBITRATION EXHIBITS. If Gray consents to arbitrate, each party shall have the right to immediate production of the records of the other party relating to the Project for inspection and copying except for those portions which are covered by an unwaived attorney-client privilege or which were prepared in anticipation of arbitration or litigation. No later than 15 days prior to the arbitration hearing, the parties shall make available to each other, for inspection and copying, the exhibits, photographs, and other documents which they intend to introduce or refer to during the arbitration.

16.5    ATTORNEY'S FEES, ARBITRATION COSTS, AND/OR COURT COSTS.

(a)     Attorney's fees and expenses shall be awarded to the prevailing party if a claim or dispute is found to have been asserted or defended unreasonably or in bad faith.

(b)     The prevailing party in arbitration or court proceeding shall recover its attorney's fees and court costs incurred in any judicial proceedings necessary, including those fees necessary to obtain (i) enforcement of this arbitration clause or (ii) confirmation, enforcement, or collection of an arbitration award or court judgment.

# SECTION 17

## MISCELLANEOUS PROVISIONS

17.1    GOVERNING LAW. This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Kentucky applicable to agreements executed, delivered, and to be performed solely within the Commonwealth of Kentucky.

17.2    SEVERABILITY AND WAIVER. The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision. The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

17.3    TITLES. The titles given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any other purpose.

17.4    ATTORNEYS' FEES. The Subcontractor shall reimburse Gray for all of Gray's attorney's fees, court costs and other expenses incurred in enforcing or declaring the Subcontractor's obligations under this Agreement, incurred in exercising any right or remedy hereunder or under law or equity in the event of a default by the Subcontractor, or incurred in any litigation or arbitration in which Gray, without its fault, becomes involved by reason of the existence of this Agreement.

Standard Subcontract Agreement

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |

17.5    WRITTEN NOTICES. Written notices to Gray required by this Agreement shall be addressed to 10 Quality Street, Lexington, Kentucky 40507-1450. Written notices to Subcontractor required by this Agreement shall be sent to the address given in Section 1.1 of this Agreement. Any notice sent by mail shall be deemed to have been received the third calendar day after the date of mailing. Notice may also be delivered by hand delivery or fax, in which event notice shall be deemed effective on the date such notice is given.

17.6    ENTIRE AGREEMENT. This Agreement is solely for the benefit of the signatories hereto and represents the entire and integrated agreement between the parties hereto and supersedes all prior contemporaneous negotiations, representations, understandings or agreements, either written or oral. This Agreement shall not be modified except by a written instrument signed by the parties.

## SECTION 18

### SPECIAL PROVISIONS

18.1    BINDING EFFECT. This Agreement shall be binding upon and inure to the benefit of Gray, Subcontractor, and their successors and assigns.

18.2    PRECEDENCE. It is understood the Work to be performed under this Agreement, including the terms and conditions thereof, is as described in Section 1 through 17 herein together with the following Scope of Work, which are intended to complement same. However, in the event of an inconsistency, these Special Provisions shall govern.

18.3    INCONSISTENCIES AND OMISSIONS. Should inconsistencies or omissions appear in the Subcontract Documents, it shall be the duty of the Subcontractor to so notify Gray in writing within three (3) working days of the Subcontractor's discovery thereof. Upon receipt of said notice, Gray shall instruct the Subcontractor as to the measures to be taken and the Subcontractor shall comply with Gray's instructions.

18.4    CROSS REFERENCE OF DOCUMENTS. Subcontractor shall review all specifications, drawings, reports and existing conditions which affect the relationship of Subcontractor's Work to the complete project, and be responsible for that relationship. By way of example, a roofing Subcontractor shall be responsible for including and performing mechanical and plumbing roof penetrations, which may or may not be detailed on the roof plans and details, but may be shown on the mechanical drawings.

18.5    SUBCONTRACT DOCUMENTS. The Subcontract Documents are identified as follows and incorporated by reference:

(a)    Scope of Work – Exhibit A

(b)    Drawing List – Exhibit B

(c)    Specifications & Other Documents – Exhibit C

(d)    Other Provisions – Exhibit D

(e)    Application for Payment – Exhibit E

(f)    Sub-Subcontractors/Materialmen's Waiver of Lien – Exhibit F

(g)    Subcontractor Safety Orientation Manual – Exhibit G

(h)    This Agreement

(i)    The Contract Documents identified in the contract between the Owner and Gray, including but not limited to the signed agreement between the Owner and Gray,

| | | |
|---|---|---|
| | Issue Date: | 08/01/03 |
| | Revision No.: | 4 |
| Standard Subcontract Agreement | Revision Issue Date: | 05/23/06 |

·conditions of the contract (general, supplementary, special and other conditions), drawings, specifications, addenda, change orders, other written modifications, and other documents enumerated therein;

WITNESS WHEREOF, The parties have caused this Agreement to be executed by their duly authorized representatives, under seal, as of the day and year first above written.

**CONTRACTOR**

GRAY CONSTRUCTION, INC.

_____
Project Manager

_____
Executed By

_EXECUTIVE V.P. AUTOMOTIVE MARKET_
Title

(Seal)
Attest:

_____

_____
Title

**SUBCONTRACTOR**

_STANDARD ROOFING OF MONTGOMERY, INC._
Company Name

_____
Signature

_PETE TAYLOR_
Printed Name

_PRESIDENT_
Title

(Seal)

Attest:

_____

STEVEN C. COX

SECRETARY- TREASURER
Title

## *If applicable, complete certificate on the following page.*

## CERTIFICATE

(Certificate DOES NOT need to be completed IF subcontractor is a Sole Proprietorship. Notary Public section must be completed by all entities.)

I, __PETE TAYLOR__, certify that I am an/a

__OFFICER__ of __STANDARD ROOFING OF MONTGOMERY, INC.__
(Officer/Member/Partner)                    (Name of Subcontractor Entity)

and that I am authorized and empowered by valid resolutions of the __BOARD OF DIRECTORS__
(Partners/ Board of Directors/ Managers)

of said __CORPORATION__ to execute this Subcontract for and on its behalf.
(Partnership/Corporation/Limited Liability Company)

This __10 TH__ day of __NOVEMBER__, 20 __06__

State of __ALABAMA__

County of __MONTGOMERY__

Officer __PETE TAYLOR, PRESIDENT__

Subscribed, sworn to and acknowledged before me by __PETE TAYLOR__

This __10 TH__ day of __NOVEMBER__, 20 __06__

Notary Public

My Commission Expires: __1/26/2010__

---

Standard Subcontract Agreement

| | |
|---|---|
| Issue Date: | 08/01/03 |
| Revision No.: | 4 |
| Revision Issue Date: | 05/23/06 |



**Gray Construction**

### EXHIBIT A
### SCOPE OF WORK
### SUBCONTRACT AGREEMENT NO.: 207005-07-100

Standard Roofing of Montgomery, Inc. shall provide all materials, labor, equipment and other services necessary to complete the Roofing Work for the Hwashin Project in Greenville, Alabama. All work shall be performed in accordance with plans and specifications as prepared by Gray Construction.

Furthermore, the scope of work shall be more specifically defined but shall in no way be limited to the following:

1.   This scope of work includes but is not limited to selective demolition and temporary roofing protection.

2.   The Subcontractor is to provide all requirements for roof access and lifting of materials.

3.   Gray does not allow the 6' monitoring system to be utilized.

4.   All material will be staged in designated areas and on sufficient dunnage to ensure the material is maintained in a clean manner, free from mud and debris prior to and after installation. No stoned staging areas will be provided, and this is the Subcontractor's responsibility if required to meet schedule.

5.   Subcontractor to conform to and enforce all items in Gray safety policy.

6.   Subcontractor to send a representative to site meetings weekly.

7.   The Subcontractor shall provide all field layout for the execution of this scope of work. Design/builder will provide permanent benchmarks. Field verification of all existing conditions will be required.

8.   The Subcontractor shall provide daily clean up of all work areas, or work will be completed by others and backcharged.  Large quantities of waste will be disposed of by the subcontractor, small amounts of waste may be deposited directly into Gray's waste removal dumpster, provided that the waste is suitable for normal disposal.

9.   Subcontractor is responsible for the cleaning of debris and residue deposited on public roads as a result of its operations.

10.  Invoices will be due to Gray by the 25th of each month, with work projected through the end of the month.  A 10% retainage will be withheld from each month's invoice.

Exhibit A - Standard Subcontract Agreement

11. The subcontractor (and tiered subcontractors/suppliers, when applicable) shall comply with **Gray Construction project reporting procedures** in regards to Daily Reports, Safety Reports, HAZ. Com., and Safety Training Reports, QA/QC verifications, and two week look ahead schedules.

12. The Subcontractor and tiered subcontractors/suppliers shall embrace and abide by the **Gray Construction Alcohol and Drug Free Project Policy for Subcontractors.**

13. The Subcontractor and tiered subcontractor/suppliers shall comply with the **safety requirements of Gray Construction**, including 100% tie-off requirements, 100% eye protection, State, Federal, OSHA and all regulatory agencies having jurisdiction.

14. The Subcontractors and tiered subcontractor/suppliers shall be responsible for all applicable taxes, fees, insurance and permits for their scope of work.

15. All Subcontractors and tiered subcontractors/suppliers shall provide the required **insurance certificates** before initiating any work on site. Gray Construction is to be listed as an additionally insured on Certificate of Insurance. Builders Risk Insurance will be by others.

16. Parking will be restricted to assigned areas. Only company vehicles delivering materials or equipment will be allowed on site and only in areas where designated by the Contractor.

17. The Subcontractor (and tiered subcontractors/suppliers when applicable) shall provide and maintain competent on-site supervisors during the execution of the work as well as a sufficient number of qualified workers to properly service the project schedule.

18. Temporary toilets for use of all workmen on the project will be provided by others.

19. The Subcontractor shall also provide the following as necessary for their scope of work:

    • Ice and drinking water for his employees, storage sheds and trailers, and office facilities including telephone, fax, copier, and any other support elements as required for their own use.

20. The Subcontractor shall remove all temporary facilities and restore areas to original condition before final acceptance of the work.

21. The Subcontractor shall provide a complete system in accordance with the intent of the drawings, specifications, and contract documents. It is understood that there will be no revisions to the contract amount as long as the scope of work and the intent as referenced is not altered.

22. The Subcontractor will cooperate with Grays O punch list initiative.

**PRICE BREAKDOWN:**

Please submit quantities for the following items of work.  Prices shall include all labor, taxes, material, insurance, payroll overhead, benefits, overhead and profit.  Gray reserves the right to reject any or all unit prices.

| Description | Unit | Base Bid Quantity | Total cost for Item |
|---|---|---|---|
| Phase I Work | | | $17,778.67 |
| Phase II Work | | | TBD |
| Phase III Work | | | TBD |
| Contract Amount | | | $17,778.67 |

Monthly billings submitted by the Subcontractor must be broken down and charged against the following code(s).

| COST CODE | DESCRIPTION | AMOUNT |
|---|---|---|
| 207005-07-100 | Roofing | $17,778.67 |

Exhibit A - Standard Subcontract Agreement



**Gray Construction**

EXHIBIT B
DRAWING LIST
SUBCONTRACT AGREEMENT NO.: 207005-07-100

| Drawing No. | Drawing Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Exhibit B - Standard Subcontract Agreement



**Gray Construction**

EXHIBIT C
SPECIFICATIONS & OTHER DOCUMENTS
SUBCONTRACT AGREEMENT NO.: 207005-07-100

| Document No. | Document Title | Date | Description |
|---|---|---|---|
| | Not applicable at this time. | | |

Page 1

Exhibit C – Standard Subcontract Agreement



**Gray Construction**

EXHIBIT D
OTHER PROVISIONS
SUBCONTRACT AGREEMENT NO.: 207005-07-100


Not applicable at this time.

Exhibit D – Standard Subcontract Agreement

**Exhibit E**                              APPLICATION FOR PAYMENT                              **GRAY**

*REMIT TO:*
**GRAY CONSTRUCTION, INC.**
**Post Office Box 8330**
**Lexington, Kentucky  40533-8330**

| | |
|---|---|
| Date: | Gray Project: |
| Subcontractor Name: | Gray Project No.: |
| Remit To Address: | Subcontractor Project Number: |
| City, State, Zip: | Date of Subcontract: |
| Contact Person: | Application No.: |
| Phone:          Fax: | Billing Period: From:          To: |

Interim ☐          Final ☐          Retention ☐

**STATEMENT OF SUBCONTRACT**

Original Subcontract Amount                                    $ _____

**APPROVED** Change Order #1 Thru _____        $ _____

Adjusted Subcontract Amount to Date                     $ _____

**JOB TO DATE APPLICATION CALCULATIONS**

| | | Totals to Date |
|---|---|---|
| Total Value of Work Complete & Mat'l Stored (per breakdown)... | A | $ |
| Less _____ % Retainage | B | $ |
| Total to Date Less Retainage  (Line A - Line B) | C | $ |
| Less Previous Applications | D | $ |
| **Amount** of This Application  (Line C - Line D) | E | $ |

**FOR GRAY USE ONLY**

Approved by: _____

Date: _____

Pay with money from Customer Billing Est. # _____

Change Order Needed: _____

Insurance Needed: _____

Other Payment Instructions: _____

_____

Page 1 Exhibit E                                                                                              Rev. 08/03

**Exhibit E**                    VALUE OF WORK COMPLETE BREAKDOWN                    **GRAY**

| A | B | C | D | E | F | G | H* | I |
|---|---|---|---|---|---|---|---|---|
| Cost Code(s) | Description | Original Contract Amount | Approved Change Order(s) Amount | Current Contract Amount (C+D) | Value of Work Complete | Materials Stored | Total Value of Work Cmpl & Mat'l Stored. (F+G) | % Cmpl |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | TOTALS | | | | | | | |

* Must include subtotals by cost code for both original contract value and change orders.
Page 2 Exhibit E

Rev. 08/03

**Exhibit E**    LIST OF SUB-SUBCONTRACTOR/MATERIAL SUPPLIERS PERFORMING WORK UNDER YOUR SUBCONTRACT    GRAY

**(Attach separate list if necessary)**

Listed below is each and every Sub-subcontractor and/or Material Supplier who has performed work for this Subcontractor on the aforementioned project, together with payments which have been made to each Sub-subcontractor and/or Material Supplier and the unpaid amounts claimed by each, through the billing period for this Application for Payment.

| Sub-Subcontractors and/or Material Suppliers | Address/Phone No. | Description of Work | Previous Amount Paid | Unpaid Amount Claimed | Lien Waiver Attached ☑ |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Page 3 Exhibit E                                    Rev. 08/03

**Exhibit E**          SUBCONTRACTOR AFFIDAVIT AND WAIVER OF LIEN - ACKNOWLEDGMENT OF PAYMENT                    **GRAY**

Subcontractor, having a Subcontract with Gray Construction, Inc. on the aforementioned project, has performed work and/or furnished materials, equipment, and/or machinery or has fabricated materials especially for the Project, during the Billing Period described on page 1 of this Application for Payment.

Subcontractor has paid in full all bills or obligations for labor, sub-subcontract work, payroll taxes, material, (whether or not specifically fabricated for this project), equipment, and/or machinery, which are due or payable on or before the last day of the Billing Period.

The Subcontractor further certifies that it has complied with all federal, state and local tax and employment laws, including, but not limited to, Social Security, Unemployment and worker's compensation laws, applicable to its contract and work on the Project through the Billing Period.

The Subcontractor hereby waives and releases all rights to liens and claims against the Owner, Gray, and any surety for the performance of his contract from inception through the Billing Period of this Application for Payment, except for (a) retention which is unpaid to date and (b) work which has been performed which is not the subject of an approved change order <u>and</u> which has been described in an attached document. The Subcontractor further states that no other person has any right to a lien or claim against the Owner on account of work performed or for material, equipment, and/or machinery, or for material especially fabricated for the Project, furnished to the Subcontractor through the Billing Period of this Application for Payment.

waiver and release is given with the understanding that Gray Construction, Inc. and others will rely upon it, and to induce Gray to make payments to the Subcontractor. The waiver and release will become effective immediately upon the receipt of the amount shown in Line E of "Job to Date Application Calculations".

If this amount is a final payment request, there are attached hereto final waivers and releases for liens from all sub-subcontractors and material suppliers.

The Subcontractor hereby certifies that the foregoing Application for Payment is true and accurate and properly describes the work performed and materials, equipment, machinery or materials furnished or fabricated especially for the Project during the period covered and the payments to which the undersigned is entitled under the contract and applicable change orders as a result.

State of: _____    County of: _____

Subscribed and sworn before me this _____ day of _____, _____ by

_____, the _____ of                                      Subcontractor

_____, a _____ corporation (or partnership or sole
proprietorship), on behalf of the Subcontractor.

_____ Notary Public    My commission expires: _____

_____
Subcontractor

_____
Signature/Title

_____
Printed Name

Page 4 Exhibit E                                                                        Rev. 08/03

**EXHIBIT F**
## SUB-SUBCONTRACTOR OR MATERIAL SUPPLIER
## WAIVER OF MECHANICS AND/OR MATERIALMEN'S LIEN

Project Name: _____ Location: _____
(hereinafter THE PROJECT)

Subcontractor to Gray: _____
(hereinafter SUBCONTRACTOR)

Sub-Subcontractor or Supplier
to above listed Subcontractor: _____
(hereinafter SUB-SUBCONTRACTOR/SUPPLIER)

    WHEREAS, GRAY CONSTRUCTION, INC. is the General Contractor (hereinafter GRAY) for the construction of a facility for THE PROJECT referenced above, and,

    WHEREAS, the undersigned has furnished and received payment for materials and/or labor in the amount of $_____ to the SUBCONTRACTOR for incorporation into said project.

    NOW, THEREFORE, as an inducement to GRAY to make certain progress payments to SUBCONTRACTOR, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT prior to the _____ day of _____, 20 _____.

**Final Waiver of Lien**: By initialing in this space the undersigned represents that it has furnished and received FULL AND FINAL payment for materials and/or labor from the SUBCONTRACTOR which was incorporated into said project. THEREFORE, the undersigned hereby waives any and all rights it has to assert a lien with respect to THE PROJECT, or to assert any claim of any kind against GRAY, and/or its payment and performance bond surety, for services performed upon or materials furnished for THE PROJECT.

_____
(Name of sub-subcontractor/material supplier)

_____
(Address)

_____
(Phone)

_____
(Signature)

State of: _____
County of: _____

Subscribed and sworn to before me this _____ day of _____, 20 _____ by _____, the _____ of _____,
a ___ corporation ___ partnership ___ sole proprietorship, on behalf of the said entity.

_____ Notary Public  My commission expires: _____

Page 1                                                                 Rev. 8/03

Exhibit F – Standard Subcontract Agreement



October 24, 2006

Mr. Milton Park
Hwashin America Corporation
661 Montgomery Hwy.
Greenville, AL  36037

Dear Mr. Park:

On October 17, 2006, Hwashin requested Gray's assistance in connection with the roof collapse that occurred at Hwashin's facility in Greenville, Alabama that morning.  In response to Hwashin's request, Gray immediately mobilized a team of its employees and subcontractors to help address Hwashin's immediate needs relating to collapse, including building stabilization, initial clean-up, and temporary repairs.  Gray's team is still on site assisting Hwashin with issues relating to the collapse.

It is Gray's understanding that Hwashin has contacted its insurance carrier(s) in connection with the collapse.  Gray will continue to keep track of the significant costs that it and its subcontractors have incurred in assisting Hwashin.  Gray has provided this assistance in good faith and with the expectation of being reimbursed in full for its efforts as part of Hwashin's building damage claim.

Customer satisfaction is a top priority at Gray.  It is Gray's hope that this prompt assistance, even after the project has been completed, will help minimize any disruptions to Hwashin's business that may result as a result of this unfortunate event.

Respectfully,

Chris Allen
Executive Vice President

Gray Construction
2204 First Avenue South, Suite 101
Birmingham, AL 35233

T 205.380.1800
F 205.380.1819
gray.com

## IN THE CIRCUIT COURT FOR
## BUTLER COUNTY, ALABAMA

JENNIFER PIGGOTT and SLADE    *
PIGGOTT,    *
   *
     Plaintiffs,    *
   *
   *     **CASE NUMBER**
vs.    *     **CV-06- 176**
   *
GRAY CONSTRUCTION, INC.;    *
Fictitious Defendant "A", the person,    *
company, corporation, or other entity    *
which was responsible for the design    *
of the building at Hwashin America    *
Corporation, including the roof;    *
Fictitious Defendant "B", the person,    *
company, corporation, or other entity    *
which was the general contractor    *
responsible for construction of the    *
building, including the roof at    *
Hwashin America Corporation;    *
Fictitious Defendant "C", the person,    *
company, corporation, or other entity    *
who or which was the engineer    *
responsible for inspecting the roof    *
throughout construction and upon    *
completion of the roof at Hwashin    *
America Corporation; Fictitious    *
Defendant "D", the project manager    *
who was responsible for overseeing    *
the construction project involving the    *
roof at Hwashin America Corporation;    *
Fictitious Defendant "E", the person,    *
company, corporation, or other entity    *
which was the responsible for safety    *
and compliance with all state and    *
federal standards and regulations    *
regarding construction at Hwashin    *
America Corporation, including the    *
roof; Fictitious Defendant "F", the    *
person, company, corporation, or    *
other entity which was responsible for    *



FILED IN OFFICE
ALLEN STEPHENSON
NOV 17 2006
CIRCUIT CLERK
BUTLER COUNTY

1

## IN THE CIRCUIT COURT OF
## BUTLER COUNTY, ALABAMA

JENNIFER & SLADE PIGGOTT,                    *
                                             *
        Plaintiffs,                          *
                                             *
vs.                                          *       CASE NUMBER: CV-06 - 176
                                             *
GRAY CONSTRUCTION, INC.;                     *
et al.,                                      *
                                             *
        Defendants.                          *

### SUMMONS

        This service by certified mail of this summons is initiated upon the written request of Plaintiffs' attorney pursuant to the Alabama Rules of Civil Procedure.

NOTICE TO:        GEORGE GRAY
                  GRAY CONSTRUCTION CO., INC.
                  2204 1ST AVENUE SOUTH, SUITE 101
                  BIRMINGHAM, AL 35233

        The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to,

                  JULIA A. BEASLEY
                  BEASLEY, ALLEN, CROW, METHVIN,
                  PORTIS & MILES, P.C.
                  P. O. Box 4160
                  Montgomery, Alabama 36103-4160

the attorney for the Plaintiffs.   THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

_____
CIRCUIT CLERK

Dated: ____NOV 1 7 2006____

1

ensuring the structural integrity and *
stability of the roof upon completion *
of the construction of the roof at *
Hwashin America Corporation plant; *
Fictitious Defendants "G", "H", "I", *
"J" and "K", are those other persons, *
corporations, or other entities whose *
negligence, wantonness, or other *
wrongful conduct contributed to *
cause injuries and damages to *
Plaintiff Jennifer Piggott, whose true *
and correct names are unknown to *
Plaintiffs at this time, but will be *
substituted by amendment when *
ascertained, *
                                        *
    **Defendants.** *

## COMPLAINT

### Statement of the Parties

1.    Plaintiff Jennifer Piggott is over the age of nineteen years and resides in Butler County, Alabama.

2.    Plaintiff Slade Piggott, the husband of Jennifer Piggott, is over the age of nineteen years, and resides in Butler County, Alabama.

3.    Defendant Gray Construction, Inc., (hereinafter "Gray Construction") is an Alabama corporation with its principle place of business in Birmingham, Alabama, which does business by agent in Butler County, Alabama.

4.    Fictitious Defendant "A" is the person, company, corporation, or other entity which was responsible for the design of the building at Hwashin America Corporation (hereinafter "Hwashin") in Greenville, Alabama, including the roof.

2

5.     Fictitious Defendant "B" is the person, company, corporation, or other entity which was the general contractor responsible for construction of the building, including the roof, at Hwashin in Greenville, Alabama.

6.     Fictitious Defendant "C" is the person, company, corporation, or other entity which was the engineer responsible for inspecting the roof throughout construction and upon completion of the roof at Hwashin in Greenville, Alabama.

7.     Fictitious Defendant "D" is the project manager who was responsible for overseeing the construction project involving the roof at Hwashin in Greenville, Alabama.

8.     Fictitious Defendant "E" is the person, company, corporation, or other entity which was the responsible for safety and compliance with all state and federal standards and regulations regarding construction at Hwashin, including the roof, in Greenville, Alabama.

9.     Fictitious Defendant "F" is the person, company, corporation, or other entity which was responsible for ensuring the structural integrity and stability of the roof upon completion of the construction of the roof at Hwashin in Greenville, Alabama.

10.     Fictitious Defendants and "G" "H", "I", "J", and "K" are those other persons, corporations, or entities, whose negligence, wantonness, or other wrongful conduct contributed to cause the injuries and damages of Plaintiff Jennifer Piggott.

11.     The true and correct names of the Fictitious Defendants are unknown to Plaintiff at this time, but will be substituted by amendment when ascertained.

### Statement of the Facts

12.     On October 17, 2006, Plaintiff Jennifer Piggott was an employee of Hwashin America Corporation in Greenville, Alabama.

3

13.    At said time and place, Jennifer Piggott was performing her duties at her desk in the office at the Hwashin location.

14.    At said time and place, a wall collapsed and the roof of the building collapsed on Jennifer Piggott, knocking her to the floor and causing her to be severely injured.

15.    At all times material hereto, Plaintiff Slade Piggott is married to and the husband of Jennifer Piggott.

16.    Upon information and belief, it is alleged that Defendant Gray Construction was responsible for the design and construction of the building at Hwashin.

17.    At the aforesaid time and place, Defendant Gray Construction and all Fictitious Defendants had a duty to ensure that the roof and support walls were designed, constructed and completed in such a manner to prevent it from collapsing on persons, including workers such as Jennifer Piggott.

18.    At said time and place, Defendant Gray Construction and all Fictitious Defendants had a duty to properly design and construct the building, including the walls and roof, with adequate support and materials to withstand the elements of weather.

## COUNT ONE

19.    Plaintiffs reallege paragraphs 1 through 18 of the Complaint as if set out here in full.

20.    Defendant Gray Construction and all Fictitious Defendants negligently failed to design and/or construct the roof in such a manner to ensure its structural integrity and stability so that it would withstand heavy rain and/or wind.

4

21.     As a proximate consequence of Defendant Gray Construction's negligence and the negligence of all Fictitious Defendants, Plaintiff Jennifer Piggott was injured and damaged as follows:  she sustained serious and permanent injuries, including a crushed vertebrae at L4-5 which caused fluid to leak out of her spinal cord, caused numbness in her legs and toes and which required emergency surgery; she sustained injuries to her right knee, her back suffered lacerations and pieces of glass were embedded in her back, she suffered physical pain and will continue to suffer paid in the future; she was required to be hospitalized; she is required to wear a back brace; she suffered a broken rib; she incurred medical expenses and will continue to incur medical expenses in the future; she suffered mental anguish and will continue to suffer mental anguish in the future; she will be required to miss work and lose income as a result of her injuries; she will continue to lose income in the future; she will continue to have physical problems in the future as a result of the crushed vertebrae in her back; and she has otherwise been injured and damaged.

WHEREFORE, Plaintiffs demand judgment against Defendant Gray Construction and all Fictitious Defendants in such an amount of compensatory damages as a jury may deem reasonable, and the costs of this action.

## COUNT TWO

22.     Plaintiffs reallege paragraphs 1 through 20 of the Complaint as if set out here in full.

23.     Defendant Gray Construction and all Fictitious Defendants had a duty to enforce safety policies and/or to require compliance with all state and federal standards

5

and regulations regarding construction, including the roof and walls of the Hwashin building.

24.    Defendant Gray Construction and all Fictitious Defendants negligently failed to inspect the roof and walls of the building during and/or at completion of construction to determine whether its structural integrity was capable of withstanding the elements, including rain and wind.

25.    Defendant Gray Construction and all Fictitious Defendants negligently failed to require the roof and walls to have structural integrity.

26.    Defendant Gray Construction and all Fictitious Defendants negligently failed to enforce safety policies and/or failed to require compliance with all state and federal standards and regulations regarding construction, including the roof and walls of the Hwashin building.

27.    As a proximate consequence of Defendant Gray's negligence and the negligence of all Fictitious Defendants, Plaintiff Jennifer Piggott was injured and damaged as alleged in paragraph number 21 above.

WHEREFORE, Plaintiffs demand judgment against Defendant Gray Construction and all Fictitious Defendants in such an amount of compensatory damages as a jury may deem reasonable, and the costs of this action.

## COUNT THREE

28.    Plaintiffs reallege paragraphs 1 through 20 of the Complaint as if set out here in full.

6

29.    Defendant Gray Construction and all Fictitious Defendants had a duty to ensure that the roof and walls were designed, constructed and completed in such a manner to prevent it from collapsing.

30.    Defendant Gray Construction and all Fictitious Defendants had a duty to construct the aforesaid building, including the walls and roof, with adequate support and materials to withstand the elements of weather.

31.    Defendant Gray Construction and all Fictitious Defendants wantonly failed to properly design and/or construct the Hwashin building.

32.    Defendant Gray Construction and all Fictitious Defendants wantonly failed to properly design and/or construct the roof in such a manner to ensure its structural integrity and stability to withstand heavy rain and/or wind.

33.    As a proximate consequence of Defendant Gray Construction's wantonness and the wantonness of all Fictitious Defendants, Plaintiff Jennifer Piggott was injured and damaged as alleged in paragraph number 21 above.

WHEREFORE, Plaintiffs demand judgment against Defendant Gray Construction and all Fictitious Defendants in such an amount of punitive damages as a jury may deem reasonable, and the costs of this action.

## **COUNT FOUR**

34.    Plaintiffs reallege paragraphs 1 through 20 of the Complaint as if set out here in full.

35.    Defendant Gray Construction and all Fictitious Defendants had a duty to enforce safety policies and/or to require compliance with all state and federal standards

7

and regulations regarding construction, including the roof and walls of the Hwashin building.

36.    Defendant Gray Construction and all Fictitious Defendants wantonly failed to inspect the roof and walls during and/or at completion of construction to determine whether its structural integrity was capable of withstanding the elements, including rain and wind.

37.    Defendant Gray Construction and all Fictitious Defendants wantonly failed to enforce safety policies and/or failed to require compliance with all state and federal standards and regulations regarding construction, including the roof and walls at the Hwashin building.

38.    As a proximate consequence of Defendant Gray Construction's wantonness and the wantonness of all Fictitious Defendants, Plaintiff Jennifer Piggott was injured and damaged as alleged in paragraph number 21 above.

WHEREFORE, Plaintiffs demand judgment against all Defendant Gray Construction and all Fictitious Defendants in such an amount of compensatory damages as a jury may deem reasonable, and the costs of this action.

## COUNT FIVE

39.    Plaintiffs reallege paragraphs 1 through 20 of the Complaint as if set out here in full.

40.    The negligence or wantonness or other wrongful conduct of all Defendants combined and concurred to cause the aforesaid incident involving Plaintiff Jennifer Piggott.

41.    As a proximate consequence of the combining and concurring negligence or wantonness or other wrongful conduct of all Defendants, Plaintiff Jennifer Piggott was injured and damaged as alleged in paragraph 21 above.

WHEREFORE, Plaintiffs demand judgment against all Defendants in such an amount of compensatory damages as a jury may award, a separate amount of punitive damages and the costs of this action.

## COUNT SIX

42.    Plaintiff Slade Piggott realleges all prior paragraphs of the Complaint as if set out here in full.

43.    Plaintiff Slade Piggott is the husband and marital partner of Plaintiff Jennifer Piggott.

44.    Plaintiff Jennifer Piggott was injured and damaged as alleged in paragraph 21 of the Complaint as a result of Defendants' negligence or wantonness.

45.    As a proximate consequence of Defendants' negligence, Plaintiff Slade Piggott has lost and will continue to lose the love, affection, and services of his wife, he also has lost income and has lost the ability to obtain jobs because of the necessity of taking care of his wife after she was injured when the roof fell on her; and he has otherwise been injured and damaged.

WHEREFORE, Plaintiff Slade Piggott demands judgment against all Defendants in such an amount of compensatory damages as a jury may award, and his costs of this action.

JERE L. BEASLEY (BEA020)

JULIA A. BEASLEY (BEA039)
Attorneys for Plaintiff

OF COUNSEL:
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P. O. Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343

## JURY DEMAND

PLAINTIFFS HEREBY DEMAND TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

OF COUNSEL

10

| State of Alabama<br>Unified Judicial System<br><br>Form ARCivP-93   Rev. 5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number<br>[C][V][ ][ ][ ][ ][ ][ ][ ].[ ][ ]<br>Date of Filing:         Judge Code:<br>[ ][ ]  [ ][ ]  [ ][ ][ ][ ]<br>Month   Day   Year |
| --- | --- | --- |

## GENERAL INFORMATION

IN THE CIRCUIT COURT OF ___Butler___, ALABAMA
*(Name of County)*

___Jennifer Piggott___ v. ___Gray Construction, Inc.___
Plaintiff                        Defendant

| First Plaintiff | ☐ Business  ☒ Individual<br>☐ Government  ☐ Other | First Defendant | ☒ Business  ☐ Individual<br>☐ Government  ☐ Other |
| --- | --- | --- | --- |

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA - Wrongful Death
- ☒ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☐ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other: _____

**TORTS: PROPERTY INJURY**
- ☐ TOPE - Personal Property
- ☐ TORE - Real Property

**OTHER CIVIL FILINGS**
- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**
- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/<br>Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/Injunction<br>Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP - Workers' Compensation
- ☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN** *(check one):*   F ☒ INITIAL FILING   A ☐ APPEAL FROM DISTRICT COURT   ☐ OTHER: _____
R ☐ REMANDED   T ☐ TRANSFERRED FROM OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?**   ☒ YES  ☐ NO   Note: Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**   ☒ MONETARY AWARD REQUESTED   ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**   [B][E][A][C][3][9]   Date ___11-15-06___   Signature of Attorney/Party filing this form ___ulia___

**MEDIATION REQUESTED:**   ☒ YES  ☐ NO  ☐ UNDECIDED

# GIDIERE, HINTON, HERNDON & CHRISTMAN

ATTORNEYS AT LAW

60 COMMERCE STREET, SUITE 904

MONTGOMERY, ALABAMA 36104

TELEPHONE: (334) 834-9950

FACSIMILE: (334) 834-1054

JACK B. HINTON, JR.*
STEVEN K. HERNDON
ANDREW W. CHRISTMAN
MATTHEW Y. BEAM**

OF COUNSEL
PHILIP S. GIDIERE, JR.

MAILING ADDRESS:
P.O. BOX 4190
MONTGOMERY, AL 36103

*ALSO ADMITTED IN
WASHINGTON, DC

**ALSO ADMITTED IN
TENNESSEE

January 10, 2007

**Via Email Transmission**

Mr. James Michael Smith, AIC
Commercial Property Major Case Unit
Travelers Insurance Co.
P.O. Box 1989
Mableton, GA 30126

   Re: Gray Construction
      Hwashin Plant
      Greenville, Alabama
      GHH&C: 5832

Dear Michael:

  I hope this letter finds you well. Gray Construction has requested that I follow up on my December 4, 2006 letter to you regarding the emergency repair costs reflected in the invoice submitted to you by Gray Construction. While my letter is dated December 4, 2006, the invoice is dated November 29, 2006, and includes a detailed itemization of the emergency repair efforts undertaken by Gray Construction. The total amount of that invoice was $400,511.00 which was due for payment on January 3, 2007. Please put this invoice in line for immediate payment. If you need additional information regarding this invoice, please let me know so that we can promptly supply you with the information required. Thank you for your prompt attention to this matter. I look forward to speaking with you again soon.

       Sincerely,

       Andrew W. Christman

AWC:stp

Gray Construction
Construction Costs To Date

March 2, 2007

Hwashin America
Greenville, AL

| Tab | Description | Code | Classification | QTY | Unit | Labor | Material | Sub-Bid | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1 | General Conditions To Date | 01 | | | | | | | |
| 1.1 | Payroll Burden | | | 1.0 | ls | $ 19,809 | | | $ 19,809 |
| 1.2 | Insurance Claims/Recovery | | | 1.0 | ls | | $ 29,918 | | $ 29,918 |
| 1.3 | Legal | | | 1.0 | ls | | $ 71,872 | | $ 71,872 |
| 1.4 | Equipment Fuel | | | 1.0 | ls | | $ 100 | | $ 100 |
| 1.5 | Small Tools/Equipment | | | 1.0 | ls | | $ 4,595 | | $ 4,595 |
| 1.6 | Office & Storage Trailers | | | 1.0 | ls | | $ 10,501 | | $ 10,501 |
| 1.7 | Field Office Supplies | | | 1.0 | ls | | $ 9,479 | | $ 9,479 |
| 1.8 | Office Equipment | | | 1.0 | ls | | $ 1,335 | | $ 1,335 |
| 1.9 | Telephone | | | 1.0 | ls | | $ 2,109 | | $ 2,109 |
| 1.10 | Plans/Specs | | | 1.0 | ls | | $ 1,610 | | $ 1,610 |
| 1.11 | Ice/Cups | | | 1.0 | ls | | $ 95 | | $ 95 |
| 1.12 | Photos | | | 1.0 | ls | | $ 33 | | $ 33 |
| 1.13 | Signage | | | 1.0 | ls | | $ 355 | | $ 355 |
| 1.14 | Office Setup | | | 1.0 | ls | | $ 307 | | $ 307 |
| 1.15 | Daily Cleanup & Dumpster | | | 1.0 | ls | | $ 4,403 | | $ 4,403 |
| 1.16 | Engineering/Testing Services | | | 1.0 | ls | | $ 1,190 | | $ 1,190 |
| 1.17 | Per Diems & Truck Allowance | | | 1.0 | ls | | $ 5,302 | | $ 5,302 |
| 1.18 | Hotels | | | 1.0 | ls | | $ 5,818 | | $ 5,818 |
| 1.19 | Meals | | | 1.0 | ls | | $ 2,739 | | $ 2,739 |
| 1.20 | Travel | | | 1.0 | ls | | $ 38,456 | | $ 38,456 |
| 1.21 | Temporary Enclosures | | | 1.0 | ls | | $ 9,540 | | $ 9,540 |
| 1.22 | Safety | | | 1.0 | ls | | $ 323 | | $ 323 |
| 1.23 | Other Functions | | | 1.0 | ls | | $ 5,967 | | $ 5,967 |
| 1.24 | Service Team Costs | | | 1.0 | ls | | $ 1,815 | | $ 1,815 |
| 1.25 | Job Superintendent | | | 1.0 | ls | $ 28,603 | | | $ 28,603 |
| 1.25.1 | Paul Lambert | | | | hrs | | | | |
| 1.25.2 | Daniel Phillips | | | | hrs | | | | |
| 1.25.3 | David Shanks | | | | hrs | | | | |
| 1.25.4 | Roger Powell | | | | hrs | | | | |
| 1.26 | Assistant Superintendent | | | | hrs | $ 1,371 | | | $ 1,371 |
| 1.26.1 | ??? | | | | | | | | |
| 1.27 | Project Manager | | | 1.0 | ls | $ 15,216 | | | $ 15,216 |
| 1.27.1 | David Hird | | | | hrs | | | | |
| 1.27.2 | Phil Shin | | | | hrs | | | | |
| 1.28 | Assistant Project Manager | | | 1.0 | ls | $ 6,477 | | | $ 6,477 |
| 1.28.1 | Jason Mosakowksi | | | | hrs | | | | |
| 1.29 | Construction Administrative Asst. | | | 1.0 | ls | $ 488 | | | $ 488 |
| 1.29.1 | Sara Ray | | | | hrs | | | | |
| 1.29.2 | Sherron Langley | | | | hrs | | | | |
| 1.30 | Design Management | | | 1.0 | ls | $ 11,248 | | | $ 11,248 |
| 1.30.1 | Michael Rach | | | | hrs | | | | |
| 1.30.2 | John Thorne | | | | hrs | | | | |
| 1.30.3 | Chris Crovo | | | | hrs | | | | |
| 1.30.4 | Brian Fain | | | | hrs | | | | |
| 1.30.5 | Randall Vaughn | | | | hrs | | | | |
| 1.30.6 | Terry Hainley | | | | hrs | | | | |
| 1.31 | Design Management Support | | | 1.0 | ls | $ 3,419 | | | $ 3,419 |
| 1.31.1 | John Deller | | | | hrs | | | | |
| 1.31.2 | Jessica Silvernell | | | | hrs | | | | |
| 1.31.3 | Joe Whipple | | | | hrs | | | | |
| 1.31.4 | Kim Case | | | | hrs | | | | |
| 1.31.5 | Amy Lett | | | | hrs | | | | |
| 1.31.6 | David Crickard | | | | hrs | | | | |
| 1.32 | Design Administrative Asst. | | | 1.0 | ls | $ 927 | | | $ 927 |
| 1.32.1 | Emily James | | | | hrs | | | | |
| 1.32.2 | Elizabeth Richardson | | | | hrs | | | | |
| | | | | | | | | | |
| 2 | Corley Land | 02 | | | | | | | |
| 2.1 | Bulldozer Rental To Date | | | 1.0 | ls | | | $ 18,314 | $ 18,314 |
| | | | | | | | | | |
| 3 | ServPro | 02 | | | | | | | |
| 3.1 | Dewatering To Date | | | 1.0 | ls | | | $ 100,173 | $ 100,173 |
| | | | | | | | | | |
| 4 | Industrial Fencing | 02 | | | | | | | |
| 4.1 | Temporary Fencing | | | 1.0 | ls | | | $ 10,753 | $ 10,753 |
| | | | | | | | | | |
| 5 | Level Masonry | 04 | | | | | | | |
| 5.1 | Temporary Dike Wall | | | 1.0 | ls | | | $ 9,456 | $ 9,456 |
| | | | | | | | | | |
| 6 | Cooper Steel | 05 | | | | | | | |
| 6.1 | Temporary Shoring & Debris Removal | | | 1.0 | ls | | | $ 15,826 | $ 15,826 |
| | | | | | | | | | |
| 7 | South State Contractors | 07 | | | | | | | |
| 7.1 | Temporary Downspouts & Debris Removal | | | 1.0 | ls | | | $ 11,337 | $ 11,337 |
| | | | | | | | | | |
| 8 | Standard Roofing | 07 | | | | | | | |

Gray Construction
Construction Costs To Date

March 2, 2007

Hwashin America
Greenville, AL

| Tab | Description | Code | Classification | QTY | Unit | Labor | Material | Sub-Bid | Total |
|-----|-------------|------|----------------|-----|------|-------|----------|---------|-------|
| 8.1 | Temporary Roofing To Date | | | 1.0 | ls | | | $ 27,033 | $ 27,033 |
| 8 | Commercial Door & Hardware | 08 | | | | | | | |
| 8.1 | Temporary Locks | | | 1.0 | ls | | | $ 513 | $ 513 |
| 9 | Montgomery Lock & Key | 08 | | | | | | | |
| 9.1 | Temporary Hardware | | | 1.0 | ls | | | $ 377 | $ 377 |
| 10 | Four Star Interior | 09 | | | | | | | |
| 10.1 | Debris Removal, Temporary Wall Construction, & Trailer Deck Construction To Date | | | 1.0 | ls | | | $ 35,210 | $ 35,210 |
| 11 | R3 Mechanical | 15 | | | | | | | |
| 11.1 | Temporary HVAC & Plumbing | | | 1.0 | ls | | | $ 11,509 | $ 11,509 |
| 12 | Roto Rooter | 15 | | | | | | | |
| 12.1 | Plumbing Inspections | | | 1.0 | ls | | | $ 1,093 | $ 1,093 |
| 13 | Dotson Electric | 16 | | | | | | | |
| 13.1 | Temporary Electric To Date | | | 1.0 | ls | | | $ 67,850 | $ 67,850 |
| 14 | American Fire Protection | 17 | | | | | | | |
| 14.1 | Temporary Fire Sprinkler | | | 1.0 | ls | | | $ 4,503 | $ 4,503 |
| | TOTAL | | | | | $ 87,556 | $ 207,865 | $ 313,947 | $ 609,368 |

## Lloyd, Gray & Whitehead, P.C.

JAMES S. LLOYD
JAMES C. GRAY III
STEPHEN E. WHITEHEAD
LAURA C. NETTLES *
E. BRITTON MONROE **
THOMAS J. SKINNER IV
HOWARD Y. DOWNEY
JOHN C. WEBB V
JENNA M. BEDSOLE
MARK E. TINDAL
PATRICK PATRONAS *
W. HILL SEWELL
MICKEY B. WRIGHT
CHRISTOPHER D. COBB
KAREN M. ROSS
LEGRAND H. AMBERSON, JR.

ATTORNEYS AT LAW

COLONIAL BANK BUILDING

2501 TWENTIETH PLACE SOUTH

SUITE 300

**Birmingham, Alabama 35223**

telephone (205) 967-8822

facsimile (205) 967-2380

WWW.LGWPC.COM

FIRM ADMINISTRATOR
JAMES B. BROOKS

TAFFI S. STEWART
CARL K. DOWDEY III
*** DAVID A. POTE
J. RICK WALLIS
BRIAN M. MCCLENDON
MEREDITH A. SHAH
*** GAYLE L. DOUGLAS
**** KAREN D. FARLEY
RACHEL E. VANNORTWICK
*** **** FRENCH A. MCMILLAN
* GRAHAM R. PULVERE
LAURA A. MONCRIEF
JAMES E. HILL III

* ALSO ADMITTED IN MISSISSIPPI
** ALSO ADMITTED IN CALIFORNIA
*** ALSO ADMITTED IN FLORIDA
**** ALSO ADMITTED IN GEORGIA

### VIA EMAIL AND U.S. MAIL

March 29, 2007

Matt Watson
Beacon Comprehensive Loss Recovery, LLC
240 Rope Mill Industrial Parkway, Suite 2
Woodstock, Georgia 30188

> Re:  *Jennifer & Slade Piggott v. Gray Construction, Inc; Hwashin America Corporation*
> In the United States District Court, for the Middle District of Alabama
> Civil Action File No.  CV 06-1158
> Our File No.          12014.42

Dear Mr. Watson;

I am in receipt of your February 14, 2007 Beacon Comprehensive Loss Recovery Report directed to Gray Construction regarding additional information requested for the emergency services provided by Gray Construction to Hwashin America Corporation. This request was made in response to Gray's November 29, 2006 invoice. (Attached). Gray provided a final invoice on March 2, 2002 to Travelers. An additional copy is attached. This invoice included a more detailed description of the tasks performed. Although we believe the level of documentation being requested by Beacon is unnecessarily burdensome, in order to obtain payment we are attempting to respond to your request.

Attached you will find a draft of a preliminary response to Questions 1 through 35 to your February 14, 2007 letter provided by Gray's Project Manager. Additionally, we will make the relevant documents available in Gray's Birmingham, Alabama and Lexington, Kentucky offices for inspection and copying as may be needed to validate the charges being requested for reimbursement. Due to the size and scope of the project, the documents are rather voluminous. All accounting records are located in Lexington, Kentucky, while project files are located in Birmingham, Alabama.

If Travelers does not intend to pay these invoices within fourteen (14) days, we will have no choice but to take further legal action, including, but not limited to, filing a lien on your insured's property. We are more than willing to work with you to get this invoice paid by providing you the opportunity to review the documents referenced. However, neither Gray nor its subcontractors are in a position to wait any longer for this invoice to be paid.

If you wish to schedule a time to visit either of Gray's offices, please contact me at your earliest convenience. Thank you for much for your consideration in this matter. Again, if you have questions or concerns, please do not hesitate to contact me.

Very truly yours,

**_Britt Monroe_**

E. Britton Monroe

cc:    Michael Smith, General Adjuster
St. Paul Travelers, Major Case Unit *(w/enclosures)*
Linda Ambrose, Esquire *(w/enclosures)*
Scott Parker *(w/o enclosures)*

**Gray Construction**                                                    03/20/07
**Response to Beacon Comprehensive**

1.  A narrative can be provided to describe the activities that took place following the Hwashin Roof Collapse. It might be best, however, to review Gray's daily reports written by the project staff during all phases of work.

2.  All contracts and associated attachments can be issued upon request. It might require additional work by the subcontractors to supply Gray with a cost basis, as some did not submit T&M tickets.

3.  Most small tools were purchased as needed by staff. Items include, but are not limited to, generators, light stands, extension cords, wet/dry vacuum, ladder and pressure washers.

4.  Gray provided Hwashin with (1) office trailer with steps, as well as (2) 40' connex storage trailers. In addition to this, Gray had (1) office trailer for our on site staff. All trailers were rented from Metro Trailer.

5.  Field office supplies were purchased as needed. Items include, but are not limited to, (3) desks, filing cabinets, telephones, paper, general office supplies, digital camera and digital camcorder. Also included in field office supplies are wood for construction of the Hwashin trailer decks and rails (constructed as requested by Hwashin). These purchases can be tracked by purchase orders to Office Depot and approved employee expense reports.

6.  Gray can provide plans/specs as requested. These include as-built drawings for the existing facility and additional drawings for pricing reconstruction.

7.  Signage included general construction safety signage.

8.  More detailed information provided on updated Invoice.

9.  Daily Cleanup & Dumpster costs are related to porta-johns, trailer septic tanks, and dumpsters provided by Alabama Dumpster for debris removal and sanitary waste.

10. Per diems were issued monthly to site management stationed at Hwashin. Per diems are issued to cover living expenses while working away from home. The per diems issued can be provided in a report from our accounting department.

11. These purchases can be tracked by approved employee expense reports.

12. These purchases can be tracked by approved employee expense reports.

13. Mileage can be tracked by approved employee expense reports. Information related to flight charges may be tracked by approved employee expense reports and costs related to chartered flights.

**Gray Construction**                                                          03/20/07
**Response to Beacon Comprehensive**

14. Temporary enclosures include purchased material to mitigate rainwater away from the Office Roof. These structures are still in place at Hwashin and include rigid plastic pipe, flex plastic pipe, timber for pipe support and screws. Quantity of material can be found on the invoices from Construction Material.

15. More detailed information provided on updated Invoice.

16. More detailed information provided on updated Invoice.

17. All Job Superintendent personnel timesheets are located at our Lexington, Kentucky office.

18. All Project Management personnel timesheets are located at our Lexington, Kentucky office.

19. All Assistant Project Management personnel timesheets are located at our Lexington, Kentucky office.

20. All Construction Administrative Assistant personnel timesheets are located at our Lexington, Kentucky office.

21. All Design Management personnel timesheets are located at our Lexington, Kentucky office.

22. All Design Management Support personnel timesheets are located at our Lexington, Kentucky office.

23. All Design Administrative Assistant personnel timesheets are located at our Lexington, Kentucky office.

24. Invoices paid to Corley land for bulldozer rental and stone can be provided by the accounting department.

25. ServePro's invoice is available for inspection at our Lexington, Kentucky office.

26. This information can be provided from Industrial Fence's approved invoice.

27. This information can be provided from Level Masonry's approved invoice. Work included construction of dike wall in the Office Area, which was the height of (1) block course.

28. Cooper Steel installed temporary shoring for the collapsed steel in the Office Area, including a main building girder. They also assisted in removing building debris and damaged office equipment so that access could be gained in and around the damaged portion of the building.

**Gray Construction**                                                    03/20/07
**Response to Beacon Comprehensive**

29. South State Contractors installed the temporary downspout system, as well as assisted in removing building debris and damaged office equipment, so that access could be gained in and around the damaged portion of the building.

30. T&M reports were issued by Standard Roofing and can be available for review. This area of construction was temporary construction, which had to be repaired and replaced multiple times.

31. Four Star Interior installed all decking for Hwashin's trailers, removed and reinstalled ceiling tile and grid, constructed a temporary office inside of Hwashin's cafeteria as directed by Hwashin and assisted in removing building debris and damaged office equipment so that access could be gained in and around the damaged portion of the building.

32. In brief, RJ Mechanical inspected and cut off gas lines to the damaged roof, reconfigured the air conditioning system so that it could be used by Hwashin, including adding additional ductwork, miscellaneous demolition and servicing Hwashin's equipment to insure its operation.

33. Roto Rooter inspected the underground stormwater system to insure that no additional damaged was done to the pipe beneath the slab.

34. See Dotson Electric's subcontract for specific scope items.

35. American Fire Protection made necessary repairs and modifications to the fire protection system in areas that were to be occupied. These repairs were required as much of the fire line was destroyed during the collapse.

Gray Construction

Construction Costs To Date

November 29, 2006

Hwashin America

Greenville, AL

| Tab | Description | Code | QTY | Unit | Total | |
|---|---|---|---|---|---|---|
| 1 | General Conditions To Date | 01 | | | | |
| 1.1 | Payroll Burden | | 1.0 | ls | $ | 12,257 |
| 1.2 | Equipment Fuel | | 1.0 | ls | $ | 100 |
| 1.3 | Small Tools/Equipment | | 1.0 | ls | $ | 2,852 |
| 1.4 | Office & Storage Trailers | | 1.0 | ls | $ | 7,520 |
| 1.5 | Field Office Supplies | | 1.0 | ls | $ | 7,202 |
| | Office Equipment | | 1.0 | ls | $ | 1,335 |
| 1.6 | Plans/Specs | | 1.0 | ls | $ | 417 |
| 1.7 | Signage | | 1.0 | ls | $ | 222 |
| 1.8 | Office Setup | | 1 | ls | $ | 117 |
| 1.9 | Daily Cleanup & Dumpster | | 1 | ls | $ | 2,558 |
| 1.10 | Per Diems & Truck Allowance | | 1 | ls | $ | 3,887 |
| 1.11 | Hotels | | 1 | ls | $ | 1,436 |
| 1.12 | Meals | | 1 | ls | $ | 1,557 |
| 1.13 | Travel | | 1 | ls | $ | 25,185 |
| 1.14 | Temporary Enclosures | | 1 | ls | $ | 8,446 |
| 1.15 | Safety | | 1 | ls | $ | 323 |
| 1.16 | Other Functions | | 1 | ls | $ | 1,049 |
| 1.17 | Service Team Costs | | 1 | ls | $ | 1,815 |
| 1.18 | Job Superintendent | | 1.0 | ls | $ | 16,524 |
| 1.18.1 | Paul Lambert | | 205.0 | hrs | | |
| 1.18.2 | Daniel Phillips | | 187.0 | hrs | | |
| 1.18.3 | David Shanks | | 164.0 | hrs | | |
| 1.18.4 | Roger Powell | | 124.0 | hrs | | |
| 1.19 | Project Manager | | 1 | ls | $ | 9,776 |
| 1.19.1 | David Hird | | 198 | hrs | | |
| 1.19.2 | Phil Shin | | 60 | hrs | | |
| 1.20 | Assistant Project Manager | | 1 | ls | $ | 2,300 |
| 1.20.1 | Jason Mosakowksi | | 103 | hrs | | |
| 1.21 | Construction Administrative Asst. | | 1 | ls | $ | 488 |
| 1.21.1 | Sara Ray | | 20 | hrs | | |
| 1.21.2 | Sherron Langley | | 8 | hrs | | |
| 1.22 | Design Management | | 1 | ls | $ | 8,822 |
| 1.22.1 | Michael Rach | | 12 | hrs | | |
| 1.22.2 | John Thorne | | 11 | hrs | | |
| 1.22.3 | Chris Crovo | | 3 | hrs | | |
| 1.22.4 | Brian Fain | | 239 | hrs | | |
| 1.22.5 | Randall Vaughn | | 37 | hrs | | |
| 1.22.6 | Terry Hainley | | 3 | hrs | | |
| 1.23 | Design Management Support | | 1 | ls | $ | 3,388 |
| 1.23.1 | John Deller | | 44 | hrs | | |
| 1.23.2 | Jessica Silvernell | | 8 | hrs | | |
| 1.23.3 | Joe Whipple | | 6 | hrs | | |
| 1.23.4 | Kim Case | | 2 | hrs | | |
| 1.23.5 | Amy Lett | | 14 | hrs | | |
| 1.23.6 | David Crickard | | 57 | hrs | | |
| 1.24 | Design Administrative Asst. | | 1 | ls | $ | 927 |
| 1.24.1 | Emily James | | 5 | hrs | | |
| 1.24.2 | Elizabeth Richardson | | 41 | hrs | | |
| 2 | Corley Land | 02 | | | | |
| 2.1 | Bulldozer Rental To Date | | 1 | ls | $ | 5,273 |

**Gray Construction**

**Construction Costs To Date**

<u>November 29, 2006</u>

**Hwashin America**

**Greenville, AL**

| Tab | Description | Code | QTY | Unit | Total | |
|-----|-------------|------|-----|------|-------|--|
| 3<br>3.1 | ServPro<br>  Dewatering To Date | 02 | 1 | ls | $ | 93,834 |
| 4<br>4.1 | Industrial Fencing<br>  Temporary Fencing | 02 | 1 | ls | $ | 10,753 |
| 5<br>5.1 | Level Masonry<br>  Temporary Dike Wall | 04 | 1 | ls | $ | 9,433 |
| 6<br>6.1 | Cooper Steel<br>  Temporary Shoring & Debris Removal | 05 | 1 | ls | $ | 15,826 |
| 7<br>7.1 | South State Contractors<br>  Temporary Downspouts & Debris Removal | 07 | 1 | ls | $ | 11,337 |
| 8<br>8.1 | Standard Roofing<br>  Temporary Roofing To Date | 07 | 1 | ls | $ | 20,446 |
| 8<br>8.1 | Commercial Door & Hardware<br>  Temporary Locks | 08 | 1 | ls | $ | 513 |
| 9<br>9.1 | Montgomery Lock & Key<br>  Temporary Hardware | 08 | 1 | ls | $ | 377 |
| 10<br>10.1 | Four Star Interior<br>  Debris Removal, Temporary Wall Construction, & Trailer Deck Construction<br>  To Date | 09 | 1 | ls | $ | 33,298 |
| 11<br>11.1 | RJ Mechanical<br>  Temporary HVAC & Plumbing | 15 | 1 | ls | $ | 11,509 |
| 12<br>12.1 | Roto Rooter<br>  Plumbing Inspections | 15 | 1 | ls | $ | 1,093 |
| 13<br>13.1 | Dotson Electric<br>  Temporary Electric To Date | 16 | 1 | ls | $ | 61,813 |
| 14<br>14.1 | American Fire Protection<br>  Temporary Fire Sprinkler | 17 | 1 | ls | $ | 4,503 |
| | **TOTAL** | | | | $ | 400,511 |

Gray Construction
Construction Costs To Date

March 2, 2007

Hwashin America
Greenville, AL

| Tab | Description | Code | Classification | QTY | Unit | Labor | Material | Sub-Bid | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1 | General Conditions To Date | 01 | | | | | | | |
| 1.1 | Payroll Burden | | | 1.0 | ls | $ 19,809 | | | $ 19,809 |
| 1.2 | Insurance Claims/Recovery | | | 1.0 | ls | | $ 29,918 | | $ 29,918 |
| 1.3 | Legal | | | 1.0 | ls | | $ 71,872 | | $ 71,872 |
| 1.4 | Equipment Fuel | | | 1.0 | ls | | $ 100 | | $ 100 |
| 1.5 | Small Tools/Equipment | | | 1.0 | ls | | $ 4,595 | | $ 4,595 |
| 1.6 | Office & Storage Trailers | | | 1.0 | ls | | $ 10,501 | | $ 10,501 |
| 1.7 | Field Office Supplies | | | 1.0 | ls | | $ 9,479 | | $ 9,479 |
| 1.8 | Office Equipment | | | 1.0 | ls | | $ 1,335 | | $ 1,335 |
| 1.9 | Telephone | | | 1.0 | ls | | $ 2,109 | | $ 2,109 |
| 1.10 | Plans/Specs | | | 1.0 | ls | | $ 1,610 | | $ 1,610 |
| 1.11 | Ice/Cups | | | 1.0 | ls | | $ 95 | | $ 95 |
| 1.12 | Photos | | | 1.0 | ls | | $ 33 | | $ 33 |
| 1.13 | Signage | | | 1.0 | ls | | $ 355 | | $ 355 |
| 1.14 | Office Setup | | | 1.0 | ls | | $ 307 | | $ 307 |
| 1.15 | Daily Cleanup & Dumpster | | | 1.0 | ls | | $ 4,403 | | $ 4,403 |
| 1.16 | Engineering/Testing Services | | | 1.0 | ls | | $ 1,190 | | $ 1,190 |
| 1.17 | Per Diems & Truck Allowance | | | 1.0 | ls | | $ 5,302 | | $ 5,302 |
| 1.18 | Hotels | | | 1.0 | ls | | $ 5,818 | | $ 5,818 |
| 1.19 | Meals | | | 1.0 | ls | | $ 2,739 | | $ 2,739 |
| 1.20 | Travel | | | 1.0 | ls | | $ 38,456 | | $ 38,456 |
| 1.21 | Temporary Enclosures | | | 1.0 | ls | | $ 9,540 | | $ 9,540 |
| 1.22 | Safety | | | 1.0 | ls | | $ 323 | | $ 323 |
| 1.23 | Other Functions | | | 1.0 | ls | | $ 5,967 | | $ 5,967 |
| 1.24 | Service Team Costs | | | 1.0 | ls | | $ 1,815 | | $ 1,815 |
| 1.25 | Job Superintendent | | | 1.0 | ls | $ 28,603 | | | $ 28,603 |
| 1.25.1 | Paul Lambert | | | | hrs | | | | |
| 1.25.2 | Daniel Phillips | | | | hrs | | | | |
| 1.25.3 | David Shanks | | | | hrs | | | | |
| 1.25.4 | Roger Powell | | | | hrs | | | | |
| 1.26 | Assistant Superintendent | | | | hrs | $ 1,371 | | | $ 1,371 |
| 1.26.1 | ??? | | | | | | | | |
| 1.27 | Project Manager | | | 1.0 | ls | $ 15,216 | | | $ 15,216 |
| 1.27.1 | David Hird | | | | hrs | | | | |
| 1.27.2 | Phil Shin | | | | hrs | | | | |
| 1.28 | Assistant Project Manager | | | 1.0 | ls | $ 6,477 | | | $ 6,477 |
| 1.28.1 | Jason Mosakowski | | | | hrs | | | | |
| 1.29 | Construction Administrative Asst. | | | 1.0 | ls | $ 488 | | | $ 488 |
| 1.29.1 | Sara Ray | | | | hrs | | | | |
| 1.29.2 | Sherron Langley | | | | hrs | | | | |
| 1.30 | Design Management | | | 1.0 | ls | $ 11,248 | | | $ 11,248 |
| 1.30.1 | Michael Rach | | | | hrs | | | | |
| 1.30.2 | John Thorne | | | | hrs | | | | |
| 1.30.3 | Chris Crovo | | | | hrs | | | | |
| 1.30.4 | Brian Fain | | | | hrs | | | | |
| 1.30.5 | Randall Vaughn | | | | hrs | | | | |
| 1.30.6 | Terry Hainley | | | | hrs | | | | |
| 1.31 | Design Management Support | | | 1.0 | ls | $ 3,419 | | | $ 3,419 |
| 1.31.1 | John Deller | | | | hrs | | | | |
| 1.31.2 | Jessica Silvernell | | | | hrs | | | | |
| 1.31.3 | Joe Whipple | | | | hrs | | | | |
| 1.31.4 | Kim Case | | | | hrs | | | | |
| 1.31.5 | Amy Lett | | | | hrs | | | | |
| 1.31.6 | David Crickard | | | | hrs | | | | |
| 1.32 | Design Administrative Asst. | | | 1.0 | ls | $ 927 | | | $ 927 |
| 1.32.1 | Emily James | | | | hrs | | | | |
| 1.32.2 | Elizabeth Richardson | | | | hrs | | | | |
| | | | | | | | | | |
| 2 | Corley Land | 02 | | | | | | | |
| 2.1 | Bulldozer Rental To Date | | | 1.0 | ls | | | $ 18,314 | $ 18,314 |
| | | | | | | | | | |
| 3 | ServPro | 02 | | | | | | | |
| 3.1 | Dewatering To Date | | | 1.0 | ls | | | $ 100,173 | $ 100,173 |
| | | | | | | | | | |
| 4 | Industrial Fencing | 02 | | | | | | | |
| 4.1 | Temporary Fencing | | | 1.0 | ls | | | $ 10,753 | $ 10,753 |
| | | | | | | | | | |
| 5 | Level Masonry | 04 | | | | | | | |
| 5.1 | Temporary Dike Wall | | | 1.0 | ls | | | $ 9,456 | $ 9,456 |
| | | | | | | | | | |
| 6 | Cooper Steel | 05 | | | | | | | |
| 6.1 | Temporary Shoring & Debris Removal | | | 1.0 | ls | | | $ 15,826 | $ 15,826 |
| | | | | | | | | | |
| 7 | South State Contractors | 07 | | | | | | | |
| 7.1 | Temporary Downspouts & Debris Removal | | | 1.0 | ls | | | $ 11,337 | $ 11,337 |
| | | | | | | | | | |
| 8 | Standard Roofing | 07 | | | | | | | |

Gray Construction
Construction Costs To Date

March 2, 2007

Hwashin America
Greenville, AL

| Tab | Description | Code | Classification | QTY | Unit | Labor | Material | Sub-Bid | Total |
|-----|-------------|------|----------------|-----|------|-------|----------|---------|-------|
| 8.1 | Temporary Roofing To Date | | | 1.0 | ls | | | $ 27,033 | $ 27,033 |
| 8 | Commercial Door & Hardware | 08 | | | | | | | |
| 8.1 | Temporary Locks | | | 1.0 | ls | | | $ 513 | $ 513 |
| 9 | Montgomery Lock & Key | 08 | | | | | | | |
| 9.1 | Temporary Hardware | | | 1.0 | ls | | | $ 377 | $ 377 |
| 10 | Four Star Interior | 09 | | | | | | | |
| 10.1 | Debris Removal, Temporary Wall Construction, & Trailer Deck Construction To Date | | | 1.0 | ls | | | $ 35,210 | $ 35,210 |
| 11 | RJ Mechanical | 15 | | | | | | | |
| 11.1 | Temporary HVAC & Plumbing | | | 1.0 | ls | | | $ 11,509 | $ 11,509 |
| 12 | Roto Rooter | 15 | | | | | | | |
| 12.1 | Plumbing Inspections | | | 1.0 | ls | | | $ 1,093 | $ 1,093 |
| 13 | Dotson Electric | 16 | | | | | | | |
| 13.1 | Temporary Electric To Date | | | 1.0 | ls | | | $ 67,850 | $ 67,850 |
| 14 | American Fire Protection | 17 | | | | | | | |
| 14.1 | Temporary Fire Sprinkler | | | 1.0 | ls | | | $ 4,503 | $ 4,503 |
| | TOTAL | | | | | $ 87,556 | $ 207,865 | $ 313,947 | $ 609,368 |



**BEACON**
COMPREHENSIVE LOSS RECOVERY, LLC

VIA EMAIL

April 4th, 2007

E. Britton Monroe "Britt Monroe"
Lloyd, Gray & Whitehead, P.C.
Attorneys at Law
Colonial Bank Building
2501 Twentieth Place South
Suite 300
Birmingham, AL 35223

Re:    Gray Construction Hwashin America supporting documentation request

Dear Mr. Monroe:

I have received your March 29th letter, Gray Construction's revised invoice with additional costs, and Gray Construction's preliminary response to my February 14th request(s) document.

I would like to clarify that it is not Beacon's intent to be unnecessarily burdensome. It appears that the work performed had many variables contributing to cost including multiple subcontractors, multiple phases, travel expenses, materials, equipment, etc. spread over weeks and weeks of duration. Projects of this nature with this level of "involvement" require a substantial amount of supporting documentation to validate the charges. Backup is pertinent and necessary to evaluate the veracity of the charges, and for presentation to the insurance carrier for coverage consideration.

I have been requested by Travelers to evaluate the charges invoiced by Gray Construction ("Gray"), and to determine if they are consistent with reasonable and customary charges for like work. I must gather as much information as is necessary to complete this evaluation. I am familiar with work of this nature and how it needs to be presented for insurance claims purposes and I understand that the extent of back-up can be substantial. With that in mind, I thank Gray for attempting to respond to my earlier request.

ATLANTA / SOUTHEAST

240 ROPEMILL INDUSTRIAL PARKWAY SUITE 2 WOODSTOCK , GA 30188
PHONE: (678) 222-3434 FAX (770) 516-1166 TOLL FREE 1 (877) FIRE-H2O
E-MAIL: information@beaconrecovery.com

FL Lic. #CGC1510442
SC Lic. #G112775
MS Lic. #15686



**BEACON**
Comprehensive Loss Recovery, LLC

E. Britton Monroe "Britt Monroe"
April 2nd, 2007
Page 2 of 2

Unfortunately, Gray's preliminary response to my requests doesn't really answer my questions or provide me with much more information than I already possessed. I am looking forward to their detailed response and ask that they incorporate all of the additional charges found on the new invoice. Additionally, I am asking that this information be completely compiled by Gray Construction and presented in a comprehensive package.

I cannot comment on your second to last paragraph involving payment and liens. As a General Contractor, Beacon is offering a third party independent opinion of the costs invoiced for this project. Beacon is completely removed from any other part of this claim process.

Thanks for your time and consideration. I am under the impression that you will distribute this letter to the relevant parties with Gray Construction. If this is wrong, please notify me.

Feel free to contact me with any questions or comments.

Sincerely,


Matt Watson
BEACON


cc:    Michael Smith, General Adjuster
       St. Paul Travelers, Major Case Unit
       Linda Ambrose
       St. Paul Travelers
       Mickey Wright
       Lloyd, Gray & Whitehead, P.C.
       S. Parker
       Gray Construction

## LLOYD, GRAY & WHITEHEAD, P.C.

ATTORNEYS AT LAW

COLONIAL BANK BUILDING

2501 TWENTIETH PLACE SOUTH

SUITE 300

BIRMINGHAM, ALABAMA 35223

TELEPHONE (205) 967-8822

FACSIMILE (205) 967-2380

WWW.LGWPC.COM

FIRM ADMINISTRATOR
JAMES B. BROOKS

JAMES S. LLOYD
JAMES C. GRAY III
STEPHEN E. WHITEHEAD
LAURA C. NETTLES *
E. BRITTON MONROE **
THOMAS J. SKINNER IV
HOWARD Y. DOWNEY
JOHN C. WEBB V
JENNA M. BEDSOLE
MARK E. TINDAL
PATRICK PATRONAS *
W. HILL SEWELL
MICKEY B. WRIGHT
CHRISTOPHER D. COBB
KAREN M. ROSS
LEGRAND H. AMBERSON, JR.

TAFFI S. STEWART
CARL K. DOWDEY III
*** DAVID A. POTE
J. RICK WALLIS
BRIAN M. MCCLENDON
DANIEL P. AVERY
* JENNIFER S. PRECISE
MONICA L. CARROLL
MEREDITH A. SHAH
*** GAYLE L. DOUGLAS
**** KAREN D. FARLEY
RACHEL E. VANNORTWICK
*** **** FRENCH A. MCMILLAN
* GRAHAM R. PULVERE
LAURA A. MONCRIEF
JAMES E. HILL III
DUSTIN J. KITTLE

* ALSO ADMITTED IN MISSISSIPPI
** ALSO ADMITTED IN CALIFORNIA
*** ALSO ADMITTED IN FLORIDA
**** ALSO ADMITTED IN GEORGIA

*Via Email Only*
April 11, 2007

Michael Smith
Commercial General Adjuster
Commercial Property Major Case Unit
PO Box 1989
Mableton, GA 30126

Re:    *Jennifer & Slade Piggott v. Gray Construction, Inc; Hwashin America Corporation*
      In the United States District Court for the Middle District of Alabama
      Civil Action File No.    CV 06-1158
      Insurer's Claim No.    030-232799115-3432
      Our File No.          12014.42

Dear Michael:

This is to confirm our conversation where you advised me that the only matter holding up payment of this claim is the documentation to support the dollar amounts asserted by my client. Pursuant to your assurance that this is not a simple delay tactic because of the other issues involved with the Piggott claim, I will endeavor to have my client to immediately provide a package supporting all of their cost incurred in the cleanup. We expect that upon receipt of these backup documents you would immediately issue the payments for the services rendered.

Thank you very much for your consideration in this matter. If you have any questions or concerns, please do not hesitate to give me a call.

Very truly yours,

*Mickey B. Wright*

Mickey B. Wright

MBW/chh
Cc:    Scott Parker
      E. Britton Monroe

459816_1.DOC

# LLOYD, GRAY & WHITEHEAD, P.C.

ATTORNEYS AT LAW

COLONIAL BANK BUILDING

2501 TWENTIETH PLACE SOUTH

SUITE 300

## BIRMINGHAM, ALABAMA 35223

TELEPHONE (205) 967-8822

FACSIMILE (205) 967-2380

WWW.LGWPC.COM

FIRM ADMINISTRATOR
JAMES B. BROOKS

JAMES S. LLOYD
JAMES C. GRAY III
STEPHEN E. WHITEHEAD
LAURA C. NETTLES *
E. BRITTON MONROE **
THOMAS J. SKINNER IV
HOWARD Y. DOWNEY
JOHN C. WEBB V
JENNA M. BEDSOLE
MARK E. TINDAL
PATRICK PATRONAS *
W. HILL SEWELL
MICKEY B. WRIGHT
CHRISTOPHER D. COBB
KAREN M. ROSS
LEGRAND H. AMBERSON, JR.

TAFFI S. STEWART
CARL K. DOWDEY III
*** DAVID A. POTE
J. RICK WALLIS
BRIAN M. MCCLENDON
DANIEL P. AVERY
* JENNIFER S. PRECISE
MONICA L. CARROLL
MEREDITH A. SHAH
*** GAYLE L. DOUGLAS
**** KAREN D. FARLEY
RACHEL E. VANNORTWICK
*** **** FRENCH A. MCMILLAN
* GRAHAM R. PULVERE
LAURA A. MONCRIEF
DUSTIN J. KITTLE

* ALSO ADMITTED IN MISSISSIPPI
** ALSO ADMITTED IN CALIFORNIA
*** ALSO ADMITTED IN FLORIDA
**** ALSO ADMITTED IN GEORGIA

## VIA FEDERAL EXPRESS AND EMAIL
May 3, 2007

Matt Watson
Beacon Comprehensive Loss Recovery, LLC
240 Rope Mill Industrial Parkway, Suite 2
Woodstock, Georgia 30188

> Re: *Jennifer & Slade Piggott v. Gray Construction, Inc; Hwashin America Corporation*
> In the United States District Court, for the Middle District of Alabama
> Civil Action File No. CV 06-1158
> Our File No.      12014.42

Dear Mr. Watson;

Please find enclosed a copy of Gray Construction's Emergency Repair Cost Invoice dated April 30, 2007. This invoice is cumulative and all-inclusive, and supercedes and replaces all previously submitted invoices as further explained below. Gray Construction has endeavored to provide you with a new tabulated invoice by line item with the necessary backup documentation.

We have provided the backup documentation for each line item that is in excess of $5,000.00. The $5,000.00 amount was simply chosen at random; however, as you will notice, the bulk of the line items are in excess of $5,000.00 and thus backup is included. Hopefully, after you have reviewed this documentation you will be satisfied with the level of detail provided.

The total amount of invoice is now $699,206.00 representing a change from the March 2007 invoice. As we were gathering our backup documentation it was discovered there were more hours spent than had previously been charged. We have provided you with the hours spent by each individual behind tabs 1.1, 1.2 and 1.3.

Additionally, the new invoice reflects the profit and overhead after the subtotal so that the documentation would match identically to each individual line item. The prior invoices had profit and overhead calculated into each line item. Finally, we also removed certain costs such as

legal expenses that were incurred for this project as Gray believes those would not be properly claimed.

If you do not understand any particular line item and/or the documentation, Scott Parker, CFO for Gray Construction, will be more than happy to discuss the line items with you. If you would like to meet with Mr. Parker, please give me a call to set up a time. However, it appears to me that all of the line items are fairly self-explanatory and the documentation is on point.

Based on my conversations with Michael Smith, upon receipt of this backup documentation, payment will be forthcoming quickly. I would like to have payment in hand for the $699,206.00 by May 14, 2007. Gray Construction has undertaken great expense and spent substantial amounts of time preparing this package for your review and we would request that payment be made quickly.

Thank you very much for your consideration in this matter. If you have any questions or concerns, please do not hesitate to give me a call.

Very truly yours,

*Mickey B. Wright*

Mickey B. Wright

MBW/chh
Enclosure

cc:    Michael Smith, General Adjuster *(w/o enclosures)*
       St. Paul Travelers, Major Case Unit *(w/o enclosures)*
       Linda Ambrose, Esquire *(w/o enclosures)*
       Lister Hubbard, Esquire *(w/o enclosures)*
       Scott Parker *(w/o enclosures)*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

|                                       |   |                          |
|---------------------------------------|---|--------------------------|
| JENNIFER PIGGOTT and SLADE PIGGOTT,   | ) |                          |
|                                       | ) |                          |
|     Plaintiffs,                       | ) |                          |
|                                       | ) |                          |
| v.                                    | ) | CASE NO. 2:06-cv-1158-MEF |
|                                       | ) |                          |
| GRAY CONSTRUCTION, INC.,              | ) |                          |
|                                       | ) |                          |
|     Defendant.                        | ) |                          |

### COMPLAINT ON INTERVENTION

1.    This is an action to protect the interest of Hwashin America Corporation, by and through its worker's compensation carrier, the Alabama Self-Insured Worker's Compensation Fund, the real party in interest, for subrogation of worker's compensation benefits and medical benefits which have been paid and/or will be paid to or on behalf of Jennifer Piggott, a worker's compensation claimant. This claim is made pursuant to §25-5-11(a), *Code of Alabama*, 1975, as amended.

2.    Plaintiff Jennifer Piggott was an employee of Hwashin America Corporation on or about October 17, 2006, the date of her injury.

3.    The Alabama Self-Insured Worker's Compensation Fund is licensed to do business in the State of Alabama.

4.    Plaintiff Jennifer Piggott is over the age of nineteen years.

5.    The Alabama Self-Insured Worker's Compensation Fund has paid worker's compensation benefits and medical bills in excess of $46,625.00 at the present time to Jennifer Piggott and/or her medical care providers.

6.      Plaintiff Jennifer Piggott has filed this current action against alleged third-party tortfeasors.

WHEREFORE, the above premises considered, Hwashin America Corporation, by and through its worker's compensation carrier, Alabama Self-Insured Worker's Compensation Fund, demands that it be reimbursed for worker's compensation benefits (including but not limited to indemnity and medical benefits currently paid or will pay in the future) paid to or on behalf of Plaintiff Jennifer Piggott, and those benefits payable in the future to or on behalf of Jennifer Piggott from the funds recoverable or to be recovered in the underlying tort action.

Respectfully submitted on this the 22nd day of May 2007.

s/ W. Christopher Waller, Jr.
W. Christopher Waller, Jr. (WAL187)
James A. Rives   (RIV005)
Attorneys for Hwashin America Corporation,
by and through the Alabama Self-Insured
Worker's Compensation Fund

OF COUNSEL:
Ball, Ball, Matthews & Novak, P.A.
2000 Interstate Park Dr., Suite 204
P.O. Box 2148
Montgomery, AL  36102-2148
Telephone:  (334) 387-7680

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2007, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following registered persons and that those persons not registered with the CM/ECF system were served by U.S. mail:

Jere L. Beasley, Esq.
Julia A. Beasley, Esq.
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
P.O. Box 4160
Montgomery, Alabama 36103-4160

E. Britton Monroe, Esq.
Mickey B. Wright, Esq.
Brian M. McClendon, Esq.
Lloyd, Gray & Whitehead, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama  35223

s/ W. Christopher Waller, Jr.
OF COUNSEL

## Rosemarie Fernandez

| | |
|---|---|
| **From:** | efile_notice@almd.uscourts.gov |
| **Sent:** | Tuesday, May 22, 2007 4:38 PM |
| **To:** | almd_mailout@almd.uscourts.gov |
| **Subject:** | Activity in Case 2:06-cv-01158-MEF-TFM Piggott et al v. Gray Construction, Inc. "Intervenor Complaint" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Alabama Middle District

Notice of Electronic Filing

The following transaction was received from Waller, William Christopher entered on 5/22/2007 at 4:38 PM CDT and filed on 5/22/2007

**Case Name:**      Piggott et al v. Gray Construction, Inc.
**Case Number:**    2:06-cv-1158
**Filer:**          Hwashin America Corporation
**Document Number:** 20

**Docket Text:**
Intervenor COMPLAINT, filed by Hwashin America Corporation.(Waller, William)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=5/22/2007] [FileNumber=729508-0]
[0bd4136e6270e578586e7d1f07eb25d5d1f24bb8a61c0f0be5a1c2adadd70a2fadf3
c2beee077cf727433717f09492fecd8723ba8bd67f6ed87d6b093500207d]]

**2:06-cv-1158 Notice will be electronically mailed to:**

Jere L. Beasley     jere.beasley@beasleyallen.com, libby.rayborn@beasleyallen.com

Julia Ann Beasley    elizabeth.kidd@beasleyallen.com

Brian Michael McClendon    bmcclendon@lawpc.com, scole@lgwpc.com

Elliot Britton Monroe    bmonroe@lgwpc.com, rfernandez@lgwpc.com

Albry Joe Peddy    Attorneys@ssp-law.com,

James A. Rives    jrives@ball-ball.com, firm@ball-ball.com

William Christopher Waller , Jr    CWaller@ball-ball.com, CStrickland@ball-ball.com

Mickey B. Wright    mwright@lgwpc.com, chelms@lgwpc.com

**2:06-cv-1158 Notice will be delivered by other means to:**

# LLOYD, GRAY & WHITEHEAD, P.C.

JAMES S. LLOYD
JAMES C. GRAY III
STEPHEN E. WHITEHEAD
LAURA C. NETTLES *
E. BRITTON MONROE **
THOMAS J. SKINNER IV
HOWARD Y. DOWNEY
JOHN C. WEBB V
JENNA M. BEDSOLE
MARK E. TINDAL
PATRICK PATRONAS *
W. HILL SEWELL
MICKEY B. WRIGHT
CHRISTOPHER D. COBB
KAREN M. ROSS

ATTORNEYS AT LAW
COLONIAL BANK BUILDING
2501 TWENTIETH PLACE SOUTH
SUITE 300
BIRMINGHAM, ALABAMA 35223
TELEPHONE (205) 967-8822
FACSIMILE (205) 967-2380
WWW.LGWPC.COM

FIRM ADMINISTRATOR
JAMES B. BROOKS

TAFFI  S. STEWART
CARL K. DOWDEY III
*** DAVID A. POTE
J. RICK WALLIS
BRIAN M. MCCLENDON
DANIEL P. AVERY
* JENNIFER S. PRECISE
MONICA L. CARROLL
MEREDITH A. SHAH
*** GAYLE L. DOUGLAS
**** KAREN D. FARLEY
RACHEL E. VANNORTWICK
*** **** FRENCH A. MCMILLAN
* GRAHAM R. PULVERE
LAURA  A. MONCRIEF
DUSTIN J. KITTLE

* ALSO ADMITTED IN MISSISSIPPI
** ALSO ADMITTED IN CALIFORNIA
*** ALSO ADMITTED IN FLORIDA
**** ALSO ADMITTED IN GEORGIA

## VIA FACSIMILE ONLY

June 11, 2007

Catherine Henderson
Senior Counsel, Travelers
Central Coverage Advice Group
4400 North Point Parkway, Suite 160
Alpharetta, GA 30022

Re:     *Jennifer & Slade Piggott v. Gray Construction, Inc; Hwashin America Corporation*
*In the United States District Court for the Middle District of Alabama*
*Civil Action File No.:   CV 06-1158*
*AIG's Claim No.        030-232799115-3432*
*Traveler's Claim No.   B5Y2444*
*Our File No.:              12014.42*

Dear Catherine:

I have left you several voice mails. My client has been waiting for the payment of the emergency repair work done for Hwashin for some time. In fact, on May 4, 2007, I submitted an extensive package of materials to Matt Watson from Beacon Comprehensive Loss Recovery, LLC that was retained by Travelers to review the invoices. The package was delivered to Mr. Watson on May 4, 2007 via Federal Express. It has now been over a month and I have not received any response from either you, Mr. Watson or Michael Smith. I have enclosed a copy of my April 11, 2007 letter to Michael Smith confirming that payment would be forthcoming for this bill upon receipt of the documentation. I believe a month is more than ample time to review the documentation set forth in my May 4, 2007 correspondence.

Please let me hear from you by the end of this week as to the status of the payment of the emergency repair invoices submitted by Gray Construction. We have deadlines looming and we may have no choice but to initiate action if this does not receive immediate attention.

Thank you very much for your consideration in this matter. If you have any questions or concerns, please do not hesitate to give me a call.

Very truly yours,

Mickey B. Wright

MBW/chh
Enclosures
484832_1.DOC

Jun. 21. 2007  2:33PM                                                    No. 1235   P. 2

 **TRAVELERS**

Catherine Henderson

Senior Counsel
Travelers
Central Coverage Advice Group

(770) 521-3534
(770) 521-3078 (fax)

4400 North Point Parkway
Suite 180
Alpharetta, GA 30022

June 21, 2007

<u>**Via Facsimile**</u>

Mickey Wright, Esq.
Lloyd, Gray & Whitehead, P.C.
2501 20th Place South
Suite 300
Birmingham, AL 35223

      Re:   Insured:    Hwashin America Corporation
              Claim No.:  CDT7409
              Our File No.  2007 02968

Dear Mickey:

      I am in receipt of a preliminary report from Matt Watson regarding his review of the documentation provided by Gray Construction in support of their repair costs. Mr. Watson informs me that there remains some information requests outstanding and that his review has prompted some additional questions. In order to complete his review, Mr. Watson requires the following information:

**GENERAL CONDITIONS**
1.    Indicate the duration of use in # of days for:
      a.  hand trucks
      b.  generators
      c.  temporary lights

2.    Supply the receipts/invoices for the following purchases indicating the items purchased:

| | | | |
|---|---|---|---|
| a. | By: Roger Powell | On: 10-25-06 Vendor: Wal-Mart | Amount: $82.11 |
| b. | By: Roger Powell | On: 10-20-06 Vendor: Wal-Mart | Amount: $94.39 |
| c. | By: Roger Powell | On: 10-23-06 Vendor: Wal-Mart | Amount: $21.84 |
| d. | By: Roger Powell | On: 10-24-06 Vendor: Goodys | Amount: $82.81 |
| e. | By: Roger Powell | On: 10-20-06 Vendor: Lowes | Amount: $99.77 |
| f. | By: Roger Powell | On: 10-20-06 Vendor: Lowes | Amount: $556.07 |

Jun. 21. 2007  2:33PM                                    No. 1235   P. 3

Mickey Wright, Esq.
June 21, 2007
Page 2

    g.  By: Roger Powell    On: 10-26-06  Vendor: Shell Oil    Amount: $30.74
    h.  By: Roger Powell    On: 10-23-06  Vendor: Greenville Hardware -
                                                           Amount: $271.41

3.     The following submitted costs have no backup.  Supply detailed descriptive
        explanations for:
        a.  Phone charges                           $1834.00
        b.  Plans/Specs                             $1400.00
        c.  Signs                                      $309.00
        d.  Daily clean-up and dumpsters        $3829.00
        e.  Engineering/testing services        $1035.00
        f.  Small tools and equipment (detailed list)   $3996.00
        g.  Other functions                    $3156.00

These additional requests are important as there is a present difference of over $40,000.00 between what Gray has submitted as supporting documentation and the amount listed for the General Conditions on their Emergency Repairs Costs table.

**LABOR**

1.     Provide Gray's billing rate sheet at the time of the work, to include the classification with associated rate.

2.     Provide a detailed description of the work performed by each of the individuals listed on the Gray Construction Emergency Repair Costs Table Tab 1.3 for the Hwashin Project to include:
        a.  Michael Rach, John Thorne, Chris Crovo, Brian Fain, Randall Vaughn, Terry Hainley, John Deller, Jessica Sivernell, Joe Whipple, Kim Case, Amy Lett, David Crickard, Emily James, Elizabeth Richardson.

3.     Please provide a narrative explanation of why so many Project Management, Design, and Executive supervision individuals at top billing rates were necessary on such a comparatively small project, and why the management costs of such a project are fully 40% of the total costs of the project.

      As you can imagine, this information is necessary to be able to complete Travelers' review, especially with respect to the large executive charges.  In order to expedite this matter, you may feel free to forward the documentation and materials directly to Matt Watson.  His address is Beacon Comprehensive Loss Recovery, LLC, 240 Ropemill Industrial Parkway, Suite 2, Woodstock, Georgia 30188.

                Very truly yours,

                Catherine Henderson

ACH:sal

**To:**     Scott Parker (sparker@jngray.com)[sparker@jngray.com];
dcombssr@sdgky.com[dcombssr@sdgky.com];
**Cc:**     Britt Monroe[bmonroe@lgwpc.com]; Cheryl Helms[chelms@lgwpc.com];
**Flag Status:**     0x00000002
**Subject:**     FW: #492327, v1 <LGWDOCS> - Travelers 6.21.07 Correspondence   -
WorkSite Acrobat Integration
**Sent:**     Thur 6/21/2007 7:08:54 PM
**From:**     Mickey Wright

<u>492327_1.PDF</u>

Scott and David,

Please find attached the letter I just received from Travelers for the Emergency Repairs.  I also talked to
Catherine about this claim.  She is contacting Beacon to see if they will tell her the amount that is
uncontested.  I have requested that they go ahead and make payment for the uncontested amount now.
She said she would recommend to go ahead and pay the uncontested amount.  However it appears they
are currently contesting about 40% of the invoice.  Please give me a call at your earliest convenience to
discuss.

Thanks,

**Mickey B. Wright, Esq.**
LLOYD, GRAY & WHITEHEAD, P.C.
2501 Twentieth Place South, STE 300
Birmingham, Alabama 35223
205-967-8822 Phone
205-967-2380 Fax

**From:** Scan PC
**Sent:** Thursday, June 21, 2007 2:03 PM
**To:** Mickey Wright
**Subject:** #492327, v1 <LGWDOCS> - Travelers 6.21.07 Correspondence - WorkSite Acrobat Integration

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

JENNIFER PIGGOTT and          *
SLADE PIGGOTT,                *
                             *
    Plaintiffs,              *        File Number CV-06-1158-F
v.                           *
                             *
GRAY CONSTRUCTION, INC.,     *
                             *
    Defendant.               *
                             *
HWASHIN AMERICA CORP.,       *
                             *
    Intervenor Plaintiff     *
                             *
v.                           *
                             *
JAMES N. GRAY COMPANY, a/k/a *
GRAY CONSTRUCTION, INC.,      *
GNF ARCHITECTS AND            *
ENGINEERS, PSC, THE HARDY     *
CORPORATION, FREELAND-        *
HARRIS CONSULTING             *
ENGINEERS OF GEORGIA, INC.,   *
FREELAND-HARRIS CON-          *
SULTING ENGINEERS OF          *
KENTUCKY, INC., ALL-SOUTH     *
SUBCONTRACTORS, INC., MID-    *
SOUTH SUBCONTRACTORS, INC., *
d/b/a MID-SOUTH ROOF SYSTEMS,*
COOPER'S STEEL FABRICATORS    *
INC., LATTA PLUMBING &         *
CONSTRUCTION CO., INC., and   *
FIRESTONE BUILDING PRODUCTS*
COMPANY, LLC                  *
                             *
    Defendants.              *

EXHIBIT
A
tabbies

```
                                        *
GRAY CONSTRUCTION, INC.,                 *
                                        *
        Defendant and Third-Party        *
        Plaintiff                        *
                                        *
        v.                               *
                                        *
COOPER'S STEEL FABRICATORS,              *
INC., et. al.                            *
                                        *
                                        *
        Third-Party Defendants.          *
                                        *
```

## HWASHIN AMERICA CORPORATION'S
## AMENDED COMPLAINT IN INTERVENTION

COMES NOW, HWASHIN AMERICA CORPORATION ("Hwashin"), and, within the time limit provided in this Court's Scheduling Order, files its Amended Complaint in Intervention, and states as follows:

### THE PARTIES

1.

Hwashin restates Paragraphs 1 through 6 of its original Complaint in Intervention in Paragraphs 72 through 77 below.

2.

Defendant, James N. Gray Company, a/k/a Gray Construction, Inc., ("Gray") is a corporation incorporated in the State of Kentucky with its principal place of business located in the State of Kentucky and, at all times relevant hereto,

2

did business in the State of Alabama, (previously under the name of James N. Gray Company), and is subject to the jurisdiction of this Court (hereinafter referred to as "Gray"). It is believed that "James N. Gray Company, Inc." is presently a fictitious name for Gray.

### 3.

Gray may be served with process by serving its registered agent, The Corporation Company, 2000 Interstate Park Drive, Suite 204, Montgomery, Alabama 36109.

### 4.

Defendant, GNF Architects and Engineers, PSC ("GNF") is a corporation incorporated under the laws of the State of Kentucky with its principal place of business located in the State of Kentucky and, at all times relevant hereto, did business in the State of Alabama, and is subject to the jurisdiction of this Court.

### 5.

GNF can be served by serving its registered agent, The Corporation Company, 2000 Interstate Park Drive, Suite 204, Montgomery, Alabama 36109.

### 6.

Defendant, The Hardy Corporation, ("Hardy") is a corporation incorporated under the laws of the State of Alabama with its principal place of business located at Birmingham, Alabama, and is subject to the jurisdiction of this Court.

7.

Hardy may be served with process by serving its registered agent, Craig E. Westendorf, located at 430 12th Street, Birmingham, Alabama 35233.

8.

Defendant, Freeland Harris Consulting Engineers, of Georgia, Inc., ("Freeland-Harris-Georgia") is a corporation incorporated under the laws of the State of Georgia with its principal place of business located at Tucker, Georgia, and, at all times relevant hereto, did business in the State of Alabama, and is subject to the jurisdiction of this Court.

9.

Freeland Harris-Georgia may be served with process by serving its registered agent, The Corporation Company, located at 2000 Interstate Park Drive, Suite 204, Montgomery, Alabama 36109.

10.

Defendant, Freeland-Harris Consulting Engineers of Kentucky, Inc. ("Freeland-Harris-Kentucky") is a corporation incorporated under the laws of the State of Kentucky with its principal place of business in Lexington, Kentucky and, at all times relevant hereto, did business in the State of Alabama, and is subject to the jurisdiction of this Court.

11.

Freeland-Harris-Kentucky may be served with process by serving its registered agent, The Corporation Company, located at 2000 Interstate Park Drive, Suite 204, Montgomery, Alabama.

12.

Defendant, All-South Subcontractors, Inc., ("All-South"), is a corporation incorporated under the laws of the State of Alabama with its principal place of business located in Birmingham, Alabama, and is subject to the jurisdiction of this Court.

13.

All-South may be served with process by serving its registered agent, CSC Lawyers, Incorporating SVC, Inc., 150 South Perry Street, Montgomery, Alabama 36104.

14.

Defendant, Mid-South Subcontractors, Inc., d/b/a Mid-South Roof Systems, ("Mid-South") is a corporation incorporated under the laws of the State of Georgia with its principal place of business located in Georgia, and, at all times relevant hereto, did business in the State of Alabama and is subject to the jurisdiction of this Court.

15.

Mid-South may be served with process by serving its registered agent, National Registered Agents, Inc., located at 150 S. Perry Street, Montgomery, Alabama 36104.

16.

Defendant, Latta Plumbing & Construction Co., Inc. ("Latta"), is an Alabama corporation with its principal place of business located in Gardendale, Alabama, and is subject to the jurisdiction of this Court.

17.

Latta may be served with process by serving its registered agent, Rex Latta, located at 2605 Decatur Highway, Gardendale, Alabama 35071.

18.

Defendant, Cooper's Steel Fabricators, Inc. ("Cooper's Steel") is a Tennessee corporation with its principal place of business located in Shelbyville, Tennessee and, at all times relevant hereto, was authorized to do business and was doing business in the State of Alabama and is subject to the jurisdiction of this Court.

19.

Cooper's Steel may be served with process by serving its registered agent, CSC Lawyers, located at 150 S. Perry Street, Montgomery, Alabama 36104.

6

20.

Defendant, Firestone Building Products Company, LLC ("Firestone"), is an Indiana corporation with its principal place of business located in Indianapolis, Indiana and, at all times relevant hereto, was authorized to do business and was doing business in the State of Alabama, and is subject to the jurisdiction of this Court.

21.

Firestone may be served with process by serving its registered agent, National Registered Agents, located at 150 S. Perry Street, Montgomery, Alabama 36104.

22.

Hwashin is a corporation existing under the laws of the State of Delaware with its principal place of business located in the State of Alabama, and is subject to the jurisdiction of this Court.

**STATEMENT OF FACTS**

23.

Hwashin restates Paragraphs 1 through 22 of this complaint as though set forth in full.

24.

On or about September 24, 2003, Hwashin entered into a contract with defendant Gray, wherein Gray agreed to design and build an approximately 273,000 square foot manufacturing facility, including an office building, in Greenville, Butler County, Alabama ("Contract"). Subsequently, but prior to the incident that is the subject of this lawsuit, Gray was involved in certain repair work to the roofs and/or related drainage systems for the manufacturing facility.

25.

Based on information and belief, at all times relevant hereto, Defendant GNF was contracted by Gray to provide, and did so provide, architectural services relating to the performance of the Contract, including, but not limited, to the roofs and drainage system for the roofs for the manufacturing facility ("Roofs"). As the "Architect of Record", GNF also had responsibility for coordinating the various design components for the facility.

26.

Based on information and belief, Defendant Hardy was retained by Gray to design and/or install certain mechanical systems for the Hwashin facility, including but not limited to the drainage system for the Roofs of the manufacturing facility referred to in the Contract.

27.

Based on information and belief, Defendant Freeland-Harris Kentucky contracted with Defendant GNF to provide structural engineering services for construction of the Hwashin facility pursuant to the Contract, including, but not limited to, design of the structure supporting the Roofs. Freeland-Harris Kentucky then subcontracted with Freeland-Harris Georgia to provide certain structural engineering services for the construction of the Hwashin facility, including but not limited to design of the structure supporting the Roofs. (These Freeland Harris defendants are referred to in this Complaint collectively as "Freeland-Harris").

28.

Based on information and belief, Defendant All-South was retained by Gray to perform certain engineering, materials, labor, equipment and services with respect to the installation of the Roofs for the manufacturing facility described in the Contract.

29.

Based on information and belief, Defendant Mid-South was retained by Gray to install the gutters for the drainage system for the Roofs of the manufacturing facility described in the Contract and to perform certain repairs to the roof drainage system prior to the loss which is the subject of this lawsuit.

30.

Based on information and belief, Defendant Cooper's Steel was responsible for supplying and installing, including related design services, the structural steel, girders, joists, bridging, roof decking, roof frames and other steel products for the buildings designed and constructed for Hwashin pursuant to the Contract.

31.

Based on information and belief, Defendant Latta was hired by defendant Hardy to install all plumbing at the Hwashin facility constructed pursuant to the Contract, including pipes incorporated into the roof drainage system.

32.

Firestone manufactured the Roofs over the office building owned by Hwashin that was constructed pursuant to the Contract, inspected and approved the Roofs after it was installed and issued a warranty regarding the Roofs.

33.

Based on information and belief, the office building described in the Contract was substantially completed on or about June 30, 2004.

34.

Based on information and belief, after the Roofs, structural system and drainage system for the Roofs were installed, they were, or should have been, inspected by employees, representatives and/or agents of the Defendants.

35.

Based on information and belief, employees, agents and/or representatives of defendants approved the installation of the Roofs, the structural system for the Roofs and/or the drainage system for the Roofs.

36.

On or about October 17, 2006, during a rainstorm, the roof over the office building of the manufacturing facility described above suddenly collapsed.

37.

Based on information and belief, the roof over the office building of the manufacturing facility collapsed due to inadequate drainage for the Roofs for the manufacturing facility and/or inadequate structural support for the Roofs.

38.

Based on information and belief, the roof over the office building collapsed because the design and/or installation of the drainage system, the roofing system and/or the structural system for the Roofs were inadequate and/or were otherwise insufficient to handle the rainwater accumulating on the Roofs, causing rain water to pool on top of that roof until the building could no longer hold the weight of the water, resulting in the collapse of the roof and walls of the office building.

39.

As a result of the incident described above, Hwashin suffered damages to its

manufacturing facility, business property and other contents, an interruption of its

business and other related damages.

## COUNT ONE
## (NEGLIGENCE – ALL DEFENDANTS)

40.

Hwashin incorporates paragraphs 1 through 39 of this Complaint as though

set forth in full.

41.

Defendants had a duty to use reasonable care in their design, inspection,

coordination, installation, repairs and/or construction of Hwashin's manufacturing

facility, including its office building.

42.

Defendants breached their applicable standard of care and were negligent in

their rendering of services for the Hwashin manufacturing facility.

43.

As a factual and proximate consequence of the Defendants' negligence, the

office building collapsed and Hwashin suffered damages in excess of $100,000.00,

for which it now seeks relief.

**WHEREFORE,** Hwashin requests that judgment be entered in its favor and against Defendants, in excess of $100,000.00, plus interest, costs, and such other relief as this Court deems appropriate.

**COUNT TWO**
**(BREACH OF CONTRACT – GRAY)**

44.

Hwashin incorporates Paragraphs 1 though 43 of this Amended Complaint at though set forth in full.

45.

On or about September 24, 2003, Hwashin entered into a contract with Gray whereby Gray contracted to design and build Hwashin's manufacturing facility in Greenville, Alabama, where the incident that is the subject of the lawsuit occurred ("Contract").

46.

Under the Contract, among other obligations, Gray agreed:

a. to provide design services with the care and skill ordinarily used by members of the design profession practicing under similar conditions at the same time and locality of the Project;

b. to be responsible to Hwashin for the quality of the design services and for the quality of the construction performed;

13

c. to provide design services, labor, materials, equipment, tools, construction equipment …and other facilities and services necessary for proper execution and completion of the work;

d. to be responsible for all construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the work;

e. to be responsible for the work complying with the requirements of the Contract Documents;

f. to be responsible for latent defects in the work;

g. to maintain its general liability and professional liability insurance for three (3) years after final payment to cover damages resulting from latent defects.

47.

Based on information and belief, Gray breached its contractual obligations to Hwashin, resulting in the collapse of the office building

48.

Gray's breach of its contractual obligations as described above proximately and factually caused the damages for which Hwashin seeks relief.

**WHEREFORE,** Hwashin requests that judgment be entered in its favor and against Gray, in excess of $100,000.00, plus interest, costs, and such other relief as this Court deems appropriate.

## COUNT THREE
## (NEGLIGENT HIRING, RETENTION AND TRAINING – GRAY)

### 49.

Hwashin re-allages paragraphs 1 through 48 of this Amended Complaint as though set forth in full.

### 50.

Gray had a duty to Hwashin to use due care to hire and retain qualified contractors and consultants to design and/or install the Roofs, and the structural and drainage systems therefore, for Hwashin's manufacturing facility.

### 51.

Gray had a duty to Hwashin to use due care to ensure that the companies or individuals it so hired were properly trained or otherwise qualified for the services rendered.

### 52.

Based on information and belief, Gray breached the standard of care when it failed to hire companies or individuals properly trained or otherwise qualified to perform their services for the design and/or construction of Hwashin's manufacturing facility.

### 53.

Based on information and belief, Gray's negligence as described above proximately and factually resulted in the damages for which Hwashin seeks relief.

**WHEREFORE,** Hwashin requests that judgment be entered in its favor and against Gray, in excess of $100,000.00, plus interest, costs, and such other relief as this Court deems appropriate.

**COUNT FOUR**
**(BREACH OF THE IMPLIED WARRANTY**
**OF SUITABILITY OF DESIGN)**

54.

Hwashin re-alleges paragraphs 1 though 53 of this Complaint as though set forth in full.

55.

Under Alabama law, Defendants Gray, GNF, Hardy, All-South, Cooper's Steel and Freeland Harris impliedly warranted that their design would be suitable for the use intended.

56.

Based on information and belief, said defendants breached their implied warranty of suitability in that the Roofs, related drainage system and/or related structural system failed under intended rain conditions.

57.

Said Defendants breach of the implied warranty of suitability factually and proximately caused the damages for which Hwashin seeks relief.

16

**WHEREFORE,** Hwashin requests that judgment be entered in its favor and against said Defendants, in excess of $100,000.00, plus interest, costs, and such other relief as this Court deems appropriate.

## COUNT FIVE
## (BREACH OF THE IMPLIED WARRANTY OF WORKMANSHIP)

58.

Hwashin re-alleges paragraphs 1 through 57 of this complaint as though set forth in full.

59.

Defendants Gray, Hardy, Mid-South, Cooper's Steel, Latta and All-South impliedly warranted that the work that they performed with respect to the Roofs, structural system and/or drainage system for the Hwashin facility was done in a workmanlike manner.

60.

Based on information and belief, said Defendants breached their implied warranty of workmanship in that the Roofs and related structural and drainage systems were not constructed in a workmanlike manner and failed under foreseeable rain conditions.

61.

Said Defendants breach of the implied warranty of workmanship factually and proximately caused the damages for which Hwashin seeks relief.

**WHEREFORE,** Hwashin requests that judgment be entered in its favor and against said Defendants, in excess of $100,000.00, plus interest, costs, and such other relief as this Court deems appropriate.

## COUNT SEVEN
## (RECKLESS OR WANTON CONDUCT –
## ALL DEFENDANTS)

62.

Hwashin re-alleges paragraphs 1 though 61 of this complaint as though set forth in full.

63.

The Defendants actions described above were done either wantonly or recklessly, proximately resulting in the sudden and catastrophic collapse of Hwashin's administrative building.

64.

Hwashin contends that it is entitled to punitive damages based on the actions of said Defendants, which actions factually and proximately caused the damages for which Hwashin seeks relief.

**WHEREFORE,** Hwashin requests that judgment be entered in its favor and against said Defendants, in excess of $100,000.00, plus interest, costs, and such other relief as this Court deems appropriate.

## COUNT EIGHT
## (BREACH OF WARRANTY – FIRESTONE)

65.

Hwashin re-alleges paragraphs 1 through 64 of this complaint as though set forth in full.

66.

Hwashin purchased from Firestone the roof over the office building that collapsed.

67.

Firestone issued a warranty to Hwashin covering the roof over the office building.

68.

Firestone inspected the roof over Hwashin's office building after its completion, and warranted that it was properly manufactured and installed.

69.

In fact, the roof over Hwashin's office building was not properly completed or installed, contributing to the collapse of the office building.

70.

Firestone's breach of warranty proximately and factually caused the damages for which Hwashin seeks relief.

**WHEREFORE,** Hwashin requests that judgment be entered in its favor and against Defendant Firestone, in excess of $100,000.00, plus interest, costs, and such other relief as this Court deems appropriate.

## COUNT NINE

71.

Hwashin re-alleges paragraphs 1 through 70 of this complaint as though set forth in full.

72.

As set forth in Hwashin's Complaint in Intervention (Document 20), this is, in part, an action to protect the interest of Hwashin, by and through its worker's compensation carrier, the Alabama Self-Insured Worker's Compensation Fund, the real party in interest as to this Count Nine, for subrogation of worker's compensation benefits and medical benefits which have been paid and/or will be paid to or on behalf of Jennifer Piggott, a worker's compensation claimant. This Count Nine is made pursuant to §25-5-11(a), *Code of Alabama*, 1975, as amended.

73.

Plaintiff Jennifer Piggott was an employee of Hwashin on or about October 17, 2006, the date of her injury.

74.

The Alabama Self-Insured Worker's Compensation Fund is licensed to do business in the State of Alabama.

75.

Plaintiff Jennifer Piggott is over the age of nineteen years.

76.

The Alabama Self-Insured Worker's Compensation Fund has paid worker's compensation benefits and medical bills in excess of $46,625.00 at the present time to Jennifer Piggott and/or her medical care providers.

77.

Plaintiff Jennifer Piggott has filed this current action against alleged third-party tortfeasors.

WHEREFORE, the above premises considered, Hwashin, by and through its worker's compensation carrier, Alabama Self-Insured Worker's Compensation Fund, demands that it be reimbursed for worker's compensation benefits (including but not limited to indemnity and medical benefits currently paid or will pay in the future) paid to or on behalf of Plaintiff Jennifer Piggott, and those benefits payable in the future to or on behalf of Jennifer Piggott from the funds recoverable or to be recovered in the underlying tort action.

/s/W. Christopher Waller, Jr.
Christopher Waller, Esq. (WAL187)
James A. Rives (RIV005)
Attorneys for Intervener
Hwashin America Corp.

**OF COUNSEL:**
BALL, BALL, MATTHEWS & NOVAK
PO Box 2148
Montgomery, Alabama 36102-2148
(334) 387-7680
(334) 387-3222 (fax)

/s/J. Lister Hubbard
**J. LISTER HUBBARD  (HUB007)**
**RICHARD H. ALLEN (ALL053)**
**ARDEN R. PATHAK (PAT072)**
Attorneys for Intervener
Hwashin America Corp.

**OF COUNSEL:**
CAPELL & HOWARD, P.C.
Post Office Box 2069
150 South Perry Street
Montgomery, Alabama  36102-2069
334/241-8000

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following:

| | |
|---|---|
| Jere L. Beasley, Esquire<br>Julia Ann Beasley, Esquire<br>Beasley, Allen, Crow, Methvin,<br>  Portis & Miles, P.C.<br>Post Office Box 4160<br>Montgomery, AL 36103-4160 | James A. Rives, Esquire<br>William Christopher Waller, Jr.<br>Ball, Ball, Matthews & Novak P.A.<br>Post Office Box 2148<br>Montgomery, AL 36102-2148 |
| Linda C. Ambrose, Esquire<br>Rogers & Associates<br>3000 Riverchase Galleria<br>Suite 650<br>Birmingham, AL 35244 | Albry Joe Peddy, Esquire<br>Robert B. Stewart, Esquire<br>Smith, Spires & Peddy, P.C.<br>2015 Second Avenue North<br>Suite 200<br>Birmingham, AL 35203-3711 |
| Brian Michael McClendon, Esquire<br>Elliot Britton Monroe, Esquire<br>Mickey B. Wright, Esquire<br>Lloyd, Gray & Whitehead, P.C.<br>2501 Twentieth Place South<br>Suite 300<br>Birmingham, AL 35223 | Charles Keith Hamilton, Esquire<br>Bainbridge, Mims, Rogers & Smith<br>Post Office Box 530886<br>Birmingham, AL 35253 |
| Thomas T. Gallion, III, Esquire<br>Constance C. Walker, Esquire<br>Felicia Abernathy Long, Esquire<br>Haskell, Slaughter,<br>  Young & Gallion, LLC<br>305 South Lawrence Street<br>Montgomery, AL 36104 | |

/s/J. Lister Hubbard
**J. LISTER HUBBARD (HUB007)**

23

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| **JENNIFER PIGGOTT and** ) | |
| **SLADE PIGGOTT,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case No.: CV-06-1158** |
| **v.** ) | |
| ) | |
| **GRAY CONSTRUCTION, INC.,** ) | |
| ) | |
| **Defendant/Third-Party Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **COOPER'S STEEL** ) | |
| **FABRICATORS, INC., et al.,** ) | |
| ) | |
| **Third-Party Defendants.** ) | |

**GRAY CONSTRUCTION INC.'S OPPOSITION TO HWASHIN AMERICA
CORPORATION'S MOTION FOR LEAVE TO AMEND COMPLAINT IN
INTERVENTION**

Hwashin America Corporation ("Hwashin") seeks to amend a Complaint filed on behalf

of its worker's compensation carrier, the Alabama Self-Insured Worker's Compensation Fund's

("the Fund"), to protect the Fund's worker's compensation subrogation interest to interject

property damage claims which the Fund has no standing to assert. Even if Hwashin or the Fund

had standing, to allow the interjection of Hwashin's property damage claims into this personal

injury suit (which contains no property damage claim to date) would unduly delay these

proceedings and unfairly prejudice the original parties. Moreover, Gray has already sued

Hwashin in a separate action in this Court for the failure to pay repair costs to the facility, a

property damage case. Hwashin should assert its property damage claim in that case as a counterclaim. Hwashin's Motion for Leave is due to be denied.

## I.    STATEMENT OF FACTS.

On September 24, 2003, Gray and Hwashin entered into a design/build contract ("the Contract") for the design and construction of a manufacturing facility in Greenville, Alabama ("the Hwashin facility"). (A true and correct copy of the Contract is attached hereto as Exhibit A.). The Hwashin facility was completed on June 30, 2004. (A true and correct copy of the Certificate of Substantial Completion is attached hereto as Exhibit B.).

On or around October 17, 2006, the Hwashin facility office roof collapsed. (Plaintiffs' Complaint at ¶ 13-14.). Plaintiff Jennifer Piggott ("Mrs. Piggott") is alleged to have been injured while exiting the office area during the collapse. (Plaintiffs' Complaint at ¶ 13-14.).

On November 17, 2006, Slade Piggott ("Mr. Piggott") and Mrs. Piggott filed their Complaint in the Circuit Court of Butler County, Alabama. (See Plaintiffs' Complaint.). Gray timely removed the action to this Court on December 29, 2006. (Notice of Removal, Document No. 2 in the Court Docket.).

On December 7, 2006, Hwashin, by and through the Fund, filed its Motion to Intervene in the Circuit Court of Butler County, Alabama. (See Hwashin's Motion to Intervene.). That Motion was transferred to this Court at the time of removal. (Id.).

On January 24, 2007, Gray filed its Response to the Motion to Intervene. (Response to Motion, Document No. 4 in the Court Docket.). Gray did not oppose the Fund's intervention for the sole purpose of protecting its worker's compensation subrogation interest. (Id.). The Court granted the Fund's Motion to Intervene on May 16, 2007. (Order on Motion to Intervene, Document No. 17 in the Court Docket.).

On June 7, 2007, Gray filed its Motion for Leave to file a Third-Party Complaint. (Motion For Leave to File, Document No. 24 in the Court Docket.). Gray sought leave to file third-party claims against Hwashin, subcontractors and suppliers for their conduct which caused the collapse of the roof. (Id.). Gray sought to file claims of indemnity against Hwashin for its failure to maintain the roof drains of the Hwashin facility. (Id.). Gray's Third-Party Complaint seeks only the recovery of any funds it has to pay Mr. and Mrs. Piggott for their alleged injuries. (Id.). Gray's Third-Party Complaint contains no property damage claims and did seek recovery for any property damage. (Id.).

Gray's Motion was granted on June 8, 2007. (Order on Motion for Leave to File, Document No. 25 in the Court Docket.). Gray filed its Third-Party Complaint that same day. (Third Party Complaint, Document No. 26 in the Court Docket.).

On June 26, 2007, Gray filed a separate Complaint in the United States District Court for the Middle District of Alabama against Hwashin. (A true and correct copy of Gray's Complaint in Case No. cv-07-584 is attached as Exhibit C.). Gray alleges Hwashin is liable to Gray for Hwashin's failure to pay Gray for repairs made by Gray to the Hwashin facility. (Id.). Hwashin has not yet answered Gray's Complaint. (Id.).

On June 29, 2007, the deadline to amend pleadings, Hwashin, for itself, and not by or through the Fund, filed a Motion for Leave to Amend the Complaint in Intervention. (Motion For Leave to File, Document No. 55.). Hwashin seeks to add parties and assert claims against Gray, GNF Architects and Engineers, P.S.C. ("GNF"), Freeland Harris Structural Engineers ("Freeland Harris"), Freeland Harris Consulting Engineers of Georgia, Inc. ("Freeland Harris-Georgia"), Cooper's Steel Fabricators, Inc. ("Cooper's Steel"), The Hardy Corporation ("Hardy"), Latta Plumbing & Construction Co., Inc. ("Latta"), All-South Subcontractors ("All-

South"), Firestone Building Products Company, LLC ("Firestone") and Mid-South

Subcontractors, Inc. ("Mid-South") for property damage and other consequential damages not

related to Mrs. Piggott's injuries it contends it sustained as a result of the office roof collapse.

(Id.).

Hwashin seeks to recover Hwashin's "damages to its manufacturing facility, business

property and other contents, an interruption of its business and other related damages." (Id.).

Hwashin attempts to interject into this case for the first time property damage claims which have

absolutely nothing to do with Mr. and Mrs. Piggott's alleged injuries. (Id.).

II.    ARGUMENT.

A.    Hwashin, Itself, Is Not the Plaintiff in Intervention and Has No
Standing to Add Property Damage Claims.

Ala. Code § 25-5-11(a) provides, in pertinent part, that:

To the extent of the recovery of damages against the other party, the employer
shall be entitled to reimbursement for the amount of compensation theretofore
paid on account of injury or death.

*  *  *  *  *

For purposes of this amendatory act, the employer shall be entitled to subrogation
for medical and vocational benefits expended by the employer on behalf of the
employee. . . . .

The Alabama Supreme Court has interpreted § 25-5-11(a) to mean:

The employer or insurance carrier is entitled to be reimbursed, out of any
judgment recovered by the employee or his representative in a suit against a third
party wrongdoer, all payments made by the employer or the insurance carrier
which are included within the meaning of the word 'compensation' as used in §
312, Title 26 [predecessor to § 25-5-11], as amended, irrespective of the type of
damages claimed in the complaint in the suit against the third party wrongdoer.

See Millers Mut. Ins. Ass'n v. Young 601 So.2d 962 (Ala. 1992.).

The original Complaint in Intervention clearly indicates the claim is being brought "by and through the Alabama Self-Insured Worker's Compensation Fund". The Fund is the true party Plaintiff. The party designation alone indicates that the real party in interest is the Fund.

Even overlooking Hwashin's own description of the true party in interest, it is clear from the pleadings the real party in interest is the Fund. The Alabama Supreme Court has held that §25-5-11 allows for the recovery of "payments made by the employer or the insurance carrier". See Millers Ins. Ass'n at 963. See also Foster & Creighton Co. v. St. Paul Mercury Indem. Co. 88 So.2d 825 (Ala. 1956) (insurance carrier has right to seek compensation paid to the injured employee.).

Hwashin never paid Mrs. Piggott any workers compensation benefits. (See Hwashin's First Amended Complaint in Intervention at Paragraph 76.). Mrs. Piggott's worker's compensation payments were made by the Fund. (Id.). Hwashin has no statutory right to recover the worker's compensation subrogation interest, only the Fund does since it paid. (Id.).

### B.    The Fund Has No Standing to Assert Hwashin's Property Damage Claims.

The Fund lacks standing to assert claims for Hwashin's alleged property damage. The Fund is not alleged to have incurred and has not incurred any of the property damage Hwashin seeks to recover in its First Amended Complaint in Intervention. The Fund's only claim is to recover its worker's compensation subrogation interest. The Fund has no property damage claims alleged in the First Amended Complaint in Intervention against Gray.

5

    **C.**    **Neither Hwashin Nor the Fund Should Be Allowed to Permissively Intervene to Interject Property Damage Claims.**

The Fund intervened as a matter of right to protect its worker's compensation subrogation interest. (See Hwashin's Motion to Intervene.). Hwashin now seeks to permissively intervene and assert unrelated claims for Hwashin's property damage.

Federal Rules of Civil Procedure, Rule 24(b) provides:

> Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

    **1.**    **There Are No Questions of Law Common to Both Mr. and Mrs. Piggott's Claims or Hwashin's Claims.**

Gray concedes there is a common issue of fact as to why the roof collapsed; however, that is where the similarities between Mr. and Mrs. Piggott's personal injury claims and Hwashin's property damage claims ends.

None of the claims asserted by Mr. and Mrs. Piggott and Hwashin overlap. The only claims Hwashin and Mr. and Mrs. Piggott have in common are negligence and wantonness. However, Gray's duty to each differs. Gray owed Mr. and Mrs. Piggott a common law duty. Gray's duties to Hwashin arise from the parties Contract. Thus, the issue of duty is different as to both.

Hwashin makes claims which Mr. and Mrs. Piggott do not. Hwashin alleges Gray is liable for breaching the implied warranty of suitability and implied warranty of workmanship.

Mr. and Mrs. Piggott do not allege Gray violated any implied warranty. Hwashin makes contract claims. Mr. and Mrs. Piggott do not.

Hwashin's claims are severely limited, if not waived in total, in Paragraph 5.2.3 of the Contract between Hwashin and Gray:

> The making of final payment shall constitute a waiver of claims by the Owner except those arising from: 1) liens, claims, security interests or encumbrances arising out of the Contract and unsettled; 2) failure of the Work to comply with the requirements of the Contract Documents; or 3) terms of special or general warranties required by the Contract Documents. 4) latent defects; 5) Design/Builder's indemnity and insurance obligations as set forth in this Agreement. . . .

Paragraph 7.3.8 states:

> The Owner and the Design/Builder waive all rights against each other and the Architect and other design professionals, contractors, subcontractors, agents and employees, each of the other, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 7-3 or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner and Design/Builder as trustee. The Owner or Design/Builder, as appropriate, shall require from contractors and subcontractors by appropriate agreements, written where legal required for validity, similar waivers each in favor of other parties enumerated in this Paragraph 7-3. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

Hwashin has also waived its right to consequential damages. Paragraph 11.9 states:

> Except for (i) Owner's claims for liquidated damages as expressly specified in this Agreement and except (ii) to the extent Owner's claims are covered by insurance provided by Design/Builder under this Agreement, the Design/Builder and Owner waive any and all claims against each other for consequential damages arising out of or relating to this Contract. Subject to the above-cited exceptions, this mutual waiver includes: (1) Damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity

or of the services of such person; and (2) damages incurred by the Design/Builder for principal or home office expenses including the compensation of personnel stationed there, for losses of financing, income, business and reputation, for loss of management or employee productivity or of the services of such persons, and for loss of profit except anticipated profit arising directly from the Work. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination of this Agreement.

Interpretation of these and the other provisions of the Contract are unique to Hwashin's claims. To interject Hwashin's claims will present contractual issues which are not necessary to adjudicate Mr. and Mrs. Piggott's claims.

The law of damages for Hwashin's claims and Mr. and Mrs. Piggott's claims are completely different. Mr. and Mrs. Piggott allege personal injury claims, while Hwashin seeks property damage. The law concerning the two types of damages focuses on different issues that do not overlap. Mr. and Mrs. Piggott's damages will focus on Mrs. Piggott's actual physical injury, pain and suffering, emotional distress and mental anguish, lost income, lost ability to earn future income, the expenses associated with the injury and Mr. Piggott's loss of marital services. Hwashin's damages will focus on the costs of repairs, loss of property in the Hwashin facility and the unrecoverable consequential damages it alleges in its Amended Complaint.

Courts have repeatedly denied requests for permissive intervention where allowing the intervention will require the interjection of additional issues. See Utah v. U.S., 394 U.S. 89, 96, (1969)(it was not an abuse of discretion to prevent intervention where doing so would "introduce new issues which had not been raised."); ManaSota-88, Inc. v. Tidwell, 896 F.2d 1318 (11th Cir. 1990)(the interjection of issues not raised by the plaintiff in the underlying action would result in protracted litigation and denial of permissive intervention was not an abuse of discretion.); U.S. v. South Florida Water Management Dist., 922 F.2d 704 (11th Cir. 1991)(where permissive

intervention would result in the addition of witnesses and interjection of collateral issues, denial

of motion for permissive intervention was not an abuse of discretion.); Shea v. Angulo, 19 F.3d

343 (7th Cir. 1994)(denial of motion for permissive intervention was not an abuse of discretion,

"as allowing the intervention would insert into the action a complex factual question completely

unrelated to the quarrel between the original parties and delay the adjudication of the rights of

the original parties"); SEC v. Everest Management Corp. 475 F.2d 1236, 1240 (2nd Cir.

1972)(individual investors were not allowed to intervene into an SEC enforcement proceeding,

as additional issues that would be raised outweighed the benefit of adjudicating the matter in a

single action); Federal Trade Comm'n v. First Capital Consumer Membership Servs., Inc., 206

F.R.D. 358 (D.C.N.Y. 2001)(it was not an abuse of discretion to deny permissive intervention

where grant of motion would result in introduction of collateral issues and cause undue delay).

     This case is similar to Marvel Entertainment Group, Inc. v. Hawaiian Triathlon Corp.,

132 F.R.D. 143 (S.D.N.Y.1990). Marvel, owners of the copyrighted Iron Man comic book

merchandise and trademark, sued Hawaiian Triathlon, the sponsor of the Iron Man Triathlon, for

alleged breach of an agreement concerning Hawaiian Triathlon's use of the Iron Man name.

Timex Corporation sought leave to intervene to assert claims of unfair competition and

intentional interference against Marvel and claims of breach of contract and fraud against

Hawaiian Triathlon arising out of a tri-party licensing agreement which named Timex the official

timekeeper of the race and allowed Timex to market a line of watches using the Iron Man name.

The Court denied Timex's Motion for permissive intervention. While the Court recognized

"some overlap in the factual and legal issues", the Court determined that the interjection of

unrelated issues would cause undue delay and ultimately prejudice the original parties by

protracting the litigation.

**2.    Hwashin's Claims Will Cause Undue Delay and Prejudice to the Original Parties.**

Even if a Court determines that a common question of law or fact exists, it has the discretion to deny a motion for permissive intervention, if the intervention will result in undue delay or prejudice.    Id. See also Sunbelt Veterinary Supply, Inc. v. International Business Systems United States, Inc., 200 F.R.D. 463 (M.D.Ala. 2001).    In considering a motion for permissive intervention, the Court must consider its potential to delay progress of case and the effect of intervention on existing parties.    see Dillard v. City of Foley, 926 F.Supp. 1053 (M.D.Ala. 1995).

The introduction of Hwashin's claims will interject numerous witnesses and substantial documents not related at all to Mr. and Mrs. Piggott's claims.    Hwashin alleges it has incurred "damages to its manufacturing facility, business property and other contents, an interruption of its business and other related damages."    Proving each of these areas of damage will result in substantial delays in the discovery process and trial of Mr. and Mrs. Piggott's claims.

Hwashin alleges it has incurred damage to its manufacturing facility.    This claim will require testimony and documents concerning the costs to clean up the debris after the roof collapse and the reasonableness of these costs, the costs to rebuild the office and the reasonableness of these costs, the effect of the waiver provisions found in the Contract, the value of the Hwashin facility both prior to and after the roof collapse and whether Hwashin properly mitigated its damages.

Hwashin also alleges it has incurred damage to it business property and contents of the office.    This claim will require testimony and documents concerning the exact business property and contents damaged, the extent of the damage, the repair or replacement costs of the property

and the reasonableness of those costs, the value of the property prior to and after the roof collapse, whether the property could be salvaged or was a total loss, whether Hwashin properly mitigated its damages, whether any defects in the property existed prior to the roof collapse and the effect of the waiver provisions found in the Contract on Hwashin's claim.

Hwashin alleges it has suffered damage as a result of the interruption of its business. This area of damage will require testimony and documents concerning the length of the alleged interruption, whether the interruption resulted in lost sales, whether Hwashin was forced to pay its employees during the interruption, the profitability of Hwashin prior to and after the collapse, whether Hwashin properly mitigated its damages and the effect of the waiver provisions found in the Contract.

The case will be further delayed by the additional legal issues raised. Interpretation issues regarding the Contract provisions regarding indemnity and waiver alone are substantial

Hwashin's dual role as both Mrs. Piggott's employer seeking to recover its worker's compensation subrogation interest and its role as the property owner seeking to recover its property damage and lost profits will confuse the jury. As to the worker's compensation subrogation claim, Hwashin stands in the shoes of Mrs. Piggott. Gray can only assert defenses it has against Mrs. Piggott. Gray has no known contributory negligence against Mrs. Piggott.

On the other hand, Hwashin, as the property owner, does not stand in the shoes of Mrs. Piggott and Gray has an excellent contributory negligence defense to Hwashin's property damage claims. The prospect of the jury not applying contributory negligence to Hwashin's subrogation claim, but to Hwashin's property damage claim, will be confusing.

There is also the certainty of additional intervenors as to Hwashin's property damage claims. Hwashin seeks to recover for damage to the Hwashin facility and to its business property.

496221_14.DOC                                        11

A large portion of these alleged damages have been paid by Hwashin's insurance carrier. Allowing Hwashin to assert property damages claims as a Plaintiff in Intervention will result in Hwashin's insurance carrier filing its own Motion to Intervene to protect its subrogation interest. There will clearly be one more Plaintiff in this case, and probably others, if this Court allows Hwashin's property damage claims in this case.

If Hwashin is allowed to assert its claims in this case, Gray will be prejudiced by the interjection of the existence of insurance into the personal injury portion of this case. Federal Rules of Civil Procedure, Rule 411 states:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

Federal courts have unequivocally held that the existence of insurance coverage cannot be raised before the jury in personal injury action. See Joynor v. Berman Leasing Co., 398 F.2d 875 (5th Cir. 1968).

The Contract paragraphs 7.3.8 and 11.9 both limit Hwashin's and Gray's right to recover damages against each other to the extent their claims are covered by insurance. By allowing Hwashin to assert claims for property damage, Gray will be forced to raise these contractual defenses and thereby interject the existence of insurance into this action. Gray will be unfairly prejudiced by the mention of insurance at the trial of Mr. and Mrs. Piggott's personal injury case. Mr. and Mrs. Piggott will also be prejudiced by having to endure the substantial delay in these proceedings while discovery proceeds on Hwashin's property damage claims.

D.    **Hwashin Should Either File a New Action or a Counterclaim in the Related Litigation.**

While the question of whether a party seeking to intervene has other means of protecting its rights is not controlling, Courts have held that it may be considered. See Korioth v. Briscoe, 523 F.2d 1271. (5th Cir. 1975)(held that when appellant had other adequate means of asserting its rights, a charge of abuse of discretion in the denial of a motion for permissive intervention would appear to be almost untenable on its face.); In re Bank of New York Derivative Litigation, 320 F.3d 291 (2nd Cir. 2003); Head v. Jellico Housing Authority, 870 F.2d 1117 (6th Cir. 1989).

Hwashin has adequate means of protecting its interests outside of its alleged Amended Complaint. Hwashin is free to file its own Complaint claiming property damage and lost profits. Hwashin would not be prejudiced. The statute of limitations is far from expired. This would free this action from the undue delay, unfair prejudice and confusion Hwashin's claims will certainly cause.

Second, there is an existing case in this Court to which Hwashin is already a party on June 26, 2007. Gray filed suit against Hwashin in CV-07-584 pending in this Court. Gray has sued Hwashin for Hwashin's failure to pay Gray for repairs to the facility, the exact same property damage Hwashin is trying to assert in this action. Hwashin could easily, and more appropriately, file a counterclaim in that action.

Hwashin will not be prejudiced by pursuing its recovery as a counterclaim, rather than a claim in intervention in this one. In fact, it is expected that Hwashin will argue that it is entitled to a set off for the payments owed to Gray due to Gray's negligence and breach of contract in the action Gray has filed. If so, the exact same legal and factual issues Hwashin attempts to assert in this action will be litigated in the other case.

### III.    CONCLUSION.

Hwashin is not a true party Plaintiff and lacks standing. The Fund is not the proper party to assert Hwashin's property damage claim and lacks standing. Even if Hwashin or the Fund had standing, they should not be allowed to permissively intervene to interject property damage claims into this case which will only unduly delay this litigation and prejudice the original parties. Rather, Hwashin should file a new case or assert its property damage claim as a counterclaim in Case No. CV-07-584.

**WHEREFORE,** Gray respectfully requests this Court deny Hwashin's Motion for Leave to Amend it Complaint in Intervention.

Done this  13  day of July, 2007.

By: _____
E. Britton Monroe (MON032)
Mickey B. Wright (WRI048)
Brian M. McClendon (MCC133)
Attorneys for Defendant/ Third Party
Plaintiff Gray Construction, Inc.


**OF COUNSEL:**
LLOYD, GRAY & WHITEHEAD, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama 35223
Telephone: (205) 967-8822
Facsimile: (205) 967-2380

## CERTIFICATE OF SERVICE

I hereby certify that on the _13th_ day of July, a true and correct copy of the foregoing has been furnished by U.S. Mail, postage prepaid, and electronically upon the following parties:

Jere L. Beasley, Esq.
Julia Ann Beasley, Esq.
Beasley, Allen, Crow, Methvin,
    Portis & Miles, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
**Counsel for Plaintiffs Jennifer and Slade
Piggott**

Thomas T. Gallion, III, Esq.
Constance C. Walker, Esq.
Felicia A. Long, Esq.
Haskell, Slaughter, Young & Gallion, LLC
P.O. Box 4660
Montgomery, AL 36103-4660
**Counsel for Latta Plumbing & Construction Co.,
Inc.**

James A. Rives, Esq.
William Christopher Waller, Jr., Esq.
Ball, Ball, Matthews & Novak, P.A.
P.O. Box 2148
Montgomery, AL 36102-2148
**Counsel for Hwashin America Corp.**

John S. Somerset, Esq.
Sudderth & Somerset
5385 First Avenue North
Birmingham, AL 35212
**Counsel for All-South Subcontractors, Inc.**

Linda H. Ambrose, Esq.
Rogers & Associates
3000 Riverchase Galleria, Ste. 650
Birmingham, AL 35244
**Counsel for Hwashin America Corp.**

A. Joe Peddy, Esq.
Robert B. Stewart, Esq.
Smith, Spires & Peddy
2015 2nd Avenue North, Ste. 200
Birmingham, AL 35203
**Counsel for Cooper's Steel Fabricators, Inc.**

J. Lister Hubbard, Esq.
Richard H. Allen, Esq.
Arden Reed Pathak, Esq.
Capell & Howard, P.C.
P.O. Box 2069
Montgomery, AL 36102-2069
**Counsel for Hwashin America Corp.**

Charles Keith Hamilton, Esq.
Bainbridge, Mims, Rogers & Smith
P.O. Box 530886
Birmingham, AL 35253-0886
**Counsel for Freeland-Harris Consulting Engineers
of Kentucky, Inc.**

Hope T. Cannon, Esq.
Brittin T. Coleman, Esq.
Kenneth M. Perry, Esq.
Bradley, Arant, Rose & White, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
**Counsel for Firestone Building Products
Company, LLC**

John M. Laney, Jr., Esq.
John C. DeShazo, Esq.
Laney & Foster, P.C.
P.O. Box 43798
Birmingham, AL 35243-0798
**Counsel for Freeland-Harris Consulting Engineers
of Georgia, Inc.**

Larry William Harper, Esq.
Porterfield, Harper, Mills & Motlow, PA
P.O. Box 530790
Birmingham, AL   35253-0790
**Counsel for The Hardy Corporation**

OF COUNSEL

# Owner and Design/Builder

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES; CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS USE, COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

This document comprises two separate Agreements: Part 1 Agreement and Part 2 Agreement. To the extent referenced in these Agreements, subordinate parallel agreements to A191 consist of AIA Document A491, Standard Form of Agreements Between Design/Builder and Contractor, and AIA Document B901, Standard Form of Agreements Between Design/Builder and Architect.

Copyright 1985, ©1996 The American Institute of Architects, 1735 New York Avenue, NW, Washington, DC 20006-5292. Reproduction of the material herein or substantial quotation of its provisions without the written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.

**PART 2 AGREEMENT**

**1996 EDITION**

## AGREEMENT
made as of the 24 day of September in the year of 2003
(In words, indicate day, month and year.)

BETWEEN the Owner:
*(Name and address)*
Hwashin America Corporation
P.O. Box 1139
Greenville, AL 36037

and the Design/Builder:
*(Name and address)*
James N. Gray Company
10 Quality Street
Lexington, KY 40507-1450

For the following Project:
*(Include Project name, location and a summary description.)*
To design and build an approximately 273,000 sq. ft. manufacturing facility on an undeveloped property located in Greenville, Alabama.

The architectural services described in Article 3 will be provided by the following person or entity who is lawfully licensed to practice architecture:

| *(Name and address)* | *(Registration Number)* | *(Relationship to Design/Builder)* |
|---|---|---|
| GNP Architects and Engineers, P.S.C. | Dennis Bopp (Alabama 5077) | Architect of Record |
| 10 Quality Street | | |
| Lexington, Kentucky 40507 | | |

Normal structural, mechanical and electrical engineering services will be provided contractually through the Architect except as indicated below:

| *(Name, address and discipline)* | *(Registration Number)* | *(Relationship to Design/Builder)* |
|---|---|---|
| Freeland Harris Structural Engineers | Freeland Harris, P.E. (Alabama 19702) | Structural Engineering Consultant |
| 108 Esplanade, Suite 210 | | |
| Lexington, Kentucky 40507 | | |

The Owner and the Design/Builder agree as set forth below.

---

**TERMS AND CONDITIONS – PART 2 AGREEMENT**

---

| ARTICLE 1 | 1.1 | **BASIC DEFINITIONS** |
|---|---|---|
| **GENERAL PROVISIONS** | | |
| | 1.1.1 | The Contract Documents consist of the Part 2 |

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

**8**

A000007001                                                                 A000007001

EXHIBIT A

Agreement to the extent not modified by this Part 2 Agreement, this Part 2 Agreement, the Design/Builder's Proposal and written addenda to the Proposal as well as other documents identified in Article 14, the Construction Documents approved by the Owner in accordance with Subparagraph 3.2.3 and Modifications issued after execution of this Part 2 Agreement. A Modification is a Change Order or a written amendment to this Part 2 Agreement signed by both parties, or a Construction Change Directive issued by the Owner in accordance with Paragraph 8.3.

**1.1.2** The term "Work" means the construction and services provided by the Design/Builder to fulfill the Design/Builder's obligations.

**1.2 EXECUTION, CORRELATION AND INTENT**

**1.2.1** It is the intent of the Owner and Design/Builder that the Contract Documents include all items necessary for proper execution and completion of the Work. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Design/Builder shall be required only to the extent consistent with and reasonably inferable from the Contract Documents as being necessary to produce the intended results. Words that have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

**1.2.2** If the Design/Builder believes or is advised by the Architect or by another design professional retained to provide services on the Project that implementation of any instruction received from the Owner would cause a violation of any applicable law, the Design/Builder shall notify the Owner in writing. Neither the Design/Builder nor the Architect shall be obligated to perform any act which either believes will violate any applicable law.

**1.2.3** Nothing contained in this Part 2 Agreement shall create a contractual relationship between the Owner and any person or entity other than the Design/Builder.

**1.3 OWNERSHIP AND USE OF DOCUMENTS**

**1.3.1** Drawings, specifications, and other documents and electronic data furnished by the Design/Builder are instruments of service. The Design/Builder's Architect and other providers of professional services shall retain all common law, statutory and other reserved rights, including copyright in those instruments of service furnished by them. Drawings, specifications, and other documents and electronic data are furnished for use solely with respect to this Part 2 Agreement. The Owner shall be permitted to retain copies, including reproducible copies, of the drawings, specifications, and other documents and electronic data furnished by the Design/Builder for information and reference in connection with the Project except as provided in Subparagraphs 1.3.2 and 1.3.3.

**1.3.2** Drawings, specifications, and other documents and electronic data furnished by the Design/Builder shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, except

by agreement in writing and with appropriate compensation to the Design/Builder, unless the Design/Builder is adjudged to be in default under this Part 2 Agreement or under any other subsequently executed agreement.

**1.3.3** If the Design/Builder defaults in the Design/Builder's obligations to the Owner, the Architect shall grant a license to the Owner to use the drawings, specifications, and other documents and electronic data furnished by the Architect to the Design/Builder for the completion of the Project, conditioned upon the Owner's execution of an agreement to cure the Design/Builder's default in payment to the Architect for services previously performed and to indemnify the Architect and Design/Builder with regard to claims arising from such reuse without the Design/Builder's or Architect's professional involvement to the extent such claims are not caused by the negligence of Design/Builder or Architect.

**1.3.4** Submission or distribution of the Design/Builder's documents to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the rights reserved in Subparagraph 1.3.1.

**ARTICLE 2**
**OWNER**

**2.1** The Owner shall designate a representative authorized to act on the Owner's behalf with respect to the Project. The Owner or such authorized representative shall examine documents submitted by the Design/Builder and shall render decisions in a timely manner and in accordance with the schedule accepted by the Owner. The Owner may obtain independent review of the Contract Documents and shop drawings by a separate architect, engineer, contractor or cost estimator under contract to or employed by the Owner. Such independent review shall be undertaken at the Owner's expense in a timely manner and shall not delay the orderly progress of the Work.

**2.2** The Owner may appoint an on-site project representative to observe the Work and to have such other responsibilities as the Owner and Design/Builder agree in writing.

**2.3** The Owner shall cooperate with the Design/Builder in securing building and other permits, licenses and inspections. The Owner shall not be required to pay the fees for such permits, licenses and inspections unless the cost of such fees is excluded from the Design/Builder's Proposal.

**2.4** Except where the City of Greenville has otherwise agreed to furnish The Owner shall furnish services of land surveyors, geotechnical engineers and other consultants for subsoil, air and water conditions, in addition to those provided under the Part 1 Agreement, when such services are deemed necessary by the Design/Builder to properly carry out the design services required by this Part 2 Agreement. In the event the City of Greenville fails to furnish any item to

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia — 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

9

Design/Builders that it has agreed to furnish, then Owner, upon written request from Design/Builder shall promptly furnish such item.

**2.5** The Owner shall disclose, to the extent known to the Owner, the results and reports of prior tests, inspections or investigations conducted for the Project involving: structural or mechanical systems; chemical, air and water pollution; hazardous materials; or other environmental and subsurface conditions. The Owner shall disclose all information known to the Owner regarding the presence of pollutants at the Project's site.

**2.6** The Owner shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project, including such auditing services as the Owner may require to verify the Design/Builder's Applications for Payment.

**2.7** Those services, information, surveys and reports required ~by Paragraphs 2.4 through 2.6 which are within the~ Owner's ~control~ provided by the Owner or the City of Greenville shall be furnished at the Owner's or City's expense, and the Design/Builder shall be entitled to rely upon, and the Owner accepts full responsibility and liability for, the accuracy and completeness thereof, except to the extent the Owner advises the Design/Builder to the contrary in writing.

**2.8** If the Owner requires the Design/Builder to maintain any special insurance coverage, policy, amendment, or rider, the Owner shall pay the additional cost thereof, except as otherwise stipulated in this Part 2 Agreement.

**2.9** If the Owner observes or otherwise becomes aware of a fault or defect in the Work or nonconformity with the Design/Builder's Proposal or the Construction Documents, the Owner shall give prompt written notice thereof to the Design/Builder.

**2.10** The Owner shall, at the request of the Design/Builder, prior to execution of this Part 2 Agreement and promptly upon request thereafter, furnish to the Design/Builder reasonable evidence and documentation acceptable to Design/Builder of Owner's ability to pay for the Work ~that financial arrangements have been made to fulfill the Owner's obligations under the Contract~. Owner shall not thereafter materially alter such financial arrangements without written notice to, and consent in writing from, Design/Builder. Furnishing such evidence and documentation of financial arrangements shall be a condition precedent to Design/Builder's commencement or continuation of the Work.

**2.11** The Owner shall communicate with persons or entities employed or retained by the Design/Builder through the Design/Builder, unless otherwise directed by the Design/Builder.

**ARTICLE 3**
**DESIGN/BUILDER**

**3.1    SERVICES AND RESPONSIBILITIES**

**3.1.1** Design services required by this Part 2 Agreement shall be performed by qualified architects and other design professionals. The contractual obligations of such professional persons or entities are undertaken and performed in the interest of the Design/Builder. The standard of care for all design services performed to execute the Work shall be the care and skill ordinarily used by members of the design profession practicing under similar conditions at the same time and locality of the Project. Notwithstanding the preceding sentence, if the parties agree upon specific performance standards for any aspect of the Work, which standards are to be set forth in an exhibit to the Agreement entitled "Performance Standard Requirements," the design services shall be performed to achieve such standards.

**3.1.2** The agreements between the Design/Builder and the persons or entities identified in this Part 2 Agreement, and any subsequent modifications, shall be in writing. These agreements, including financial arrangements with respect to this Project, shall be promptly and fully disclosed to the Owner upon request.

**3.1.3** The Design/Builder shall be responsible to the Owner for the quality of the design services and for the quality of the construction performed by ~acts and omissions of the~ Design/Builder's employees, subcontractors and their agents and employees ~and other persons, including the Architect and other design professionals, performing any portion of the Design/Builder's obligations under this Part 2 Agreement~.

**3.2    BASIC SERVICES**

**3.2.1** The Design/Builder's Basic Services are described below and in Article 14.

**3.2.2** The Design/Builder shall designate a representative authorized to act on the Design/Builder's behalf with respect to the Project.

**3.2.3** The Design/Builder shall submit Construction Documents for review and approval by the Owner. Construction Documents may include drawings, specifications, and other documents and electronic data setting forth in detail the requirements for construction of the Work, and shall:

.1    be consistent with the intent of the ~May 21, 2003 Bid Package and the~ Design/Builder's Proposal; CONTRACT DOCUMENTS

.2    provide information for the use of those in the building trades; and

.3    include documents customarily required for regulatory agency approvals.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1012416, which expires on 10/31/2003.

Electronic Format A191-1996
10

3.2.4   The Design/Builder, with the assistance of the Owner, shall file documents required to obtain necessary approvals of governmental authorities having jurisdiction over the Project.

3.2.5   Unless otherwise provided in the Contract Documents, the Design/Builder shall provide or cause to be provided and shall pay for design services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

3.2.6   Design/Builder agrees to defend, indemnify (including payment of attorney's fees) and to hold Owner harmless from any and all liens, claims of lien, security interests or other encumbrances against Owner's property in favor of the Design/Builder, contractors, materials suppliers, consultants or other persons or entities making a claim by reason of having provided labor, services, materials and equipment relating to the Work. Design/Builder further agrees to bond off, at its cost, any such liens or encumbrances pursuant to Alabama law, if requested by Owner. Notwithstanding the foregoing, Design/Builder shall be obligated to defend, indemnify and hold Owner harmless from liens, claims of lien, security interests and other encumbrances and to bond off such liens or encumbrances only to the extent such lien, claim of lien, security interest or encumbrance is not the result of Owner's non-payment of funds justly due under this Agreement.

3.2.67   The Design/Builder shall be responsible for all construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under this Part 2 Agreement.

3.2.78   The Design/Builder shall keep the Owner informed of the progress and quality of the Work.

3.2.89   The Design/Builder shall be responsible for correcting Work which does not conform to the Contract Documents as provided in Article 9 of this Agreement.

3.2.910   The Design/Builder warrants to the Owner that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the construction will be free from faults and defects, and that the construction will conform with the requirements of the Contract Documents. Construction not conforming to these requirements, including substitutions not properly approved by the Owner, shall be corrected in accordance with Article 9. Notwithstanding any other provision of the Contract Documents, it is agreed that Design/Builder does not expressly or impliedly warrant the adequacy, sufficiency or suitability of any design

provided or specified by the Owner or specified sole source or brand-named products, equipment, or materials and Owner accepts the manufacturer's warranty as its sole recourse with regard to such items.

3.2.101   The Design/Builder shall pay all sales, consumer, use and similar taxes which had been legally enacted at the time the Design/Builder's Proposal was first submitted to the Owner, and shall secure and pay for building and other permits and governmental fees, licenses and inspections necessary for the proper execution and completion of the Work which are either customarily secured after execution of a contract for construction or are legally required at the time the Design/Builder's Proposal was first submitted to the Owner.

3.2.112   The Design/Builder shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities relating to the Project.

3.2.123   The Design/Builder shall pay royalties and license fees for patented designs, processes or products. The Design/Builder shall defend suits or claims for infringement of patent rights and shall hold the Owner harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer is required by the Owner. However, if the Design/Builder has reason to believe the use of a required design, process or product is an infringement of a patent, the Design/Builder shall be responsible for such loss unless such information is promptly furnished to the Owner.

3.2.134   The Design/Builder shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under this Part 2 Agreement. At the completion of the Work, the Design/Builder shall remove from the site waste materials, rubbish, the Design/Builder's tools, construction equipment, machinery, and surplus materials.

3.2.145   The Design/Builder shall notify the Owner when the Design/Builder believes that the Work or an agreed upon portion thereof is substantially completed. If the Owner concurs, the Design/Builder Owner shall issue a Certificate of Substantial Completion which shall establish the Date of Substantial Completion, shall state the responsibility of each party for security, maintenance, heat, utilities, damage to the Work and insurance, shall include a list of items to be completed or corrected and shall fix the time within which the Design/Builder shall complete items listed therein. Disputes between the Owner and Design/Builder regarding the Certificate of Substantial Completion shall be resolved in accordance with provisions of Article 10.

3.2.16.6   The Design/Builder shall maintain at the site for the Owner one record copy of the drawings, specifications, product data, samples, shop drawings, Change Orders and other modifications, in good order and regularly updated to record the completed construction. These shall be delivered to the Owner upon completion of construction and prior to final payment.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/3?/2003.

Electronic Format A191-1996
11

A000007004                                    A000007004

### 3.3 ADDITIONAL SERVICES

**3.3.1** The services described in this Paragraph 3.3 are not included in Basic Services unless so identified in Article 14, and they shall be paid for by the Owner as provided in this Part 2 Agreement, in addition to the compensation for Basic Services. The services described in this Paragraph 3.3 shall be provided only if authorized or confirmed in writing by the Owner.

**3.3.2** Making revisions in drawings, specifications, and other documents or electronic data when such revisions are required by the enactment or revision of codes, laws or regulations subsequent to the preparation of such documents or electronic data.

**3.3.3** Providing consultation concerning replacement of Work damaged by fire or other cause during construction, and furnishing services required in connection with the replacement of such Work.

**3.3.4** Providing services in connection with a public hearing, arbitration proceeding or legal proceeding, except where the Design/Builder is a party thereto.

**3.3.5** Providing coordination of construction performed by the Owner's own forces or separate contractors employed by the Owner, and coordination of services required in connection with construction performed ~~and equipment supplied by the~~ Owner.

**3.3.6** ~~Preparing a set of reproducible record documents or electronic data showing significant changes in the Work made during construction.~~

**3.3.7** Providing assistance in the utilization of equipment or systems such as preparation of operation and maintenance manuals, training personnel for operation and maintenance, and consultation during operation.

### ARTICLE 4
### TIME

**4.1** Unless otherwise indicated, the Owner and the Design/Builder shall perform their respective obligations as expeditiously as is consistent with reasonable skill and care and the orderly progress of the Project.

**4.2** Time limits stated in the Contract Documents are of the essence. The Work to be performed under this Part 2 Agreement shall commence upon receipt of a notice to proceed unless otherwise agreed and, subject to authorized Modifications, Substantial Completion shall be achieved on or before the time established in Article 14.

**4.3** Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the Owner can occupy or utilize the Work for its intended use.

**4.4** Based on the Design/Builder's Proposal, a construction schedule shall be provided consistent with Paragraph 4.2 above and for Owner's approval.

**4.5** If the Design/Builder is delayed at any time in the progress of the Work by an act or neglect of the Owner, Owner's employees, or separate contractors employed by the Owner, or by the City of Greenville, or by changes ordered in the Work, or by ~~labor disputes~~, fire, ~~unusual delay in deliveries~~, adverse weather conditions not reasonably anticipatable, unavoidable casualties or other causes beyond the Design/Builder's control, or by delay authorized by the Owner pending arbitration, or by other causes which the Owner and Design/Builder agree may justify delay, then the Contract Time shall be reasonably extended by Change Order.

### ARTICLE 5
### PAYMENTS

### 5.1 PROGRESS PAYMENTS

**5.1.1** The Design/Builder shall deliver to the Owner itemized Applications for Payment in such detail as indicated in Article 14.

**5.1.2** Within ~~ten (10)~~ twenty (20) days of the Owner's receipt of a properly submitted and correct Application for Payment, the Owner shall make payment to the Design/Builder.

**5.1.3** The Application for Payment shall constitute a representation by the Design/Builder to the Owner that the design and construction have progressed to the point indicated, the quality of the Work covered by the application is in accordance with the Contract Documents, and the Design/Builder is entitled to payment in the amount requested.

**5.1.4** Upon receipt of payment from the Owner, the Design/Builder shall promptly pay the Architect, other design professionals and each contractor the amount to which each is entitled in accordance with the terms of their respective contracts.

**5.1.5** The Owner shall have no obligation under this Part 2 Agreement to pay or to be responsible in any way for payment to the Architect, another design professional or a contractor performing portions of the Work.

**5.1.6** Neither progress payment nor partial or entire use or occupancy of the Project by the Owner shall constitute an acceptance of Work not in accordance with the Contract Documents.

**5.1.7** The Design/Builder warrants that title to all construction covered by an Application for Payment will pass to the Owner no later than the time of payment. The Design/Builder further warrants that upon submittal of an Application for Payment all construction for which payments have been received from the Owner shall be free and clear of liens, claims, security interests or encumbrances in favor of the

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
12

A000007005                                                    A000007005

Design/Builder or any other person or entity performing construction at the site or furnishing design services, materials or equipment relating to the construction.

**5.1.8**   At the time of Substantial Completion, the Owner shall pay the Design/Builder the retainage, if any, less the reasonable cost to correct or complete incorrect or incomplete Work and any offsets or credits to which Owner is entitled under the terms of this Agreement. Final payment of such withheld sum shall be made upon correction or completion of such Work.

**5.1.9**   Contemporaneously with the execution of this Agreement, Owner shall make an initial, up-front payment to Design/Builder in the amount of Six Hundred Twenty-Five Thousand and No/100 U.S. Dollars ($625,000.00).

**5.1.10**   Notwithstanding any other provisions of the Contract Documents to the contrary, if the Owner does not pay the Design/Builder for any partial billing within the twenty (20) day period following receipt by the Owner of a properly submitted and correct application for payment from the Design/Builder, then, after providing Owner with seven (7) days written notice of such nonpayment, the Design/Builder shall have the absolute unconditional right to stop the work until payment has been received.   The Contract Sum and Contract Time shall be increased by the amount of the Design/Builder's cost and time of shutdown, delay and startup and such changes shall be effected by appropriate change order before Design/Builder shall be obligated to return to work.   Design/Builder shall not have or incur any liability to Owner or any other person as a result of exercising its rights hereunder.

**5.2   FINAL PAYMENT**

**5.2.1**   Neither final payment nor amounts retained, if any, shall become due until the Design/Builder submits to the Owner: (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or Owner's property might be responsible or encumbered (less amounts withheld by the Owner) have been paid or otherwise satisfied; (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner; (3) a written statement that the Design/Builder knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents; (4) consent of surety, if any, to final payment; and (5) if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner.   If a contractor or other person or entity entitled to assert a lien against the Owner's property refuses to furnish a release or waiver required by the Owner, the Design/ Builder may furnish

a bond satisfactory to the Owner to indemnify the Owner against such lien.   If such lien remains unsatisfied after payments are made, the Design/Builder shall indemnify the Owner for all loss and cost, including reasonable attorneys' fees incurred as a result of such lien.

**5.2.2**   When the Work has been completed and the contract fully performed, the Design/Builder shall submit a final application for payment to the Owner, who shall make final payment within 30 days of receipt in accordance with subparagraphs 13.1.54 through 13.1.56.

**5.2.3**   The making of final payment shall constitute a waiver of claims by the Owner except those arising from:

.1   liens, claims, security interests or encumbrances arising out of the Contract and unsettled;

.2   failure of the Work to comply with the requirements of the Contract Documents; or

.3   terms of special or general warranties required by the Contract Documents.

.4   latent defects;

.5   Design/Builder's indemnity and insurance obligations as set forth in this Agreement; or

**5.2.4**   Acceptance of final payment shall constitute a waiver of all claims by the Design/Builder except those previously made in writing and identified by the Design/Builder as unsettled at the time of final Application for Payment.

**5.3   INTEREST PAYMENTS**

**5.3.1**   Payments due the Design/Builder under this Part 2 Agreement which are not paid when due shall bear interest from the date due at the rate specified in Article 13, or in the absence of a specified rate, at the legal rate prevailing where the Project is located.

**ARTICLE 6**
**PROTECTION OF PERSONS AND PROPERTY**

**6.1**   The Design/Builder shall be responsible for initiating, maintaining and providing supervision of all safety precautions and programs in connection with the performance of this Part 2 Agreement.   Notwithstanding any other provision of the Contract Documents, all provisions of this Article 6 are solely for the benefit of the Owner and are not intended to benefit or create a duty to, and shall not be relied upon, in any way whatsoever by any other person, firm, or entity.

**6.2**   The Design/Builder shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to: (1) employees on the Work and other persons who may be affected thereby; (2) the Work

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 – OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
13

A000007006                                                                    A000007006

and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody, or control of the Design/Builder or the Design/Builder's contractors; and (3) other property at or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal relocation or replacement in the course of construction.

6.3     The Design/Builder shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on the safety of persons or property or their protection from damage, injury or loss.

6.4     The Design/Builder shall promptly remedy damage and loss (other than damage or loss insured or required to be insured under property insurance provided or required by the Contract Documents) to property at the site but only to the extent caused in whole or in part by the Design/Builder, a contractor of the Design/Builder or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable.

## ARTICLE 7
## INSURANCE AND BONDS

### 7.1     DESIGN/BUILDER'S LIABILITY INSURANCE

7.1.1     The Design/Builder shall purchase from and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, such insurance as will protect the Design/Builder from claims set forth below which may arise out of or result from operations under this Part 2 Agreement by the Design/Builder or by a contractor of the Design/Builder, or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

    .1     claims under workers' compensation, disability benefit and other similar employee benefit laws that are applicable to the Work to be performed;

    .2     claims for damages because of bodily injury, occupational sickness or disease, or death of the Design/Builder's employees;

    .3     claims for damages because of bodily injury, sickness or disease, or death of persons other than the Design/Builder's employees;

    .4     claims for damages covered by usual personal injury liability coverage which are sustained (1) by a person as a result of an offense directly or indirectly related to employment of such person by the Design/Builder or (2) by another person;

    .5     claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

    .6     claims for damages because of bodily injury, death of a person or property damage arising out of ownership,

maintenance or use of a motor vehicle; and

    .7     claims involving contractual liability insurance applicable to the Design/Builder's obligations under Paragraph 11.5.

    .8     claims arising out of the performance of professional services caused by negligent errors or omissions.

7.1.2     The insurance required by Subparagraph 7.1.1 shall be written for not less than limits of liability specified in this Part 2 Agreement or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of the Work until date of final payment and termination of any coverage required to be maintained after final payment three (3) years after the final payment.

7.1.3     Certificates of Insurance acceptable to the Owner shall be delivered to the Owner immediately after execution of this Part 2 Agreement. These Certificates and the insurance policies required by this Paragraph 7.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. If any of the foregoing insurance coverages are required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the application for final payment. Information concerning reduction of coverage shall be furnished by the Design/Builder with reasonable promptness in accordance with the Design/Builder's information and belief.

7.1.4     Design/Builder shall name Owner as an additional insured on Design/Builder's general liability, automobile liability and excess liability insurance policies and such insurance shall be primary and non-contributory with respect to the additional insured.

7.1.5     Design/Builder's workers' compensation insurance policy shall provide for a waiver of subrogation against Owner arising out of claims covered by such insurance.

### 7.2     OWNER'S LIABILITY INSURANCE

7.2.1     The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance. Optionally, the Owner may purchase and maintain other insurance for self-protection against claims which may arise from operations under this Part 2 Agreement. The Design/Builder shall not be responsible for purchasing and maintaining this optional Owner's liability insurance unless specifically required by the Contract Documents.

### 7.3     PROPERTY INSURANCE

7.3.1     Unless otherwise provided under this Part 2 Agreement, the Owner, Design/Builder shall purchase and maintain, in a company or companies authorized to do business in the jurisdiction in which the principal

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
14

A000007007                                                                    A000007007

improvements are to be located, property insurance upon the Work to the full insurable value thereof on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made or until no person or entity other than the Owner has an insurable interest in the property required by this Paragraph 7.3 to be insured, whichever is earlier. This insurance shall include interests of the Owner, the Design/Builder, and their respective contractors and subcontractors in the Work.

7.3.2   Property insurance shall be on an all-risk policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for the services and expenses of the Design/Builder's Architect and other professionals required as a result of such insured loss. Coverage for other perils shall not be required unless otherwise provided in the Contract Documents.

7.3.3   ~~If the Owner does not intend to purchase such property insurance required by this Part 2 Agreement and with all of the coverages in the amount described above, the Owner shall so inform the Design/Builder prior to commencement of the construction. The Design/Builder may then effect insurance which will protect the interests of the Owner, Design/Builder and the Design/Builder's contractors in the construction, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Design/Builder is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, then the Owner shall bear all reasonable costs properly attributable thereto.~~

7.3.4   ~~Unless otherwise provided, t~~The Owner shall purchase and maintain such boiler and machinery insurance required by this Part 2 Agreement or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner. This insurance shall include interests of the Owner, the Design/Builder, the Design/Builder's contractors and subcontractors in the Work, and the Design/Builder's Architect and other design professionals. The Owner and the Design/Builder shall be named insureds.

7.3.5   A loss insured under the ~~Owner's~~ Design/Builder's property insurance shall be adjusted by the ~~Owner~~ Design/Builder as fiduciary and made payable to the ~~Owner~~Design/Builder as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause and ~~of Subparagraph 7.3.10~~. The Design/Builder shall pay contractors their shares of insurance proceeds received by the Design/Builder, and by appropriate agreement, written where legally required for validity, shall require contractors to make payments to their subcontractors in similar manner.

7.3.6   Before an exposure to loss may occur, the ~~Owner~~Parties shall file with the each other Design/Builder s copy of each policy that includes insurance coverages required by this Paragraph 7.3. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Design/Builder or Owner, whichever is applicable.

7.3.7   If the ~~Design/Builder~~Owner requests in writing that insurance for risks other than those described herein or for other special hazards be included in the property insurance policy, the ~~Owner~~Design/Builder shall, if possible, obtain such insurance, and the cost thereof shall be charged to the ~~Design/Builder~~ Owner by appropriate Change Order.

7.3.8   The Owner and the Design/Builder waive all rights against each other and the Architect and other design professionals, contractors, subcontractors, agents and employees, each of the other, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 7.3 or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the ~~Owner~~Design/Builder as trustee. The Owner or Design/Builder, as appropriate, shall require from contractors and subcontractors by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated in this Paragraph 7.3. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

7.3.9   If required in writing by a party in interest, the ~~Owner~~ Design/Builder as trustee shall, upon occurrence of an insured loss, give bond for proper performance of the~~ir~~ Owner's duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The ~~Owner~~ Design/Builder shall deposit in a separate account proceeds so received, which the ~~Owner~~ Design/Builder shall distribute in accordance with such agreement as the parties in interest may reach, or in accordance with an arbitration award in which case the procedure shall be as provided in Article 10. If after such loss no other special agreement is made, replacement of damaged Work shall be covered by appropriate Change Order.

7.3.10   The ~~Owner~~ Design/Builder as trustee shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing, within five (5) days after occurrence of loss to the ~~Owner's~~ Design/Builder's exercise of this power; if such objection be made, the parties shall enter into dispute resolution under procedures provided in Article 10. If distribution of insurance proceeds by arbitration is required, the arbitrators will direct such distribution.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

15

A000007008                                                    A000007008

**7.3.11**  Partial occupancy or use prior to Substantial Completion shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Design/ Builder shall take reasonable steps to obtain consent of the insurance company or companies and shall not, without mutual written consent, take any action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of coverage.

### 7.4    LOSS OF USE INSURANCE

**7.4.1**  The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Design/Builder for loss of use of the Owner's property, including consequential losses due to fire or other hazards, however caused.

### ARTICLE 8
### CHANGES IN THE WORK

### 8.1    CHANGES

**8.1.1**  Changes in the Work may be accomplished after execution of this Part 2 Agreement, without invalidating this Part 2 Agreement, by Change Order, Construction Change Directive, or order for a minor change in the Work, subject to the limitations stated in the Contract Documents.

**8.1.2**  A Change Order shall be based upon agreement between the Owner and the Design/Builder; a Construction Change Directive may be issued by the Owner without the agreement of the Design/Builder; an order for a minor change in the Work may be issued by the Design/Builder alone.

**8.1.3**  Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Design/Builder shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive, or order for a minor change in the Work.

**8.1.4**  If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed Change Order or Construction Change Directive that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or the Design/ Builder, the applicable unit prices shall be equitably adjusted.

### 8.2    CHANGE ORDERS

**8.2.1**  A Change Order is a written instrument prepared by the Design/Builder and signed by the Owner and the Design/Builder, stating their agreement upon all of the following:

.1    a change in the Work;

.2    the amount of the adjustment, if any, in the Contract Sum; and

.3    the extent of the adjustment, if any, in the Contract Time.

**8.2.2**  If the Owner requests a proposal for a change in the Work from the Design/Builder and subsequently elects not to proceed with the change, a Change Order shall be issued to reimburse the Design/Builder for any costs incurred for estimating services, design services or preparation of proposed revisions to the Contract Documents.

### 8.3    CONSTRUCTION CHANGE DIRECTIVES

**8.3.1**  A Construction Change Directive is a written order prepared and signed by the Owner, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both.

**8.3.2**  Except as otherwise agreed by the Owner and the Design/Builder, the adjustment to the Contract Sum shall be determined on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including the expenditures for design services and revisions to the Contract Documents. In case of an increase in the Contract Sum, the cost shall include a reasonable allowance for overhead and profit. In such case, the Design/Builder shall keep and present an itemized accounting together with appropriate supporting data for inclusion in a Change Order. Unless otherwise provided in the Contract Documents, costs for these purposes shall be limited to the following:

.1    costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.2    costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.3    rental costs of machinery and equipment exclusive of hand tools, whether rented from the Design/Builder or others;

.4    costs of premiums for all bonds and insurance permit fees, and sales, use or similar taxes;

.5    additional costs of supervision and field office personnel directly attributable to the change; and fees paid to the Architect, engineers and other professionals.

**8.3.3**  Pending final determination of cost to the Owner, amounts not in dispute may be included in Applications for Payment. The amount of credit to be allowed by the Design/Builder to the Owner for deletion or change which results in a net decrease in the Contract Sum will be actual net

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2002. AIA License Number 1017416, which expires on 10/31/2002.

Electronic Format A191-1996
16

A000007009                                                                A000007009

cost. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of the net increase, if any, with respect to that change.

**3.3.4** When the Owner and the Design/Builder agree upon the adjustments in the Contract Sum and Contract Time, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

**8.4** **MINOR CHANGES IN THE WORK**

**8.4.1** The Design/Builder shall have authority to make minor changes in the Construction Documents and construction consistent with the intent of the Contract Documents when such minor changes do not involve adjustment in the Contract Sum or extension of the Contract Time. The Design/Builder shall promptly inform the Owner, in writing, of minor changes in the Construction Documents and construction.

**8.5** **CONCEALED CONDITIONS**

**8.5.1** If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents, or (2) unknown physical conditions of an unusual nature which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Contract Sum shall be equitably adjusted for such concealed or unknown conditions by Change Order upon claim by either party made within 21 days after the claimant becomes aware of the conditions.

**8.6** **REGULATORY CHANGES**

**8.6.1** The Design/Builder shall be compensated for changes in the construction necessitated by the enactment or revisions of codes, laws or regulations subsequent to the submission of the Design/Builder's Proposal.

**ARTICLE 9**
**CORRECTION OF WORK**

**9.1** The Design/Builder shall promptly correct Work rejected by the Owner or known by the Design/Builder to be defective or failing to conform to the requirements of the Contract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Design/Builder shall bear costs of correcting such rejected Work, including additional testing and inspections.

**9.2** If, within one (1) year after the date of Substantial Completion of the Work or, after the date for commencement of warranties established in a written agreement between the Owner and the Design/Builder, or by terms of an applicable special warranty required by the Contract Documents, any of

the Work is found to be not in accordance with the requirements of the Contract Documents, the Design/Builder shall correct it promptly after receipt of a written notice from the Owner to do so unless the Owner has previously given the Design/Builder a written acceptance of such condition.

**9.3** Nothing contained in this Article 9 shall be construed to establish a period of limitation with respect to other obligations which the Design/Builder might have under the Contract Documents. Establishment of the time period of one (1) year as described in Subparagraph 9.2 relates only to the specific obligation of the Design/Builder to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Design/Builder's liability with respect to the Design/Builder's obligations other than specifically to correct the Work.

**9.4** If the Design/Builder fails to correct nonconforming Work as required or fails to carry out Work in accordance with the Contract Documents, the Owner, by written order signed personally or by an agent specifically so empowered by the Owner in writing, may order the Design/Builder to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the Owner's right to stop the Work shall not give rise to a duty on the part of the Owner to exercise the right for benefit of the Design/Builder or other persons or entities.

**9.5** If the Design/Builder defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within seven (7) days after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may give a second written notice to the Design/Builder and, seven (7) days following receipt by the Design/Builder of that second written notice and without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Design/Builder, the costs of correcting such deficiencies. If the payments then or thereafter due the Design/Builder are not sufficient to cover the amount of the deduction, the Design/Builder shall pay the difference to the Owner. Such action by the Owner shall be subject to dispute resolution procedures as provided in Article 10.

**ARTICLE 10**
**DISPUTE RESOLUTION –**
**MEDIATION AND ARBITRATION**

**10.1** Claims, disputes or other matters in question between the parties to this Part 2 Agreement arising out of or relating to this Part 2 Agreement or breach thereof, except those claims that have been waived by the making or acceptance of final payment and those claims expressly excluded by Paragraph 10.7, shall be subject to and decided by mediation or arbitration. Such mediation or arbitration shall be conducted in accordance with the Construction Industry Mediation or Arbitration Rules of the American Arbitration Association

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

17

A000007010                                                    A000007010

currently in effect. The location of such mediation or arbitration shall be the Project site or Montgomery, Alabama, as mutually agreed by the parties.

**10.2**    In addition to and Prior to a demand for arbitration or initiation of litigation of claims not subject to arbitration, the parties shall attempt in good faith to resolve the dispute during the twenty (20) day period following first written notice by one party of its claim. If the matter remains unresolved, prior to arbitration, the parties shall endeavor to settle disputes by mediation. Demand for mediation shall be filed in writing with the other party to this Part 2 Agreement and with the American Arbitration Association. A demand for mediation shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for mediation be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

**10.3**    If the matter remains unresolved for ninety (90) days following the first written notice of the claim, then Ddemand for arbitration shall be filed in writing with the other party to this Part 2 Agreement and with the American Arbitration Association. A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

**10.4**    An arbitration pursuant to this Article may be joined with an arbitration involving common issues of law or fact between the Design/Builder and any person or entity with whom the Design/Builder has a contractual obligation to arbitrate disputes. No other arbitration arising out of or relating to this Part 2 Agreement shall include, by consolidation, joinder or in any other manner, an additional person or entity not a party to this Part 2 Agreement or not a party to an agreement with the Design/Builder, except by written consent containing a specific reference to this Part 2 Agreement signed by the Owner, the Design/Builder and any other person or entities sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by the parties to this Part 2 Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

**10.5**    The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

**10.6**    Unless otherwise agreed in writing, Design/Builder shall continue with the Work pending arbitration and, if so, Owner

shall continue to make payments earned by Design/Builder in accordance with this Agreement.

**10.7**    This Agreement to arbitrate shall not apply to any claim:

**(a)**    For contribution or indemnity asserted by one party to this Agreement against the other party and arising out of an action brought in a state or federal court or in arbitration by a person who is under no obligation to arbitrate the subject matter of such action with either of the parties hereto; or

**(b)**    Asserted by the Owner against Design/Builder if Design/Builder asserts said claim, either in whole or part, against a Subcontractor or Supplier and such Subcontractor or Supplier will not consent to arbitration or the contract between Design/Builder and such Subcontractor or Supplier does not provide for binding arbitration, or does so provide but the two arbitration proceedings cannot be consolidated, in any case of which the parties hereto shall so notify each other either before or after demand of arbitration is made.

**(c)**    Asserted by the Design/Builder against the Owner if Owner asserts said claim, either in whole or in part against the City of Greeneville and the City of Greeneville will not consent to arbitration or the contract between Owner and the City of Greeneville does not provide for binding arbitration, or does so provide but the two arbitration proceedings cannot be consolidated, in any case of which the parties hereto shall so notify each other either before or after demand for arbitration is made.

### ARTICLE 11
### MISCELLANEOUS PROVISIONS

**11.1**    Unless otherwise provided, this Part 2 Agreement shall be governed by the law of the place where the Project is located.

**11.2    SUBCONTRACTS**

**11.2.1**    The Design/Builder, as soon as practicable after execution of this Part 2 Agreement, shall furnish to the Owner in writing the names of the persons or entities the Design/Builder will engage as contractors for the Project.

**11.2.2**    Design/Builder shall use its best efforts to include in any subcontracts and supplier agreements a binding arbitration clause with a provision for consolidation of any arbitration between Design/Builder and Subcontractor or supplier with related disputes between Owner and Design/Builder.

**11.3    WORK BY OWNER, CITY OF GREENEVILLE OR OWNER'S THEIR CONTRACTORS**

**11.3.1**    The Owner and The City of Greeneville reserves the right to perform construction or operations related to the Project with the Owner's or City of Greeneville's own forces, and to award separate contracts in connection with other

---

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

18

A000007011                                A000007011

portions of the Project or other construction or operations on the site under conditions of insurance and waiver of subrogation identical to the provisions of this Part 2 Agreement. If the Design/Builder claims that delay or additional cost is involved because of such action by the Owner, the Design/Builder shall assert such claims as provided in Subparagraph 11.4. Claims against the City of Greenville arising out of the City's performance of work at or adjacent to the Project during the course of Design/Builder's work shall be asserted against the City.

**11.3.2**  The Design/Builder shall afford the Owner's and City of Greenville's separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities and shall connect and coordinate the Design/Builder's construction and operations with theirs as required by the Contract Documents.

**11.3.3**  Costs caused by delays or by improperly timed activities or defective construction shall be borne by the party responsible therefor.

## 11.4    CLAIMS FOR DAMAGES

**11.4.1**  If either party to this Part 2 Agreement suffers injury or damage to person or property because of an act or omission of the other party, of any of the other party's employees or agents, or of others for whose acts such party is legally liable, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after first observance. The notice shall provide sufficient detail to enable the other party to investigate the matter. If a claim of additional cost or time related to this claim is to be asserted, it shall be filed in writing.

## 11.5    INDEMNIFICATION

**11.5.1**  To the fullest extent permitted by law, the Design/Builder shall indemnify and hold harmless the Owner, Owner's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom, but only to the extent caused in whole or in part by negligent acts or omissions of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 11.5.

**11.5.2**  In claims against any person or entity indemnified under this Paragraph 11.5 by an employee of the Design/Builder, anyone directly or indirectly employed by the Design/Builder or anyone for whose acts the Design/Builder may be liable, the

indemnification obligation under this Paragraph 11.5 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Design/Builder under workers' compensation acts, disability benefit acts or other employee benefit acts.

## 11.6    SUCCESSORS AND ASSIGNS

**11.6.1**  The Owner and Design/Builder, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Part 2 Agreement and to the partners, successors and assigns of such other party with respect to all covenants of this Part 2 Agreement. Neither the Owner nor the Design/Builder shall assign this Part 2 Agreement without the written consent of the other. The Owner may assign this Part 2 Agreement to any institutional lender providing construction financing, and the Design/Builder agrees to execute all consents reasonably required to facilitate such an assignment. If either party makes such an assignment, that party shall nevertheless remain legally responsible for all obligations under this Part 2 Agreement, unless otherwise agreed by the other party.

## 11.7    TERMINATION OF PROFESSIONAL DESIGN SERVICES

**11.7.1**  Prior to termination of the services of the Architect or any other design professional designated in this Part 2 Agreement, the Design/Builder shall identify to the Owner in writing another architect or other design professional with respect to whom the Owner has no reasonable objection, who will provide the services originally to have been provided by the Architect or other design professional whose services are being terminated.

## 11.8    EXTENT OF AGREEMENT

**11.8.1**  This Part 2 Agreement represents the entire agreement between the Owner and the Design/Builder and supersedes prior negotiations, representations or agreements, either written or oral. This Part 2 Agreement may be amended only by written instrument and signed by both the Owner and the Design/Builder.

**11.9  Claims for Consequential Damages.  Except for (i) Owner's claims for liquidated damages as expressly specified in this Agreement and except (ii) to the extent Owner's claims are covered by insurance provided by Design/Builder under this Agreement, the Design/Builder and Owner waive any and all claims against each other for consequential damages arising out of or relating to this Contract. Subject to the above-cited exceptions, this mutual waiver includes: (1) Damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and (2) damages incurred by the Design/Builder for principal or home office expenses including the compensation of personnel stationed there, for losses of financing, income, business and reputation, for loss of management or employee productivity or of the services of**

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia — 8/26/2002. AIA License Number 1017416, which expires on 10/31/2002.

Electronic Format A191-1996
19

A000007012                                                    A000007012

such persons, and for loss of profit except anticipated profit arising directly from the Work. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination of this Agreement.

## 11.10  Site Conditions/Environmental Matters

**11.10.1**  Notwithstanding any other provision of the Contract Documents to the contrary, it is hereby expressly agreed that the Design/Builder and its parent, successors, officers, agents, employees, and assigns (hereinafter collectively referred to as "Design/Builder") shall not have any liability or responsibility of any kind whatsoever to the Owner, or any other person, firm or entity, with regard to, or for, any actions, suits, claims, liabilities, warranties, controversies, damages, demands, expenses, incidental damages, causes of action or grievances, of any kind, character, or description, now existing or which may hereafter arise, known or unknown, permanent or otherwise (hereinafter collectively referred to as "claims") indirectly or directly resulting from, growing out of pertaining to, or in connection with the condition (including but not limited to, any earth work, fill work, compaction, settlement, soil density, plasticity, or slippage) of the site on which the Project is to be constructed except to the extent such claim is caused by the negligent act or omission of or breach of contract by, Design/Builder, its Subcontractors, suppliers, consultants agents and employees.

**11.10.2**  Notwithstanding any other provision of this Contract, the Owner is solely responsible for furnishing the site to the Design/Builder in a condition which meets all applicable Federal, State and/or local requirements concerning hazardous materials, chemicals and/or any other form of contamination. Furthermore, Owner shall be solely responsible for all testing, inspections, permits and/or any other requirements related to the environmental condition of the site necessary in order to make the site suitable for construction of the Project, whether necessary before or after the commencement of Work by Design/Builder on the Project. Notwithstanding any language which may be to the contrary in any of the Contract Documents, Design/Builder shall have no obligation to investigate subsurface or otherwise concealed conditions at the site or unknown physical conditions of an unusual nature at the site, and shall be entitled to relief with respect to any such conditions as provided in Section 8.5.1 of this Agreement. Owner has contracted with the City of Greeneville to perform the subsurface investigation and geotechnical engineering for the Owner with respect to the project and Design/Builder shall be entitled to fully and completely rely upon such subsurface investigation and geotechnical engineering.

**11.10.3**  Environmental Audit. Owner is responsible for performing or furnishing an environmental audit. If Owner does not perform or furnish an environmental audit Design/Builder shall have no responsibility or liability of any kind arising from any conditions, substances, or material

which would have been ascertained or discovered by the performance of an environmental audit of the premises upon which the Project is located.

**11.10.4**  Pollutants from Owner's Operations. Owner's knowledge of its activities that will be conducted within the facility to be designed and constructed by Design/Builder, and the materials involved in those activities, is superior to Design/Builder's knowledge. Accordingly, and anything contained in this Agreement to the contrary notwithstanding, any duty or warranty by Design/Builder hereto shall not apply to the discharge, dispersal, escape, release or saturation of any pollutant into the atmosphere or any body of water or on, onto, upon, in or into the surface or subsurface of land resulting from Owner's operations. For purpose of this section, the word "pollutant" shall mean any solid liquid, gaseous, or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkaline, chemicals and waste and shall include any Hazardous Substance. The capacity of the facility and the design of any of its parts so as to prevent the escape, release, discharge, dispersal or saturation of pollutants shall be the sole responsibility of Owner.

**11.10.4.1**  Encountering Hazardous Substances. In the event Design/Builder or its Subcontractors encounter on the Project site material reasonably believed to be asbestos, polychlorinated biphenyl ("PCB") or other "Hazardous Substances" as defined in paragraph 11.10.4.4, which has not been rendered harmless, Gray shall immediately stop Work in the area affected and report the condition to the Owner in writing. The Work in the affected area shall be resumed (1) in the absence of any Hazardous Substances, (2) when any Hazardous Substances have been rendered harmless, (3) by written agreement of the Owner and Gray, or (4) in accordance with the final determination under Article 10.

**11.10.4.2**  Working Conditions. Neither Design/Builder nor its Subcontractors shall be required without their consent to perform any Work relating to asbestos, PCB, or other Hazardous Substances.

**11.10.4.3**  Owner's Indemnification Responsibilities. To the fullest extent permitted by law, the Owner shall defend, indemnify, and hold harmless Design/Builder, its Subcontractors, Suppliers, consultants, agents and employees from any and all claims, liability, damages and expenses (including attorney fees and expenses), arising out of or resulting from:

(a)  Any claim, suit or legal proceeding to recover damages for wrongful death, bodily injury, illness or disease or injury to, or destruction of, tangible property alleged to be caused either directly or indirectly by any substances, condition, element, or material or any combination of the foregoing: (a) produced by

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1012416, which expires on 10/31/2003.

Electronic Format A191-1996

20

A000007013                                          A000007013

Owner or emitted or released by Owner either intentionally or unintentionally, from the facilities designed and/or constructed by Design/Builder for the benefit of Owner, or (b) used by Design/Builder or incorporated by Design/Builder into the Work herein agreed to be performed by Design/Builder for the benefit of Owner if specifically required by Owner or if necessary for the planned use of the work and to the extent not caused by the mishandling of such substances, condition, element, or material by Design/Builder, its Subcontractors, suppliers, consultants, agents, and employees;

(b) Performance of the Work in the affected area if in fact the material is asbestos, PCB, or other Hazardous Substances, and has not been rendered harmless, provided that such claim, damages, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and to the extent not caused by the negligent act or omission of Design/Builder, its Subcontractors, suppliers, consultants, agents, and employees;

11.10.4.4    Definition of Hazardous Substances.    For purposes of this Agreement, the term "Hazardous Substances" means any substance, including solid, liquid or gaseous material which is listed or defined as "Hazardous" in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. Section 1251, et seq., or regulations promulgated pursuant thereto; and source, special nuclear, or by product material as defined by the Atomic Energy Act of 1954, 42 U.S.C., Section 3011, et seq., or regulations promulgated pursuant thereto; and includes any other substance defined by federal, state or local statute, regulations, or ordinance as hazardous, toxic or dangerous waste or substance.

## ARTICLE 12
## TERMINATION OF THE AGREEMENT

**12.1    TERMINATION BY THE OWNER**

12.1.1    This Part 2 Agreement may be terminated by the

Owner upon 14 days' written notice to the Design/Builder in the event that the Project is abandoned. If such termination occurs, the Owner shall pay the Design/Builder for Work that is satisfactorily completed, or for proven loss sustained upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit ~~and applicable damages. Design/Builder will not be entitled to payment for uncompleted work, anticipated profit on Work not completed, or unabsorbed overhead.~~

12.1.2    If the Design/Builder defaults or persistently fails or neglects to carry out the Work in accordance with the Contract Documents or fails to perform the provisions of this Part 2 Agreement, the Owner may give written notice that the Owner intends to terminate this Part 2 Agreement.    If the Design/Builder fails to correct the defaults, failure or neglect within seven (7) days after being given notice, the ~~Owner may then give a second written notice and, after an additional seven (7) days,~~ the Owner may without prejudice to any other remedy terminate the employment of the Design/Builder and take possession of the site and of all materials, equipment, tools and construction equipment and machinery thereon owned by the Design/Builder and finish the Work by whatever method the Owner may deem expedient.    If the unpaid balance of the Contract Sum exceeds the expense of finishing the Work and all damages incurred by the Owner, such excess shall be paid to the Design/Builder to the extent earned and payable under the Agreement.    If the expense of completing the Work and all damages incurred by the Owner exceeds the unpaid balance, the Design/Builder shall pay the difference to the Owner. This obligation for payment shall survive termination of this Part 2 Agreement.

**12.2    TERMINATION BY THE DESIGN/BUILDER**

12.2.1    If the Owner fails to make payment when due, the Design/Builder may give written notice of the Design/Builder's intention to terminate this Part 2 Agreement.    If the Design/Builder fails to receive payment within seven (7) days after receipt of such notice by the Owner, the Design/Builder may give a second written notice and, seven (7) days after receipt of such second written notice by the Owner, may terminate this Part 2 Agreement and recover from the Owner payment for Work satisfactorily completed ~~executed~~ and for proven losses sustained upon materials, equipment, tools, and construction equipment and machinery, including reasonable profit and applicable damages.

## ARTICLE 13
## BASIS OF COMPENSATION

The Owner shall compensate the Design/Builder in accordance with Article 5, Payments, and the other provisions of this Part 2 Agreement as described below.

**13.1    COMPENSATION**

13.1.1    ~~For the Design/Builder's performance of the Work, as described in Paragraph 3.2 and including any other services listed in Article 14 as part of Basic Services, the Owner shall pay the Design/Builder in current funds the Contract Sum as follows:~~
For Basic Services, as described in Paragraphs 3.2.2, through 3.2.16, and for any other services included in Article 14 as part of Basic Services, basic compensation shall be as follows:    Owner shall pay Design/Builder in current U.S. funds for the Cost of the Work as

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996

21

A000007014                                                          A000007014

hereinafter defined and Design-Builder.

**Guaranteed Maximum Price**

**13.1.2** The sum of the Cost of the Work and the Design-Builder's Fee is guaranteed by the Design/Builder not to exceed Twelve Million Five Hundred Thousand and No/100 U.S. Dollars ($U.S. 12,500,000.00), subject to additions and deductions by Change Order as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price. Costs which would cause the Guaranteed Maximum Price, as adjusted from time to time pursuant to the Contract Documents, to be exceeded shall be paid by the Design/Builder without reimbursement by the Owner and with no additional Fee to Design/Builder. Upon completion of the Work, an accounting will be made of the Cost of Work and if the Cost of the Work plus Design/Builder's Fee is less than the adjusted Guaranteed Maximum Price, the difference (the "savings") shall be divided as follows: ninety percent (90%) to Owner and ten percent (10%) to Design/Builder.

Design/Builder's Fee shall be a lump sum of Nine Hundred Thirty Thousand and 00/100 U. S. Dollars ($930,000.00). In the event of changes to the Work, the Design/Builder's Fee shall be adjusted as follows: If a change in the Work is made during the first six (6) weeks of the detailed design phase (i.e. within the first six (6) weeks after the date of Design/Builder's letter of intent dated June 17, 2003) and the Cost of the Work associated with such change is less than $500,000.00, then Design/Builder's Fee shall not be adjusted. If a change in the Work is made during the first six (6) weeks of the detailed design phase and the Cost of the Work associated with such change exceeds $500,000.00, then Design/Builder's Fee shall be adjusted by an amount equal to 5.5% of the Cost of the Work associated with such change (3% for overhead, 2.5% for profit). If a change in the Work is made after the first six (6) weeks of the detailed design phase, then Design/Builder's Fee shall be adjusted to include the design costs associated with such change (at the hourly rates set forth on the attached schedule) plus 7.5% of the Cost of the work associated with such change (5% for overhead, 2.5% for profit).

**13.1.3** The Guaranteed Maximum Price is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:

**13.1.4** The amounts agreed to for unit prices, if any, are as follows:

**13.1.5** The Guaranteed Maximum Price includes the following allowance items/categories. In the event the Cost of the Work allocable to any one or more items/categories exceeds the amount allocated below, the excess shall be an addition to the Guaranteed Maximum Price and shall be paid by the Owner to the Contractor:

| 1. Pit Allowance | $2,116,104.00 |
| 2. Office Allowance | $  85,200.00 |

**13.1.6** The Guaranteed Maximum Price includes Design/Builder's contingency in the amount of One Hundred Thirty Thousand and No/100 Dollars ($130,000.00), a sum mutually agreed upon for use at Design/Builder's sole and exclusive discretion to cover costs incurred in performing the Work which are properly reimbursable as a Cost of the Work but which are not included in a specific line item or the basis for a Change Order. The contingency is not available to the Owner for any reason including, without limitation, changes in scope or any other item which would enable Design/Builder to increase the Guaranteed Maximum Price under the Contract Documents or which would otherwise entitle Design/Builder to additional compensation.

**13.1.7** Adjustments to the Guaranteed Maximum Price on account of changes in the Work may be determined by any of the methods listed in Article 8 of the Agreement.

**COSTS TO BE REIMBURSED**

**13.1.8** The term Cost of the Work shall mean costs necessarily incurred by the Design/Builder in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 13.

**LABOR COSTS**

**13.1.9** Wages of construction workers directly employed by the Design/Builder to perform the construction of the Work at the site or, with the Owner's agreement, at off-site workshops.

**13.1.10** Wages or salaries of the Design/Builder's supervisory and administrative personnel when stationed at the site with the Owner's

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 107416, which expires on 10/31/2003.

Electronic Format A191-1996
22

A000007015                                                          A000007015

**13.1.11** Wages and salaries of the Design/Builder's supervisory or administrative personnel engaged, at factories or workshops on the road, in expediting the production of transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

**13.1.12** Costs paid or incurred by the Design/Builder for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations, and pensions, provided such costs are based on wages and salaries included the the Cost of the Work under Clauses 13.1.9 through 13.1.12.

### SUBCONTRACT COSTS

**13.1.13** Payments made by the Design/Builder to Subcontractors in accordance with the requirements of the subcontracts.

### COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

**13.1.14** Costs, including transportation of materials and equipment incorporated or to be incorporated in the completed construction.

**13.1.15** Costs of materials described in the preceding Clause 13.1.14 in excess of those actually installed but required to provide reasonable allowance for waste and for spoilage. Unused excess materials, if any, shall be handed over to the Owner at the completion of the Work or, at the Owner's option, shall be sold by the Design/Builder and amounts realized, if any, from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

### COST OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

**13.1.16** Costs, including transportation, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by the construction workers, which are provided by the Design/Builder at the site and fully consumed in the performance of the Work; and cost less salvage value on such items if not fully consumed, whether sold to others or retained by the Design/Builder. Cost for items previously used by the Design/Builder shall mean fair market value.

**13.1.17** Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by the Design/Builder at the site, whether rented from the Design/Builder or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof. Rates and quantities of equipment rented shall be subject to the Owner's prior approval.

**13.1.18** Costs of removal of debris from the site.

**13.1.19** Costs of telegrams and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

**13.1.20** That portion of the reasonable travel and subsistence expenses of the Design/Builder's personnel incurred while traveling in discharge of duties connected with the Work.

### MISCELLANEOUS COSTS

**13.1.21** That portion directly attributable to this Contract to premiums for insurance and bonds.

**13.1.22** Sales, use or similar taxes imposed by a governmental authority which are related to the Work and for which the Design/Builder is liable.

**13.1.23** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Design/Builder is required by the Contract Documents to pay.

**13.1.24** Fees of testing laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded due to failure of the portions of the Work to comply with requirements established by the Contract Documents and which do not fall within the scope of Clauses 13.1.30 through 13.1.32 below.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 - OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
23

A000007016                                                           A000007016

13.1.25  Royalties and license ... at par ... the use of a particular design, process or product  ... sused.  ... Contract Documents; the cost of defending suits or claims for infringement of patent or copyright rights arising from such requirements of the Contract Documents; payments made in accordance with legal judgments against the Design/Builder resulting from such suits or claims and payments of settlements made with the Owner's consent; however, that such cost of legal defenses, judgment and settlements shall not be included in the calculation of the Design/Builder's Fee or of a Guaranteed Maximum Price.  However, if the Design/Build has reason to believe that the required design, process or product is an infringement of a copyright or patent, the Design/Builder shall be responsible for such loss unless such information is promptly furnished to the Owner.

13.1.26  Deposits lost for causes other than the Design/Builder's fault or negligence.

**OTHER COSTS**

13.1.27  Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

**EMERGENCIES: REPAIRS TO DAMAGED, DEFECTIVE OR NONCONFORMING WORK**

13.1.28  The cost of the Work shall also include costs described below which are incurred by the Design/Builder:

13.1.29  In taking action to prevent threatened damage injury or loss in case of an emergency affecting the safety of persons and property.  Additional compensation or extension of time claimed by the Design/Builder on account of acting at the Design/Builder's discretion shall be determined as provided in Article 8 of the Agreement.

13.1.30  In repairing or correcting Work damaged or improperly executed by construction workers in the employ of the Design/Builder, provided such damage or improper execution did not result from the fault or negligence of the Design/Builder or the Design/Builder's foremen, engineers or superintendents, or other supervisory, administrative or managerial personnel of the Design/Builder.

13.1.31  In repairing damaged Work other than that described in Clause 13.1.30, provided such damage did not result from the fault or negligence of the Design/Builder or the Design/Builder's personnel, and only to the extent that the cost of such repairs is not recoverable by the Design/Builder from others  and the Design/Builder is not compensated therefor by insurance or otherwise.

13.1.32  [DELETED]

**COSTS NOT TO BE REIMBURSED**

13.1.33  The Cost of the Work shall not include:

13.1.34  Salaries and other compensation of the Design/Builder's personnel stationed at the Design/Builder's principal office or offices other than the site office, except as specifically provided in Clauses 13.1.10 and 13.1.11 or as may be provided in Article 14.

13.1.35  Expenses of the Design/Builder's principal office and offices other than the site office.

13.1.36  Overhead and general expenses, except as may be expressly included in Article 13.

13.1.37  Rental costs of machinery and equipment, except as specifically provided in Clause 13.1.17.

13.1.38  Except as provided in Clauses 13.1.30 through 13.1.32, costs due to the fault or negligence of the Design/Builder, Subcontractors, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including but not limited to costs for the correction of damaged, defective or nonconforming Work, disposal and replacement of materials and equipment incorrectly ordered or supplied, and making good damage to property not forming part of the Work.

13.1.39  Any cost not specifically and expressly described in Article 13.

13.1.40  Costs which would cause the Guaranteed Maximum Price, if any, to be exceeded.

**DISCOUNTS, REBATES AND REFUNDS**

13.1.41  Cash discounts obtained on payments made by the Design/Builder shall accrue to the Owner if (1) before making the payment,

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 ∙ OWNER-DESIGN/BUILDER AGREEMENT ∙ 1996 EDITION ∙ AIA® ∙ WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1012416, which expires on 10/31/2003.

Electronic Format A191 –1996
24

A000007017                                                      A000007017

Case 2:07-cv-00584-MEF-TFM    Document 11-23    Filed 08/21/2007    Page 57 of 70

Case 2... the Design/Builder includes ...em in an ...plication for Payment and received payment there ... from the Owner; or (2) the Owner has ...4 of 50

the Design/Builder includes them in an application for Payment and received payment there from the Owner; or (2) the Owner has deposited funds with the Design/Builder with which to make payments; otherwise, cash used, if used, shall accrue to the Design/Builder. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Design/Builder shall make provisions so that they can be secured.

**13.1.42**  Amounts which accrue to the Owner in accordance with the provisions of Clause 13.1.41 shall be credited to the Owner as a deduction from the Cost of the Work.

## SUBCONTRACTS AND OTHER AGREEMENTS

**13.1.43**  Those portions of the Work that the Design/Builder does not customarily perform with the Design/Builder's own personnel shall be performed under subcontracts or by other appropriate agreements with the Design/Builder. The Design/Builder shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work. The Owner will then determine, with the advice of the Design/Builder, which bids will be accepted. The Owner may designate specific persons or entities from whom the Design/Builder shall obtain bids; however, if a Guaranteed Maximum Price has been established, the Owner may not prohibit the Design/Builder from obtaining bids from others without reasonable objection. The Design/Builder shall not be required to contract with anyone to whom the Design/Builder has a reasonable objection.

**13.1.44**  If a Guaranteed Maximum Price has been established and a specific bidder among those whose bids are delivered by the Design/Builder to the Owner (1) is recommended to the Owner by the Design/Builder; (2) is qualified to perform that portion of the Work; and (3) has submitted a bid which conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires another bid be accepted, then the Design/Builder may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Design/Builder and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

## ACCOUNTING RECORDS

**13.1.45**  The Design/Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Contract and the accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's accountants shall be afforded access to the Design/Builder's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Contract, and the Design/Builder shall preserve these for a period of three years after final payment, or for such longer period as may be required by law.

## PROGRESS PAYMENTS

**13.1.46**  Each Application for Payment shall be based upon the most recent schedule of values submitted by the Design/Builder and approved by the Owner in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Design/Builder's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless object to by the Owner, shall be used as a basis for reviewing the Design/Builder's Application for Payment.

**13.1.47**  Applications for Payment shall show percentage completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage completion shall be the percentage of that portion of the Work which has actually been completed.

**13.1.48**  Subject to other provisions of the Contract Documents, the amount of progress payment shall be computed as follows:

**13.1.49**  Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute may be included as provided in Article 8 of the Agreement, even though the Guaranteed Maximum Price has not yet been adjusted by Change Order.

**13.1.50**  Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work or, if approved in advance by the Owner, suitably stored and insured off the site at a location agreed upon in writing.

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.afa -- 8/26/2003. AIA License Number 1017416, which expires on 10/19/2003.

Electronic Format A191-1996
25

A000007018                                    A000007018

13.1.51  Add the Design/Builder's Fee.  Subtract from the total sum retainage of ten percent (10%).  The Design/Builder's Fee shall be computed upon the allocable values described in the two preceding Clauses.  Upon achieving 50% completion of the Work, retainage withheld from Design/Builder shall be reduced to five (5%) percent.

13.1.52  Subtract the aggregate of previous payments made by the Owner.

13.1.53  Subtract the shortfall, if any, indicated by the Design/Builder in the documentation required by the Owner to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's accountants in such documentation.

*This article supplements but does not modify the terms of Article 5, Progress Payments of the Agreement.*

**FINAL PAYMENT**

13.1.54  The Owner's final payment to the Design/Builder shall be made after the Owner's receipt of Design/Builder's properly submitted and correct final Application for Payment as provided below.

13.1.55  The Owner's accountants will review and report in writing on the Design/Builder's final accounting within thirty (30) days after delivery of the final accounting to the Owner by the Design/Builder.  Based upon such Cost of the Work as the Owner's accountants report to be substantiated by the Design/Builder's final accounting, and provided the other conditions of final payment have been met, the Owner will, within seven (7) days after receipt of the written report of the Owner's accountants, either make final payment to Design/Builder, or notify the Design/Builder in writing of the Owner's reasons for withholding payment, which reasons shall be set forth in detail with references to particular provisions of the Contract Documents pursuant to which Owner is withholding such amounts.

13.1.56  If the Owner's accountants report the Cost of the Work as substantiated by the Design/Builder's final accounting to be less than claimed by the Design/Builder, the Owner shall so notify the Design/Builder in writing, and the Design/Builder shall be entitled to demand arbitration of the disputed amount within thirty (30) days from the receipt thereof; failure to demand arbitration within this thirty (30) day period shall result in the substantiated amount reported by the Owner's accountants becoming binding on the Design/Builder.  Pending a final resolution by arbitration, the Owner shall pay the Design/Builder the amount substantiated by Owner's accountants.

13.1.57  [DELETED]

13.1.258 For Additional Services, as described in Paragraph 3.3 and including any other services listed in Article 14 as Additional Services, compensation shall be as follows:

**13.2    REIMBURSABLE EXPENSES**

13.2.1   Reimbursable Expenses are in addition to the compensation for Basic and Additional Services, and include actual expenditures made by the Design/Builder and the Design/Builder's employees and contractors in the interest of the Project, as follows:

13.2.2   FOR REIMBURSABLE EXPENSES, compensation shall be a multiple of (   ) times the amounts expended.

**13.3    INTEREST PAYMENTS**

13.3.1   The rate of interest for past due payments shall be as follows:

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Design/Builder's principal places of business, at the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletion, modification or other requirements, such as written disclosures or waivers.)*

**ARTICLE 14
OTHER CONDITIONS AND SERVICES**

14.1    The Basic Services to be performed shall be commenced on _____ and, subject to authorized adjustments and to delays not caused by the Design/Builder, Substantial Completion shall be achieved on or before May 6, 2004 in the Contract Time of

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia – 8/26/2003. AIA License Number 1012416, which expires on 10/31/2003.

Electronic Format A191-1996
16

A000007019                                              A000007019

(-) calendar days.

14.1.1    Acceleration

(a) Design/Builder shall at all times supply sufficient tools, equipment, materials, supervision, subcontracted services and labor to meet the then-current approved project schedule. To the extent, in the reasonable belief of the Owner, the progress of the Work is such that the contract completion date, as adjusted for time extensions provided elsewhere in this Agreement, will not be met due to the fault or cause of Design/Builder or its subcontractors, suppliers, consultants, agents and employees, then the Owner may direct Design/Builder in writing to take such steps as Owner deems necessary to improve Design/Builder's progress, all without additional cost or fee to the Owner. Such steps may include, but shall not be limited to, increasing the number of shifts, adding overtime operations, increasing the labor force and/or supervision, working holidays and weekends and adding equipment and operators. Such an acceleration shall be separately accounted for by Design/Builder. If Design/Builder reasonably believes that acceleration is not justified under the terms of this clause, it shall so advise Owner in writing within seven (7) days of receipt of the directive to accelerate. In such case of objection, Design/Builder may expressly reserve its right to claim a compensable acceleration under paragraph (b) below, but nevertheless must proceed with the acceleration as directed.

(b) In the event the progress of the Work is on schedule for meeting the contract completion date, as adjusted for time extensions provided elsewhere in this Agreement, the Owner reserves the right to direct Design/Builder to accelerate its progress as a change in the Work and with compensation as provided in Article 8 hereof; provided, however, that Design/Builder shall have no obligation to so accelerate its progress unless and until a change order or constructive change directive is executed by Owner with respect to such acceleration. Costs of such acceleration shall be separately accounted for by Design/Builder and shall be cause for an increase in the Guaranteed Maximum Price.

14.2    The Basic Services beyond those described in Article 3 are as follows:

14.2    Additional Services beyond those described in Article 3 are as follows:

14.4    The Design/Builder shall submit an Application for Payment on the last  (-) day of each month. It shall be in a form and with such certifications and releases as reasonably required by Owner.

14.5    The Design/Builder's Proposal includes the following documents:
(List the documents by specific title and date; include any required performance and payment bonds.)

14.6    Other documents forming part of the Contract Documents include:
_____    A.    Bid Documents prepared by SSOE dated April 04, 2003
_____    B.    Addendum No. 1 dated April 11, 2003
_____    C.    Addendum No. 2 dated April 23, 2003
_____    D.    Gray Proposal dated April 24, 2003
_____    E.    Proposal Clarification dated April 28, 2003
_____    F.    Re-Bid and Addendum No. 3 dated May 21, 2003
_____    G.    To Do/Decision List Release 6/15 dated June 15, 2003
_____    H.    Letter of Intent Meeting Minutes dated June 17, 2003, including hourly rate attachment
_____    I.    Letter of Intent dated June 17, 2003

Title                                            Date  8 OCTOBER, 2003

This Agreement entered into as of the day and year first written above.

_____          _____
OWNER (Signature)                         DESIGN/BUILDER (Signature)

President / CEO  DONGKIL NAM               JIM GRAY , DIRECTOR
(Printed name and title)                  (Printed name and title)

© 1996 THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292. AIA DOCUMENT A191 • OWNER-DESIGN/BUILDER AGREEMENT • 1996 EDITION • AIA® • WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: a191.aia -- 8/26/2003. AIA License Number 1017416, which expires on 10/31/2003.

Electronic Format A191-1996
27

A000007020                                              A000007020

# CERTIFICATE OF SUBSTANTIAL COMPLETION

| | |
|---|---|
| **PROJECT:**<br>Hwashin<br>661 Montgomery Hwy<br>Greenville, AL 36037 | **PROJECT NO:** 203048<br>**CONTRACT FOR:** Design/Build Services<br>**CONTRACT DATE:** 09/24/03 |
| **CUSTOMER:**<br>Mr. David Nam, President<br>Hwashin America Corp.<br>2821 Eastern Blvd., Ste. 100<br>Montgomery, AL 36116 | **DESIGN/BUILDER:**<br>James N. Gray Co.<br>10 Quality Street<br>Lexington, KY 40507 |

**DATE OF ISSUANCE:**

**PROJECT OR DESIGNATED PORTION SHALL INCLUDE:** Office

The work performed under this Contract has been reviewed and found, to the Design/Builder's best knowledge, information and belief, to be substantially complete. Substantial Completion is the stage in the progress of the work when the work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the customer can occupy or utilize the work for its intended use. The date of Substantial Completion of the Project or portion thereof designated above is hereby established as:

06/30/04

which is also the date of commencement of applicable warranties required by the Contract Documents, except as stated below:

A list of items to be completed or corrected is attached hereto. The failure to include any items on such list does not alter the responsibility of the Design/Builder to complete all work in accordance with the Contract Documents.

| GNF Architects and Engineers, P.S.C. | | |
|---|---|---|
| **PROJECT ARCHITECT/ENGINEER** | BY: Dennis E. Bopp, R.A. | DATE |

The Contractor will complete or correct the work on the list of items attached hereto within     day(s) from the above date of Substantial Completion.

| James N. Gray Co. | | |
|---|---|---|
| **PROJECT CONTRACTOR** | BY: Brad T. Cvenglos | DATE 6/23/04 |

The Customer accepts the work or designated portion thereof as substantially complete and will assume full possession thereof at               on

| Hwashin America Corp. | | |
|---|---|---|
| **CUSTOMER** | BY: David Nam, President | DATE 8/20/04 |

1

EXHIBIT B

The responsibilities of the Customer and the Design/Builder for security, maintenance, heat, utilities, damage to the work and insurance shall be as follows:

1.    Door hardware and sweeps to be installed at all exterior doors (typical).

2.    Column at entry vestibule to be wrapped.

3.    Roof leak in office at door between vestibule and cafeteria.

4.    Paint accent soffit between corridor C and Cafeteria 109.  See revised finish schedule.

5.    Verify HIPAA requirements at First Aid – possibly replace lay-in ceiling system with hard ceiling.

2

**REQUIREMENTS FOR CERTIFICATE OF OCCUPANCY**

05/23/2004

Hwashin America Corp.
Gray Job #203048

| Item | Area | Descriptions | Responsibility | Sub | Date Completed | Note |
|------|------|--------------|----------------|-----|----------------|------|
| 1 | n/a | Produce "Life Safety Plan" drawing. | Gray | Gray | | |
| 2 | All Bldg. | Paint all ladders in safety yellow. | Gray | Woosley | | |
| 3 | All Bldg. | Fire alarm for each zone to be tested and reported. | Gray | Tri-State | | |
| 4 | Mfrg. | Install exit sign at door #178. | Gray | M&L | | |
| 5 | All Office | Complete ceiling system. | Gray | Ken Isaacs | | |
| 6 | All Office | Complete all system above ceiling. | Gray | Herdy, M&L, Tri-State | | |
| 7 | All Office | Complete flooring. | Gray | Faulkner | | |
| 8 | All Office | Complete all electrical outlet. | Gray | M&L | | |
| 9 | All Office | Complete all doors. | Gray | CDP | | |
| 10 | All Office | Complete all interior paint. | Gray | Woosley | | |
| 11 | All Office | All emergency device to be complete, tested, and reported. | Gray | M&L | | |
| 12 | Rm#192 | Replace two outlets at workroom (above sink) with GFI receptacles. | Gray | M&L | | |
| 13 | Rm#113 | Replace outlet with medical grade GFI receptacle. | Gray | M&L | | |
| 14 | Rm#115, 118, 119, 120 | Complete receptacle and wiring with GFI rated. | Gray | M&L | | |
| 15 | Rm#116, 120 | Install toilet partitions. | Gray | Ken Isaacs | | |
| 16 | Exterior | Complete employee parking lot (asphalt, stripe, handicap sign, lighting) | Hwashin | --- | | Asphalt andStriping Not in Contract |

# UNITED DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA RECEIVED

GRAY CONSTRUCTION, INC.,       )
                               )
    Plaintiff,              )
                               )
v.                             )
                               )
HWASHIN AMERICA CORPORATION,   )
                               )
    Defendant.              )

2007 JUN 25 P 2: 44

Civil Action Number:

2:07-CV-584-WKW

**TRIAL BY STRUCK JURY
IS DEMANDED**

---

## COMPLAINT

---

### PARTIES

1.    Plaintiff Gray Construction, Inc. ("Gray") is a Kentucky corporation with its principal place of business in Lexington, Kentucky.

2.    Defendant Hwashin America Corporation ("Hwashin") is a Delaware corporation, with its principal place of business in Montgomery County, Alabama.

### JURISDICTION AND VENUE

3.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 as the Parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of intent and cost.

4.    Venue is proper in this action pursuant to 28 U.S.C. § 1391(c) as Defendant's principal place of business and the property at issue are located in this judicial district and the acts and omissions giving rise to this Complaint occurred in this judicial district.

EXHIBIT C

## STATEMENT OF FACTS

5.      On or about September 24, 2003, Gray entered into a contract with Hwashin to repair a commercial facility on certain real property located in Butler County, Alabama, which is owned by Hwashin.

6.      The real property is located at 661 Montgomery Highway, Greenville, Butler County, Alabama.

7.      On or about December 29, 2006, Gray completed repairs at the Hwashin facility.

8.      Defendant has refused to pay the outstanding balance of Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00) that is due to Gray in its entirety for the repair work done by Gray at the facility.

9.      On June 22, 2007, Gray recorded a verified statement of lien in the Probate Court of Butler County, Alabama, in the amount of Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00) representing the amount owed to Gray.

## COUNT ONE – MATERIALSMAN LIEN

10.     Gray realleges as though fully set forth all allegations contained in Paragraph Nos. 1 through 9 of the Complaint.

11.     After full payment was not received by Gray and within six (6) months of "final work", Gray filed and recorded in the Probate Court of Butler County, Alabama a verified statement of lien. A true and correct copy of the lien is attached as Exhibit "A".

12.     This lawsuit is filed within six (6) months of the "final work" pursuant to Alabama Code, § 35-11-221 (1975).

492082-1                                            2

WHEREFORE, Gray demands judgment against the Defendant for Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00), plus pre-judgment interest, post-judgment interest, attorney's fees, court cost and expenses, and request that this Court grant a lien against the real property in that amount, declare that the lien be superior to any and all interest of any interested parties and order the property be sold for payment.

## COUNT TWO – BREACH OF CONTRACT

13.    Gray realleges as though fully set forth all allegations contained in Paragraph Nos. 1 through 12 of the Complaint.

14.    Gray entered into a contract with the Defendant for Gray to make repairs to Defendant's commercial building.

15.    Gray completed its work pursuant to the terms of the agreement with the Defendant and has fully complied with its obligation under the contract.

16.    Defendant has breached the contract with Gray by failing to pay Gray for the work performed in the amount of Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00).

17.    As a direct, proximate and consequential result of Defendant's breach of the contract, Gray has been damaged.

WHEREFORE, Gray demands judgment against Defendant for Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00), plus pre-judgment interest, post-judgment interest, attorney's fees, court cost and expenses.

## COUNT THREE – UNJUST ENRICHMENT

18.  Gray realleges as though fully set forth all allegations contained in Paragraph Nos. 1 through 17 of the Complaint.

19.  Gray supplied materials and services to repair the Hwashin facility, from which Hwashin substantially benefited at the expense of Gray.

20.  To allow Hwashin to benefit from these materials and services without compensating Gray would unjustly enrich Defendant.

WHEREFORE, Gray demands judgment against Defendant for Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00), plus pre-judgment interest, post-judgment interest, attorney's fees, court cost and expenses.

## COUNT FOUR – QUANTUM MERUIT

21.  Gray realleges as though fully set forth all allegations contained in Paragraph Nos. 1 through 20 of the Complaint.

22.  Defendant knowingly accepted materials and services provided by Gray and benefited as a result of receipt of Gray's materials and services.

23.  Gray had a reasonable expectation of compensation for the materials and services provided because Defendant agreed to pay for the materials and services provided.

24.  The reasonable value of the materials and services provided by Gray is equal to Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00).

Case 2:07-cv-00584-MEF-TFM    Document 11-23    Filed 08/21/2007    Page 67 of 70
Case 2:06-cv-01158-WKW-SRW    Document 77-1    Filed 07/13/2007    Page 44 of 50
Case 2:07-cv-00584-WKW-SRW    Document 1    Filed 06/25/2007    Page 44 of 50

WHEREFORE, Gray demands judgment against Defendant for Six Hundred Ninety Nine Thousand Two Hundred Six Dollars ($699,206.00), plus pre-judgment interest, post-judgment interest, attorney's fees, court cost and expenses.

## TRIAL BY STRUCK JURY IS DEMANDED

DATED this the 25th day of June, 2007.

By: _____

E. Britton Monroe (MON032)
Mickey B. Wright (WRI048)
Brian M. McClendon (MCC133)
Attorneys for Gray Construction, Inc.

**OF COUNSEL:**
LLOYD, GRAY & WHITEHEAD, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama 35223
Telephone: (205) 967-8822
Facsimile: (205) 967-2380

Case 2:07-cv-00584-MEF-TFM    Document 11-23    Filed 08/21/2007    Page 68 of 70

Case 2:06-cv-01158-MEF-TFM    Document 77-1    Filed 07/13/2007    Page 45 of 50
Case 2:07-cv-00584-WKW-SRW    Document 1    Filed 06/25/2007    Page 6 of 6

**PLAINTIFF REQUESTS THE FOLLOWING BE SERVED BY CERTIFIED MAIL:**

Hwashin America Corporation
c/o Michael B. O'Conner
105 Tallapoosa Street, Suite 101
Montgomery, AL 36104

OF COUNSEL

Case 2:07-cv-00584-MEF-TFM    Document 11-23    Filed 08/21/2007    Page 69 of 70

Case 2:06-cv-01158-MEF-TFM    Document 77-1    Filed 07/13/2007    Page 46 of 50
Case 2:07-cv-00584-WKW-SRW    Document 1    Filed 06/26/2007    Page 69 of 70

I CERTIFY THIS INSTRUMENT WAS FILED ON
06/22/2007 12:46:07 PM
JUDGEMENTS BOOK: 30 PAGE: 506
Entry#: 62805
DEED TAX:$0.00 MORTG TAX:$0.00 MIN TAX:$0.00
REC-FEE:$7.00 FILE-FEE:$0.00 TRANS-FEE:$0.00

*Steve Norman*

Judge of Probate

This instrument prepared by:
Lloyd, Gray & Whitehead, PC
2501 20th Place South, Suite 300
Birmingham, Alabama 35223

STATE OF ALABAMA    )
BUTLER COUNTY    )

### VERIFIED STATEMENT OF LIEN

Gray Construction of Lexington, Kentucky, files this statement in writing, verified by the oath of Scott Parker, as Chief Financial Officer of Gray Construction, who has personal knowledge of the facts herein set forth:

That said Gray Construction, claims a lien upon the following property situated in Butler County, Alabama, to-wit: 661 Montgomery Highway, Greenville, Butler County, Alabama, and is legally described as follows:

Commence at an iron pin at the Northwest Corner of the Northeast Quarter of Section 18, T-10-N, R-15-E, Butler County, Alabama; Thence run N 88° 04'20" E, 1336.44 feet to a point; Thence run N 88° 01'29" E, 111.64 feet to a point lying on the west right of way of U.S. Highway 31 (ROW Varies); Thence run along said west right of way, S 20° 35'24" W, 268.50 feet to a point lying on the existing west right of way of U.S. Highway 31 (ROW Varies); Thence leave said west right of way and run N 24° 24'36" W, 42.43 feet to a point lying on the proposed new west right of way of said U.S. Highway 31, said point being the Point of Beginning; Thence from said Point of Beginning, run along said proposed right of way, S 20° 35'24" W, 116.50 feet to a point; Thence continue along said proposed right of way, 30.0 feet west of, parallel to and contiguous with the existing west right of way, S 20° 42'05" W, 460.76 feet to a point of curvature; Thence continue along said proposed right of way and said curve (concave westerly, R=22346.65'), a chord of S 21° 32'27" W, 654.90 feet to a point of curvature; Thence continue along said proposed right of way and said curve (concave westerly, R=22346.65'), 10.0 feet west of, parallel to and contiguous with the existing west right of way, a chord of S 22° 45'42" W, 297.42 feet to a point of curvature; Thence continue along said proposed right of way and said curve (concave westerly, R=22346.65'), 30.0 feet west of, parallel to and contiguous with the existing west right of way, a chord of S 23° 21'37" W, 169.53 feet to a point; Thence continue along said proposed right of way, S 23° 34'40" W, 209.99 feet to a point; Thence leave said proposed right of way and run N 89° 59'03" W, 662.48 feet to a point; Thence run N 00° 29'08" W, 274.42 feet to a point; Thence run S 87° 49'03" W, 235.74 feet to a point; Thence run N 00° 40'58" W, 1528.36 feet to a point; Thence run N 88° 04'20" E, 939.89 feet to a point; Thence run N 79° 32'29" E, 101.12 feet to a point; Thence run N 88° 04'20" E, 351.31 feet to a point of curvature; Thence run along said curve (concave southerly, R=465.0'), a chord of S 89° 08'17" E, 45.26 feet to a point; Thence run S 65° 20'42" E, 48.12 feet to a point of curvature; Thence run along said curve (concave southerly, R=450.0'), a chord of S 75° 00'51" E, 87.89 feet to a point; Thence run S 69° 24'36" E, 60.47 feet to a point; Thence run S 24° 24'36" E, 21.21 feet to the Point of Beginning.

Said described property lying and being situated in the North Half of Section 18, T-10-N, R-15-E, Butler County, Alabama and contains 52.207 Acres, more or less.

**EXHIBIT A**

Case 2:07-cv-00584-MEF-TFM    Document 11-23    Filed 08/21/2007    Page 70 of 70

Case 2:06-cv-01158-MEF-TFM    Document 77-1    Filed 07/12/2007    Page 47 of 2
Case 2:07-cv-00584-WKW-SRW    Document 1    Filed 06/25/2007    Page 2 of 50

This lien is claimed separately and severally as to the both the buildings and improvements thereon and the land of the owner or lease-hold interest of the proprietor.

That the lien is claimed to secure an indebtedness of SIX HUNDRED NINETY-NINE THOUSAND TWO HUNDRED SIX AND 00/100 DOLLARS ($699,206.00) with interest from December 29, 2006, for work and labor done and materials supplied for the construction of the improvements on the property at the request of the owner.

The above-described property is owned by **Hwashin America Corporation** by virtue of the Statutory Warranty Deed dated May 1, 2005, and recorded May 2, 2006, at Book 0288, Page 613, in the Office of the Judge of Probate, Butler County, Alabama.

Scott Parker, Chief Financial Officer
Gray Construction

STATE OF KENTUCKY        )
FAYETTE COUNTY           )

Before me a Notary Public in and for the said County of Fayette, State of Kentucky, personally appeared Scott Parker, who, being first duly sworn, does depose and say that he has personal knowledge of the facts set forth in the foregoing Statement of Lien and that the same are true and correct to the best of his knowledge and belief. Subscribed and sworn to before me this 21st day of June, 2008, by said affiant.

[SEAL]

**NOTARY PUBLIC**
In and for said County and State

My Commission Expires:

November 19, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JENNIFER PIGGOTT and            )
SLADE PIGGOTT,                  )
                               )
    Plaintiffs,              )
                               )
and                            )
                               )
HWASHIN AMERICA CORP.,          )
                               )
    Plaintiff in Intervention,  )
                               )
vs.                            )        Case No.: CV-06-1158
                               )
GRAY CONTRUCTION, INC.,         )
                               )
    Defendant/Third-Party Plaintiff,  )
                               )
vs.                            )
                               )
COOPER STEEL                   )
FABRICATORS, INC., et al.,      )
                               )
    Third-Party Defendants.   )

HWASHIN AMERICA CORPORATION'S
MOTION FOR LEAVE TO FILE ITS
AMENDED COMPLAINT IN INTERVENTION

    COMES NOW Plaintiff in Intervention Hwashin America Corporation ("Hwashin") and respectfully requests the Court grant it leave to file an Amended Complaint in Intervention asserting additional claims against James N. Gray Company a/k/a Gray Construction, Inc. ("Gray"), as well as integral claims against GNF Architects and Engineers ("GNF"), PSC, The Hardy Corporation ("Hardy"), Freeland-Harris Consulting Engineers of Georgia, Inc. (Freeland-Harris-Georgia"), Freeland-Harris Consulting Engineers of Kentucky, Inc. ("Freeland-Harris-Kentucky") (collectively, "Freeland-Harris"), All-South Subcontractors, Inc. ("All-South"), Mid-South

Subcontractors, Inc. d/b/a Mid-South Roof Systems ("Mid-South"), Cooper's Steel Fabricators, Inc. ("Cooper's Steel"), Latta Plumbing & Construction Co., Inc.("Latta"), and Firestone Building Products Company, LLC ("Firestone"). In support of this Motion, Hwashin states as follows:

1.     On or about November 17, 2006, Plaintiffs Jennifer and Slade Piggott ("Mr. and Mrs. Piggott") filed a Complaint in the Circuit Court of Butler County, Alabama.  Mr. and Mrs. Piggott's claims stem from the collapse of the roof at the Hwashin manufacturing facility in Greenville, Alabama ("Hwashin Facility").

2.     On December 29, 2006, Gray filed its Notice of Removal removing the case to the United States District Court for the Middle District of Alabama.

3.     On December 29, 2006, Hwashin filed its Motion to Intervene.

4.     On March 13, 2007, the Parties submitted their Report of Parties' Planning Meeting.  The Parties agreed to allow Mr. and Mrs. Piggott until July 13, 2007, to join additional parties and amend pleadings and to allow Defendants until August 10, 2007, to join additional parties and amend pleadings.

5.     On March 20 2007, the Court entered its Uniform Scheduling Order stating "Any motions to amend the pleadings and to add parties shall be filed on or before May 30, 2007."

6.     On May 16, 2007, the Court granted Hwashin's Motion to Intervene.

7.     On May 22, 2007, Hwashin filed its Complaint in Intervention.

8.     On May 25, 2007, Plaintiff in Intervention Hwashin filed a Motion to extend the deadline to file motions to amend the pleadings and add additional parties.

9.    On May 29, 2007, the Court granted Hwashin's Motion and extended the deadline to file motions, to amend the pleadings, and to add parties until June 29, 2007.

10.    On June 7, 2007 Gray filed its Motion for Leave to File a Third Party Complaint.

11.    On June 8, 2007, the Court granted Gray's Motion for Leave to File a Third Party Complaint.

12.    On June 8, 2007, Gray filed its Third Party Complaint.

13.    Through Gray's Third Party Complaint, Hwashin has learned the identities of the additional parties responsible for the design, construction and/or maintenance of the roof, structural system and drainage system of the Hwashin facility. These parties, in addition to others Hwashin had previously identified, are responsible for the catastrophic collapse of the roof at the Hwashin facility on October 17, 2006, which is the subject of this action.

14.    Hwashin sustained substantial damages as a result of the collapse.

15.    Gray contracted with Hwashin to design and build the Hwashin facility (the "Contract"). Among other obligations described in the Amended Complaint, Gray agreed to provide design services with the care and skill ordinarily used by members of the design profession practicing under similar conditions at the same time and locality of the Project and to be responsible for the quality of the design services and for the quality of the construction performed. Gray breached its contractual obligations to Hwashin resulting in the collapse of the Hwashin facility.

16.    Gray negligently, wantonly and/or recklessly failed to design and engineer the Hwashin Facility and negligently, wantonly and/or recklessly failed to use due care to

3

hire and retain qualified contractors and subconsultants, which factually and proximately resulted in the catastrophic collapse of the facility.

17.    GNF was contracted by Gray to provide architectural design services relating to the performance of the Contract, including, but not limited to, the roofs and drainage system for the roofs for the Hwashin Facility. As "Architect of Record" for the Contract, GNF also had responsibility for coordinating the various design components of the facility. GNF negligently, wantonly and/or recklessly failed to use due care in its design the Hwashin Facility and negligently, wantonly and/or recklessly failed to use due care in the coordination of the various design components, which factually and proximately resulted in the catastrophic collapse of the facility.

18.    Gray contracted with Hardy to design and/or install certain mechanical systems for the Hwashin facility pursuant to the Contract, including the roof drainage system. Hardy negligently, wantonly and/or recklessly failed to use due care in its design and/or installation of the roof drainage system, which factually and proximately resulted in the catastrophic collapse of the facility.

19.    GNF contracted with Freeland-Harris-Kentucky to provide structural engineering services for the construction of the Hwashin facility pursuant to the Contract, including the design of the structure supporting the roof. Freeland-Harris-Kentucky then subcontracted with Freeland-Harris-Georgia to provide certain structural engineering services for the construction of the Hwashin facility, including the design of the structure supporting the roof. Freeland-Harris negligently, wantonly and/or recklessly failed to use due care in its design and/or installation of the structure supporting the roof, which factually and proximately resulted in the catastrophic collapse of the facility.

4

20.   Gray contracted with All-South to provide certain engineering, materials, labor, equipment and services with respect to the installation of the roof and roof systems for the construction of the Hwashin facility pursuant to the Contract. All-South negligently, wantonly and/or recklessly failed to use due care in the design and installation of the roof and roof systems, which factually and proximately resulted in the catastrophic collapse of the facility.

21.   Gray contracted with Mid-South to install the gutters for the roof drainage system for the construction of the Hwashin facility pursuant to the Contract and to perform repairs to the roof drainage system after completion of the project. Mid-South negligently, wantonly and/or recklessly failed to use due care in the installation of and repairs to the roof drainage system, which factually and proximately resulted in the catastrophic collapse of the facility.

22.   Cooper's Steel was responsible for supplying and installing, including related design services, all structural steel, including girders, joists, bridging, roof decking, roof frames and other steel products designed and constructed for the Hwashin facility pursuant to the Contract. Cooper's Steel negligently, wantonly and/or recklessly failed to use due care in the design, supply and installation of the structural steel, which factually and proximately resulted in the catastrophic collapse of the facility.

23.   Hardy contracted with Latta to install all plumbing, including pipes incorporated into the roof drainage system at the Hwashin facility pursuant to the Contract. Latta negligently, wantonly and/or recklessly failed to use due care in the installation of the pipes incorporated into the roof drainage system, which factually and proximately resulted in the catastrophic collapse of the facility.

5

24.    Firestone manufactured the roof materials used on the roof over the office of the Hwashin facility pursuant to the Contract, and inspected and approved the roof after it was installed, and issued a warranty for the roof. Firestone negligently, wantonly and/or recklessly failed to use due care in the manufacture, inspection, and warranting of the roof, which factually and proximately resulted in the catastrophic collapse of the facility.

25.    Hwashin timely moves this court for leave to file its Amended Complaint within the time set in the Court's Scheduling Order. Thus, pursuant to Rule 15(a) applies and leave should be freely granted because justice so requires.

26.    By filing the Amended Complaint, Hwashin will name only two additional parties to this action, GNF and Mid-South. All other parties against whom Hwashin asserts claims were either an original party or were added by Gray in its Third Party Complaint.

27.    Hwashin's rights and interests will be substantially affected by the issues raised in Gray's Third Party Complaint and Hwashin would likely be precluded from prosecuting its interests against the above parties in a subsequent action.

28.    Both the injuries to Mr. and Mrs. Piggott and the damages sustained and by Hwashin, and the respective claims arising therefrom, naturally and consequently resulted from a single occurrence—the collapse of the roof at the Hwashin facility— which occurred as a result of the negligence, design flaws or construction defects by which Gray, GNF, Hardy, Freeland-Harris, All-South Mid-South, Cooper's Steel, Latta and Firestone are responsible.

6

WHEREFORE, Hwashin respectfully requests this Court grant it leave to file the

Amended Complaint in Intervention attached to this Motion as Exhibit "A".

Respectfully submitted this the 29th day of June, 2007.

/s/ William Christopher Waller, Jr.
**WILLIAM CHRISTOPHER WALLER, JR.**
Attorney for Plaintiff/Intervener

OF COUNSEL:
**BALL, BALL, MATTHEWS & NOVAK P.A.**
Post Office Box 2148
Montgomery, AL 36102-2148
 (205) 982-4620
(205) 982-4630 (fax)

s/J. Lister Hubbard
**J. LISTER HUBBARD (HUB007)**
**RICHARD H. ALLEN (ALL053)**
**ARDEN REED PATHAK (PAT072)**
Attorneys for Plaintiff/Intervener
Hwashin America Corp.

OF COUNSEL:
**CAPELL & HOWARD, P.C.**
Post Office Box 2069
150 South Perry Street
Montgomery, Alabama 36102-2069
(334) 241-8000
(334) 323-8888

## CERTIFICATE OF SERVICE

I hereby certify that on June 29th, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following:

| | |
|---|---|
| Jere L. Beasley, Esquire<br>Julia Ann Beasley, Esquire<br>Beasley, Allen, Crow, Methvin,<br>  Portis & Miles, P.C.<br>Post Office Box 4160<br>Montgomery, AL 36103-4160 | Linda H. Ambrose, Esq.<br>Rogers & Associates<br>3000 Riverchase Galleria<br>Suite 650<br>Birmingham, Alabama 35244 |
| Thomas T. Gallion, III, Esquire<br>Constance C. Walker, Esquire<br>Felicia Abernathy Long, Esquire<br>Haskell, Slaughter,<br>  Young & Gallion, LLC<br>305 South Lawrence Street<br>Montgomery, AL 36104 | Albry Joe Peddy, Esquire<br>Robert B. Stewart, Esquire<br>Smith, Spires & Peddy, P.C.<br>2015 Second Avenue North<br>Suite 200<br>Birmingham, AL 35203-3711 |
| Brian Michael McClendon, Esquire<br>Elliot Britton Monroe, Esquire<br>Mickey B. Wright, Esquire<br>Lloyd, Gray & Whitehead, P.C.<br>2501 Twentieth Place South<br>Suite 300<br>Birmingham, AL 35223 | Charles Keith Hamilton, Esquire<br>Bainbridge, Mims, Rogers & Smith<br>Post Office Box 530886<br>Birmingham, AL 35253 |

/s/J. Lister Hubbard
**J. LISTER HUBBARD (HUB007)**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

JENNIFER PIGGOTT and                    )
SLADE PIGGOTT,                          )
                                        )
          Plaintiffs,                   )
                                        )        Case No.: CV-06-1158
v.                                      )
                                        )
GRAY CONSTRUCTION, INC.,                )
                                        )
          Defendant/Third-Party Plaintiff,  )
                                        )
v.                                      )
                                        )
COOPER'S STEEL                          )
FABRICATORS, INC., et al.,              )
                                        )
          Third-Party Defendants.       )

---

GRAY CONSTRUCTION INC.'S OPPOSITION TO HWASHIN AMERICA
CORPORATION'S MOTION FOR LEAVE TO AMEND COMPLAINT IN
INTERVENTION

---

Hwashin America Corporation ("Hwashin") seeks to amend a Complaint filed on behalf

of its worker's compensation carrier, the Alabama Self-Insured Worker's Compensation Fund's

("the Fund"), to protect the Fund's worker's compensation subrogation interest to interject

property damage claims which the Fund has no standing to assert. Even if Hwashin or the Fund

had standing, to allow the interjection of Hwashin's property damage claims into this personal

injury suit (which contains no property damage claim to date) would unduly delay these

proceedings and unfairly prejudice the original parties. Moreover, Gray has already sued

Hwashin in a separate action in this Court for the failure to pay repair costs to the facility, a

property damage case.  Hwashin should assert its property damage claim in that case as a counterclaim.  Hwashin's Motion for Leave is due to be denied.

## I.     STATEMENT OF FACTS.

On September 24, 2003, Gray and Hwashin entered into a design/build contract ("the Contract") for the design and construction of a manufacturing facility in Greenville, Alabama ("the Hwashin facility").  (A true and correct copy of the Contract is attached hereto as Exhibit A.).  The Hwashin facility was completed on June 30, 2004.  (A true and correct copy of the Certificate of Substantial Completion is attached hereto as Exhibit B.).

On or around October 17, 2006, the Hwashin facility office roof collapsed.  (Plaintiffs' Complaint at ¶ 13-14.).  Plaintiff Jennifer Piggott ("Mrs. Piggott") is alleged to have been injured while exiting the office area during the collapse.  (Plaintiffs' Complaint at ¶ 13-14.).

On November 17, 2006, Slade Piggott ("Mr. Piggott") and Mrs. Piggott filed their Complaint in the Circuit Court of Butler County, Alabama.  (See Plaintiffs' Complaint.).  Gray timely removed the action to this Court on December 29, 2006.  (Notice of Removal, Document No. 2 in the Court Docket.).

On December 7, 2006, Hwashin, by and through the Fund, filed its Motion to Intervene in the Circuit Court of Butler County, Alabama.  (See Hwashin's Motion to Intervene.).  That Motion was transferred to this Court at the time of removal.  (Id.).

On January 24, 2007, Gray filed its Response to the Motion to Intervene.  (Response to Motion, Document No. 4 in the Court Docket.).  Gray did not oppose the Fund's intervention for the sole purpose of protecting its worker's compensation subrogation interest.  (Id.).  The Court granted the Fund's Motion to Intervene on May 16, 2007.  (Order on Motion to Intervene, Document No. 17 in the Court Docket.).

On June 7, 2007, Gray filed its Motion for Leave to file a Third-Party Complaint. (Motion For Leave to File, Document No. 24 in the Court Docket.). Gray sought leave to file third-party claims against Hwashin, subcontractors and suppliers for their conduct which caused the collapse of the roof. (Id.). Gray sought to file claims of indemnity against Hwashin for its failure to maintain the roof drains of the Hwashin facility. (Id.). Gray's Third-Party Complaint seeks only the recovery of any funds it has to pay Mr. and Mrs. Piggott for their alleged injuries. (Id.). Gray's Third-Party Complaint contains no property damage claims and did seek recovery for any property damage. (Id.).

Gray's Motion was granted on June 8, 2007. (Order on Motion for Leave to File, Document No. 25 in the Court Docket.). Gray filed its Third-Party Complaint that same day. (Third Party Complaint, Document No. 26 in the Court Docket.).

On June 26, 2007, Gray filed a separate Complaint in the United States District Court for the Middle District of Alabama against Hwashin. (A true and correct copy of Gray's Complaint in Case No. cv-07-584 is attached as Exhibit C.). Gray alleges Hwashin is liable to Gray for Hwashin's failure to pay Gray for repairs made by Gray to the Hwashin facility. (Id.). Hwashin has not yet answered Gray's Complaint. (Id.).

On June 29, 2007, the deadline to amend pleadings, Hwashin, for itself, and not by or through the Fund, filed a Motion for Leave to Amend the Complaint in Intervention. (Motion For Leave to File, Document No. 55.). Hwashin seeks to add parties and assert claims against Gray, GNF Architects and Engineers, P.S.C. ("GNF"), Freeland Harris Structural Engineers ("Freeland Harris"), Freeland Harris Consulting Engineers of Georgia, Inc. ("Freeland Harris-Georgia"), Cooper's Steel Fabricators, Inc. ("Cooper's Steel"), The Hardy Corporation ("Hardy"), Latta Plumbing & Construction Co., Inc. ("Latta"), All-South Subcontractors ("All-

South"), Firestone Building Products Company, LLC ("Firestone") and Mid-South Subcontractors, Inc. ("Mid-South") for property damage and other consequential damages not related to Mrs. Piggott's injuries it contends it sustained as a result of the office roof collapse. (Id.).

Hwashin seeks to recover Hwashin's "damages to its manufacturing facility, business property and other contents, an interruption of its business and other related damages." (Id.). Hwashin attempts to interject into this case for the first time property damage claims which have absolutely nothing to do with Mr. and Mrs. Piggott's alleged injuries. (Id.).

## II.    ARGUMENT.

### A.    Hwashin, Itself, Is Not the Plaintiff in Intervention and Has No Standing to Add Property Damage Claims.

Ala. Code § 25-5-11(a) provides, in pertinent part, that:

> To the extent of the recovery of damages against the other party, the employer shall be entitled to reimbursement for the amount of compensation theretofore paid on account of injury or death.

                              * * * * *

> For purposes of this amendatory act, the employer shall be entitled to subrogation for medical and vocational benefits expended by the employer on behalf of the employee. . . . .

The Alabama Supreme Court has interpreted § 25-5-11(a) to mean:

> The employer or insurance carrier is entitled to be reimbursed, out of any judgment recovered by the employee or his representative in a suit against a third party wrongdoer, all payments made by the employer or the insurance carrier which are included within the meaning of the word 'compensation' as used in § 312, Title 26 [predecessor to § 25-5-11], as amended, irrespective of the type of damages claimed in the complaint in the suit against the third party wrongdoer.

See Millers Mut. Ins. Ass'n v. Young 601 So.2d 962 (Ala. 1992.).

496221_14.DOC                              4

The original Complaint in Intervention clearly indicates the claim is being brought "by and through the Alabama Self-Insured Worker's Compensation Fund". The Fund is the true party Plaintiff. The party designation alone indicates that the real party in interest is the Fund.

Even overlooking Hwashin's own description of the true party in interest, it is clear from the pleadings the real party in interest is the Fund. The Alabama Supreme Court has held that §25-5-11 allows for the recovery of "payments made by the employer or the insurance carrier". See Millers Ins. Ass'n at 963.  See also Foster & Creighton Co. v. St. Paul Mercury Indem. Co. 88 So.2d 825 (Ala. 1956) (insurance carrier has right to seek compensation paid to the injured employee.).

Hwashin never paid Mrs. Piggott any workers compensation benefits. (See Hwashin's First Amended Complaint in Intervention at Paragraph 76.). Mrs. Piggott's worker's compensation payments were made by the Fund. (Id.). Hwashin has no statutory right to recover the worker's compensation subrogation interest, only the Fund does since it paid. (Id.).

**B.    The Fund Has No Standing to Assert Hwashin's Property Damage Claims.**

The Fund lacks standing to assert claims for Hwashin's alleged property damage. The Fund is not alleged to have incurred and has not incurred any of the property damage Hwashin seeks to recover in its First Amended Complaint in Intervention. The Fund's only claim is to recover its worker's compensation subrogation interest. The Fund has no property damage claims alleged in the First Amended Complaint in Intervention against Gray.

C.     **Neither Hwashin Nor the Fund Should Be Allowed to Permissively Intervene to Interject Property Damage Claims.**

The Fund intervened as a matter of right to protect its worker's compensation subrogation interest. (See Hwashin's Motion to Intervene.). Hwashin now seeks to permissively intervene and assert unrelated claims for Hwashin's property damage.

Federal Rules of Civil Procedure, Rule 24(b) provides:

> Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

1.     **There Are No Questions of Law Common to Both Mr. and Mrs. Piggott's Claims or Hwashin's Claims.**

Gray concedes there is a common issue of fact as to why the roof collapsed; however, that is where the similarities between Mr. and Mrs. Piggott's personal injury claims and Hwashin's property damage claims ends.

None of the claims asserted by Mr. and Mrs. Piggott and Hwashin overlap. The only claims Hwashin and Mr. and Mrs. Piggott have in common are negligence and wantonness. However, Gray's duty to each differs. Gray owed Mr. and Mrs. Piggott a common law duty. Gray's duties to Hwashin arise from the parties Contract. Thus, the issue of duty is different as to both.

Hwashin makes claims which Mr. and Mrs. Piggott do not. Hwashin alleges Gray is liable for breaching the implied warranty of suitability and implied warranty of workmanship.

Mr. and Mrs. Piggott do not allege Gray violated any implied warranty. Hwashin makes contract claims. Mr. and Mrs. Piggott do not.

Hwashin's claims are severely limited, if not waived in total, in Paragraph 5.2.3 of the Contract between Hwashin and Gray:

> The making of final payment shall constitute a waiver of claims by the Owner except those arising from: 1) liens, claims, security interests or encumbrances arising out of the Contract and unsettled; 2) failure of the Work to comply with the requirements of the Contract Documents; or 3) terms of special or general warranties required by the Contract Documents. 4) latent defects; 5) Design/Builder's indemnity and insurance obligations as set forth in this Agreement. . . .

Paragraph 7.3.8 states:

> The Owner and the Design/Builder waive all rights against each other and the Architect and other design professionals, contractors, subcontractors, agents and employees, each of the other, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 7-3 or other property insurance applicable to the Work, except such rights as they may have to proceeds of such insurance held by the Owner and Design/Builder as trustee. The Owner or Design/Builder, as appropriate, shall require from contractors and subcontractors by appropriate agreements, written where legal required for validity, similar waivers each in favor of other parties enumerated in this Paragraph 7-3. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

Hwashin has also waived its right to consequential damages. Paragraph 11.9 states:

> Except for (i) Owner's claims for liquidated damages as expressly specified in this Agreement and except (ii) to the extent Owner's claims are covered by insurance provided by Design/Builder under this Agreement, the Design/Builder and Owner waive any and all claims against each other for consequential damages arising out of or relating to this Contract. Subject to the above-cited exceptions, this mutual waiver includes: (1) Damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity

or of the services of such person; and (2) damages incurred by the Design/Builder for principal or home office expenses including the compensation of personnel stationed there, for losses of financing, income, business and reputation, for loss of management or employee productivity or of the services of such persons, and for loss of profit except anticipated profit arising directly from the Work. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination of this Agreement.

Interpretation of these and the other provisions of the Contract are unique to Hwashin's claims. To interject Hwashin's claims will present contractual issues which are not necessary to adjudicate Mr. and Mrs. Piggott's claims.

The law of damages for Hwashin's claims and Mr. and Mrs. Piggott's claims are completely different. Mr. and Mrs. Piggott allege personal injury claims, while Hwashin seeks property damage. The law concerning the two types of damages focuses on different issues that do not overlap. Mr. and Mrs. Piggott's damages will focus on Mrs. Piggott's actual physical injury, pain and suffering, emotional distress and mental anguish, lost income, lost ability to earn future income, the expenses associated with the injury and Mr. Piggott's loss of marital services. Hwashin's damages will focus on the costs of repairs, loss of property in the Hwashin facility and the unrecoverable consequential damages it alleges in its Amended Complaint.

Courts have repeatedly denied requests for permissive intervention where allowing the intervention will require the interjection of additional issues. See Utah v. U.S., 394 U.S. 89, 96, (1969)(it was not an abuse of discretion to prevent intervention where doing so would "introduce new issues which had not been raised."); ManaSota-88, Inc. v. Tidwell, 896 F.2d 1318 (11th Cir. 1990)(the interjection of issues not raised by the plaintiff in the underlying action would result in protracted litigation and denial of permissive intervention was not an abuse of discretion.); U.S. v. South Florida Water Management Dist., 922 F.2d 704 (11th Cir. 1991)(where permissive

8

intervention would result in the addition of witnesses and interjection of collateral issues, denial of motion for permissive intervention was not an abuse of discretion.); Shea v. Angulo, 19 F.3d 343 (7th Cir. 1994)(denial of motion for permissive intervention was not an abuse of discretion, "as allowing the intervention would insert into the action a complex factual question completely unrelated to the quarrel between the original parties and delay the adjudication of the rights of the original parties"); SEC v. Everest Management Corp. 475 F.2d 1236, 1240 (2nd Cir. 1972)(individual investors were not allowed to intervene into an SEC enforcement proceeding, as additional issues that would be raised outweighed the benefit of adjudicating the matter in a single action); Federal Trade Comm'n v. First Capital Consumer Membership Servs., Inc., 206 F.R.D. 358 (D.C.N.Y. 2001)(it was not an abuse of discretion to deny permissive intervention where grant of motion would result in introduction of collateral issues and cause undue delay).

This case is similar to Marvel Entertainment Group, Inc. v. Hawaiian Triathlon Corp., 132 F.R.D. 143 (S.D.N.Y.1990). Marvel, owners of the copyrighted Iron Man comic book merchandise and trademark, sued Hawaiian Triathlon, the sponsor of the Iron Man Triathlon, for alleged breach of an agreement concerning Hawaiian Triathlon's use of the Iron Man name. Timex Corporation sought leave to intervene to assert claims of unfair competition and intentional interference against Marvel and claims of breach of contract and fraud against Hawaiian Triathlon arising out of a tri-party licensing agreement which named Timex the official timekeeper of the race and allowed Timex to market a line of watches using the Iron Man name. The Court denied Timex's Motion for permissive intervention. While the Court recognized "some overlap in the factual and legal issues", the Court determined that the interjection of unrelated issues would cause undue delay and ultimately prejudice the original parties by protracting the litigation.

    **2.    Hwashin's Claims Will Cause Undue Delay and Prejudice to the Original Parties.**

Even if a Court determines that a common question of law or fact exists, it has the discretion to deny a motion for permissive intervention, if the intervention will result in undue delay or prejudice. Id. See also Sunbelt Veterinary Supply, Inc. v. International Business Systems United States, Inc., 200 F.R.D. 463 (M.D.Ala. 2001). In considering a motion for permissive intervention, the Court must consider its potential to delay progress of case and the effect of intervention on existing parties. see Dillard v. City of Foley, 926 F.Supp. 1053 (M.D.Ala. 1995).

The introduction of Hwashin's claims will interject numerous witnesses and substantial documents not related at all to Mr. and Mrs. Piggott's claims. Hwashin alleges it has incurred "damages to its manufacturing facility, business property and other contents, an interruption of its business and other related damages." Proving each of these areas of damage will result in substantial delays in the discovery process and trial of Mr. and Mrs. Piggott's claims.

Hwashin alleges it has incurred damage to its manufacturing facility. This claim will require testimony and documents concerning the costs to clean up the debris after the roof collapse and the reasonableness of these costs, the costs to rebuild the office and the reasonableness of these costs, the effect of the waiver provisions found in the Contract, the value of the Hwashin facility both prior to and after the roof collapse and whether Hwashin properly mitigated its damages.

Hwashin also alleges it has incurred damage to it business property and contents of the office. This claim will require testimony and documents concerning the exact business property and contents damaged, the extent of the damage, the repair or replacement costs of the property

and the reasonableness of those costs, the value of the property prior to and after the roof collapse, whether the property could be salvaged or was a total loss, whether Hwashin properly mitigated its damages, whether any defects in the property existed prior to the roof collapse and the effect of the waiver provisions found in the Contract on Hwashin's claim.

Hwashin alleges it has suffered damage as a result of the interruption of its business. This area of damage will require testimony and documents concerning the length of the alleged interruption, whether the interruption resulted in lost sales, whether Hwashin was forced to pay its employees during the interruption, the profitability of Hwashin prior to and after the collapse, whether Hwashin properly mitigated its damages and the effect of the waiver provisions found in the Contract.

The case will be further delayed by the additional legal issues raised. Interpretation issues regarding the Contract provisions regarding indemnity and waiver alone are substantial

Hwashin's dual role as both Mrs. Piggott's employer seeking to recover its worker's compensation subrogation interest and its role as the property owner seeking to recover its property damage and lost profits will confuse the jury. As to the worker's compensation subrogation claim, Hwashin stands in the shoes of Mrs. Piggott. Gray can only assert defenses it has against Mrs. Piggott. Gray has no known contributory negligence against Mrs. Piggott.

On the other hand, Hwashin, as the property owner, does not stand in the shoes of Mrs. Piggott and Gray has an excellent contributory negligence defense to Hwashin's property damage claims. The prospect of the jury not applying contributory negligence to Hwashin's subrogation claim, but to Hwashin's property damage claim, will be confusing.

There is also the certainty of additional intervenors as to Hwashin's property damage claims. Hwashin seeks to recover for damage to the Hwashin facility and to its business property.

A large portion of these alleged damages have been paid by Hwashin's insurance carrier. Allowing Hwashin to assert property damages claims as a Plaintiff in Intervention will result in Hwashin's insurance carrier filing its own Motion to Intervene to protect its subrogation interest. There will clearly be one more Plaintiff in this case, and probably others, if this Court allows Hwashin's property damage claims in this case.

If Hwashin is allowed to assert its claims in this case, Gray will be prejudiced by the interjection of the existence of insurance into the personal injury portion of this case. Federal Rules of Civil Procedure, Rule 411 states:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

Federal courts have unequivocally held that the existence of insurance coverage cannot be raised before the jury in personal injury action. See Joynor v. Berman Leasing Co., 398 F.2d 875 (5th Cir. 1968).

The Contract paragraphs 7.3.8 and 11.9 both limit Hwashin's and Gray's right to recover damages against each other to the extent their claims are covered by insurance. By allowing Hwashin to assert claims for property damage, Gray will be forced to raise these contractual defenses and thereby interject the existence of insurance into this action. Gray will be unfairly prejudiced by the mention of insurance at the trial of Mr. and Mrs. Piggott's personal injury case. Mr. and Mrs. Piggott will also be prejudiced by having to endure the substantial delay in these proceedings while discovery proceeds on Hwashin's property damage claims.

### D.   Hwashin Should Either File a New Action or a Counterclaim in the Related Litigation.

While the question of whether a party seeking to intervene has other means of protecting its rights is not controlling, Courts have held that it may be considered.  See Korioth v. Briscoe, 523 F.2d 1271. (5th Cir. 1975)(held that when appellant had other adequate means of asserting its rights, a charge of abuse of discretion in the denial of a motion for permissive intervention would appear to be almost untenable on its face.); In re Bank of New York Derivative Litigation, 320 F.3d 291 (2nd Cir. 2003); Head v. Jellico Housing Authority, 870 F.2d 1117 (6th Cir. 1989).

Hwashin has adequate means of protecting its interests outside of its alleged Amended Complaint.  Hwashin is free to file its own Complaint claiming property damage and lost profits.  Hwashin would not be prejudiced.  The statute of limitations is far from expired.  This would free this action from the undue delay, unfair prejudice and confusion Hwashin's claims will certainly cause.

Second, there is an existing case in this Court to which Hwashin is already a party on June 26, 2007.  Gray filed suit against Hwashin in CV-07-584 pending in this Court. Gray has sued Hwashin for Hwashin's failure to pay Gray for repairs to the facility, the exact same property damage Hwashin is trying to assert in this action.  Hwashin could easily, and more appropriately, file a counterclaim in that action.

Hwashin will not be prejudiced by pursuing its recovery as a counterclaim, rather than a claim in intervention in this one.  In fact, it is expected that Hwashin will argue that it is entitled to a set off for the payments owed to Gray due to Gray's negligence and breach of contract in the action Gray has filed. If so, the exact same legal and factual issues Hwashin attempts to assert in this action will be litigated in the other case.

## III.    CONCLUSION.

Hwashin is not a true party Plaintiff and lacks standing. The Fund is not the proper party to assert Hwashin's property damage claim and lacks standing. Even if Hwashin or the Fund had standing, they should not be allowed to permissively intervene to interject property damage claims into this case which will only unduly delay this litigation and prejudice the original parties. Rather, Hwashin should file a new case or assert its property damage claim as a counterclaim in Case No. CV-07-584.

**WHEREFORE,** Gray respectfully requests this Court deny Hwashin's Motion for Leave to Amend it Complaint in Intervention.

Done this _13_ day of July, 2007.

By: _____
E. Britton Monroe (MON032)
Mickey B. Wright (WRI048)
Brian M. McClendon (MCC133)
Attorneys for Defendant/ Third Party
Plaintiff Gray Construction, Inc.

**OF COUNSEL:**
LLOYD, GRAY & WHITEHEAD, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama 35223
Telephone: (205) 967-8822
Facsimile: (205) 967-2380

496221_14.DOC                                14

## CERTIFICATE OF SERVICE

I hereby certify that on the 13ᵗʰ day of July, a true and correct copy of the foregoing has been furnished by U.S. Mail, postage prepaid, and electronically upon the following parties:

Jere L. Beasley, Esq.
Julia Ann Beasley, Esq.
Beasley, Allen, Crow, Methvin,
   Portis & Miles, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
***Counsel for Plaintiffs Jennifer and Slade Piggott***

Thomas T. Gallion, III, Esq.
Constance C. Walker, Esq.
Felicia A. Long, Esq.
Haskell, Slaughter, Young & Gallion, LLC
P.O. Box 4660
Montgomery, AL 36103-4660
***Counsel for Latta Plumbing & Construction Co., Inc.***

James A. Rives, Esq.
William Christopher Waller, Jr., Esq.
Ball, Ball, Matthews & Novak, P.A.
P.O. Box 2148
Montgomery, AL 36102-2148
***Counsel for Hwashin America Corp.***

John S. Somerset, Esq.
Sudderth & Somerset
5385 First Avenue North
Birmingham, AL 35212
***Counsel for All-South Subcontractors, Inc.***

Linda H. Ambrose, Esq.
Rogers & Associates
3000 Riverchase Galleria, Ste. 650
Birmingham, AL 35244
***Counsel for Hwashin America Corp.***

A. Joe Peddy, Esq.
Robert B. Stewart, Esq.
Smith, Spires & Peddy
2015 2ⁿᵈ Avenue North, Ste. 200
Birmingham, AL 35203
***Counsel for Cooper's Steel Fabricators, Inc.***

J. Lister Hubbard, Esq.
Richard H. Allen, Esq.
Arden Reed Pathak, Esq.
Capell & Howard, P.C.
P.O. Box 2069
Montgomery, AL 36102-2069
***Counsel for Hwashin America Corp.***

Charles Keith Hamilton, Esq.
Bainbridge, Mims, Rogers & Smith
P.O. Box 530886
Birmingham, AL 35253-0886
***Counsel for Freeland-Harris Consulting Engineers of Kentucky, Inc.***

Hope T. Cannon, Esq.
Brittin T. Coleman, Esq.
Kenneth M. Perry, Esq.
Bradley, Arant, Rose & White, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
***Counsel for Firestone Building Products Company, LLC***

John M. Laney, Jr., Esq.
John C. DeShazo, Esq.
Laney & Foster, P.C.
P.O. Box 43798
Birmingham, AL 35243-0798
***Counsel for Freeland-Harris Consulting Engineers of Georgia, Inc.***

496221_14.DOC

15

Larry William Harper, Esq.
Porterfield, Harper, Mills & Motlow, PA
P.O. Box 530790
Birmingham, AL   35253-0790
**Counsel for The Hardy Corporation**

OF COUNSEL _____