# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

|  |  |  |
|---|---|---|
| **GRAY CONSTRUCTION, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No.  2:07-cv-584-WKW** |
| | ) | |
| **HWASHIN AMERICA CORP.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPLY TO GRAY CONSTRUCTION, INC.'S OPPOSITION TO HWASHIN'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, <u>MOTION TO CONSOLIDATE</u>

Comes now Hwashin America Corporation ("Hwashin") and hereby submits this Reply to Gray Construction, Inc.'s Opposition to Hwashin America Corporation's Motion to Dismiss, or in the Alternative, Motion to Consolidate. (Doc. 11)

**I.    THE SEPTEMBER 24, 2003 DESIGN/BUILD CONTRACT IS CENTRAL TO THIS CASE AND THE PIGGOTT CASE.**

In its Complaint, Gray alleges that it made the repairs to the Hwashin facility pursuant to the September 24, 2003 Design/Build Contract (the "2003 Contract").  (Doc. 1, ¶ 5)  In its Opposition, Gray now adopts a new theory of recovery, claiming that it performed the repairs pursuant to a verbal contract with Hwashin that was entered into after the roof collapse.  (Doc. 11, fn. 1)  Gray now claims that its express reliance on the 2003 Contract in its Complaint was an "obvious mistake".[1]  (Doc. 11, fn. 1)  Curiously, Gray did not include a single reference to a verbal contract in its Complaint, nor has it

---

[1]    Gray contends that the mistake is "obvious" since the parties could not possibly have contemplated repair work necessary in 2006 (*i.e.*, resulting from the roof collapse) when they executed the 2003 Contract.  Contrary to Gray's position, as discussed in Section I.A below, the parties in fact did contemplate repair obligations  of this very nature by incorporating subsections 3.1.3, 5.2.3 and 7.1.2 into the 2003 Contract.

even attempted to amend its Complaint in order to remedy this "obvious mistake". Regardless of Gray's reversal of position and belated attempt to distance itself from its obligations under the 2003 Contract, the 2003 Contract is very much at issue in this case, just as it is in the *Piggott* case.

A.    **The 2003 Contract Contains Provisions That Bear on Gray's Entitlement to Recovery in This Case.**

Regardless of whether Gray's claims are based upon the 2003 Contract or a verbal contract, if Hwashin is required to litigate in this Court, several of Hwashin's defenses and counterclaims will be based upon the terms of the 2003 Contract. For example, Subsection 3.1.3 of the 2003 Contract states that Gray is "responsible to the Owner for the quality of the design services and for the quality of the construction performed by the Design/Builder's employees, subcontractors and their agents and employees."[2] Subsection 5.2.3 of the 2003 Contract thereafter expressly preserves several claims on behalf of Hwashin against Gray beyond final payment, including Hwashin's rights to pursue (1) claims against Gray for <u>latent defects</u> and (2) claims which invoke Gray's indemnity and insurance obligations as set forth in the 2003 Contract. Hwashin's claims against Gray arising from the roof collapse (which will be the primary basis of Hwashin's affirmative defense in this action) are claims based upon latent defects (*i.e.,* the roof collapsed as a result of latent defects resulting from faulty design and/or construction). Further, these claims of Hwashin do involve Gray's indemnity and insurance obligations. Gray's indemnification obligations are found in Section 11.5 of the 2003 Contract. That

---

[2]    Gray attached a copy of the 2003 Contract to its pleading entitled "Gray Construction, Inc.'s Opposition to Hwashin American Corporation's Motion for Leave to Amend Complaint in Intervention." *Piggott v. Gray, et al.,* Case No. 2:06-cv-01158-MEF-TFM (Doc. 77, Exh. A, p. 17-36 of 50). A true and correct copy of the 2003 Contract was also attached as Exhibit A to Hwashin's Motion to Dismiss or, in the Alternative, Motion to Consolidate which was filed in this action. (Doc. 6)

section provides that Gray is to defend and indemnify Hwashin against any bodily injury and property damage claims arising out of or resulting from the negligent performance of the contract work, by Gray or its subcontractors.  Gray's insurance obligations are found in Subsection 7.1.1 of the 2003 Contract.  That subsection expressly requires that Gray purchase and maintain insurance coverage for claims of the type at issue in this case and the *Piggott* case.  Clearly, Hwashin's claims against Gray for the roof collapse implicate Gray's indemnity and insurance obligations.  Further, Subsection 7.1.2 requires that the above insurance coverages be maintained by Gray "without interruption from the date of the commencement of the Work until three (3) years after the final payment."  Final payment under the 2003 Contract took place sometime after June 24, 2004, as evidenced by the Verified Statement of Lien filed against Hwashin by Gray for payment for its original services under the 2003 Contract.  (A true and correct copy of Gray's Verified Statement of Lien is attached hereto as Exhibit A).  Thus, at the time of the roof collapse on October 17, 2006, Gray was still under contractual obligation to maintain the above insurance coverages which were intended to pay for losses resulting from Gray's latent defects of design or construction.

If required to proceed in this Court, Hwashin's central defense (and the basis of potential counterclaims) will be that Gray is responsible for the roof collapse through faulty design and/or construction of the facility.  This directly implicates the 2003 Contract provisions addressed above, most of which are also directly at issue in the *Piggott* case.

**B.    Gray's Newly Submitted Evidence Fails to Support a Theory of Verbal Contract or Equitable Claims Against Hwashin.**

In an effort to jettison any reliance upon the 2003 Contract, Gray devotes a substantial number of pages (including the attachment of 14 exhibits) to detailing communications it now claims establish the existence of a verbal contract with Hwashin. (Doc. 11, pp. 1-6, Ex. A-N).  Notably, Gray fails to present any evidence that Hwashin ever promised or implied, whether before or after Gray provided its repair services, that it would pay Gray for any of the services it provided.

The only direct, written communication between it and Hwashin that Gray provides to support its theory of a post-accident verbal contract is its own letter to Hwashin of October 24, 2006 which allegedly confirms "that Hwashin requested Gray's assistance in connection with the roof collapse." (Doc. 11, p. 3, Ex. E).  What Gray conveniently omits is Hwashin's response to this letter.  Just two days after Gray's letter, Hwashin's attorney responded to Gray's letter by expressing that Hwashin is "somewhat mystified that Gray is expecting to be reimbursed for its efforts."  (A true and correct copy of the October 26, 2004 letter is attached hereto as Exhibit B).  At that early stage, Hwashin's position, as stated by Hwashin's counsel, was the same as it is now:

> Assuming customer satisfaction is indeed a top priority at Gray, we would remind Gray that, under its Hwashin contract, *it assumed comprehensive design and construction responsibilities* for this building, i.e., it likely has no one else to blame for the collapse, that *Hwashin reserved beyond final payment its claims against Gray for "latent defects"* (which is most certainly the cause of this collapse), that the *contract also reserves to Hwashin certain claims against Gray for consequential damages* and that, *as further evidence of Gray's continuing obligations, the contract requires it to maintain its insurance coverages at least three years beyond final payment.*  This is not an exhaustive listing of Gray's obligations under the contract or other responsibilities under the law, but just to give you some idea of why Hwashin believes Gray is in no position to seek reimbursement of its costs or expenses in this regard. Moreover, the only property insurance provided for under the contract in which Gray may have an interest was the all-risk policy purchased by Gray which has log since expired.

Indeed, almost all of the communications upon which Gray now bases a verbal contract with Hwashin were between Gray and Hwashin's insurance carrier or that insurance carrier's representatives. Gray provided no evidence, or case law, supporting its position that Hwashin's insurance carrier (or its insurance carrier's representatives) could bind Hwashin to an alleged verbal contract.

Gray also fails to inform the Court of other important matters related to the alleged verbal contract. For example, within a week of the collapse, Gray's owner flew to the collapsed building in order to meet with Hwashin managers and night shift employees. (*See* Hwashin's Response No. 13—page 12, lines 17-19—to Gray's First Set of Interrogatories in the *Piggott* case, a true and correct copy of which is attached hereto as Exhibit C. Hwashin's Response Number 13 continues:

> Mr. Gray stood on a chair in front of the night shift employees and said, "Look, nobody has anything to worry about—we're gonna take care of everything." He apologized to the employees for everything that was happening, and for what they had to go through, and ensured them that Gray was doing its best to get everything up and running again. He assured the employees several times that "everything would be taken care of" and that Gray was doing "everything it can to fix everything."

(Ex. B, p. 12, lines 19-23 through p. 13, lines 1-2). Thus, Hwashin understood and rightfully expected that Gray intended to honor its legal obligations to make repairs of the damages for which it was clearly responsible.

## II.    THE CAUSATION OF THE ROOF COLLAPSE IS CENTRAL TO BOTH CASES.

Regardless of how this Court rules on Hwashin's present motion, the cause of the roof collapse and a determination of the party or parties responsible for the roof collapse, will be tried in the *Piggott* case. All parties with any potential responsibility for the roof collapse are already included as parties in the *Piggott* case. An enormous amount of

discovery and trial effort in *Piggott* will be devoted to technical expert witness testimony, lay witness testimony and exhaustive review of the parties' project files on the issues of causation and responsibility for the collapse.   There is simply no sound reason to duplicate this exhaustive process in two separate proceedings.

Discussing Rule 42, the Eleventh Circuit has stated:

> This rule is a codification of a trial court's inherent managerial power "'to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *In re Air Crash Disaster at Florida Everglades,* 549 F.2d 1006, 1012 (5th Cir. 1977) (quoting *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S. Ct. 163, 166, 81 L. Ed. 153 (1936)).  We have encouraged trial judges to "make good use of Rule 42(a) . . . in order to expedite the trial and eliminate unnecessary repetition and confusion." *Dupont v. Southern Pacific Co.,* 366 F.2d 193, 195 (5th Cir. 1966), *cert. denied*, 386 U.S. 958, 87 S. Ct. 1027, 18 L. Ed. 2d 106 (1967).

*Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985).   The Eleventh Circuit continued:

> A district court's decision under Rule 42(a) is purely discretionary, however, in exercising this discretion, the court must determine:
>
>> whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives. The court must also bear in mind the extent to which the risks of prejudice and confusion that might attend a consolidated trial can be alleviated by utilizing cautionary instructions to the jury during the trial and controlling the manner in which the plaintiffs' claims (including the defenses thereto) are submitted to the jury for deliberation.

*Hendrix v. Raybestos-Manhattan, Inc.*, 776 F.2d at 1495 (internal citations omitted).

This case lends itself to consolidation with the *Piggott* case under the above considerations.   Consolidation of this case with the *Piggott* case would save time and

expense for the Court and the parties, avoid unnecessary repetition and confusion, including the risk of inconsistency of results and be less of a burden on the parties, witnesses and judicial resources.[3]

The risk of inconsistent results is a very real concern, particularly on the causation and fault issues. Further, the preclusion rules of *res judicata* and collateral estoppel could prejudice Hwashin.[4] One of the cases, if it continues on separately, will come to final conclusion before the other. Both cases involve the same parties, Hwashin and Gray, and could end up including more of the same parties, depending on the actions taken by the courts and parties going forward in the present action, e.g., impleader or counterclaims against many of the subcontractors and subconsultants already parties in the *Piggott* case. Both cases would also include many of the same causes of action and issues. Certainly, most of the legal theories in the two cases arise out of the same operative nucleus of facts. Thus, for example, should this Court render a judgment in favor of Gray on the causation

---

[3]    Gray at least tacitly agrees that consolidation for purposes of discovery might be appropriate, given the overlap of the causation issue. (Doc. 11, p. 13) However, Gray argues that the cases should not be consolidated for trial purposes since such complete consolidation would make the *Piggott* case too complex. Hwashin respectively suggests that any potential prejudices due to complexity could be addressed and alleviated by the *Piggott* Court, either through cautionary instructions and controlling the manner in which the claims and defenses are submitted to the jury or by bifurcating those issues which cannot fairly be tried together.

[4]    A party seeking to invoke doctrine of res judicata must establish its propriety by establishing four initial elements: (1) a prior decision rendered by court of competent jurisdiction; (2) which is in nature of final judgment on merits; (3) that both cases involve same parties or their privies; and (4) that both cases involve same causes of action. *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001); See also *Manning v. City of Auburn,* 953 F.2d 1355, 1358-59 (11th Cir.1992) ("Res judicata acts as a bar 'not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact.'") In order to claim the benefit of collateral estoppel, the party relying on the doctrine must show that: (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding." *Pleming v. Universal-Rundle Corp.,* 142 F.3d 1354, 1359 (11th Cir. 1998).

or fault issues before judgment is entered in *Piggott*, Hwashin could be precluded from re-arguing causation and fault in *Piggott*, or vice versa.

## CONCLUSION

No matter how this Court rules on Hwashin's present motion, the cause of the roof collapse, as well as the responsible party, is going to be tried in the *Piggott* case and is indeed the central issue in that case. All of the parties who could possibly have any responsibility for the roof collapse (Gray, Hwashin and all of Gray's subcontractors and subconsultants) are already parties to the *Piggott* case. Each will devote an enormous amount of effort in discovery and trial attempting to establish their own theories of causation, developing their own technical expert testimony (as well as lay testimony) to support their positions, and cross-examining other parties' witnesses to shift blame away. Further, the *Piggott* Court will undoubtedly have to devote considerable judicial resources dealing with the causation and fault issues and ultimately will have to make a determination on them. Should this case proceed, these very same efforts will have to be duplicated in these proceedings. Not only would judicial resources and the parties' resources be wasted in this duplicative effort, but the risk of inconsistent verdicts and prejudice from the preclusion rules could do harm to the parties. Clearly, justice would not be served if the cases proceed on separate tracks.

Further, the 2003 Contract, which is clearly at issue in the *Piggott* case, will be an issue in this case. Gray's Complaint, which has yet to be amended, specifically relies upon the 2003 Contract as the basis of its recovery. Regardless of Gray's new allegations

of a verbal contract, the primary affirmative defense of Hwashin in this case, and the basis of any compulsory counterclaims it is required to bring in this case, will invoke the very same terms of the 2003 Contract that will be litigated in *Piggott.*

Thus, for the above stated reasons, this Court should dismiss Gray's Complaint, or in the alternative, consolidate this case in its entirety with the *Piggott* litigation.

Respectfully submitted,

/s/J. Lister Hubbard
**J. LISTER HUBBARD (HUB007)**
**RICHARD H. ALLEN (ALL053)**
**ARDEN REED PATHAK (PAT072)**
Attorneys for Intervenor
Hwashin America Corp.

OF COUNSEL:
**CAPELL & HOWARD, P.C.**
Post Office Box 2069
150 South Perry Street
Montgomery, Alabama  36102-2069
334/241-8000

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following:

Brian Michael McClendon, Esquire
Elliot Britton Monroe, Esquire
Mickey B. Wright, Esquire
Lloyd, Gray & Whitehead, P.C.
2501 Twentieth Place South
Suite 300
Birmingham, AL  35223

/s/J. Lister Hubbard
**J. LISTER HUBBARD  (HUB007)**

FILED IN PROBATE OFFICE
BUTLER COUNTY, ALA.

## VERIFIED STATEMENT OF LIEN

04 JUN 24 PM 12: 31

STATE OF ALABAMA:

COUNTY OF BUTLER:

STEVE NORMAN

JAMES N. GRAY COMPANY (herein referred to as "Claimant"), files this statement in writing, verified by the oath of David Dean, as Regional Office Manager of James N. Gray Company, who has personal knowledge of the facts herein set forth:

That said Claimant claims a lien upon the following property, situated in Butler County, Alabama, to-wit:

See Exhibit A.

This lien is claimed, separately and severally, as to both the buildings and improvements thereon, and the said realty.

That said lien is claimed to secure an indebtedness of, to-wit, ONE MILLION THREE HUNDRED EIGHTY THOUSAND, NINE HUNDRED THIRTY-THREE DOLLARS ($1,380,933.00), with interest due from varying dates, for materials, equipment, services, and supervision furnished, delivered and used in construction of improvements to said property.

The name of the owner or proprietor of the said property is The Industrial Development Board of the City of Greenville, Alabama, or Hwashin America Corporation.

JAMES N. GRAY COMPANY,
Claimant

By: _____
DAVID DEAN

- 1 -

**EXHIBIT**

A

STATE OF ALABAMA:

COUNTY OF MONTGOMERY:

BEFORE ME, _Susan M. McAlee_, a Notary Public, in and for the State of Alabama At Large, personally appeared DAVID DEAN, who, being duly sworn, doth depose and say:

That he has personal knowledge of the facts set forth in the foregoing statement of lien, and that the same are true and correct to the best of his knowledge and belief.

DAVID DEAN, Affiant

SUBSCRIBED and sworn to before me on this the 16th day of June, 2004, by said Affiant.

NOTARY PUBLIC My Commission Expires 9/23/07

(IMPRESS SEAL)

This instrument prepared by:

W. Alexander Moseley
Hand Arendall, L.L.C.
Post Office Box 123
Mobile, AL 36601

- 2 -

Hughin Site
Butler County, Alabama

Commence at an iron pin at the Northwest Corner of the Northeast Quarter of Section 18, T-10-N, R-15-E, Butler County, Alabama; Thence run N 88°04'20" E, 1338.44 feet to a point; Thence run N 85°01'28" E, 111.84 feet to a point lying on the west right of way of U.S. Highway 31 (ROW Varies); Thence run along said west right of way S 20°35'24" W, 34.38 feet to a point; Thence continue along said west right of way S 20°35'24" W, 234.12 feet to a point, said point being the Point of Beginning; Thence from said Point of Beginning, continue along said west right of way S 20°35'24" W, 88.50 feet to a point; Thence continue along said west right of way, S 20°42'06" W, 460.82 feet to a point of curvature; Thence continue along said west right of way and said curve (concave northwesterly, R=22378.65'), a chord of S 21°32'27" W, 655.78 feet to a point of right of way offset; Thence run N 67°37'10" W, 20.0 feet to a point lying in a curved portion of said right of way and said curve (concave northwesterly, R=22398.65'), a chord of S 22°45'42" W, 237.26 feet to a point of right of way offset and ... ... said right of way, said point lying in a curve; Thence run along said ... said right of way and said curve (concave northwesterly, R=22398.65'), a chord of S 23°21'37" W, 162.61 feet to a point; Thence continue along said proposed west right of way, S 23°34'40" W, 200.63 feet to a point; Thence leave said proposed west right of way and run N 89°29'03" W, 673.30 feet to a point; Thence run N 00°27'02" ... ... 274.42 feet to an iron pin; Thence run S 87°45'03" W, 233.74 feet to an iron pin; Thence run N 00°40'38" W, 1526.36 feet to a point; Thence run N 85°04'20" E, ... feet to a point; Thence run N 73°32'28" E, 101.12 feet to a point; Thence run N 85°04'20" E, 301.27 feet to a point of curvature; Thence run along said curve (concave southerly, R=465.00'), a chord of S 85°06'19" E, 45.26 feet to a point; Thence run S 85°04'42" E, 46.39 feet to a point of curvature; Thence run along said curve (concave southerly, R=450.00'), a chord of S 75°00'39" E, 87.39 feet to a point; Thence run S 65°24'39" E, 90.47 feet to a point; Thence run S 24°24'39" E, 63.64 feet to the Point of Beginning.

Said described property lying and being situated in the North Half of Section 18, T-10-N, R-15-E, Butler County, Alabama, and contains 53.253 Acres (2319706 S.F.), more or less.

EXHIBIT A

FRANK H. McFADDEN
JOHN F. ANDREWS
WILLIAM D. COLEMAN
WILLIAM K. MARTIN
GEORGE L. BECK, JR.
BRUCE J. DOWNEY III
HENRY C. BARNETT, JR.
K. PALMER SMITH
ROBERT T. MEADOWS III
HENRY H. HUTCHINSON
SHAPARD D. ASHLEY
D. KYLE JOHNSON
ROBERT F. NORTHCUTT

J. LESTER HUBBARD
JAMES N. WALTER, JR.
JAMES H. McLEMORE
CONSTANCE SMITH BARKER
W. HOLT SPEIR III
CHRISTOPHER W. WELLER
DEBRA DEAMES SPAIN
C. CLAY TORBERT III
R. BROOKE LAWSON III
J. SCOTT PIERCE
ROBERT D. RIVES
RICHARD H. ALLEN
M. COURTNEY WILLIAMS

PAIGE R. JACKSON
LEE M. RUSSELL, JR.
CHAD W. BRYAN
MICHAEL P. DALTON
CATY HOUSTON RICHARDSON
ARDEN REED PATHAK
TERRIE SCOTT BIGGS

OF COUNSEL:
JAMES M. SCOTT
THOMAS S. LAWSON, JR.

# CAPELL & HOWARD P.C.
## ATTORNEYS AT LAW

October 26, 2006

Anne E. Gorham, Esq.
Stites & Harbison, PLLC
200 West Main Street
Suite 2300
Lexington, KY 40507

(Via Facsimile Transmission
1-859-425-7884 and
First Class Mail)

Andrew Wayne Christman, Esq.
Gidiere, Hinton, Herndon & Christman
Post Office Box 4190
Montgomery, AL 36103

Via Facsimile Transmission
334-834-1054 and
First Class Mail)

Re:   Building Collapse; Hwashin America Corporation's
       Greenville, AL Manufacturing Facility

EXHIBIT
B

Dear Anne and Drew:

As you already know, I represent Hwashin America Corporation in connection with this matter and have been asked to respond to Gray Construction's letter of October 24, 2006 to Mr. Milton Park, copy enclosed.

While Hwashin is certainly appreciative of Gray's prompt mobilization to the site and its assistance in mitigating the loss occurring from the building collapse, we are somewhat mystified that Gray is expecting to be reimbursed for its efforts. Assuming customer satisfaction is indeed a top priority of Gray, we would remind Gray that, under its Hwashin contract, it assumed comprehensive design and construction responsibilities for this building, i.e., it likely has no one else to blame for the collapse, that Hwashin reserved beyond final payment its claims against Gray for "latent defects" (which is most certainly the cause of this collapse), that the contract also reserves to Hwashin certain claims against Gray for consequential damages and that, as further evidence of Gray's continuing obligations, the contract requires it to maintain its insurance coverages at least three years beyond final payment. This is not an exhaustive listing of Gray's obligations under the contract or other responsibilities under law, but just to give you some idea of why Hwashin believes Gray is in no position to seek reimbursement of its costs or expenses in this regard. Moreover, the only property insurance provided for under the contract in which Gray may have an interest was the all-risk policy purchased by Gray, which has long since expired.

We do understand that Gray has placed its liability carrier on notice, and we look forward to the conclusion of that adjustment as well as any other consideration to be offered by Gray to

**MONTGOMERY · OPELIKA / AUBURN**

1079139 150 SOUTH PERRY STREET (36104), POST OFFICE BOX 2069, MONTGOMERY, ALABAMA 36102-2069
334 241 8000 tel   334 323 8888 fax   www.capellhoward.com

 

satisfy this loss. Also, we understand that Gray has placed its subcontractors and subconsultants on notice of this loss, and we would normally expect them or their carriers to contribute to the settlement of the loss, though we maintain that Gray remains fully responsible as well.

We understand that a written proposal from Gray is forthcoming for the repair and restoration of the building and that a number of inspections/evaluations of the loss are still being considered. Obviously, in conjunction with reviewing this proposal, we'll have to sort through various issues of funding the work. All rights, claims and remedies of Hwashin are reserved in this matter.

Sincerely yours,

J. Lister Hubbard

JLH/gf

Enclosure: letter of October 24, 2006

pc:    Hwashin America Corporation
       Attn: Mr. Milton Park

1079139

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| JENNIFER PIGGOTT and<br>SLADE PIGGOTT,<br><br>      Plaintiffs,<br><br>and<br><br>HWASHIN AMERICA CORP.,<br><br>      Plaintiff in Intervention,<br><br>vs.<br><br>GRAY CONTRUCTION, INC.,<br><br>      Defendant/Third-Party Plaintiff,<br><br>vs.<br><br>COOPER STEEL<br>FABRICATORS, INC., et al.,<br><br>      Third-Party Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.:  CV-06-1158 |

### HWASHIN AMERICA CORPORATION'S RESPONSES TO GRAY CONSTRUCTION INC.'S FIRST SET OF INTEROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

COMES NOW Plaintiff in Intervention Hwashin America Corporation ("Hwashin") and hereby responds to Defendant Gray Construction Inc.'s[1] ("Gray") First Interrogatories and Requests for Production of Documents.

### GENERAL OBJECTIONS AND EXPLANATIONS

1.     Hwashin generally objects to these interrogatories and requests for production to the extent that they are unduly burdensome, overly broad, vague,

---

[1] Gray Construction, Inc. is also known as James N. Gray Company.  Both are collectively referred to herein as "Gray," and reference to one alias shall include reference to the other.



EXHIBIT

C

RESPONSE: Hwashin objects to the directive "describe in detail each and every communication" in that it is unduly burdensome, overly broad, vague, ambiguous and not reasonably calculated to lead to admissible evidence. Hwashin also objects to Gray's use of "relating to" in that it is confusing, unduly burdensome, overly broad, vague, ambiguous and not reasonably calculated to lead to admissible evidence. Additionally, many records were destroyed due to water damage as a result of the roof collapse or due to the subsequent water damage arising out of an accident during the demolition of the administration building. Subject to the foregoing objections, and to the extent documents still exist, documents are being produced in response to Requests for Production 1-3 and 24-26 and, furthermore, Hwashin states the following:

After the accident, there were several telephone conversations between Hwashin and Mrs. Piggott regarding her medical clearance to return to work. She also came to Hwashin to pick up her checks at which time her condition was discussed. By the time that Mrs. Piggott was cleared to return to work for the final time, Hwashin had completed the project on which she was temporarily hired to work. Thus, Hwashin reminded Mrs. Piggott she was a temporary employee and her services were no longer needed by Hwashin.

13.    Describe in detail each and every communication between Hwashin and Gray relating to the roof, girders, joists, HVAC system or drainage system of the Hwashin Facility or the accident.

11

RESPONSE: Hwashin objects to the directive "describe in detail each and every communication" in that it is unduly burdensome, overly broad, vague, ambiguous and not reasonably calculated to lead to admissible evidence. Hwashin also objects to Gray's use of "relating to" in that it is confusing, unduly burdensome, overly broad, vague, ambiguous and not reasonably calculated to lead to admissible evidence. In addition to and without waiving the foregoing, in many instances, it has been several years since such actions were taken or communications were made and memories have faded. Additionally, many records were destroyed due to water damage as a result of the roof collapse or due to the subsequent water damage arising out of an accident during the demolition of the administration building. Subject to the foregoing objections, and to the extent such documents exist, they are being produced, and furthermore Hwashin states the following:

Hwashin immediately called Gray when the roof collapsed to inform Gray of what happened. Gray mobilized within a few hours and meetings regularly began taking place between Hwashin and Gray representatives generally regarding safety, clean-up, temporary trailers, decking, water removal, etc.

Within a week of the collapse, Gray's owner, Jim Gray, came to the facility. He flew into Greenville over night and had Hwashin arrange a meeting with the employees on the night shift. Mr. Gray stood on a chair in front of the night shift employees and said, "Look, nobody has anything to worry about—we're gonna take care of everything." He apologized to the employees for everything that was happening, and for what they had to go through, and ensured them that Gray was doing its best to get everything up and running again. He assured the employees

several times that "everything would be taken care of" and that Gray was doing "everything it can to fix everything." Mr. Gray then took questions from the employees. One employee asked if it was safe to be in other parts of the building. Mr. Gray replied, "We have had people checking the building. Everything is perfectly safe." He also said, "We will continue to look at everything to be sure there are no more problems." Mr. Gray stated that he could not say for sure what had happened in the front side of the building and that they were investigating it, but their main concern was to get everything up and running again.

Meetings between Gray and Hwashin continued at the facility for several months regarding, but not limited to, the issues listed above, in addition to meetings regarding, for example, Hwashin's needs for emergency services, logistical discussions and plans for the demolition and rebuild. Gray representatives stated that they would return the building to the way that it was before the collapse. Some time later, Gray began discussing and submitting pricing for the work. Around the same time, one Gray representative told Hwashin that some of the roof drains were stopped up with leaves which may be part of the reason that the roof collapsed.


14.    Describe in detail each and every communication between Hwashin and Freeland Harris Consulting Engineers relating to the roof, girders, joists, HVAC system or drainage system of the Hwashin Facility or the accident.

RESPONSE: Hwashin objects to the directive "describe in detail each and every communication" in that it is unduly burdensome, overly broad, vague, ambiguous and not reasonably calculated to lead to admissible evidence. Hwashin

**STATE OF ALABAMA**                     )

**COUNTY OF** *Butler*                   )

I, the undersigned, Rhonda Simmons, being first duly sworn on oath, do depose and say as follows:

My name is Rhonda Simmons. I am the Senior Human Resources Manager of Hwashin America Corporation.

I have read Plaintiff Hwashin America Corporation's Response to Defendant Gray Construction Inc.'s First Interrogatories and know their contents. Based upon my personal knowledge, collected information or belief, it is my opinion that the factual statements included therein are true and correct.

Rhonda Simmons

SWORN TO AND SUBSCRIBED before me by the said Rhonda Simmons on the 26 day of June, 2007.

_____
Notary Public

(S E A L)                                    My Commission Expires: _My Commission Expires 5·9·08_

SIGNED      AS      TO      OBJECTIONS,      LEGAL      RESPONSES      TO
INTERROGATORIES, AND REQUEST FOR PRODUCTION.

_____
W. CHRISTOPHER WALLER, JR. (WAL187)
JAMES A. RIVES (RIV005)

38

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on the following counsel by placing the same in the U.S. Mail, postage prepaid and properly addressed, on this the 24th day of July 2007:

Jere L. Beasley, Esq.
Julia A. Beasley, Esq.
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
P.O. Box 4160
Montgomery, Alabama 36103-4160

Andrew W. Christman, Esq.
Steven K. Herndon, Esq.
Gidiere, Hinton, Herndon & Christman
P.O. Box 4190
Montgomery, Alabama 36103

E. Britton Monroe, Esq.
Mickey B. Wright, Esq.
Brian M. McClendon, Esq.
Lloyd, Gray & Whitehead, P.C.
2501 20th Place South, Suite 300
Birmingham, Alabama 35223

Felicia A. Long, Esq.
Thomas T. Gallion, III, Esq.
Constance C. Walker, Esq.
Haskell, Slaughter, Young & Gallion, LLC
P.O. Box 4660
Montgomery, Alabama 36103-4660

John M. Laney, Jr., Esq.
John C. DeShazo, Esq.
Laney & Foster, P.C.
P.O. Box 43798
Birmingham, Alabama 35243-0798

Charles K. Hamilton, Esq.
Bainbridge, Mims, Rogers & Smith, LLP
600 Luckie Building, Suite 415
P.O. Box 530886
Birmingham, Alabama 35253

Robert B. Stewart, Esq.
A. Joe Peddy, Esq.
Smith, Spires & Peddy, P.C.
2015 Second Avenue North, Suite 200
Birmingham, Alabama 35203

Larry W. Harper, Esq.
Porterfield, Harper, Mills & Motlow, P.A.
22 Inverness Center Parkway
Suite 600
Birmingham, Alabama 35253-0790

John S. Somerset, Esq.
Sudderth & Somerset
5385 1st Avenue North
Birmingham, Alabama 35212

Linda H. Ambrose, Esq.
Rogers & Associates
3000 Riverchase Galleria, Suite 650
Birmingham, Alabama 35244

Hope T. Cannon, Esq.
Brittin T. Coleman, Esq.
Kenneth M. Perry, Esq.
Bradley, Arant, Rose & White, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2104

_____
OF COUNSEL

39